ORIGINAL

53/505

32 Pgs
Exh Y

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION, VIDEO SOFTWARE DEALERS ASSOCIATION, and MICHIGAN RETAILERS ASSOCIATION, )))))))) | JUDGE : Steeh, George Caram<br>DECK : S. Division Civil Deck<br>DATE : 09/21/2005 @ 15:59:47<br>CASE NUMBER : 2:05CV73634<br>CMP ENTERNAINMENT SOFTWRE ASS ET<br>AL V JENNIFER GRANHOLM ET AL SI |

ENTERTAINMENT SOFTWARE                )
ASSOCIATION, VIDEO SOFTWARE           )
DEALERS ASSOCIATION, and              )
MICHIGAN RETAILERS                    )
ASSOCIATION,                          )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )
                                      )
JENNIFER M. GRANHOLM, in her          )
official capacity as Governor of the State of  )
Michigan; MICHAEL A. COX, in his      )
official capacity as Attorney General of the   )
State of Michigan; and KYM L. WORTHY  )
in her official capacity as Wayne County )
Prosecuting Attorney,                 )
                                      )
            Defendants.               )

Magistrate Judge Steven D. Pepe

## COMPLAINT

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA"), by and through their attorneys, aver and allege as follows:

### NATURE OF THE ACTION

1.     Plaintiffs are associations whose members include companies that create, publish, distribute, sell, rent, or make video games available to the public.  Plaintiffs bring this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against enforcement of a new Michigan statute that significantly infringes upon constitutionally protected rights of free expression.

Dockets.Justia.com

2.      2005 Public Act 107 ("P.A. 107" or "the Act") was signed into law on September 14, 2005 and is due to go into effect on December 1, 2005.  The challenged portions of the Act penalize the sale or rental of video games based solely on their expressive content, in violation of the First Amendment.[1]  The Act makes it illegal for anyone in Michigan to disseminate to anyone under the age of 17 an "ultra-violent explicit video game that is harmful to minors," as that term is defined in the Act.  Act, pt. II, § 17(1).  A person who knowingly disseminates a prohibited game to a minor is liable for a fine ranging from $5,000 to $40,000, depending on the number of violations.  *Id.* § 17.  The Act also subjects to liability any person with "managerial responsibility for a business enterprise" who knowingly permits an unsupervised minor to play or view the playing of a prohibited video game; violators are subject to up to 93 days in prison, a $25,000 fine, or both.  *Id.* § 20.

3.      The Act violates the First Amendment and other provisions of the United States Constitution by creating penalties for the sale or rental of video games based solely on a game's "ultra-violent explicit" content.  The First Amendment prohibits such content-based censorship.  Not only does the Act directly restrict the dissemination and receipt of a considerable amount of fully protected expression, but, because of its numerous vague terms, the Act also creates a chilling effect on a great deal of speech, as game creators and retailers will respond to the Act's uncertainty by self-censoring, depriving adults and children of access to undeniably protected expression.

4.      Every court that has considered this issue, including the Sixth, Seventh, and Eighth Circuits, has recognized that video games constitute expression protected by the First

---

[1] Plaintiffs do not challenge the restrictions contained in Part I of the Act pertaining to the dissemination of "sexually explicit matter."  *See* Act, pt. I.

Amendment and has rejected attempts to restrict video game expression through the force of law. *See James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (confirming that the First Amendment protects the communicative aspect of video games); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579-80 (7th Cir. 2001) (holding that video games are protected expression, and striking down ordinance that similarly sought to restrict minors' access to "violent" video games); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003) (noting that "[t]he mere fact" that video games "appear in a novel medium is of no legal consequence," and striking down ordinance restricting "violent" video games); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) (finding that video games are "expressive and qualify for the protections of the First Amendment," and invalidating state statute restricting video games).

5.    Because some of Plaintiffs' members create, publish, rent, or sell games that may fall within the statutory definition, they may be subject to prosecution under the Act. The Act will violate Plaintiffs' members' rights to free speech not only through direct restriction, but also as a result of the Act's inevitable chilling effect on video game expression.

6.    Plaintiffs maintain (a) that the challenged provisions of the Act are void and of no force and effect because they are unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States and thus actionable under 42 U.S.C. § 1983 and (b) that Plaintiffs and their members, as well as many citizens of Michigan, will suffer immediate, serious, and irreparable injury if the challenged provisions take effect.

## JURISDICTION AND VENUE

7.     This action arises under the Constitution of the United States, the First and

Fourteenth Amendments thereto, and the laws of the United States, 42 U.S.C. §§ 1983 and 1988,

and 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over the subject matter of this

action under 28 U.S.C. §§ 1331 and 1343(a)(3).  This action is brought against the defendants in

their official capacities under 42 U.S.C. § 1983.

8.     Venue is proper in the Eastern District of Michigan.  Many of Plaintiffs VSDA's

and MRA's members are located in and/or do business in this judicial district, and the claims

thus arise in this district.  Defendant Kym L. Worthy also resides in this judicial district, and is

responsible for enforcing the Act for and within Wayne County.

## PARTIES

9.     Plaintiff ESA is a nonprofit trade association organized under the laws of the

State of Delaware with its principal place of business in the District of Columbia.  A

fundamental purpose of ESA is to serve and promote the business and public affairs interests of

companies that publish entertainment software used for video games, including such companies'

right to publish and distribute works of expression that are protected under the First Amendment

to the United States Constitution and similar provisions of the constitutions of various states.

ESA members include a number of entities that publish, distribute, and/or supply video games to

owners and operators of sale and rental outlets within Wayne County and throughout Michigan.

10.     Plaintiff VSDA, established in 1981, is the not-for-profit international trade

association for the $24 billion home entertainment industry.  VSDA is incorporated in the State

of Delaware and its principal place of business is in Los Angeles, California.  VSDA represents

more than 1,000 companies throughout the United States, Canada, and other nations. Its members operate approximately 10,000 retail outlets in the United States, including approximately 29 members in the State of Michigan, that sell and/or rent DVDs, VHS cassettes, and console video games in approximately 432 stores. Membership comprises the full spectrum of video retailers (from single-store operators to large chains), video distributors, the home video divisions of major and independent motion picture studios, and other related businesses that constitute and support the home video entertainment industry.

11.     Plaintiff MRA is a not-for-profit trade association whose purpose is to promote and improve retail business and consumer-retailer relations in Michigan. MRA is incorporated in the State of Michigan and its principal place of business is in Lansing, Michigan. MRA is the nation's largest trade association of general merchandise retailers. Its 5,500 member retail businesses own and operate over 12,000 stores across the State, at least 940 of which sell and/or rent video or computer games.

12.     The interests that Plaintiffs ESA, VSDA, and MRA seek to protect in this action are germane to the purposes of each organization, and neither the claims nor the forms of relief sought in this action require participation of individual members of Plaintiffs. One or more members of each association have standing to bring this action in their own right.

13.     Plaintiffs are threatened with immediate, serious, and irreparable injury as a result of the enactment and imminent enforcement of the challenged provisions of the Act. Once the Act is in force, Plaintiffs and their members will be subject to liability for disseminating works fully protected under the First Amendment. The Act will have an immediate and vast chilling effect upon constitutionally protected speech because those who sell, rent, or permit to be sold or

rented video games (and their respective distributors and providers) will, to avoid liability under the Act, refrain from offering for rental or sale a wide array of games, either to minors or to all customers. This will in turn chill video game distributors, publishers, and creators from developing, publishing and distributing works that may run afoul of the Act's vague definition of prohibited content.

14.     The Act will also cause irreparable harm to willing listeners – both under and above age 17 – who will be deprived of the ability to hear and view Plaintiffs' members' speech. In this facial challenge to the Act, Plaintiffs have standing to assert not only their own rights and harm, but also that of the potential recipients of Plaintiffs' members' speech.

15.     Defendant Jennifer M. Granholm is the Governor of the State of Michigan. As Governor, she is vested with the State's "executive power" and must "take care that the laws be faithfully executed." Mich. Const. art. V §§ 1, 8. This injunctive action is brought against Governor Granholm in her official capacity.

16.     Defendant Michael A. Cox is the Attorney General of the State of Michigan. In that capacity, he "supervise[s] the work of, consult[s] and advise[s] the prosecuting attorneys, in all manners pertaining to the duties of their office." M.C.L.A. § 14.30. Additionally, Attorney General Cox has the authority to prosecute both criminal and civil infractions under the Act. *Id.* § 14.28 (permitting Attorney General to prosecute any case "in which the people of this state may be . . . interested"). This injunctive action is brought against Attorney General Cox in his official capacity.

17.     Defendant Kym L. Worthy is the Prosecuting Attorney and is responsible for enforcing criminal laws within Wayne County. M.C.L.A. § 49.153. This injunctive action is brought against Prosecuting Attorney Worthy in her official capacity.

## BACKGROUND

### Video Games and the First Amendment

18.     The challenged provisions of the Act seek to regulate the content of a certain medium of expression (defined as "video games" under the Act) and limit access to certain video games based solely on the content of the expression depicted or contained therein.

19.     Video games are a form of artistic expression much like other forms of protected expression, such as movies, books, and music. Video games contain extensive storylines and character development, comparable to that of books and movies. The storylines and plot, and associated dialogue among characters, continue throughout the game play and are an integral part of the game itself. Like the best of literature, the storylines often involve familiar themes such as good versus evil, triumph over adversity, struggle against corrupt governments and rulers, and/or quest for adventure. Expression in other media, such as movies and books, draws thematic ideas directly from video games. Video games similarly draw and evolve themes from other media.

20.     Video games also feature the artwork of some of the best modern graphic artists. The typical video game contains many different animated or computer-generated illustrations. Video games also contain music, much of it original and performed by top musicians and orchestras. Like the music that plays during movies, the music in video games enhances and complements the expression conveyed by the images and dialogue, often in dramatic fashion.

21.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I. The prohibitions and protections of the First Amendment apply to the State of Michigan, U.S. Const. amend. XIV.

22.    The First Amendment shields verbal expression, written expression, visual expression, entertainment, art, and music. The protections of the First Amendment apply just as much to video games as they do to books, newspapers, films, theater, and music.

23.    The First Amendment also protects expressions and depictions of violence devoid of obscene sexual content. Thus, video games depicting violence—just like movies or illustrations that depict violence—are fully protected by the First Amendment.

### The Act

24.    The Act was passed by the Michigan Legislature on September 7, 2005 and was signed into law by Governor Granholm on September 14, 2005. A true, complete, and accurate copy of the Act is attached hereto as Exhibit 1, and is incorporated herein. The Act is due to go into effect on December 1, 2005. Act, Enacting Section 1.

*The Act's Restrictions on Protected Speech*

25.    The Act will suppress expression in the video game medium because of the supposed effect of that expression on minors under the age of 17. The Act asserts that the State may restrict speech based on its "legitimate and compelling interest" in "safeguarding both the physical and psychological well-being of minors," "preventing violent, aggressive, and asocial behavior from manifesting itself in minors," and "alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, § 15(e), (f), (g).

26.    Section 17 of the Act will impose restrictions on freedom of expression by making it unlawful for any "person" to "disseminate" to a minor an "ultra-violent explicit video game that is harmful to minors," as those terms are defined in Part II, §§ 16(f), (h), (*l*), 17(*l*). A minor is defined as a person "less than 17 years of age." *Id.* § 16(j). To "disseminate" means to "sell, lend, give, exhibit, show, or allow to examine or to offer or agree to do the same." *Id.* § 16(f).

27.    An "[u]ltra-violent explicit video game" is one that "continually and repetitively depicts extreme and loathsome violence." Act, pt. II, § 16(*l*). The Act defines "extreme and loathsome violence" as:

> real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture.

Act, pt. II, § 16(g).

28.    In the context of "ultra-violent explicit video games," "harmful to minors" is defined as follows:

> "Harmful to minors" means having all of the following characteristics:
>
> (i) Considered as a whole, appeals to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standards.
>
> (ii) Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.
>
> (iii) Considered as a whole, lacks serious literary, artistic, political, educational, or scientific value for minors.

Act, pt. II, § 16(h).

29.    The Act states that a "'[m]orbid interest in asocial, aggressive behavior of minors' means a morbid interest in committing uncontrolled aggression against an individual." The Act further provides that "[i]n determining whether an ultra-violent explicit video game appeals to this interest, the video game shall be judged with reference to average 16-year-old minors. If it appears from the character of the video game that it is designed to appeal to this interest of a particular group of persons, then the video game shall be judged with reference to average 16-year-old minors within the particular group for which it appears to be designed." Act, pt. II, § 16(k).

30.    A person who violates the Act's "ultra-violent explicit video games" provisions is "responsible for a state civil infraction" and may be ordered to pay a fine up to $40,000, depending on whether the person previously violated the Act. Act, pt. II, § 17.

31.    A person who knowingly facilitates the dissemination of an ultra-violent explicit video game by falsely representing that "he or she is the parent or guardian of a minor, or that a minor is 17 years of age or older," is liable for a misdemeanor, imprisonment for up to 93 days, and/or a fine of up to $15,000. Act, pt. II, § 19.

32.    A person with "managerial responsibility for a business enterprise renting or selling ultra-violent explicit video games that are harmful to minors" may not "knowingly permit a minor who is not accompanied by a parent or guardian to play or view the playing" of such video games. Act, pt. II, § 20. A violation of that section subjects a person to a misdemeanor, imprisonment for up to 93 days, and/or a fine of up to $25,000. *Id.*

*The Act's Affirmative Defenses*

33.     The Act establishes several "good faith" affirmative defenses.  Act, pt. II, §

23(1), (2).  "Good faith" cannot be shown unless the person satisfies each of several conditions.

34.     With respect to video games disseminated through a face-to-face interaction, the

person must show that "(a) [t]he minor show[ed] the person identification that appear[ed] to be

valid and that contain[ed] a photograph and a date of birth purporting to show that the minor is

17 years of age or older," that "[t]he person does not have independent knowledge that the minor

is under 17 years of age," and that "the person complies with a rating system established by the

pertinent entertainment industry."  Act, pt. II, § 23.

35.     Although not specifically noted in the Act, the phrase "rating system established

by the pertinent entertainment industry" likely refers to that of the Entertainment Software

Rating Board ("ESRB").  The ESRB rating system is a voluntary system which has been almost

universally adopted by retailers, manufacturers and distributors of video games in the United

States.

36.     The ESRB rating system identifies suitable video games based on age.  For

example, a "Mature" or "M" rating under the ESRB system is reserved for video games that

"have content that may be suitable for persons ages 17 and older. Titles in this category may

contain intense violence, blood and gore, sexual content, and/or strong language."   ESRB Game

Ratings, *available at* http://www.esrb.org/esrbratings.asp.

37.    The ESRB's "T" or "Teen" rating is given to video games that "have content that may be suitable for ages 13 and older. Titles in this category may contain violence, suggestive themes, crude humor, minimal blood and/or infrequent use of strong language." *Id.*

38.    In light of the Act's broad language, both T-rated and M-rated games might be construed as "ultra-violent explicit video games." Yet even though the ESRB rating system would permit a 13-year old to purchase a T-rated game, the affirmative defense would not apply unless the minor presented identification that he or she was at least 17 years old.

39.    The Act also provides an affirmative defense for a person "possess[ing] managerial responsibility for a business enterprise." Act, pt. II, § 20. Such a person can show good faith if, "at the time of the alleged violation," the business for which he or she works has a policy requiring employees to comply with an appropriate rating system, "trains" its employees to follow the policy, and "enforces" the policy. *Id.* § 23(2). The Act does not explain what actions constitute compliance with these requirements, nor does it define the term "possess managerial responsibility for a business enterprise."

### The Act Violates the First Amendment

40.    By restricting the sale or rental of video games deemed "explicit ultra-violent" and "harmful to minors" under the statute, the Act imposes penalties based on the content of the games' expression. The Act therefore is subject to the most exacting scrutiny under the First Amendment.

41.    No compelling state interest exists that justifies the broad suppression of speech imposed by the Act. The Act is based on purported legislative findings that "ultra-violent explicit" video games promote "violent, asocial, or aggressive behavior," and that "the effects of

-12-

media violence on minors 'are measurable and long-lasting.'" Act, pt. II, § 15(a), (b).  But those

claims not only are not supported by credible evidence, they are contradicted and challenged by a

strong body of compelling research.  The purported legislative "findings" therefore are not based

on reasonable inferences drawn from substantial evidence.

42.    In addition, the Act suppresses "ultra-violent explicit" expression without any

legislative finding, or underlying evidence, that exposure to such expression is directed to and

likely to cause imminent violent action by the game player.

43.    The Act is not the least restrictive means of achieving any of the Legislature's

asserted goals.  Other less speech-restrictive means of regulating minors' access to "ultra-violent

explicit" video games exist, including those that were proposed to the Legislature by Plaintiffs

and their members  (such as educational efforts and retailer enforcement initiatives).  Indeed, just

two days before signing the Act, the Governor signed into law a bill requiring retailers to post

signs about the nature of the video games they sell.  *See* 2005 P.A. 105 (Mich. 2005).  Rather

than permitting P.A. 105 to achieve the same legislative objectives, the Legislature and the

Governor proceeded to adopt P.A. 105 *and* P.A. 107.

44.    Moreover, the Act adds as an element an expansive, unconstitutional "harmful to

minors" standard to depictions of violence, despite the Supreme Court's explicit limitation of

that standard to sexually explicit matter.

45.    The Act presents Plaintiffs' members with the possibility of arbitrary and

discriminatory enforcement because the Act fails to set forth minimal standards for enforcement.

The Act does not set forth adequately specific standards for determining which video games have

sufficient "ultra-violent explicit content" to fall within the Act's prohibitions.  As a result,

different retailers and publishers will almost certainly reach different, and conflicting, determinations as to which games are likely to be restricted by the Act.

46.    The challenged provisions of the Act are unconstitutionally vague in that many of the terms and phrases employed therein, including but not limited to, the terms and phrases "extreme and loathsome violence," "ultra-violent explicit" video game," "parties who realistically appear to be human beings," "morbid interest in asocial, aggressive behavior," and "morbid interest in committing uncontrolled aggression against an individual" have no clear meaning in the context of video games. For example, how would a retailer assess whether a particular video game depicted "physical violence against parties who realistically appear to be human beings"? Would a character with magical powers qualify? What about a zombie? A centaur? Likewise, what is meant by appealing to a "morbid interest in uncontrolled aggression against an individual"? What does it mean to say that the aggression is "uncontrolled," and at what point does aggression become "uncontrolled"? How does a person know whether "extreme and loathsome violence" is depicted "continually and repetitively"? Persons of common intelligence are forced to guess at the meaning and scope of the challenged provisions.

47.    The Act will have a chilling effect on game publishers and retailers. Under the Act, game publishers and retailers must determine which games may be subject to the statute's penalties. By their nature, games offer the player a wide range of possible game play of significant duration. Even if only a small portion of a game contained content that theoretically met the Act's definitions, the entire game would be suppressed. Moreover, to ensure that the games they sold do not violate the Act, retailers and clerks would be expected to review the entire possible course of play in a particular game. The significant burdens imposed by the law will ultimately lead to a chilling of speech of game developers, retailers, and consumers.

-14-

48.    Some of the content displayed by the video games created, published, distributed, rented, sold, and/or made available to the public by Plaintiffs or their members, while fully protected by the United States Constitution, may be deemed by law enforcement officials in Michigan, including the Defendants, to meet the Act's definitions for "ultra-violent explicit" video games, thus subjecting Plaintiffs or their members to the threat of prosecution, as well as creating a chilling effect on their rights to freedom of expression.

49.    The challenged provisions of the Act would infringe the First Amendment rights (i) of businesses physically present in Michigan, including Plaintiffs' members, who face the threat of prosecution if they do not comply with restrictions on their right to distribute constitutionally protected expression, (ii) of potential customers of those businesses—including both those under 17 as well as adults—who, because of these restrictions, will be deprived of the opportunity to receive fully protected speech, and (iii) of businesses located outside Michigan, including members of Plaintiffs, whose ability to distribute their creative works within Michigan will be burdened based on the content of those works of expression.

50.    In addition to the prohibition on the sale or rental of "ultra-violent explicit" video games, the Act will impose other significant burdens on freedom of expression. The Act imposes stiff penalties on a store manager for allowing an unaccompanied minor to play or view the playing of a prohibited video game in the store. Act, pt. II, § 20. Thus, if allowed to go into effect, the Act will restrict retailers' ability to offer consumers the chance to play sample segments of games or to show game footage "previews" on monitors in their stores. As a result, the Act will restrict the speech of video game retailers and publishers, and will prevent the expression of Plaintiffs' members from reaching willing recipients, including adult consumers.

51.     The Act's so-called "affirmative defenses" exacerbate, rather than cure, the statute's flaws.  As explained in Paragraphs 35 through 37, the ESRB rating system suggests that some video games containing violence may be suitable for individuals 13 and older.  Yet under the Act, a person adhering to the ESRB ratings cannot utilize the affirmative defense unless the minor shows identification purporting to be at least 17 years old, even though a "T"-rated game may be suitable for an individual over 13.  The affirmative defense therefore is essentially meaningless, other than for its narrow application to minors showing they are at least 17 years old and are therefore able to purchase "M"-rated games.

52.     To the extent the Act seeks to incorporate the ESRB rating system into its scheme for restricting speech, it constitutes an unconstitutional delegation of legislative authority to a private third party.  Incorporating the industry's voluntary rating system also presents serious problems under the First Amendment, because the Legislature may not delegate to a third party the decision about whether speech is protected or not.  Courts have invalidated similar legislative attempts to incorporate the Motion Picture Association of America's rating system.  *See, e.g., Engdahl v. City of Kenosha*, 317 F. Supp. 1133, 1135 (E.D. Wis. 1970); *Motion Picture Ass'n of America v. Specter*, 315 F. Supp. 824 (E.D. Pa. 1970); *Drive In Theatres v. Huskey*, 305 F. Supp. 1232 (W.D.N.C. 1969), *aff'd*, 435 F.2d 228 (4th Cir. 1970).

53.     Aside from the constitutional difficulties associated with Act's incorporation of the video game industry's voluntary rating system, the affirmative defense for "persons with managerial responsibilities" is inadequate and illogical.  Even if a store manager could claim the benefit of the affirmative defense for having and enforcing a rating policy, the clerks who sold a prohibited game would still be liable, because the affirmative defense applies only to those with "managerial responsibilities."  Act, pt. II, § 23(1).  Moreover, a manager may utilize the

affirmative defense only if the "business enterprise" maintains a ratings system policy. Because many store managers are not tasked with setting store-wide policies, the affirmative defense apparently is unavailable unless the businesses themselves – over which the managers may have no control – have implemented, enforced, and conducted training on, appropriate policies.

54.    The challenged provisions of the Act threaten Plaintiffs, their members, and other businesses involved in the creation, distribution, display, sale, or rental of video games, as well as adults and those under 17 who wish to receive the speech in those games, with serious, immediate, and irreparable injury for which there is no adequate remedy at law.

55.    In this facial constitutional challenge to the Act, Plaintiffs have standing to assert the rights of, and harm to, the potential customers of Plaintiffs' members.

## COUNT I

### (First and Fourteenth Amendments—Freedom of Expression)

56.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 55 as if fully set forth herein.

57.    The challenged provisions of the Act would restrict access to video games based solely upon the nature of the creative expression depicted. The content of the expression made subject to these restrictions is not obscene or obscene as to minors. Nor does it fall within any other category of expression that may constitutionally be regulated based solely upon its content.

58.    The Act imposes unconstitutional content regulation by prohibiting a person from disseminating any video game meeting the statutory definition of an "ultra-violent explicit video game that is harmful to minors" to any person under the age of 17, and by restricting the ability

of retailers to display such games in their stores. The Act restricts the freedom of creators, distributors, retailers, and publishers of games, as well as purchasers, renters, and other players of such games, to communicate and receive expression that is not constitutionally subject to regulation based upon its content. The Act's suppression of "ultra-violent explicit" video games is unsupported by any legislative finding, or underlying evidence, that exposure to such expression is directed to and likely to cause imminent violent action by the game player. Moreover, the Act's stated purposes are not based on credible evidence and are insufficient under the First Amendment to justify the broad content discrimination imposed by the Act. Not only does the Act fail to serve a compelling governmental interest, but the Act is not narrowly tailored to serve any such interest, and the Legislature did not give adequate consideration to less speech-restrictive means of achieving its goals. Instead, the Legislature proceeded to enact the Act, which sets forth a more restrictive scheme than any of the proposed alternatives.

59.    The Act does not establish standards for determining which games contain content meeting the description set forth in Paragraphs 27 through 29 hereof. The challenged provisions of the Act would impose upon those who disseminate video games the burden of determining whether each such video game meets the description set forth in Paragraphs 27 through 29 hereof, prior to publishing, distributing, or otherwise holding that game out to the public. The challenged provisions impose upon every such person the risk of substantial penalties. This burden and risk are aggravated by the vagueness of the statutory description of the regulated content. The challenged provisions thus would establish an unconstitutional scheme of censorship under which even works of expression that do not meet the statutory description in the Act would be suppressed because of the burden placed upon persons selling or renting video games of determining the scope of the Act's coverage and because of the risk of

erroneous determinations. Persons disseminating video games (and their respective distributors and suppliers) would be induced to refuse to include certain works in their inventories or on their premises, for fear of running afoul of the Act's ambiguous prohibitions. Imposition of this burden and risk serves no compelling interest and is not narrowly tailored to serve any such interest.

60.    For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (First and Fourteenth Amendments—Vagueness)

61.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 60 as if fully set forth herein.

62.    The challenged provisions of the Act are unconstitutionally vague. Many of the terms and phrases employed by the Act fail to give constitutionally sufficient notice of the types of expression that would be restricted. These terms include, but are not limited to, the terms and phrases "extreme and loathsome violence," "ultra-violent explicit" video game," "parties who realistically appear to be human beings," "morbid interest in asocial, aggressive behavior," and "morbid interest in committing uncontrolled aggression against an individual." These terms fail to provide clear meaning in the context of video games.

63.    The unconstitutional vagueness of the challenged provisions will have a chilling effect on producers, designers, publishers, and distributors of video games and will impose

substantial burdens upon persons who sell, rent, or permit to be sold or rented video games,

preventing them from exercising their constitutionally protected freedom of expression. The

Act's vagueness is also likely to lead to enforcement by law enforcement officials on an unfair,

subjective, and *ad hoc* basis. Because many of the Act's terms have no clear meaning, the Act

will restrict a far broader range of video games than even the State claims it is seeking to

regulate, as stores, store clerks, and game developers will respond to this uncertainty and fear of

prosecution by refusing to provide video games—to both adults and minors—that conceivably

could be deemed to fall within the Act's prohibitions.

64.     The statutory defenses exacerbate, rather than cure, the Act's vagueness

problems. Given the vagueness of terms like "good faith," "appears to be valid," "complies with

a rating system," and "trains its employees to follow the policy," Act, pt. II, § 23, clerks and

retailers will not know whether they will qualify for a statutory defense. Furthermore, the scope

of the defenses is unclear.

65.     The Act will also have a chilling effect on those with "managerial responsibility."

Act, pt. II, § 20. Part II, § 20 requires store managers to ensure that unsupervised minors neither

play nor watch the prohibited video games. Managers who knowingly permit minors to engage

in such actions are subjected to criminal liability, including a prison term of up to 93 days.

Because the Act fails to delineate with specificity the types of prohibited speech, store managers

may respond by steering far clear of the line in order to reduce their risk of criminal prosecution.

This would result in restricting Plaintiffs' members' expression from reaching willing recipients,

including children and adults. Retailers may also stop carrying certain titles and stop employing

minors who would have access to the prohibited videogames.

66.    For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment.

## COUNT III

### (Fourteenth Amendment—Equal Protection)

67.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 66 as if fully set forth herein.

68.    The challenged provisions of the Act regulate and restrict under the threat of substantial penalties certain works of expression presented through the medium of video games. These same regulations, restrictions, and penalties do not apply to other works of expression containing the same or similar content, but communicated in other media, including, by way of example only, cable television, broadcast television, movies, books, and magazines. Indeed, many of these other media -- which compete with video games for consumers -- contain expression that is based on video games that could fall within the prohibitions of the Act. Likewise, video games that could fall within the Act's prohibitions may themselves be based on similar speech in other, unregulated media.

69.    The challenged provisions of the Act arbitrarily and irrationally would establish a legislative scheme of classifications that burden fundamental rights and that are not closely related to any compelling state interest.

70.     For the foregoing reasons, and others, the challenged provisions of the Act are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (First and Fourteenth Amendments—Due Process)

71.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 70 as if fully set forth herein.

72.     The Act unconstitutionally delegates the power of the legislature to define the narrow categories of speech that may be criminalized, in derogation of Due Process.  The Act creates an affirmative defense to the statute's "ultra-violent explicit" video game prohibitions that "the person complies with a rating system established by the pertinent entertainment industry."  Act, pt. II, § 23(1)(c).  In so doing, the Act impermissibly delegates legislative authority to an undefined entity (but presumably the ESRB).  By delegating the power to determine what video games are subject to the law's restrictions to a private organization, and without any accompanying legislative standards, the Act violates Due Process.

73.     For the reason set forth above, and others, the challenged provisions of the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment.

## COUNT V

### (Violation of 42 U.S.C. § 1983)

74.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 73 as if fully set forth herein.

75.     The challenged provisions of the Act would cause Plaintiffs and their members to be subjected to the deprivation of rights, privileges, and immunities secured to them by the Constitution and laws of the United States. The challenged provisions thus constitute a deprivation of rights actionable under 42 U.S.C. § 1983.

76.     In the event Plaintiffs prevail on any claims under the Constitution of the United States set forth in this Complaint, Plaintiffs are entitled to recover attorneys' fees under 42 U.S.C. § 1988.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand that this Court enter a judgment in Plaintiffs' favor and against Defendants as follows:

(a)     That this Court issue a declaratory judgment that the challenged provisions of the Act are void and of no force and effect;

(b)     That this Court issue a preliminary injunction and a permanent injunction against Defendants enjoining them from enforcing, or directing the enforcement of, the challenged provisions of the Act in any respect;

(c)     That Plaintiffs be awarded their attorneys' fees under 42 U.S.C. § 1988;

(d)     That Plaintiffs be awarded their costs herein; and

(e)     That this Court order such other general and equitable relief as it deems fit and proper.

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION, and
MICHIGAN RETAILERS ASSOCIATION

_____
One of the Attorneys for Plaintiffs

Dennis J. Levasseur (P39778)
Alicia J. Blumenfeld (P67511)
BODMAN LLP
100 Renaissance Center
Detroit, MI 48243
Tel (313) 393-7596
Fax (313) 393-7579

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
JENNER & BLOCK LLP
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Tel. (202) 639-6000
Fax (202) 639-6066



Act No. 107
Public Acts of 2005
Approved by the Governor
September 14, 2005

Filed with the Secretary of State
September 14, 2005

EFFECTIVE DATE: December 1, 2005

## STATE OF MICHIGAN

## 93RD LEGISLATURE

## REGULAR SESSION OF 2005

Introduced by Senator Cropsey

# ENROLLED SENATE BILL No. 416

AN ACT to amend 1978 PA 33, entitled "An act to prohibit the dissemination, exhibiting, or displaying of certain sexually explicit matter to minors; to prohibit certain misrepresentations facilitating the dissemination of sexually explicit matter to minors; to provide penalties; to provide for declaratory judgments and injunctive relief in certain instances; to impose certain duties upon prosecuting attorneys and the circuit court; to preempt local units of government from proscribing certain conduct; and to repeal certain acts and parts of acts," by amending the title and sections 1, 2, and 4 (MCL 722.671, 722.672, and 722.674), section 1 as amended by 2003 PA 192, and by adding section 12a, part II, and a heading for part I.

*The People of the State of Michigan enact:*

TITLE

An act to prohibit the dissemination, exhibiting, or displaying of certain sexually explicit matter and ultra-violent explicit video games to minors; to prohibit certain misrepresentations facilitating the dissemination of sexually explicit matter and ultra-violent explicit video games to minors; to provide penalties and sanctions; to provide for declaratory judgments and injunctive relief in certain instances; to impose certain duties upon prosecuting attorneys and the circuit court; to preempt local units of government from proscribing certain conduct; and to repeal acts and parts of acts.

PART I

SEXUALLY EXPLICIT MATTER

Sec. 1. As used in this part:

(a) "Display" means to put or set out to view or to make visible.

(b) "Disseminate" means to sell, lend, give, exhibit, show, or allow to examine or to offer or agree to do the same.

(c) "Exhibit" means to do 1 or more of the following:

(i) Present a performance.

(ii) Sell, give, or offer to agree to sell or give a ticket to a performance.

(iii) Admit a minor to premises where a performance is being presented or is about to be presented.

(d) "Minor" means a person less than 18 years of age.

(59)

(e) "Restricted area" means any of the following:

(i) An area where sexually explicit matter is displayed only in a manner that prevents public view of the lower 2/3 of the matter's cover or exterior.

(ii) A building, or a distinct and enclosed area or room within a building, if access by minors is prohibited, notice of the prohibition is prominently displayed, and access is monitored to prevent minors from entering.

(iii) An area with at least 75% of its perimeter surrounded by walls or solid, nontransparent dividers that are sufficiently high to prevent a minor in a nonrestricted area from viewing sexually explicit matter within the perimeter if the point of access provides prominent notice that access to minors is prohibited.

Sec. 2. As used in this part:

(a) "Nudity" means the lewd display of the human male or female genitals or pubic area.

(b) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(c) "Erotic fondling" means touching a person's clothed or unclothed genitals, pubic area, buttocks, or, if the person is female, breasts, for the purpose of sexual gratification or stimulation.

(d) "Sadomasochistic abuse" means either of the following:

(i) Flagellation, or torture, for sexual stimulation or gratification, by or upon a person who is nude or clad only in undergarments or in a revealing or bizarre costume.

(ii) The condition of being fettered, bound, or otherwise physically restrained for sexual stimulation or gratification, of a person who is nude or clad only in undergarments or in a revealing or bizarre costume.

(e) "Sexual intercourse" means intercourse, real or simulated, whether genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex or between a human and an animal.

Sec. 4. As used in this part:

(a) "Harmful to minors" means sexually explicit matter that meets all of the following criteria:

(i) Considered as a whole, it appeals to the prurient interest of minors as determined by contemporary local community standards.

(ii) It is patently offensive to contemporary local community standards of adults as to what is suitable for minors.

(iii) Considered as a whole, it lacks serious literary, artistic, political, educational, and scientific value for minors.

(b) "Local community" means the county in which the matter was disseminated.

(c) "Prurient interest" means a lustful interest in sexual stimulation or gratification. In determining whether sexually explicit matter appeals to the prurient interest, the matter shall be judged with reference to average 17-year-old minors. If it appears from the character of the matter that it is designed to appeal to the prurient interest of a particular group of persons, including, but not limited to, homosexuals or sadomasochists, then the matter shall be judged with reference to average 17-year-old minors within the particular group for which it appears to be designed.

Sec. 12a. This part does not apply to any of the following:

(a) A medium of communication to the extent regulated by the federal communications commission.

(b) An internet service provider or computer network service provider that is not selling the sexually explicit matter being communicated but that provides the medium for communication of the matter. As used in this section, "internet service provider" means a person who provides a service that enables users to access content, information, electronic mail, or other services offered over the internet or a computer network.

(c) A person providing a subscription multichannel video service under terms of service that require the subscriber to meet both of the following conditions:

(i) The subscriber is not less than 18 years of age at the time of the subscription.

(ii) The subscriber proves that he or she is not less than 18 years of age through the use of a credit card, through the presentation of government-issued identification, or by other reasonable means of verifying the subscriber's age.

## PART II

### ULTRA-VIOLENT EXPLICIT VIDEO GAMES

Sec. 15. In light of section 51 of article IV of the state constitution of 1963, which directs that "The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health.", and after hearing from expert witnesses

and law enforcement officials, considering the testimony of expert witnesses before other legislative bodies, and reviewing dozens of studies and metastudies of hundreds of studies, the legislature finds all of the following:

(a) Published research overwhelmingly finds that ultra-violent explicit video games are harmful to minors because minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression.

(b) Spokespersons for not less than 6 major national health associations have concluded and testified that after reviewing more than 1,000 studies, the studies "point overwhelmingly to a causal connection between media violence and aggressive behavior in some children", concluding that the effects of media violence on minors "are measurable and long-lasting".

(c) Law enforcement officers testified that recent statewide targeted enforcement efforts reveal that minors are capable of purchasing, and do purchase, ultra-violent explicit video games.

(d) Law enforcement officers testified about cases of minors acting out ultra-violent explicit video game behaviors by victimizing other citizens.

(e) The state has a legitimate and compelling interest in safeguarding both the physical and psychological well-being of minors.

(f) The state has a legitimate and compelling interest in preventing violent, aggressive, and asocial behavior from manifesting itself in minors.

(g) The state has a legitimate and compelling interest in directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games.

Sec. 16. As used in this part:

(a) "Computer" means any connected, directly interoperable or interactive device, equipment, or facility that uses a computer program or other instructions to perform specific operations including logical, arithmetic, or memory functions with or on computer data or a computer program and that can store, retrieve, alter, or communicate the results of the operations to a person, computer program, computer, computer system, or computer network.

(b) "Computer network" means the interconnection of hardwire or wireless communication lines with a computer through remote terminals, or a complex consisting of 2 or more interconnected computers.

(c) "Computer program" means a series of internal or external instructions communicated in a form acceptable to a computer that directs the functioning of a computer, computer system, or computer network in a manner designed to provide or produce products or results from the computer, computer system, or computer network.

(d) "Computer system" means a set of related, connected or unconnected, computer equipment, devices, software, or hardware.

(e) "Device" includes, but is not limited to, an electronic, magnetic, electrochemical, biochemical, hydraulic, optical, or organic object that performs input, output, or storage functions by the manipulation of electronic, magnetic, or other impulses.

(f) "Disseminate" means to sell, lend, give, exhibit, show, or allow to examine or to offer or agree to do the same.

(g) "Extreme and loathsome violence" means real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture.

(h) "Harmful to minors" means having all of the following characteristics:

(i) Considered as a whole, appeals to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standards.

(ii) Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.

(iii) Considered as a whole, lacks serious literary, artistic, political, educational, or scientific value for minors.

(i) "Local community" means the county in which the video game was disseminated.

(j) "Minor" means a person less than 17 years of age.

(k) "Morbid interest in asocial, aggressive behavior" means a morbid interest in committing uncontrolled aggression against an individual. In determining whether an ultra-violent explicit video game appeals to this interest, the video game shall be judged with reference to average 16-year-old minors. If it appears from the character of the video game that it is designed to appeal to this interest of a particular group of persons, then the video game shall be judged with reference to average 16-year-old minors within the particular group for which it appears to be designed.

(l) "Ultra-violent explicit video game" means a video game that continually and repetitively depicts extreme and loathsome violence.

3

(m) "Video game" means an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

Sec. 17. (1) A person shall not knowingly disseminate to a minor an ultra-violent explicit video game that is harmful to minors. Except as provided in subsections (2) and (3), a person who violates this subsection is responsible for a state civil infraction and may be ordered to pay a civil fine of not more than $5,000.00.

(2) A person who violates subsection (1) and who has 1 prior determination of responsibility under this section is responsible for a state civil infraction and may be ordered to pay a civil fine of not more than $15,000.00.

(3) A person who violates subsection (1) and who has 2 or more prior determinations of responsibility under this section is responsible for a state civil infraction and may be ordered to pay a civil fine of not more than $40,000.00. In imposing a fine under this subsection, the court shall consider the scope of the defendant's commercial activity in disseminating ultra-violent explicit video games to minors.

Sec. 18. Section 17 does not apply to the dissemination of an ultra-violent explicit video game to a minor by any of the following:

(a) A parent or guardian who disseminates an ultra-violent explicit video game to his or her child or ward.

(b) An immediate family member of the minor who disseminates an ultra-violent explicit video game to the minor in the immediate family member's residence or the minor's residence.

(c) An individual who disseminates an ultra-violent video game to a minor who is a guest in the individual's residence.

(d) An individual who disseminates an ultra-violent explicit video game for a legitimate medical, scientific, governmental, or judicial purpose.

Sec. 19. (1) A person shall not knowingly make a false representation that he or she is the parent or guardian of a minor, or that a minor is 17 years of age or older, with the intent to facilitate the dissemination to the minor of an ultra-violent explicit video game that is harmful to minors. A person knowingly makes a false representation as to the age of a minor or as to the status of being the parent or guardian of a minor if the person either is aware that the representation is false or recklessly disregards a substantial risk that the representation is false.

(2) A person who violates subsection (1) is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $15,000.00, or both.

Sec. 20. A person who possesses managerial responsibility for a business enterprise renting or selling ultra-violent explicit video games that are harmful to minors shall not knowingly permit a minor who is not accompanied by a parent or guardian to play or view the playing of an ultra-violent explicit video game that is harmful to minors. A person who violates this section is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $25,000.00, or both.

Sec. 21. (1) A person knowingly disseminates an ultra-violent explicit video game to a minor if the person knows both the nature of the video game and the status of the minor to whom the video game is disseminated.

(2) A person knows the nature of the ultra-violent explicit video game if the person either is aware of its character and content or recklessly disregards circumstances suggesting its character and content.

(3) A person knows the status of a minor if the person either is aware that the person to whom the dissemination is made is a minor or recklessly disregards a substantial risk that the person to whom the dissemination is made is a minor.

Sec. 22. A conviction, sentence, or determination of responsibility for a violation of this part does not preclude a conviction, sentence, or determination of responsibility for a violation of any other law of this state arising from the same transaction.

Sec. 23. (1) It is an affirmative defense to an alleged violation under this part that the person acted in good faith. Except as provided in subsection (2), good faith exists if at the time the alleged violation occurs all of the following conditions are satisfied:

(a) The minor shows the person identification that appears to be valid and that contains a photograph and a date of birth purporting to show that the minor is 17 years of age or older, or the service terms of the internet provider of a seller or rental enterprise that sells or rents ultra-violent explicit video games over the internet require a purchaser or renter to be 17 years of age or older if all of the following conditions are met:

(i) The ultra-violent explicit video game is purchased or rented over the internet.

4

(*ii*) The ultra-violent explicit video game is sent to the purchaser's or renter's home or place of residence or otherwise made directly available through the internet to the purchaser or renter.

(*iii*) The purchaser or renter of the ultra-violent explicit video game uses a credit card to purchase or rent the ultra-violent explicit video game.

(b) The person does not have independent knowledge that the minor is under 17 years of age.

(c) Relying upon information described in subdivisions (a) and (b), the person complies with a rating system established by the pertinent entertainment industry that does not conflict with this part.

(2) If the person possesses managerial responsibility for a business enterprise, good faith exists if at the time the alleged violation occurs the business enterprise satisfies all of the following conditions:

(a) The business enterprise has in existence a policy that its employees are required to comply with a rating system established by the pertinent entertainment industry that does not conflict with this part.

(b) The business enterprise trains its employees to follow the policy described in subdivision (a).

(c) The business enterprise enforces the policy described in subdivision (a).

Enacting section 1. This amendatory act takes effect December 1, 2005.

Enacting section 2. This amendatory act does not take effect unless all of the following bills of the 93rd Legislature are enacted into law:

(a) Senate Bill No. 463.

(b) House Bill No. 4702.

(c) House Bill No. 4703.

This act is ordered to take immediate effect.

_____
Secretary of the Senate

_____
Clerk of the House of Representatives

Approved _____

_____
Governor

5

JS 44 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

## I. (a) PLAINTIFFS

Entertainment Software Association, Video Software Dealers Association, and Michigan Retailers Association

(b) County of Residence of First Listed    Foreign

(C) Attorney's (Firm Name, Address, and Telephone Number)

Dennis J. Levasseur (P39778)
Bodman LLP, 100 Renaissance Center, 34th Floor
Detroit, Michigan 48243    (313) 259-7777

## DEFENDANTS

Jennifer M. Granholm , in her official capacity as Governor of the State of Michigan, Michael A. Cox, in his official capacity as Attorney General of the State of Michigan, et al

County of Residence of First Listed    Ingham

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

Unknown

Magistrate Judge Steven D. Pepe
Magistrate Judge Steven

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment and Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

### TORTS
PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault Libel And Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

PERSONAL INJURY
- [ ] 362 Personal Injury- Med. Malpractice
- [ ] 365 Personal Injury - Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21: 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [X] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multi district Litigation
- [ ] 7 Appeal to District Judge from Magistrate

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. 1983 - Enforcement of First Amendment Rights

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE

DOCKET NUMBER

DATE    Sep 21, 2005

SIGNATURE OF ATTORNEY OF RECORD    Dennis Levasseur (P39778)

RSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?

☐ Yes

☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

☐ Yes

☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes : _____