## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

                    Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her
official capacity as Governor of the State
of Michigan; MICHAEL A. COX, in his
official capacity as Attorney General of
the State of Michigan; and KYM L.
WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

                    Defendants.

Case No: 05-73684

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

_____ /

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579

       and

JENNER & BLOCK LLP
By:    Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs
_____ /

## FIRST AMENDED COMPLAINT

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA"), by and through their attorneys, aver and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are associations whose members include companies that create, publish, distribute, sell, rent, or make video games available to the public. Plaintiffs bring this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against enforcement of a new Michigan statute that significantly infringes upon constitutionally protected rights of free expression.

2.      2005 Public Act 108 ("P.A. 108" or "the Act") was signed into law on September 14, 2005 and is due to go into effect on December 1, 2005.[1] The challenged portions of the Act penalize the sale or rental of video games based solely on their expressive content, in violation of the First Amendment.[2] The Act makes it illegal for anyone in Michigan to disseminate to anyone under the age of 17 an "ultra-violent explicit video game that is harmful to minors," as that term is defined in the Act. Act, pt. II, § 17(1). A person who knowingly disseminates a prohibited game to a minor is liable for a fine ranging from $5,000 to $40,000, depending on the number of violations. *Id.* § 17. The Act also subjects to liability any person with "managerial

---

[1] The initial complaint in this action refers to 2005 Public Act 107. Due to a printing error by the Office of the Great Seal of the State of Michigan, the Act was originally published as Public Act 107. This incorrect version was attached as Exhibit 1 to the original complaint. The Office of the Great Seal of the State of Michigan has subsequently corrected the mistake and the Act has been republished as 2005 Public Act 108. The corrected version is attached as Exhibit 1 to this First Amended Complaint.

[2] Plaintiffs do not challenge the restrictions contained in Part I of the Act pertaining to the dissemination of "sexually explicit matter." *See* Act, pt. I.

responsibility for a business enterprise" who knowingly permits an unsupervised minor to play

or view the playing of a prohibited video game; violators are subject to up to 93 days in prison, a

$25,000 fine, or both.  *Id.* § 20.

3.     The Act violates the First Amendment and other provisions of the United States

Constitution by creating penalties for the sale or rental of video games based solely on a game's

"ultra-violent explicit" content.  The First Amendment prohibits such content-based censorship.

Not only does the Act directly restrict the dissemination and receipt of a considerable amount of

fully protected expression, but, because of its numerous vague terms, the Act also creates a

chilling effect on a great deal of speech, as game creators and retailers will respond to the Act's

uncertainty by self-censoring, depriving adults and children of access to undeniably protected

expression.

4.     Every court that has considered this issue, including the Sixth, Seventh, and

Eighth Circuits, has recognized that video games constitute expression protected by the First

Amendment and has rejected attempts to restrict video game expression through the force of law.

*See James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (confirming that the First

Amendment protects the communicative aspect of video games); *American Amusement Mach.*

*Ass'n v. Kendrick*, 244 F.3d 572, 579-80 (7th Cir. 2001) (holding that video games are protected

expression, and striking down ordinance that similarly sought to restrict minors' access to

"violent" video games); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954,

957 (8th Cir. 2003) (noting that "[t]he mere fact" that video games "appear in a novel medium is

of no legal consequence," and striking down ordinance restricting "violent" video games); *Video*

*Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180,  1184-85 (W.D. Wash. 2004) (finding

that video games are "expressive and qualify for the protections of the First Amendment," and invalidating state statute restricting video games).

5.     Because some of Plaintiffs' members create, publish, rent, or sell games that may fall within the statutory definition, they may be subject to prosecution under the Act.  The Act will violate Plaintiffs' members' rights to free speech not only through direct restriction, but also as a result of the Act's inevitable chilling effect on video game expression.

6.     Plaintiffs maintain (a) that the challenged provisions of the Act are void and of no force and effect because they are unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States and thus actionable under 42 U.S.C. § 1983 and (b) that Plaintiffs and their members, as well as many citizens of Michigan, will suffer immediate, serious, and irreparable injury if the challenged provisions take effect.

### JURISDICTION AND VENUE

7.     This action arises under the Constitution of the United States, the First and Fourteenth Amendments thereto, and the laws of the United States, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343(a)(3).  This action is brought against the defendants in their official capacities under 42 U.S.C. § 1983.

8.     Venue is proper in the Eastern District of Michigan.  Many of Plaintiffs VSDA's and MRA's members are located in and/or do business in this judicial district, and the claims thus arise in this district.  Defendant Kym L. Worthy also resides in this judicial district, and is responsible for enforcing the Act for and within Wayne County.

**PARTIES**

9.      Plaintiff ESA is a nonprofit trade association organized under the laws of the
State of Delaware with its principal place of business in the District of Columbia.  A
fundamental purpose of ESA is to serve and promote the business and public affairs interests of
companies that publish entertainment software used for video games, including such companies'
right to publish and distribute works of expression that are protected under the First Amendment
to the United States Constitution and similar provisions of the constitutions of various states.
ESA members include a number of entities that publish, distribute, and/or supply video games to
owners and operators of sale and rental outlets within Wayne County and throughout Michigan.

10.      Plaintiff VSDA, established in 1981, is the not-for-profit international trade
association for the $24 billion home entertainment industry.  VSDA is incorporated in the State
of Delaware and its principal place of business is in Los Angeles, California.  VSDA represents
more than 1,000 companies throughout the United States, Canada, and other nations.  Its
members operate approximately 10,000 retail outlets in the United States, including
approximately 29 members in the State of Michigan, that sell and/or rent DVDs, VHS cassettes,
and console video games in approximately 432 stores.  Membership comprises the full spectrum
of video retailers (from single-store operators to large chains), video distributors, the home video
divisions of major and independent motion picture studios, and other related businesses that
constitute and support the home video entertainment industry.

11.      Plaintiff MRA is a not-for-profit trade association whose purpose is to promote
and improve retail business and consumer-retailer relations in Michigan.  MRA is incorporated
in the State of Michigan and its principal place of business is in Lansing, Michigan.  MRA is the
nation's largest trade association of general merchandise retailers.  Its 5,500 member retail

businesses own and operate over 12,000 stores across the State, at least 940 of which sell and/or rent video or computer games.

12.     The interests that Plaintiffs ESA, VSDA, and MRA seek to protect in this action are germane to the purposes of each organization, and neither the claims nor the forms of relief sought in this action require participation of individual members of Plaintiffs.  One or more members of each association have standing to bring this action in their own right.

13.     Plaintiffs are threatened with immediate, serious, and irreparable injury as a result of the enactment and imminent enforcement of the challenged provisions of the Act.  Once the Act is in force, Plaintiffs and their members will be subject to liability for disseminating works fully protected under the First Amendment.  The Act will have an immediate and vast chilling effect upon constitutionally protected speech because those who sell, rent, or permit to be sold or rented video games (and their respective distributors and providers) will, to avoid liability under the Act, refrain from offering for rental or sale a wide array of games, either to minors or to all customers.  This will in turn chill video game distributors, publishers, and creators from developing, publishing and distributing works that may run afoul of the Act's vague definition of prohibited content.

14.     The Act will also cause irreparable harm to willing listeners – both under and above age 17 – who will be deprived of the ability to hear and view Plaintiffs' members' speech. In this facial challenge to the Act, Plaintiffs have standing to assert not only their own rights and harm, but also that of the potential recipients of Plaintiffs' members' speech.

15.     Defendant Jennifer M. Granholm is the Governor of the State of Michigan.  As Governor, she is vested with the State's "executive power" and must "take care that the laws be

faithfully executed." Mich. Const. art. V §§ 1, 8. This injunctive action is brought against Governor Granholm in her official capacity.

16.     Defendant Michael A. Cox is the Attorney General of the State of Michigan. In that capacity, he "supervise[s] the work of, consult[s] and advise[s] the prosecuting attorneys, in all manners pertaining to the duties of their office." M.C.L.A. § 14.30. Additionally, Attorney General Cox has the authority to prosecute both criminal and civil infractions under the Act. *Id.* § 14.28 (permitting Attorney General to prosecute any case "in which the people of this state may be . . . interested"). This injunctive action is brought against Attorney General Cox in his official capacity.

17.     Defendant Kym L. Worthy is the Prosecuting Attorney and is responsible for enforcing criminal laws within Wayne County. M.C.L.A. § 49.153. This injunctive action is brought against Prosecuting Attorney Worthy in her official capacity.

## BACKGROUND

### Video Games and the First Amendment

18.     The challenged provisions of the Act seek to regulate the content of a certain medium of expression (defined as "video games" under the Act) and limit access to certain video games based solely on the content of the expression depicted or contained therein.

19.     Video games are a form of artistic expression much like other forms of protected expression, such as movies, books, and music. Video games contain extensive storylines and character development, comparable to that of books and movies. The storylines and plot, and associated dialogue among characters, continue throughout the game play and are an integral part of the game itself. Like the best of literature, the storylines often involve familiar themes such as

good versus evil, triumph over adversity, struggle against corrupt governments and rulers, and/or quest for adventure. Expression in other media, such as movies and books, draws thematic ideas directly from video games. Video games similarly draw and evolve themes from other media.

20.     Video games also feature the artwork of some of the best modern graphic artists. The typical video game contains many different animated or computer-generated illustrations. Video games also contain music, much of it original and performed by top musicians and orchestras. Like the music that plays during movies, the music in video games enhances and complements the expression conveyed by the images and dialogue, often in dramatic fashion.

21.     The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I. The prohibitions and protections of the First Amendment apply to the State of Michigan, U.S. Const. amend. XIV.

22.     The First Amendment shields verbal expression, written expression, visual expression, entertainment, art, and music. The protections of the First Amendment apply just as much to video games as they do to books, newspapers, films, theater, and music.

23.     The First Amendment also protects expressions and depictions of violence devoid of obscene sexual content. Thus, video games depicting violence—just like movies or illustrations that depict violence—are fully protected by the First Amendment.

## The Act

24.     The Act was passed by the Michigan Legislature on September 7, 2005 and was signed into law by Governor Granholm on September 14, 2005. A true, complete, and accurate

copy of the Act is attached hereto as Exhibit 1, and is incorporated herein. The Act is due to go into effect on December 1, 2005. Act, Enacting Section 1.

*The Act's Restrictions on Protected Speech*

25.    The Act will suppress expression in the video game medium because of the supposed effect of that expression on minors under the age of 17. The Act asserts that the State may restrict speech based on its "legitimate and compelling interest" in "safeguarding both the physical and psychological well-being of minors," "preventing violent, aggressive, and asocial behavior from manifesting itself in minors," and "alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, § 15(e), (f), (g).

26.    Section 17 of the Act will impose restrictions on freedom of expression by making it unlawful for any "person" to "disseminate" to a minor an "ultra-violent explicit video game that is harmful to minors," as those terms are defined in Part II, §§ 16(f), (h), (*l*), 17(*l*). A minor is defined as a person "less than 17 years of age." *Id.* § 16(j). To "disseminate" means to "sell, lend, give, exhibit, show, or allow to examine or to offer or agree to do the same." *Id.* § 16(f).

27.    An "[u]ltra-violent explicit video game" is one that "continually and repetitively depicts extreme and loathsome violence." Act, pt. II, § 16(*l*). The Act defines "extreme and loathsome violence" as:

> real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture.

Act, pt. II, § 16(g).

28.    In the context of "ultra-violent explicit video games," "harmful to minors" is

defined as follows:

> "Harmful to minors" means having all of the following
> characteristics:
>
> (i) Considered as a whole, appeals to the morbid interest in asocial,
> aggressive behavior of minors as determined by contemporary
> local community standards.
>
> (ii) Is patently offensive to contemporary local community
> standards of adults as to what is suitable for minors.
>
> (iii) Considered as a whole, lacks serious literary, artistic, political,
> educational, or scientific value for minors.

Act, pt. II, § 16(h).

29.    The Act states that a "'[m]orbid interest in asocial, aggressive behavior of minors'

means a morbid interest in committing uncontrolled aggression against an individual."  The Act

further provides that "[i]n determining whether an ultra-violent explicit video game appeals to

this interest, the video game shall be judged with reference to average 16-year-old minors.  If it

appears from the character of the video game that it is designed to appeal to this interest of a

particular group of persons, then the video game shall be judged with reference to average 16-

year-old minors within the particular group for which it appears to be designed."  Act, pt. II, §

16(k).

30.    A person who violates the Act's "ultra-violent explicit video games" provisions is

"responsible for a state civil infraction" and may be ordered to pay a fine up to $40,000,

depending on whether the person previously violated the Act.  Act, pt. II, § 17.

31.     A person who knowingly facilitates the dissemination of an ultra-violent explicit video game by falsely representing that "he or she is the parent or guardian of a minor, or that a minor is 17 years of age or older," is liable for a misdemeanor, imprisonment for up to 93 days, and/or a fine of up to $15,000.  Act, pt. II, § 19.

32.     A person with "managerial responsibility for a business enterprise renting or selling ultra-violent explicit video games that are harmful to minors" may not "knowingly permit a minor who is not accompanied by a parent or guardian to play or view the playing" of such video games.  Act, pt. II, § 20.  A violation of that section subjects a person to a misdemeanor, imprisonment for up to 93 days, and/or a fine of up to $25,000.  *Id.*

*The Act's Affirmative Defenses*

33.     The Act establishes several "good faith" affirmative defenses.  Act, pt. II, § 23(1), (2).  "Good faith" cannot be shown unless the person satisfies each of several conditions.

34.     With respect to video games disseminated through a face-to-face interaction, the person must show that "(a) [t]he minor show[ed] the person identification that appear[ed] to be valid and that contain[ed] a photograph and a date of birth purporting to show that the minor is 17 years of age or older," that "[t]he person does not have independent knowledge that the minor is under 17 years of age," and that "the person complies with a rating system established by the pertinent entertainment industry."  Act, pt. II, § 23.

35.     Although not specifically noted in the Act, the phrase "rating system established by the pertinent entertainment industry" likely refers to that of the Entertainment Software Rating Board ("ESRB").  The ESRB rating system is a voluntary system which has been almost

-11-

universally adopted by retailers, manufacturers and distributors of video games in the United
States.

36.     The ESRB rating system identifies suitable video games based on age.  For
example, a "Mature" or "M" rating under the ESRB system is reserved for video games that
"have content that may be suitable for persons ages 17 and older. Titles in this category may
contain intense violence, blood and gore, sexual content, and/or strong language."  ESRB Game
Ratings, *available at* http://www.esrb.org/esrbratings.asp.

37.     The ESRB's "T" or "Teen" rating is given to video games that "have content that
may be suitable for ages 13 and older. Titles in this category may contain violence, suggestive
themes, crude humor, minimal blood and/or infrequent use of strong language." *Id.*

38.     In light of the Act's broad language, both T-rated and M-rated games might be
construed as "ultra-violent explicit video games."  Yet even though the ESRB rating system
would permit a 13-year old to purchase a T-rated game, the affirmative defense would not apply
unless the minor presented identification that he or she was at least 17 years old.

39.     The Act also provides an affirmative defense for a person "possess[ing]
managerial responsibility for a business enterprise."  Act, pt. II, § 20.   Such a person can show
good faith if, "at the time of the alleged violation," the business for which he or she works has a
policy requiring employees to comply with an appropriate rating system, "trains" its employees
to follow the policy, and "enforces" the policy. *Id.* § 23(2).  The Act does not explain what
actions constitute compliance with these requirements, nor does it define the term "possess
managerial responsibility for a business enterprise."

## The Act Violates the First Amendment

40.     By restricting the sale or rental of video games deemed "explicit ultra-violent" and "harmful to minors" under the statute, the Act imposes penalties based on the content of the games' expression.  The Act therefore is subject to the most exacting scrutiny under the First Amendment.

41.     No compelling state interest exists that justifies the broad suppression of speech imposed by the Act.  The Act is based on purported legislative findings that "ultra-violent explicit" video games promote "violent, asocial, or aggressive behavior," and that "the effects of media violence on minors 'are measurable and long-lasting.'"  Act, pt. II, § 15(a), (b).  But those claims not only are not supported by credible evidence, they are contradicted and challenged by a strong body of compelling research.  The purported legislative "findings" therefore are not based on reasonable inferences drawn from substantial evidence.

42.     In addition, the Act suppresses "ultra-violent explicit" expression without any legislative finding, or underlying evidence, that exposure to such expression is directed to and likely to cause imminent violent action by the game player.

43.     The Act is not the least restrictive means of achieving any of the Legislature's asserted goals.  Other less speech-restrictive means of regulating minors' access to "ultra-violent explicit" video games exist, including those that were proposed to the Legislature by Plaintiffs and their members  (such as educational efforts and retailer enforcement initiatives).  Indeed, just two days before signing the Act, the Governor signed into law a bill requiring retailers to post signs about the nature of the video games they sell.  *See* 2005 P.A. 105 (Mich. 2005).  Rather

than permitting P.A. 105 to achieve the same legislative objectives, the Legislature and the
Governor proceeded to adopt P.A. 105 *and* P.A. 108

44.     Moreover, the Act adds as an element an expansive, unconstitutional "harmful to
minors" standard to depictions of violence, despite the Supreme Court's explicit limitation of
that standard to sexually explicit matter.

45.     The Act presents Plaintiffs' members with the possibility of arbitrary and
discriminatory enforcement because the Act fails to set forth minimal standards for enforcement.
The Act does not set forth adequately specific standards for determining which video games have
sufficient "ultra-violent explicit content" to fall within the Act's prohibitions.  As a result,
different retailers and publishers will almost certainly reach different, and conflicting,
determinations as to which games are likely to be restricted by the Act.

46.     The challenged provisions of the Act are unconstitutionally vague in that many of
the terms and phrases employed therein, including but not limited to, the terms and phrases
"extreme and loathsome violence," "ultra-violent explicit" video game," "parties who
realistically appear to be human beings," "morbid interest in asocial, aggressive behavior," and
"morbid interest in committing uncontrolled aggression against an individual" have no clear
meaning in the context of video games.  For example, how would a retailer assess whether a
particular video game depicted "physical violence against parties who realistically appear to be
human beings"?  Would a character with magical powers qualify?  What about a zombie?  A
centaur?  Likewise, what is meant by appealing to a "morbid interest in uncontrolled aggression
against an individual"?  What does it mean to say that the aggression is "uncontrolled," and at
what point does aggression become "uncontrolled"?  How does a person know whether "extreme

and loathsome violence" is depicted "continually and repetitively"? Persons of common intelligence are forced to guess at the meaning and scope of the challenged provisions.

47. The Act will have a chilling effect on game publishers and retailers. Under the Act, game publishers and retailers must determine which games may be subject to the statute's penalties. By their nature, games offer the player a wide range of possible game play of significant duration. Even if only a small portion of a game contained content that theoretically met the Act's definitions, the entire game would be suppressed. Moreover, to ensure that the games they sold do not violate the Act, retailers and clerks would be expected to review the entire possible course of play in a particular game. The significant burdens imposed by the law will ultimately lead to a chilling of speech of game developers, retailers, and consumers.

48. Some of the content displayed by the video games created, published, distributed, rented, sold, and/or made available to the public by Plaintiffs or their members, while fully protected by the United States Constitution, may be deemed by law enforcement officials in Michigan, including the Defendants, to meet the Act's definitions for "ultra-violent explicit" video games, thus subjecting Plaintiffs or their members to the threat of prosecution, as well as creating a chilling effect on their rights to freedom of expression.

49. The challenged provisions of the Act would infringe the First Amendment rights (i) of businesses physically present in Michigan, including Plaintiffs' members, who face the threat of prosecution if they do not comply with restrictions on their right to distribute constitutionally protected expression, (ii) of potential customers of those businesses—including both those under 17 as well as adults—who, because of these restrictions, will be deprived of the opportunity to receive fully protected speech, and (iii) of businesses located outside Michigan,

including members of Plaintiffs, whose ability to distribute their creative works within Michigan will be burdened based on the content of those works of expression.

50.    In addition to the prohibition on the sale or rental of "ultra-violent explicit" video games, the Act will impose other significant burdens on freedom of expression.  The Act imposes stiff penalties on a store manager for allowing an unaccompanied minor to play or view the playing of a prohibited video game in the store.  Act, pt. II, § 20.  Thus, if allowed to go into effect, the Act will restrict retailers' ability to offer consumers the chance to play sample segments of games or to show game footage "previews" on monitors in their stores.  As a result, the Act will restrict the speech of video game retailers and publishers, and will prevent the expression of Plaintiffs' members from reaching willing recipients, including adult consumers.

51.    The Act's so-called "affirmative defenses" exacerbate, rather than cure, the statute's flaws.  As explained in Paragraphs 35 through 37, the ESRB rating system suggests that some video games containing violence may be suitable for individuals 13 and older.  Yet under the Act, a person adhering to the ESRB ratings cannot utilize the affirmative defense unless the minor shows identification purporting to be at least 17 years old, even though a "T"-rated game may be suitable for an individual over 13.  The affirmative defense therefore is essentially meaningless, other than for its narrow application to minors showing they are at least 17 years old and are therefore able to purchase "M"-rated games.

52.    To the extent the Act seeks to incorporate the ESRB rating system into its scheme for restricting speech, it constitutes an unconstitutional delegation of legislative authority to a private third party.  Incorporating the industry's voluntary rating system also presents serious problems under the First Amendment, because the Legislature may not delegate to a third party

the decision about whether speech is protected or not.  Courts have invalidated similar legislative attempts to incorporate the Motion Picture Association of America's rating system.  *See, e.g., Engdahl v. City of Kenosha*, 317 F. Supp. 1133, 1135 (E.D. Wis. 1970); *Motion Picture Ass'n of America v. Specter*, 315 F. Supp. 824 (E.D. Pa. 1970); *Drive In Theatres v. Huskey*, 305 F. Supp. 1232 (W.D.N.C. 1969), *aff'd*, 435 F.2d 228 (4th Cir. 1970).

53.     Aside from the constitutional difficulties associated with Act's incorporation of the video game industry's voluntary rating system, the affirmative defense for "persons with managerial responsibilities" is inadequate and illogical.  Even if a store manager could claim the benefit of the affirmative defense for having and enforcing a rating policy, the clerks who sold a prohibited game would still be liable, because the affirmative defense applies only to those with "managerial responsibilities."  Act, pt. II, § 23(1).  Moreover, a manager may utilize the affirmative defense only if the "business enterprise" maintains a ratings system policy.  Because many store managers are not tasked with setting store-wide policies, the affirmative defense apparently is unavailable unless the businesses themselves – over which the managers may have no control – have implemented, enforced, and conducted training on, appropriate policies.

54.     The challenged provisions of the Act threaten Plaintiffs, their members, and other businesses involved in the creation, distribution, display, sale, or rental of video games, as well as adults and those under 17 who wish to receive the speech in those games, with serious, immediate, and irreparable injury for which there is no adequate remedy at law.

55.     In this facial constitutional challenge to the Act, Plaintiffs have standing to assert the rights of, and harm to, the potential customers of Plaintiffs' members.

## COUNT I

### (First and Fourteenth Amendments—Freedom of Expression)

56.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 55 as if fully set forth herein.

57.    The challenged provisions of the Act would restrict access to video games based solely upon the nature of the creative expression depicted.  The content of the expression made subject to these restrictions is not obscene or obscene as to minors.  Nor does it fall within any other category of expression that may constitutionally be regulated based solely upon its content.

58.    The Act imposes unconstitutional content regulation by prohibiting a person from disseminating any video game meeting the statutory definition of an "ultra-violent explicit video game that is harmful to minors" to any person under the age of 17, and by restricting the ability of retailers to display such games in their stores.  The Act restricts the freedom of creators, distributors, retailers, and publishers of games, as well as purchasers, renters, and other players of such games, to communicate and receive expression that is not constitutionally subject to regulation based upon its content.  The Act's suppression of  "ultra-violent explicit" video games is unsupported by any legislative finding, or underlying evidence, that exposure to such expression is directed to and likely to cause imminent violent action by the game player. Moreover, the Act's stated purposes are not based on credible evidence and are insufficient under the First Amendment to justify the broad content discrimination imposed by the Act.  Not only does the Act fail to serve a compelling governmental interest, but the Act is not narrowly tailored to serve any such interest, and the Legislature did not give adequate consideration to less speech-restrictive means of achieving its goals.  Instead, the Legislature proceeded to enact the Act, which sets forth a more restrictive scheme than any of the proposed alternatives.

59.     The Act does not establish standards for determining which games contain content meeting the description set forth in Paragraphs 27 through 29 hereof.  The challenged provisions of the Act would impose upon those who disseminate video games the burden of determining whether each such video game meets the description set forth in Paragraphs 27 through 29 hereof, prior to publishing, distributing, or otherwise holding that game out to the public.  The challenged provisions impose upon every such person the risk of substantial penalties.  This burden and risk are aggravated by the vagueness of the statutory description of the regulated content.  The challenged provisions thus would establish an unconstitutional scheme of censorship under which even works of expression that do not meet the statutory description in the Act would be suppressed because of the burden placed upon persons selling or renting video games of determining the scope of the Act's coverage and because of the risk of erroneous determinations.  Persons disseminating video games (and their respective distributors and suppliers) would be induced to refuse to include certain works in their inventories or on their premises, for fear of running afoul of the Act's ambiguous prohibitions.  Imposition of this burden and risk serves no compelling interest and is not narrowly tailored to serve any such interest.

60.     For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (First and Fourteenth Amendments—Vagueness)

61.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 60 as if fully set forth herein.

62.    The challenged provisions of the Act are unconstitutionally vague.  Many of the terms and phrases employed by the Act fail to give constitutionally sufficient notice of the types of expression that would be restricted.  These terms include, but are not limited to, the terms and phrases "extreme and loathsome violence," "ultra-violent explicit" video game," "parties who realistically appear to be human beings," "morbid interest in asocial, aggressive behavior," and "morbid interest in committing uncontrolled aggression against an individual."  These terms fail to provide clear meaning in the context of video games.

63.    The unconstitutional vagueness of the challenged provisions will have a chilling effect on producers, designers, publishers, and distributors of video games and will impose substantial burdens upon persons who sell, rent, or permit to be sold or rented video games, preventing them from exercising their constitutionally protected freedom of expression.  The Act's vagueness is also likely to lead to enforcement by law enforcement officials on an unfair, subjective, and *ad hoc* basis.  Because many of the Act's terms have no clear meaning, the Act will restrict a far broader range of video games than even the State claims it is seeking to regulate, as stores, store clerks, and game developers will respond to this uncertainty and fear of prosecution by refusing to provide video games—to both adults and minors—that conceivably could be deemed to fall within the Act's prohibitions.

64.     The statutory defenses exacerbate, rather than cure, the Act's vagueness problems.  Given the vagueness of terms like "good faith," "appears to be valid," "complies with a rating system," and "trains its employees to follow the policy," Act, pt. II, § 23, clerks and retailers will not know whether they will qualify for a statutory defense.  Furthermore, the scope of the defenses is unclear.

65.     The Act will also have a chilling effect on those with "managerial responsibility." Act, pt. II, § 20.  Part II, § 20 requires store managers to ensure that unsupervised minors neither play nor watch the prohibited video games.  Managers who knowingly permit minors to engage in such actions are subjected to criminal liability, including a prison term of up to 93 days. Because the Act fails to delineate with specificity the types of prohibited speech, store managers may respond by steering far clear of the line in order to reduce their risk of criminal prosecution. This would result in restricting Plaintiffs' members' expression from reaching willing recipients, including children and adults.  Retailers may also stop carrying certain titles and stop employing minors who would have access to the prohibited videogames.

66.     For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment.

## COUNT III

### (Fourteenth Amendment—Equal Protection)

67.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 66 as if fully set forth herein.

68.     The challenged provisions of the Act regulate and restrict under the threat of substantial penalties certain works of expression presented through the medium of video games. These same regulations, restrictions, and penalties do not apply to other works of expression containing the same or similar content, but communicated in other media, including, by way of example only, cable television, broadcast television, movies, books, and magazines.  Indeed, many of these other media -- which compete with video games for consumers -- contain expression that is based on video games that could fall within the prohibitions of the Act. Likewise, video games that could fall within the Act's prohibitions may themselves be based on similar speech in other, unregulated media.

69.     The challenged provisions of the Act arbitrarily and irrationally would establish a legislative scheme of classifications that burden fundamental rights and that are not closely related to any compelling state interest.

70.     For the foregoing reasons, and others, the challenged provisions of the Act are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (First and Fourteenth Amendments—Due Process)

71.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 70 as if fully set forth herein.

72.     The Act unconstitutionally delegates the power of the legislature to define the narrow categories of speech that may be criminalized, in derogation of Due Process.  The Act creates an affirmative defense to the statute's "ultra-violent explicit" video game prohibitions

that "the person complies with a rating system established by the pertinent entertainment industry." Act, pt. II, § 23(1)(c). In so doing, the Act impermissibly delegates legislative authority to an undefined entity (but presumably the ESRB). By delegating the power to determine what video games are subject to the law's restrictions to a private organization, and without any accompanying legislative standards, the Act violates Due Process.

73.     For the reason set forth above, and others, the challenged provisions of the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the First Amendment to the United States Constitution, as applied to the State of Michigan by the Due Process Clause of the Fourteenth Amendment.

## COUNT V

## (Violation of 42 U.S.C. § 1983)

74.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 73 as if fully set forth herein.

75.     The challenged provisions of the Act would cause Plaintiffs and their members to be subjected to the deprivation of rights, privileges, and immunities secured to them by the Constitution and laws of the United States. The challenged provisions thus constitute a deprivation of rights actionable under 42 U.S.C. § 1983.

76.     In the event Plaintiffs prevail on any claims under the Constitution of the United States set forth in this Complaint, Plaintiffs are entitled to recover attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand that this Court enter a judgment in Plaintiffs' favor and against Defendants as follows:

       (a)      That this Court issue a declaratory judgment that the challenged provisions of the Act are void and of no force and effect;

       (b)      That this Court issue a preliminary injunction and a permanent injunction against Defendants enjoining them from enforcing, or directing the enforcement of, the challenged provisions of the Act in any respect;

       (c)      That Plaintiffs be awarded their attorneys' fees under 42 U.S.C. § 1988;

       (d)      That Plaintiffs be awarded their costs herein; and

       (e)      That this Court order such other general and equitable relief as it deems fit and proper.

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION, and
MICHIGAN RETAILERS ASSOCIATION

/s/ Alicia J. Blumenfeld_____
BODMAN LLP
By:   Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, MI  48243
Telephone: (313) 393-7596
Fax: (313) 393-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

and

JENNER & BLOCK LLP
By:   Paul M. Smith
        Katherine A. Fallow
        Kathleen R. Hartnett
        Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC  20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs