## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

              Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her
official capacity as Governor of the State
of Michigan; MICHAEL A. COX, in his
official capacity as Attorney General of
the State of Michigan; and KYM L.
WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

              Defendants.

_____ /

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

**PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579

       and

JENNER & BLOCK LLP
By:    Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs
_____ /

September 26, 2005

Dockets.Justia.com

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Entertainment Software Association, Video Software Dealers Association, and Michigan Retailers Association (collectively, "Plaintiffs") respectfully move for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing 2005 Public Act 108 (Mich. 2005) (hereinafter, the "Act").

In support of this Motion, Plaintiffs state as follows:

1.      The Act was signed into law on September 14, 2005, and is due to take effect on December 1, 2005. The Act places civil and criminal penalties on the sale, rental and viewing of "ultra-violent explicit video games" to individuals under age 17 and imposes other burdens on the expression of consumers, video game retailers, and video game creators.

2.      Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games. On September 21, 2005, Plaintiffs filed a five-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. As set forth in each count of the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression, equal protection, and due process, and because it is unconstitutionally vague.

3.      Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their constitutional challenge to the Act, and because the equities weigh strongly against enforcement of the Act. Similar attempts to place legal burdens on "violent" video games have been invalidated on First Amendment grounds by *every* federal court to have reached the question. *See James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (attempted tort liability); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954,

957 (8th Cir. 2003) ("*IDSA*") (ban on "violent" games"); *American Amusement Mach. Ass'n v.*

*Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001) (Posner, J.) ("*AAMA*"); *Video Software Dealers*

*Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) ("*VSDA*") (same); *Sanders*

*v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (attempted tort liability);

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same).

4.      The Act, which restricts speech in order to prevent "real-life" violent acts, cannot

meet the standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See James*, 300 F.3d at 698.

The State cannot show that video games, which are played safely by millions, are "directed at,"

and "likely to," produced "imminent" violence or lawless action. The Act's restrictions on

"ultra-violent explicit video games" also fail strict scrutiny, because they are unsupported by a

compelling state interest that is materially advanced by narrowly tailored means. In addition, the

Act is unconstitutionally vague and fails to provide guidance on the types of types of speech and

actions it prohibits.

5.      The equities weigh strongly in favor of an injunction. Plaintiffs and their

members will suffer irreparable harm if the Act is allowed to go into effect, because the loss of

First Amendment freedoms, for any amount of time, constitutes irreparable injury. The First

Amendment rights of members of the public will be similarly impaired.

6.      In support of this Motion, Plaintiffs are submitting a memorandum of law,

declarations detailing the Act's chilling effect on protected expression, and copies of sample

video games that might be impermissibly censored under the Act.

7.      Pursuant to E.D. Mich. LR 7.1, Plaintiffs' counsel sought concurrence in the relief

requested in this motion. Concurrence was denied.

WHEREFORE, Plaintiffs request that this Court enter a preliminary injunction enjoining all Defendants to this action, and their officers, employees, and representatives, from enforcing, or directing the enforcement of 2005 Public Act 108 (Mich. 2005) until resolution of this action or further order of this Court.

Respectfully Submitted,

BODMAN LLP


/s/ Alicia J. Blumenfeld
By:     Dennis J. Levasseur (P39778)
          Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan  48243
Telephone: (313) 259-7777
Fax: (313) 393-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

JENNER & BLOCK LLP
By:     Paul M. Smith
          Katherine A. Fallow
          Kathleen R. Hartnett
          Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Telephone: (202) 639-6000
Fax: (202) 639-6066

September 26, 2005

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

              Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her
official capacity as Governor of the State
of Michigan; MICHAEL A. COX, in his
official capacity as Attorney General of
the State of Michigan; and KYM L.
WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

              Defendants.

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579
      and
JENNER & BLOCK LLP
By:    Paul M. Smith
        Katherine A. Fallow
        Kathleen R. Hartnett
        Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs

September 26, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 2

A. The Nature Of Video Games. ................................................................................................... 2

B. The Video Game Industry's Well-Established Voluntary Rating System ................................. 3

C. The Challenged Statute. ........................................................................................................... 4

    1.  The "Violent" Video Game Ban. ...................................................................................... 4

ARGUMENT .................................................................................................................................. 5

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS,
GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST
AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS. ............................. 6

    A. Video Games Depicting Violence Are Fully Protected By The First Amendment. ............. 6

    B. The Act's "Violent" Video Game Restrictions Fail The *Brandenburg* Standard ................ 7

    C. The Act's Content-Based Restrictions Fail Strict Scrutiny. ................................................ 9

        1.  The State Has No Legitimate, Much Less Compelling, Interest In Controlling
Minors' Thoughts Or Feelings. ................................................................................... 10

        2.  The Act Does Not Materially Advance The State's Interests And Is Not
Narrowly Tailored. ...................................................................................................... 12

        3.  The Affirmative Defenses Do Not Cure The Act's Constitutional Infirmities ............ 14

    D. The Act Is Unconstitutionally Vague. ............................................................................. 16

II.  THE EQUITIES STRONGLY SUPPORT AN INJUNCTION. ............................................ 19

CONCLUSION ............................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ...........................................................13

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ...................................................................................1, 2, 5, 6, 8, 9, 11, 12, 13, 18

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986)...............................................................................................................9

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .......................................................7, 8, 11

*Boos v. Barry*, 485 U.S. 312 (1988)............................................................................... 10-11

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).................................................................................7

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) .....................................................................8

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998).....................................2, 5, 19

*Dixie Fuel Co. v. Commissioner of Social Security*, 171 F.3d 1052 (6th Cir. 1999)......................5

*Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188 (9th Cir. 1989)................................................9

*Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63 (2d Cir. 1997) ..................................................6

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ..............................................................11

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ...............................................................................12

*Ginsberg v. New York*, 390 U.S. 629 (1968) ......................................................................... 11-12

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).....................................................................16

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ...................................................................................................1, 2, 5, 6, 8, 9, 12

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) .......................................1, 6, 7, 8, 9, 12

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004) .........................................20

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ..................................................................11

*Kolender v. Lawson*, 461 U.S. 352 (1983)...................................................................................16

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) .................................11

*Miller v. California*, 413 U.S. 15 (1973) .........................................................................12

*NAACP v. Button*, 371 U.S. 415 (1963)............................................................................16

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) .........19

*Ohio ex rel. Celebrezze v. Nuclear Regulatory Commission*, 812 F.2d 288 (6th Cir. 1987).........19

*Potter v. State*, 509 P.2d 933 (Okla. Crim. App. 1973)..................................................15

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................................9, 10

*Reno v. ACLU*, 521 U.S. 844 (1997)..........................................................................14, 16

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) ....... 1-2

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105 (1991)............................................................................................................10

*State v. Watkins*, 191 S.E.2d 135 (S.C. 1972), *vacated and remanded on other grounds*, 413 U.S. 905 (1973)...............................................................................................15

*Texas v. Johnson*, 491 U.S. 397 (1989) ...............................................................1, 8, 11

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ...............11

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ......................10, 12, 13

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998)..........................................................19

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ............10, 13

*Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992) ...............................................................................18

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) .....................17

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ...............................................................1, 2, 5, 6, 8, 9, 10, 12, 13, 18

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002)...........................2

*Winters v. New York*, 333 U.S. 507 (1948)......................................................................................7

**INTRODUCTION**

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing 2005 Public Act 108 (Mich. 2005) (hereinafter, the "Act"). The Act was signed into law on September 14, 2005, and is due to take effect on December 1, 2005.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles. Michigan's sweeping legislation places civil and criminal penalties on the dissemination or display of "ultra-violent explicit" video games to individuals under age 17, and imposes other burdens on the expression of consumers, video game retailers, and video game creators. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

The Act violates this "bedrock principle," and under controlling law Plaintiffs are likely to succeed on their constitutional claims. The Sixth Circuit – along with the Seventh and Eighth Circuits, and other federal district courts – has held that the First Amendment precludes attempts to impose legal burdens based on the expressive content of video games. *James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (rejecting attempt to impose tort liability on makers of "violent" video games); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003) ("*IDSA*") (holding that video games are protected by the First Amendment, and striking ban on "violent video games"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001) (Posner, J.) ("*AAMA*") (same); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) ("*VSDA*") (same); *Sanders v.*

1

*Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (rejecting attempted tort

liability); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same).

Indeed, every previous government attempt to restrict the dissemination of "violent" video

games has been invalidated on First Amendment grounds. *IDSA*, 329 F.3d at 957; *AAMA*, 244

F.3d at 579; *VSDA*, 325 F. Supp. 2d at 1184-85.

Not only are Plaintiffs likely to prevail on their claims, but the equities also weigh

strongly in favor of an injunction. *See, e.g.*, *AAMA*, 244 F.3d at 580. As the Sixth Circuit has

recognized, the "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281,

288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Plaintiffs

will undoubtedly suffer irreparable harm if the Act is allowed to go into effect. The First

Amendment rights of members of the public — whose rights are also at stake in this facial

challenge — will be similarly impaired. Accordingly, the Act should be enjoined.

## FACTUAL BACKGROUND

### A.    The Nature Of Video Games.

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent

video games. Compl. ¶¶ 9-11. The Act, if allowed to go into effect, will result in censorship and

limit the distribution of some of these creative works, based solely upon their expressive content.

*Id.* ¶ 13. In this facial challenge, Plaintiffs also assert the rights of willing listeners. *Id.* ¶ 14.

Video games are a modern form of artistic expression. Like motion pictures and

television programs, video games tell stories and entertain audiences through the use of complex

pictures, sounds, and text. *See* Price Decl. ¶¶ 3-4.[1] These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 3-4, 20. Like great literature, these games often involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 18-61.

**B.    The Video Game Industry's Well-Established Voluntary Rating System.**

Like other popular media, such as motion pictures, television, and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system — which the FTC has called the "most comprehensive" of industry-wide media rating systems — is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 5-6. The purpose of the ESRB system is to provide easily understood information about games to consumers and parents — not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 7. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, essentially all video game publishers submit their games for rating. *Id.* ¶ 6. Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to restrict the sale of "M" games to individuals under age 17. *See* Andersen Decl. ¶ 15.

---

[1] In support of their Motion, Plaintiffs are submitting the Declaration of Ted Price ("Price Decl."), President and CEO of Insomniac Games, Inc.; Declaration of Crossan R. Andersen ("Andersen Decl."), President of Plaintiff VSDA; and Declaration of Douglas Lowenstein ("Lowenstein Decl."), President of Plaintiff ESA. Plaintiffs are also submitting copies of video games that may be deemed to be covered by the Act's restrictions, along with taped recordings of representative play of those games. These materials are contained in a separate appendix.

C.      **The Challenged Statute.**

    1.      **The "Violent" Video Game Ban.**

The Act makes it a state civil infraction for a person to "knowingly disseminate to a

minor an ultra-violent explicit video game that is harmful to minors." Act, pt. II, § 17.  A person

who violates this provision is liable for a civil fine ranging from $5,000 to $40,000, depending

on the number of violations.  *Id.*  The Act also provides misdemeanor criminal penalties of up to

93 days in prison, a fine of $25,000, or both, for store managers who permit a minor to "play or

view the playing" of a prohibited video game.  *Id.* § 20.  "Ultra-violent explicit video games"

under the Act are those that "continually and repetitively depict[] extreme and loathsome

violence."  *Id.* § 16(*l*).  "Extreme and loathsome violence" is defined as "real or simulated

graphic depictions of physical injuries or physical violence against parties who realistically

appear to be human beings, including actions causing death, inflicting cruelty, dismemberment,

decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual

conduct, or torture."  *Id.* § 16(g).  An "ultra-violent explicit video game" is "harmful to minors"

under the Act if it has all the following characteristics:

> (i)  Considered as a whole, appeals to the morbid interest in
> asocial, aggressive behavior of minors as determined by
> contemporary local community standards.
>
> (ii)  Is patently offensive to contemporary local community
> standards of adults as to what is suitable for minors.
>
> (iii)  Considered as a whole, lacks serious literary, artistic,
> political, education, or scientific value for minors.

*Id.* § 16(h).

The Act stated purposes for its restrictions on "ultra-violent explicit" video games are:

"safeguarding both the physical and psychological well-being of minors," "preventing violent,

aggressive and asocial behavior from manifesting itself in minors," and "directly and

4

substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, §§ 15(e), (f), (g). The Act purports to make "findings" that "minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression" and that "the effects of media violence on minors 'are measurable and long-lasting.'" *Id.* §§ 15(a), (b).

## ARGUMENT

In determining whether to issue a preliminary injunction, "a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Dixie Fuel Co. v. Commissioner of Soc. Sec.*, 171 F.3d 1052, 1059-60 (6th Cir. 1999). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Connection Distrib. Co.*, 154 F.3d at 288 (quotation marks omitted). Because a First Amendment violation "unquestionably constitutes irreparable injury," the likelihood of success on the merits "often will be the determinative factor." *Id.*

Plaintiffs easily satisfy this standard. Indeed, other courts have already entered preliminary and permanent injunctions in challenges to materially identical bans on distribution of "violent" video games. *See AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis"); *IDSA*, 329 F.3d at 960; *VSDA*, 325 F. Supp. 2d at 1191.

5

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

A.    **Video Games Depicting Violence Are Fully Protected By The First Amendment.**

The Sixth Circuit, along with several other federal courts, has held that video games constitute expression protected by the First Amendment. *James*, 300 F.3d at 695-96; *AAMA*, 244 F.3d at 577-78 (explaining that the court had "little difficulty" concluding that the First Amendment protects the communicative aspects of video games); *IDSA*, 329 F.3d at 958 (video games "'are as much entitled to the protection of free speech as the best of literature'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *VSDA*, 325 F. Supp. 2d at 1184-85 (video games "are expressive and qualify for the protections of the First Amendment"). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *VSDA*, 325 F. Supp. 2d at 1184; *see also James*, 300 F.3d at 695 (because plaintiffs were seeking to impose liability based on expressive aspects of video games, tort lawsuit raised "significant constitutional problems under the First Amendment.").

That the Act restricts depictions of violence makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty"); *IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of

6

[unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context

of "violent" magazines, characterized by the state as "massing" "bloodshed" and "crime," the

Supreme Court has stated that violent expression is "as much entitled to the protection of free

speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).

**B.    The Act's "Violent" Video Game Restrictions Fail The *Brandenburg* Standard.**

The Act restricts video games based on the Legislature's belief that video games cause

violence, and the Act's central purpose is to prevent the "real-life harms" supposedly caused by

"violent" video games. *See* Act, pt. II, §§ 15(f), (g) (asserting that the State has a "legitimate and

compelling interest in preventing violent, aggressive, and asocial behavior from manifesting

itself in minors," and "substantially alleviating the real-life harms perpetrated by minors who

play ultra-violent explicit video games."). In support of its restrictions, the Act cites unidentified

studies "'point[ing] overwhelmingly to a causal connection between media violence and

aggressive behavior in some children.'" *Id.* § 15(b); *see id.* § 15(a).

Any effort to justify the Act on the theory that disfavored content in video games will

cause some players to act violently must meet the stringent standards of *Brandenburg v. Ohio*,

395 U.S. 444 (1969). *See James*, 300 F.3d at 698 ("In protecting against the propensity of

expression to cause violence, states may only regulate that speech" that meets the *Brandenburg*

standard). As the Sixth Circuit has explained, "[f]ederal courts . . . have generally demanded that

all expression, advocacy or not, meet the *Brandenburg* test before its regulation for its tendency

to incite violence is permitted." *Id.* at 699. Under *Brandenburg*, the government must prove that

the targeted expression "'is *directed to* inciting or producing *imminent* lawless action and is

*likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002)

(quoting *Brandenburg*, 395 U.S. at 447) (emphasis added); *James*, 300 F.3d at 698. As the

7

Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Texas v. Johnson*, 491 U.S. at 408-09 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

Yet that is exactly what the Act purports to do. It regulates speech ostensibly based on the Michigan Legislature's conclusory "findings" that "minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression." Act, pt. II, § 15(a). Even assuming that such findings were based on any reliable evidence,[2] which they are not, the State would fail to meet the *Brandenburg* standard based on such aggregate effects. First, as the Sixth Circuit has observed, video games, designed for entertainment, are not "directed" to inciting violence. *See, e.g., James*, 300 F.3d at 698 (video game makers do not "'intend' to produce violent actions by the consumers, as required by the *Brandenburg* test"). Second, the purported basis for the Act – that long-term exposure to "violent" video games increases violent or aggressive behavior in some small

_____

[2] The Act's citation to "published research" as support for its cursory conclusions about the effects of "violent" games on minors' real-world violent behavior ignores a substantial body of conflicting evidence that contradicts those conclusions. Indeed, every court considering the issue has concluded that the research fails to establish any causal link between exposure to such games and subsequent harm to anyone. *See IDSA*, 329 F.3d at 959 (finding law lacking "the 'substantial supporting evidence' of harm that is required before an ordinance that threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do not support" the regulation of "violent" video games, because these studies "do not find that video games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at 1188 (finding that "the current state of the research cannot support the . . . Act because there has been no showing that exposure to video games . . . is likely to lead to actual violence"). But even accepting the Legislature's purported "findings" – that video games lead to "violent, asocial, or aggressive behavior" by minors – they would not demonstrate the level of "imminence" required by the *Brandenburg* standard. *See, e.g., James*, 300 F.3d at 698.

percentage of at-risk persons – falls far short establishing a risk of "imminent" violence. Considering a similar argument in *James*, the Sixth Circuit held that the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the *Brandenburg* test." *Id.* Finally, as in *James*, there is absolutely no finding by the Legislature that video games, which are played safely every day by millions, are "likely" to produce "imminent" violence. *Id.* at 699; *see also AAMA*, 244 F.3d at 575.

Therefore, because the Act fails to meet the strict standards of *Brandenburg*, it cannot be sustained under the First Amendment as a measure designed to reduce violent behavior in society. *James*, 300 F.3d at 698-99; *cf. Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989) (holding that the "causal relationship between pornographic materials and violent actions is ambiguous and unvalidated," and therefore does not establish a "clear and present danger" under First Amendment jurisprudence); *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) (speech that *might* increase violence toward women cannot be restricted where the dangers are not immediate).

C.    **The Act's Content-Based Restrictions Fail Strict Scrutiny.**

To the extent that the Legislature articulated some purpose for the Act going beyond a supposed reduction in violent behavior, such additional justifications also fail constitutional scrutiny. Because the Act restricts access to expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *VSDA*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a

9

regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.

### 1. The State Has No Legitimate, Much Less Compelling, Interest In Controlling Minors' Thoughts Or Feelings.

The Act includes a finding that "violent" video games cause minors to "have feelings of aggression," and posits a "legitimate and compelling" state interest in protecting the "psychological well-being of minors." Act, pt. II, §§ 15(a), (e). Even assuming that this justification is anything more than a repackaging of the "preventing real-life" violence rationale, it still amounts to an illegitimate effort to restrict access to expression based on consumers' anticipated "psychological" reaction to that content. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens &

10

Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions

of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. at 408-09 (interest

in protecting bystanders from feeling offended or angry is not sufficient to justify ban on

expression). An effort by the State to censor speech in order to promote citizens' "well-being"

amounts to nothing more than improper thought control. As the Supreme Court has noted, "First

Amendment freedoms are most in danger when the government seeks to control thought or to

justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

Like adults, minors have a First Amendment right to be free from content-based

governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal

Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First

Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des

Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969). The government does not

have a generalized power to limit minors' exposure to creative works based on a belief that they

may be psychologically harmful. Such works "may affect public attitudes and behavior in a

variety of ways, ranging from direct espousal of a political or social doctrine to the subtle

shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).[3] Thus, the State

simply may not restrict protected expression merely because it dislikes the way that expression

shapes individuals' thoughts and attitudes.

The Act nevertheless cloaks its speech restrictions in "harmful to minors" language, in an

effort to exploit the narrow subset of sexually explicit speech that the Supreme Court has held

the government may regulate consistent with the First Amendment. *See, e.g., Ginsberg v. New*

---

[3] As Judge Posner has explained, there is a serious "danger of allowing government to
control the access of children to information and opinion," as "[p]eople are unlikely to become
well-functioning, independent-minded adults and responsible citizens if they are raised in an
intellectual bubble." *AAMA*, 244 F.3d at 577.

*York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors" regulation of certain

explicit sexual expression). But the "harmful to minors" category of speech is limited to sexual

materials and has no application to the "violent" material that the State seeks to regulate here.

Indeed, the Sixth Circuit – along with other courts – has expressly "decline[d] to extend [its]

obscenity jurisprudence to violent, instead of sexually explicit, material." *James*, 300 F.3d at

698; *see also IDSA*, 329 F.3d at 958 ("[D]epictions of violence cannot fall within the legal

definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 578-79 (concerns

underlying *Ginsberg* do not apply with respect to "violent" video games); *VSDA*, 325 F. Supp.

2d at 1185 (explaining that *Ginsberg* is limited to sexually explicit expression); *cf. Miller v.

California*, 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope of [regulation of

obscene materials] to works which depict or describe sexual conduct.").

> **2.    The Act Does Not Materially Advance The State's Interests And Is Not
> Narrowly Tailored.**

Even assuming that the State's justifications for the Act were not facially illegitimate and

unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State

would have to demonstrate that the Act's restrictions actually and materially address the alleged

government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189.

Here, the fact that the State has singled out video games — even though a wide range of media

make comparable violent expression available to minors — is strong evidence that the Act fails

to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the

"facial underinclusiveness" of a regulation undermines the claim that the regulation serves its

alleged interests); *VSDA*, 325 F. Supp. 2d at 1189 (explaining that "the Act is too narrow in that

it will have no effect on the many other channels through which violent representations are

presented to children").[4]  "Violent" video games "are a tiny fraction of the media violence to

which modern American children are exposed." *AAMA*, 244 F.3d at 579.  But the Act leaves

these other media unaffected.  Under the Act, for example, a minor could be legally barred from

buying or renting an "M"-rated video game containing "violent" content, but that same minor

could legally buy or rent the movie and book on which the video game was based.  *See, e.g.*,

Price Decl. ¶¶ 4 (noting that the "M"-rated game *Tom Clancy's Rainbow Six 3* is based on writer

Tom Clancy's highly successful novels).

Moreover, the Act fails strict scrutiny because it is not narrowly tailored.  The narrow

tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to

banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.  The

State cannot make such a showing here, where such alternative exists, including encouraging

awareness of the voluntary ESRB video game rating system, which provides guidance to parents

and other consumers.  *See generally* Lowenstein Decl.; *Playboy*, 529 U.S. at 824 ("A court

should not assume a plausible, less restrictive alternative would be ineffective; and a court

should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v.

Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising

alcohol prices because of less restrictive alternatives, such as an "educational campaign" or

"counterspeech").  The State cannot meet its burden of demonstrating the absence of less

restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate

---

[4] Such differential regulation of comparable expression invokes the specter of
impermissible viewpoint discrimination. *See, e.g.*, *Playboy*, 529 U.S. at 812 ("Laws designed or
intended to suppress or restrict the expression of specific speakers contradict basic First
Amendment principles." (striking down a regulation that targeted "adult" cable channels, but
permitted similar expression by other speakers)); *Turner*, 512 U.S. at 659 ("Regulations that
discriminate among media, or among different speakers within a single medium, often present
serious First Amendment concerns.").

consumers about the well-established and comprehensive ESRB system, and instead proceeded to adopt the Act's restrictive measures. *See* Lowenstein Decl. ¶¶ 15-16.

Even under a somewhat lower standard of scrutiny, the Act would not survive review. As explained in detail below, *infra* § I.D, the language employed by the Act to identify the censored games is hopelessly – and unconstitutionally – vague. Likewise, the restrictions on minors' access to "ultra-violent explicit" video games, which rests on vague and overbroad terms, would result in an overly broad and impermissible suppression of *adults'* access to protected speech. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997). For example, the Act's restrictions on store game displays likely will mean that some retailers will decide not to offer an opportunity for customers to test out games in the store, or to show game footage on monitors in the store. Andersen Decl. ¶ 17-18. Similarly, retailers may decide not to stock any games with violent content potentially covered by the Act, because of the difficulty of determining which games may be sold or rented to minors. *Id.* ¶ 7-14. As a result, Plaintiffs' speech will not reach willing recipients, including adults. The broad suppression of speech created by the Act would require its invalidation even if there were some legal basis for applying some less strict level of First Amendment scrutiny, which there is not.

### 3.    The Affirmative Defenses Do Not Cure The Act's Constitutional Infirmities.

The Act contains certain "affirmative defenses" that purportedly curtail the Act's reach. As explained below, however, the affirmative defenses exacerbate, rather than cure, the Act's flaws.

Some of the "affirmative defenses" provide no real defense at all. For example, one provision affords a "good faith" defense to a person who "disseminates" a covered video game to a minor, if the minor shows identification indicating that he or she is over 17, and the person

disseminating the game "complies with a rating system established by the pertinent entertainment industry that does not conflict with this part." Act, pt. II, § 23. The ESRB rating system, however, recommends that "T"-rated video games may be appropriate for individuals over thirteen years of age, even though a "T"-rated game may contain violence that falls within the Act's broad restrictions. Therefore, a person who sold a "T"-rated game that fell within the Act's definition to a minor over 13 would be liable under the Act – despite the fact that such a sale would be wholly consistent with the ESRB rating system. *See* Andersen Decl. ¶ 19. The affirmative defense therefore is essentially meaningless, other than for its narrow application to minors showing they are at least 17 years old and are therefore able to purchase "M"-rated games.[5]

Likewise, the "store manager" defense would provide only minimal benefit. A store manager may assert an affirmative defense to the Act's restrictions on the dissemination or display of covered games if, at the time of the alleged violation, a) the business had a policy requiring employees to comply with the relevant rating system, b) trained its employees to follow the policy, and c) enforced the policy. Act, pt. II, § 23(2). But compliance with these requirements, even if it benefited the manager, would not absolve store *clerks* from liability. Thus, a manager relying on the § 23(2) affirmative defense would shift the exposure of liability from store managers to store clerks.

Further, the affirmative defense provisions, like much of the Act, contain numerous vague terms that fail to give the reasonable manager and clerk sufficient notice about what types

---

[5] In any event, to the extent the Act seeks to incorporate the ESRB rating system into its scheme for restricting speech, it constitutes an unconstitutional delegation to a private third party. *See, e.g., State v. Watkins*, 191 S.E.2d 135, 143-44 (S.C. 1972), *vacated and remanded on other grounds*, 413 U.S. 905 (1973); *Potter v. State*, 509 P.2d 933, 935-36 (Okla. Crim. App. 1973).

of behavior are required. By the use of vague and confusing terms, the affirmative defenses will

only enhance the Act's chilling of speech. *See* Andersen Decl. ¶ 16, 19. But, at the most

fundamental level, these defenses do not cure the Act's First Amendment problem because they

permit criminal and civil punishment for the dissemination of fully protected expression.

### D.    The Act Is Unconstitutionally Vague.

The Act is unconstitutional on an independent ground: vagueness. Because several of

the Act's key terms are impermissibly vague and place the burden of compliance on game

retailers, the Act will restrict a far broader range of expression than even the State claims it is

seeking to regulate. The Constitution demands that statutes be set forth with "sufficient

definiteness that ordinary people can understand what conduct is prohibited." *Kolender v.

Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may act

accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting

precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at

871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one

imposing criminal penalties, "raises special First Amendment concerns because of its obvious

chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Several key terms in the Act either are inherently vague or are defined in such a way as to

fail to provide fair notice. To begin with, the Act's prohibition targets violence "against parties

who realistically appear to be human beings." Act, pt. II, § 16(g). But "human beings" is a term

particularly ill-suited to a medium that relies extensively on animated, extra-terrestrial, and

fantastic forms and characters — which may be depicted as having only some "human"

characteristics, or which may be "human" at some times and not others. For example, in

*Resident Evil IV*, part of a popular series of video games that have inspired feature films, the vast

16

majority of enemies in the game are zombies and mutants with human characteristics. *See* Price

Decl. ¶¶ 26-32. Would zombies and mutants be viewed as "human" within the meaning of the

Act? Similarly, in *Jade Empire*, which takes the player's character on an adventure through a

mythical Chinese kingdom, both the player's character and the enemy forces possess magical

abilities and transform into non-humanoid creatures. *See id.* ¶¶ 33-40; *id.* ¶¶ 41-49. Does this

game contain characters that "realistically appear to be human beings" as defined by the Act?

Do part-animal or part-alien creatures "realistically appear to be human beings"?

Likewise, the definition of "ultra-violent explicit video game" is hopelessly vague. An

"ultra-violent explicit video game" is defined as one that "continually and repetitively depicts

extreme and loathsome violence." Act, pt. II, § 16(*l*). What is meant by "continually and

repetitively"? Is there a threshold number of acts that establishes liability under the Act? What

if the game permits each player to determine how much "violence" occurs in a game (as many

do)? *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. If it is merely possible to engage in "continual

and repetitive" "violence," will the game be censored for all? *Id.*

The Act's "harmful to minors" definition suffers from equally substantial vagueness

problems. Even assuming that the harmful to minors standard could be expanded beyond the

regulation of sexually explicit material (and it cannot), the Act fails to provide explanations of

what constitutes a "morbid interest in asocial, aggressive behavior," "morbid interest in

uncontrolled aggression against an individual," and "what is suitable for minors" with respect to

depictions of violence. *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. As with the other provisions of

the Act, the "harmful to minors" definition fails to give reasonable notice of what conduct is

proscribed by the Act. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir.

1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter*

17

*alia*, term "morbid" was not defined); *see also Video Software Dealers Ass'n v. Webster*, 773 F.

Supp. 1275, 1281 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684, 689 (8th Cir. 1992); *cf. Winters*, 333

U.S. at 513, 518-19 (striking down as vague a statute prohibiting the distribution of tales of

criminal deeds of bloodshed and lust "so massed as to become vehicles for inciting violent and

depraved crimes against the person" and appealing "to that portion of the public who (as many

recent records remind us) are disposed to take to vice for its own sake").[6]

Stores and store clerks will be subject to steep liability if they wrongly guess about what

games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty

in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting

access to *any* potentially offending video game title, or, conceivably, by pulling a wide range of

games off the shelves altogether. *See, e.g.*, Lowenstein Decl. ¶ 13-14; Andersen Decl. ¶¶ 12, 17-

18, 20-21; Price Decl. ¶¶ 15. As the federal district court in Washington stated, in striking down

a Washington State "violent" video game ban as unconstitutionally vague, "[n]ot only is a

conscientious retail clerk (and her employer) likely to withhold from minors all games that could

possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer

far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly

marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109). Such

understandable, self-protective behavior will deprive access to such expression not just to

---

[6] Moreover, the Act covers "real or simulated graphic depictions of" violence — terms with no logical boundary in a medium in which all images are obviously computer-generated and therefore unrealistic. Act, pt. II, § 16(g). The Seventh Circuit observed that video games are populated by "cartoon characters, that is animated drawings[,]" and that "[n]o one would mistake them for photographs of real people." *AAMA*, 244 F.3d at 579. Similar confusion will be spawned by the Act's use of other vague terms — such as the various, non-exclusive categories of "physical injuries or physical violence," Act, pt. II, § 16(g) — that become all the more ambiguous and unclear when applied to the inherently unrealistic video game medium.

minors, but to adult customers as well — whose right to access "violent" and "sexually explicit" video games could not be questioned by the State.

## II.    THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes into effect. As the Sixth Circuit has made clear, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co.,* 154 F.3d at 288 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). In the First Amendment context, the irreparable injury "stems from the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority* ("SORTA"), 163 F.3d 341, 363 (6th Cir. 1998) (internal quotation marks omitted). Thus, no adequate remedy at law exists for Plaintiff's claims. *See, e.g., Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (injunctive relief is appropriate where "legal remedies prove inadequate."); *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of an injunction. The public interest would be harmed if the Act were allowed to go into effect. *See SORTA*, 163 F.3d at 363 (holding that failure to enjoin the Government's suppression of advertisement in public fora "would harm the public's interests in protecting First Amendment

19

rights in order to allow the free flow of ideas"). The enforcement of the Act will not only affect Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout Michigan and beyond, all of whom will suffer infringements on their constitutional right to produce and view the expression contained in the wide array of video games implicated here. By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distrib. Co*, 154 F.3d at 288). The equities compel an injunction here.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

Respectfully submitted,

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION, and
MICHIGAN RETAILERS ASSOCIATION

/s/Alicia J. Blumenfeld

Dennis J. Levasseur
Alicia J. Blumenfeld
**BODMAN LLP**
100 Renaissance Center
Detroit, MI 48243
Tel (313) 393-7596
Fax (313) 393-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
**JENNER & BLOCK LLP**
601 Thirteenth Street, N.W.
Washington, DC 20005
Tel. (202) 639-6000
Fax (202) 639-6066

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

                Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

                Defendants.               /

Case No: 02:05-cv-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

### PROOF OF SERVICE

      Kimberly Jarvis certifies that she is an employee of Bodman LLP, that on September 26, 2005 she caused to be served a copy of  **Plaintiffs' Motion for a Preliminary Injunction, Memorandum in Support of Motion for a Preliminary Injunction, Appendix to Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Notice of Filing Exhibits in the Traditional Manner** and this Proof of Service upon the person(s) listed below via **Hand Delivery** upon:

Denise C. Barton, Esq.
Assistant Attorney General
Department of Attorney General
525 W. Ottawa Street, Floor 5
Lansing, Michigan 48909

  Jeffrey Caminsky, Esq.
Timothy A. Baughman, Esq.
Assistant Prosecuting Attorney
Wayne County
1441 St. Antoine St., Room 1200
Detroit, Michigan 48226

      I declare under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

                                  Kimberly Jarvis