# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE )
ASSOCIATION, VIDEO SOFTWARE )
DEALERS ASSOCIATION, and )
MICHIGAN RETAILERS )
ASSOCIATION, )
        )
    Plaintiffs, )
        )                Case No: 05-73634
    vs. )
        )
JENNIFER M. GRANHOLM, in her )
official capacity as Governor of the State of )
Michigan; MICHAEL A. COX, in his )
official capacity as Attorney General of the )
State of Michigan; and KYM L. WORTHY )
in her official capacity as Wayne County )
Prosecuting Attorney, )
        )
    Defendants. )

## DECLARATION OF CROSSAN R. ANDERSEN

Pursuant to 28 U.S.C. § 1746, I, Crossan R. Andersen, under penalty of perjury state as follows:

1. I am employed as President of the Video Software Dealers Association (hereafter, "VSDA" or "the Association") and have been so employed since January 1999. I previously served VSDA as its Senior Vice President and General Counsel and began my employment with VSDA in July 1995. VSDA's principal offices are located in Los Angeles, California, where I reside.

2. I have previously served as a Trial Attorney for the United States Department of Justice, Antitrust Division (1971-1980), and as an Assistant United States Attorney for the

Central District of California (1980-1988). During the period 1988 to July 1995, I was employed as counsel to the Motion Picture Association of America.

3. The VSDA was established in 1981 as a not-for-profit trade association for the home entertainment industry. The Association represents more than 1,000 companies throughout the United States, Canada, and other nations. Its members operate thousands of retail outlets in the United States that sell and/or rent DVDs, VHS cassettes, and console video games. VSDA's membership comprises the full spectrum of movie video and video game retailers (from single-store retailers to large chains), video distributors, the home video divisions of major and independent motion picture studios, and other related businesses that constitute and support the home video entertainment industry. Membership of the Association includes a number of retailers and retail stores that sell or rent console video games within the State of Michigan and within the Eastern District of Michigan. As explained more fully below, these VSDA members would have standing in this matter to seek judicial relief in their own right.

4. As President of VSDA, I am called upon to represent VSDA and the retailing of home entertainment, including console video games and other packaged video products. This regularly includes representation in consumer and trade media, at conventions and other trade events and before federal and state governments and international trade organizations. I have personal knowledge of the facts stated in this declaration.

5. In my capacity as President of VSDA, I have remained informed concerning the issues and process concerning the recently enacted Michigan Public Act 108 (the "Act"), which is due to take effect on December 1, 2005. The Act imposes civil penalties on retailers of video games, including many of VSDA's members, for selling, renting, and exhibiting to persons under age 17 what the Act defines as an "ultra-violent explicit video game that is harmful to

minors," Act, pt. II § 17, and even appears to prohibit the display of the physical product and its packaging on retail shelves accessible to persons under age 17, *id.* § 16(f).

6. I have been involved in attempting to determine what the Act means and what VSDA's members must do to be in compliance with the Act. In this regard, I have worked with VSDA members directly, including members in the Eastern District of Michigan, many of whom fear prosecution by State and County officials based on the Act's prohibitions.

7. In order for VSDA's members to comply with the Act, they must review their present inventories and attempt to determine which video game titles might come within the coverage of the definition in the Act of "an ultra-violent explicit video game that is harmful to minors." Moreover, retailers and distributors must make guesses about the content of video games not yet released but which, by custom and trade practice, are ordered in advance of the release of the game. In internal consultations among VSDA's leadership and members, it has become apparent that no consensus exists or could reasonably be deduced as to the scope of this definition's reach and no clear criteria in the Act provide a useful guide to the decision-making called for by the Act.

8. In particular, while the VSDA and its member retailers and distributors can try to guess which video games might be covered by the Act, it is impossible for VSDA's members to determine with any degree of certainty whether any number of the titles in their inventories are covered by the Act's definition of "an ultra-violent explicit video game that is harmful to minors" because, in the context of virtual depictions featured in most games, the language used in the act to define "ultra-violent explicit video game" and "harmful to minors" are vague and without definite meaning.

9. A game is defined in the Act as "an ultra-violent explicit video game" if it "continually and repetitively depicts extreme and loathsome violence." Act, pt. II § 16(l). "Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture." *Id.* § 16(g). In the context of video games, where all depictions are computer generated and animated, and by their nature fictionalized, the meaning of terms such as "graphic", "cruelty", "disfigurement", and "torture", among others, are difficult or impossible to know, and even "death" is an ephemeral concept in the world of video games. Many games currently in retailers' and distributors' inventories allow a player to engage in combat with a human form, wherein they may knock down the computer-generated form and soon thereafter advance beyond the depiction of the downed combatant. In such cases, there is no reasonable way for a retailer or distributor to determine whether a "death" is depicted. Likewise, the terms "murder" and "criminal sexual conduct" are legal terms that are difficult for VSDA's members to apply when dealing with animated characters.

10. In addition, the meaning of "parties who realistically appear to be human beings" as that term is used in the Act's definition of "extreme and loathsome violence" is without definite meaning. Combatants, including the player's fictional character and the opponent, in many games are more or less mythological, often possessed with "powers" not possessed by humans. There is no reasonable way for VSDA and its members to determine whether a depiction in a computer game involves "parties who realistically appear to be human beings,"

4

particularly given that many video games include animated, extra-terrestrial, and fantasized "human" forms with superhuman powers.

11.     The Act restricts games that depict "extreme and loathsome violence" "continually and repetitively." *Id.* § 16(l). As with the other definitional terms, it would be difficult for retailers to decipher and apply the term "continually and repetitively" in the context of video games. Many video game are complex, non-linear, multi-layered narratives. Retailers are unclear how to interpret "continually and repetitively" in the context of video games, whether it applies to each "chapter" of the game, each "level," an unstated length of time or period of play (which will vary from player to player), or the game in its entirety and how to determine if it applies in a story that may literally be told dozens of different ways.

12.     Under the Act, an "ultra-violent explicit video game" is "harmful to minors" if it is "patently offensive to contemporary local community standards of adults as to what is suitable for minors," lacks value for minors, and "appeals to the morbid interest in asocial, aggressive behavior of minors." *Id.* § 16(h). Retailers do not know how to identify "local community standards" regarding depictions of violence. In the context of fictionalized actions by unreal characters, retailers' experience is that adults have widely differing views on what depictions of violence are inappropriate for minors and there is no broad consensus on which they can rely which they can use as a guide for avoiding liability under the Act. Moreover, it would be expensive and burdensome for retailers to be required to conduct studies or tests to develop empirical evidence of such local community standards, if any existed, as to what fictional depictions of violence are suitable for minors. Instead of bearing this cost, most retailers likely would decide not to stock any games with violent content, absent any guide for avoiding liability under the Act.

5

13.     The definition of "morbid interest in asocial, aggressive behavior" in Section 16(k) of the Act provides no clarity to retailers. "A morbid interest in committing uncontrolled aggression against an individual" does not provide any objective guidance as to how the phrase is to be interpreted.

14.     Ultimately, VSDA's members will be unable to determine with any certainty whether each individual game may be sold, rented, or displayed to a person under the age of 17. This is so not only because of the Act's vague terms, but also because video games often contain more than 50 hours of game play, much of which is non-linear or accessible only to advanced game players. Thus, unlike a movie, which can be viewed in its entirety by a retailer or distributor, most video games are not susceptible to such review by retailers.

15.     The Act's restrictions are inconsistent with current video game ratings and retailers' established voluntary business practices designed to guide and assist parents to make informed choices about the what content is appropriate for the maturity and sophistication of their children. VSDA has long supported widespread use of the rating system of the Entertainment Software Rating Board (ESRB), encouraging all retailers to use it (by voluntarily choosing to not rent or sell "Adults Only"-rated games to minors at all, and only to provide minors with "Mature"-rated games with parental consent), and to display prominently consumer information concerning the ESRB rating in their stores. VSDA and its members encourage the public to use the rating and content descriptors assigned by the ESRB as an aid in determining whether a particular game is appropriate for them or a family member. VSDA and its members have together invested thousands of dollars developing awareness of the ESRB rating system and seeking its acceptance by consumers as a useful guide, attempting to give it the same level of public awareness and acceptance as is enjoyed by the familiar Motion Picture Association of

America's ratings for motion pictures. The Act's absolute restriction on the sale of some video games to minors compels retailers to act in a manner inconsistent with the fundamental message they seek to advance to parents: "inform yourself concerning and use the ESRB rating and content descriptors."

16. The affirmative defenses provided in the Act do not reduce the burden the Act imposes on retailers. The affirmative defenses are available to retailers and their employees only if they enforce "a rating system established by the pertinent entertainment industry that does not conflict with this part." Act, pt. II § 23 (emphasis added). Given the vague definitions of the Act, some games designated as "T (Teen)", which the ESRB system indicates "may be suitable for persons age 13 or older" conceivably could meet the Act's definition of "an ultra-violent explicit video game that is harmful to minors," which are not to be made available to persons under age 17. Because it is highly likely that some ratings of the Entertainment Software Rating Board will in fact conflict with the determinations of the state of Michigan regarding what is appropriate for individuals age 13-16, the affirmative defense will be unavailable to retailers and their employees. Additionally, it is arguable that because enforcement of the ESRB ratings is voluntary and the restrictions imposed by the Act are mandatory, the two systems fundamentally conflict.

17. The Act also provides substantial criminal penalties for a person with "managerial responsibility" to "knowingly permit[]" an unsupervised minor to play or view the playing of a covered video game." Act, pt. II § 20. Many retailers offer customers the opportunity to play sample segments of video games and otherwise provide "previews" of various games in their stores. Because the meaning of the term "knowingly permit[]" is not defined in the Act, retailers will likely either stop permitting game play and exhibiting previews in their stores or will be

7

obliged to employ clerks to ensure that minors neither play, nor linger near, any of the preview stations. Retailers will be obliged to prohibit exposure to covered games even if no "explicit" "ultra-violent" action is contained in the preview or can be played in the store, because the Act exposes persons with "managerial responsibility" to criminal sanctions (including imprisonment) for allowing a minor to play or view "an ultra-violent explicit video game that is harmful to minors." To avoid risking arrest and jail time, retailers would have to constantly monitor preview stations and, where appropriate, check their customers' identification in the area in which a preview may be played or exhibited. To avoid this expense and burden, retailers may forgo the use of play stations and previews of game footage, even though no ultra–violent explicit content is available for viewing.

18.  The Act's restrictions on the "display" of "ultra-violent video games" that are "harmful to minors" will also impact the relationship between retailers and their adult customers. The restrictions essentially either preclude retailers from previewing video games for their adult customers or require them to establish separate "adults-only" viewing booths for the preview of games. As noted above, retailers are unable to discern with any certainty which video games are subject to this prohibition, and they cannot limit who can view what is on a monitor in their store, open to the public at large. The alternatives to ceasing in-store previews – establishing "adults-only" viewing booths or closing the store to persons under 17 years of age or – would carry the stigma associated with adults-only stores and with private viewing booths for pornographic videos. Rather than establish private viewing booths, retailers are likely to forgo the use of previews of game footage, even though no ultra–violent explicit content is included in the previews. The Act would therefore chill the ability of both retailers and publishers to have their speech (the game previews) reach willing recipients, including adults.

19. The Act's inclusion of certain affirmative defenses for those with "managerial responsibility" will not diminish the harm that retailers will suffer through enforcement of the Act. A store manager may assert an affirmative defense to a violation of the Act if, at the time of the alleged violation, the business had a policy requiring employees to comply with the relevant rating system, trained its employees on the policy, and enforced the policy. Act, pt. II § 23(2). But compliance with these requirements, even if it benefited the manager, would not absolve store clerks of liability. Instead, a manager relying on this affirmative defense would merely shift the exposure of liability from store managers to store clerks. Store clerks, in contrast, would be exposed to liability for selling or renting to a 16 year-old (with knowledge of the customer's age) a covered game which was rated "T" by the ESRB, even though the sales clerk would otherwise be in compliance with the ESRB rating system. Moreover, the Act provides no guidance regarding what it means to train employees on the appropriate policy or the level of actions managers must take in order to "enforce" that policy. To ensure against personal exposure to criminal prosecution, managers may take excessive stances as to what constitutes "enforcement" of the ratings policy, which could lead to unnecessary discipline – and even termination – of employees. To avoid termination or discipline, store clerks may prohibit the sale or rental of T-rated games to 16 year-olds, even if most of the games did not meet the Act's definition of an ultra-violent explicit video game.

20. VSDA members operating stores in Michigan are concerned that designating as "an ultra-violent explicit video game that is harmful to minors" every game covered by the broad and vague language of the Act will create such stigma that M-rated, T-rated, or even lower-rated games so designated will no longer be perceived as products that simply contain material some parents might find unsuitable for their children (like R-rated or PG-13-rated movies), but will

instead be treated as though they were products actually harmful to minors – or even pornography. Indeed, some adult consumers, wary of owning, renting or being seen to possess "explicit" or "harmful to minors" products, will be chilled in their efforts to acquire it. Because of the serious liability visited upon retailers for failing to guess correctly as to scope of the definition of "an ultra-violent explicit video game that is harmful to minors," retailers in Michigan would have no choice but to carve out a broad zone of protection and sweep into the category video games they do not reasonably believe any parent would object to, but which nevertheless might fit a prosecutor's interpretation of Section 17 of the Act.

21.     The negative stigma associated with a video game that would be designated as "an ultra-violent explicit video game that is harmful to minors" is compounded by the apparent prohibition on retailers even displaying the physical media and packaging containing such games to persons under age 17. The prohibition on dissemination of games covered by the Act includes "allow[ing] to examine" (Sec. 16(F)). Thus, retailers would be required to segregate covered games in separate areas of their stores inaccessible to persons under age 17, just as they would be required to segregate sexually oriented material that is obscene for minors.

22.     As a rule, many video retailers in Michigan who rent video games do so under contractual agreements they enter into with their adult customers. Under these agreements, the adult customer may designate other family members, including their children, as authorized by the parent to rent movies or games using the parent's account. Many of these contracts allow the parent to designate, for each child authorized to rent, what ratings limitations, if any, the parent chooses to place on the child. The Act burdens retailers and their customers (who are consenting parents under these agreements) by obligating the retailer to disregard the parent's wishes and

instead restrict their children's access to materials designated as "an ultra-violent explicit video game that is harmful to minors" by the state.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on September 23, 2005.

_____
Crossan R. Andersen