UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE )
ASSOCIATION, VIDEO SOFTWARE )
DEALERS ASSOCIATION, and )
MICHIGAN RETAILERS )
ASSOCIATION, )
 )
    Plaintiffs, )
 )
vs. ) No. CA 05-73634
 )
JENNIFER M. GRANHOLM, in her )
official capacity as Governor of the State of )
Michigan; MICHAEL A. COX, in his )
official capacity as Attorney General of the )
State of Michigan; and KYM L. WORTHY )
in her official capacity as Wayne County )
Prosecuting Attorney, )
 )
    Defendants. )

### DECLARATION OF DOUGLAS LOWENSTEIN

Pursuant to 28 U.S.C. § 1746, I, Douglas Lowenstein under penalty of perjury state as follows:

1. I am currently employed as President of the Entertainment Software Association ("ESA"). I have been the President of the ESA (formerly known as the Interactive Digital Software Association) since June of 1994.

2. The ESA is the only United States trade association exclusively dedicated to serve and promote the business and public affairs interests of companies that publish entertainment software used for video game consoles (such as Nintendo GameCube, Microsoft Xbox, and Sony Playstation 2), personal computers, wireless, and the Internet. One such interest that the ESA promotes is these companies' right to publish and distribute works of expression that are protected under the First Amendment to the United States Constitution. The ESA's membership

includes a number of entities that distribute and/or supply video games and related software to owners and operators of sales and rental outlets within the State of Michigan.

3. As a result of my duties as President of the ESA, I have personal knowledge of the facts stated in this declaration.

**The ESRB Rating System**

4. The Entertainment Software Rating Board ("ESRB") is a self-regulatory body established by the ESA to rate independently the content of interactive entertainment software for all platforms.

5. In 1994, the ESRB created a rating system for computer and video games. In a September 2000 report, the Federal Trade Commission ("FTC") called the ESRB rating system the "most comprehensive" of industry-wide media rating systems. See http://www.ftc.gov/reports/violence/vioreport.pdf ("FTC Report") at 37. Senator Joe Lieberman has called the ESRB system a model for other entertainment industries to follow.

6. The ESRB rating system was created as part of the industry's commitment to empower parents and other consumers to make informed decisions based on the general content and nature of games that they may buy, rent, or play. The rating system was designed to provide credible, reliable, and easily understood information about games to consumers. Like the movie rating system, the ESRB rating system is entirely voluntary; neither the ESA nor the ESRB requires video game publishers to submit their games to the ESRB for review, even though nearly all such publishers do so. The ESA is not, and has never been, involved directly or indirectly in the issuance of ratings by the ESRB, or in the ESRB's interpretations of its own rating guidelines. The ESRB is funded in part by fees that it charges companies, which submit products to the ESRB for ratings.

7.  The purpose of the ESRB rating system is to give parents and consumers information about the content of interactive entertainment software products so that they can make informed purchase and rental decisions. Although the rating system provides guidance to consumers on whether content is appropriate for certain age groups, it is not intended to supplant parents' and/or consumers' own judgments. For any given game, the rating system offers both: (i) an actual rating in one of six categories for age appropriateness of content; and (ii) short descriptive phrases called "content descriptors" that give additional information about a game's content. A copy of the ESRB's rating system, including both the rating categories and the glossary of content descriptors, is attached as Exhibit A.

8.  Under the ESRB system, games designated "EC" (Early Childhood) contain content that may be suitable for users age 3 and older, games designated "E" (Everyone) contain content that may be suitable for users age 6 and older, games designated "E10+" (Everyone Ten and Older) contain content that may be suitable for users age 10 and older, games designated "T" (Teen) contain content that may be suitable for users age 13 and older, games designated "M" (Mature) contain content that may be suitable for users age 17 and older, and games designated "AO" (Adults Only) contain content that the ESRB suggests should only be played by users 18 and older.

9.  The ESRB rating system is dynamic, and is responsive to changes in the marketplace and to feedback from parents and consumers. For example, the ESRB recently amended its rating system to add the new "E10+" rating, after consultations with academics and child development experts.

10. The ESRB also assists video game publishers and retailers in educating parents and other consumers about video games. Among other things, the ESRB makes available to

retailers – for example, via its website – standardized artwork for in-store signage and circulars that provide full and complete information about the rating system. Similarly, ESRB makes available to video game publishers standardized graphics for video game packaging, including the trademarked ESRB rating symbols and content descriptors, as well as labels alerting consumers to "check the ratings." The value of these materials as an educational tool for parents is particularly important, as the FTC has found that parents are involved in 83% of video game purchases for minors. See FTC Report at 42.

**The Michigan Statute**

11. In my capacity as President of the ESA, I have remained informed about the issues and processes concerning the recently enacted Michigan Public Law 108 (the "Act"), which was enacted into law on September 14, 2005. The Act is due to take effect on December 1, 2005.

12. The challenged provisions of the Act seek to censor expression in the video game medium because of the perceived effect of this expression on minors under the age of 17. Specifically, the Act imposes civil fines ranging up to $40,000 on a person who "knowingly disseminate[s] to a minor an ultra-violent explicit video game that is harmful to minors." Act, pt. II, § 17. The Act also provides misdemeanor criminal penalties of up to 93 days in prison, a fine of $25,000, or both, for store managers who permit a minor to play or review the playing of a prohibited video game. Act, pt. II. § 20. "Ultra-violent explicit video games" under the Act are those that "continually and repetitively depict[] extreme and loathsome violence." *Id.*, § 16(i). "Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture." *Id.* § 16(g).

4

13. Some of the content displayed by the video games created, published, distributed, and/or made available to the public by the ESA's members may be deemed by law enforcement officials in the State of Michigan to meet the statutory definitions of an "ultra-violent explicit video game." Should the Act take effect, some retail establishments will likely sell or rent fewer copies of certain games because those games can no longer be sold or rented to minors under the Act, while other retailers may choose not to stock some games altogether -- for adults or children -- for fear of being subjected to the penalty for selling games that may be deemed covered by the Act to individuals under age 17. In either case, because the Act restricts the sale of ESA members' products, it will prevent the expression of ESA members from reaching a wide range of willing recipients.

14. The Act will also restrict the display in stores of the "play previews" (short game segments that allow consumers to sample a video game before purchasing) and videotaped game footage that are offered in many stores. The Act imposes stiff penalties on a store manager for allowing an unaccompanied minor to play or view the playing of a prohibited video game in the store. If the Act is allowed to go into effect, retail establishments may likely decline to offer "play previews" or display videotaped game footage. As a result, the Act will have the effect of preventing the expression of ESA members from reaching willing recipients, including adult consumers. If retailers do continue to permit game previews, store clerks will be forced to constantly monitor the preview stations to ensure against violation of the Act.

15. Anticipating the Act's impact on the ESA members' First Amendment rights, the ESA offered to work with the Michigan Legislature prior to the passage of the Act to implement less speech-restrictive, constitutional means of achieving the Legislature's goals. To that end, the ESA provided testimony and materials to the Michigan Senate Judiciary Committee and

House Judiciary Committee explaining that the Act was unconstitutional because it infringed on individuals' First Amendment rights. The ESA also explained that the ESRB ratings system provides a reliable, independent guide for parents and consumers to determine whether they find particular video games suitable for children. ESA representatives also described the efforts the industry has undertaken to educate parents and other consumers about video games and the ESRB rating system. Educating parents and the public about the ESRB rating system would be an alternative means of achieving the Legislature's goals, for, as the FTC has found, parents are involved in 83% of video game purchases for minors. See FTC Report at 42. The ESA communicated a similar message to Governor Granholm.

16.   Both the Legislature and the Governor rejected these offers to work together with the ESA and members of the video game industry, and failed to give adequate consideration to less speech-restrictive alternatives – such as educational campaigns – to the Act's absolute prohibitions. Although informed of the Act's constitutional failings, the Legislature and the Governor nonetheless chose to enact the Act into law, rather than to explore less speech-restrictive means of achieving their goal of preventing certain computer and video games from being viewed by minors.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on September 26, 2005.

Douglas Lowenstein