UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION ,

                Plaintiffs,

v

JENNIFER GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General for the State of Michigan, et
al, and KYM L. WORTHY, in her official
capacity as Wayne County Prosecuting
Attorney,

                Defendants.

No. 05-73634

HON. GEORGE CARAM STEEH
MAGISTRATE JUDGE PEPE

Dennis J. Levasseur (P39778)
Alicia J. Blumenfeld (P67511)
Bodman LLP
100 Renaissance Center
Detroit MI 48243
(313) 393-7596

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
Jenner & Block LLP
601 Thirteenth Street, NW, Ste 1200
Washington DC 20005
(202) 639-6000

Denise C. Barton (P41535)
Ann Sherman (P67762)
Jason Evans (P61567)
Attorney for Defendants
Michigan Department of Attorney General
Public Employment, Elections & Tort Div.
P.O. Box 30736
Lansing MI 48909
(517) 373-6434

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## CONCISE STATEMENT OF ISSUES PRESENTED

I.    A preliminary injunction should issue only if Plaintiffs are likely to succeed on the merits and the equities weigh in their favor.  Here, Plaintiffs are not likely to succeed on the merits because the Act meets the strict scrutiny standard:  the legislative record evidences a causal link between ultra-violent explicit video games and harm to minors sufficient to demonstrate that the State of Michigan has a compelling interest in regulating minors' access to these videos, and the Act is narrowly tailored to meet the State's compelling interest.  Additionally, the equities do not weigh in Plaintiffs' favor.  A preliminary injunction, therefore, should not issue.

## CONTROLLING AUTHORITY

*American Amusement Machine Association v Kendrick*, 244 F3d 572, 579 (7th Cir, 2001)

*Athenaco v Mike Cox*, USDC-ED, No 02-75049 (September 2, 2004) (unpublished decision )

*Cross Mt Coal v Ward*, 93 F3d 211, 217 (6th Cir, 1996)

*Eddings v Oklahoma*, 455 US 104, 115-116 &  11;  102 S Ct 869; 71 L Ed 2d 1 (1982)

*Ginsberg v New York*, 390 US 629, 639; 89 S Ct 1274; 20 L Ed 2d 195 (1968)

*Interactive Digital Software Ass'n v St Louis County*, 329 F3d 954, 957 (8th Cir, 2003)

*James v Meow Media, Inc*, 300 F3d 683, 696 (6th Cir, 2002)

*Miller v California*, 413 US 15; 93 S Ct 2607; 37 L Ed 419 (1973)

*Mut Ins Co of Am v Royal Appliance Mfr Co*, 2004 US App LEXIS 17805 (6th Cir, 2004 (unpublished decision)

*Roper v Simmons*, ___U.S. ___, 125 S Ct 1183, 1195; 161 L Ed 2d 1 (2005)

*Sable Communic of California, Inc v FCC*, 492 US 115, 126; 109 S Ct 2829; 106 L Ed 93 (1989)

*US v Petrillo*, 332 US 1, 7; 67 S CT 1538; 91 L Ed 1877 (1947)

*Video Software Dealers Ass'n v Maleng*, 325 F Supp 2d 1180, 1186 (W.D. Wash 2004)

## STATEMENT OF THE FACTS

2005 Public Act 109 ("P.A. 108" or "the Act") was signed into law on September 14, 2005 and is due to go into effect on December 1, 2005.  The act prohibits the dissemination, exhibiting, or display of certain sexually explicit and ultra-violent explicit video games to minors, and provides civil penalties and sanctions against those who violate the Act.

The Act contains two parts:  Part I deals exclusively with sexually explicit matter; Part II deals exclusively with ultra-violent explicit video games.  Part II states that, in light of the public health and the general welfare of Michigan citizens, the Legislature finds that:  (1) ultra-violent explicit video games are harmful to minors because minors who play them are more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression; (2) there is a causal connection between media violence and aggressive behavior in some children, and that the effects of media violence are "measurable and long-lasting;" and, (3) that minors are capable of purchasing, and do purchase, ultra-violent explicit video games.  (Legislative History, Appendix (Appendix) 4, Enrolled Senate Bill No. 416, Part II, Sec 15(a)-(c), p. 3).[1]  The Legislature based these findings on substantial amounts of public research, testimony from spokespersons for at least six major health associations, and testimony of law enforcement officers.  (Appendix 4, Part II, Sec 15(a)-(c), p 3 and generally, Appendix).

The Legislature articulated three legitimate and compelling interests justifying the Act:  (1) safeguarding both the physical and psychological well-being of minors; (2) preventing violent, aggressive, and asocial behavior from manifesting itself in minors; and (3) directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games.  (Appendix 4, Part II, Sec 15(e)-(g)).

---

[1] At the direction of the Court, the entire legislative history has not been filed.

Plaintiffs in this action are Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA")—associations whose members include companies that create, publish, distribute, sell, rent, or make video games available to the public. Plaintiffs have filed their five-count Complaint against two State officials, Governor Jennifer M. Granholm and Attorney General Michael A. Cox, and one county official, Wayne County Prosecuting Attorney Kym L. Worthy.

Count I of Plaintiffs' Complaint alleges that the Act violates the free expression guaranteed by the First Amendment of the United States Constitution because video games are fully protected speech. Plaintiffs also allege that the Act does not support a compelling State interest in preventing harm to minors or to society because there is no causal connection between exposure to video games and violent behavior, and the Act is not narrowly tailored to serve the State's compelling interest.

Count II of the Complaint alleges that the Act is unconstitutionally vague because it fails to provide standards for determining which video games contain illegal content, and imposes an unconstitutional censorship scheme under the First and Fourteenth Amendment against creators, distributors, retailers, and publishers of video games, as well as purchasers, renters, and other players of these games.

Count II alleges that the Act violates the equal protection clause of the Fourteenth Amendment of the United States Constitution because it arbitrarily and irrationally restricts works of expression presented through the medium of video games and does not apply to other works of expression containing the same or similar content, such as cable television, broadcast television, movies, books, and magazines.

Count IV alleges that the Act's use of the rating system established by the entertainment industry impermissibly delegates legislative authority to a private organization in violation of the

due process clause of the Fourteenth Amendment of the United States Constitution.  Count V of

the Act alleges that the actions by the Defendants violate federal law under 42 USC § 1983.

## INTRODUCTION

Responding to a public outcry over the proliferation of violent video games to children throughout the State of Michigan, the Michigan State Legislature held hearings and considered the harm to children from exposure to these video games.  After considering extensive research and extensive testimony from experts and community leaders, 2005 Public Act 108 (Mich 2005) ("the Act") was signed into law on September 14, 2005.  The Act was supported by both conservatives and liberals, Democrats and Republicans, and passed by an overwhelming majority.

The Act is due to take effect on December 1, 2005.  The Act consists of two parts:  Part I relates to sexually explicit video games, and Part II relates to ultra-violent explicit video games.  Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA") and Michigan Retailers Association ("MRA") seek a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing Part II of the Act.

The Act should not be enjoined because Plaintiffs are not likely to prevail on their claims.  Nor do the equities weigh strongly in favor of an injunction.

Plaintiffs rely heavily on what they refer to as "controlling law" to demonstrate their likelihood of success on the merits.  (Plaintiffs' Motion for Preliminary Injunction, p. 1.)[2]  The decisions from the Seventh and Eighth Circuits are not, however, binding on this Court.  Moreover, the record in this case is far more complete and compelling than that submitted in either the *Interactive Digital Software Ass'n* v *St. Louis County*[3] or *American Amusement*

---

[2] *Cross Mt Coal v Ward*, 93 F3d 211, 217 (6th Cir, 1996) (decisions of other circuits are entitled to respect but are not binding).
[3] *Interactive Digital Software Ass'n v St Louis County*, 329 F3d 954, 957 (8th Cir, 2003).

4

*Machine Association v Kendrick*[4] cases.  The only case law that binds this Court is the Sixth

Circuit's decision in *James v Meow Media, Inc*., holding that the expressive content of video

games is protected by the First Amendment.[5]  Even there, the Court dealt only with the question

of whether First Amendment protection could be extended to video games in the context of a tort

action; thus, the Court had no need to analyze what type of record would support a State's

compelling interest in regulating expressive speech.[6]  Moreover, the Court limited its holding to

the narrow facts of that case.[7]  The strong record in this case documents a causal connection

between ultra-violent explicit video games and harm to minors, and therefore, supports he State's

compelling interest in regulating minors' access to these videos.

---

[4] *American Amusement Machine Association v Kendrick*, 244 F3d 572, 579 (7th Cir, 2001).

[5] *James v Meow Media, Inc*, 300 F3d 683, 696 (6th Cir, 2002).

[6] *James*, 300 F3d at 695-696.

[7] *James*, 300 F3d at 696.

## ARGUMENT

This Court must consider four factors in determining whether to issue a preliminary injunction: (1) the plaintiffs' likelihood of success on the merits; (2) whether the plaintiffs may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction upon the public interest.[8] Although the Court must balance these four factors, plaintiffs must always demonstrate irreparable injury in order for a preliminary injunction to issue.[9] The extent to which a party must demonstrate a substantial likelihood of success generally varies inversely with the degree of harm the party will suffer absent an injunction.[10] A preliminary injunction will not issue unless plaintiffs' right to relief is clear.[11]

Plaintiffs fail to meet this standard. They have not demonstrated a likelihood of success on the merits because Defendants cite sufficient evidence to demonstrate that the State has a compelling interest in protecting its minor citizens from the negative effects of ultra-violent explicit video games. Additionally, Plaintiffs have not demonstrated that the equities weigh in their favor.

**I.    Plaintiffs are not likely to succeed on the merits because the record supports the State of Michigan's compelling interest in restricting minors' access to ultra-violent video games, the Act advances that interest, and is narrowly tailed to meet that interest.**

Plaintiffs attempt to focus this Court on previous case law striking down violent video game legislation as unconstitutional because it did not meet the compelling interest standard. Those prior decisions involved case-specific determinations based on evidence that was far less

---

[8] *Dixie Fuel Co v Comm'r of Soc Sec*, 171 F3d 1052, 1059-60 (6th Cir, 1999) (*citing Connection Distrib Co v Reno*, 154 F3d 281, 288 (6th Cir, 1998).
[9] *Neveux*, 921 F Supp 1568, 1570-71 (E.D. Mich 1996).
[10] *Neveux*, 921 F Supp at 1571.
[11] *Neveux*, 921 F Supp at 1571 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v Grall*, 836 F Supp 428, 432 (W.D. Mich 1993)).

developed than the evidence before this Court.  As video games grow ever-more realistic, more violently graphic, and increasingly popular with minors, brain science and social science also evolve.  This growing research documents the harmful effects of ultra-violent explicit videos on minors, and thus supports the State's compelling interest in restricting minors' access to these video games.

Scientific studies now show a demonstrable neurophysiological effect of violent video games on the brains of children, and thus, on their behavioral development.  A wide variety of social science studies have determined that exposure to violent video games increases aggressive behavior, thinking, and emotions, and negative physiological arousal, while simultaneously decreasing prosocial behavior.  (See, e.g., Appendix 10 EEE, Craig A. Anderson, *Violent Video Games and Aggressive Thoughts, Feelings, and Behaviors*, Ch 6, Children in the Digital Age, p 104,).  Moreover, the United States Supreme Court recently acknowledged research that documents the developmental differences between adults and minors.[12]  Additionally, tangible evidence from Michigan law enforcement links the playing of violent video games to real-life harms within the State.  (Appendix 10 GGG).

A.    **Michigan's Violent Video Games Statute satisfies the First Amendment because the State has a compelling interest in protecting minors.**

Although some courts have held that video games constitute expression,[13] the issue is not as clear-cut as Plaintiffs would have this Court believe.  The Sixth Circuit's opinion in *James v Meow Media, Inc,*— the only opinion binding on this court—recognized that extending First Amendment protection to video games "presents some thorny issues" because they include expressive as well as non-expressive features.[14]  The Court conceded that the manner in which the player controls the game is not "particularly communicative" but attached First Amendment

---

[12] *Roper v Simmons*, ___U.S. ___, 125 S Ct 1183, 1195; 161 L Ed 2d 1 (2005).
[13] *Kendrick*, 244 F3d 572, 579-80; *Interactive,* 329 F3d at 957.

protection to videos where plaintiffs' tort claim was that the video games "communicated to [the player] a disregard for human life and an endorsement of violence."[15]  The Sixth Circuit, therefore, has signaled that whether video games are protected speech under the First Amendment depends on the framing of the resulting harm.

Here, the Act's interest in "safeguarding both the physical and psychological well-being of minors", and "preventing violent, aggressive, and asocial behavior from manifesting itself in minors"[16] encompasses harms that stem from the video game player's mere functional act of maneuvering a control and thereby murdering, decapitating, mutilating, maiming, disfiguring or inflicting cruelty on parties who realistically appear to be human beings—totally apart from any expressive element contained in the video.  Even if this Court applies a strict scrutiny standard, however, the State can prove a compelling interest.

The Government may regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.[17]  "Federal courts have repeatedly recognized that the State has a legitimate and compelling interest in safeguarding both the physical and psychological well-being of minors."[18] The United States Supreme Court has recognized that "the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."[19] The Supreme Court has also acknowledged that "[t]he State also has an independent interest in the well-being of its youth."[20]  In recognition of these two important concerns, the Court has stated that "[t]he government's interest in the well-being of its youth and in supporting parents'

---

[14] *James*, 300 F3d at 696.
[15] *James*, 300 F3d at 696.
[16] Senate Bill No. 416, Part II, Sec. 15(e)-(g).
[17] *Sable Communic of California, Inc v FCC*, 492 US 115, 126; 109 S Ct 2829; 106 L Ed 93 (1989).
[18] *Video Software Dealers Ass'n v Maleng*, 325 F Supp 2d 1180, 1186 (W.D. Wash 2004).
[19] *Ginsberg v New York*, 390 US 629, 639; 89 S Ct 1274; 20 L Ed 2d 195 (1968).

claim to authority in their own household justif[y] the regulation of otherwise protected expression."[21]

The Seventh Circuit in *American Amusement Machine Ass'n v Kendrick*, even while it found the record insufficient to demonstrate a causal connection between violent video games and minors' commission of violent acts, left the door open to a justification based on the welfare of the game-playing child.[22]  That Court stated that "[t]he studies do not find that video games have ever caused anyone to commit a violent act, <u>as opposed to feeling aggressive</u>."[23]  That Court specifically recognized that one such concern would be the potential psychological harm to children of being exposed to violent images, a concern "unrelated to the broader societal concern with violence that was the primary motivation for the ordinance.[24]

In this case, the Act can be upheld because Michigan's legislature has "drawn reasonable inferences based on substantial evidence."[25]  The question is not whether the State was correct, since drawing two inconsistent conclusions from the evidence does not preclude a legislative finding that is supported by substantial evidence.[26]

The substantial physiological and social science evidence considered by the Michigan Legislature prior to passage of Bill 416 amply documents the negative effects of violent video games on the brain function and behavior of minors.  The State of Michigan's interest in the well-being of its youth, and the State's recognition that decisions such as whether a minor has

---

[20] *Ginsberg*, 390 US at 640.
[21] *FCC v Pacifica Found*, 438 US 726, 749 (1978).
[22] *Kendrick*, 244 F3d at 575 (7th Cir, 2001).
[23] *Kendrick*, 244 F3d at 578-179.
[24] *Kendrick*, 244 F3d at 576.
[25] *Turner Broadcasting Sys, Inc v FCC*, 512 US 622, 666 (1994); see also, *Interactive*, 329 F3d at 959 (applying "substantial evidence standard to law regulating violent video games); *Maleng*, 326 F Supp 2d at 1187 (same).
[26] *Turner Broadcasting Sys, Inc v FCC* ("*Turner II*"), 520 US 180, 211 (1997).

access to violent video games ultimately belongs in the hands of parents, justify any limited restrictions the Act might place on speech.

Although the State's compelling interest in protecting its minors is itself sufficient to justify any restrictions on the speech of minors, the State also has a compelling interest in "directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." (Appendix 4, Senate Bill No 416, Part II, Sec 15(g)).  Based on social science research and law enforcement evidence, the Legislature made reasonable inferences that video game violence was causally linked to real-life harms in the State of Michigan.

> **1.    Juvenile brains differ from those of adults, and video games have a demonstrable neurophysiological effect on the brains of minors.**

To date, no court considering the constitutionality of violent video games has considered any substantial evidence relating to brain research and activity.

Yet, the Supreme Court has consistently recognized, as recently as its last term, that developmental differences exist between adults and minors.[27]  The Court's statements as to these differences have evolved as research has evolved.  Previously, the Court had differentiated minors from adults by reasoning that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure."[28]  In *Eddings v Oklahoma*, for example, the Court stated that "youth is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."[29]

---

[27] *Roper*, 125 S Ct at 1195.
[28] *Roper*, 125 S Ct at 1195.
[29] *Eddings v Oklahoma*, 455 US 104, 115-116 & n 11; 102 S Ct 869; 71 L Ed 2d 1 (1982).

Recently, the Court in *Roper v Simmons* noted three general differences between juveniles under eighteen and adults.[30]  First, the Court stated that a "lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions."[31]  In so concluding, the Court relied, in part, on research documenting the statistical overrepresentation of adolescents in virtually every category of reckless behavior.[32]

Second, the Court noted that "juveniles are more vulnerable or susceptible to influence and to psychological damage."[33]  The Court relied, in part, on recent research by researchers Lawrence Steinberg and Elizabeth Scott, concluding that juveniles "have less control, or less experience with control, over their own environment."[34]  Mr. Steinberg further elaborated on this point in an address before the meeting of the Society for Research in Child Development"[35]:

> In addition to their diminished decision-making capacity overall, there is good reason to speculate that adolescents are also more vulnerable than adults to . . . provocation, duress, or coercion.   Individuals whose decision-making capacity may already be compromised by immaturity are probably less able to control their aggressive impulses when provoked, to stay level-headed when stressed, or to think through the future consequences of their actions when coerced by others. We already know that adolescents are more susceptible to peer pressure than adults, especially in antisocial situations.

---

[30] *Roper*, 125 S Ct at 1195.

[31] *Roper*, 125 S Ct at 1195 (*citing Johnson v Texas*, 509 US 350, 359-362; 113 S Ct 2658; 125 L Ed 2d 290 (1993).

[32] *Roper*, 125 S Ct at 1195 (citing Arnett, *Reckless Behavior in Adolescence:  A Developmental Perspective*, 12 Developmental Review 339 (1992)).

[33] *Roper*, 125 S Ct at 1195 (citing *Eddings*, 455 US at 110-112).

[34] *Roper*, 125 S Ct at 1195 (citing Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity , Dimished Responsiblity, and the Juvenile Death Penalty*, 58 Am Psychologist 1009, 1014 (2004)).

[35] Laurence Steinberg, *Less Guilty by Reason of Adolescence:  A Developmental Perspective on Adolescence and the Law*, lecture given before the Society for Research in Child Development, April 26, 2003.

Third, the Court noted that "the character of a juvenile is not as well formed as that of an adult," and that "the personality traits of juveniles are more transitory.[36]

Finally, the Court noted that juveniles' "own vulnerability and comparative lack of control over their immediate surroundings mean [they] have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment."[37]

Significantly, in making these determinations in the context of whether the United States Constitution prohibits the execution of a juvenile under 18, the Court had access to a staggering amount of research, including testimony from leading neuropsychologists and numerous amicus curiae describing scientific findings of medical, psychiatric and psychological research on juveniles.   An amicus filed by the AMA, for example, describes recent scientific research, including that of Dorothy Lewis, M.D., a psychiatrist at Yale University's Child Study Center.[38] Lewis and her colleagues note that the frontal lobe of the brain is involved in judgment, making decisions, and putting breaks on behavior.[39]

The United States Supreme Court has been presented with similar information in other death penalty cases.  In *Patterson v State of Texas*, Ruben C. Gur, PhD, a leading neuropsychologist, presented a summary of  the process of maturation in the human brain during the juvenile period and up to young adult.[40]  Gur noted that there was a "congruence of evidence

---

[36] *Roper*, 125 S Ct at 1195 (citing ERICKSON, IDENTITY:  YOUTH AND CRISIS (1968)).

[37] *Roper*, 125 S Ct at 1195 (citing *Stanford v Kentucky*, 492 US 361; 109 S Ct 2969; 106 L Ed 2d 306 (1989)).

[38] Amicus Curie American Medical Association, filed in *Roper*, 125 S Ct at1183.

[39] Amicus Curie AMA (citing Dorothy Lewis, et al, *Neuropsychiatric, Psychoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States*, 145 Am J Psychiatry 584 (1988)).

[40] Declaration of Ruben C. Gur, Phd, on behalf of Toronto Patterson, July 29, 2002, Appendix E to Petitioner's Brief, p 3, Petition for Writ of Cert to the United States Supreme Court in *Patterson v State of Texas*, also included in Amicus Curiae brief filed by Texas Catholic Conference in support of Patterson, Court of Criminal Appeals, Austin, Texas, (Exhibit 1). Defendants cite this declaration to illustrate that brain research has long been before the courts.

indicating that brain maturation is not complete until young adulthood (about age 21)."[41]  He also

noted that the frontal lobes specifically modulate and inhibit impulse, and that "brain anatomy

date indicate that people are not biologically prepared to exercise mature frontal lobe control

until they reach adulthood."[42]

Scientists studying brain activity have long found a consistently strong relationship

between the neurophysiological process of the brain and the behavioral triggers for aggression,

fear, and self-control.  According to the National Research Council Panel on the Understanding

and Control of Violent Behavior, "[b]iological research on aggressive and violent behavior has

given particular attention to the following  . . . neurophysiological (i.e., brain wave)

abnormalities, particularly in the temporal lobe of the brain; brain dysfunctions that interfere

with language processing or cognition."[43]

The Michigan Legislature considered similar studies prior to the passage of the Act.  In

one such study, Dr. William Kronenberger and his neurophsychological team from the Indiana

University School of Medicine, indicate that media violence exposure is related to poorer

executive functioning (the ability of the individual to inhibit, regulate, direct, plan, and execute

behavior).  (Appendix 10R, William G. Kronenberger, et al, *Media Violence Exposure and

Executive Functioning in Aggressive and Control Adolescents*, Jnl of Clinical Psch, 2004).

Additional research by this team suggests that both video game and television media violence

exposure are independently related to aggression in adolescents, and that this relationship is not

explained by gender, IQ, or age. (Appendix 10S, Kronenberger, et al, *Media Violence Exposure

in Aggressive and Control Adolescents:  Differences in Self- and Parent- Reported Exposure to

Violence on Television and in Video Games,* Aggressive Behavior (2005), at 214).  This team's

---

[41] Ruben Gur declaration, p. 3.
[42] Ruben Gur declaration, p. 4.

research builds on preliminary research suggesting that areas in the frontal lobe and amygdala portions of the brain may be activated by viewing violent television and video games. (Appendix 10R).  More recent research by this team on the relation between media violence exposure and brain activation as measured by functional magnetic resonance imaging (fMRI) has suggested that media violence exposure may be associated with alterations in brain functioning.[44]

> **2.     Social science evidence demonstrates that there is a relationship between video game violence and aggressive feelings and behavior.**

In reaching its conclusion that violent video games are harmful to minors and society, the Legislature considered no fewer than 55 social science studies (See generally, Appendix to Defendants' Response to Plaintiffs' Motion for Preliminary Injunction 10A – 10FFF)[45], as well as meta-studies of hundreds of studies.[46]  Researchers in the media violence field have used a variety of research methods, including experimental studies and longitudinal studies, in testing theoretical models regarding the causal link between video game violence and aggressive feeling and behavior in minors.

The Legislature also considered the compelling position adopted by the American Medical Association, the American Pediatric Association and the American Psychological Association—that violent video games have a negative impact on minors.[47]  (Appendix 10A,

---

[43] A. Riss and J. Roth, Ed.  1993.  National Academy of Sciences/National Research Council, Understanding and Preventing Violence, National Academy Press.

[44] Vincent P Mathews, MD, et al, *Media Violence Exposure and Frontal Lobe Activation Measured by Functional Magnetic Resonance Imaging in Aggressive and Nonaggressive Adolescents*, Comput Assist Tomogr, Vol 29, Number 3, May/June 2005.  See also, Elkhonon Goldberg, *the Executive Brain:  Frontal Lobes and the Civilized Mind*, Oxford University Press (2001).

[45] At the direction of the Court Defendants have not e-filed all their exhibits.

[46] Senate Bill 416, Part II, Sec 15.

[47] Amer Acad of Pediatrics, *With Violent and Sexy Video Games Selling Fast, When Should Parents Pull the Plug*, Sacramento Bee (August 8, 2002) (finding in all but 18 of 3500 studies a connection between media violence exposure and aggressive or violent behavior).

Joint Statement on the Impact of Entertainment Violence on Children, Congressional Public Health Summit, July 26, 2000).

        **a.**        **Meta-studies support the negative effects of violent video games.**

Meta-studies, a common statistical procedure used to summarize the results of original empirical studies, have long supported the connection between media violence exposure and childhood aggression. (Appendix 10EEE, Craig A. Anderson, *Violent Video Games and Aggressive Thoughts, Feelings, and Behaviors*, Ch 6, Children in the Digital Age, p 104,). A recent meta-study supports the more specific conclusion that video games produce aggressive feelings and behavior in minors. (Appendix 10EEE, Craig A. Anderson, *Violent Video Games and Aggressive Thoughts, Feelings, and Behaviors*, 2002, at pp 104, 109).

        **b.**        **Experimental studies demonstrate that violent video games increase short-term aggressive behavior in minors.**

Experimental studies have shown that exposure to violent video games increases short-term aggressive behavior, thinking, and emotions and negative physiological arousal, while simultaneously decreasing procsosial behaviors. (Appendix 10F, Craig A. Anderson, et al, *The Influence of Media Violence on Youth*, Psychological Science in the Public Interest, Vol 4, No 3, Dec 2003, at 90-91 and the studies cited therein). One such study assessed physical aggression between boys who had just played either a violent or a nonviolent video game, demonstrating that those who played the violent video game were more physically aggressive. (Appendix 10F, at 91). Other studies have documented similarly increased short-term aggressive thoughts and responses in participants who played violent games. (Appendix 10F, at 91).

        **c.**        **Research also supports the long-term association between violent video games and aggression.**

Other studies also document the long-term effects of video game violence, demonstrating a long-term increase in aggressive behavior.

### i.    *Longitudinal studies*

A longitudinal study collects information about participants over the course of time. Although there are currently no published longitudinal studies that examine the effects of violent video game exposure, University of Michigan professor Rowell Huesmann has examined the longitudinal relations between TV-violence viewing at ages six to ten and adult aggressive behavior about fifteen years later.  (Appendix 10P, L. Rowell Huesmann, et al, *Longitudinal Relations between Children's Exposure to TV Violence and Their Aggressive and Violent Behavior in Young Adulthood:1977-1992*, Developmental Psychology (2003), at 2001).  His research concluded that childhood exposure to media violence predicts young adult aggressive behavior in both males and females.  (Appendix 10P, at 201.)  Moreover, early exposure to TV violence was predictive of more aggression later in life, independent of intellectual capacity, childhood aggression, social status, or degree of parental nurturing.  (Appendix 10P, at 217 ).

### ii.    *Psychological trauma*

Studies of children and adolescents suggest that chronic exposure to violence is associated with psychological symptoms such as depression, suicidal ideation, disassociation, and posttraumatic stress, and that witnessing violence can be just as traumatic. (Appendix 10Y, Singer, et al, *Exposure to violence, parental monitoring, and television viewing as contributors to children's psychological trauma*, Jnl of Comm Psych, Vol 32, No 5, at  491 (citing numerous studies).

In a recent study considering the contribution of violence to children's self-reported symptoms of psychological trauma, researchers assessed the degree to which total trauma symptom scores could be explained by demographic variables, parental monitoring, television viewing habits, recent violence-exposure and past-violence exposure.  (Appendix 10Y, p 497). When all variables were taken into account, the study showed that recent and past violence

exposure (more active forms than the television viewing of violence) were the strongest contributors to the prediction of trauma symptoms.  (Appendix 10Y, p 498).   Given that the interactive nature of violent video games more closely mirrors actual violence-exposure than the mere passive act of watching television, the results of this and similar studies bolster the State's concern over the long-term affects of video game violence.

### iii.    *Aggressive memory"scripts"*

Discovery of increased activity in the posterior cingulate region of the brain during a minor's exposure to violent media suggests that the minor is storing the violence portrayed in those images for long-term use.  According to researchers, [e]ach time people play violent video games, they rehearse aggressive scripts that teach and reinforce vigilance for enemies. . . ., aggressive action against others, expectations that others will behave aggressively, positive attitudes toward the use of violence and beliefs that violent solutions are effective and appropriate.  (Appendix, 10II, Anderson, et al, *Video Games and Aggressive Thoughts, Feelings, and Aggressive Behavior in the Laboratory and in Life*, 78 Jnl of Personality and Social Psychology 772, 774 (2000)).

### iv.    *Videos as an effective teaching tool*

Video games are teaching machines. (Appendix 10AAA, Eugene F. Provenzo, Jr., Testimony, p 3.).  Even a cursory glance at the presentations offered at Michigan State University's recent international video game conference reveals that numerous academicians recognize video games as a powerful teaching tool and are focusing on designing games to enhance learning.[48]

University Professor and author Eugene Provenzo, Jr. argues that video games not only teach children about violence, but also how to be violent.  (Appendix 10AAA, p 3).  Provenzo

17

cites the Marine Corps's adaptation of the video game *Doom* to train soldiers in the Corps. (Appendix 10AAA, p 4). First-person shooter games, for example, have evolved in such a way that the player actually steps inside the body of a killer and participates in the action of the game. (Appendix 10AAA, p 3). Lieutenant Colonel David Grossman, a former Professor of Psychology at West Point, has argued that these first person shooter video games are "murder simulators which over time, teach a person how to look another person in the eye and snuff their life out." (Appendix 10AAA, p 3).[49]

> ### d. Studies that are contrary to this extensive body of research have failed to disprove the connection between violent video games and harm to minors.

These overwhelming findings were introduced into the Legislative record, along with a small number of research studies supposedly-contradictory studies. (Appendix 8C, p 1255). However, none of these three supposedly-contradictory studies have disproved the results of the studies documenting the harmful effects of violent video games on minors. (Appendix 8C, p 1255). An article by a professor of psychiatry at Harvard concluded only that there was little evidence of a substantial link between exposure to violent interactive games and serious real life violence or crime. It did not discuss the causal link between exposure to video game violence and harm to children. Recent research by Brian Vastag concluded only that <u>consensus was lacking</u> as to whether the violent content of video games fuels aggressive behavior in children and adolescents. (Appendix 8C, p 1255). Not only was Mr. Vastag unable to disproved the theory that violent video games fuels aggression, he also did not disprove other research linking violent video games to harm to minors such as depression and asocial behavior.

---

[48] FuturePlay, the International Academic Conference on the Future of Game Design, <u>www.futureplay.org.</u>
[49] See also, David Grossman, *On Killing: The Psychological Cost of Learning to Kill in War and Society* (1996) (pointing out that the military trains soldiers to kill be using video games similar to those played daily by millions of children).

Neither has the industry presented any research disproving the determinations of the United States Supreme Court in *Roper*, or the conclusions of Craig Anderson, his associates, or major health organizations in our country.

        **3.**      **Although not necessary to prove the State's compelling interest, the Legislature also considered evidence of real-life societal harm to society as a result of children being exposed to violent videos.**

Courts that have previously considered the effect of violent video games on aggression, have stated that there are no studies linking video games to serious, real-life aggression. As previously discussed, the Court in *Kendrick* stated that "[t]he studies do not find that video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive."[50]

In this case, the evidence of harm to minors is sufficient to alleviate the need for the State to prove that video games are specifically linked to violent acts. Therefore, Defendants need not meet the standard set forth in *Brandenburg v Ohio*, that of proving that minors' access to violent videos "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[51]

Nevertheless, unlike the *Kendrick* case, the Michigan Legislature actually considered documented examples of the causal connection between violent video games and real-life harm in our State. (Appendix 10GGG). In February of 2004, the Ingham County Sheriff's Office Responded to a two-car fatal accident. (Appendix 10GGG). The driver of one of the vehicles was pronounced dead at the scene. (Appendix 10GGG). That driver's son was transported to the hospital and remains in critical condition. (Appendix 10GGG). Just prior to the accident, the driver of the other vehicle and a friend were playing a violent video game entitled "True Crime Streets of LA." for a number of hours. (Appendix 10GGG), Ingham County Sheriff Report). Both minors, Brandon Taylor and Anthony Shantil, were bragging about driving recklessly on

---

[50] *Kendrick*, 244 F3d at 578-579.

the roads and never getting caught by the police. (Appendix 10GGG, Sheriff's Incident Report). According to eyewitness testimony, Brandon told Anthony "that the car he was driving belonged to his ex-girlfriend and had a passing gear just like the car they were driving in the video game and the car was very fast and he should try it." (Appendix 10GGG, Sheriff's Incident Report). Anthony then left in Brandon's vehicle (a stolen car), stating before he left the house that he was going to "drive crazy just like the video game." (Appendix 10GGG, Sheriff's Incident Report). This tragic incident is neither conclusory nor conjectural; it is a powerful demonstration that real-life harms can be directly linked to video games.

### B.    The Act advances the State's interest and is narrowly-tailored.

The State of Michigan can demonstrate that the Act's restrictions advance the State's interests in protecting its minor citizens.[52] The State can also demonstrate that the Act is narrowly-tailored to serve the State's compelling interest.[53]

The Government may regulate the content of constitutionally protected speech in order to promote a compelling interest as long as it chooses the least restrictive means to further the articulated interest.[54] To that end, legislation aimed at protecting minors from harmful material satisfies even the most rigorous scrutiny as long as adult access to material is not significantly burdened or banned outright.[55] Even where the Court has found adult access burdened or

---

[51] *Brandenburg v Ohio*, 395 US 444, 447; 89 S Ct 1827; 23 L Ed 2d 430 (1969).

[52] *Turner*, 512 US at 664-665 (the State must prove that the Act actually serves the State's compelling interest and is "necessary" to do so).

[53] *RAV v City of St Paul*, 505 US 377, 395; 112 S Ct 2538; 120 L Ed 2d 305 (1992).

[54] *Sable,* 492 US at 126..

[55] See *Sable*, 492 US at 131 (ban on indecent dial-a-porn prevented adult access); *US v Playboy Entertainment Group, Inc*, 529 US 803, 807; 120 S Ct 1878; 146 L Ed 2d 865 (2000) (16-hour-a-day ban on offensive television programming burdened adults); *Ashcroft v ACLU*, 543 US 656, 124 S Ct 2783, 2792; 159 L Ed 2d 690 (2004) (prohibition of offensive material on internet prevented adult access).

banned, the Court suggested lesser restrictive alternatives that empowered parents to control whether the material should be accessible in the home. [56]

In *Denver Area Educational Telecommunications Consortium, Inc v FCC*, the Supreme Court upheld a statute allowing the <u>complete ban</u> of material harmful to minors because adults could get the same or similar entertainment from tapes, theaters, or a satellite dish.[57] In *FCC v Pacifica Foundation*, the Supreme Court upheld a daytime ban on offensive speech because adults could view it at night, if offered as programming, or they could buy tapes or visit nightclubs to hear it.[58] Both the Eighth and the Tenth Circuits have upheld as constitutional laws requiring vendors to cover up their displays of offensive material, deeming them narrowly tailored because adults could go to adult-only stores to view them, or they could purchase them and view them at home.[59] This district court has also upheld the practice of limiting displays of offensive materials to minors.[60]

Similarly, the Act is constitutional because it advances the State's compelling interest in protecting minors from the negative effects of ultra-violent video games, but employs the least restrictive means to further this compelling interest. The Act does not restrict adult access to video games. Nor does it restrict a parent's decision to purchase these violent video games for their children. It simply prevents an unsupervised minor from purchasing, or testing for

---

[56] See, e.g. *Playboy*, 529 US at 815 (targeting blocking would allow parents to block programming in their household); *ACLU, 542 US* at 656 (filtering technology would allow individual computers to block minor access to explicit websites even while allowing adult access).

[57] *Denver Area Educ Telecommunic Consortium, Inc v FCC*, 518 US 727, 745; 116 S Ct 2344; 135 L Ed 2d 888 (1996).

[58] *FCC v Pacifica Found*, 438 US 726, 750 and N 28; 98 S Ct 3026; 57 L Ed 2d 1073 (1978).

[59] *Midwest Booksellers Ass'n v City of Minneapolis*, 780 F2d 1389, 1390 (8th Cir, 1986); *MS News Co v Casado*, 721 F2d 1281, 1288 (10th Cir, 1983).

[60] *Athenaco v Mike Cox*, USDC-ED, No 02-75049 (September 2, 2004) (unpublished decision ) (Exhibit 2).

purchase, a violent video game.  In so restricting minors' access to video games, the State places the decision-making process where it belongs—in the hands of parents and guardians.

        i.       **The Act does not restrict adult access to violent video games.**

Plaintiffs repeatedly insist that the Act burdens adult access to violent video games.  This is simply not true.  The Act does not sweep adult access within its ambit, nor does it limit adults' parental role in deciding whether these games are too risky for their children.  Adults are free to buy these games and play them, and they are also free to share them with their children if they deem them appropriate on an individual basis.  The Act restricts <u>only</u> an unsupervised minor's access to ultra-violent video games.  Since adults may still purchase violent video games for themselves or their children, the industry has not demonstrated that it will be chilled from developing new games or that the Act will impose significant financial burdens.

Predictably, Plaintiffs also insist that purchases will be curtailed because adults will be restricted from "trying out" video games for potential purchase.  (Pls' Memorandum in Support of Motion for Preliminary Injunction, at 18-19).  The Act does not restrict adult viewing of games.  It merely requires businesses and store managers to monitor previews on store monitors and restrict <u>minors'</u> access to "testing" these ultra-violent explicit  videos.  This monitoring is no different than the minor inconveniences placed on businesses with regard to sexually explicit material, tobacco products, or alcohol.

Finally, the Act covers only the type of violence that violates community norms and that prompted this legislature.  It does not sweep into its ambit non-violent videos, moderately violent videos, or even violent videos where the violence is not repetitive or continuous.  Nor does it include access to violent video games by those over 17.  Moreover, it protects all minors from the harmful effects of ultra-violent videos, regardless of the minor's viewpoint or status.

        ii.       **The video industry's attempts, or supposed attempts, to self-regulate have failed.**

The video games industry members formed the Interactive Digital Software Association ("ISDA") in 1994, in response to members of Congress who were critical of the electronic game industry's lack of a self-regulatory system to rate electronic games. (Appendix  10RR, Federal Trade Commission Report, Marketing Violent Entertainment to Children (2000), p. 36).  The ISDA created the Entertainment Software Rating Board ("ESRB") to develop an interactive software rating system. (Appendix RR, FTC Report, p. 36).  The ESRB system rates game titles according to five age-based categories:  (1) "EC" (Early Childhood); (2) "E" (Everyone); (3) "T" (Teen – suitable only for persons ages 13 and older); (4) "M" (Mature – suitable only for persons ages 17 and older); and (5) "AO" (Adults Only).  (Appendix RR, FTC Report, p. 38).

Plaintiffs continually tout the efforts of video game retailers to educate consumers about the ESRB rating system and to restrict the sale of "M" games to minors. (Pls' Motion for Preliminary Injunction, p. 3, ¶ 2).   Yet, the industry's efforts to self-regulate have been a failure**.** Recent research from the Federal Trade Communication (the "FTC") indicates that an overwhelming percentage of minors play M-rated video games and count them among their favorites.[61]  FTC research also indicates that consumer familiarity with and usage of the ESRB system appears to be low. (Appendix RR, FTC Report, p. 41).

Moreover, the industry's self-proclaimed accolades are disingenuous at best, since it specifically targets its M-rated video games to minors.[62]  According to the FTC, nearly all the game companies they contacted have marketed violent M-rated games to children, despite an anti-targeting provision created by the ISDA. (Appendix RR, FTC Report, p. 45).  Specifically, marketing documents from industry members show plans to advertise for M-rated games in

---

[61] FTC Report, *Marketing Violent Entertainment to Children:  A Fourth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*, at 20-28 (July, 2004) (Exhibit 3).
[62] FTC July 2004 Report, at 20-28.

magazines with a majority under-17 audience, on television shows popular with young teens, and on Internet sites popular with younger teens.  (Appendix, FTC Report, p. 46).  Other promotional tactics, such as in-store displays, paraphernalia giveaways, solicitation of reviews, and encouragement of electronic "chat" are frequently used as vehicles to inform and excite minors about new videos, many of which are M-rated.  (Appendix RR, FTC Report, p. 44-45).

The FTC's undercover operations demonstrate that, once the industry has piqued the interest of minors in M-rated video games, the industry is more than willing to sell these games to unsupervised children.  In its most recent report, the FTC found that 69 percent of minors 13 through 16 years old were able to buy M-rated games.[63]

The State of Michigan's own undercover investigations confirm minors' easy access to M-rated videos.  (Appendix 10HHH), Governor Granholm press release).  These independent investigations, conducted in Cass, Genesee, Ingham, Lenawee, Monroe, and Wayne Counties at the request of Governor Granholm, found that children as young as nine were able to purchase adult-rated video games "containing violent and sexually explicit material in nearly five out of 10 attempts."  (Appendix 10HHH), ¶ 1); 9(C),  May 10, 2005 Judiciary Committee Meetings, testimony of Sheriff Wrigglesworth, pp 13-14.).    More specifically, children ranging from age 9 to 16 were able to purchase video games rated M for Mature or NC-17 at 26 of 58 stores in the six participating counties.  (Appendix 10HHH), ¶ 3).  Ingham County Sheriff Gene Wrigglesworth testified during a Senate Judiciary Committee regarding a sting operation performed by the Ingham County Sheriff's Department in which minors were able to purchase adult-rated games.[64]

The State of Michigan's findings are consistent with the FTC findings:  the industry's voluntary rating system is not working.  Research has shown that children often enter stores

---

[63] FTC July 2004 Report, at 168-169.

without their parents and are not deterred by announcements or labeling that a video game is intended for adults or minors over the age of 17.

### C.     The Act sufficiently defines its terms and standards and therefore is not vague.

Plaintiffs challenges numerous terms and definitions in the Act, including "extreme and loathsome violence," "ultra-violent explicit" video game," "parties who realistically appear to be human beings," "morbid interest in asocial, aggressive behavior," and "morbid interest in committing uncontrolled aggression against an individual."  (Pls' Motion for Preliminary Injunction, p 19).  They claim that these terms and phrases are vague because they do not provide clear meaning in the context of video games.  (Pls' Motion for Preliminary Injunction, p 19).  They also challenge the following terms in the Act's good faith defense section:  "good faith," "appears to be valid," "complies with a rating system," and "trains its employees to follow the policy."  (Pls' Motion for Preliminary Injunction, p 20).

The Due Process Clause does not impose an "insuperable obstacle to legislation" by requiring mathematical precision of terms.[65]  To survive a vagueness challenge, the statute must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.[66]

The Act is not unconstitutionally vague, and Plaintiffs direct this Court to no case law supporting their theory that the Act's language—language that is otherwise commonly understood—is somehow vague in the context of video games.  A person of ordinary intelligence would know what video games are prohibited by the Act based on the explicit definitions and standards contained in the Act.

---

[64] Affidavit of Wrigglesworth (Exhibit 4).
[65] *US v Petrillo*, 332 US 1, 7; 67 S CT 1538; 91 L Ed 1877 (1947).
[66] *Grayned v City of Rockford*, 408 US 104, 108-109; 92 S Ct 2294; 33 L Ed 2d 222 (1972).

The Act specifically defines "extreme and loathsome violence" as "real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture."[67]  The phrases "real or simulated graphic depictions" and "parties who appear to be human beings" merely make the point that these may not be actual human beings in these video games.  Regarding the word "simulated," the industry uses a similar word, "depictions,"in its ESRB Content Descriptors.  (Appendix to Plaintiff's Memo in Support of Motion for Preliminary Injunction, p 45).  As to the phrase "parties who appear to be human beings," the district court in *ISDA* rejected a vagueness challenge to similar language.[68]  The district court found it "incredulous" that plaintiffs claimed not to know the meaning of human-like" when they put that phrase in their rating system.  The Eighth Circuit in *ISDA* did not refute this analysis since it expressly did not reach the vagueness question.[69]  Finally,  the Act could not be more specific or inclusive in its list of the types of actions that constitute "physical injuries or physical violence":  actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture.[70]  By claiming that this definition is vague, Plaintiffs impliedly suggest the absurd notion that the Act is unconstitutional unless it describes the parties and actions of each and every video.  The law requires no such insurmountable obstacle.[71]

---

[67] Senate Bill 416, Part II, Sec. 16(g).
[68] *ISDA*, 200 F Supp 2d at 1140.
[69] *ISDA*, 329 F2d at 960.
[70] Compare the ESRB rating system, which categorizes games as containing mild violence, violence, or intense violence, but does not even attempt to define what actions might constitute these levels of violence.  (Plaintiff's Appendix to Memo in support of Motion for Preliminary Injunction, p. 45).
[71] *Petrillo*, 332 US at 7.

The Act's definition of "ultra-violent explicit" references the above, act-specific language of the "extreme and loathsome definition," and adds a further clarifying element: the video game must "continually and repetitively" depict extreme and loathsome violence. Not only are continually and repetitively defined in every household dictionary but they are also words of common meaning and understanding to persons of ordinary intelligence.

"Morbid interest in aggressive, asocial behavior" is defined as "a morbid interest in committing uncontrolled aggression against an individual." One does not have to be a psychologist to understand this phrase. The terms "morbid," "uncontrolled," and "aggression" are terms commonly understood by a person of ordinary intelligence, particularly in the context of the Act's purpose, and its definitions of "ultra-violent explicit" and "extreme and loathsome."

In light of this clear and detailed language, a person of ordinary intelligence would know which videos would be proscribed by the Act. Therefore, Plaintiffs' concerns that game creators, distributors, and retailers will self-censor or otherwise restrict "access to *any* potential offending video game title," or conceivably pull a wide range of games off the shelves altogether, are not only wildly exaggerated but also utterly unfounded.

The declarations of various individuals from the video game industry submitted by Plaintiffs are self-serving at best, and should be disregarded by this Court. Most of the declarations simply introduce the video game and video tape exhibits submitted by Plaintiffs in support of their Motion. The other declarations, submitted by the President of the Video Software Dealers Association and the President of a video game manufacturer, give biased opinions about how difficult it would be to understand such terms as "human being" and "death." (Appendix 1; Anderson Declaration at 9, 10; Appendix 2, Price Declaration at 5). Although Plaintiffs attack the alleged vagueness of terms appearing in the Act, such as "human beings" and

"death," the ESRB rating system refers to "human or non-human characters" and "death." (Appendix 3a to Plaintiffs' memorandum, ESRB Content Descriptors).

Plaintiffs also attack the language of the affirmative defenses portion of the Act. First, the Act's definitions and its "harmful to minor standard" are clear enough that those in a position to make determinations about individual videos need not resort to the Act's affirmative defenses. Second, the challenged phrases of the affirmative defense portion, "appears to be valid," "complies with a rating system," and "trains its employees to follow the policy," can be easily understood by a person of ordinary intelligence. "Good faith" is defined by the act as meeting easily certain conditions that are explicitly set forth[72] and easily understood by a person of common intelligence.

In short, Plaintiffs' vagueness claims fail as a matter of law.

### D.    The Act does not violate Equal Protection.

Plaintiffs do not even bother to argue their equal protection claim (Count III Pls' First Amended Complaint) in their Motion for Preliminary injunction. In any event, the Act does not, violate equal protection simply because it does not include other media forms, including cable television, broadcast television, movies, books, and magazines.

Over the years, studies have suggested that the active nature of video games makes them unique among the screen-based media, because video game players actually participate in, and to some degree actually create the video game actions, rather than simply being a recipient. (Appendix 10N, Jeanne B. Funk, et al., *Violence exposure in real-life, video games, television, movies, and the internet: is there desensitization?*, Jnl of Adolescence 27, p. 24 (2004)). There is currently at least one published study directly testing whether violent video game exposure is more detrimental than violent movie or television exposure. (Appendix 10N). It found that high

---

[72] Sec. 22(1)(a).

exposure to video games was associated with lower levels of empathy and more positive attitudes towards violence. (Appendix 10N, abstract). In contrast, television violence did not independently contribute to either empathy or attitudes towards violence. Movie violence was significantly associated only with attitudes towards violence. (Appendix 10N, abstract).

Even from a purely common sense perspective, there are strong reasons to believe that violent video games could have a stronger impact on the player than other forms of media have on the viewer. These factors include a higher level of involvement when playing video games, reinforcement of violent actions, higher amounts of violence exposure in video games versus other media. The Court in *Maleng*, even though it ultimately invalidated the law because there was no showing that video games would led to actual violence against [law enforcement] officers, noted the especially hazardous qualities of video games[73]:

> [T]he unique characteristics of video games, such as their interactive qualities, the first-person identification aspect, and the repetitive nature of the action, makes video games potentially more harmful to the psychological well-being of minors than other forms of media.

### E.    The Act comports with due process.

Neither do Plaintiffs discuss their due process claim. (Count IV, Pls' First Amended Complaint). They need not. This Court should abstain from deciding this question, and even if it does not, the Act does not unconstitutionally delegate legislative authority. (Pls' First Amended Complaint, p 23, ¶ 72).

1963 Mich Const, art IV, § 1 provides that "[t]he legislative power of the State of Michigan is vested in a senate and a house of representatives."[74] The question of whether the State of Michigan improperly delegated its authority to a private entity is "a question

---

[73] *Maleng*, 326 F Supp 2d at 1188.
[74] Const 1963, art IV, § 1.

of Michigan law over which the Michigan Supreme Court has the final say."[75]  Because

this question implicates important State law interests, this Court should abstain from

deciding this question.

Even if this Court does not exercise its discretion to abstain from deciding this

issue, no unlawful delegation occurred.  The Act neither relies on the ESRB ratings nor

delegates the legislature's authority without accompanying legislative standards.  The

standard for the Act is not the ESRB rating system but the "harmful to minors" standard

that contains language closely mirroring the *Miller* obscenity test.[76]

Section 16 of the Act defines "Harmful to Minors" as having all of the following

characteristics:

> (i)     Considered as a whole, appeals to the morbid interest in asocial,
>         aggressive behavior of minors as determined by contemporary local
>         community standards.
> (ii)    Is patently offensive to contemporary local community standards of adults
>         as to what is suitable for minors.
> (iii)   Considered as a whole, lacks serious literary , artistic, political,
>         educational, or scientific value for minors.

(Appendix 4, Enrolled Bill 416, Part II, Sec 16 (H)(i)-(iii).

The ESRB rating is merely one of a number of conditions that might allow a person to

assert an affirmative defense.  Section 23 of the Act provides:

> (1)     It is an affirmative defense to an alleged violation under this part that the
> person acted in good faith.  Except as provided in subsection (2), good faith exists
> if at the time the alleged violation occurs all of the following conditions are
> satisfied:
>                                 * * *
>
> (c)     Relying upon information described in subdivisions (a) and (b), the
> person complies with a rating system established by the pertinent entertainment
> industry that does not conflict with this part.

---

[75] See *Mut Ins Co of Am v Royal Appliance Mfr Co*, 2004 US App LEXIS 17805 (6th Cir, 2004 (unpublished decision) (Exhibit 5).
[76] *Miller v California*, 413 US 15; 93 S Ct 2607; 37 L Ed 419 (1973).

(Appendix 4, Enrolled Bill 416, Part II, Sec 23 (1)(c).

The Act does not give the ESRB the power to define what is an ultra-violent explicit video game. The ESRB rating is merely one of a number of conditions that might allow a person to assert an affirmative defense. Such a reference to an industry standard is not uncommon.[77]

Ironically, while the Plaintiffs are criticizing the Michigan legislature for referring to "standards" in the Act, these standards presumably were established by one of the Plaintiffs in this case – the ESA. Notwithstanding this criticism, the Act neither relies on the ESRB system nor delegates the Legislature's authority without accompanying legislative standards.[78] In *Currin v Wallace*, the United States Supreme Court held that Congress did not impermissibly delegate its legislative authority to a private entity where Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given tobacco market "unless two-thirds of the growers voting favor it."[79] The use of an industry standard in the Act is, therefore, a permissible exercise of power by the Michigan Legislature.

**II.      PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE PRELIMINARY INJUNCTION DOES NOT ISSUE; HOWEVER, MICHIGAN'S MINOR CITIZENS WILL SUFFER IRREPARABLE HARM IF IT ISSUES.  THE EQUITIES THEREFORE DO NOT WEIGH IN PLAINTIFFS' FAVOR.**

Plaintiffs demonstrate no irreparable harm if a preliminary injunction does not issue. The only remotely plausible harm Plaintiffs manage to articulate is the temporary loss of First Amendment freedoms. Even there, however, the Sixth Circuit has linked the irreparable injury stemming from loss of First Amendment rights to the fear that person will be deterred from

---

[77] See *People v Luera*, 86 Cal App 4th 513, 519-520, 103 Cal Rptr 2d 438, 442-443 (Cal App 2nd Dist 2001) (a statute that created an affirmative defense rated by the Motion Picture Association of America was valid).

[78] *Currin v Wallace*, 306 US 1, 15-16; 59 S Ct 379; 83 L Ed 441 (1939).

exercising those rights in the future.[80]  To be sure, the industry will not be deterred from any future production of violent video games or its vigorous marketing of these video games to minors, should this Court deny Plaintiffs' request for a preliminary injunction.  Neither will unsupervised minors who have been tantalized by the industry's advertising tactics be deterred from attempting to purchase ultra-violent videos, simply because a preliminary injunction does not issue and their access to these videos is temporarily limited.  Finally, the Act is not even due to be enforced until December 1, 2005, further minimizing Plaintiffs' exaggerations as to the harm that will ensue if a preliminary injunction does not issue.

In contrast, the harm to Michigan's minor citizens is great in the event the Act is not enforced.  Unlike Plaintiffs' speculations, actual data demonstrates that without the Act's restrictions, minors will continue to buy ultra-violent videos and suffer the harmful effects to their psyche and their behavior.   The strong public interest in protecting children from the notably harmful effects of this interactive violence far outweighs any slight inconvenience to the industry.

---

[79] Accord *Cusack Co v Chicago*, 242 US 526, 530; 37 S Ct 190; 61 L Ed 472 (1917).
[80] *United Food & Commercial Workers Union, Local 1099 v Southwest Ohio Regional Transit Auth ("SORTA")*, 163 F3d 341, 363 (6th Cir, 1998).

## CONCLUSION AND RELIEF SOUGHT

Plaintiffs have not shown that a preliminary injunction should issue because they have

not demonstrated a likelihood of success on the merits, nor that the equities weigh in their favor.

WHEREFORE, Defendants Governor Jennifer M. Granholm, Attorney General Michael A. Cox,

respectfully request that this Honorable Court deny Plaintiffs' Motion for a Preliminary

Injunction.

Respectfully submitted,

MICHAEL A. COX
Attorney General

*s/ Denise C. Barton (P41535)*
Denise C. Barton (P41535)
Ann Sherman (P67762)
Jason Evans (P61567)
Assistant Attorney General
Public Employment, Elections
& Tort Defense Division

Dated:  October 17, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2005, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing of the

following: Defendants' Response to Plaintiffs' Motion for A Preliminary Injunction.

*s/ Denise C. Barton (P41535)*
Dept of Attorney General
Public Employment, Elections & Tort Defense Div.
P.O. Box 30736
Lansing, MI 48909-8236
(517) 373-6434
Email: bartond@michigan.gov

33