

# Marketing Violent Entertainment to Children:

## A Fourth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries

# A Report to Congress

Federal Trade Commission

July 2004

Dockets.Justia.com

**FEDERAL TRADE COMMISSION**

Timothy J. Muris, Chairman
Mozelle W. Thompson, Commissioner
Orson Swindle, Commissioner
Thomas B. Leary, Commissioner
Pamela Jones Harbour, Commissioner

**Report Contributors**

Richard F. Kelly, Bureau of Consumer Protection, Division of Advertising Practices
Elizabeth Delaney, Bureau of Consumer Protection, Division of Advertising Practices
Kial Young, Bureau of Consumer Protection, Division of Advertising Practices
Mark Eichorn, Bureau of Consumer Protection, Division of Advertising Practices
Lesley A. Fair, Bureau of Consumer Protection, Division of Advertising Practices
Mary K. Engle, Associate Director, Bureau of Consumer Protection, Division of Advertising Practices.

**Assistants**

Sallie Schools, Bureau of Consumer Protection, Division of Advertising Practices
Katherine Zownir, Bureau of Consumer Protection, Division of Advertising Practices
Kerry Constabile, Bureau of Consumer Protection
Stefano Sciolli, Bureau of Economics

**Interns**

Chadwick Crutchfield, Bureau of Consumer Protection, Division of Advertising Practices
Jamie Gentry, Bureau of Consumer Protection, Division of Advertising Practices
Nicholas A. James, Bureau of Consumer Protection, Division of Advertising Practices
Jonathan Longobardi, Bureau of Consumer Protection, Division of Advertising Practices



# Marketing Violent Entertainment to Children:

## A Fourth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries

# A Report to Congress

Federal Trade Commission

July 2004

# Contents

Executive Summary ....................................................................................................................... *i*

**I.   Introduction** ........................................................................................................................1
   A.   Commission Reports on Marketing Violent Entertainment to Children ...........................1
   B.   Sources of Information for this Report ..............................................................................1

**II.   Motion Pictures** ..................................................................................................................2
   A.   Marketing to Children:  Advertising Placement ...............................................................2
      1.   Self-regulatory programs restricting placement of advertising in media popular with children ........................................................................................................................2
      2.   Advertising placements:  current practices .............................................................3
   B.   Ratings and Reasons for Ratings in Advertising ...............................................................6
      1.   Self-regulatory programs governing disclosure of ratings and reasons ...................6
      2.   Advertising of rating information:  current practices ...............................................6
   C.   Efforts to Enforce Rating System in Movie Theaters and at Stores ..................................9
   D.   Analysis of Current Industry Practices ............................................................................10

**III.  Music Recordings** ............................................................................................................11
   A.   Marketing to Children:  Advertising Placement .............................................................11
      1.   Self-regulatory programs restricting placement of advertising in media popular with children ......................................................................................................................11
      2.   Advertising placements:  current practices ...........................................................11
   B.   Advisory Labels and Reasons for Labels in Advertising .................................................13
      1.   Self-regulatory programs governing disclosure of parental advisory label and reasons .....13
      2.   Advertising of advisory label: current practices ...................................................13
   C.   Efforts to Enforce the Labeling System at Point-of-Sale ................................................18
   D.   Product Packaging ...........................................................................................................18
   E.   Analysis of Current Industry Practices ...........................................................................19

**IV.  Electronic Games** .............................................................................................................20
   A.   Marketing to Children:  Advertising Placement .............................................................20
      1.   Self-regulatory programs restricting placement of advertising in media popular with children ......................................................................................................................20
      2.   Advertising placements:  current practices ...........................................................20
   B.   Ratings and Reasons for Ratings in Advertising .............................................................23
      1.   Self-regulatory programs governing disclosure of ratings and reasons .................23
      2.   Advertising of rating information: current practices ..............................................24
   C.   Efforts to Enforce the Rating System at Point-of-Sale ...................................................26
   D.   Product Packaging ...........................................................................................................27
   E.   Analysis of Current Industry Practices ...........................................................................28

**V.   Conclusion** ........................................................................................................................28

**Endnotes** ...................................................................................................................................30

**Appendix A:  Marketing Violent Entertainment To Children:A Workshop On Industry Self-regulation**

**Appendix B:  Mystery Shopper Survey**

**Appendix C:  Data Collection Methodology And Television And Print Demographics**

**Appendix D: Internet Surveys**

# Executive Summary

In September 2000, the Federal Trade Commission issued a report requested by the President and Congress entitled, *Marketing Violent Entertainment to Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*. That report found that these entertainment industries had engaged in widespread marketing of violent movies, music, and electronic games to children that was inconsistent with the cautionary messages of their own parental advisories and that undermined parents' attempts to make informed decisions about their children's exposure to violent content. In addition, the Commission found that advertisements for such products frequently failed to contain rating information. Finally, the Commission reported on the results of an undercover "mystery" shop by unaccompanied teens, aged 13-16, of retailers and movie theaters. The young shoppers were able to buy M-rated electronic games and parental advisory-labeled music recordings 85% of the time and purchase tickets for an R-rated movie almost half (46%) of the time.

In April and December 2001, and in June 2002, the Commission issued follow-up reports in response to requests from Congressional committees and individual members of Congress. Each report documented progress by the movie and electronic game industries to limit advertising in popular teen media, but noted that the music industry had not changed its ad placement practices. In the music industry's view, advertising targeted to all ages (including children) is consistent with its parental advisory labeling program which, unlike the rating programs for movies and electronic games, does not designate an age for which parental advisory-labeled music may be inappropriate.

In its most recent report, issued in June 2002, the Commission found that the movie and game industries were in substantial compliance with each industry's self-regulatory standards governing ad placements and disclosure of rating information in advertising. At the same time, the Commission found many examples of advertisements by the movie industry and some advertisements by the electronic game industry placed on television programs with large numbers of teen viewers, and continued placement of advertising by the electronic game industry in game enthusiast magazines with large youth readership. The report also found that the music industry showed virtually no change in its placement of parental advisory-labeled music ads since the September 2000 Report. Advertisements continued to be placed on television shows and in print magazines popular with teens. The Commission did find some improvement in the music industry's disclosure of labeling information in its advertising.

This Report documents the current state of marketing in the areas addressed in the Commission's previous reports. As was the case with the Commission's December 2001 Report, this Report includes a review of marketing documents from nine industry members, as well as the results of ongoing Commission monitoring of advertising practices. In addition, it reports on a Commission-sponsored Public Workshop held in October 2003 at which industry and consumer groups discussed the state of self-regulation in each of these industries as well as the results of an undercover "mystery" shopper survey conducted in the summer of 2003, in which young teens attempted to purchase tickets to R-rated movies, or buy parental advisory-labeled recordings, R-rated movie DVDs, and M-rated games.

## Movies

The Commission's review of internal marketing documents and ad placements for selected R-rated films showed that studios did not target advertising for those films at children under 17, and, for the most part, did not advertise those films in media with an under-17 audience share over 35%. The studios continue to advertise violent, R-rated films and DVDs on programs with large teen viewership, however. In addition, some studios have conducted promotions for R-rated films in venues likely to attract significant numbers of young teens, an apparent resurgence of a practice that previously had decreased.

With respect to the disclosure of film ratings and rating reasons by the motion picture studios, the Commission finds that current industry practices continue to improve. In television, print, and Internet website advertising, the studios routinely disclose both ratings and rating reasons for R-rated and PG-13-rated films and DVDs. Although there remains room for improvement in the legibility of ratings reasons – particularly in print ads – the studios' practices in this area generally are commendable. Retailer advertisements for DVDs, by contrast, often do not contain ratings or reasons at all.

Finally, the Commission's undercover shopper survey of children's access to tickets for R-rated films indicated significant improvement by movie theaters, as only 36% of the 13-16- year-old shoppers successfully purchased tickets. In contrast, DVD retailers – included for the first time in this survey – sold R-rated DVDs to 81% of teen shoppers seeking to buy them.

## Music

The Commission's review of ad placements for parental advisory-labeled music showed that the music industry has substantially curtailed advertising in print media popular with teens but continues to place ads on television shows with substantial teen audiences, primarily on cable music channels. Although the Commission found improvement in the music industry's disclosure of labeling information in print and television advertising, the industry's compliance with labeling requirements for product packaging has improved only slightly since September 2000.

For the first time, the Commission reviewed commercial online music downloading services and found that all of the services examined provided some sort of advisory about explicit-content music. Nevertheless, only a third of these services offered a parental control mechanism to exclude explicit-content labeled recordings. During the Commission's October 2003 Workshop, the music industry's trade association made a commitment to reinforce the importance of consistent parental advisory descriptors and encourage these online services to implement parental control mechanisms.

The Commission's undercover shopper survey showed that some progress has been made in restricting sales of explicit-content labeled recordings to children, particularly among the youngest shoppers. Nevertheless, 83% of the teenaged shoppers were able to make a purchase.

## Games

For the electronic game industry, the Commission's ongoing ad monitoring and its review of company marketing documents found substantial, but not universal, compliance with industry standards limiting ad placements for M-rated games where children under 17 constitute a certain percentage of the audience – 35 percent for television and 45 percent for print. Nonetheless, these standards do not prevent the placement of ads in television programs and in game enthusiast magazines with substantial teen audiences. Advertising for M-rated games continues to appear in such media.

The Commission also found some instances of the marketing of Teen-rated video games in media popular with a pre-teen audience. According to the industry's own description of that rating, such products are suitable for children who are thirteen and older. Yet, with limited exceptions, the self-regulatory system for electronic games does not directly address such marketing.

The game industry continues to provide rating information prominently in advertising and on product packaging. Although some areas still should be improved – *e.g.*, including content descriptors in television advertising and on the front of product packaging – the game industry's rating disclosure requirements go far to ensure that parents have access to rating information when considering product purchases.

Finally, the Commission's mystery shopper survey documented some progress by electronic game retailers in limiting sales to unaccompanied children of M-rated games. Even with that progress, however, 69% of the young teen shoppers were able to buy such games.

## Cross-industry Issues

In the case of all three industries, the Commission's Public Workshop noted several examples of the cross-marketing of entertainment media products with different ratings, labels, and intended audiences. The electronic game industry has adopted some provisions to address aspects of this marketing, and individual movie studios have placed some restrictions on the marketing to children of licensed products based on R-rated movies. The question remains unanswered whether some of this cross-marketing attracts younger children and teens to entertainment media intended for an older audience.

As in prior reports, the Commission offers suggestions for improvements by each of the industries. Because of First Amendment and other issues, the Commission continues to support private sector initiatives by industry and individual companies to implement these suggestions.

The Commission will continue to work with industry and parent groups and support efforts to improve self-regulation and increase education of parents.

Further, as directed by Congress, the Commission will work with video game publishers and retailers toward ensuring that games rated T and M are marketed or sold to children in a manner consistent with the rating's age guideline. The Commission also will undertake efforts to educate parents about the content included in T and M games. Finally, the Commission has made its toll-free

consumer complaint line and its website complaint form available for consumer complaints regarding media violence, and is publicizing to consumers the availability of these complaint mechanisms. Following implementation of these steps, and a one-year period of monitoring industry practices and consumer concerns, the Commission believes that a follow-up report would be appropriate.

# I. Introduction

## A. Commission Reports on Marketing Violent Entertainment to Children

This is the fifth Commission Report on the marketing to children of violent entertainment products by the motion picture, music recording, and electronic game industries. The Commission's prior reports – the initial report released in September 2000 ("September 2000 Report"), and three smaller follow-up reviews in April 2001 ("April 2001 Report"), December 2001 ("December 2001 Report"), and June 2002 ("June 2002 Report") – were in response to requests from the President and Congress.[1] The reports examine whether these three industries promote products that they themselves acknowledge warrant parental caution in venues where children make up a substantial percentage of the audience.

The September 2000 Report found that industry members routinely targeted children in their advertising and marketing of violent entertainment products, despite self-regulatory ratings or labels indicating the products might not be appropriate for children.[2] The Commission concluded that such advertising and marketing efforts undermined each industry's parental advisories and frustrated parents' attempts to protect their children from possibly inappropriate material. It called upon the industries to strengthen their self-regulatory programs by: (1) prohibiting target marketing to children and imposing sanctions for violations; (2) improving self-regulatory programs at the retail level; and (3) increasing parental awareness of the ratings and labels. Because of First Amendment issues, the Commission concluded that vigilant self-regulation offers the best approach to helping parents choose what is appropriate for their children.

The Commission's three follow-up reviews described the adoption and implementation of new self-regulatory initiatives by the four industry trade associations — the Motion Picture Association of America ("MPAA"), the National Association of Theatre Owners ("NATO"), the Recording Industry Association of America ("RIAA"), and the Interactive Digital Software Association ("IDSA") (now the Entertainment Software Association ("ESA")).[3] The Commission also reported its findings that although the movie and electronic game industries had made progress in limiting marketing of R- and M-rated products to children, the music recording industry had not significantly changed its marketing practices since the September 2000 Report. The Commission continued to urge the industries to strengthen their self-regulatory programs.

In releasing the June 2002 Report, the Commission indicated that it would review industry practices for a year, and then prepare and release an additional report.

## B. Sources of Information for this Report

To prepare this Report, the Commission collected information from several sources. As it had done for each follow-up report, the Commission tracked advertising placements in media popular with youth, and reviewed advertisements in major media – print and television – to determine whether they included clear and prominent rating and labeling information. The Commission also reviewed retail packaging

for music products to assess the extent to which the size and placement of the parental advisory label complied with industry guidelines.

In addition, the Commission reviewed internal company documents provided by nine individual industry members, including marketing plans for certain R- and PG-13-rated movies, explicit-content labeled music, and M- and T-rated games released since the Commission's June 2002 Report. The company documents describe, among other things, where advertisements were placed and the target audiences they were intended to reach, the nature and extent of promotional activities used to generate consumer awareness and interest in the products, and company research.

More specifically, with respect to the motion picture industry, the Commission reviewed marketing plans for nine R-rated films and three PG-13-rated films released by three major studios between June 2002 and July 2003.[4]  In selecting these films, the Commission chose R- and PG-13-rated movies whose ratings were based, at least in part, on violent content.[5]  For the music recording industry, the Commission studied the marketing of 14 explicit-content labeled recordings[6] released by three major recording companies over the past year.[7]  For the electronic game industry, the Commission reviewed the marketing of 18 violent M-rated games and six T-rated games by three of the major companies in the marketplace.[8]  The Commission selected M-rated games issued in the last year.[9]

In addition, in the summer of 2003, the Commission undertook an undercover shopper survey – as it had done for its September 2000 and December 2001 Reports – to determine whether progress has been made in limiting the sale to children of products rated or labeled as potentially inappropriate for them without their parents' consent. Finally, on October 29, 2003, the Commission held a one-day public workshop, at which representatives from consumer and parents' groups as well as each of the industries' major trade and retailer associations – the MPAA, the RIAA, the ESA, the NATO, the Entertainment Software Rating Board ("ESRB"), the National Association of Recording Merchandisers ("NARM"), the Interactive Entertainment Merchants Association ("IEMA"), and the Video Software Dealers Association ("VSDA") – discussed and debated the success of self-regulation in each of these industries.

## II. Motion Pictures

### A. Marketing to Children:  Advertising Placement

#### 1. Self-regulatory programs restricting placement of advertising in media popular with children

In its September 2000 Report, the Commission found that the motion picture industry had engaged in extensive marketing of violent R-rated movies to children under 17.[10]  In response to the report and the Commission's recommendations, the MPAA implemented 12 initiatives.[11]  Among the Initiatives was a promise that each member studio would "review its marketing and advertising practices in order to further the goal of not inappropriately specifically targeting children in its advertising of films rated R for violence."[12]  In addition, the studios pledged to "request theater owners not to show trailers advertising films rated R for violence in connection with the exhibition of its G-rated films."[13]

Several individual motion picture studios undertook additional steps to respond to the Commission's report. For example, three studios announced that they would not advertise R-rated movies in media with an under-17 audience of more than 35%,[14] and many pledged not to attach trailers for violent R-rated movies to PG-rated movies. Members of the NATO similarly pledged not to show trailers advertising R-rated films in connection with any G- or PG-rated feature film.[15]

### 2.    Advertising placements:  current practices

#### a.    Television advertising

The Commission has previously noted that most moviegoers, and teens in particular, become aware of movies through television ads.[16] Accordingly, the Commission has recommended that the film industry prohibit advertising of R-rated films in media with a substantial under-17 audience. In response, several studios committed to avoid advertising in media with an under-17 audience of more than 35%,[17] and other studios instituted alternative policies intended to curb the advertising of R-rated films to children.[18]

In its June 2002 Report, the Commission reported that studios had largely complied with their pledges not to advertise films rated R for violence on television programs with an under-17 audience of 35% or more.[19]

For this Report, the Commission reviewed motion picture advertising during an eight-week period and found that the studios continue to advertise violent, R-rated films on television programs popular among teens.[20] For example, Warner Bros.' *The Matrix Reloaded* was advertised on *WWE Smackdown*[21] and BET's *Rap City*, Fox's *Wrong Turn* was advertised on BET's *106th & Park*, and Columbia's *Identity* was advertised on MTV's *Direct Effect*. In all, the Commission found 59 ads for seven films rated R for violence on programs popular with teens during the monitored time period.[22] The Commission also monitored the advertising of home video and DVD releases on the same programs, but did not find any television ads for violent, R-rated videos.[23]

The Commission's review of first-airing data for the time period June 2002 through early September 2003 revealed 19 instances in which a studio first aired an advertisement for a violent R-rated film or DVD/home video release on a program popular with teens.[24] Examples include ads for Universal's *8 Mile* on *The Bernie Mac Show*, Miramax's *Confessions of a Dangerous Mind* on *The Simpsons*, Paramount's *The Hunted* on *WWE Smackdown*, and MGM's *Jeepers Creepers 2* on *The Simpsons*.

Similarly, data received from the Parents Television Council further confirmed the Commission's finding that studios continue to advertise films rated R for violence on some of the programs most popular with youth audiences.[25] Among the films and DVD releases advertised on these programs were Fox's *Wrong Turn*, New Line Cinema's *Final Destination 2,* Sony Picture's *Bad Boys 2*, and Warner Bros.' *Cradle 2 the Grave*.[26]

Finally, the Commission's review of documents from three motion picture studios yielded similar findings.[27] Consistent with policies implemented by the studios following the Commission's September 2000 Report,[28] media plans submitted for this Report indicated that the studios did not specifically

target advertising for R-rated films at children under 17.  In fact, documents relating to the studied R-rated films uniformly identified the films' target audiences as comprising persons aged 18 years and older.  Nonetheless, the Commission found that one studio advertised two of its R-rated violent films on BET's *Rap City* and *106th & Park* – programs that were disqualified under the studio's own policy of not advertising on programs with an under-17 audience of more than 35%.[29]  Moreover, the documents indicate that the studios have continued to place advertisements for violent R-rated movies on other programs with substantial youth audiences, including *Cedric the Entertainer, Smallville*, *The Bernie Mac Show*, and *WWE Smackdown*.  Notably, another studio advertised two of its R-rated films on a few television shows it had specifically targeted for "teen burst" and "families" advertising for a PG-13-rated film.[30]

### b.  Print and radio advertising

The Commission's review of print and radio advertising showed that the studios continue to limit ad placement for violent R-rated films.  In its September 2000 Report, the Commission found that studios advertised their R-rated films in youth-oriented publications,[31] and, in subsequent reports, the Commission has noted significant improvement in this area.[32]  For this Report, the Commission monitored advertisements in the June 2002 through October 2003 issues of 13 magazines with substantial or majority youth audiences,[33] and, as in the June 2002 Report, found no studio advertisements for R-rated movies currently running in theaters.  The monitoring did reveal, however, that DVDs for Lions Gate's *House of 1000 Corpses* and New Line's *A Man Apart*, two films rated R for violence, were advertised in *World Wrestling Entertainment Magazine*, a magazine with a substantial youth audience.[34]

The Commission's review of the three studios' media plans did not reveal any plans to advertise R-rated films in youth-oriented publications.  Two of the three studios have compiled lists of youth-oriented magazines that the studios deemed inappropriate for ads for R-rated films, and the third studio has a policy not to advertise or market R-rated films in any publication with an under-17 audience of 35% or higher.[35]

Similarly, with respect to radio advertising, the three studios' media plans did not indicate that they specifically targeted under-17 audiences for advertising R-rated films.  One of the studios collected audience demographic data for radio programming and sought to avoid advertising its R-rated films during time periods on certain stations when the audience share of children under 17 likely exceeded 35%.  This studio also sent letters to radio stations requesting that promotional ads for one of its R-rated films not air during programs with a 35% or higher under-17 audience.

### c.  Trailers

In its September 2000 Report, the Commission found that trailers for R-rated films were shown to audiences containing substantial numbers of youngsters attending PG-13 films – including PG-13 films marketed to children aged 11 years and younger – and that trailers for R-rated films were shown before

features rated PG.[36]  At the time, the major theater chains had a policy limiting trailer placement to within one rating of the feature presentation.[37]  The Commission recommended that the industry prohibit placing advertisements for R-rated films in venues with a substantial under-17 audience.[38]

In response, MPAA member studios pledged to ask theater owners not to show trailers advertising films rated R for violence in connection with a G-rated feature film.[39]  Several studios extended this commitment to apply to PG-rated films as well.[40]  NATO member theaters went further.  They pledged not to show trailers for R-rated films before G- or PG-rated films, and, before showing such trailers in connection with PG-13-rated films, promised to ensure that the trailers are consistent in tone and content with the feature film.[41]

The Commission's review of studio documents indicated that the studios largely are complying with their commitments.  With respect to the films studied, marketing and other documents show that the studios attached or requested that trailers for those films be shown only before features rated R or PG-13,[42] with one exception.[43]  With respect to DVD and home video releases, documents indicated that the three studios attached trailers for R-rated films only to features rated R or PG-13, again with one exception.[44]

### d.  Promotions

In its September 2000 Report, the Commission found that promotions for R-rated films, including the distribution of free passes to movie screenings or film-related merchandise, were sometimes conducted at places where teens congregate.[45]  The December 2001 Report noted significant improvement in this area.[46]

The marketing plans reviewed for this Report indicate that the studios' promotional activities for the R-rated films studied generally have not been expressly targeted to under-17 audiences.  The marketing documents reveal, however, that two studios conducted some promotions and other advertising at locations or events that likely attracted substantial numbers of teens, including:  music and gaming stores, an amusement park, comic book stores, arcades, skateboard stores and skate parks, and recreation centers.  One of the studios also arranged to have posters and doorknob hangars for one of its R-rated films distributed at high schools, as well as at a July 4th event described as being "for families."

### e.  Internet advertising

Internet advertising by studios on third-party websites remained a relatively small, but growing, component of the advertising campaigns for the films reviewed for this Report.  All three of the studios advertised online for the R-rated films studied,[47] and for the most part this advertising did not specifically target youth audiences.[48]  Nonetheless, all three studios did advertise on websites with youth audiences of at least 35%, and in one case a majority, including:  gamespy.com (36%), IGN.com (40%), MTV.com (38%), teenpeople.com (53%), and ugo.com (44%).[49]

### f. Other steps

The studios submitted documents describing additional steps taken in response to the Commission's recommendation that they avoid targeting their marketing of violent R-rated films to children under 17. Most of these steps have been noted in previous Commission reports.[50] For example, one studio's policy prohibits the licensing of certain products based on films rated R for violence if the products are "specifically targeted for sale to children under the age of 17" and prohibits the distribution of such products through any outlet that "specifically targets children under 17 as their primary demographic." Another studio appears to require that licensed products based on R-rated films contain a clear indication on their packaging that they are "not for children under the age of 17," and further that such products be sold "only through segregated adult collector areas" in retail outlets.

The studio documents generally confirm continued compliance with these policies. For the most part, studios did not appear to cross-promote their R-rated films with companies selling products intended for a younger age group. The one exception was an R-rated film promoted in conjunction with other media products carrying a lower appropriate age, including a video game rated T (for Teen).[51]

## B. Ratings and Reasons for Ratings in Advertising

### 1. Self-regulatory programs governing disclosure of ratings and reasons

In its September 2000 Report, the Commission found that motion picture advertisements generally provided the films' rating but did not provide the reasons for the rating.[52] The Commission recommended that the studios clearly and conspicuously disclose both the rating and the reasons in all advertising.[53] In response, MPAA member studios pledged to "seek ways to include" ratings reasons in print advertising and official movie websites.[54] Among the specific requirements implemented by the MPAA in this regard is the inclusion of rating reasons for all films (other than those rated G) in newspaper ads above a certain size, websites, posters, and billboards.[55] Member studios also vowed to encourage newspapers and theaters to provide or include rating reasons,[56] and NATO members pledged to seek ways to disseminate rating reasons.[57]

Since then, the Commission has noted progress by the studios in disclosing ratings and rating reasons clearly and prominently.[58] For this Report, the Commission reviewed studio documents and conducted its own monitoring of studio and retailer advertisements in various media.

### 2. Advertising of rating information: current practices

### a. Television advertising

Although the MPAA Advertising Handbook only requires member studios to disclose a film's rating and its definition, legibly, in television advertisements,[59] the Commission's review of television advertisements provided by the three studios studied suggests that the studios nearly always included both the letter rating (with its definition) and the reasons for the rating in their commercials for the R-rated films studied. With the exception of ads for films not yet rated, the television ads presented the

film's rating both visually and audibly, and also provided the rating reasons, usually visually.[60]  The ratings themselves were typically readable but the reasons were less so.

###    b.   Print and radio advertising

Among the commitments the MPAA member studios made in response to the Commission's September 2000 Report was to seek ways to include a film's rating reasons in print advertising.[61]  For this Report, the Commission reviewed more than 1,700 newspaper and magazine advertisements for films rated PG-13 or R[62] to determine the extent to which the rating and rating reasons were disclosed and legible.[63]

Consistent with the Commission's most recent findings,[64] nearly all of these ads contained both the rating and reasons,[65] and, in most of those cases, the rating and reasons were clearly displayed.[66]  The reasons in some ads were notably prominent, such as those for MGM's *Die Another Day* and Columbia's *Tears of the Sun*.  In other ads, however, the reasons were much smaller or less conspicuous, often due to placement over the ad's graphics or to the use of colored or gray print rather than black on white.  Some of the ads had rating reasons that were so small or obscured that they were very difficult to decipher, and in others the reasons were so tiny or blurred that they were literally unreadable, including some ads from Fox Searchlight, Sony Pictures Classics, Focus Features, and Lions Gate Films.[67]  Finally, consistent with past reviews,[68] some studios provide legible rating reasons in ads less than five inches in height, although the MPAA Guidelines do not require them.

The Commission also reviewed magazine print ads for DVD and home video releases, and found that the majority of these ads contained both the film's rating and its rating reasons.[69]  Of the 55 advertisements for movies rated PG-13 or R at least in part for violence, about half displayed the ratings and rating reasons clearly, while another ten displayed clear ratings but the rating reasons were either difficult to read or obscured by their placement.  Eleven ads contained ratings but no reasons, and six contained neither ratings nor rating reasons.

The Commission's review of retailer DVD ads yielded more mixed results.[70]  Consistent with previous Commission findings,[71] Target and Best Buy continued to display prominently the R rating for movies featured in their inserts and to include the words "Restricted Rating" next to or near R-rated DVD clip art.  Toys "R" Us prominently displayed movie ratings for all the DVDs it advertised.[72]  Half the retailers, however – Amazon, Circuit City, Kmart, and Tower – did not disclose ratings for any of the R-rated DVDs they advertised.  CompUSA only sometimes disclosed R ratings; in one instance, an ad featuring two R-rated DVDs side by side disclosed the rating for only one of them.

Finally, the Commission also reviewed the studios' disclosure practices with respect to radio advertising.  The studio documents indicated that ads for the R-rated films studied did provide the film's rating in audio.  Ads for two of the films also provided the rating reasons.[73]

### c. Internet advertising

#### (1) Motion picture websites

For its June 2002 Report, the Commission's review of 20 official movie websites showed that nearly all displayed the film's rating symbol and rating reasons, and linked to at least one of three rating information sites.[74]  For this Report, the Commission again reviewed the rating information practices of 20 official movie websites.[75]

The Commission's review indicated that the studios are substantially complying with the Commission's recommendations in this area.[76]  All of the sites displayed the R rating symbol and rating reasons somewhere on the site, and nearly all (18 of 20) displayed the rating and reasons on either the teaser page or home page.[77]  In a notable improvement, more than half the sites displayed the rating symbol and rating reasons on every page or nearly every page – often in a frame that remained constant on part of the screen as the visitor navigated through the site.

Virtually all of the sites linked to at least two of three rating information sites, and all but four sites linked to all three.[78]  Four sites offered the opportunity to purchase movie tickets through a third-party site, and displayed the R rating in close proximity to the link to the third-party site; two sites also displayed the rating reasons close to the link.[79]  All of the sites had a trailer of the film available for viewing and/or downloading.[80]

#### (2) Theater and movie ticket websites

The Commission also reviewed the rating information practices of websites for 15 major movie theater circuits and three online movie ticket sellers and found mostly positive results.[81]  All of the theater sites displayed the movies' ratings and the rating reasons.[82]  Particularly with respect to rating reasons, this finding marks a significant improvement over previous reports.  Six sites (40%) provided information about the MPAA rating system, and five of those sites (33% of total sites) also linked to rating information sites – comparatively lower percentages than previous reports found.[83]  One of the theater sites offered movie tickets for sale directly, and nine others offered visitors the opportunity to purchase tickets through a third-party site.[84]

The Commission's review of three movie ticket sites yielded comparable results.  All three websites displayed the films' official ratings, and Movietickets.com and Fandango.com also displayed the rating reasons.  All three provided information about the MPAA rating system, although none linked to any of the rating information sites.

#### (3) Home video/DVD retailer and rental websites

The Commission surveyed five online movie retailers' sites to determine their rating information practices with respect to five movies rated R for violence, and found that these retailers' practices have improved relative to previous Commission findings.[85]  All five websites provided each movie's correct MPAA rating, and four of the sites provided the official rating reasons for each of the five films

examined.  Amazon.com did not provide rating reasons but specified that R-rated movies are "Not for sale to persons under age 18."[86]  None of the sites linked to film rating information sites, although BestBuy.com and TowerRecords.com provided information on their sites about the movie rating system.

For the first time, the Commission reviewed the practices of three websites that allow consumers to rent movies via the Internet.[87]  Two of the sites allow users to rent films online that are then mailed to their homes,[88] while the third site allows users to download movies for viewing on the computer.[89]  All three of these sites displayed the movies' official ratings, and two of the three also displayed the films' rating reasons.  None of the sites linked to any of the rating information sites, although one site did provide information about the MPAA rating system on its own website.  That same site also required users to check a box to indicate that they are at least 17 years of age.

## C.  Efforts to Enforce Rating System in Movie Theaters and at Stores

In connection with two previous reports, the Commission conducted nationwide undercover studies to determine the extent to which unaccompanied children under 17 were able to purchase tickets to R-rated films.  In its September 2000 Report, the Commission reported that almost half of the theaters studied sold tickets to the "mystery shoppers," and the Commission found a similar result in its December 2001 Report.[90]  In response to these reports, the MPAA, the NATO, the VSDA, and individual motion picture studios have continued to urge theater owners and video retailers to improve their enforcement of the rating system.[91]

The Commission conducted its third undercover survey in July and August 2003.[92]  The results indicate an improvement in theaters' performance in restricting children's access to R-rated motion pictures:  only 36% of the "mystery shoppers" were able to buy tickets to R-rated films, as compared to 48% in the 2001 survey.[93]  In addition, more theaters checked the ages of the teen shoppers, increasing from 39% in the 2001 survey to 48%.[94]  For the first time in this survey, the Commission also surveyed practices at stores selling R-rated movies on DVD:  81% of the teen shoppers were able to purchase the product, and in only 19% of cases did the cashier or clerk ask the shopper's age.

**FTC Mystery Shop Results - Movies**
**Q. Was the shopper able to make the purchase?**

**Movie Theaters**

|                | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|----------------|--------------|--------------|--------------|--------------|-------|
| No             | 49           | 34           | 42           | 18           | 143   |
|                | 75%          | 71%          | 65%          | 38%          | 64%   |
| Yes            | 16           | 14           | 23           | 29           | 82    |
|                | 25%          | 29%          | 35%          | 62%          | 36%   |
| # of Shoppers  | 65           | 48           | 65           | 47           | 225   |

**DVD Movie Stores**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 18<br>27% | 9<br>18% | 13<br>21% | 4<br>8% | 44<br>19% |
| Yes | 49<br>73% | 40<br>82% | 49<br>79% | 44<br>92% | 182<br>81% |
| # of Shoppers | 67 | 49 | 62 | 48 | 226 |

To help evaluate current industry practices, the Commission also obtained information from a number of DVD/home video retailers regarding the retailers' policies, if any, governing the sale of R-rated movies to children under 17.[95]  Several major retailers indicated that they do have such policies. Some of these policies require clerks or cashiers to check the identification of anyone seeking to purchase an R-rated movie who is suspected of being under 17, and at least one retailer stated that it uses a cash register prompt that reminds the clerk, when a restricted product is scanned for purchase, to perform the ID check.  Another policy restricts the sale of R-rated movies to children under 17 unless a parent previously has provided consent.  One retailer does not require ID checks at all, and another leaves the decision up to individual stores.  Some of the companies also indicated that they display in-store signage explaining the MPAA rating system or the store's restrictions on sales to children under 17.  Notwithstanding the existence of such policies, mystery shop data obtained by the Commission indicates, as discussed above, that four out of five children under 17 are able to purchase R-rated DVDs from retailers.

## D. Analysis of Current Industry Practices

On the whole, the motion picture industry has continued to comply with its pledge not to specifically target children under 17 when advertising films rated R for violence.  In addition, the studios generally are providing clear and conspicuous ratings and rating information in advertisements for their R- and PG-13-rated films.  However, the studios continue to advertise and promote R-rated films in some media and venues popular with youth.  In addition, retailers commonly are not providing ratings and rating reasons in advertisements for DVDs, and do not appear to be effectively restricting youth from purchasing R-rated DVDs, despite the existence of policies adopted by some retailers.  Movie theaters have shown improvement in barring unaccompanied children under 17 from purchasing tickets to R-rated films.

## III. Music Recordings

### A. Marketing to Children:  Advertising Placement

#### 1.  Self-regulatory programs restricting placement of advertising in media popular with children

The Recording Industry Association of America's ("RIAA") Parental Advisory Program Guidelines do not indicate that a sound recording is either appropriate or inappropriate for any particular age group. Instead, according to the RIAA, the parental advisory label is a clear "heads-up" to all consumers that a sound recording contains explicit content, and a method to empower parents to make their own determinations about what content is appropriate for their particular child.[96]  Accordingly, the RIAA's guidelines do not prohibit companies from placing, or even recommend that they refrain from placing, advertising for explicit-content labeled recordings in media popular with children.

Not surprisingly, therefore, in previous reports the Commission consistently has found that the music industry advertises on television shows and in print magazines popular with teens.  Even though the parental advisory system does not purport to be an age-based system, such marketing appears inconsistent with a label that advises parents that some material may not be appropriate for children.[97] For this Report, the Commission requested that three music recording companies provide information, including marketing plans, about 14 explicit-content labeled recordings.[98]

#### 2.  Advertising placements:  current practices

##### a.  Television advertising – cable music channels

Television cable channels that show music videos and other music-related programming continue to figure prominently in the marketing of explicit-content labeled recordings to children under 17. Marketing documents the Commission examined for each of the 14 explicit-content labeled recordings discussed placing advertisements on some or all of the following music cable channels that have substantial youth audiences in many day-parts:  MTV; MTV2; BET; and Much Music USA.[99]  Nine of the 14 marketing plans examined specifically discussed placing this advertising on popular after-school and early-prime-time shows such as MTV's *Total Request Live* ("*TRL*") and *Direct Effect* and BET's *Rap City* and *106th & Park*.[100]  In addition, marketing documents for 10 of the 14 recordings discussed promoting the recording on these cable music channels in other ways, either through rotation of videos associated with the recording, contests, or artist appearances on programming such as *TRL*, *Direct Effect* and *106th & Park*.[101]

To supplement information from the marketing plans, the Commission obtained additional information on advertising for explicit-content labeled recordings aired during popular teen programs on cable television during the months of May and June 2003.[102]  Four of the five major recording companies[103] as well as three independent record labels placed advertising for 13 different explicit-content labeled recordings on cable music programming popular with teens.[104]  First airing data for June 2002 through September 2003[105] reviewed by the Commission showed that the five major recording

companies advertised 35 different explicit-content labeled recordings on programs with a substantial youth audience such as *106th & Park*,[106] *Direct Effect*,[107] and MTV's *WWE Heat.*[108]

### b.  Other television advertising

As indicated in earlier Commission reports, marketing plans for explicit-content labeled recordings place much less emphasis on network and non-music cable channel advertising and promotions.  This continues to be the case.  Five of the 14 marketing plans indicated plans to advertise explicit-content labeled recordings on wrestling programs.  A sixth marketing plan indicated that it would advertise an explicit-content labeled recording on *Yugioh*, a children's cartoon program that airs on the WB channel daily at 4:30 p.m.[109]  None of the other marketing plans examined discussed placing advertising on network television.

Additional advertising information the Commission obtained for popular television programs aired on network and non-music cable programming revealed that two recording companies ran advertising for two different explicit-content labeled recordings during *WWF Smackdown* and syndicated airings of *The Simpsons*.[110]  First airing data obtained by the Commission also showed that a third recording company advertised an explicit-content labeled recording on the WB's *The Gilmore Girls*.[111]

### c.  Print advertising

Since the Commission's initial report in September 2000, the recording industry has shown steady improvement in the area of ad placement in print media with substantial teen audiences.  The Commission's most recent review shows that only 21% (three of 14) of the marketing plans examined discussed placing advertising in magazines with a majority or substantial teen audience, compared to 70% of the marketing plans reviewed for September 2000 Report.[112]

The Commission's monitoring of print advertising confirms the trend toward fewer advertising placements in popular teen magazines.  Over a four-month period, the Commission reviewed advertisements in seven magazines with a majority or substantial readership under 18,[113] and found that two of the five recording companies – EMI and UMG – each ran one advertisement for an explicit-content labeled recording.[114]  Over the same time period, independent record companies ran four ads for explicit-content labeled recordings in *Thrasher* and one in *Right On!*  These results show marked improvement from the results reported in April 2001 where 77 ads were placed in four magazines, and June 2002, where 14 ads were placed in three magazines.[115]

### d.  Internet marketing

As noted in previous reports, Internet advertising and promotion is an integral part of the marketing of explicit-content labeled recordings.[116]  Twelve of the 14 marketing plans reviewed for this Report discussed efforts to promote explicit recordings on websites with significant teen audiences, including Alloy.com, MTV.com, BET.com, Teenpeople.com, Katrillion.com, and AOL Teens Music.[117]  These

promotional efforts included artist interviews and online chats, "first listens" and premieres of music videos and singles, contests, music downloads, streaming concerts, and listening parties.

## B.  Advisory Labels and Reasons for Labels in Advertising

### 1.  Self-regulatory programs governing disclosure of parental advisory label and reasons

The RIAA's revised guidelines, effective April 1, 2002, enhanced the disclosure of the explicit-content designation in consumer advertising by requiring that, in addition to print advertising, radio and television advertising for explicit-content recordings also must "communicate the presence of explicit content."[118]  The guidelines note that this may be achieved by the use of an actual depiction of the parental advisory label ("PAL") in the ad, or by prominently displaying the exact wording of the PAL – "Explicit Content - Parental Advisory" – in the consumer advertisement.  In addition, if the advertisement contains a miniature depiction of the album cover, the guidelines suggest that, at a minimum, the words "Explicit Content - Parental Advisory" be placed nearby.[119]  In these instances, the guidelines require that the use of the PAL logo or the wording "Explicit Content - Parental Advisory" be legible.[120]

As noted in previous reports, unlike the motion picture and electronic game industries rating systems, the PAL does not provide the reasons for the advisory.  One of the major recording companies, BMG, began placing "enhanced" advisory labels on its explicit-content labeled recordings as of August 2002.  The parental advisory label that BMG uses indicates, when applicable, whether the recording has been stickered because of "Strong Language," "Sexual Content," "Violent Content," or "Sexual + Violent Content."[121]  The Commission is not aware that other recording companies have followed BMG's lead and adopted an expanded label that includes the particular reasons why the recording has an advisory.

### 2.  Advertising of advisory label: current practices

#### a.  Television and radio advertising

As noted above, the RIAA's policy to require advisories in television and radio advertisements became effective on April 1, 2002, and it appears advisory language is frequently included in television advertising.  The Commission obtained additional information about advertisements for explicit-content labeled recordings that aired during popular teen programs on cable, network, and syndicated television during May and June 2003.[122]  This data shows improvement in usage of the PAL logo:  all but one of the 25 ads contained the PAL logo,[123] a substantial improvement from the June 2002 Report, which showed that only about half of the 49 television ads for explicit-labeled recordings contained the PAL logo.[124]

A review of the sample television ads received by the Commission for this Report indicated that six of nine contained a legible PAL logo at the end of the advertisement.[125]  The PAL logos for the six ads

were prominent and legible, some extremely so.  In addition, advertising for two different recordings by one recording company also indicated that an edited version was available.  By contrast, sample advertising submitted by recording companies for the Commission's December 2001 Report did not include any advisory information.[126]  Neither of the two sample radio advertisements for explicit-content recordings submitted by one recording company to the Commission for this Report, however, communicated parental advisory information.

### b. Print advertising

The recording industry also continues to show improvement in placing PAL logos in print advertising for explicit-content recordings.  For this Report, the Commission reviewed ten magazines covering a 15-month period.[127]  The review showed that 60% (58 of 96) of the ads placed by the recording industry contained a PAL logo.  Only 74% of those advisories (43 of 58), however, were clear and conspicuous.[128]  An analysis of the most recent four months of monitoring period shows better results:  69% (9 of 13) of the ads placed by the recording industry for explicit-content recordings contained a PAL logo and all of the ads that contained the PAL logo used it in a clear and conspicuous fashion.[129]  These results show continued improvement since the Commission began monitoring print advertising in conjunction with the September 2000 Report.  At that time, the Commission's review of print advertising showed that only 8% (18 of 234) of ads in magazines popular with teens displayed the parental advisory.[130]  By the time of the June 2002 Report, 48% (12 of 25) of the ads placed by major recording companies for explicit-content recordings contained a PAL logo, all of which were clear and conspicuous.[131]

This recent review of magazines also showed fairly consistent usage of the PAL logo by retailers when placing ads for explicit-content labeled recordings.  Over the most recent four-month review period, two retailers placed six ads for explicit-content recordings; all of the ads contained the PAL logo.  In four instances the PAL logo was clear and conspicuous, while in the other two instances, it was small, but readable.[132]

A review of free-standing inserts in Sunday newspapers showed that most ads included a PAL logo on the clip art for the music promoted.  As pointed out in the June 2002 Report, however, these labels are frequently too small, blurry, or inconspicuously placed to be easily noticed or read.[133]  Progress in this area was lacking despite RIAA's specific acknowledgment of this potential problem and its suggestion that the wording "Explicit Content - Parental Advisory" be placed near the miniature depiction of the album in advertising.[134]  Two exceptions were ads for Target and Best Buy, which had larger, conspicuous labels and the addition of the words "Parental Advisory" next to the clip art for explicit titles.

### c. Internet promotions and sales

The current labeling program, updated in April 2002, provides guidelines for online sales of physical recordings and digital downloads.  The RIAA recommends that all online retail sites

prominently display the PAL logo when a shopper is searching for or reviewing recordings that are explicit-content labeled and suggests that an indication that a recording contains explicit content "appear in **all** stages of the purchases process – from search results to the shopping cart."[135]  The guidelines offer three ways to accomplish this:  using the PAL logo in a sufficiently legible size; prominently displaying the words "Explicit Content – Parental Advisory" in the product description; or including the same wording near the miniature depiction of the album.  The guidelines specifically recommend that companies avoid using inconsistent or unclear descriptions such as "E" (for explicit) or "PA" (for parental advisory).[136]  Finally, the RIAA recommends that individual sites, whether those of record companies or members of the online retail community, link to or otherwise incorporate information from the entertainment industry's informational website, www.parentalguide.org.

During the Commission's Workshop held in October 2003, the RIAA recognized the growing importance of the online distribution model for music, and identified the Internet as one of the methods that children are increasingly using to obtain music.[137]  In light of this development, the RIAA committed to revise its parental advisory guidelines to encourage online music downloading sites to provide effective parental control mechanisms and to reinforce the importance of using consistent parental advisory descriptors on these sites.[138]

For this Report, as it has done for the last three previous reports, the Commission surveyed websites to determine whether industry members are providing online disclosures about explicit content.  It surveyed 20 artist and recording company sites and five major online retailer sites.  For the first time, the Commission also surveyed six popular online music downloading services as well as four peer-to-peer file-sharing services.

### (1)   Artist or recording company websites

Despite the extension of the RIAA guidelines to include the online distribution and promotion of explicit-content labeled recordings on the Internet, the recording industry's performance in this area showed little, if any, improvement.  For this Report, the Commission examined 20 official artist and recording company websites.[139]  Sixty percent (12 of 20) of the sites displayed the PAL logo,[140] compared to 50% (10 of 20) in the June 2002 Report.[141]  Eight of those 12 sites (about 67%) displayed the PAL logo on the home page and/or teaser page,[142] compared to 80% (8 of 10) in the June 2002.[143]  In addition, the percentage of sites that provided a legible PAL logo shrank from 90% (9 of 10) in June 2002 to 67% (8 of 12) in this review.

Fewer websites provided lyrics for the explicit-content labeled recordings, although the number of sites that allowed the visitor to listen to audio samples and play downloadable video clips stayed about the same.[144]  Furthermore, while 25% of the sites in June 2002 provided a link to riaa.org or parentalguide.org, only 15% percent of the sites surveyed for this Report did.

Seventy-five percent (15 of 20) of the music company and artist websites examined offered the opportunity to purchase the explicit-content labeled recording, either from an official recording company website or through a link to a third-party online retailer.[145]  The PAL logo or other advisory language

about the explicit content of the recording was visible some time during the search or purchase process for about 67% (10 of 15) of the sites.[146]  In six out of ten of those cases, however, the website merely showed a PAL logo on the cover art and once the recording was placed in the shopping cart, there was no indication of explicit content.[147]  In comparison, the websites for Sony and Atlantic Records were particularly effective in providing the PAL logo as well as other advisory language about the content of the recording through most, if not all, of the entire purchase process as recommended by the RIAA's guidelines.

### (2)  Retailer websites

The review of the five major online retailers' websites showed results somewhat similar to those found in past surveys.[148]  In nearly all cases (22 out of 24 recordings), the websites either displayed the PAL logo on the album art, or used other language indicating explicit content.[149]  Both Circuit City and Sam Goody relied solely on the PAL logo on the album cover art to relay information about the explicit-content status of the recording.  In many of these cases, the PAL logo was difficult to read, although Sam Goody indicated that the recordings contained "Explicit Lyrics" during the checkout process.  Nearly two-thirds of the time (in 15 of 24 instances), the visitor, regardless of age, could play either part or the full version of songs from the album.  This was similar to the findings made in the June 2002 Report.[150]

None of the websites linked to the entertainment industry's informational site, parentalguide.org, although Bestbuy.com did provide detailed information about the parental advisory label system when the visitor clicked on the words "Parental Advisory."  Towerrecords.com was the only website reviewed that consistently provided advisory language throughout the purchasing process, for all albums surveyed.

Although not examined as part of the music retailer survey, the Commission also reviewed the online shopping portions of MTV.com and VH1.com for each of the same five explicit-content labeled recordings.  In all instances, both MTV.com and VH1.com indicated that the recording had a parental advisory.  VH1.com used the PAL logo on the album cover art,[151] while MTV.com used large lettering indicating "Explicit Version."  Both sites also indicated explicit content during the search function – VH1.com used "PA" while MTV.com noted that the recording was the "Explicit Version."  In addition, MTV.com provided advisory language for all five albums during the checkout process, as recommended by the RIAA's guidelines.  Neither site linked to parentalguide.org or otherwise provided information about the industry's parental advisory labeling program.

### (3)  Music downloading websites

For the first time, the Commission examined the online disclosure practices of several online digital music providers.[152]  For this Report, the Commission examined six popular online music downloading sites to determine whether these services followed the RIAA's guidelines regarding the notice of the parental advisory for Internet-based sales and promotions.[153]

Although all six of the online music downloading services labeled explicit-content music with a parental advisory, the method for doing so varied from one service to another. Three services used the terminology "Explicit" when a track or album had received an explicit-content designation,[154] while the other three services merely used the initials "PA."[155] These designations were displayed either next to the track title or next to the album title. All of the services also offered edited versions of explicit-content labeled recordings and provided this information through the use of the words "Edited" or "Clean." In addition, five of the six services also used album cover art displaying the PAL logo on their websites.[156] The logo was often barely legible, however, and in some cases it was completely illegible.

Four of the six services provided information about the explicit content of a song while it was being played.[157] In particular, Napster depicted a very noticeable PAL logo on the toolbar during song playback. Three of the six services indicated that a track contained explicit content during download to a user's hard drive.[158]

Half of the services provided information about the Parental Advisory system by linking to parentalguide.org as recommended by the RIAA's guidelines.[159] On the iTunes service, clicking on the "Explicit" or "Clean Lyrics" icon located next to the album cover art brought the user to a pop-up screen that displayed a detailed description of the Parental Advisory system and linked to the RIAA's website, riaa.org. Although not required by the RIAA's guidelines, only Napster and MusicNet provided any sort of parental control mechanism to allow the parent to prevent a child's access to explicit-content labeled music.[160]

### (4)   Peer-to-peer file-sharing services

The Commission examined the software and websites of four popular peer-to-peer file-sharing services for this Report, to assess what on-line disclosures, if any, are made regarding the content of individual files shared by users of these services.[161] All four services offer consumers the ability to download free software that enables them to share files, including music downloads, with other users.[162] The files do not reside in a central location, but rather are stored on the hard drives of the users of the software. None of the peer-to-peer file-sharing services themselves label or otherwise provide notice of explicit content for music recordings that had been designated with a parental advisory by a recording company. Instead, each user of a particular peer-to-peer file-sharing program uploads files to a shared folder on his or her own hard drive and thus can label or designate the file in any manner he or she chooses. Accordingly, each file, if labeled or otherwise described as having explicit content, would have been labeled by the individual user. Thus, as industry correctly notes, this means of distribution effectively circumvents the parent advisory labeling system.[163]

Each of the peer-to-peer file-sharing programs offered some type of filter to exclude unwanted content. Kazaa and LimeWire provided filters that blocked access to materials that contained offensive or otherwise adult words in the description of the file.[164] In addition, all four services gave users the ability to create their own filters by manually entering all the words that they wanted blocked from search results. All of these filters, however, operate by filtering language found in the title or descriptor

of the file, rather than the content of the file.  For example, music recordings that have been designated with a parental advisory by a recording company would only be blocked by the filter if a word in the title or descriptor of the file happened to be offensive.  A recording company may have decided to apply the Parental Advisory Label to a particular recording for any number of reasons other than the presence of offensive words in the title.  Substituting the use of a filter in place of the Parental Advisory Label undermines the recording company's own determination of whether to label a particular recording.

The limitation of this type of filter is also an issue when files have been mislabeled.  As reported frequently in the press and in government reports, many files are labeled inaccurately, sometimes intentionally, and even though the descriptor may be innocuous, the file may be explicit or pornographic in nature and may contain viruses and spyware.[165]  To caution computer users about the potential privacy and security risks associated with peer-to-peer file-sharing, the Commission issued a consumer alert in July 2003.[166]

## C.  Efforts to Enforce the Labeling System at Point-of-Sale

In its December 2001 Report, the Commission reported that its nationwide undercover study had found that 90% of unaccompanied children ages 13-16 were able to buy explicit-content labeled recordings at retail stores.[167]  A similar survey conducted for this Report shows a slight decrease in the percentage of sales:  83% of unaccompanied teens, ages 13-16, were able to buy an explicit recording.[168]  Furthermore, there appears to be some improvement in preventing the sale of explicit-content labeled recordings to the youngest shoppers:  69% of 13-year-olds were able to buy explicit-content labeled recordings, as compared to 87% of 13-year-olds as reported in the December 2001 Report.  A breakout by age of the mystery shop results follows:

**FTC Mystery Shop Results by Age - Music**
**Q.  Was the shopper able to make the purchase?**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 31% | 15% | 14% | 4% | 17% |
| Yes | 69% | 85% | 86% | 96% | 83% |
| # of Shoppers | 65 | 48 | 63 | 47 | 223 |

## D.  Product Packaging

Once a recording company or an artist determines that a sound recording warrants a Parental Advisory Label, the RIAA guidelines require that the label "be plainly displayed in nonremovable form on the album cover" and be placed beneath the cellophane shrink wrap.[169]  The RIAA also requires that the label measure 1" x 5/8."[170]

A review of the packaging of the 14 CDs produced to the Commission by three recording companies for this Report reveals a lack of compliance with the RIAA's labeling guidelines, primarily

with the RIAA's size requirement for the Parental Advisory Label.  Only 29% (4 of 14) of the CDs were in full compliance with requirements that the PAL logo be permanently affixed to the cover art of the album and that the logo measure 1" x 5/8."[171]  For nine of the 10 non-compliant CDs, the Parental Advisory Label logo was too small; for the remaining CD, the sticker was not permanently affixed.  In comparison, the September 2000 review of the packaging of CDs produced to the Commission showed that 50% (27 of 55) met the RIAA recommendations for size, placement, and format.[172]

The Commission's separate examination of the packaging of 25 top-selling CDs[173] that bore the Parental Advisory Label, however, suggested better compliance with the RIAA's guidelines:  48% (12 of 25) of the CDs examined fully complied with the requirements for size and placement of the Parental Advisory Label.  This is an improvement from September 2000, when only 36% (nine of 25) top-selling explicit recordings fully complied with the RIAA guidelines.[174]

**Product Packaging Review Results**

| Report | Origin of CDs | Size | Affixation |
|---|---|---|---|
| **Sept. 2000** | 55 produced by companies | 61% met size requirement (33/55) 39% too small (22/55) | 75% were part of cover art (41/55) 25% were stickers (14/55) |
| **Sept. 2000** | 25 purchased | 48% met size requirement (12/25) 52% too small (13/25) | 84% were part of cover art (21/25) 16% were stickers (4/25) |
| **June 2002** | 12 purchased | 83% met size requirement  (10/12) 17% were too small (2/12) | 92% were part of cover art (11/12) 8% were stickers (1/12) |
| **Dec. 2003** | 14 produced by companies | 36% met size requirement  (5/14) 64% too small (9/14) | 93% were part of cover art (13/14) 7% were stickers (1/14) |
| **Dec. 2003** | 25 purchased | 60% met size requirement (15/25) 40% too small (10/25) | 80% were part of cover art (20/25) 20% were stickers (5/25) |

## E.  Analysis of Current Industry Practices

Overall, the practices of the music industry show some improvement.  In particular, the industry has made progress in decreasing the amount of advertising placed in magazines popular with teens.  Although industry members continue to advertise explicit-content labeled recordings on cable music channels and wrestling programs popular with teens, advertising on other television shows is virtually nonexistent.  In addition, the industry continues to improve the frequency with which print and television ads for explicit-content labeled recordings contain the Parental Advisory Label.

The industry needs to ensure that the application of the Parental Advisory Label continues to improve in every venue:  compliance with RIAA guidelines for placement of the Parental Advisory Label on the packaging of top-selling recordings has increased only slightly, and little, if any, improvement has been shown in placing the Parental Advisory Label on websites.  Providing notice of the parental advisory is an important component of the RIAA's system, and the Commission encourages the recording industry to improve its performance in complying with this requirement.  Finally, retailers need to take additional steps to limit the sale of music with a parental advisory to children.

## IV. Electronic Games

### A. Marketing to Children:  Advertising Placement

#### 1.  Self-regulatory programs restricting placement of advertising in media popular with children

In its September 2000 Report, the Commission found widespread marketing of Mature ("M")-rated electronic games to children under 17[175] – a practice that violated the anti-targeting provision of the game industry's self-regulatory advertising and marketing code ("AdCode").  Following issuance of that report, the electronic game industry amended its anti-targeting provision to add specific standards defining targeting.  Under those provisions, ads for M-rated games cannot appear on TV and radio programs with a 35% or more under-17 audience, or in print media or on Internet sites with a 45% or more under-17 audience.[176]  In addition, on October 31, 2001, the ESRB implemented an expanded enforcement system premised on the severity of a particular violation and the number of points accrued by a publisher for past and current violations of the industry code.  Sanctions range from requiring corrective action to monetary fines for inappropriate target marketing.  In the first nine months of 2003, thirty-two companies were found to have violated the ESRB's requirements and were assessed points and, in four instances, fines.[177]

As a complement to restricting the marketing of M-rated electronic games to children under 17, the Commission's prior reports have noted programs developed by the VSDA and the ESRB for retailers that wish to restrict sale or rental of products.  Those programs continue.[178]  In addition, the IEMA has just announced a new initiative by its member retailers to restrict sales by the end of 2004.[179]

#### 2.  Advertising placements:  current practices

For this Report, the Commission monitored industry advertising placements on television and in print media.  In addition, the Commission reviewed marketing plans from three companies that had released and promoted several M-rated games in the last year, including information on where ads for those products were placed in major media, including television, print, and online.[180]

##### a.  Television advertising

None of the plans submitted to the Commission for the M-rated games expressly targeted an under-17 audience, although all that specified a target audience included youth as young as 17 or 18.[181]  In seeking to reach that 17- and 18-year-old audience, several of the marketing plans included at least some planned ad placements for M-rated games on television shows popular with teens, including *Jackass, Total Request Live, WWE Smackdown*, *Smallville*, and *King of the Hill*.[182]  Placements on MTV's *Total Request Live* would appear to run afoul of the industry's advertising code's prohibition against placing ads for M-rated games on shows with a 35% or greater under-17 audience, but the other shows are permitted under the code.[183]

To supplement information from the marketing plans, the Commission monitored advertising on network, cable, and syndicated programs popular with teens for an eight-week period commencing in May 2003.[184]  That monitoring found that ads were placed for two M-rated games (Midway's *Mortal Kombat*, and Microsoft's *Brute Force*) on *WWE Smackdown.*  In addition, ad monitoring data provided by The Parents Television Council for the period January to August 2003 showed several more ad placements for M-rated games on programs popular with teens, including MTV's *Making the Band 2* and *Sorority Life 2;* Fox's *Cedric the Entertainer;* UPN's *Girlfriends;* and WB's *Smallville.*[185]  The five M-rated games promoted on one or more of those programs were: Activision's *Tenchu: Wrath of Heaven*; Capcom's *Devil May Cry 2*; Microsoft's *Brute Force*; and SCEA's *Primal* and *The Getaway*. Although these ad placements would appear to comply with the AdCode's 35% requirement, all are on shows with large teen audiences.

### b.  Print advertising

In the September 2000 Report, the Commission found that game companies' marketing documents revealed plans to advertise M-rated games repeatedly in magazines with a substantial readership under 17.  The media plans submitted for this Report continue to show advertising in print media popular with teens, although virtually none of the print ad placements would violate the AdCode's standard that ads for M-rated games not be placed in print media with a 45% or greater under-17 audience.  Ads were often placed in print media that came very close to the 45% limit.  In only one instance did the media plans show that a company placed ads in a magazine with a majority under-17 readership.  The ESRB challenged that placement, but the company appealed ESRB's challenge on the basis that its media buyer had placed the ads in error.

To monitor industry-wide ad placements, the Commission reviewed *Electronic Gaming Monthly* and *Playstation 2 Magazine* over a four month period (June - September 2003).  Although neither of these magazines have a readership that is 45% or more under 17, each has a sizeable readership among teens and older children.[186]  The Commission's review found that ads for M-rated games made up 33% of the game ads placed in those magazines, even though M-rated games account for less than 10% of the game titles published in the last year.  A breakout of the magazine ads by rating is presented here.



Playstation 2 Magazine and Electronic Gaming Monthly Advertising Composition by Rating June – September 2003

E Rated 31%
M Rated 33%
T Rated 36%

"Rating Pending" ads are grouped by the rating they later received.

In addition to the large percentage of M-rated game ads found in *Electronic Gaming Monthly* and *Playstation 2 Magazine*, the Commission reviewed *Tips & Tricks*, which has a 43% readership under 17. In the *Tips & Tricks* issues from June to September 2003, 13% of the ads were for M-rated games.[187]

As noted in the Commission's June 2002 Report, the publisher of *GamePro* instituted a change to its M-rated game ad placement policy: ads for M-rated games are not allowed in its subscription edition because of its large under-17 readership (59%). Nonetheless, the Commission's review of the subscription edition of *GamePro* found ads by five different game publishers for six games that ultimately were rated M. These eight ads all carried a Rating Pending icon; each placement would, nonetheless, violate the AdCode if the game maker were aware at the time of placement that the game would likely be rated M.[188] Ads appeared in *GamePro* for: UbiSoft's *XIII*; Rockstar's *Grand Theft Auto Vice City*; THQ's *Pride Fighting Championships*; Gotham Games' *The Great Escape* and *Celebrity Deathmatch*; and Eidos's *Backyard Wrestling*. This finding is in contrast to the finding in the Commission's June 2002 Report, where a review of the *GamePro* subscription issues did not find any ads for M-rated games.[189]

One additional concern relates to the placement of ads for T-rated games in publications with a large pre-teen readership, such as *Nintendo Power*. The AdCode requires that "Companies . . . not specifically target advertising for entertainment software products rated "Teen," "Mature," or "Adults Only" to consumers for whom the product is not rated as appropriate." The Commission's review of *Nintendo Power* found many ads for T-rated games (suitable for those 13 and over) with violent content descriptors, even though 43% of its readership is 12 and under and the median age of its readers is 13.

Although the AdCode does not define what percentage of magazine readership might put a publication off limits for ads for T-rated games, the ESRB indicates that ads for T-rated games should not appear in publications that are targeted to children under 13. This would appear to cover magazines like *Boys Life* (Cub Scout Edition), *Nickelodeon Magazine*, *Disney Adventures*, and *Sports Illustrated for Kids*. None of those magazines were reviewed for this Report, except for the December 2003 issue of *Sports Illustrated for Kids*. Sixty-six percent of *Sports Illustrated for Kids'* readership is under 13. Contrary to the ESRB policy, there were four T-rated game ads – TDK Interactive's *The Haunted Mansion*, Namco's *I-Ninja*, Sony Computer Entertainment's *JAK II*, and Crystal Dynamics' *Whiplash*. In 2002, the Children's Advertising Review Unit ("CARU") of the Council of Better Business Bureaus challenged ad placements in *Sports Illustrated for Kids* for a T-rated game, *Tom and Jerry in War of the Whiskers*. The advertiser, NewKidCo., agreed not to make similar ad placements in the future.[190]

### c.   Internet advertising

In the September 2000 Report, the Commission found that nearly all of the game publishers studied had placed ads for M-rated games on websites popular with teens.[191] Marketing documents reviewed for this Report show that these practices continue. Nonetheless, none of these ads placements would violate the AdCode's requirement that ads for M-rated games not appear on websites with a 45% or greater under-17 audience.[192] The marketing plans do, however, show ad placements on websites where

youth visitors constitute one third or more of the audience. These sites include gamespot.com (33%), gamespy.com (36%), and IGN.com (40%).[193]

### d. Cross-promotions

The AdCode addresses cross-promotions and cross-sells. Cross-promotions are defined as "promotions that feature entertainment software products in conjunction with another company's brand, products or event." The AdCode prohibits such promotions for M-rated games with another company's event if it is reasonable to assume that the event will reach a "substantial audience of persons under 17 years old."[194] Cross-sells are defined as "ancillary or separate entertainment software products that are being sold or promoted in conjunction with a core entertainment software or hardware product."[195] Under its cross-sell requirements, the AdCode prohibits the use of a T-rated product to market a game that is M-rated.[196]

Two promotions involving video games occurred in 2003 that concern cross-promotions and cross-sells. The first, the Lollapalooza music festival, involved a cross-promotion with video games. Part of the festival's appeal was GameRiot, essentially a tent in the middle of the concert area that allowed festival attendees to play various video games and compete in game contests. The games available for play at GameRiot were of various ratings, and included several popular and violent M-rated games.[197] Although the festival was billed as targeting 14-34 year-olds, festival promoters made efforts to ensure that tournament players of the M-rated games were at least 17.

A second promotion involved a cross-sell where a video game was used to promote a movie. According to various reports, the T-rated *Enter the Matrix* video game contains a trailer for the R-rated movie, *Matrix Revolutions*.[198] The cross-sell prohibitions of the AdCode prohibit an industry member from using a T-rated game to promote an M-rated (17+) game. Here the promotion was for an R-rated (17+) movie. With the increasing cross-promotions across entertainment media, questions can be raised about whether members in one industry could use promotions of another industry's products to market to an audience that it could not directly reach in its own promotions.[199]

## B. Ratings and Reasons for Ratings in Advertising

### 1. Self-regulatory programs governing disclosure of ratings and reasons

In the September 2000 Report, the Commission recommended that all advertising contain both the rating and the reasons for that rating, also known as content descriptors. The ESA and the ESRB require that such information be included in print advertisements, and that the rating (but not the content descriptors) be included in television and radio advertising. In addition, some game publishers have gone beyond the ESRB requirements to include content descriptors in television ads.[200] The ESRB also continues substantial efforts to educate parents about the rating system.

The ESRB has made several revisions to its Adcode since the Commission's June 2002 Report, including increasing the size of the rating icon in print ads, changing the size and design of the

requirements for descriptors on the back of packaging, and requiring age identifiers on the Mature and Adults Only icons (Mature icon now says "MATURE 17+").[201]

### 2. Advertising of rating information: current practices

#### a. Television advertising

For this Report, the Commission reviewed a selection of ads for M-rated games that aired in 2003. This review found that all but one of the 10 game ads included the AdCode's required voice-overs and rating icons. One 30-second ad incorrectly used the abbreviated voice-over intended for shorter, 15-second ads.[202] These results suggest game industry advertisers are generally complying with industry requirements for disclosing rating information in television advertising.

#### b. Print advertising

In its review of print ads in the June 2002 Report, the Commission found nearly all game advertisers either fully or substantially complied with industry requirements for rating disclosure, with 2% of ads containing a very small icon or descriptor and 1% missing or containing an incorrect icon or descriptor.[203]

For this Report, the Commission conducted a review of print ads running between June 2002 and October 2003[204] in the following six popular game enthusiast magazines: *100% Independent PlayStation 2 Magazine, GamePro, Computer Gaming World, Electronic Gaming Monthly, Tips & Tricks,* and *Nintendo Power*. Overall, 4% of the ads reviewed contained an icon that was sized substantially below the ESRB requirements and



another 2% of the ads contained a missing or incorrect icon or descriptor.[205]

A large majority of the major advertisers were in compliance with industry standards. Of the 52 companies that placed four or more ads during the eighteen-month review period, 39 adhered to the industry standards. The companies that did not comply placed at least some ads that had icons and descriptors that were incorrect or missing altogether.[206]

The Commission also reviewed retailer ads in these same publications from Best Buy, Electronics Boutique, Wal-Mart, Ebay, Amazon.com, CompUSA, Virgin Megastore, Kmart, and Pricegrabber.com. Each of the retailers displayed the rating icon on the cover art of the product packaging shown in

the ad. Two retailers, Wal-Mart and Best Buy, also included an ESRB icon in their ads showing the range of ratings displayed in the ad like "RP-T." None of the retailer ads displayed the games' content descriptors.

A review of free-standing Sunday newspaper inserts showed that most of the retailer ads included the game's rating on the clip art, although the rating was often hard to find and read. Target and Best Buy were the most consistent in displaying conspicuous or enlarged M ratings on M-rated games. In addition, Best Buy included the words "Mature Rating," and Target added "Rated M for Mature" next to the clip art for M-rated games. Toys "R" Us prominently displayed an explanation of each of the ratings on the page where the game ads appeared. Best Buy, Circuit City, and Toys "R" Us disclosed the ESRB toll-free phone number near advertisements for games, and Circuit City and Toys "R" Us included the address for the ESRB website. None of the retailer ads displayed the games' content descriptors.

### c. Internet advertising

#### (1) Game publisher websites

The Adcode requires a number of specific disclosures for game publishers' websites. If the publisher's advertisement is one-fourth of a screen page or larger, the rating icon and content descriptors must be visibly and prominently displayed directly on the advertisement.[207] If the publisher is selling the game online, both the rating icon and content descriptors must appear on any page where a game can be purchased.[208] For game "demos," the rating icon and content descriptors or text of rating information (*e.g.*, "ESRB Rating: EVERYONE with COMIC MISCHIEF") must be displayed adjacent to the name of the title on the page where the demo is accessed or on the page prior to download.[209]

Twenty game websites were surfed to determine their compliance with the ESRB's requirements.[210] Seventy-five percent of the websites displayed the ESRB rating and icon somewhere on the site, and 14 out of 15 displayed the rating on either the home page or teaser page. Two of the sites, *Hunter the Reckoning – Wayward* and *Silent Scope Complete*, still displayed an "RP" rating instead of the correct "M" rating. Nine of the 15 required the visitor to scroll down the screen to view the rating.

Nine of the game websites displayed content descriptors and two-thirds of those sites required the visitor to hold the cursor over the rating icon to view the content descriptors. Fourteen of the sites had a demo available either to view or to play. However, only three of the demos displayed the rating and content descriptors. The sites that did display the rating and descriptor were *Return to Castle Wolfenstein*, *SWAT: Global Strike Team* and *True Crime: Streets of LA*. The site for *Postal 2* contained a facetious "warning" statement about the content of the site.[211]

Twelve of the sites allowed the visitor to purchase the game, either at the site or through a third-party site. Eleven of the games that could be purchased displayed a rating on a page that the visitor had to view at some point during the purchase process of the game, but only three displayed content descriptors on a page that the visitor had to view during the purchase process. Forty percent of the game sites provided a link to the ESRB website.

The site for *X Files* was the only site that provided specific information about the ESRB ratings. None of the sites linked to parentalguide.org. The homepage for *Outlaw Volleyball* linked to a section of the site containing sexually explicit imagery, although there was a disclosure stating that this section may not be suitable for children under 18.

### (2)   Retailer websites

For this Report, the Commission reviewed five retailer sites – Amazon.com, BestBuy.com, CircuitCity.com, EBGames.com, and GameStop.com – to see if they included rating information for five M-rated games.[212]  Parents looking on major retailers' sites for a game's rating can usually find it easily. The rating was usually prominently placed near the box art.  The retailers linked from the web page with information on the game to helpful information on the ESRB rating system – Circuit City also linked to the ESRB's website, www.esrb.org.  Some of the sites also provide additional information, such as reviews or descriptions of the game, that may give more details about game play and content.

Aside from EBGames, however, only one site provided the ESRB content descriptors in addition to the rating – and then only for one of the five games checked.  Also, while the rating itself was usually provided, the ratings given were not always accurate.  One site erroneously categorized a game as not having been rated, when it was actually rated "Mature"; another site indicated that a Mature-rated game was rated "Teen."  Two sites provided a rating in writing that was inconsistent with a rating icon visible on the game's box art.  In one case the site indicated that the game had been rated "Mature," when the icon on the game's box art indicated "RP" (rating pending); in the other, the reverse situation occurred, as the site indicated the game had not yet been rated, when the icon on the box indicated that the game was rated "M."  Similarly, the content descriptors that were provided were often different, though usually subtly, from the official content descriptors assigned by the ESRB.  One game that the ESRB assigned an "intense violence" descriptor was instead described as containing "violence."

The EBGames site was exemplary in providing information about the rating system and the ratings process and in providing the content descriptors, both in text and in several instances in a screen shot of the back of the box art.

## C.  Efforts to Enforce the Rating System at Point-of-Sale

The Commission's prior nationwide undercover surveys in 2000 and 2001 found that unaccompanied children ages 13-16 were able to buy M-rated games 85% (2000) and 78% (2001) of the time.  The survey conducted for this Report shows continued, modest improvement.  Sixty-nine percent of the children were able to purchase M-rated games, and more than half (56%) of the youngest shoppers – 13-year-olds – were able to buy an M-rated game.  A breakout by age of the mystery shop results follows:

**FTC Mystery Shop Results by Age – Electronic Games**
**Q.  Was the shopper able to make the purchase?**

|              | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|--------------|--------------|--------------|--------------|--------------|-------|
| No           | 44%          | 23%          | 34%          | 15%          | 31%   |
| Yes          | 56%          | 77%          | 66%          | 85%          | 69%   |
| # of Shoppers| 68           | 47           | 62           | 48           | 225   |

Even among those retailers with programs in place to restrict sales,[213] 55% of the unaccompanied children were able to buy violent M-rated games.  Although the results reflect improvement from the Commission's last survey two years ago and indicate that some retailers are enforcing policies to restrict sales, the numbers still fall short of what might be expected given the multi-year effort by the ESRB to encourage retailers to adopt restrictive sales policies.  The trade group representing game retailers, the IEMA, indicated at the Workshop that the industry was considering additional steps and would have some announcement in the near future.[214]  On December 8, 2003, the IEMA announced that all merchants belonging to the association will have in place by the "Holiday Season of 2004" a national carding program and an identification check process for all M-rated games.[215]

Such steps are important because M-rated games continue to be very popular with young teens, especially boys.  A recent Gallup poll reported that 75% of boys 17 and under indicated that they had played at least one of the games in the *Grand Theft Auto* series.[216]  Additional data from Gallup suggests as well that the younger respondents (those age 13 to 15) were more likely to say they had played a game in the series than the older respondents (age 16 or 17).[217]  The latest *Video Game Report Card* issued by the National Institute on Media and the Family notes that its own survey, conducted in the summer of 2003, showed that 87% of tween and teen boys (and 46% of girls) say they have played M-rated games, and that most indicate that M-rated games are among their favorites.[218]  According to industry data, nearly 40% of M-rated games purchased in 2002 were for children under 17.[219]

## D.  Product Packaging

To obtain a rating from the ESRB, companies must agree to place the assigned ESRB rating icon on the lower portion of the front of the package, and any content descriptors on the lower portion of the back of the package.[220]  The size of the rating icon varies with the size of the box.[221]  The rating icon also must be displayed legibly and prominently on game cartridges, compact discs, and smart cards, and on or in the game's manual or an accompanying insert.[222]  In June 2003, the ESRB improved these requirements (enforcement of these new provisions began on September 30, 2003).  The ESRB now requires that a game's content descriptors be placed in a rectangular box attached to the rating icon on the lower portion of the back of the product package.[223]  This change enhances the readability and prominence of the descriptors.  Still, the Commission is aware of research that suggests that most parents would prefer to have a game's content descriptors on the front of the package.

## E.  Analysis of Current Industry Practices

As the Commission has recognized in its prior reports, the electronic game industry has adopted numerous standards that limit children's exposure to ads for Mature-rated products and require the disclosure of rating information in most forms of advertising.  The industry is actively enforcing those standards and penalizing those companies found to be in noncompliance.  Yet those standards permit, and, in fact, industry members continue to place, advertisements in television and print media with substantial youth audiences.

The industry, with the exception of some retailers, continues in nearly all instances to include in its advertising rating information that would be helpful for parents.  Retailers, while doing a better job in restricting sales to children of Mature-rated products, still routinely make such sales to most buyers.  These sales should diminish substantially, however, if promised industry improvements in adopting and enforcing restrictive sales policies are put into place by the end of this year.

# V.  Conclusion

The Commission's review of marketing practices by the motion picture, music recording, and electronic game industries reveals that the movie and game industries continue to comply, for the most part, with their self-regulatory limits on ad placement, and that the music industry has made some progress in this area as well.  In addition, the industries are disclosing rating information in most forms of advertising, and generally are doing so in a clear and conspicuous manner; this practice is not widespread among retailers, however.

Nonetheless, the Commission finds that all three industries continue to advertise violent R-rated movies, explicit-content labeled recordings, and M-rated games in media with large teen audiences.  The Commission has noted this practice in earlier reports.[224]  In addition, despite the existence of restrictive policies among some retailers, the Commission continues to find that teens can purchase rated or labeled entertainment products at a significant number of stores and theaters.  The movie theater industry has made real progress in this area, and to a lesser extent so have game retailers, compared to the Commission's prior "mystery shops," but there remains room for improvement across the board.

The Commission recommends that all three industries continue to improve compliance with existing ad placement guidelines and rating information practices, with particular attention to avoiding advertising in venues popular with under-17 audiences, regardless of whether those audiences reach or exceed 35%.[225]  All three industries should also consider developing "best practices" to avoid advertising in venues popular with teen audiences, such as recommending  that promotions for R-rated films not take place in venues likely to attract significant numbers of young teens or that advertisements not be placed on websites that have a substantial teen audience.

The Commission also recommends that the industries continue to improve their rating information disclosure practices.  Although there has been notable progress in both the frequency and legibility of rating information disclosures, there remains room for improvement in both areas.  With respect to

retailers, both in-store and online, the Commission encourages better disclosure of ratings and reasons in advertising, and more widespread implementation and enforcement of sales policies restricting children's access to restricted or labeled entertainment media, and, in particular, to R-rated DVDs and home videos, music with a parental advisory, and M-rated games.[226]  It is particularly noteworthy that although movie theaters are doing much to restrict children's access to R-rated motion pictures, DVD retailers of the same movies appear to be doing little to prevent such sales.

Currently, the movie industry typically places the movie's rating and ratings reasons on the back of each video and DVD.  In addition, although the electronic game industry does place the game's rating on the front of product packaging, it still puts the game's content descriptors on the back.  Having both industries consider placing all of the rating information prominently on the front of product packaging would not only make that information more visible for parents and children, it would also assist retail store clerks who might be enforcing a policy not to sell R-rated videos or DVDs and M-rated video games to children.  Moreover, the Commission repeats the recommendation it has made in prior reports that the music industry consider providing more information on product packaging and in advertising as to why a particular recording has been labeled with a parental advisory.[227]  BMG's use of an enhanced label that includes such information provides a good model for others to follow.

Further, as directed by Congress, the Commission will work with video game publishers and retailers toward ensuring that games rated T and M are not marketed or sold to children in a manner inconsistent with the rating's age guideline.  The Commission also will undertake efforts to educate parents about the content included in T and M games.  Finally, the Commission has made its toll-free consumer complaint line and its website complaint form available for consumer complaints regarding media violence, and is publicizing to consumers the availability of these complaint mechanisms. Following implementation of these steps and a one-year period of monitoring industry practices and consumer concerns, the Commission believes that a follow-up report would be appropriate.

Because of First Amendment issues, the Commission supports private sector initiatives by industry and individual companies to implement these suggestions.  All three industries have taken positive steps in response to many of the Commission's past recommendations.  Nonetheless, more progress is needed in several important areas, and the Commission will work with industry and parent groups to encourage such change.

# Endnotes

1.  See June 2002 Report at 1, nn.1-2.

2.  The MPAA's system designates movies with one of the following ratings:  **G** (General Audiences.  All ages admitted);  **PG** (Parental Guidance Suggested.  Some material may not be suitable for children);  **PG-13** (Parents Strongly Cautioned.  Some material may be inappropriate for children under 13);  **R** (Restricted.  Under 17 requires accompanying parent or adult guardian); and **NC-17** (No one 17 and under admitted).  Each film assigned a rating other than G also receives a brief explanation for the film's rating, *e.g.*, "Rated R for terror, violence and language," or "Rated PG-13 for intense sci-fi violence, some sexuality and brief nudity."

    The ESRB's system designates electronic games with one of the following ratings:  **EC** (Early Childhood.  Suitable for ages 3 and older.  Contains no material that parents would find inappropriate);  **E** (Everyone.  Suitable for persons ages 6 and older.  Titles in this category may contain minimal violence, some comic mischief and/or mild language);  **T** (Teen.  Suitable for persons ages 13 and older.  May contain violent content, mild or strong language, and/or suggestive themes);  **M** (Mature.  Suitable for persons ages 17 and older.  Titles in this category may contain mature sexual themes, more intense violence and/or strong language);  **AO** (Adults Only.  Suitable only for adults.  Titles in this category may include graphic depictions of sex and/or violence.  Adults Only products are not intended for persons under the age of 18.); and **RP** (Rating Pending).  As in the motion picture rating system, a descriptive phrase may be assigned to the letter rating to indicate content that might be of concern to parents, such as language, sexual themes, or violence.  Current descriptors reflecting violent content include "Animated Blood," "Blood," "Blood and Gore," "Cartoon Violence," "Comic Mischief," "Fantasy Violence," "Intense Violence," "Mild Violence," "Sexual Violence," and "Violence."

    The RIAA encourages its members to use a parental advisory label, a black and white label that says  "Parental Advisory, Explicit Content."

    

    RIAA's labeling program does not provide reasons for the advisory label or "content descriptors" indicating the nature or the amount of the explicit content (*e.g.*, strong language or graphic references to violence, sex, or substance abuse).  Instead, one advisory covers a broad spectrum of content, including violence and/or sex.  Also, it is not an age-based system, and the label does not specify the age groups for which an explicit-content labeled recording may be inappropriate.

3.  The Commission's prior follow-up reports described the following industry-wide initiatives:

    *   The MPAA's 12-point initiative promised:  to avoid running trailers for violent R-rated films before G-rated feature films; to review policies regarding marketing violent R-rated movies to children; to avoid using children in research for R-rated films; to install compliance officers to review their marketing practices; to encourage movie theaters to enforce the R-rating restriction; and to take steps to include the reasons for ratings in print advertisements, on websites, and in home videos.  The MPAA member studios – the Walt Disney Company, Metro-Goldwyn-Mayer, Paramount Pictures, Sony Pictures Entertainment, Twentieth Century Fox Film Corp., Universal City Studios, and Warner Bros. – plus Dreamworks SKG, which is not an MPAA member, signed on to the initiative.  *See* Motion Picture Association of America, *A Response to the FTC Report* (Sept. 26, 2000).

    *   NATO's 12-point initiative:  reaffirmed its ID-check policy for R and NC-17 films; promised not to show trailers advertising R films before any G or PG film, and only before PG-13 films if consistent in tone and content with the feature film; and committed to appoint an executive compliance officer and seek additional ways to disseminate rating information.  *See* National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission).

    *   The RIAA's revised Parental Advisory Labeling system recommended the use of:  broad standards for making the explicit-content labeling decisions and guidelines for placing the advisory in print advertising and on retail websites.  In July 2001, the RIAA announced that its members supported placing the advisory label in *all* advertising for explicit content recordings, as well as increasing efforts to provide parents with information about the labeling system.  *See* Testimony of Hilary B. Rosen, President and CEO, Recording Industry Association of America, House Subcommittee on Telecommunications and the Internet (July 20, 2001).

    *   The IDSA's revised Advertising Code of Conduct ("AdCode") limited ad placements in magazines, television shows, and Internet sites popular with teens.  The Entertainment Software Rating Board ("ESRB") stepped up its enforcement of the AdCode and began to develop additional sanctions for repeat violators of its provisions.  *See*

Testimony of Douglas Lowenstein, President, Interactive Digital Software Association, House Subcommittee on Telecommunications and the Internet (July 20, 2001).

4. The Commission sent requests to Warner Bros., Twentieth Century Fox, and Sony Pictures Entertainment. These studios were selected because, during the period of review, they were among those that released the most films rated R based, at least in part, on violent content. Each studio cooperated in supplying its marketing materials.

5. These films were selected after taking into account factors such as the extent of the marketing of the film during the review period, the amount the film grossed, and whether the film had been released on DVD/home video.

6. Because the recording companies do not keep track of which recordings received the parental advisory label due to violent content, as opposed to some other explicit content, the Commission requested materials for recordings labeled for any reason due to their "explicit" content (which could include strong language and/or depictions of sex, violence, or substance use). The Commission did not attempt to evaluate which recordings contained violent lyrics. Recordings were selected based on their appearance as a top-selling album on "The Billboard 200" chart for the week of May 3, 2003.

7. The Commission sent requests to Sony Music Entertainment, Inc., Universal Music Group, and Warner Music Group. The companies were selected on the basis of industry data showing that they were the largest distributors of explicit-content labeled music during the review period. Each company cooperated in supplying materials.

8. The Commission sent requests to Activision, Inc., Capcom Entertainment, Inc., and Take-Two Interactive, Inc. The companies were selected on the basis of their size and the extent of marketing of M-rated games during the review period. Each company cooperated in supplying its marketing materials.

9. The Commission selected all the games rated M for violence that were marketed in the review period and not previously reviewed by the Commission.

10. September 2000 Report at 13-14.

11. *See* Motion Picture Association of America, *A Response to the FTC Report*, Sept. 26, 2000. Not every movie studio is an MPAA member. Studios who subscribed to the MPAA's 12-Point Initiatives are: Walt Disney Company, Dreamworks SKG, Metro-Goldwyn-Mayer, Paramount Pictures, Sony Pictures Entertainment, Twentieth Century Fox Film Corporation, Universal Studios, and Warner Bros.

12. *Id.*

13. *Id.* The studios further committed not to attach trailers for films rated R for violence to G-rated movies released on videocassette or on DVD. *Id.*

14. *Marketing Violence to Children II: Hearing Before the Senate Comm. on Commerce, Science and Transp.*, 106th Cong. (Sept. 27, 2000), Fed. New Serv., LEXIS, Legis Library, Hearng [sic] File.

15. National Association of Theatre Owners, *Response of the National Association of Theatre Owners (NATO) to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission). In addition, with respect to trailers for R-rated films shown in connection with PG-13-rated features, NATO members also pledged to "examine the trailers to ensure that their tone and content are consistent with the feature film." *Id.*

16. September 2000 Report at 14. Studio documents reviewed for this Report, including film audience "exit" surveys, confirmed that television commercials remain one of the most-cited sources of awareness of a film. MPAA member studios spent just over 40% of their total advertising costs for theatrical releases on network and spot television alone in 2002. *See* Motion Picture Association Worldwide Market Research, *U.S. Entertainment Industry: 2002 MPA Market Statistics* at 21 (citing MPAA).

17. *Marketing Violence to Children II: Hearing Before the Senate Comm. on Commerce, Science and Transp.*, 106th Cong. (Sept. 27, 2000), Fed. New Serv., LEXIS, Legis Library, Hearng [sic] File.

18. One studio, for example, pledged to adhere to network standards and practices, and also not to advertise films rated R for violence on certain programs, channels, and/or time periods, including Saturday morning children's cartoons, MTV before 7:00 p.m., Nickelodeon, and the Cartoon Network.

Many television networks have their own advertising standards or guidelines, which may affect studios' marketing plans for R-rated films. For example, according to documents produced by the studios, some networks allow advertising for R-rated films only during certain specified times of the day (*e.g.*, weekday "daytime" or after 9:00 p.m.) or during certain types of programming (*e.g.*, sports). Other networks prohibit ads for R-rated films during any "family programming," "children's programs," or any program with an anticipated under-17 audience of 35% or more.

19. The Commission found, nevertheless, that studios continued to place some ads for those films on some of the programs most watched by teens. June 2002 Report at 3.

20. The Commission purchased data from Video Monitoring Service ("VMS"), which monitored certain shows for an eight-week period between May and July 2003. These shows included programs with a significant under-17 audience share, and, in some cases, with an under-17 audience share over 35%. *See* Appendix C for demographic information pertaining to these shows.

The network programs monitored were: *7th Heaven, The Bernie Mac Show, Cedric the Entertainer*, *Gilmore Girls, King of the Hill, Malcolm in the Middle, Oliver Beene, The Simpsons, Smallville*, and *WWE Smackdown*. The cable shows monitored were: on BET, *Rap City* and *106th & Park*, and on MTV, *Direct Effect* and *Total Request Live*. For syndicated shows, the Commission monitored the following programs during the 5:00 p.m. to 7:30 p.m. time slots on Mondays in Los Angeles and New York: *Drew Carey, The Fresh Prince of Bel Air, The Hughleys, The Jamie Foxx Show, King of the Hill, Sabrina the Teenage Witch, The Simpsons*, and *The Steve Harvey Show*. The Commission ultimately did not count ad placements occurring on *Drew Carey*, *The Fresh Prince of Bel Air*, and *The Jamie Foxx Show* because the first two had less than 23% under-17 audiences, and demographic data was not obtained for *Jamie Foxx*.

21. For purposes of this Report, *WWE Smackdown* and *WWF Smackdown* refer to the same television program; the name was changed.

22. Ads for Warner Bros.' *The Matrix Reloaded* and *Terminator 3: Rise of the Machines* aired on the monitored programs a total of 21 times; Twentieth Century Fox's *Wrong Turn* was advertised 19 times and its subsidiary Fox Searchlight's *28 Days Later* 10 times; and Columbia (a subsidiary of Sony Pictures Entertainment) advertised *Bad Boys 2*, *Identity*, and *Gigli* a total of 9 times.

23. Advertising for home video and DVD release is substantial. Recent press reports have cited figures ranging from $641 million to $800 million in 2002, an increase of 63-72% over 2001. *See* "See Spots Run: Ads for DVD Proliferate," VB in DEPTH (June 13, 2003), *available at* www.videobusiness.com/article.asp?articleID=5637&query=see+spots+run&c atType=NEWS. One studio executive recently stated that 50% of a movie's revenues derive from DVD and home video release, and DVD sales reportedly have exceeded box office revenues for the first half of 2003 – $4.8 billion to $4.4 billion. "Pirates of the Internet," CBSNEWS.com (Nov. 2, 2003), www.cbsnews.com/stories/2003/10/31/60minutes/ main581153.shtml; Hugh Hart, "It's 'Pie' Taken to the Nth Degree," *Los Angeles Times* (Jul. 29, 2003).

24. The Commission obtained information as to the date, time, station, and program on which advertisements for violent R-rated films or DVD/home videos first aired during the time period June 2002 through early September 2003. *See* Appendix C for a full description of the first airing monitoring.

25. The Parents Television Council is a non-profit research and education organization concerned with the content of entertainment programming. The Council conducts its own ongoing monitoring program and tracks, among other things, advertisements for R-rated films that air on various networks and cable channels during prime time. As a courtesy, the Council made its information available to the Commission. The Commission examined the Council's data on advertisements for R-rated films that aired between January and August 2003.

26. Commercials for violent R-rated films airing on programs with substantial youth audiences included, for example: Fox's *28 Days Later* on *Smallville*; Fox's *Wrong Turn* on *Smallville* and *Cedric the Entertainer*; Sony Picture's *Basic* on *Smallville*, *The Bernie Mac Show*, and *Cedric the Entertainer*; Warner Bros.' *Cradle 2 the Grave* on *Cedric the Entertainer*, *Smallville,* and *The Bernie Mac Show*; Sony Picture's *Bad Boys II* on *Smallville*; New Line Cinema's *Final Destination 2* on *Smallville*; Columbia Pictures' *Gigli* on *Smallville*; and Universal's *The Life of David Gale* on *Smallville* and *The Bernie Mac Show*.

Commercials promoting the DVD/home video release of R-rated films that aired on programs with substantial youth audiences included Universal's *8 Mile* on *The Bernie Mac Show* and *Smallville*, and Warner Bros.' *Cradle 2 the Grave* on *Smallville*.

27. As noted previously, the Commission requested documents relating to three R-rated and one PG-13-rated film released by each studio, as well as documents relating generally to the studios' marketing practices.

28. All three studios signed on to the MPAA's 12-point Initiatives. In addition, one studio committed to avoid advertising its R-rated films during any time period or program which has an audience share of children under 17 exceeding 35%. Another studio implemented a policy not to advertise on any broadcast network programs with a 35% or higher anticipated under-17 audience size. Both of these studios state that they conduct ongoing reviews of audience demographics for relevant programming to ensure compliance. The third studio adheres to network standards and has further pledged not to advertise during specified times on certain channels, and excludes some channels altogether.

29.  Documents produced by the studio indicated that advertising on BET was "unacceptable" during the time periods those programs aired. In addition, Nielsen data indicates that both of these programs garner under-17 audiences well above 35%. *See* Appendix C. The studio also appears to have advertised these films on MTV during times that attract significant under-17 audiences.

30.  The television shows included *Smallville*, *Buffy the Vampire Slayer*, *Dawson's Creek*, and *Malcolm in the Middle*.

Studio documents and first airing data also revealed that a few ads for violent, PG-13-rated films were placed on television programming directed at or appealing to youth audiences under 13. For example, one studio advertised a PG-13-rated film on cable channels such as the Cartoon Network, ABC Family, and Nickelodeon, which are popular with very young audiences. In addition, ads for PG-13-rated films first aired on programs such as *Scooby Doo*, *Pokemon*, and *The Grim Adventures of Billy and Mandy* – shows with substantial or majority 2-11 audiences. Although the motion picture industry's self-regulatory code does not directly address the marketing of PG-13-rated films to children under 13 – nor does it restrict children under 13 from attending such films at theaters – the industry's PG-13 rating signifies "Parents Strongly Cautioned – Some material may be inappropriate for children under 13."

31.  September 2000 Report at 17-18.

32.  *E.g.*, December 2001 Report at 5-6 (no ads for R-rated films in magazines surveyed); June 2002 Report at 4 (same).

33.  The Commission monitored: *100% Independent Playstation 2 Magazine*, *CosmoGirl!*, *Electronic Gaming Monthly*, *GamePro*, *Metal Edge*, *Nintendo Power*, *Right On!*, *Seventeen*, *Teen People*, *Thrasher*, *Tips & Tricks*, *World Wrestling Entertainment Magazine* and *YM*. *See* Appendix C for demographic data pertaining to these magazines.

34.  Data in industry documents indicates that the under-17 audience share may currently be between 30% and 40%. *See* Appendix C at C-4.

35.  However, in listing the "highlights" of its national publicity campaigns, one of the studios cited feature stories, previews, and other mentions of two of its R-rated films in some youth-oriented magazines that it had listed as not appropriate for advertising such films. It is not clear from the documents whether such stories and other mentions resulted from the studio's publicity campaigns or from the magazines' own editorial decisions.

36.  September 2000 Report at 16-17.

37.  *Id.* Under this policy, a trailer for an R-rated film could be shown before a feature rated R or PG-13, and a trailer for a PG-13-rated film could be shown before a feature rated R, PG-13, or PG.

38.  September 2000 Report at 54.

39.  Studios further committed not to attach trailers for films rated R for violence to G-rated movies released on videocassettes or to DVDs containing G-rated movies. Motion Picture Association of America, *A Response to the FTC Report*, Sept. 26, 2000.

40.  Some studios took additional steps, such as sending letters to theater owners urging them to improve enforcement of the rating system. One of those studios also implemented a program whereby each trailer shipped to an exhibitor bears a sticker indicating the film's rating and, for films rated R, requesting that the theater not show the trailer in connection with feature films rated G or PG.

41.  National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission).

42.  Motion picture exhibitors ultimately determine which trailers run before feature films, but studios can influence those determinations. For example, a studio can physically "attach" a trailer to a specific film, or the studio can send a trailer to a theater with a request that the theater show the trailer before a particular feature. Two of the studios provided extensive lists of all feature films to which trailers for the studied R-rated films were attached or requested to be shown. The third studio did not provide such detailed information, but the documents produced did not indicate that trailers for the R-rated films, once the films were rated, were shown before features rated PG or G.

43.  Documents indicated that a trailer for one film, not yet rated but ultimately rated R, was shown before the PG-rated film *Star Wars Episode II: Attack of the Clones*. It is not clear whether the studio requested that the trailer be shown or the theater decided to show it.

44.  A trailer for one R-rated film was attached to the home video for the PG-rated film *Chasing Papi*.

45.  September 2000 Report at 17.

46.   December 2001 Report at 6-7.  The Commission's April 2001 and June 2002 Reports did not review promotional activities.

47.   All three studios also advertised online for the PG-13 rated films studied.

48.   One of the studios has a policy prohibiting advertising for films rated R for violence on any online sites "specifically targeted for children or teens."

49.   The Commission reviewed Nielsen//NetRatings demographic data on these and several other websites on which the studios, electronic game publishers, and music recording companies advertised products rated or labeled as potentially inappropriate for children.  A number of these sites had youth audiences over 35%, and others had between 25% and 35%.  See Appendix C for a list of these sites and demographic information pertaining to each.  In this regard, the Commission notes that documents the studios produced indicate that some Internet portals – including ones on which the studios also advertised – have implemented advertising guidelines that apply to motion pictures advertisements, which may affect advertising in this medium.

50.   For example, the studios sent letters to theater owners, newspapers, media agencies, and others encouraging those third parties to increase compliance with the MPAA rating system and applicable advertising guidelines.  One studio adopted a policy prohibiting actor appearances and interviews on certain youth-oriented television programming, and prohibiting the provision of publicity material to certain youth-oriented publications.  In addition, for R-rated films, the studios stopped testing television ads and trailers, and stopped conducting focus groups, on children under 17 who are not accompanied by a parent or adult guardian.  Prior to the September 2000 Report, studios had conducted research for R-rated films, such as focus groups and trailer tests, on children under 17.  See September 2000 Report at 14.

Documents reviewed for this Report revealed that one studio tested a television ad for an unrated film, which was ultimately rated PG-13, on children 8-11 years old; according to the documents, the film – a sequel to a PG-13 film – was expected to be rated either PG or PG-13.

51.   Both the film and video game were released on the same day, and the game was marketed as one component of "the most integrated entertainment experience to date."  Other components of the "multi-media experience" included a soundtrack, a website, and a PG-13-rated DVD of animated "shorts" inspired by the R-rated film.

The studio also granted licenses for figurines and posters for sale in toy stores, including KB Toys and Toys "R" Us, among other distribution channels.  The figurines were intended to be sold at toy stores.  The studio documents suggest that steps were taken to ensure that the movie-related products be sold only through segregated adult sections of the stores, not co-mingled with children's toys, and that the products be labeled as not for children under 17.

52.   See September 2000 Report at 10.

53.   Id. at 55.

54.   Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

55.   2002 MPAA Advertising Handbook at 5, 23.  Some studios further committed to include rating reasons in magazine advertisements of a certain size.  Films rated G are not assigned rating reasons.  Id. at 5.

56.   Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

57.   National Association of Theatre Owners, Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission (Nov. 2, 2000) (on file with the Commission).

58.   See, e.g., June 2002 Report at 4-6, 9-10; December 2001 Report at 9-12.

59.   2002 MPAA Advertising Handbook at 21.

60.   Television ads for all three PG-13 movies studied also presented the rating both visually and in audio.  Ads for two of the three films also displayed the rating reasons visually, but for the third film only two of approximately 25 ads displayed the rating reasons.

61.   Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

62.   These ads included films that had violence as a rating reason, as well as films that did not.

63.   The Commission reviewed ads placed in the magazines discussed in the Advertising Placement section, see note 33 supra, as well as Computer Gaming World, Rolling Stone, Spin, Vibe, and Wizard.  The Commission also examined ads in the following six general circulation newspapers: Chicago Sun-Times, Chicago Tribune, Los Angeles Times, New York Daily News, New York Post, and New York Times.  See Appendix C.  The advertisements reviewed were at least

five inches (excluding space for theater listings), which triggers the MPAA's requirement to disclose rating information. *See* 2002 MPAA Advertising Handbook at 5.

64. *See* June 2002 Report at 9-10.

65. Less than ten percent of the ads (111) were found without a rating or rating reasons, or had a rating but not the reasons for the rating. A number of these ads were for movies distributed by MPAA member studios or their subsidiaries, including Fox Searchlight's *Bend It Like Beckham*.

66. Of the 1,700 newspaper ads reviewed, 1,597 contained both a rating and rating reasons, and 1,380 displayed that information clearly.

67. There were 227 ads that fell into these two categories.

68. *See* June 2002 Report at 10.

69. *See* Appendix C for a complete list of, and demographic information for, the magazines reviewed.

70. The Commission reviewed free-standing inserts from eight retailers – Amazon, Best Buy, Circuit City, CompUSA, Kmart, Target, Tower, and Toys "R" Us – placed in the Sunday edition of two major newspapers – the *Los Angeles Times* and *The Washington Post* – over the 18-month period between June 2002 and September 2003.

71. *See, e.g.,* June 2002 Report at 10.

72. Toys "R" Us did not advertise any R-rated DVDs.

73. Radio ads for the two of the PG-13 movies studied also conveyed the film's rating but not the reasons. No radio ads were provided for the third PG-13-rated film.

74. June 2002 Report at 5-6.

75. The Commission examined the following 20 motion picture websites in August 2003: *28 Days Later, Bad Boys II, Better Luck Tomorrow, Buffalo Soldiers, City of Ghosts, The Dancer Upstairs, Freddy vs. Jason, Gigli, The Hard Word, House of 1000 Corpses, Identity, Jeepers Creepers 2, The Magdalene Sisters, A Man Apart, The Matrix Reloaded, Open Range, Phone Booth, Swimming Pool, Terminator 3: Rise of the Machines,* and *Wrong Turn*. The movies were selected based on the following criteria: they had a release date between April 1, 2003 and August 31, 2003, received an R-rating, and had a rating reason that involved violence. The studios that released these films included MPAA members as well as non-MPAA members.

76. *See* Appendix D for more detailed results of the survey.

77. The site for Fox's *Wrong Turn* had a prominent rating reasons display. Before a visitor could enter the website, a pop-up screen with a large warning appeared, reading: "Warning! Strong violence and gore. Some language and drug use. Under 17 requires an accompanying parent or guardian." *Wrong Turn*, at www.wrongturnmovie.com (visited Aug.7, 2003). The R rating was not displayed, however. The *Wrong Turn* website allowed visitors to view a red-banded trailer (*i.e.,* approved for adult audiences only) for the film; it was the only website examined that contained such a trailer. Before a visitor could view the trailer, a box appeared asking if the viewer is over 17. If the viewer checked the box, a pop-up appeared stating again that the viewer must be 17 to view the trailer.

78. The official website for Focus Feature's *Swimming Pool* did not link to any of the three rating information sites. The sites for three other films – Buena Vista's *Open Range* and New Line Cinema's *A Man Apart* and *Freddy v. Jason* – linked to filmratings.com and parentalguide.org, but not to MPAA.org.

79. The rating information practices of three movie ticket websites are reviewed in Section II.B.2.c(2), below.

80. Nineteen of the sites offered trailers that were approved for all audiences. The site for Fox's *Wrong Turn* offered a red-banded trailer, which is approved only for audiences 17 and older. *See* note 77, *supra*.

81. The Commission examined websites for the following motion picture theater chains: AMC, Carmike, Century Theatres, Cinemark, Clearview Cinemas, GKC Theaters, Goodrich Quality Theaters, Kerasotes Theatres, Landmark Theatres, Loews Cineplex, Marcus Theatres, National Amusement, Regal Cinemas, United Artists, and Wallace Theater Corp. With the exception of AMC, these theater chains are members of the NATO. The online movie ticket sites examined were movietickets.com, fandango.com, and moviefone.com. The Commission conducted its review of the theater and ticket sites in September and October 2003. *See* Appendix D for more detailed results of the survey.

82. Some of the sites provided rating reason information through a third-party site, to which a visitor was linked after clicking on a movie name.

83. The December 2001 and June 2002 Reports found that 67% and 69% of sites provided detailed information about the rating system, respectively, and 56% and 44% linked to at least one rating website.  December 2001 Report at 12; June 2002 Report at 6-7.

84. Cinemark's website offered tickets for sale directly through the site.  The other nine theater sites linked to one or more of the following third-party ticket vendor sites:  movietickets.com, fandango.com, and moviefone.com.

85. The Commission examined the following retailer websites in September and October 2003:  Amazon.com, BestBuy.com, CircuitCity.com, SamGoody.com, and TowerRecords.com.  The Commission surveyed these same sites in connection with the June 2002 Report.  *See* June 2002 Report at 7-8.  In this instance, the Commission reviewed the sites' rating information practices pertaining to the following movies rated R at least in part for violence:  *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition*.  The Commission notes that, since the surf was conducted, information about DVDs available from Sam Goody and Circuit City sites is now provided in a common format by a third-party site.  *See* Appendix D for more detailed results of the survey.

86. All five of the sites required a form of payment, such as a credit card, to which many children may not have access.

87. The rental sites were Netflix.com, Filmcaddy.com, and Movielink.com.  The Commission  reviewed practices pertaining to the same five movies reviewed for DVD retailer sites – *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition* – in September and October 2003.  *See* Appendix D for more detailed results of the survey.

88. These sites are Netflix.com and Filmcaddy.com.  Upon signing up for these services and paying a monthly membership fee, consumers can rent a number of DVDs at one time.  These services are beginning to grow:  Netflix, for example, recently reported that it has over 1 million subscribers.  *See* "Netflix Subscribers Rise 74 Percent," Reuters (Oct. 1, 2003), www.reuters.com/newsArticle.jhtml?type=internetNews&storyID=3543321.

89. This site is Movielink.com, a joint venture by major motion picture studios Metro-Goldwyn-Mayer Studios, Paramount Pictures, Sony Pictures Entertainment, Universal Studios, and Warner Bros. Studios.  Once a film is downloaded from Movielink, a user has 24 hours to view it.

90. September 2000 Report at 20; December 2001 Report at 13.

91. Specifically, the MPAA member studios pledged to "strongly encourage theater owners and video retailers to improve compliance with the rating system."  Motion Picture Association of America, *A Response to the FTC Report*, Sept. 26, 2000.  Members of the NATO promised to take steps to reaffirm NATO's existing ID-check policy for R-rated films, which was announced in 1999.  *See* National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission); comments of John Fithian, President, National Association of Theatre Owners, at Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 176-77 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

The VSDA had an existing "Pledge to Parents" program, through which participating retailers committed, among other things, not to rent or sell R-rated movies to children under 17 without parental consent.  *See* Statement of the Video Software Dealers Association, Senate Comm. on Commerce, Science and Transp. (Mar. 21, 2000) (on file with the Commission).  Finally, some studios sent letters to individual theater owners and video retailers urging them to improve compliance with the rating system by not selling tickets or granting admission to R-rated movies, or selling or renting R-rated videos or DVDs, to any persons under 17 not accompanied by a parent or adult guardian.

92. *See* Appendix B for a discussion of the survey methodology and results.

93. *Compare* December 2001 Report at 13.

94. *Id.*

95. In all, the Commission sought information from nine retailers:  Best Buy Co., Inc., Target Corporation, Wal-Mart Stores, Inc., Blockbuster, Inc., Circuit City Stores, Inc., GameStop Corp., Musicland Group, Inc., Trans World Entertainment Corp., and Wherehouse Entertainment, Inc.  (Wherehouse Entertainment subsequently was acquired by Trans World Entertainment.)  These companies were selected based on the following criteria:  each retailer sells at least one type of restricted product R-rated movies, Parental Advisory-labeled recordings, or M-rated video games) and each has a large number of retail outlets.  The Commission requested information about the companies' policies affecting the sale or rental of restricted products, and about efforts to inform and educate parents regarding the rating and labeling systems for movies, music, and electronic games.

96. *See* RIAA Parental Advisory Program Guidelines, effective April 1, 2002, at 2.

97.  In response to the Commission's "continued criticism of the recording industry for advertising to teens," the RIAA has noted that most recordings are available in an "edited version" and that recording companies advertise these edited versions "as well as and along with" the versions carrying the parental advisory label.  Letter from Hilary Rosen, President and CEO, Recording Industry Association of America, to the Honorable Timothy J. Muris, Chairman, Federal Trade Commission (Apr. 26, 2002) (on file with the Commission).  During testimony, Ms. Rosen explained, "[s]ince much of the reason that music marketing is different from other media is the existence of edited versions of the same product which is sold with explicit versions, we have significantly increased awareness of edited versions of these recordings."  Statement of Hilary B. Rosen, Chairman and CEO, Recording Industry Association of America, House Committee on Telecommunications and the Internet, "Recording Industry Marketing Practices:  A Check-Up," (Oct. 9, 2002) at 18.

The RIAA guidelines note that "[i]f an edited version is also available for sale, consumer advertising may also contain language indicating such a version of the recording is available."  *See* RIAA Parental Advisory Program Guidelines at 5.

98.  *See* note 7, *supra*.

99.  For all the recordings reviewed, marketing plans or other documents indicated that the music companies would place paid advertising on one or all of these cable channels.

100.  *See* Appendix C for demographic information for these programs.

101.  Although cable music channels may air edited versions of some of these music videos, the marketing materials for explicit-labeled recordings frequently stress the importance of placing music videos on these channels.  As noted in past Commission reports, these videos, even if edited to remove some explicit content, continue to play a key role in promoting the sale of explicit recordings to an under-17 audience.  *See* December 2001 Report at 15 n.84.

102.  The Commission purchased this data from VMS.  *See* Appendix C for a list of cable shows monitored by VMS.

103.  The five major recording companies are:  Universal Music Group ("UMG"), Warner Music Group ("WMG"), Sony Music Entertainment ("SME"), EMI Recorded Music ("EMI"), and BMG Entertainment ("BMG").

104.  Five of these recordings were associated with independent labels while the remaining eight were associated with UMG, WMG, SME or BMG.  UMG ran ads for:  *Mississippi:  The Album* on *106th & Park* and *Rap City*; *Joe Budden* on *106th & Park, Rap City, Total Request Live* and *Direct Effect;* and *2 Fast 2 Furious Soundtrack* on *Rap City* and *Direct Effect*.  WMG ran ads for *14 Shades of Grey* on *Total Request Live* and *Direct Effect*.  SME ran ads for *Da Unbreakables* on *Rap City* and for *Streetsweeper* on *106th & Park* and *Rap City*.  BMG ran an ad for *Best of UGK* on *Rap City* and one ad for *Bittersweet* on *106th & Park*.  EMI ran no ads for explicit-content recordings during the monitoring time period.

Independent record companies (Koch, FUBU, Ready! Set! Go!, and Landspeed) ran ads for *All or Nothing, Murda Mix Tape, Firestarr, Movement* and *Headphone Masterpiece* on *106th & Park, Rap City*, and *Total Request Live*.

105.  These data provide information about the first time a television ad is aired and was obtained from VMS.

106.  UMG ran ads on *106th & Park* for *From Me to You, A Gangster and a Gentleman, Aziatic, Better Dayz, Diplomatic Immunity, Electric Circus, From Tha Roota to Tha Toota, Legend of the Liquid Sword, Get Rich or Die Tryin', Ghetto Heisman, Girl Interrupted, God's Favorite, Mississippi: The Album, Nellyville, Philadelphia Freeway, Power in Numbers, The Blueprint 2: The Gift & The Curse, The Fix, The Last Temptation, Truthfully Speaking*, and *Snoop Dogg Presents: Doggy Style All-Stars – Welcome to Tha House Vol. 1*.  SME ran ads on *106th & Park* for *10 Years and Gunnin* and *God's Son*.  BMG ran three ads on *106th & Park* for *Lord Willin Loud Records:  The Early Daze*, and *Breaking News*.  WMG ran ads on *106th & Park* for *Animal House*, *Redemption*, *Street Dreams*, and *Under Construction*.  EMI ran one ad on *106th & Park* for *The Ownerz*.

107.  UMG ran an ad for *Get Rich or Die Tryin'* on *Direct Effect*.

108.  BMG ran ads for *Insomniacs Dream* and *It Ain't Safe No More*, SME ran an ad for *Steal This Album!*, and EMI ran an ad for *Tropical Storm* on *WWE Heat*.

109.  Demographic information about *Yugioh*, which indicated an audience of over 70% under the age of 17, was included in the marketing documents produced by the recording company.

110.  UMG ran an ad on UPN's *WWF Smackdown* for *Year of the Spider*.  WMG ran ads for *14 Shades of Grey* on *WWF Smackdown* and syndicated airings of *The Simpsons*.

111.  EMI ran an ad on *Gilmore Girls* for *Escapology*.

112.  *See* September 2000 Report at 31.  The Commission found in its review for this Report that recording companies still closely track the placement in these publications of feature stories about their artists who had released explicit-content

labeled recordings, although this tracking is not a prominent aspect of the companies' marketing plans. Seven of the 14 marketing plans for explicit-content labeled recordings that the Commission reviewed indicated that features such as interviews or CD reviews were scheduled to run in publications with a majority or substantial teen audience, such as: *J-14*, *Metal Edge*, *Teen People*, *Right On!*, *YM*, *Alloy Girl*, *Seventeen*, and *Strength*.

113. *Metal Edge*, *Right On!*, *CosmoGirl!*, *Thrasher*, *Teen People*, *YM*, and *Seventeen* were reviewed from July 2003 through October 2003.

114. EMI ran one ad in *Right On!* and UMG ran one ad in *Thrasher*.

   In its review of these same seven magazines over a 15-month period (June 2002 through December 2002 and March 2003 through October 2003), the Commission found that recording companies ran a total of 50 ads for explicit-content recordings in issues of *Metal Edge*, *Right On!*, and *Thrasher*. Specifically, BMG ran two ads in *Metal Edge*, one ad in *Right On!* and one ad in *Thrasher*. EMI ran one ad in *Right On!*, two ads in *Thrasher* and two ads in *Metal Edge*. SME ran two ads in *Right On!* and one ad in *Metal Edge*. UMG ran fourteen ads in *Metal Edge*, two in *Right On!* and three ads in *Thrasher*. Independent recording companies ran twelve ads in *Metal Edge*, two in *Right On!* and five in *Thrasher*. No ads for explicit content recordings were found in *Teen People, CosmoGirl!, Seventeen*, or *YM*.

115. *See* April 2001 Report at 14 n.81; June 2002 Report at 39 n.55.

116. *See* September 2000 Report at 33; December 2001 Report at 16.

117. See Appendix C for website demographic information from Nielsen//NetRatings. Although demographic information was not obtained for Katrillion.com and AOL Teens Music, both of these sites are directed to teen audiences.

118. RIAA Parental Advisory Program Guidelines at 5.

119. The guidelines acknowledge that "[o]therwise, the small size of the album 'mini' may result in the Label appearing as an illegible black dot, or in confusion regarding the album designation." RIAA Parental Advisory Program Guidelines at 5.

120. In addition, the revised guidelines now suggest that consumer print advertising contain language alerting consumers that an "edited" version of the recording is also available for sale, when that is the case. The RIAA recommends that this be accomplished by placing the wording "Edited Version Also Available" near the specific album or recording that has been designated with the explicit-content label. Finally, the revised guidelines added recommendations with respect to labeling the edited versions of explicit-content recordings and now suggest that an edited version of an album include an "Edited Version" label plainly displayed on either the front of the album (either on the cellophane or on the album cover) or on the top spine of the CD. *Id.*

121. A spot-check of explicit-content labeled recordings showed that the enhanced label is being placed on certain BMG recordings. In addition, the Commission found that the additional descriptive information for certain recordings was also displayed by some online retailers as part of the cover art. A review of product packaging, however, which included two BMG recordings, showed that, although the enhanced label was being used, neither label was part of the permanent cover art (they were removable stickers), nor did they meet the RIAA's size specifications. *See* Section III.D, *infra.*

122. The Commission purchased this data from VMS. *See* Appendix C for a list of shows monitored by VMS.

123. SME ran an ad for *Da Unbreakables* containing no Parental Advisory Label. Five out of eight ads for explicit content recordings placed by independent companies contained a Parental Advisory Label.

124. *See* June 2002 Report at 13. A spot-check done for the Commission's December 2001 Report showed that 19 of the 48 television ads reviewed contained the PAL logo. *See* December 2001 Report at 18.

125. Three of the four ads submitted by one recording company contained a legible PAL logo at the end of the ad while three of the five ads submitted by the other recording company displayed the PAL logo.

126. *See* December 2001 Report at 18.

127. The Commission reviewed *CosmoGirl!, Metal Edge, Right On!, Rolling Stone, Spin, Seventeen, Teen People, Thrasher, Vibe,* and *YM* from June 2002 through December 2002 and from March 2003 through October 2003.

128. Specifically, BMG ran seven ads, three without Parental Advisory Labels. Of the four ads displaying Parental Advisory Labels, two were clear and conspicuous and two were blurry. EMI ran 14 ads, three without Parental Advisory Labels, 11 with Parental Advisory Labels. Of those 11, eight were clear and conspicuous and three were readable but small. SME ran five ads, all of which contained Parental Advisory Labels, three of which were clear and conspicuous and two of which were blurry. UMG ran 40 ads, eight without Parental Advisory Labels, 32 with Parental Advisory

Labels, 27 of which were clear and conspicuous and five of which were blurry. WMG ran six ads, one with a clear and conspicuous Parental Advisory Label, and five without Parental Advisory Labels. Independent labels ran 24 ads, 19 without Parental Advisory Labels, five with the label. Of those five, two were clear and conspicuous and three were readable but small.

129. The most recent four-month period was from July 2003 through October 2003. UMG placed four ads, all with clear and conspicuous PAL logos. BMG and WMG placed one ad each with a clear and conspicuous PAL. EMI placed three ads, two with clear and conspicuous PAL logos and one with no PAL logo. Independent labels placed four ads – three with no PAL logo (Beer City) and one with a clear and conspicuous PAL logo (Big Cat).

130. *See* September 2000 Report at 29.

131. *See* June 2002 Report at 13-14.

132. Virgin Megastore placed two ads in *Vibe* and used a clear and conspicuous PAL logo in both. Coalition Music Stores placed four ads in *Thrasher* – two with clear and conspicuous PALs and two with small, but readable, PALs.

A review of the same ten magazines over the 15-month period shows better results: 42 ads were placed by five different retailers, and in 79% (33 of 42) of the cases, the ad contained a clear and conspicuous PAL. Best Buy placed two ads in *Rolling Stone* with clear and conspicuous PALs, and 11 ads in *Spin* with clear and conspicuous PALs. Coalition Music Stores placed two ads in *Thrasher*, Target placed 15 ads in *Spin*, and Virgin Megastore placed three ads in *Vibe* – all with a clear and conspicuous PAL. In four cases, the ad contained a small but readable PAL, while five ads contained no PAL. Virgin Megastore placed one ad in *Spin* with a PAL that was small but readable. Coalition Music placed two ads in *Thrasher* that carried small but readable PALs. Best Buy placed one ad in *Spin* with a small but readable PAL. Ballbuster Hard Music placed two ads in *Metal Edge* without PALs and Virgin Megastore placed three ads in *Vibe* without PALs.

133. *See* June 2002 Report at 14.

134. RIAA Parental Advisory Program Guidelines at 5.

135. *Id.* at 7 (emphasis in original).

136. *Id.* at 6-7.

137. FTC's Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 29 and 33 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

138. *Id.* at 33.

139. The websites reviewed were: www.daunbreakables.com, www.metallica.com, www.lizphair.com, www.staind.com, www.joebudden.com, www.50cent.com, www.blucantrell.com, www.crookedlettaz.com, www.coldonline.com, www.intothematrixmusic.com, www.madonna.com, www.typeonegative.net, www.3eb.com, www.mestcrapp.com, www.djkayslay.com, www.smileemptysoul.com, www.gangstarronline.com, www.godsmack.com, www.marilynmanson.com, and www.lilkim.com.

*See* Appendix D for more detailed results of the survey.

140. Only one of the sites used descriptive advisory language, *i.e.*, "Explicit," in addition to displaying the PAL logo to indicate that the site was promoting an explicit-content labeled recording.

141. *See* June 2002 Report at 15.

142. Some websites displayed the PAL logo on every page of the website, although it was not always legible. For example, the Godsmack and Joe Budden websites both displayed the PAL logo on every page, although the logo on the Joe Budden site was unreadable. The Marilyn Manson and 50 Cent websites also displayed the logo on nearly every page, although the label was quite small on some pages.

143. *Id.*

144. Ninety-five percent of the sites allowed the visitor to play all or part of the album at the site, while 90% allowed visitors to download music video clips. In June 2002, all the sites surveyed allowed visitors to listen to music, and 95% provided downloadable video clips. *See* June 2002 Report at 14-15.

145. The websites included: sonymusicstore.com, atlantic-records.com/store, artistdirect.com, circuitcity.com, amazon.com, awarestore.com, musictoday.com, and interpunk.com.

146. The sites that gave some indication of explicit content during the purchase process were: sonymusicstore.com (linked from djkayslay.com, daunbreakables.com); atlantic-records.com/store (linked from lilkim.com); artistdirect.com (linked

from coldonline.com and staind.com); circuitcity.com (linked from joebudden.com); musictoday.com (linked from metallica.com and 50cent.com); and interpunk.com (linked from mestcrapp.com). Several online retailers were linked from intothematrixmusic.com.

Sites that did not indicate explicit content for the recording included: amazon.com (linked from smileemptysoul.com, and typeonegative.net); awarestore.com (linked from lizphair.com); and musictoday.com (linked from madonna.com).

147. These sites were: artistdirect.com (linked from coldonline.com and staind.com); circuitcity.com (linked from joebudden.com); musictoday.com (linked from metallica.com and 50cent.com); and interpunk.com (linked from mestcrapp.com).

148. The sites reviewed were: Amazon.com, Bestbuy.com, Circuitcity.com, Samgoody.com, and TowerRecords.com. Cdnow.com, which had been reviewed in the past, is now teamed with Amazon.com and for this review was replaced with Circuitcity.com. The recordings examined at these retailers' websites were *Get Rich or Die Tryin'* by 50 Cent; *Liz Phair* by Liz Phair; *The Street Sweeper Vol. 1* by DJ Kayslay; *Smile Empty Soul* by Smile Empty Soul; and *Life is Killing Me* by Type O Negative.

*See* Appendix D for more detailed results of the survey.

149. Language used by the websites included: "Explicit Lyrics," "Parental Advisory," and "Explicit Content."

150. The June 2002 review found that visitors, regardless of age, could play either part or the full-version of songs from the explicit-content labeled recording in 16 out of 25 instances. June 2002 Report at 16.

151. The PAL logo was legible in all but one instance.

152. These online services distribute music via the Internet in a legal, industry-approved manner.

153. The following online services were reviewed: Apple's iTunes, MusicMatch, AOL's MusicNet, Full Audio's MusicNow, Napster (formerly operating as PressPlay), and RealNetworks' RealOne Rhapsody. MusicNet, MusicNow, Napster, and Rhapsody are subscription-based services that cost approximately $10 a month. These services allow users to purchase and download music (*i.e.*, to a listening device such as an MP3 player) for an additional charge per song. iTunes and MusicMatch allow users to purchase music on a song-by-song basis. All six services require the use of a credit card.

154. iTunes, MusicMatch and MusicNet.

155. Napster, Rhapsody and MusicNow.

156. MusicMatch displayed a picture of the recording artist instead of the album cover art, and did not use the PAL logo.

157. MusicNet, MusicNow, iTunes and Napster.

158. MusicNet, iTunes and Napster.

159. Napster, Rhapsody and MusicMatch.

160. Napster gave the user the option of installing a parental password, which then allowed the user to "exclude" explicit-content labeled recordings from search results and prevent access. MusicNet excluded explicit content when the parental controls were set using the AOL software. Any setting other than "General 18+" excluded explicit-content labeled recordings.

161. These services are Kazaa, Morpheus, LimeWire, and Overnet.

162. Peer-to-peer file-sharing is a "type of transient Internet network that allows a group of computer users with the same networking program to connect with each other and directly access files from one another's hard drives." *See* SearchSecurity.com website at searchsecurity.techtarget.com/gDefinition/0,294236,sid14_gci212769,00.html (visited Dec. 10, 2003).

163. The RIAA has called attention to the fact that peer-to-peer file-sharing services do not utilize the parental advisory labeling system. *See, e.g.,* Testimony of Hilary B. Rosen, Chairman and CEO, Recording Industry Association of America, House Subcommittee on Telecommunications and the Internet, "Recording Industry Marketing Practices: A Check-Up" (October 9, 2002), at 18-19.

Mitch Bainwol, current Chairman and CEO of the RIAA, recently commented during the Commission's Workshop that, in light of the popularity of file-sharing services with children for swapping music files, the lack of labeling on these services "blows a gaping hole through the labeling regime." FTC's Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 30 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

164. The Kazaa service provided password protection on its filter to prevent the setting from being altered by another user.

165. *See, e.g.*, "File-Sharing Programs:  Peer-to-Peer Networks Provide Ready Access to Child Pornography," General Accounting Office Report to the Chairman and Ranking Minority Member, Committee on Government Reform, U.S. House of Representatives (Feb. 2003); and "Children's Access to Pornography Through Internet File-Sharing Programs," Prepared for Rep. Henry A. Waxman and Rep. Steve Largent by Minority Staff, Special Investigations Division, Committee on Government Reform, U.S. House of Representatives (July 27, 2001).

166. *See* "File-Sharing:  A Fair Share?  Maybe Not," at www.ftc.gov/bcp/conline/pubs/alerts/sharealrt.htm.  In addition, in April 2004, the Commission held a public workshop on spyware, at which the relationship between peer-to-peer file-sharing software and spyware was discussed.  Later this year, the Commission will issue a comprehensive report on the workshop, including the peer-to-peer software and spyware relationship.

167. *See* December 2001 Report at 22.  In its September 2000 Report, the Commission reported that 85% of unaccompanied children ages 13-16 were able to buy explicit-content labeled recordings at retail stores.  September 2000 Report at 36.

168. *See* Appendix B.

169. *See* RIAA Parental Advisory Program Guidelines at 2.

170. *See* RIAA Parental Advisory Program, *Usage Guidelines for Audio and Music Video Product*, *available at* www.riaa.com/issues/parents/advisory2.asp (visited December 18, 2003).

171. Although all of the PAL logos on the CDs used the standardized language recommended by the RIAA – "Parental Advisory - Explicit Content," nine of the 14 labels failed to satisfy the recommended size requirement.  All but one of the labels was a permanent part of the album cover art and not a removable sticker.  One CD used a removable sticker under the cellophane shrink wrap; in this case, the use of a sticker was probably due to the absence of album cover art, and the CD was packaged and sold in a clear jewel case.

172. *See* September 2000 Report at 24 & n.135.

173. As determined by *Billboard* magazine, for the week of November 15, 2003.

174. *See* September 2000 Report at n.136.  However, a review of a smaller sample of recordings in June 2002 showed that 83% (10 of 12) of the CDs examined complied with RIAA guidelines regarding size and permanent affixation.  *See* June 2002 Report at 17.

175. September 2000 Report at 45.

176. The Advertising Code of Conduct ("Adcode") at 23, 29 & 31 (2003).

177. Letter from Patricia Vance, President, ESRB, to Richard F. Kelly, Staff Attorney, Federal Trade Commission (Oct. 27, 2003) at 6 (on file with the Commission).

178. As noted in the Commission's June 2002 Report, the VSDA had expanded its Pledge to Parents program to include a certification program – Parents in Control.  Participating retailers attest that they will allow parents to restrict the ability of their children to rent video games that the parents determine are inappropriate for them.  As part of VSDA's Parents in Control Certification program, retailers also commit not to rent or sell to children any video games that are rated "Adults Only" or are "harmful to minors."  VSDA's Pledge to Parents program goes further and asks retailers not to rent or sell M-rated video games to persons under age 17 without parental consent.  That pledge, however, is not part of VSDA's Parents in Control program.  *See* June 2002 Report at 19.

179. *See* "Major Retailers Announce New Campaign to Enforce Video Game Rating System," at releases.usnewswire.com/ GetRelease.asp?id=121-12082003 (visited Feb. 17, 2004).

180. The marketing plans for several games indicated that radio promotions had been planned.  The Commission was not provided with sufficient information to determine whether these promotions were targeted to a substantial under-17 audience.

181. Many plans targeted either males 17-24 or males 18-24.  Several included males 25-34 as a "secondary target audience."  Others targeted 18-35 year old males.

182. *See* Appendix C for demographic data on most of these programs.  *Jackass* has a 30% under-17 audience share, according to Nielsen data.

183. AdCode at 29.

184. The Commission purchased this data from VMS.  *See* Appendix C for a list of shows monitored by VMS.

185. *See* Appendix C for demographic data on some of these programs.  According to Nielsen data, the other programs have the following under-17 audience share: *Making the Band 2* (36%), *Sorority Life* (29%), and *Girlfriends* (30%).

186. Information available in early 2003 indicated that approximately 41% of *Electronic Gaming Monthly's* readership was under 17 and 39% of *Playstation 2 Magazine's* readership was under 17.  *Electronic Gaming Monthly's* latest readership survey released late this summer indicates that EGM's under-17 audience has dropped to 30%.  *See* Appendix C.

187. Three of the 24 video game ads were for M-rated games.

188. The AdCode states:  "If a title has a Rating Pending status, a company must use its best efforts to place ads for that title only in publications or outlets with an audience that is appropriate for the content within the title.  Such efforts should be based on the company's good faith expectations and reasonable discretion regarding the anticipated rating."  AdCode at 26.

189. June 2002 Report at 21.  Moreover, publications that have majority under-17 audiences, like *GamePro* (subscription edition) and, to a lesser extent, *Nintendo Power*, continue to feature stories, covers, and other news regarding the development and release of M-rated games, despite their stated policies not to accept ads for such products.  The Commission's review of marketing plans indicates that game makers often solicit and encourage such stories and product placements.  Often such solicitations are highlighted as part of the marketing strategy for the game.

190. NAD/CARU Case Reports (November 2002), at 522-23.  CARU had also questioned as inappropriate a claim in the ad that the game is the "First All-Ages Brawler for the PlayStation2," noting that the game was "clearly not for all ages according to the ESRB rating system."  The advertiser agreed to no longer use that claim.  *Id.*

191. Ten of 11 game publishers had placed ads on popular teen websites.  *See* September 2000 Report at 49.

192. AdCode at 31.

193. *See* Appendix C at C-7.

194. The AdCode expressly prohibits companies from promoting Mature-rated products at concerts or events where a "substantial portion" of the audience is likely to be under 17 years old.  AdCode at 35.

195. *Id.* at 36.

196. *Id.*

197. As one story noted, "Microsoft X-box sponsored this summer's Lollapalooza tour and set up 'GameRiot' tents to let ticket holders play against each other in games such as '*Tony Hawk's Underground*,' '*Midtown Madness 3*' and '*Return to Castle Wolfenstein*.'"  *Return to Castle Wolfenstein* is rated M.  *See* apps.lollapalooza.com/a_gameriot_comp.jsp (visited Nov. 11, 2003).  This page contains an on-line registration form for game competitions.  Under "Rules," it states that "Brute Force and Castle Wolfenstein competitions require a valid ID and will be restricted to 17 or older."  Both games are rated M.  The other games listed for the competition are rated T.

198. *See* "Infogrames announces Enter the Matrix," at www.gamershell.com/news_InfogramesannouncesbEnte.shtml (visited on Feb. 19, 2004):  "There has been extensive creative crossover that has taken place in the development of the film and the game.  Warner Bros., Joel Silver, the film's producer, and Larry and Andy Wachowski, the film's writers, creators, and directors, have clearly shown their appreciation for the connection between the interactive world and THE MATRIX audiences.  We are thrilled to unite the two with the screening in our E3 booth of the first official trailer for THE MATRIX RELOADED and THE MATRIX REVOLUTIONS."

*See also,* "Enter The Matrix Review for Xbox," at www.gamer-talk.net/review33.html (visited Feb. 19, 2004):  "At the end of the game there is a new movie trailer for the last and final Matrix movie, 'Matrix Revolutions' (due out in Nov 2003)."

199. At the Commission Workshop, Dr. David Walsh of the National Institute on Media and the Family noted that:  "Because of the power of marketing and because of the power of advertising, products that are cross-marketed . . . in very different ways are, I think, inevitably going to create an interest among kids for products that may not be appropriate for them."  FTC's Marketing Violent Entertainment to Children:  A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 133-34 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

In its September 2000 Report, the Commission recommended that the movie and video game industries "(p)rohibit licensees from marketing action figures, toys, and other products associated with R movies and M games to under-age audiences and require a disclosure that the product is based on an entertainment product rated R or M."  September 2000 Report at 54.  The ESRB has not prohibited such marketing, although its AdCode does require licensors to ensure that licensees disclose on the product that "This [*state item*] is based on a Mature rated product."  AdCode at 22.

200. In the June 2002 Report, the Commission noted that the IDSA (now the ESA) had avoided imposing such a requirement for television because the descriptors can be difficult to read on a television screen and because it does not believe that descriptors can be displayed in a 30-second ad in a way that permits viewers to absorb the information. The IDSA had stated, however, that it would continue to consider this issue. *See* June 2002 Report at 22 n.95.

201. Vance Letter, *supra* note 177 at Attachment D.

202. The ad was for Capcom's *Devil May Cry*. The required voice-over, "Rated M for Mature," applies to television ads longer than 15 seconds. For ads 15 seconds or less, the required voice-over is shortened to "Rated Mature." ESRB requires the rating icon to be 22 scan lines in size. *See* December 2001 Report at 3 n.138.

203. *See* June 2002 Report at 24.

204. *See* Appendix A.

205. These ads either: (a) omitted a descriptor assigned to the game; (b) changed the wording of the descriptor in a way that understated the level of violence, sex or strong language in the game; (c) for Rating Pending ads, left off the ESRB-required box containing the phone number and website address for the ESRB that could be called or visited to check if the game had subsequently received a rating; or (d) used rating icons substantially smaller than the size required by ESRB.

206. Three companies placed poster inserts into the gaming magazines, one of which did not include an icon or descriptor. A poster in *Nintendo Power* for Universal Interactive's *The Scorpion King: Rise of the Akkadian* did not include an icon or a descriptor. Universal Interactive's inserts for *Lord of the Rings: The Fellowship of the Ring* and *Bruce Lee: Quest of the Dragon* both had icons. A poster for Atari's *Godzilla: Destroy All Monsters* had an icon on both sides of the poster. The poster insert for Crave Entertainment's *The Lost* contained an icon. Another poster insert by Crave for *UFC Throwdown* displayed a large and prominent icon.

207. AdCode at 32. If the publisher's advertisement is smaller than one-fourth of a screen page (such as standard banner advertisement), the rating icon and content descriptors must be visibly and prominently displayed either directly on the advertisement and/or on a web page or product specific page that links directly from the advertisement. *Id.*

208. *Id.* Because a game often can be purchased from several different pages, the AdCode would appear to require disclosures on multiple pages. For purposes of this review, however, the Commission deemed a site compliant with the AdCode so long as the appropriate rating information was displayed on a page that a visitor must click through to make a purchase.

209. *Id.* at 33. The Commission's review showed that a visitor might navigate through several pages after requesting a download. Accordingly, as was done in its prior reports, the Commission deemed a site compliant with the AdCode's demo disclosure requirement, so long as the appropriate rating information was disclosed adjacent to the title of the game and either (a) in close proximity to the link that initiated the download, or (b) on any subsequent page through which a visitor must navigate during the download process.

210. The Commission examined the following 20 electronic game websites: *Aquanox 2: Revelation*, *Casino, Inc.*, *Chrome*, *Codename Nina*, *Counter-Strike: Condition Zero*, *Crimsonland, Devastation*, *Die Hard Vendetta*, *Dino Crisis 3*, *Hunter the Reckoning - Wayward*, *Outlaw Volleyball*, *Postal 2*, *Purge*, *Return to Castle Wolfenstein*, *Silent Scope Complete*, *Soldier of Fortune 2: Double Helix*, *SWAT: Global Strike Team*, *The X-Files: Resist or Serve*, *Tom Clancy's Rainbow Six 3*, and *True Crime: Streets of L.A.*

*See* Appendix D for more detailed results of the survey.

211. The notice reads in part: "DANGER. This site contains content not approved for consumption by children, senators, religious leaders and/or other easily damaged psyches, those seeking to enhance or establish political careers and/or possessed of delusions of grandeur." For the entire disclaimer, see www.gopostal.com/home.

The site for *Postal 2* had the "M" rating displayed at the time of the surf; two weeks later the rating had been removed from all sections of the site. The rating was subsequently restored.

212. CircuitCity.com was substituted for ToysRUs.com in this Report because Amazon.com and ToysRUs.com use the same Amazon.com site.

*See* Appendix D for more detailed results of the survey.

213. Toys "R" Us, Kmart, Wal-Mart, Target, Circuit City, Staples, and CompUSA.

214. *See* Statement of Hal Halpin, President of the IEMA, *Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation* (Oct. 29, 2003), transcript at 183 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

215. *See* "Major Retailers Announce New Campaign to Enforce Video Game Rating System," at releases.usnewswire.com/GetRelease.asp?id=121-12082003 (visited Feb. 17, 2004).

IEMA members are: Best Buy, Blockbuster Entertainment, Circuit City, CompUSA, Gamesource, Electronics Boutique, Hastings Entertainment, Hollywood Video, KB Toys, Kmart, Meijer, Movie Gallery, Musicland, Shopko Stores, Target, Toys "R" Us, Transworld Entertainment and Wal-Mart. Taken together, these retailers sell approximately 85% of all computer and video games sold in the United States.

216. *See* "Game Questions Frequency Table," Gallup Annual Teen Survey 2003, The Gallup Organization (on file with the Commission).

The M-rated *Grand Theft Auto III* was the number-one selling video game in 2001, *see* www.npd.com/press/releases/press_020207.htm; its M-rated sequel, *Grand Theft Auto: Vice City* was the top seller in 2002, with *Grand Theft Auto III* at number two. *See* www.npd.com/press/releases/press_030128a.htm. Through August of 2003, *Grand Theft Auto: Vice City* was number six on the list of best selling video games in 2003, some ten months after its release in October of 2002. *See* www.npd.com/press/releases/press_031001.htm.

Most of the games in the *Grand Theft Auto* series are rated M.

217. Forty-eight percent of the younger respondents (males and females aged 13 to 15) indicated that they had played a game in the Grand Theft Auto series, as compared to 37% of those 16 or 17. *See Game Questions Frequency Table*, Gallup Annual Teen Survey 2003, The Gallup Organization (on file with the Commission).

218. Seventy-eight percent of boys reported that M-rated games were among their top five favorites. Forty percent said their favorite game is rated M. *See* The National Institute on Media and the Family, *Eighth Annual Media Wise Video Game Report Card* (December 2003) *available at* www.mediafamily.org/research/report_vgrc_2003-2.shtml.

219. *See* The NPD Group, Inc., *NPD's Annual 2002 Consumer Purchase Data for the Video Game Industry* (on file with the Commission).

220. AdCode at 7-10.

221. *Id.*

222. *Id.*

223. Vance Letter, *supra* note 177 at 8 of Attachment D.

224. As the Commission has noted in its prior reports, the music industry rejects any suggestion that its Parental Advisory Label system should be age-based. The Commission is aware that such a suggestion would require fundamental changes in the music industry's labeling program. Nonetheless, the industry could still adopt standards that lessen children's exposure to ads for such recordings with a Parental Advisory. *See* June 2002 Report at 31.

225. The Commission previously has suggested that the industries consider adopting ad placement standards that take into account a range of factors, including the percentage of the audience under 17, the total number of children reached, whether the content is youth-oriented, and the popularity with children and apparent ages of the characters or performers. *See* December 2001 Report at 35.

226. The Commission encourages the music industry to consider implementing parental control mechanisms that would limit children's on-line access of explicit-content material. *See supra* note 160.

227. *See* June 2002 Report at 18; December 2001 Report at 35-36. Although the recording industry's labeling program does not provide the reasons for the advisory, one industry member, BMG, does include on its explicit-content labeled recordings an "enhanced" advisory label that indicates whether the recording has been stickered because of "Strong Language," "Sexual Content," "Violent Content," or "Sexual + Violent Content."

# Appendix A:  Marketing Violent Entertainment To Children: A Workshop On Industry Self-regulation

## I.  Introduction

On October 29, 2003, the Federal Trade Commission (FTC) sponsored *Marketing Violent Entertainment to Children:  A Workshop on Industry Self-Regulation*, a one-day public forum to discuss the state of self-regulation in the entertainment industry, including children's access to movies, music, and electronic games that have been rated or labeled as potentially inappropriate for them.  The workshop featured five panels made up of representatives from industry associations, rating and labeling boards, retailers and retailer trade associations, parent and consumer advocacy groups, and other interested parties.  Panel topics included:

- An Overview of the Rating and Labeling Systems;
- Discussion of Rating and Labeling Systems Among Industry, Consumer, and Research Groups;
- Cross-Marketing and Merchandising of Branded Products;
- Retailers' In-Store and Online Practices; and
- Next Steps: The Future Direction of Self-Regulation.[1]

The workshop opened with introductory remarks from FTC Chairman Timothy J. Muris, the Honorable Frank Wolf (R-VA), and the Honorable Joe Baca (D-CA).  Noting the Commission's four earlier Reports to Congress on the marketing of violent entertainment to children, Chairman Muris outlined three basic principles that underlie the effectiveness of self-regulation: 1) that industries should market products consistent with their ratings and parental advisories; 2) that parents should have access to useful information on products ratings before purchase; and 3) that retailers should consider ratings and labels in adopting sales policies.  Workshop Transcript, pp. 4-5 (hereinafter Tr. 4-5).[2]  Showing a videotape of excerpts from several violent video games, Congressman Wolf raised concerns about the difficulty of shielding minors from depictions of graphic violence in entertainment media.  Tr. 6. Congressman Baca discussed the reasons why he has proposed federal legislation to restrict the sale to children of certain violent video games, HR-669, the Protect Our Children from Video Game Sex and Violence Act.  Tr. 13.

## II.  An Overview Of The Rating And Labeling Systems

The first panel of the workshop featured representatives of the movie, recording, and electronic game industries discussing their perspectives on the issue of self-regulation.  Jack Valenti, President and CEO of the Motion Picture Association of America (MPAA), cited a study that its ratings system, now in its thirty-fifth year, enjoys 98% recognition by American consumers.[3]  Among parents with children under 13, 76% described the system as "very useful" or "fairly useful" in helping them decide what movies are appropriate for their children to see.  Tr. 25-26.

Mitch Bainwol, Chairman and CEO of the Recording Industry Association of America (RIAA), discussed his industry's approach to self-regulation. In contrast to the methods used by the movie and electronic game industry, the RIAA's system does not include information about the appropriateness of a particular product for children of certain age groups. Music deemed to contain "strong language or depictions of violence, sex or substance abuse" is simply labeled "Parental Advisory Explicit Content." According to Mr. Bainwol, the biggest development in the recording industry is the frequency with which youngsters acquire music by downloading it from peer-to-peer (P2P) networks such as Kazaa and Grokster instead of acquiring it from brick-and-mortar retailers or from authorized online sites such as Apple iTunes, Music Now, or AOL's MusicNet. Tr. 29. Mr. Bainwol pointed to three major challenges posed by this shift in the acquisition of music: 1) P2P networks contain no labeling or parental advisories whatsoever; 2) P2P networks bypass the point-of-sale barriers to acquisition imposed by salesclerks or parents; and 3) as many as half of the P2P files that include the names of major artists are actually pornographic material that merely use the name of the artists to lure consumers, including youth. Tr. 30, 108. Mr. Bainwol also announced at the workshop changes to the RIAA's parental advisory system, including encouraging the use of parental control filters on sites that allow the authorized downloading of music, improving the consistency of terminology used on websites to differentiate between explicit-content labeled recordings and non-labeled music,[4] and working with the FTC and other groups to improve www.parentalguide.org, a "one-stop" website offering parents information about the rating and labeling programs of the movie, electronic game, music, and television industries. Tr. 33-34.

Patricia Vance, President of the Entertainment Software Rating Board (ESRB), emphasized three components of the ESRB's self-regulatory system: 1) rating symbols, which provide general guidance about age appropriateness;[5] 2) content descriptors – thirty standardized phrases that alert parents to content elements that may be of interest or concern;[6] and 3) a code of conduct covering certain aspects of the industry's advertising and marketing practices. Tr. 35, 39. In recent months, the ESRB has added several new content descriptors intended to give consumers greater insight into the specific type of violence in a game, *e.g.*, cartoon violence, fantasy violence, or intense violence. In addition, the industry increased the visibility of ratings by repeating on the back of the game box the ratings symbols already included on the front of the box and by placing the rating next to the content descriptors in an authoritative seal. The ESRB also added the age "17+" to the Mature rating symbol and "18+" to the Adults Only rating symbol. Tr. 38. Ms. Vance showed examples of new public service announcements using celebrities to educate parents about the rating system for electronic games. Tr. 40-41. She noted that ESRB's Code of Conduct extends beyond rating and labeling to cover other marketing practices. For example, the code requires members to ensure that ratings information is legible on all advertising materials, prohibits publishers from targeting ads for M-rated games to those under 17, and imposes sanctions – including relabeling and fines – for code violations. Tr. 39-40. Ms. Vance cited opinion polls that 90% of parents surveyed believe that the ESRB's rating system provides the kind of

information they need and that 75% find it to be an effective tool in helping them shield their children from inappropriate material.  Tr. 39.

## III. Discussion Of Rating And Labeling Systems Among Industry, Consumer, And Research Groups

In the second panel, the MPAA, the RIAA, and the ESRB were joined by consumer and research groups to discuss their observations and concerns about the rating and labeling systems.[7]  Vicky Rideout of the Kaiser Family Foundation announced a new study released the day before the workshop demonstrating the pervasiveness of media in the lives of youngsters.[8]  According to the study, more than 80% of parents say they have used the movie ratings, as compared with half who have used the music, video game, or television ratings.

Criticisms about the current systems fell into four general categories: 1) confusion about the meaning of terms used to rate or label entertainment products; 2) a lack of transparency and accountability in the systems; 3) the advertising and marketing to young audiences of materials rated or labeled as unsuitable for children; and 4) lax enforcement at the retail level.

One common theme voiced by members of this panel was the tension between keeping systems easy for parents to understand and providing the more detailed reasons for the ratings that many parents find helpful.  Although parents appear to prefer content-based systems (ratings that disclose the nature of the material, *e.g.*, the presence of violence, objectionable language, or sexual content) to age-based systems (ratings that give a minimum age for which the product is suitable), the Kaiser Family Foundations's research suggests that parents understand age-based systems better than content-based systems.  Tr. 49. David Kinney of PSVratings, Inc., pointed to the difficulty that parents have in grasping the intricacies of separate ratings systems for each form of entertainment.[9]  Tr. 75.  For example, Nell Minow of Common Sense Media raised concerns with what she perceived to be vague descriptors in the movie ratings system, *e.g.*, "mild thematic elements."  Tr. 62.  Warren Buckleitner of *Children's Software Revue* cited an instance in which a parent misunderstood the ESRB's "Mature" rating to refer to whether a particular child was mature for his or her age group.  Tr. 70.  He also suggested that putting content descriptors on the front of the video game box would make it more likely that parents would read and understand the information conveyed by the descriptors.  Tr. 70.  Vicky Rideout of the Kaiser Family Foundation mentioned that the television rating TV-Y7-FV – which alerts parents to the existence of fantasy violence – was occasionally misinterpreted to mean "family viewing."  Tr. 49.

Other panelists pointed to seeming inconsistency within the systems themselves.  Daphne White of The Lion & The Lamb Project noted that the ESRB descriptor on the E-rated version of "The Hulk" video game was "violence," whereas the descriptor on the T-rated version of the same game was "mild violence."  Tr. 53.  She also expressed concern that descriptors such as "blood and gore," "mature humor," "strong language," "use of drugs," or "violence" are insufficient to alert parents to the acts depicted in some popular video games, such as decapitation or urinating on corpses.  Tr. 113.  Several panelists expressed the opinion that parents would find it easier to use the ratings were the movie, music,

and electronic game industries to adopt one uniform system for evaluating products.[10]  Tr. 63-64, 74-75, 96.

Another critique raised by some panelists was what they perceived as the lack of clarity in the criteria by which products are rated or labeled.  The Lion & Lamb Project's Daphne White noted that there are no published standards to explain to parents the line between a PG and PG-13 movie or a T- and M-rated video game.  Tr. 52, 85-86.  She also expressed concern that the ESRB descriptors give parents insufficient information to differentiate the meaning and significance of phrases such as "blood," "animated blood," and "blood and gore."  Tr. 53.  Ms. White and Nell Minow of Common Sense Media commented that there is no system whereby ratings can be challenged by members of the public.[11]  Tr. 238-39, 62.  Some panelists expressed concerned about "ratings creep," a downgrading over time that results in violent material receiving more lax treatment.  Tr. 52, 62-63.

The ESRB's Patricia Vance cited research commissioned by her organization demonstrating that parents generally agree with how video games have been rated.  Tr. 38.  She also noted the finding in the FTC's 2000 Report that 83% of video game purchases are made by or with adults.[12]  Tr. 34, 233.  However, Dr. David Walsh of the National Institute on Media and the Family cited a peer-reviewed 2001 study suggesting some disagreement on the rating of violent entertainment.[13]  Tr. 99.  According to the study, if a movie is rated R or a video game is rated M, virtually 100% of parents agree with the designation.  However, when a movie or game is rated PG-13 or T, parents are more likely to believe that the rating was too lenient.  Parents surveyed found only 60% of the PG-13-rated movies and fewer than half of the T-rated video games to be suitable for children between 13 and 17.  A common reason parents had for disagreeing with the industry rating was a belief that the industry rating was too lax with regard to the depiction of violence.[14]  Dr. Walsh also voiced concern that because many major retailers will not carry products with AO or NC-17 ratings, economic considerations may dissuade ratings groups from using these designations even for products depicting the most violence.  Tr. 100.

Although a number of panelists voiced appreciation for independent organizations that provide detailed information about content, David Kinney of PSVratings, Inc., expressed frustration that rating groups that are not affiliated with the industry are often denied advance access to new products, thereby making it difficult for them to provide timely information to parents.  Tr. 89-90, 109.  The Lion & Lamb Project's Daphne White and Common Sense Media's Nell Minow criticized the existing industry systems for not factoring in the opinions of experts in child development or considering the effect of violence on children.[15]  Tr. 52, 61.  Patricia Vance of the ESRB countered that specialists in child development had been consulted in the establishment of the rating system for electronic games.  Tr. 35, 228.  Ms. White, Ms. Minow, and Dr. Walsh of the National Institute on Media and the Family also questioned whether the rating and labeling process can ever be transparent as long as it is dominated by members of the industry.  Tr. 51, 57, 60.

A third concern related to the advertising and marketing of material rated unsuitable for children in media with a high youth audience.  Lara Mahaney of Parents Television Council cited data compiled by her organization demonstrating that some networks regularly advertised R-rated movies and M-rated

video games in the prime time "family hour" or during programs with the highest number of viewers under 17. Tr. 65-68. The ESRB's Patricia Vance cited her industry's policy of not advertising M-rating products in print media with more than a 45% readership of children under 17 and on television programs with a viewership of more than 35% in that age group. Tr. 106. She noted, however, that even for programming with a large underage audience, *e.g.*, the Superbowl, the Grammy Awards, or "Survivor," the percentage of young viewers is 15% or less. Therefore, even if children are exposed to advertisements for products deemed potentially inappropriate for them, Ms. Vance maintained that it would be incorrect to suggest that the industry was targeting them. Tr. 106-07. Ms. Mahaney responded that, given that the total viewing audience is 80% adult, the ESRB's percentages are too high because virtually no prime time television program has enough children's viewership to meet the 35% figure. Tr. 107.

Some panelists raised a fourth concern: that even the best rating or labeling system can be circumvented by lax enforcement at the retail level. Tr. 104-05, 211, 234-35. *Children's Software Revue's* Warren Buckleitner noted that parents' access to useful information was being hindered by something as simple as retailers' placement of price tags over descriptors on packaging. Tr. 70. In response to evidence from the Commission's mystery shopper study demonstrating the ease with which many children could purchase products that have been rated as potentially inappropriate for them due to violent content, the ESRB's Patricia Vance cited efforts her industry has taken to train sales staff. Tr. 41, 105. However, she doubted that any system would be perfect, given the pressures that clerks have to move customers through the check-out line quickly. Tr. 105. Daphne White of The Lion & Lamb Project argued that retailers would have stronger incentives to stop the sale to children of movies, music, and electronic games deemed inappropriate for them if, like retailers of tobacco and alcohol, they faced fines or other legal sanctions for non-compliance. Tr. 114.

## IV. Cross-marketing And Merchandising Of Branded Products

The third panel of the day explored the growing phenomenon of the cross-marketing and merchandising of branded entertainment products to children. Representatives of the MPAA, the RIAA, and the ESRB were joined by experts in youth and media advertising and members of consumer groups.[16] As background for the discussion, Michelle Erskine of Solutions Research Group pointed to statistics suggesting the overall pervasiveness that media has in the life of children. Tr. 124-25. Pete Snyder of New Media Strategies cited a recent study done by his company that suggested that 67% of video game consumers are more likely to buy a game with a movie tie-in than a game without a tie-in. Tr. 129. His study of 350 teens and tweens also suggested that for 55% of them, the fact that a video game has been rated M makes it more likely that they will want to buy the product. Tr. 130-31.

Daphne White of The Lion & Lamb Project discussed the growing phenomenon of the sale of multiple entertainment products deemed appropriate for different age groups and yet marketed under the same title or brand, *e.g.*, a video game based on an R-rated movie may receive a T-rating and might have a soundtrack with or without a parental advisory on it. She cited examples of this form of cross-

merchandising:  an ice cream sundae tied to a PG-13 movie, Tr. 140; children's educational software featuring the same title character as a PG-13 movie, Tr. 138; nationally advertised brands of cookies and crackers with cross-promotions to PG-13 movies, Tr. 141; and a T-rated video game for a movie rated R for violence, Tr. 141-42.  Dr. David Walsh of the National Institute on Media and the Family suggested that given the importance cross-marketing plays in a product's financial success, considerations regarding the potential negative effect of cross-marketing on child development will not likely be a part of the calculus.  The issue becomes one of profit maximization and not whether playing the E-rated version of a video game tied to an R-rated movie would encourage children to want to see a movie that has been deemed inappropriate for them.  Tr. 133-34.

The ESRB's Patricia Vance cited the electronic game industry's self-regulatory code that forbids the inclusion of an M-rated demo on a product rated E or T.  She also cited industry standards prohibiting the advertising of M-rated products in print media with more than a 45% readership of children and on television programs with a viewership of more than 35% children.  Tr. 143-44.  The MPAA's Fritz Attaway commented that part of the movie industry's 12-point code is that studios will review their practices to further the goal of not inappropriately targeting children through the advertising and marketing of films, including promotional activities such as cross-marketing.  Tr. 144-45.  He also noted that some of the illustrations cited by Ms. White involved characters popularized in comic books or television shows long before the movie tie-ins were created.  He believed that it was erroneous to presume that an action figure based on a character such as Spiderman would entice children to see the movie any more than the pre-existing comic strip would.  Tr. 145.

It was noted that although internal industry documents indicate that some companies are careful in their licensing agreements to require age-appropriate labeling of products based on R-rated movies or M-rated video games or to specify that such products should not be offered for sale in toy stores, similar restrictions were not found in licensing agreements for products based on PG-13-rated movies.  Tr. 146-47.  Dr. Walsh applauded the ESRB's advertising code for forbidding the marketing of products to children based on M-rated video games and suggested that the ESRB's standard should be adopted by other industries.  Tr. 151.  Industry representatives disagreed with any intimation of a concerted effort to use products rated appropriate for children to attract their interest in entertainment rated or labeled as unsuitable for youngsters of that age.  Tr. 148.  Daphne White responded that the convergence of entertainment – especially movies and video games – suggests that if the brand is rated as inappropriate for children, all products based on that brand should receive the same rating.  Tr. 151-52.

## V.  Retailers' In-store And Online Practices

The panel opened with a discussion of the results of the Commission's most recent mystery shopper survey, which indicated that 69% of the teenage shoppers were able to buy M-rated video games, 81% were able to buy R-rated DVDs, 83% were able to buy explicit-content labeled recordings, and 36% were successful in purchasing tickets for R-rated films at movie theaters.[17]  Members of the panel

included national online and brick-and-mortar retailers, as well as representatives of retailer trade associations.[18]

Trade association representatives spoke about their industries' enforcement policies. According to the representatives, retailers in the DVD, electronic game, and theater industries generally enforce policies restricting access by children under 17 to M-rated video games or R-rated movies. Among music retailers, some simply do not stock explicit-content labeled recordings. Other music retailers enforce an age-based sales policy, and ask for proof of age or incorporate a prompt in the store's check-out system. Still others simply sell recordings without regard to age. Tr. 169-70. According to Jonathan Potter of the Digital Music Association and Jules Polonetsky of America Online, authorized purveyors of online music lack the ability to check a purchaser's age in the same fashion as brick-and-mortar retailers; however, many attempt to limit children's access to inappropriate material by, for example, featuring only the non-parental advisory labeled versions of songs on websites geared to youngsters or offering filtering software that will tailor a child's online experience in accordance to a parent's wishes – by preventing a child from downloading music labeled with a parental advisory, for example. Tr. 187, 200-01. Mr. Polonetsky also explained that AOL does not allow advertising for R-rated movies or music labeled with a parental advisory on Internet radio channels geared to teens. Similarly, online retailers' requirement of a credit card can act as an age filter. Tr. 204.

Representatives of the trade associations cited a number of steps their members have taken to educate parents about the rating or labeling systems and to prevent the sale to children of products that may warrant parental caution. Panelists discussed a variety of methods used to educate parents; many distribute in-store educational materials such as posters, shelf talkers, brochures, kiosks, counter cards, etc. Tr. 164-65, 168, 176, 182. In addition, many industry members incorporate ratings education into employee training programs. Tr. 165, 170, 178, 183, 192.

John Fithian of the National Association of Theatre Owners said that his organization sends periodic updates to member theaters explaining the reasons for the rating of upcoming movies so that sales personnel can answer questions from parents. Tr. 178. He also mentioned that NATO members must designate a corporate compliance manager responsible for ensuring enforcement with industry codes at their theaters and send them to semi-annual compliance training. Tr. 179. Raymond Smith, Senior Vice President of NATO member Regal Entertainment Group, discussed practical ratings enforcement approaches adopted by his company. For example, if a child is denied a ticket to an R-rated movie and purchases another ticket instead, the ticket is marked in a way that alerts the usher to monitor the child's movements in case he or she attempts to sneak into the R-rated movie. Mr. Smith's company also requires that parents who purchase tickets for R-rated movies for their children actually attend the movie with them. Tr. 197-98.

Beverly Porway of Toys 'R' Us discussed changes to the physical lay-out of retail stores designed to reduce the sale to children of material deemed inappropriate for them, such as the stocking of M-rated video games on higher shelves or behind sales counters so that they are inaccessible unless a patron specifically asks for them. Tr. 205-06. In addition, whenever sales personnel scan M-rated games in the

check-out line, a cash register prompts them: 1) to ask for proof of age if the purchaser looks to be under 25; and 2) to inform adults that the game they are purchasing is M-rated.  Tr. 191-92.

Panelists and members of the audience raised a number of issues, including the rating of music videos, Tr. 189; the rating of individual tracks – as opposed to entire albums – in a manner that would differentiate among songs warranting and not warranting a parental advisory, Tr. 188-89; the rating of supplemental materials included on DVDs, Tr. 207; and the ongoing problem of children downloading inappropriate materials from illegal P2P file sharing sites, Tr. 189-90.  Another panelist pointed out that the mystery shop results – for the music, DVD, and game industries, at least – show that the industries have a long way to go to improve enforcement at point of sale.  Tr. 211.

## VI. Next Steps: The Future Direction Of Self-regulation

The purpose of the final panel of the day was to begin a dialogue on ways to address the issues raised in earlier sessions.  Panelists included industry representatives, consumer groups, and health advocates.[19]  Dr. Michael Rich of the American Academy of Pediatrics and the Center on Media and Child Health opened the discussion by applauding the collaborative spirit exhibited by workshop participants and expressing optimism that new technologies will allow the focused delivery of media content to appropriate audiences.  Tr. 215.  Commenting on the Kaiser Family Foundation's finding that children between the ages of eight and eighteen are exposed to almost eight hours a day of media, he gave a brief overview of research on the effects of media violence on children.  Tr. 219-21.

Panels offered a number of suggestions for future efforts:

- more careful scientific study about whether industry rating systems accurately reflect how parents would rate the movie, music, or video game, Tr. 225;
- wider dissemination and use of www.parentalguide.org, a joint parent education project of the music, electronic game, movie, and television industries, Tr. 226-27;
- more detailed rating information in advertisements and at the point of purchase, Tr. 226, 111;
- closer cooperation among industry members, consumer groups, health advocates, and government agencies on educating the public about rating systems,[20] Tr. 71, 183-84, 225, 242-43;
- more effective self-regulation regarding the advertising and marketing to children of material deemed inappropriate for them, Tr. 105;
- links from industry websites to independent organizations that offer parents in-depth information about the content of movies, video games, or recordings, Tr. 227;
- parental access to alternate sources of information, including educational materials from pediatricians, Tr. 228-29;
- additional encouragement of parents to inform themselves on the influence of media on child development, Tr. 231-32;

- additional encouragement of parents to inform themselves on the use of ratings and labels, Tr. 241;
- continued encouragement of retailers to improve their performance in the FTC's periodic mystery shopper surveys, Tr. 234; and
- continued research on the effect of media violence on children.  Tr. 220-21, 225.

# Endnotes

1.  The Commission initially planned to include an additional panel of academics to present an overview of the research on the effects of violent media on children.  After some of scheduled participants withdrew within days of the event, the panel was cancelled.

2.  The workshop transcript is available on the FTC website at www.ftc.gov/bcp/workshops/violence/transcript.pdf.

3.  The MPAA's system designates movies with one of the following ratings:  **G** (General Audiences.  All ages admitted);  **PG** (Parental Guidance Suggested.  Some material may not be suitable for children);  **PG-13** (Parents Strongly Cautioned.  Some material may be inappropriate for children under 13);  **R** (Restricted.  Under 17 requires accompanying parent or adult guardian); and **NC-17** (No one 17 and under admitted).

4.  According to Mr. Bainwol, sites now use terms such as "PA" or "explicit" to designate explicit-content labeled recordings and terms such as "clean" or "edited" to designate non-labeled music.  Given the variety of language currently in use, the RIAA pledged to work with sites to encourage consistency in this area.  Tr. 33.

5.  The ESRB's system designates electronic games with one of the following ratings:  **EC** (Early Childhood.  Suitable for ages 3 and older.  Contains no material that parents would find inappropriate);  **E** (Everyone.  Suitable for persons ages 6 and older.  Titles in this category may contain minimal violence, some comic mischief and/or mild language);  **T** (Teen.  Suitable for persons ages 13 and older.  May contain violent content, mild or strong language, and/or suggestive themes);  **M** (Mature.  Suitable for persons ages 17 and older.  Titles in this category may contain mature sexual themes, more intense violence and/or strong language);  **AO** (Adults Only.  Suitable only for adults.  Titles in this category may include graphic depictions of sex and/or violence.  Adult Only products are not intended for persons under the age of 18.); and **RP** (Rating Pending).  In 2002, of the 1229 games rated by the ESRB, almost two-thirds were rated E, slightly more than 25% were rated T, and less than 10% were rated M.  Tr. 36.

6.  The ESRB's descriptors include:  **Alcohol Reference** (Reference to and/or images of alcoholic beverages);  **Animated Blood** (Cartoon or pixilated depictions of blood);  **Blood** (Depictions of blood);  **Blood and Gore** (Depictions of blood or the mutilation of body parts);  **Cartoon Violence** (Violent actions involving cartoon-like characters.  May include violence where a character is unharmed after the action has been inflicted);  **Comic Mischief** (Scenes depicting slapstick or gross vulgar humor);  **Crude Humor** (Moderately vulgar antics, including "bathroom" humor);  **Drug Reference** (Reference to and/or images of illegal drugs);  **Edutainment** (Content of product provides user with specific skills development or reinforcement learning within an entertainment setting.  Skill development is an integral part of product);  **Fantasy Violence** (Violent actions of a fantasy nature, involving human or non-human characters in situations easily distinguishable from real life);  **Gambling** (Betting-like behavior);  **Informational** (Overall content of product contains data, facts, resource information, reference materials or instructional text);  **Intense Violence** (Graphic and realistic-looking depictions of physical conflict.  May involve extreme and/or realistic blood, gore, weapons, and depictions of human injury and death);  **Mature Humor** (Vulgar and/or crude jokes and antics including "bathroom" humor);  **Mature Sexual Themes** (Provocative material, possibly including partial nudity);  **Mild Language** (Mild references to profanity, sexuality, violence, alcohol, or drug use);  **Mild Lyrics** (Mild references to profanity, sexuality, violence, alcohol, or drug use in music);  **Mild Violence** (Mild scenes depicting characters in unsafe and/or violent situations);  **Nudity** (Graphic or prolonged depictions of nudity);  **Partial Nudity** (Brief and mild depictions of nudity);  **Sexual Violence** (Depictions of rape or other sexual acts);  **Some Adult Assistance May Be Needed** (Early Childhood Descriptor only);  **Strong Language** (Profanity and explicit references to sexuality, violence, alcohol, or drug use);  **Strong Lyrics** (Profanity and explicit references to sex, violence, alcohol, or drug use in music);  **Strong Sexual Content** (Graphic depiction of sexual behavior, possibly including nudity);  **Suggestive Themes** (Mild provocative references or materials);  **Tobacco Reference** (Reference to and/or images of tobacco products);  **Use of Drugs** (The consumption or use of illegal drugs);  **Use of Alcohol** (The consumption of alcoholic beverages);  **Use of Tobacco** (The consumption of tobacco products); and **Violence** (Scenes involving aggressive conflict).

7.  Representatives of the MPAA, the RIAA, and the ESRB were joined by Warren Buckleitner, editor of *Children's Software Revue*; David G. Kinney, President and CEO of PSVratings, Inc.; Lara Mahaney, Director of External Affairs of the Parents Television Council; Nell Minow of Common Sense Media; Vicky Rideout, Vice President of the Kaiser Family Foundation; Dr. David Walsh, President of the National Institute on Media and the Family; and Daphne White, Executive Director of The Lion & Lamb Project.

8.  Kaiser Family Foundation, ZERO TO SIX: ELECTRONIC MEDIA IN THE LIVES OF INFANTS, TODDLERS AND PRESCHOOLERS (2003), www.kff.org/entmedia/3378.cfm.  According to the study, approximately 25% of two-year-olds have televisions in their bedrooms.  *Id.* at 5.  By the time they are in the four-to-six-year-old age range, half of all children have played video games and 70% have used computers.  *Id.*

9. Although not the topic of this workshop, the television industry uses its own rating system that designates programs as **TV-Y** (appropriate for all children), **TV-Y7** (directed to children age 7 and above), **TV-Y7-FV** (directed to children age 7 and above and containing scenes of fantasy violence), **TV-G** (suitable for all ages), **TV-PG** (parental guidance suggested), **TV-14** (parents strongly cautioned), and **TV-M** (for mature audiences only).

10. According to David Kinney, in focus groups conducted by PSVratings, parents found multiple rating systems to be confusing and expressed a preference for a system that would provide more information about content and would apply across the board to movies, music, video games, and television. Tr. 74-75. Nell Minow of Common Sense Media cited a study conducted by her organization showing that 78% of parents surveyed favor a single rating system applied to all media. Tr. 96.

11. The ERSB's Patricia Vance noted that her organization has a toll-free telephone number and consumer hotline for feedback from parents and other interested parties. Tr. 240.

12. *See* Federal Trade Commission, *Marketing Violent Entertainment To Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*, Appendix F (Sept. 2000), available at www.ftc.gov/reports/violence/appendicesviorpt.pdf.

13. David A. Walsh & Douglas A. Gentile, *A Validity Test of Movie, Television, and Video-Game Ratings*, 107 PEDIATRICS 1302 (June 2001).

14. *Id.* at 1305-06.

15. During the question-and-answer period, Milwaukee Alderman Joe Davis observed that children's exposure to violent media was having deleterious effects on their behavior and could ultimately raise issues of national security. Tr. 115-16.

16. Panelists included Dean Garfield, Associate Counsel of the RIAA; Michele Erskine, Vice President of Solutions Research Group, Inc.; Pete Snyder, CEO of New Media Strategies; Fritz Attaway, Executive Vice President of the MPAA; Patricia Vance of the ESRB; Dr. David Walsh of the National Institute on Media and the Family; and Daphne White of The Lion & Lamb Project.

17. Federal Trade Commission, *Results of Nationwide Undercover Survey Released* (Oct. 14, 2003), available at www.ftc.gov/opa/2003/10/shopper.htm.

18. Panelists included Sean Bersell, Vice President-Public Affairs of the Video Software Dealers Association (VSDA); Jim Donio, Executive Vice President of the National Association of Recording Merchandisers (NARM); John Fithian, President of the National Association of Theatre Owners (NATO); Hal Halpin, President of the Interactive Entertainment Merchants Association (IEMA); Jules Polonetsky, Vice President-Integrity Assurance of America Online; Beverly Porway, Regulatory and Litigation Counsel for Toys 'R' Us, Inc.; Jonathan Potter, Executive Director of the Digital Media Association (DiMA); and Raymond L. Smith, Jr., Senior Vice President & Human Resources Counsel of Regal Entertainment Group.

19. Panelists included Mitch Bainwol of the RIAA; Douglas Lowenstein, President of the Entertainment Software Association (ESA); Dr. Michael Rich of the American Academy of Pediatrics; Jack Valenti of the MPAA; Patricia Vance of the ESRB; Dr. David Walsh of the National Institute on Media and the Family; and Daphne White of The Lion & Lamb Project.

20. One industry member voiced concern that attempts to work cooperatively with other groups had not been successful in the past, but expressed optimism that future efforts would be more successful. Tr. 41.

# Appendix B:  Mystery Shopper Survey

This Appendix reports on the third nationwide undercover or "mystery shopper" survey that the Commission has conducted to determine the extent to which the entertainment industries restrict children's access to R-rated movies, explicit-content labeled music recordings, and M-rated games at the retail level.  The Commission first conducted an undercover "mystery" shopper survey for the September 2000 Report to determine whether unaccompanied 13- to 16-year-olds could purchase tickets to R-rated movies, explicit-content labeled recordings, and M-rated games.[1]  A follow-up survey was published in the December 2001 Report.[2]  For the first time in this survey, the Commission also surveyed practices at stores selling R-rated movies on DVD.

## A.  Industry Self-Regulatory Policies for Limiting Access

It is the retailers who implement any sales restrictions included in the self-regulatory rating and labeling programs.  For movies, in response to the September 2000 Report, the National Association of Theatre Owners ("NATO") adopted a twelve-point initiative that, among other things, reaffirmed its existing ID-check policy for R and NC-17 films and promised to take steps to encourage theaters to enforce the rating system.  In addition, NATO members appointed compliance officers to strengthen enforcement of the program.  The Video Software Dealers Association ("VSDA") encouraged retailers to review their ratings education and enforcement polices to ensure compliance with VSDA's standard that R-rated movies and M-rated video games not be sold or rented to persons under age 17 without parental consent.[3]

The International Digital Software Association ("IDSA," now the Entertainment Software Association or "ESA") encouraged retailers to consider adopting a program not to sell M-rated games to persons under 17.  The Interactive Entertainment Merchants Association, which supports member retailers' rating education efforts, has indicated that many of its members, including Wal-Mart, Blockbuster, Toys 'R' Us, Electronics Boutique, Target, and Circuit City, have adopted policies restricting the sale of M-rated games.[4]  Retailers such as Kmart, Staples, and CompUSA have also adopted policies restricting sales to those under 17.  With respect to retailer efforts to limit sales of M-rated games, IDSA previously noted that it "supported these efforts even though the Mature rating itself does not say that a title is not appropriate for a person under 17; rather, the rating says that the content 'may not be suitable' for a person under 17."[5]

For music recordings, the industry's labeling program provides no age-based guidance.  According to the National Association of Recording Merchandisers, some music retailers choose not to carry explicit-content labeled recordings or stock only an edited version, while others restrict sales to children.  Still other retailers "choose not [to] interfere with parenting decisions and sell entertainment products without regard to age."[6]  Some music recording retailers have indicated that they have policies not to sell such recordings to children.

## B.  The Mystery Shopper Surveys

The 2003 mystery shopper survey followed substantially the same methodology as the two previous surveys.  For each, the Commission, through a contractor,[7] recruited 13- to 16-year-olds across the country to attempt to purchase movie tickets, music, or electronic games.  Each teenage shopper visited one retail location for one or more of the entertainment products.[8]  In all three surveys, shoppers attempted to purchase either a ticket to an R-rated movie, an explicit-content labeled CD,[9] or an M-rated electronic game; for the first time in the 2003 survey, the shoppers also attempted to purchase an R-rated movie on DVD.  Parents transported the children to the store or theater but were instructed not to accompany the children during the transaction.  The contractor required shoppers to submit proof of age and verification for completed purchases by submission of a receipt.[10]  In each survey, the panel was divided almost exactly between boys and girls and between younger and older shoppers (13 or 14 versus 15 or 16).

After attempting purchase, the shopper completed a questionnaire on the contractor's proprietary website.[11]  In each survey, the questionnaire asked three questions:

1.  Was there a sign, poster, or other information to inform customers of the rating/advisory system or the store/theater's policy on rating/advisory enforcement?

2.  Was the child able to buy the product or admission ticket?

3.  Did the cashier or clerk ask the child's age before purchase?

## C.  The 2003 Mystery Shopper Survey

In the 2003 survey, shoppers from 39 states attempted to purchase movie tickets, DVD movies, music recordings, and electronic games at 899 theaters and stores during July and August 2003.  The sample size for each industry was 225, with slight variation.  Almost half (49%) of the shoppers were female; about half (51%) were younger shoppers (13 or 14 years old).  The results of the 2003 survey are reported in Table 1.

**Table 1**
**Total Percentages of Yes and No Responses to 2003 Survey Questions**

| Product | | Movies at the Theater (in percent, of 225 shoppers) | Movies on DVD (in percent, of 226 shoppers) | Music (in percent, of 223 shoppers) | Games (in percent, of 225 shoppers) |
|---|---|---|---|---|---|
| **Question 1** | NO | 38 | 74 | 79 | 73 |
| Was Rating Information Posted? | YES | 62 | 26 | 21 | 27 |
| **Question 2** | NO | 64 | 19 | 17 | 31 |
| Was the Child Able to Make a Purchase? | YES | 36 | 81 | 83 | 69 |
| **Question 3** | NO | 52 | 81 | 87 | 76 |
| Did an Employee Ask the Child's Age? | YES | 48 | 19 | 13 | 24 |

## Key Findings

The key finding in this survey was the statistically significant, across-the-board improvement in retailers' performance in restricting children's access to potentially inappropriate content, in comparison with prior surveys (as shown in Table 2).  Each of the industries that were previously surveyed were significantly[12] more successful in limiting children's access to potentially inappropriate content in 2003 than they had been in the 2001 survey.  Both the electronic game retailers and movie theaters – but not music stores – were significantly more successful in limiting children's access than they had been in the initial survey in 2000.

**Table 2**
**Was the child able to buy the product or admission ticket?  (Percent "Yes")**

| Entertainment Product Type | 2000 Survey Results | 2001 Survey Results | 2003 Survey Results |
|---|---|---|---|
| Movie Theater Ticket | 46% | 48% | 36% |
| Movie on DVD | n/a | n/a | 81% |
| Music Recording | 85% | 90% | 83% |
| Electronic Game | 85% | 78% | 69% |

For each type of entertainment product, more shoppers noted that rating information was posted, and reported that the retail clerk or cashier had asked the shoppers' age.  While these changes were not statistically significant in most cases, as shown in Table 3, they were in the same positive direction for each industry.  Comparing the current survey to the first survey in 2000, for each of the industries previously surveyed, more teen shoppers noted signs or other information informing customers of the rating or advisory system or the venue's policy on enforcement in 2003 than in 2000; these differences were significant in each case.  Another statistically significant difference from the 2000 survey was that more game retailers asked the shoppers' age.

**Table 3**
**Results on Availability of Rating Information/"Ask Age" Questions**

| Entertainment Product Type | Does the venue provide information about ratings or ratings enforcement?  (Percent "Yes") | | Did the cashier or clerk ask the child's age?  (Percent "Yes") | |
|---|---|---|---|---|
| | 2001 | 2003 | 2001 | 2003 |
| Movie Theater Ticket | 59% | 62% | 39% | 48%* |
| Movie on DVD | n/a | 26% | n/a | 19% |
| Music Recording | 12% | 21%* | 10% | 13% |
| Electronic Game | 26% | 27% | 21% | 24% |

* Denotes a statistically significant difference from the 2001 survey.  Data for comparison were not available for DVD retailers.

As in the previous surveys, theaters displayed rating information, asked young shoppers their ages, and restricted purchases more consistently than other entertainment retailers. Music retailers again were the least likely to provide information about the parental advisory, check shoppers' ages, and restrict purchases. DVD retailers' practices, surveyed for the first time, were approximately comparable to the music retailers' results for each measure, with slightly more DVD retailers posting rating information, asking age, and restricting purchase.

### Availability of Information about the Rating or Labeling Systems

At theaters, 62% of the shoppers reported seeing posters, signs, or other information about the rating system. The figures for the other three industries were in a lower range: 27% saw rating information at electronic game retailers, 26% at DVD retailers, and 21% at music retailers.[13] More shoppers at music stores (21%) reported that they had seen rating information than in the 2001 survey (12%).

### Purchase Data

While there is room for improvement in each industry, theaters have the best record in limiting sales of rated or labeled entertainment to children under 17. The 2003 survey results show that 36% of the teenage shoppers were successful in purchasing tickets for admission to an R-rated film at movie theaters. By contrast, 69% of the teenage shoppers were able to buy M-rated games, 81% were able to buy R-rated movies on DVD, and 83% were able to buy explicit-content labeled recordings. As noted earlier, sales restrictions are not part of the music industry's parental advisory program but individual retailers may adopt policies on their own initiative.

### Age-Check Data

As a corollary to the purchase question, shoppers also noted whether the store or theater asked the shopper's age when the teen approached the cashier to purchase the product or ticket. Music retailers asked the age of 13% of the shoppers, DVD retailers 19%, game retailers 24%, and movie theaters 48%. The extent to which movie theaters checked the ages of the teen shoppers increased from 39% in the 2001 survey to 48%, a significant difference. More stores selling music and games also asked age, although these changes were not significant.

### Age, Gender, and Major Chain Comparisons

As one would expect, older shoppers were more successful in purchasing a ticket to an R-rated movie, an explicit-content labeled recording, or an M-rated electronic game than younger shoppers. Shoppers' success in purchasing R-rated movies on DVD, by contrast, did not vary significantly according to the age of the shopper. The youngest shoppers, 13-year-olds, were able to purchase rated or labeled entertainment at 73% of DVD retailers and 69% of the music retailers, compared to 56% of

electronic game retailers and 25% of movie theaters.[14]  More girls than boys were able to purchase R-rated DVDs – possibly because cashiers asked only 15% of girls their age, compared to 23% of boys.

A comparison of major[15] chains in each industry showed that the largest theater circuits, DVD retailers, and music retailers were more likely to display signs, posters, or other information about the rating system than non-majors.  Moreover, major movie theater chains and DVD sellers were more likely to restrict sales to minors and to ask age.  Major music retailers were less likely to restrict sales and to ask age than non-majors.  At major theater chains, 28 of 99 shoppers (28%) attempting to buy tickets to an R-rated movie were successful;[16] at large music retailers, 114 of 127 shoppers (90%) were able to purchase explicit content-labeled recordings;[17] and at large electronic game retailers, 92 of 132 shoppers (70%) were able to purchase M-rated electronic games.[18]  At large DVD retailers, 89 of 120 shoppers (74%) were able to purchase R-rated DVDs.[19]

There were no statistically significant differences between major and non-major game retailers.  The Commission also analyzed separately, as in the December 2001 Report, the results for seven major game retailers that were recognized in the December 2001 Report as having policies to restrict sales of electronic games to minors.  Toys 'R' Us, Kmart, Wal-Mart, Target, Circuit City, Staples, and CompUSA were more likely than other game retailers to post information about the rating system (42% vs. 22%), to restrict sale (45% vs. 26%),[20] and to ask age (36% vs. 19%).  These seven chains allowed 29% of the 13-year-olds (5 of 17) to purchase M-rated games.  While other retailers have announced enforcement policies since 2001 – so the results cannot be characterized as a comparison of stores with policies versus those without – the relative success of these retailers' enforcement in relation to the industry as a whole suggests that retailers' commitment to enforce restrictive age policies can make a difference.  Still, even at these retailers, a majority of teen shoppers (55%) were able to purchase an M-rated game.

### Comments on the Undercover Shops

As part of the mystery shopper survey, the parents were asked to provide one or two sentences of commentary about the purchase attempt and describe any interaction that occurred between the child and the employees at the store or theater.  The comments shed light on industry practices in a way that numbers alone do not.  Many of the comments reflect that the cashier sold the product without a second thought.  In contrast, some teen shoppers came across cashiers who told them that they (the cashiers) would lose their jobs for selling the product to the teen.  Other shoppers encountered clerks who were complicit in the process, selling the product with full knowledge that the child was below the restricted age.  One phenomenon was that strangers sometimes offered to stand in for the parent so that the child could purchase the product.  Selected verbatim comments follow:[21]

– When the child asked for tickets to Terminator 3, the cashier seemed astonished that she wanted to see this movie at her age and asked, "Do you know that is an R-rated movie?"  The cashier did not allow the child to buy the product.  (Movie at theater, age 15)

– The employee asked to see the child's ID. She looked around, said he was close enough, and sold him the ticket. (Movie at theater, age 16)

– The child attempted to purchase an M-rated video game but the cashier asked for a parent [sic] consent. The cashier offered to hold the game until a parent was present. (Game, age 13)

– The clerk even asked another clerk if it was okay to sell an R-rated movie. [The purchase attempt was successful.] (DVD, age 13)

– My child asked for a copy of Soldier of Fortune II, which was in a locked display case. The clerk got it for him, sold it to him, and asked him to come back in to let him know how he liked the game. (Game, age 14)

– Child presented the CD to cashier and made the purchase with no questioning. (Recording, age 13)

– This employee successfully stopped my son from making this purchase. There was a replacement item purchased. (Game, age 13)

– When the employee discovered the child was only 13, he asked if his parents were with him. Once he established that the child was alone, he said, "Sorry buddy, I can't sell you this, or I'll get fired." (DVD, age 13)

– The employee asked the child to which movie he wanted to buy a ticket. The child said, "Bad Boys II." He sold the child the ticket. Another employee was asking for identification from customers. (Movie at theater, age 16)

– The employee asked if the child was 17. He said he was almost 16 and the employee continued with the transaction. (Game, age 15)

– The store clerk asked if he could help my daughter and her friend, who was also 13 years old. They said they were looking for a birthday gift for their little brother, and the store clerk suggested the above M-rated title. (Game, age 13)

– The employee did not ask the child's age. The employee said, "I'll put you in as a child so you can get the cheaper price." (Movie at theater, age 15)

– The man behind the counter was worried about the age of the child. In fact he was trying to save him money by having him buy a pre-viewed [sic] one. (Game, age 14; purchase attempt was successful)

– There was a woman with a yellow Granger T-shirt, that neither [the child] or I knew who said, "I will vouch for her." She did tell the cashier that she was not with her. (DVD, age 13; purchase attempt was successful)

&ndash;   The clerk asked the child his age and very politely informed him that she could not sell him the movie.  A customer behind him in line said that she was his neighbor, she isn't, and would vouch for him but the clerk declined.  (DVD, age 14)

&ndash;   The package had a white sticker over the rating.  The employee did not ask for my child's age, and the child was allowed to buy the product.  (DVD, age 15)

&ndash;   The employee asked the child if it was "cool with his mom" that he bought the CD even though it carried the parental advisory.  No further inquiries or proof of age were asked, and the child was allowed to purchase the product.  (Recording, age 15)

&ndash;   My child was able to purchase an R-rated DVD.  The clerk did not ask for an age, and there were no signs posted stating they would not sell R-rated DVD's to minors.  (DVD, age 14)

&ndash;   There were three employees at the counter when my daughter asked for the ticket to the 9:30 show.  They did not ask her age, and they gave her the student rate without asking for her ID.  The theater was showing two PG-13 films also.  (Movie at theater, age 14)

&ndash;   She asked for the game, and then this conversation followed:  "Are you 18?" "No." "Are you 17?" "No." "OK, well technically I can't sell this to you, but if anyone asks, you didn't get it here."  (Game, age 14)

&ndash;   My son was informed that he was not old enough to purchase the ticket, and that he would have to be accompanied by an adult.  Also, he was told the movies he could see for his age.  (Movie in theater, age 13)

&ndash;   The employee asked for proof of age and told my son, "No one here will sell you a ticket to that movie."  (Movie in theater, age 15)

&ndash;   The employee did not look at the game while selling it.  The employee just scanned it and took my child's money.  (Game, age 14)

&ndash;   My child went through the U-scan, and it said to show verification of age to the cashier, but it went away without the child having to show her driver's license in order to complete the purchase.  (Recording, age 16)

&ndash;   My son took the CD to the register.  He had his money out as he handed the CD to the clerk.  She looked at the CD, and asked if he had identification.  He said he didn't.  She said he couldn't buy it.  (Recording, age 14)

&ndash;   My child observed a sign stating they didn't allow teens under 17 to enter R-rated films. The ticket was purchased during a slow period, and there were no adults in sight.  No one asked his age.  (Movie in theater, age 15; purchase attempt was successful)

&ndash;   My child was able to purchase a CD with the parental advisory label.  There were no signs posted, and the clerk did not ask for age or identification.  (Recording, age 15)

– The employee told my daughter that the video game was Mature in case it made any difference to her. The employee did not ask my daughter how old she was, and she was allowed to buy the product. No signage was visible that explained the rating system. (Game, age 15)

– The cashier in the music/movie department did not question my daughter when she purchased the R-rated DVD. There were signs posted at multiple registers saying they required proof of age for such purchases. (DVD, age 16)

– No information regarding a rating/advisory system was offered on the sales floor. At the checkout an associate completed the child's CD transaction without asking his age. (Recording, age 15)

– The cashier said, "Hello, will there be anything else?" When the child said no, she rang up the sale, saying thank you as she gave him the change and the R-rated DVD purchase. (DVD, age 16)

– The child asked an associate for assistance in removing the video game from the locked case. The child then walked over to the cash register, and was able to purchase the video game with no questions asked. (Game, age 16)

**Mystery Shopper 2003 Survey Questionnaire**

1.  Item child attempted to purchase
    _____ R-rated DVD
    _____ R-rated Movie Ticket
    _____ M-rated Video Game
    _____ Music Recording with Parental Advisory

2.  Name of motion picture at theater, music recording, video game, or DVD the child attempted to
    purchase: _____
    For movie theaters and DVD's:  provide title; For music recordings:  provide artist's name and
    title; For video games:  provide manufacturer name and title

3.  Did you see any sign, poster, or other information to inform customers of the rating/advisory
    system or the store/theater's policy on rating/advisory enforcement?
    _____ Yes
    _____ No

4.  Was the child able to buy the product?
    _____ Yes
    _____ No

5.  Did the employee at the store/theater ask your child's age?
    _____ Yes
    _____ No

6.  Purchase Comments
    Provide 1-2 sentences of commentary about purchase.  Describe any interaction that occurred
    between your child and store/theater employees.

7.  Name of store/theater visited: _____

8.  City/State where store/theater is located: _____

9.  ZIP Code where store/theater is located: _____

10. For movie theaters:  Number of movies currently shown at the theater
    ____ One
    ____ Two
    ____ More than two

11. Identifying information appearing on receipt/ticket
    Enter information that details the name and location of the store/theater exactly as it appears
    on the receipt/ticket.  If the original purchase was refused and an alternate purchase was made,
    enter the information from that purchase.

Evaluator Profile:
12. Parent's Evaluator ID _____
13. Child's Age _____
14. Child's Gender
    ____ Male
    ____ Female
15. Child's Ethnicity
    ____ Hispanic Origin (of any race)
    ____ American Indian, Eskimo or Aleut
    ____ Asian or Pacific Islander
    ____ Black
    ____ White

# Tables of Mystery Shopper Survey Data

## 1. Tables of Mystery Shopper Results by Age of Shopper

**Was the shopper able to make the purchase?**

### a. Movie Theaters

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 49<br>75%    | 34<br>71%    | 42<br>65%    | 18<br>38%    | 143<br>64% |
| Yes   | 16<br>25%    | 14<br>29%    | 23<br>35%    | 29<br>62%    | 82<br>36% |
| Total | 65           | 48           | 65           | 47           | 225   |

### b. Music Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 20<br>31%    | 7<br>15%     | 9<br>14%     | 2<br>4%      | 38<br>17% |
| Yes   | 45<br>69%    | 41<br>85%    | 54<br>86%    | 45<br>96%    | 157<br>83% |
| Total | 65           | 48           | 63           | 47           | 223   |

### c. Electronic Game Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 30<br>44%    | 11<br>23%    | 21<br>34%    | 7<br>15%     | 69<br>31% |
| Yes   | 38<br>56%    | 36<br>77%    | 41<br>66%    | 41<br>85%    | 156<br>69% |
| Total | 68           | 47           | 62           | 48           | 225   |

### d. DVD Movie Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 18<br>27%    | 9<br>18%     | 13<br>21%    | 4<br>8%      | 44<br>19% |
| Yes   | 49<br>73%    | 40<br>82%    | 49<br>79%    | 44<br>92%    | 182<br>81% |
| Total | 67           | 49           | 62           | 48           | 226   |

**Was the shopper asked his/her age?**

a.  Movie Theaters

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 32<br>49%    | 23<br>48%    | 31<br>48%    | 31<br>66%    | 117<br>52% |
| Yes   | 33<br>51%    | 25<br>52%    | 34<br>52%    | 16<br>34%    | 108<br>48% |
| Total | 65           | 48           | 65           | 47           | 225   |

b.  Music Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 55<br>85%    | 43<br>90%    | 53<br>84%    | 44<br>94%    | 195<br>87% |
| Yes   | 10<br>15%    | 5<br>10%     | 10<br>16%    | 3<br>6%      | 28<br>13% |
| Total | 65           | 48           | 63           | 47           | 223   |

c.  Electronic Game Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 54<br>79%    | 38<br>81%    | 40<br>65%    | 40<br>83%    | 172<br>76% |
| Yes   | 14<br>21%    | 9<br>19%     | 22<br>35%    | 8<br>17%     | 53<br>24% |
| Total | 68           | 47           | 62           | 48           | 225   |

d.  DVD Movie Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 54<br>81%    | 39<br>80%    | 45<br>73%    | 44<br>92%    | 182<br>81% |
| Yes   | 13<br>19%    | 10<br>20%    | 17<br>27%    | 4<br>8%      | 44<br>19% |
| Total | 67           | 49           | 62           | 48           | 226   |

## 2. Tables of Mystery Shopper Results by Gender

**Was the shopper able to make the purchase?**

|  | Males | Females |
|---|---|---|
| Movies at Theater | | |
| Respondents | 114 | 111 |
| Respondents Able to Purchase | 36 | 46 |
| Percent Able to Purchase | 32% | 41% |
| Music | | |
| Respondents | 112 | 111 |
| Respondents Able to Purchase | 90 | 95 |
| Percent Able to Purchase | 80% | 86% |
| Games | | |
| Respondents | 114 | 111 |
| Respondents Able to Purchase | 73 | 83 |
| Percent Able to Purchase | 64% | 75% |
| Movies on DVD | | |
| Respondents | 115 | 111 |
| Respondents Able to Purchase | 86 | 96 |
| Percent Able to Purchase | 75% | 86% |

**Was the shopper asked his/her age?**

|  | Males | Females |
|---|---|---|
| Movies | | |
| Respondents | 114 | 111 |
| Respondents Who Were Asked Their Age | 60 | 48 |
| Percent Who Were Asked Their Age | 53% | 43% |
| Music | | |
| Respondents | 112 | 111 |
| Respondents Who Were Asked Their Age | 15 | 13 |
| Percent Who Were Asked Their Age | 13% | 12% |
| Games | | |
| Respondents | 114 | 111 |
| Respondents Who Were Asked Their Age | 27 | 26 |
| Percent Who Were Asked Their Age | 24% | 23% |
| Movies on DVD | | |
| Respondents | 115 | 111 |
| Respondents Who Were Asked Their Age | 27 | 17 |
| Percent Who Were Asked Their Age | 23% | 15% |

## 3. Tables of Purchase Behavior by "Major" Chain vs. Non-"Major" Chain

**Did the shopper see any sign, poster, or other information to inform customers of the rating/advisory system or the store/theater's policy on rating/advisory enforcement? (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 55% | 14% | 30% | 17% |
| Major chain | 72% | 26% | 25% | 33% |

**Was the shopper able to purchase the item? (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 43% | 74% | 69% | 88% |
| Major chain | 28% | 90% | 70% | 74% |

**Was the shopper asked his/her age? (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 41% | 20% | 24% | 13% |
| Major chain | 57% | 7% | 23% | 25% |

# Endnotes

1. *Appendix F, Marketing Violent Entertainment to Children:  A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries* ("September 2000 Report"), *available at* www.ftc.gov/reports/violence/appendicesviorpt.pdf.  The September 2000 survey comprised 1,158 theaters and stores.

2. *Marketing Violent Entertainment to Children:  A One-Year Follow-Up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries* ("December 2001 Report")*, available at* www.ftc.gov/os/2001/12/violencereport1.pdf.

   The 2001 Mystery Shopper Survey comprised 900 theaters and stores.

3. Retailers that participate in the program, titled "Pledge to Parents," also agree not to rent or sell NC-17 movies or AO-rated electronic games to anyone under 18.

4. *See* Statement of Hal Halpin, President, Interactive Entertainment Merchants Association, FTC Workshop on Industry Self-Regulation (October 29, 2003), *available at* www.iema.org/news.php# (visited Nov. 4, 2003).

5. *See* Testimony of Douglas Lowenstein, President, Interactive Digital Software Association, House Subcommittee on Telecommunications and the Internet, July 20, 2001.   IDSA also stated that "the ultimate decision on what policies to adopt in stores properly lies with the individual retailers who are the best judge of the relationship they want with their own customers." *Id.*

6. NARM also indicated that many retailers will accept returns if a parent concludes that a recording is inappropriate for his or her child.  *See* NARM, *Parental Advisory:  A Message to Parents About Children and Music*, *available at* www.narm.com/Content/NavigationMenu/P ublic_Affairs/Parental_Advisory2/Parental_Message/Parental_Message.htm (visited Nov. 4, 2003).

7. Second to None was the contractor.

8. No shopper visited more than one location for each type of entertainment product.

9. For music, one shopper went to Wal-Mart, which does not carry explicit-content labeled recordings.  That attempt was excluded from the sample.

10. The contractor required shoppers to submit proof of age and verification for completed purchases by submission of a receipt; if they were not able to make a purchase, the shoppers were to buy another item at the store or a ticket to another movie to get a receipt, except in cases where the shopper went to a movie theater showing only one R-rated movie.

11. Parents completed the questionnaire on the website after getting the information from the child (*e.g.*, whether the child was able to purchase the product).

12. Note that differences cited in the analysis of the mystery shopper data are statistically significant differences, with $p<0.05$, unless otherwise noted.  The terms "significant" or "significantly" are used in the statistical sense only.

13. Rating information may have been posted in additional stores and theaters, but not noticed.

14. By comparison, in the 2001 survey, 13-year-olds were able to purchase at 87% of music stores, 66% of electronic game stores, and 33% of movie theaters.

15. For purposes of this appendix, so-called "major" chains include only the very largest theater circuits and retailers in each industry.  The "non-major" category includes independent stores as well as chains – including some large chains – that are not among the nation's very largest sellers of that category of product.

16. "Major" theater chains visited by the shoppers:  American Multi-Cinema, Inc. (including General Cinema), Carmike Cinemas, Inc., Century Theatres, Cinemark USA, Inc., Loews Cineplex Entertainment Corp. (including Cineplex Odeon), Marcus Theaters, National Amusements, Inc., and Regal Cinemas, Inc. (including Hoyts Cinemas Corp. and United Artist Theatre Circuit, Inc.).

17. The "major" stores visited by shoppers were owned by the following companies:  Best Buy Co., Circuit City Stores Inc., Kmart Corp., MTS, Inc. (Tower Records), Musicland Group, Inc., Target Stores, Inc., Trans World Entertainment Corp., and Wherehouse Entertainment, Inc.

18. The "major" retailers visited by the shoppers:  Best Buy Co., Inc., Electronics Boutique Holdings Corp., GameStop Corp. (including Babbage's, FuncoLand, and Software Etc.), KB Toys, Kmart Corp., Target Stores, Inc., Toys 'R' Us, Inc., and Wal-Mart Stores, Inc.

19.  "Major" DVD retailers were Best Buy Co., Inc., Blockbuster Inc., Circuit City Stores Inc., Kmart Corp., MTS, Inc. (Tower), Musicland Group (including Suncoast Motion Picture Company), Target Stores, Inc., and Wal-Mart Stores, Inc.

20.  In 2001, 73% of the shoppers were able to purchase at these seven chain stores.

21.  Note that these comments are not necessarily representative of the shoppers' experiences as a group.  The shopper's age is provided in the parenthetical following each comment.

# Appendix C:  Data Collection Methodology And Television And Print Demographics

In this Report, the Commission has examined whether violent R-rated films, explicit-content labeled music, and M-rated video games continue to be marketed to children under the age designated in the rating (or, in the case of labeled music, to children under 17), and also whether rating information is included in advertisements for these products.  The Commission examined numerous media sources, including media popular with teens in terms of total teen audience or percentage of viewers under 18. This Appendix describes these sources and the media monitoring the Commission undertook to gather data for this Report, and sets forth demographic data for the audiences for the television programs, websites, and publications discussed in the Report.

## I.  Popular Televison Shows Among Teenagers

The Commission monitored advertising that occurred during eight weeks between May and July 2003 on network and cable television, including programs in syndication, with a particular focus on the after-school and early-prime time slots when youth are most likely to watch television.  The Commission also reviewed data showing where each particular ad for an R-rated movie, M-rated game, or explicit-content labeled recording first aired between June 2002 and early September 2003.

### A.  Network, Cable, and Syndicated Television Monitoring

The Commission contracted with a commercial advertising tracking firm, Video Monitoring Service ("VMS"), to track advertisements for R-rated, M-rated or explicit-content labeled products on popular teen television programs.  In selecting which television shows to review, the Commission focused on programs that were among the most popular with teens in terms of total teen audience or percentage of viewers under 18.  For a period of eight weeks between May and July 2003, VMS continuously monitored the cable, network, and syndicated[1] programs set out in Tables A and B.  All of these programs aired between 5 and 10 p.m.  The television audience data reported in the tables below is for audiences under age 18, or for audiences aged 2-17, as indicated.  Given that R-rated movies and M-rated electronic games are restricted only for children under 17, data for audiences under 17 would be most relevant; however, the age breakdowns set forth in the tables are the standard categories used for television audience measurement.

There were 59 ads for 7 violent R-rated films,[2] 31 ads for 13 different explicit-content labeled recordings, and 11 ads for 2 violent M-rated electronic games aired on the monitored programs.

**Table A:  Network and Cable Television Shows Monitored**

| Program | Average[3] Audience Age 2-17 (thousands) | Average Total Audience (thousands) | Audience Under 18 (%) | Network |
|---|---|---|---|---|
| 7th Heaven | 1624 | 6555 | 25% | WB |
| 106th & Park | 233 | 535 | 44% | BET |
| The Bernie Mac Show* | 2496 | 9163 | 27% | FOX |
| Direct Effect | 122 | 317 | 38% | MTV |
| Gilmore Girls | 1310 | 5159 | 25% | WB |
| King of the Hill* | 2971 | 9978 | 30% | FOX |
| Malcolm in the Middle* | 3438 | 10636 | 32% | FOX |
| Oliver Beene* | 3054 | 9907 | 31% | FOX |
| Rap City | 186 | 423 | 44% | BET |
| The Simpsons* | 4184 | 13825 | 30% | FOX |
| Smallville | 1618 | 6642 | 24% | WB |
| Total Request Live | 251 | 545 | 46% | MTV |
| WWE Smackdown | 1702 | 5541 | 31% | UPN |

\* Due to scheduling changes during the monitoring period, the television programs marked with an asterisk deviated at times from the time slot for which Nielsen data was obtained.  As a result, VMS monitored also some additional programs, a few of which had substantial teen audiences, including *American Idol* (Wednesday nights) (23% under 18) and *Cedric the Entertainer* (27% under 18).  Advertisements for rated or labeled products that aired during these programs were included in the totals reported above.

The syndicated programs monitored by VMS are set out below in Table B.  VMS also monitored ad placements on *The Simpsons*.  Although demographic data are not available for that program, it is perennially ranked as one of the most popular programs for youth.[4]

**Table B:  Syndicated Television Programs Monitored**

| Program | Average Audience Age 2-17 (thousands) | Average Total Audience (thousands) | Audience Under 18 (%) | Network |
|---|---|---|---|---|
| The Hughleys | 597 | 2072 | 29 | Syndicated |
| King of the Hill | 1512 | 5275 | 29 | Syndicated |
| Sabrina the Teenage Witch | 726 | 1619 | 45 | Syndicated |
| Steve Harvey | 661 | 2491 | 27 | Syndicated |

## B.  "First Airing" Data for Television Advertisements

To supplement the television advertising monitoring described above, the Commission obtained "first airing" data from VMS.  These data provide, among other information, the date, time, station, and program on which each different advertisement for a violent R-rated movie, explicit-content labeled recording, or violent M-rated game first aired.  These data document only the first showing of an advertisement, and provide no information about additional airings of the ad on that program or others.

The Commission reviewed first airing data for the period June 2002 through early September 2003.  Focusing on advertisements initially shown on programs airing between 4:00 p.m. and 10:00 p.m., the Commission found that 19 ads[5] for 17 violent R-rated films or DVDs/home videos premiered on monitored programs – identified in Tables A and B above – or on other programs with substantial youth audiences.[6]  Advertising for 33 different explicit-content labeled albums appeared on the monitored programs or on other programs with substantial youth audiences.[7]  Fifteen ads for 11 violent M-rated games appeared on the monitored programs or on other programs with substantial youth audiences.[8]

## II.  Print Media

### A.  Magazines Reviewed to Assess Ad Placement

From June 2002 through October 2003, the Commission reviewed magazines with majority or substantial youth audiences including game enthusiast magazines, skateboarding magazines, music publications, wrestling magazines, and general interest teen magazines.  Many of these magazines had been previously identified in the marketing plans reviewed for the September 2000 Report as magazines used when the industries' target audience included children under 17.  Table C provides the names of the publications, the particular issues reviewed, and the demographics of readers (updated from the Commission's December 2001 Report, unless otherwise noted).

**Table C:  Youth-Oriented Print Publications Reviewed**

| Magazine | Issues Reviewed | Age Demographics |
|---|---|---|
| 100% Independent Playstation 2 | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, Holiday 2002, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 | 46% age 12-17<br>Mean Age: 23 |
| CosmoGirl! | 6-7/02, 8/02, 9/02, 10/02, 11/02, 12/02-1/03, 3/03, 4/03, 5/03, 6-7/03, 8/03, 9/03, 10/03 | Median Age: 16.5 (data from December 2001 Report) |
| Electronic Gaming Monthly | 6/02, 7/02, 8/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 | 30% - 40% age 16 and under[9] |
| GamePro | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03 | 57% age 16 and under[10]<br>Mean age: 18 |
| Metal Edge | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03 | Average age: 21 |
| Nintendo Power | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7-8/03, 9/03, 10/03 | Median age: 13.4[11] |
| Right On! | 6/02, 7/02, 8/02, 9/02, 12/02, 5/03, 7/03, 8/03, 10/03 | Female median age: 15<br>Male median age: 18<br>(data from December 2001 Report)[12] |
| Seventeen | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03,  4/03, 5/03, 6/03, 7/03, 8/03, 9/03 | 37% between 12 and 17<br>Median age: 21.2 |
| Teen People | 8/02, 10/02, 11/02, 12/02-1/03, 3/03, 4/03, 5/03, 6-7/03, 8/03, 9/03, 10/03 | Median age: 15.6 |
| Thrasher | 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 | 77% under 18 |
| Tips & Tricks | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03 | 43% under 17<br>Average age: 21[13] |
| World Wrestling Entertainment | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 9/03, 10/03 | Data in industry documents indicates that the under-17 audience share may currently be between 30% and 40%.[14] |
| YM | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 | Median age: 16.1<br>(data from December 2001 Report)[15] |

The Commission also obtained data from Simmons Market Research Bureau, Inc., on the popularity of many of these magazines with young children and teens. As part of its annual National Consumer Survey, Simmons interviews teens and younger children on whether they read certain magazines.[16] These results, aggregated from Simmons surveys in the Fall of 2002 and the Spring of 2003, show several trends.

Game enthusiast magazines such as *GamePro* and *Electronic Gaming Monthly* were much more popular with young males, while magazines such as *Seventeen* and *YM* were much more popular with young females (based on responses of whether they read or looked into all four of four recent issues). For example, *Electronic Gaming Monthly* and *GamePro* consistently ranked in the top 10 magazines read by young males.[17] *Electronic Gaming Monthly* ranked #8 for pre-teen boys 9-11 years old, #6 for younger tween and teen boys 12-14 years old and #2 for older teen males 15-16 years old. *GamePro* ranked #6 with pre-teen boys 9-11 years old, #2 with younger tween and teen boys 12-14, and #9 with males 15-16 years old. Simmons data indicate that younger pre-teen and teen boys (those 9-11 years old and 12-14 years old) appear to prefer *GamePro*, while older teen males (15-16 years old) prefer *Electronic Gaming Monthly*.

Although game enthusiast magazines were some of the least read by young females, *Seventeen, Teen People,* and *YM* were the top magazines read by young females. *Seventeen* ranked #3 with females ages 12-14 and #1 with females ages 15-16. *Teen People* was #1 and #3 with females ages 12-14 and 15-16, respectively. *YM* ranked #2 with females in both the 12-14 and 15-16 year old age groups.

Wrestling and skateboarding enthusiast magazines were more popular with young males than females. *World Wrestling Entertainment* magazine ranked #26 with males 12-14 years old and #6 with males 15-16 years old. *Thrasher* (skateboarding enthusiast magazine) ranked #23 with males 12-14 years old and #26 with males 15-16 years old.

## B. Magazines and Newspapers Reviewed to Assess Rating Information

To assess whether or not a rating or rating reason was displayed clearly and conspicuously in an advertisement for a rated or labeled movie, music recording, or electronic game, the Commission examined the magazines mentioned above as well as the magazines and general circulation newspapers set out in Table D below. Because rating information is primarily for parents, the Commission reviewed general circulation periodicals, and not just periodicals aimed at children. These general circulation periodicals were not used to assess whether or not ads were targeted to children.

**Table D:  Other Print Publications Reviewed for Rating Information**

| Magazines | Issues Reviewed |
|---|---|
| Computer Gaming World | 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 |
| Rolling Stone | 6/20/02, 7/4/02, 8/8/02, 9/19/02, 10/31/02, 11/14/02, 12/12/02, 3/20/03, 4/3/03, 5/15/03, 6/12/03, 7/10/03, 8/21/03, 9/18/03, 10/2/03 |
| Spin | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 |
| Vibe | 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 |
| Wizard | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 6/03, 7/03, 8/03 |

| Newspapers | Issues Reviewed |
|---|---|
| Chicago Sun-Times | 9/20/02, 9/27/02, 10/4/02, 10/11/02, 10/18/02, 11/1/02, 11/8/02, 11/15/02, 11/22/02, 12/6/02, 12/13/02, 12/20/02, 12/27/02, 6/6/03, 6/13/03, 6/20/03, 7/11/03, 7/18/03, 7/25/03, 8/15/03 |
| Chicago Tribune | 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 5/9/03, 5/16/03, 6/6/03, 6/20/03, 7/4/03, 7/11/03, 7/18/03, 8/15/03 |
| Los Angeles Times | 9/5/02, 9/12/02, 9/19/02, 9/26/02, 10/3/02, 10/10/02, 10/17/02, 10/24/02, 10/31/02, 11/7/02, 11/14/02, 11/21/02, 11/28/02, 12/5/02, 12/12/02, 12/19/02, 12/26/02, 3/13/03, 3/20/03, 3/27/03, 4/3/03, 4/10/03, 4/17/03, 4/24/03, 5/1/03, 5/15/03, 5/22/03, 5/29/03, 6/5/03, 6/12/03, 6/19/03, 6/26/03, 7/10/03, 7/17/03, 7/24/03, 7/31/03, 8/7/03, 8/28/03, 9/4/03, 9/11/03, 9/18/03, 9/25/03 |
| New York Daily News | 10/18/02, 11/8/02, 11/15/02, 8/22/03 |
| New York Post | 10/11/02, 10/18/02, 11/1/02, 11/8/02, 11/15/02, 11/27/02, 12/6/02, 12/13/02, 12/20/02, 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 4/25/03, 5/2/03, 5/9/03, 5/16/03, 5/23/03, 5/30/03, 6/6/03, 6/13/03, 6/20/03, 6/27/03, 7/18/03, 7/25/03, 8/8/03, 9/12/03 |
| New York Times | 10/18/02, 10/25/02, 11/1/02, 11/8/02, 11/15/02, 11/22/02, 11/29/02, 12/6/02, 12/13/02, 12/20/02, 12/27/02, 3/7/03, 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 4/18/03, 4/25/03, 5/2/03, 5/9/03, 5/16/03, 5/23/03, 5/30/03, 6/6/03, 6/13/03, 6/20/03, 6/27/03, 7/4/03, 7/11/03, 7/18/03, 7/25/03, 8/1/03, 8/8/03, 8/15/03, 8/22/03, 8/29/03, 9/5/03, 9/13/03, 9/26/03 |

III. Website Demographics

   Table E below sets out a list of certain websites on which R-rated movies, M-rated games, and/or explicit-content labeled recordings were advertised or planned to be advertised, according to documents submitted for this Report; the average audience share under age 18 for all of these was 30% or greater, as measured by unique visitors, from April to June 2003.[18]

**Table E: Website Audience Demographics**

| Website | % of Visitors Age 2-17 |
|---|---|
| alloy.com | 61% |
| bet.com | 39% |
| comedycentral.com | 35% |
| cosmogirl.com | 59% |
| ea.com | 31% |
| eagames.com | 37% |
| ebgames.com | 33% |
| gamespot.com | 33% |
| gamespy.com | 36% |
| gamestop.com | 37% |
| game-revolution.com | 40% |
| gamezone.com | 35% |
| ign.com | 40% |
| mtv.com | 38% |
| seventeen.com | 60% |
| teenpeople.com | 53% |
| ugo.com | 44% |

# Endnotes

1. The syndicated programs aired in New York City on channels 5, 9 and 11 on Fridays from 5-8 p.m. between May 9, 2003 and July 4, 2003, and in Los Angeles on channels 5 and 11 on Mondays from 5-7 p.m. between May 5, 2003 and June 30, 2003.

2. This total includes two ads for a film that was not rated at the time the ads aired, but ultimately was rated R.

3. The audience numbers appearing in Tables A and B came from data obtained from Nielsen Media Research for the time period of September 23, 2002 until April 22, 2003.

4. *See* April 2001 Report, Appendix A at A-4 and n.7.

5. In cases where more than one different advertisement for a particular motion picture, music recording, or game appeared in the first airing data, each different ad has been counted separately.

6. Using Nielsen data, the Commission identified other programs with substantial youth audiences in addition to those monitored.  For motion pictures, these included UPN's *Girlfriends* (30% under 18).

7. For music recordings, the other programs with substantial youth audiences included MTV's *WWE Heat* (24% under 18).

8. For electronic games, the other programs with substantial youth audiences included WB's *Jamie Kennedy* (28% under 18).

9. Two different sources of demographic data indicate under-17 audiences of 30% and at least 40%, respectively.

10. The under-17 audience share reflects data for the subscription version of this magazine.

11. Data in industry documents indicate an under-17 audience share of at least 80%.

12. Data in industry documents indicate an under-17 audience share of more than 60%.

13. Similarly, data in industry documents indicate an under-17 audience share of more than 40%.

14. Data from the Commission's December 2001 Report indicated that 62% of the magazine's audience was aged 12 to 17.

15. Data from industry documents indicate an under-17 audience share between 45% and 50%.

16. The *Simmons Spring 2003 Teen Study*, administered to Teens, 12-17, asked about the frequency in which Teens, aged 12-17, read or look at 84 magazines.  The *Simmons Spring 2003 Kids Study*, administered to children, aged 6-11, covered 25 magazines.  Copies of the surveys are on file with the Commission.

17. Simmons asked survey participants to indicate how many of every four issues of a selected list of magazines they recently "have read or looked at."  *Official U.S. Playstation Magazine* also ranked in the top 10 for boys 9-11, tween and teen boys 12-14, and males 15-16.

18. The Commission reviewed Nielsen//NetRatings data that was based on its panel of Internet users.  Nielsen//NetRatings measures and reports Internet audience behavior based on data collected from home users in the United States.

# Appendix D: Internet Surveys

This Appendix sets forth, for the Motion Picture, Movie Recording, and Electronic Game Industries, the results of the Internet website surveys conducted by the Commission during the summer and fall of 2003.

## I.  Motion Pictures

### A.  Motion Picture Websites

The Commission examined websites advertising the following 20 motion pictures in August 2003: *28 Days Later, Bad Boys II, Better Luck Tomorrow, Buffalo Soldiers, City of Ghosts, The Dancer Upstairs, Freddy vs. Jason, Gigli, The Hard Word, House of 1000 Corpses, Identity, Jeepers Creepers 2, The Magdalene Sisters, A Man Apart, The Matrix Reloaded, Open Range, Phone Booth, Swimming Pool, Terminator 3: Rise of the Machines,* and *Wrong Turn.*  The movies were selected based on the following criteria: they had a release date between April 1, 2003 and August 31, 2003, received an R-rating, and had a rating reason that involved violence.  The studios that released these films included MPAA members as well as non-MPAA members.

**Motion Picture Website Review Results**

|  | Summaries by Sites | | Percentage Yes |
|---|---|---|---|
|  | **Yes** | **No** | |
| **Does the site display the movie's rating?** | 20 | 0 | 100% |
| On the home page or teaser page? | 18 | 2 | 90% |
| Is the word "Restricted" readable? | 20 | 0 | 100% |
| Is the rating visible without scrolling? | 16 | 4 | 80% |
| **Does the site display the movie's rating reason(s)?** | 20 | 0 | 100% |
| On the home page or teaser page? | 18 | 2 | 90% |
| Are the reason(s) readable? | 20 | 0 | 100% |
| Are the reason(s) visible without scrolling? | 16 | 4 | 80% |
| **Can a visitor view a trailer for the movie at the site?** | 20 | 0 | 100% |
| **Does the site provide a link to:** |  |  |  |
| MPAA.org? | 16 | 4 | 80% |
| filmratings.com? | 19 | 1 | 95% |
| parentalguide.org? | 19 | 1 | 95% |
| **Can a visitor purchase tickets to the movie at the site?** | 4 | 16 | 20% |
| **Does the site display the rating during the purchase process?** | 4 | 0 | 100% |
| **Does the site display the rating reasons during the purchase process?** | 2 | 2 | 50% |

## B. Motion Picture Theater Chain Websites

The Commission examined websites for the following motion picture theater chains: AMC, Carmike, Century Theatres, Cinemark, Clearview Cinemas, GKC Theaters, Goodrich Quality Theaters, Kerasotes Theatres, Landmark Theatres, Loews Cineplex, Marcus Theatres, National Amusement, Regal Cinemas, United Artists, and Wallace Theater Corp. With the exception of AMC, these theater chains are all members of the NATO.

### Theater Website Review Results

| | | |
|---|---|---|
| **Does the site display the films' MPAA ratings?** | 15 of 15 | 100% |
| **Does the site display or provide a link to films' rating reason(s)?** | 15 of 15 | 100% |
| **Does the site provide information about the MPAA rating system?** | 6 of 15 | 40% |
| **Does the site link to rating information at MPAA.org, parentalguide.org, or filmratings.com?** | 5 of 15 | 33% |
| **Does the site sell tickets, either directly or through a third-party website?** | 10 of 15 | 66% |

## C. Retailer Websites – Motion Picture DVDs

The Commission examined the practices of five online retailers in September and October 2003 – Amazon.com, BestBuy.com, CircuitCity.com, SamGoody.com, and TowerRecords.com – with respect to five violent R-rated movies: *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition*.

### Motion Picture DVD Retailer Review Results

| | Amazon | Best Buy | Circuit City | Sam Goody | Tower Records |
|---|---|---|---|---|---|
| **Does the site display the movies' ratings?** | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Is it the correct rating? | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Is the rating visible without scrolling? | 0 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 0 of 5 |
| **Does the site display the movie's rating reasons?** | 0 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Are they the official MPAA reasons? | n/a | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Are the reasons visible without scrolling? | n/a | 5 of 5 | 3 of 5 | 5 of 5 | 5 of 5 |
| **Does the site provide a link to MPAA.org, filmratings.com, or parentalguide.org?** | 0 of 5 | 0 of 5 | 0 of 5 | 0 of 5 | 0 of 5 |
| **Does the site provide any information about the rating system?** | No | Yes | No | No | Yes |

### D.  Rental Websites – Motion Picture DVDs

The Commission surveyed these rental sites:  Netflix.com, Filmcaddy.com, and Movielink.com. The Commission  reviewed practices pertaining to the same five movies reviewed for DVD retailer sites – *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition* – in September and October 2003.

### DVD Rental Website Review Results

|  | Netflix.com | Filmcaddy.com | Movielink.com |
|---|---|---|---|
| **Does the site display the movie's correct MPAA rating?** | 5 of 5 | 5 of 5 | 5 of 5 |
| Is the rating visible without scrolling? | 5 of 5 | 5 of 5 | 5 of 5 |
| **Does the site display the movie's official rating reasons?** | 5 of 5 | 0 of 5 | 5 of 5 |
| Are the reasons visible without scrolling? | 5 of 5 | n/a | 5 of 5 |
| **Does the site provide a link to MPAA.org, filmratings.com, or parentalguide.org?** | 0 of 5 | 0 of 5 | 0 of 5 |
| **Does the site provide any information about the MPAA rating system?** | No | No | Yes |

## II.  Music Recordings

### A.  Artist and Recording Company Websites

The Commission reviewed official artist and recording company websites for 20 different explicit-content labeled recordings.  The recordings were selected based on their release date and by their appearance in *Billboard*'s list of top-selling music recordings.  The websites reviewed were:  www.daunbreakables.com, www.metallica.com, www.lizphair.com, www.staind.com, www.joebudden.com, www.50cent.com, www.blucantrell.com, www.crookedlettaz.com, www.coldonline.com, www.intothematrixmusic.com, www.madonna.com, www.typeonegative.net, www.3eb.com, www.mestcrapp.com, www.djkayslay.com, www.smileemptysoul.com, www.gangstarronline.com, www.godsmack.com, www.marilynmanson.com, and www.lilkim.com.

**Artist and Recording Company Website Review**

|  | YES | | NO | |
|---|---|---|---|---|
|  | # | % | # | % |
| **Does the site display the album's parental advisory label?** | 12 | 60% | 8 | 40% |
| On the home page or teaser page?  (of 12) | 8 | 67% | 4 | 33% |
| Are the words in the advisory readable?  (of 12) | 8 | 67% | 4 | 33% |
| Is the label visible without scrolling?  (of 12) | 9 | 75% | 3 | 25% |
| **Can a visitor purchase the album at the site or, through a link, at a third-party site?** | 15 | 75% | 5 | 25% |
| Is the album's PAL or other advisory language displayed on any page that must be visited during the purchase process?  (of 15) | 10 | 67% | 5 | 33% |
| **Can a visitor play all/part of a music video at the site?** | 18 | 90% | 2 | 10% |
| **Can a visitor play all/part of the album at the site?** | 19 | 95% | 1 | 5% |
| **Does the site provide a link to RIAA.org or parentalguide.org?** | 3 | 15% | 17 | 85% |
| **Does the site provide any detailed information about the Parental Advisory Label system?** | 0 | 0% | 20 | 100% |
| **Does the site provide lyrics?** | 5 | 25% | 15 | 75% |

## B.  Retailer Websites – Music Recordings

The Commission reviewed five music retailer sites:  Amazon.com, Bestbuy.com, Circuitcity.com, Samgoody.com, and TowerRecords.com.  Cdnow.com, which had been reviewed in the past, is now teamed with Amazon.com and for this review was replaced with Circuitcity.com.  The recordings examined at these retailers' websites were *Get Rich or Die Tryin'* by 50 Cent; *Liz Phair* by Liz Phair; *The Street Sweeper Vol. 1* by DJ Kayslay; *Smile Empty Soul* by Smile Empty Soul; and *Life is Killing Me* by Type O Negative.

**Music Retailer Website Review**

|  | Amazon | Best Buy[1] | Circuit City | Sam Goody | Tower Records |
|---|---|---|---|---|---|
| **Does the site indicate, either through a Parental Advisory Label or by other language, that the album has explicit content?** | 3 of 5 | 4 of 4 | 5 of 5 | 5 of 5 | 5 of 5 |
| **Does the site display at checkout the Parental Advisory Label or other language indicating explicit content?** | 2 of 5 | 1 of 4 | 0 of 5 | 5 of 5 | 5 of 5 |
| **Can visitors play at the site audio or video clips from explicit albums?** | 5 of 5 | 0 of 4 | 0 of 5 | 5 of 5 | 5 of 5 |
| **Does the site provide a link to parentalguide.org?** | No | No | No | No | No |
| **Does the site otherwise provide any detailed information about the Parental Advisory Label system?** | 0 of 5 | 4 of 4 | 0 of 5 | 0 of 5 | 0 of 5 |

## III. Electronic Games

### A.  Game Publisher Websites

The Commission examined the following 20 electronic game websites in August 2003: *Aquanox 2: Revelation*, *Casino, Inc.*, *Chrome*, *Codename Nina*, *Counter-Strike: Condition Zero*, *Crimsonland*, *Devastation*, *Die Hard Vendetta*, *Dino Crisis 3*, *Hunter the Reckoning - Wayward*, *Outlaw Volleyball*, *Postal 2*, *Purge*, *Return to Castle Wolfenstein*, *Silent Scope Complete*, *Soldier of Fortune 2: Double Helix*, *SWAT: Global Strike Team*, *The X-Files: Resist or Serve*, *Tom Clancy's Rainbow Six 3*, and *True Crime: Streets of L.A.*  Each of the games selected was released in 2003 with an M-rating and a violence descriptor.

**Electronic Game Websites**

| Electronic Game Publisher Questions | Summaries by Sites | | Percentage |
|---|---|---|---|
| | Yes | No | Yes |
| **Does the site display the ESRB rating icon?** | 15 | 5 | 75% |
| On the home page or teaser page? [of 15] | 14 | 1 | 93% |
| Is the rating icon correct? [of 15] | 13 | 2 | 87% |
| Is the word "Mature" readable? [of 13] | 11 | 2 | 85% |
| Is the rating icon visible without scrolling? [of 15] | 6 | 9 | 40% |
| **Does the site display the game's content descriptors?** | 9 | 11 | 45% |
| Are the descriptors readable? [of 9] | 9 | 0 | 100% |
| Are the descriptors readable without scrolling? [of 9] | 4 | 5 | 44% |
| Is the visitor required to hold the cursor over the rating icon to view the descriptors? [of 9] | 6 | 3 | 67% |
| **Can a visitor play or view at the site a demo for the game?** | 15 | 5 | 75% |
| Is the rating icon displayed adjacent to name of game? [of 15] | 3 | 12 | 20% |
| Are the game's content descriptors displayed adjacent to the name of the game? [of 15] | 3 | 12 | 20% |
| **Does the site provide a link to:** | | | |
| ESRB.org? | 8 | 12 | 40% |
| parentalguide.org? | 0 | 20 | 0% |
| **Does the site provide any information about the ESRB rating system?** | 1 | 19 | 5% |
| **Can a visitor purchase the game at the site?** | 12 | 8 | 60% |
| Is the game's rating displayed on any page that must be visited during the purchase process?  [of 12] | 11 | 1 | 92% |
| Are the game's content descriptors displayed on any page that must be visited during the purchase process? [of 12] | 3 | 9 | 25% |

## B. Retailer Websites – Electronic Games

The Commission reviewed five retailer websites:  Amazon.com, BestBuy.com, CircuitCity.com, EBGames.com, and GameStop.com.  CircuitCity.com was substituted for ToysRUs.com in this Report because Amazon.com and ToysRUs.com use the same Amazon.com site.

**Electronic Game Retailer Websites**

| Electronic Game Retailer | Amazon | Best Buy | Circuit City | EB Games | Game Stop |
|---|---|---|---|---|---|
| **Does the site provide the game's ESRB rating in either icon or written form?** | 5 of 5 | 5 of 5 | 5 of 5 | 4 of 5 | 4 of 5 |
| Is it the correct rating? | 5 of 5[2] | 5 of 5 | 4 of 5[3] | 4 of 4 | 4 of 5 |
| Is the word "Mature" readable? | 3 of 5 | 5 of 5 | 5 of 5[4] | 4 of 4 | 5 of 5[5] |
| Is the rating visible without scrolling? | 5 of 5 | 5 of 5 | 5 of 5 | 4 of 4 | 5 of 5 |
| **Does the site display the game's content descriptor?** | 0 of 5 | 0 of 5 | 1 of 5 | 4 of 5 | 0 of 5 |
| Is it the official ESRB content descriptor? | | | 0 of 1 | 2 of 4 | |
| Is the descriptor visible without scrolling? | | | 1 of 1 | 4 of 4 | |
| **Does the site link to ESRB.org or to other information about the rating system?[6]** | 4 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |

## Endnotes

1. Best Buy sold only the "clean" version of one of the five recordings examined.

2. One game had the correct "Mature" rating on the Web page but also had a small "RP" icon on the game box that was visible when magnified.

3. One game was mistakenly identified as "Rating Pending" on the Web page, although an image of the box art did display a small "Mature" icon.

4. One game was assigned an incorrect "Rating Pending."  That rating was readable.

5. One game was assigned an incorrect "Teen" rating, when it was actually rated "Mature."  That "Teen" rating was readable.

6. Circuit City linked to the ESRB website and provided information on the rating system on an internal web page.  The other sites did not link to ESRB.org but did link to information about the ESRB rating system on an internal web page.

| FEDERAL TRADE COMMISSION | FOR THE CONSUMER |
|---|---|
| 1-877-FTC-HELP | www.ftc.gov |