# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

    Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

    Defendants.
_____/

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

BODMAN LLP
By: Dennis J. Levasseur (P39778)
   Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

   and

JENNER & BLOCK LLP
By: Paul M. Smith
   Katherine A. Fallow
   Kathleen R. Hartnett
   Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066
_____/

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By: Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ........................................................................................................................................1

I.   THE STATE'S ATTEMPT TO SATISFY *BRANDENBURG* FAILS. .....................................1

II.  THE ACT DOES NOT OTHERWISE SURVIVE STRICT SCRUTINY. ...............................2

    A.  The State Has Not Proved a Compelling Interest in Preventing "Harm." ..........................3

        1.  The State's Interest In Controlling "Feelings" and "Thoughts" Is Not Legitimate, Let Alone Compelling. ................................................................................3

        2.  The State's Evidence of "Harm" Is Not Sufficient on Its Face. ..................................4

    B.  The State Has Not Satisfied the Other Demands of Strict Scrutiny. ..................................6

III. THE ACT IS UNCONSTITUTIONALLY VAGUE. ................................................................9

CONCLUSION ...................................................................................................................................10

# TABLE OF AUTHORITIES

## CASES
*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ..........1, 3, 4, 5, 7

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ..................................................................4

*Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773 (E.D. Mich. 2004)......................................................7

*Brandenburg v. Ohio*, 394 U.S. 444 (1969).....................................................................................1

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)...............................................1

*Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)..............................................................................................................................7

*FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) ........................................................................7

*Ginsberg v. New York*, 390 U.S. 629 (1968) ..................................................................................4

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ............3, 5, 7

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002)...............................................1, 2, 3, 4, 7

*M.S. News Co. v. Casado*, 721 F.2d 1281 (10th Cir. 1983).............................................................7

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ..................................................4

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ................................3, 7

*Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985) ............7

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004)........3, 5, 6, 7

## MISCELLANEOUS

FTC, *Report to Congress: Marketing Violent Entertainment to Children* (July 2004) ..................8

Press Release, Indiana Univ. School of Medicine, Self-Control May Be Affected By Violent Media Exposure, May 26, 2005, available at http://medicine. indiana.edu/news_releases/viewRelease.php4?art=339&print=true ..................................6

David Walsh, National Institute on Media and the Family, 2004 "Video Game Report Card" (2004), http://www.mediafamily.org/research/2004_VGRC.pdf .........................................8

Plaintiffs' opening brief demonstrated that they are entitled to a preliminary injunction barring the enforcement of the unconstitutional restrictions on "ultra-violent explicit" video games found in 2005 Public Act 108 (Mich. 2005) (the "Act"). If the Act is allowed to go into effect on December 1, 2005, it will impose substantial civil and criminal sanctions against those who "disseminate" or display to minors expression fully protected by the First Amendment, and will cause a vast chilling of free expression. This irreparable harm, combined with Plaintiffs' likelihood of success on their challenge to the Act, warrants a preliminary injunction. *See, e.g.*, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (loss of First Amendment freedoms for any period of time constitutes irreparable injury); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ("*AAMA*") (enjoining materially similar law). The State's brief wholly fails to undermine the strength of Plaintiffs' constitutional claims.

## ARGUMENT

### I. THE STATE'S ATTEMPT TO SATISFY *BRANDENBURG* FAILS.

The State asserts that it "need not meet the standard set forth in *Brandenburg*," State Mem. at 19, but that is not correct. As Plaintiffs explained in their opening brief, and as the Sixth Circuit has held, "[i]n protecting against the propensity of expression to cause violence, states may only regulate that speech which is '*directed to* inciting or producing *imminent* lawless action and *is likely to incite* or produce such action.'" *James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis in *James*)). Because the State seeks to suppress certain games based on their alleged tendency to cause real-world aggression – either directly, *see* State Mem. at 19-20, or via a process of alleged psychological "harm" and desensitization, *see id.* at 9-19 – *Brandenburg* controls.

The State concedes that courts have already determined that "there are no studies linking video games to serious, real-life aggression." State Mem. at 19. It nevertheless suggests that the

Act satisfies *Brandenburg* because the Legislature heard testimony about one fatal traffic accident that the State alleges was caused by perpetrators who had engaged in "violent" video game play. *See id.* at 19-20. But even assuming the accuracy of the State's theory about the cause of the accident, it is the very sort of "idiosyncratic" behavior that *James* rejected as a basis for satisfying *Brandenburg*. 300 F.3d at 693, 698-99. As the Sixth Circuit held, playing "violent" video games is "an activity undertaken by millions" every day without incident, *id.* at 693, and thus such games are not "likely" to produce real-world violence, as *Brandenburg* requires, *id.* at 689-99. As in *James*, the "violent" games at issue here are not "directed to" causing "imminent" violence, as *Brandenburg* demands. *James* forecloses the State's *Brandenburg* argument here.

## II.   THE ACT DOES NOT OTHERWISE SURVIVE STRICT SCRUTINY.

The State maintains that it has a compelling interest in protecting minors from "the harmful effects of ultra-violent explicit videos." State Mem. at 7. As explained below, this rationale proves too much, because under that theory, the State could restrict images of violence in *all* media – television, film, books – based on such "harmful effects." But in any event, the "harmful effects" cited by the State are the same as the State's "preventing real-world violence" rationale, because the "harm" about which the State is concerned is the potential for the games to make minors *behave aggressively*. *Id.* at 13-17. The claim that alleged psychological and neurological impacts are "harmful" because they will lead to real-life *aggression*, is governed by – and fails under – *Brandenburg*.

Even if the State's "harm" justification were sufficient to evade the duty of satisfying *Brandenburg*, the State essentially acknowledges that it must satisfy strict scrutiny. *See, e.g.*,

2

State. Mem. at 6.[1] Thus, the State must prove that the Act is necessary to serve a compelling state interest and is narrowly tailored to achieve that end, *see, e.g.*, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). Because the burden is on the *State* to justify the Act, Plaintiffs need not "disprove" the State's alleged harms. State Mem. at 8.

The State has not come close to meeting these exacting standards. As *all* courts reaching the question have concluded, the Act's content-based regulation is unconstitutional. *See AAMA*, 244 F.3d 572; *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ("*VSDA*").

**A.   The State Has Not Proved a Compelling Interest in Preventing "Harm."**

1. The State's Interest In Controlling "Feelings" and "Thoughts" Is Not Legitimate, Let Alone Compelling.

In defense of the Act, the State points to a number of studies on the purported effects of "violent" media on individuals. As explained below, however, the subset of research on which the Legislature relied is inconsistent, ignores contradictory evidence, and, in large part, has nothing to do with the effects of *video games* (as compared to other media that the Legislature left unregulated). But even assuming the validity of the studies presented by the State, they would not justify the Act's censorship of protected speech. The State cites these studies as showing a link between exposure to "violent" media and an effect on "feelings," "thoughts," and "attitudes." State Mem. at 14-17. But such an attempt to control individuals' thoughts, feelings,

---

[1] The State makes a passing suggestion that the Act does not restrict protected speech, and thus the First Amendment does not apply. State Mem. at 8. But as even the State makes clear, it is the *expression* in video games – not any "mere functional acts" – that the State seeks to suppress, namely, *depictions* of violence. *See id.* Because the State seeks to regulate "the communicative aspect of the video games" at issue, these games are entitled to full First Amendment protection. *James*, 300 F.3d at 696.

3

or viewpoints – or prevent them from an anticipated "psychological" reaction to protected expression – is precisely the kind of government action that the First Amendment prohibits. *See, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). This is no less true because the Act targets minors, for minors generally enjoy the same First Amendment rights as adults to be free from content-based governmental regulation, *see, e.g.*, *McConnell v. Federal Election Commission*, 540 U.S. 93, 231 (2003), with the exception of certain "harmful to minors" sexual speech that is *not* the subject of the Act's challenged restrictions.[2]

Notably, none of the State's "harm" arguments are specific to video games, let alone the particular category of "violent" games covered by the Act. Although the State's brief (and cited materials) *speculate* as to why "violent" video games may be more harmful than other "violent" content, they have failed to substantiate those claims with any meaningful research. Indeed, under the State's rationale, the kind of evidence on which it relies would justify government regulation of nearly any violent expression – for adults and children alike – in movies, music, television or art. The Court should firmly reject that radical notion, which cannot be squared with the First Amendment. *See, e.g.*, *AAMA*, 244 F.3d at 578-79.

    2. <u>The State's Evidence of "Harm" Is Not Sufficient on Its Face.</u>

In attempting to defend the Act, the State relies largely on the work of Dr. Craig Anderson and related researchers. *See* State Mem. at 7, 15, 17. This research – including Dr. Anderson's work in particular – has been rejected as a basis for restricting expression by *all* other courts considering similar laws, and it remains insufficient here. For example, in *AAMA*,

---

[2] As Plaintiffs explained in their opening brief, the "harmful to minors" (or "obscene as to minors") precedent such as *Ginsberg v. New* York, 390 U.S. 629 (1968), is limited to *sexual* material and has no bearing on the "violent" video game restrictions at issue here. *See, e.g.*, *James*, 300 F.3d at 698 ("We decline to extend our obscenity jurisprudence to violent, instead of sexually explicit, material.").

4

the Seventh Circuit expressly considered and rejected "the potential psychological harm to children of being exposed to violent images" as a constitutionally sufficient rationale. 244 F.3d at 576. Citing Dr. Anderson's work, *AAMA* held that the "studies do not support the ordinance," even if they show that "violent" video games cause individuals "to feel[] aggressive," *id.* at 578-79, for two reasons. First, the studies did not show that "video games have ever cause anyone to commit a violent act . . . or have caused the average level of violence to increase anywhere." *Id.* Second, they do not show "that violent video games are any more harmful to the consumer or to the public safety than violent movies or other violent, but passive, entertainments." *Id.* at 579; *accord, e.g.*, *IDSA*, 329 F.3d at 958-59 (rejecting a "psychological harm" justification because the research "falls far short of a showing that video games are psychologically deleterious"); *VSDA*, 325 F. Supp. 2d at 1188.

The research cited by the State here remains essentially unchanged from what has been offered in previous cases. Contrary to the State's assertions, the evidence in this area is at best mixed, and many experts disagree with the strident claims asserted by Dr. Anderson and others. *See, e.g.*, Declaration of Jeffrey H. Goldstein (recently submitted to the Northern District of Illinois in a similar challenge to a state "violent" video games law) (Ex. A). The research on which Dr. Anderson and others rely is wholly correlational, and even Dr. Anderson concedes that "longitudinal research is badly needed" before strong causal claims can be made about "violent" video games. State's Exhibit HH, at 359. In fact, the only published longitudinal study to date found *no* negative impact from exposure to "violent" video games over a month-long period. *See* Goldstein Decl. ¶ 44. But even accepting Dr. Anderson's conclusions as true – that "violent" games, like all "violent" media, have some diffuse and aggregate effect on aggression – those conclusions do not justify suppressing the video games singled out by the Act. *See, e.g.*,

5

*VSDA*, 325 F. Supp. 2d at 1188 (rejecting regulation based on a claim that "prolonged exposure to violent entertainment media is one of the constellation of risk factors for aggressive or anti-social behavior").

The State's reliance on a few recent "neurophysiological" studies to justify the Act is similarly unavailing. *See* State Mem. at 13-14 (citing studies of Dr. William Kronenberger and his colleagues). Even a cursory review of this research reveals that it does not support the Act's restrictions on expression.[3] Putting aside its methodological and theoretical flaws, Dr. Kronenberger's research did not evaluate the independent effect of "violent" video games, and thus provides no support for the Act's singling out of video games from other media. Moreover, Dr. Kronenberger has admitted that his research is correlational, and does not show whether adolescents with behavioral disorders seek out "violent" media, or whether some other variable is at work. Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_releases/viewRelease.php4?art=339&print=true. This tenuous research does not support a compelling state interest.

**B.     The State Has Not Satisfied the Other Demands of Strict Scrutiny.**

The State has also failed to carry its burden of establishing that the law is narrowly tailored. The State suggests that the Act is narrowly tailored because the Act purportedly does not ban or burden adult speech. State Mem. at 21-22. Even assuming the relevance of that argument to the strict scrutiny analysis, it ignores a central premise of Plaintiffs' challenge: that the Act will have a significant chilling effect on *adults'* expression (as well as expression that is

---

[3] Dr. Kronenberger's work is based on a small handful of fMRI studies that have not been widely accepted in the scientific community, and his conclusions are based on a number of fundamental misunderstandings about brain functioning and neurocognitive psychology. *See* Declaration of Dr. Howard C. Nusbaum (also submitted in the Illinois case) (Ex. B).

6

fully protected as to minors). As Plaintiffs have explained, game creators, distributors and retailers will respond to the Act's threat of criminal penalties by self-censoring or otherwise restricting access to *any* potentially offending game, and, conceivably, by pulling "M" games off the shelves altogether. *See* Lowenstein Decl. ¶¶ 13-14; Andersen Decl. ¶¶ 7-8, 14, 17-20; Price Decl. ¶¶ 15-16.

The only authorities cited by the State in support of its claim that adult speech may be suppressed based on a claim of "harm" to minors are inapposite cases not involving strict scrutiny or arising in contexts – such as broadcasting – not at issue here. *See* State Mem. at 21; *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978) (citing unique nature of broadcasting as a basis for "narrow[]" holding); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 744-45 (1996) (plurality op.) (approving federal statute allowing cable operators *voluntarily* to restrict content and citing uniquely pervasive presence of broadcast and cable programming). In fact, the *Denver Area* Court *struck down* another portion of the statute that did not "simply permit, but rather require[d], cable system operators to restrict speech." 518 U.S. at 753.[4]

Nor has the State met its burden of proving that "a plausible, less restrictive" alternative to banning certain video games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. In particular, the State has not met its burden of showing that increased awareness of the voluntary ESRB rating system – coupled with Michigan's simultaneously enacted law requiring

---

[4] In *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1396 (8th Cir. 1985), *M.S. News Co. v. Casado*, 721 F.2d 1281, 1286-87 (10th Cir. 1983), and *Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773, 782-83 (E.D. Mich. 2004), the courts upheld time, place, and manner restrictions on sexually explicit speech that is "harmful" or "obscene as to" minors. However, the Sixth Circuit (like *all* courts reaching the issue) has rejected arguments expanding this "harmful to minors" doctrine beyond sexual speech. *James*, 300 F.3d at 698; *see also IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 576-78; *VSDA*, 325 F. Supp. 2d at 1185.

7

businesses to post signs about the ESRB ratings – would not serve the State's goals in a less restrictive manner. In fact, the ESRB rating system is well respected and widely used. *See* Plaintiffs' Opening Mem. at 3; Lowenstein Decl. ¶¶ 4-11; *see also* Ex. RR to State Mem., at 37 (noting that ESRB is the "most comprehensive" of industry rating systems).

The State nevertheless dismisses the effectiveness of the ESRB system, relying on selective quotations from a 2000 FTC report. *Id.* at 23-24. But the State largely ignores the FTC's more recent 2004 report, which documents the industry's advances since 2000 to enforce and educate the public about the ESRB rating system and to enforce its advertising and marketing code. *See* FTC, *Report to Congress: Marketing Violent Entertainment to Children* (July 2004) at 20, 23-24 (Ex. C).[5] The FTC in fact found that the industry's rating system is performing *better* than its peer retail industries – movies and music; the finding that 69% of minor "mystery shoppers" were able to purchase M-rated games, cited in State Mem. at 24, in a much better result than similar studies for movie and music retailers (81% and 83% failure rates, respectively), Ex. C at 10, 18, 27. Thus, far from proving the ESRB system to be ineffective (as is the State's burden), the FTC's 2004 report shows the video game industry to be a *leader* in self-regulation. *See also* David Walsh, National Institute on Media and the Family, 2004 "Video Game Report Card" (2004), http://www.mediafamily.org/research/2004_VGRC.pdf (study finding that minors were *turned down* from purchasing M-rated games *66% of the time*).[6]

---

[5] The 2004 FTC report also concluded that "the electronic game industry has adopted numerous standards that limit children's exposure to ads for Mature-rated products," Ex. C at 28, and that "[t]he industry is actively enforcing those standards and penalizing those companies found to be in noncompliance," *id.*

[6] The State's own investigations into the ability of minors to purchase M-rated games are similarly unpersuasive. That evidence shows that minors were *turned down* from purchasing allegedly "adult" games over 50% of the time. Ex. 10-HHH to State Mem. And in another

8

**III.   THE ACT IS UNCONSTITUTIONALLY VAGUE.**

The State's defense of the Act as not unconstitutionally vague consists of a series of conclusory assertions that any person of reasonable intelligence could understand the language of Act, without any explanation of what acts are actually prohibited. None of these assertions undermines Plaintiffs' argument that the Act is unconstitutionally vague; if anything, they underscore the difficulties in interpreting the Act.

For example, the State derides Plaintiffs' argument that the term "parties who realistically appear to be human beings" is impermissibly vague (especially in the video game medium), but wholly fails to address whether the specific characters listed in Plaintiffs' opening brief would be covered by the Act. *See* Motion at 16-17 (questioning whether zombies, mutants, humanoid characters with magical powers, and gods would fall under the Act's definition). The State's only response is that failure to ascertain these terms with sufficient definiteness would be "incredulous," relying on a district court decision that was *reversed* by the Eighth Circuit. State Mem. at 26.[7]

Further, the State can neither say what number of acts of violence would constitute "continual and repetitive" violence, nor what a "morbid interest in committing uncontrolled aggression against an individual" encompasses. The fact that the individual words can be found in a household dictionary, *see id.* at 27, sheds no light on applying the words to determine whether selling a particular video game to a minor may be illegal. For example, in T-rated *Medal of Honor: Frontline*, the game puts the player in the shoes of a soldier who lands at

---

"sting" operation presented in the State's exhibits (Tab 10-III), undercover minors were in fact *unable* to purchase M-rated games in 5 out of 7 stores in which it was attempted.

[7] It is beside the point whether the ESRB's voluntary standards would be unconstitutionally vague if enacted into the law. *Cf. id.* at 26-28. The ESRB system is an effort in industry self-regulation, not a basis for criminal sanctions, and thus any vagueness in that system is tolerable because it does not separate what is lawful from what is unlawful.

9

Normandy and must battle German soldiers as part of a complex plot to foil Nazi plans. Price Decl. ¶¶ 18-24. The soldier character encounters violence, but there is no guidance under the Act to determine whether that violence would be "continual and repetitive" or whether it demonstrates any sort "morbid interest in aggressive, asocial behavior," particularly when players can play the game using different strategies. *Id.* ¶ 24. Determining whether the Act prohibits disseminating this game to minors is simply impossible.[8]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

Respectfully submitted,

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION,
and MICHIGAN RETAILERS ASSOCIATION

/s/ Alicia J. Blumenfeld

| | |
|---|---|
| Paul M. Smith | Dennis J. Levasseur (P39778) |
| Katherine A. Fallow | Alicia J. Blumenfeld (P67511) |
| Kathleen R. Hartnett | BODMAN LLP |
| Amy L. Tenney | 100 Renaissance Center |
| JENNER & BLOCK LLP | Detroit, MI 48243 |
| 601 Thirteenth Street, N.W., Suite 1200 | Tel (313) 393-7596 |
| Washington, DC 20005 | Fax (313) 393-7579 |
| Tel. (202) 639-6000 | |
| Fax (202) 639-6066 | |

---

[8] Given the strength of their First Amendment claims, Plaintiffs' equal protection and due process claims are not part of the motion for a preliminary injunction. In any event, and contrary to the State's arguments, both claims are likely to succeed on the merits. The State's assertion that Plaintiffs lack an equal protection claim because research shows that the effects of "violent" video games are "worse" than for other media is unsupported by credible research, and is inconsistent with the State's reliance on research on the effect of media violence generally as support for its purported compelling interest. Plaintiffs will address the State's arguments about their due process claim in response to the State's motion to dismiss.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

        Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

        Defendants.                      /

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

**PROOF OF SERVICE**

      Alicia J. Blumenfeld certifies that she is an employee of Bodman LLP, that on October 24, 2005 she caused to be served a copy of **Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction** and this Proof of Service upon the person(s) listed below via electronic filing:

Denise C. Barton, Esq.
Jason R. Evans, Esq.
Assistant Attorney General
Department of Attorney General
525 W. Ottawa Street, Floor 5
P.O. Box 30736
Lansing, Michigan 48909

      I declare under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

                                                     ___/s/ Alicia J. Blumenfeld_____
                                                           Alicia J. Blumenfeld