# Exhibit
## "C"

Dockets.Justia.com



# Marketing Violent Entertainment to Children:

A Fourth Follow-up Review of
Industry Practices in the Motion Picture,
Music Recording & Electronic Game Industries

## A Report to Congress

Federal Trade Commission

July 2004

**FEDERAL TRADE COMMISSION**

Timothy J. Muris, Chairman
Mozelle W. Thompson, Commissioner
Orson Swindle, Commissioner
Thomas B. Leary, Commissioner
Pamela Jones Harbour, Commissioner

**Report Contributors**

Richard F. Kelly, Bureau of Consumer Protection, Division of Advertising Practices
Elizabeth Delaney, Bureau of Consumer Protection, Division of Advertising Practices
Kial Young, Bureau of Consumer Protection, Division of Advertising Practices
Mark Eichorn, Bureau of Consumer Protection, Division of Advertising Practices
Lesley A. Fair, Bureau of Consumer Protection, Division of Advertising Practices
Mary K. Engle, Associate Director, Bureau of Consumer Protection, Division of Advertising
Practices.

**Assistants**

Sallie Schools, Bureau of Consumer Protection, Division of Advertising Practices
Katherine Zownir, Bureau of Consumer Protection, Division of Advertising Practices
Kerry Constabile, Bureau of Consumer Protection
Stefano Sciolli, Bureau of Economics

**Interns**

Chadwick Crutchfield, Bureau of Consumer Protection, Division of Advertising Practices
Jamie Gentry, Bureau of Consumer Protection, Division of Advertising Practices
Nicholas A. James, Bureau of Consumer Protection, Division of Advertising Practices
Jonathan Longobardi, Bureau of Consumer Protection, Division of Advertising Practices



# Marketing Violent Entertainment to Children:

## A Fourth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries

# A Report to Congress

Federal Trade Commission

July 2004

# Contents

Executive Summary ........................................................................................................... *i*

I.  **Introduction** .......................................................................................................... 1
    A.  Commission Reports on Marketing Violent Entertainment to Children ...................... 1
    B.  Sources of Information for this Report ................................................................. 1

II. **Motion Pictures** .................................................................................................... 2
    A.  Marketing to Children:  Advertising Placement ..................................................... 2
        1.  Self-regulatory programs restricting placement of advertising in media popular with children ........................................................................................ 2
        2.  Advertising placements:  current practices ..................................................... 3
    B.  Ratings and Reasons for Ratings in Advertising .................................................... 6
        1.  Self-regulatory programs governing disclosure of ratings and reasons ................ 6
        2.  Advertising of rating information:  current practices ........................................ 6
    C.  Efforts to Enforce Rating System in Movie Theaters and at Stores ........................... 9
    D.  Analysis of Current Industry Practices .............................................................. 10

III. **Music Recordings** ................................................................................................ 11
    A.  Marketing to Children:  Advertising Placement ................................................... 11
        1.  Self-regulatory programs restricting placement of advertising in media popular with children ...................................................................................... 11
        2.  Advertising placements:  current practices ................................................... 11
    B.  Advisory Labels and Reasons for Labels in Advertising ......................................... 13
        1.  Self-regulatory programs governing disclosure of parental advisory label and reasons ..... 13
        2.  Advertising of advisory label: current practices ............................................ 13
    C.  Efforts to Enforce the Labeling System at Point-of-Sale ....................................... 18
    D.  Product Packaging ........................................................................................ 18
    E.  Analysis of Current Industry Practices .............................................................. 19

IV. **Electronic Games** ................................................................................................ 20
    A.  Marketing to Children:  Advertising Placement ................................................... 20
        1.  Self-regulatory programs restricting placement of advertising in media popular with children ...................................................................................... 20
        2.  Advertising placements:  current practices ................................................... 20
    B.  Ratings and Reasons for Ratings in Advertising .................................................. 23
        1.  Self-regulatory programs governing disclosure of ratings and reasons ............... 23
        2.  Advertising of rating information: current practices ........................................ 24
    C.  Efforts to Enforce the Rating System at Point-of-Sale ......................................... 26
    D.  Product Packaging ........................................................................................ 27
    E.  Analysis of Current Industry Practices .............................................................. 28

V. **Conclusion** ........................................................................................................ 28

**Endnotes** .............................................................................................................. 30

**Appendix A:  Marketing Violent Entertainment To Children:A Workshop On Industry Self-regulation**

**Appendix B:  Mystery Shopper Survey**

**Appendix C:  Data Collection Methodology And Television And Print Demographics**

**Appendix D: Internet Surveys**

# Executive Summary

In September 2000, the Federal Trade Commission issued a report requested by the President and Congress entitled, *Marketing Violent Entertainment to Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*. That report found that these entertainment industries had engaged in widespread marketing of violent movies, music, and electronic games to children that was inconsistent with the cautionary messages of their own parental advisories and that undermined parents' attempts to make informed decisions about their children's exposure to violent content. In addition, the Commission found that advertisements for such products frequently failed to contain rating information. Finally, the Commission reported on the results of an undercover "mystery" shop by unaccompanied teens, aged 13-16, of retailers and movie theaters. The young shoppers were able to buy M-rated electronic games and parental advisory-labeled music recordings 85% of the time and purchase tickets for an R-rated movie almost half (46%) of the time.

In April and December 2001, and in June 2002, the Commission issued follow-up reports in response to requests from Congressional committees and individual members of Congress. Each report documented progress by the movie and electronic game industries to limit advertising in popular teen media, but noted that the music industry had not changed its ad placement practices. In the music industry's view, advertising targeted to all ages (including children) is consistent with its parental advisory labeling program which, unlike the rating programs for movies and electronic games, does not designate an age for which parental advisory-labeled music may be inappropriate.

In its most recent report, issued in June 2002, the Commission found that the movie and game industries were in substantial compliance with each industry's self-regulatory standards governing ad placements and disclosure of rating information in advertising. At the same time, the Commission found many examples of advertisements by the movie industry and some advertisements by the electronic game industry placed on television programs with large numbers of teen viewers, and continued placement of advertising by the electronic game industry in game enthusiast magazines with large youth readership. The report also found that the music industry showed virtually no change in its placement of parental advisory-labeled music ads since the September 2000 Report. Advertisements continued to be placed on television shows and in print magazines popular with teens. The Commission did find some improvement in the music industry's disclosure of labeling information in its advertising.

This Report documents the current state of marketing in the areas addressed in the Commission's previous reports. As was the case with the Commission's December 2001 Report, this Report includes a review of marketing documents from nine industry members, as well as the results of ongoing Commission monitoring of advertising practices. In addition, it reports on a Commission-sponsored Public Workshop held in October 2003 at which industry and consumer groups discussed the state of self-regulation in each of these industries as well as the results of an undercover "mystery" shopper survey conducted in the summer of 2003, in which young teens attempted to purchase tickets to R-rated movies, or buy parental advisory-labeled recordings, R-rated movie DVDs, and M-rated games.

## Movies

The Commission's review of internal marketing documents and ad placements for selected R-rated films showed that studios did not target advertising for those films at children under 17, and, for the most part, did not advertise those films in media with an under-17 audience share over 35%. The studios continue to advertise violent, R-rated films and DVDs on programs with large teen viewership, however. In addition, some studios have conducted promotions for R-rated films in venues likely to attract significant numbers of young teens, an apparent resurgence of a practice that previously had decreased.

With respect to the disclosure of film ratings and rating reasons by the motion picture studios, the Commission finds that current industry practices continue to improve. In television, print, and Internet website advertising, the studios routinely disclose both ratings and rating reasons for R-rated and PG-13-rated films and DVDs. Although there remains room for improvement in the legibility of ratings reasons – particularly in print ads – the studios' practices in this area generally are commendable. Retailer advertisements for DVDs, by contrast, often do not contain ratings or reasons at all.

Finally, the Commission's undercover shopper survey of children's access to tickets for R-rated films indicated significant improvement by movie theaters, as only 36% of the 13-16- year-old shoppers successfully purchased tickets. In contrast, DVD retailers – included for the first time in this survey – sold R-rated DVDs to 81% of teen shoppers seeking to buy them.

## Music

The Commission's review of ad placements for parental advisory-labeled music showed that the music industry has substantially curtailed advertising in print media popular with teens but continues to place ads on television shows with substantial teen audiences, primarily on cable music channels. Although the Commission found improvement in the music industry's disclosure of labeling information in print and television advertising, the industry's compliance with labeling requirements for product packaging has improved only slightly since September 2000.

For the first time, the Commission reviewed commercial online music downloading services and found that all of the services examined provided some sort of advisory about explicit-content music. Nevertheless, only a third of these services offered a parental control mechanism to exclude explicit-content labeled recordings. During the Commission's October 2003 Workshop, the music industry's trade association made a commitment to reinforce the importance of consistent parental advisory descriptors and encourage these online services to implement parental control mechanisms.

The Commission's undercover shopper survey showed that some progress has been made in restricting sales of explicit-content labeled recordings to children, particularly among the youngest shoppers. Nevertheless, 83% of the teenaged shoppers were able to make a purchase.

## Games

For the electronic game industry, the Commission's ongoing ad monitoring and its review of company marketing documents found substantial, but not universal, compliance with industry standards limiting ad placements for M-rated games where children under 17 constitute a certain percentage of the audience – 35 percent for television and 45 percent for print. Nonetheless, these standards do not prevent the placement of ads in television programs and in game enthusiast magazines with substantial teen audiences. Advertising for M-rated games continues to appear in such media.

The Commission also found some instances of the marketing of Teen-rated video games in media popular with a pre-teen audience. According to the industry's own description of that rating, such products are suitable for children who are thirteen and older. Yet, with limited exceptions, the self-regulatory system for electronic games does not directly address such marketing.

The game industry continues to provide rating information prominently in advertising and on product packaging. Although some areas still should be improved – *e.g.*, including content descriptors in television advertising and on the front of product packaging – the game industry's rating disclosure requirements go far to ensure that parents have access to rating information when considering product purchases.

Finally, the Commission's mystery shopper survey documented some progress by electronic game retailers in limiting sales to unaccompanied children of M-rated games. Even with that progress, however, 69% of the young teen shoppers were able to buy such games.

## Cross-industry Issues

In the case of all three industries, the Commission's Public Workshop noted several examples of the cross-marketing of entertainment media products with different ratings, labels, and intended audiences. The electronic game industry has adopted some provisions to address aspects of this marketing, and individual movie studios have placed some restrictions on the marketing to children of licensed products based on R-rated movies. The question remains unanswered whether some of this cross-marketing attracts younger children and teens to entertainment media intended for an older audience.

As in prior reports, the Commission offers suggestions for improvements by each of the industries. Because of First Amendment and other issues, the Commission continues to support private sector initiatives by industry and individual companies to implement these suggestions.

The Commission will continue to work with industry and parent groups and support efforts to improve self-regulation and increase education of parents.

Further, as directed by Congress, the Commission will work with video game publishers and retailers toward ensuring that games rated T and M are marketed or sold to children in a manner consistent with the rating's age guideline. The Commission also will undertake efforts to educate parents about the content included in T and M games. Finally, the Commission has made its toll-free

consumer complaint line and its website complaint form available for consumer complaints regarding media violence, and is publicizing to consumers the availability of these complaint mechanisms. Following implementation of these steps, and a one-year period of monitoring industry practices and consumer concerns, the Commission believes that a follow-up report would be appropriate.

# I.  Introduction

## A.  Commission Reports on Marketing Violent Entertainment to Children

This is the fifth Commission Report on the marketing to children of violent entertainment products by the motion picture, music recording, and electronic game industries.  The Commission's prior reports – the initial report released in September 2000 ("September 2000 Report"), and three smaller follow-up reviews in April 2001 ("April 2001 Report"), December 2001 ("December 2001 Report"), and June 2002 ("June 2002 Report") – were in response to requests from the President and Congress.[1]  The reports examine whether these three industries promote products that they themselves acknowledge warrant parental caution in venues where children make up a substantial percentage of the audience.

The September 2000 Report found that industry members routinely targeted children in their advertising and marketing of violent entertainment products, despite self-regulatory ratings or labels indicating the products might not be appropriate for children.[2]  The Commission concluded that such advertising and marketing efforts undermined each industry's parental advisories and frustrated parents' attempts to protect their children from possibly inappropriate material.  It called upon the industries to strengthen their self-regulatory programs by:  (1) prohibiting target marketing to children and imposing sanctions for violations; (2) improving self-regulatory programs at the retail level; and (3) increasing parental awareness of the ratings and labels.  Because of First Amendment issues, the Commission concluded that vigilant self-regulation offers the best approach to helping parents choose what is appropriate for their children.

The Commission's three follow-up reviews described the adoption and implementation of new self-regulatory initiatives by the four industry trade associations — the Motion Picture Association of America ("MPAA"), the National Association of Theatre Owners ("NATO"), the Recording Industry Association of America ("RIAA"), and the Interactive Digital Software Association ("IDSA") (now the Entertainment Software Association ("ESA")).[3]  The Commission also reported its findings that although the movie and electronic game industries had made progress in limiting marketing of R- and M-rated products to children, the music recording industry had not significantly changed its marketing practices since the September 2000 Report.  The Commission continued to urge the industries to strengthen their self-regulatory programs.

In releasing the June 2002 Report, the Commission indicated that it would review industry practices for a year, and then prepare and release an additional report.

## B.  Sources of Information for this Report

To prepare this Report, the Commission collected information from several sources.  As it had done for each follow-up report, the Commission tracked advertising placements in media popular with youth, and reviewed advertisements in major media – print and television – to determine whether they included clear and prominent rating and labeling information.  The Commission also reviewed retail packaging

for music products to assess the extent to which the size and placement of the parental advisory label complied with industry guidelines.

In addition, the Commission reviewed internal company documents provided by nine individual industry members, including marketing plans for certain R- and PG-13-rated movies, explicit-content labeled music, and M- and T-rated games released since the Commission's June 2002 Report. The company documents describe, among other things, where advertisements were placed and the target audiences they were intended to reach, the nature and extent of promotional activities used to generate consumer awareness and interest in the products, and company research.

More specifically, with respect to the motion picture industry, the Commission reviewed marketing plans for nine R-rated films and three PG-13-rated films released by three major studios between June 2002 and July 2003.[4] In selecting these films, the Commission chose R- and PG-13-rated movies whose ratings were based, at least in part, on violent content.[5] For the music recording industry, the Commission studied the marketing of 14 explicit-content labeled recordings[6] released by three major recording companies over the past year.[7] For the electronic game industry, the Commission reviewed the marketing of 18 violent M-rated games and six T-rated games by three of the major companies in the marketplace.[8] The Commission selected M-rated games issued in the last year.[9]

In addition, in the summer of 2003, the Commission undertook an undercover shopper survey – as it had done for its September 2000 and December 2001 Reports – to determine whether progress has been made in limiting the sale to children of products rated or labeled as potentially inappropriate for them without their parents' consent. Finally, on October 29, 2003, the Commission held a one-day public workshop, at which representatives from consumer and parents' groups as well as each of the industries' major trade and retailer associations – the MPAA, the RIAA, the ESA, the NATO, the Entertainment Software Rating Board ("ESRB"), the National Association of Recording Merchandisers ("NARM"), the Interactive Entertainment Merchants Association ("IEMA"), and the Video Software Dealers Association ("VSDA") – discussed and debated the success of self-regulation in each of these industries.

## II. Motion Pictures

### A. Marketing to Children: Advertising Placement

#### 1. Self-regulatory programs restricting placement of advertising in media popular with children

In its September 2000 Report, the Commission found that the motion picture industry had engaged in extensive marketing of violent R-rated movies to children under 17.[10] In response to the report and the Commission's recommendations, the MPAA implemented 12 initiatives.[11] Among the Initiatives was a promise that each member studio would "review its marketing and advertising practices in order to further the goal of not inappropriately specifically targeting children in its advertising of films rated R for violence."[12] In addition, the studios pledged to "request theater owners not to show trailers advertising films rated R for violence in connection with the exhibition of its G-rated films."[13]

Several individual motion picture studios undertook additional steps to respond to the Commission's report. For example, three studios announced that they would not advertise R-rated movies in media with an under-17 audience of more than 35%,[14] and many pledged not to attach trailers for violent R-rated movies to PG-rated movies. Members of the NATO similarly pledged not to show trailers advertising R-rated films in connection with any G- or PG-rated feature film.[15]

### 2.  Advertising placements: current practices

#### a.  Television advertising

The Commission has previously noted that most moviegoers, and teens in particular, become aware of movies through television ads.[16] Accordingly, the Commission has recommended that the film industry prohibit advertising of R-rated films in media with a substantial under-17 audience. In response, several studios committed to avoid advertising in media with an under-17 audience of more than 35%,[17] and other studios instituted alternative policies intended to curb the advertising of R-rated films to children.[18]

In its June 2002 Report, the Commission reported that studios had largely complied with their pledges not to advertise films rated R for violence on television programs with an under-17 audience of 35% or more.[19]

For this Report, the Commission reviewed motion picture advertising during an eight-week period and found that the studios continue to advertise violent, R-rated films on television programs popular among teens.[20] For example, Warner Bros.' *The Matrix Reloaded* was advertised on *WWE Smackdown*[21] and BET's *Rap City*, Fox's *Wrong Turn* was advertised on BET's *106th & Park*, and Columbia's *Identity* was advertised on MTV's *Direct Effect*. In all, the Commission found 59 ads for seven films rated R for violence on programs popular with teens during the monitored time period.[22] The Commission also monitored the advertising of home video and DVD releases on the same programs, but did not find any television ads for violent, R-rated videos.[23]

The Commission's review of first-airing data for the time period June 2002 through early September 2003 revealed 19 instances in which a studio first aired an advertisement for a violent R-rated film or DVD/home video release on a program popular with teens.[24] Examples include ads for Universal's *8 Mile* on *The Bernie Mac Show*, Miramax's *Confessions of a Dangerous Mind* on *The Simpsons*, Paramount's *The Hunted* on *WWE Smackdown*, and MGM's *Jeepers Creepers 2* on *The Simpsons*.

Similarly, data received from the Parents Television Council further confirmed the Commission's finding that studios continue to advertise films rated R for violence on some of the programs most popular with youth audiences.[25] Among the films and DVD releases advertised on these programs were Fox's *Wrong Turn*, New Line Cinema's *Final Destination 2,* Sony Picture's *Bad Boys 2*, and Warner Bros.' *Cradle 2 the Grave.*[26]

Finally, the Commission's review of documents from three motion picture studios yielded similar findings.[27] Consistent with policies implemented by the studios following the Commission's September 2000 Report,[28] media plans submitted for this Report indicated that the studios did not specifically

target advertising for R-rated films at children under 17.  In fact, documents relating to the studied R-rated films uniformly identified the films' target audiences as comprising persons aged 18 years and older.  Nonetheless, the Commission found that one studio advertised two of its R-rated violent films on BET's *Rap City* and *106th & Park* – programs that were disqualified under the studio's own policy of not advertising on programs with an under-17 audience of more than 35%.[29]  Moreover, the documents indicate that the studios have continued to place advertisements for violent R-rated movies on other programs with substantial youth audiences, including *Cedric the Entertainer, Smallville*, *The Bernie Mac Show*, and *WWE Smackdown*.  Notably, another studio advertised two of its R-rated films on a few television shows it had specifically targeted for "teen burst" and "families" advertising for a PG-13-rated film.[30]

### b.  Print and radio advertising

The Commission's review of print and radio advertising showed that the studios continue to limit ad placement for violent R-rated films.  In its September 2000 Report, the Commission found that studios advertised their R-rated films in youth-oriented publications,[31] and, in subsequent reports, the Commission has noted significant improvement in this area.[32]  For this Report, the Commission monitored advertisements in the June 2002 through October 2003 issues of 13 magazines with substantial or majority youth audiences,[33] and, as in the June 2002 Report, found no studio advertisements for R-rated movies currently running in theaters.  The monitoring did reveal, however, that DVDs for Lions Gate's *House of 1000 Corpses* and New Line's *A Man Apart*, two films rated R for violence, were advertised in *World Wrestling Entertainment Magazine*, a magazine with a substantial youth audience.[34]

The Commission's review of the three studios' media plans did not reveal any plans to advertise R-rated films in youth-oriented publications.  Two of the three studios have compiled lists of youth-oriented magazines that the studios deemed inappropriate for ads for R-rated films, and the third studio has a policy not to advertise or market R-rated films in any publication with an under-17 audience of 35% or higher.[35]

Similarly, with respect to radio advertising, the three studios' media plans did not indicate that they specifically targeted under-17 audiences for advertising R-rated films.  One of the studios collected audience demographic data for radio programming and sought to avoid advertising its R-rated films during time periods on certain stations when the audience share of children under 17 likely exceeded 35%.  This studio also sent letters to radio stations requesting that promotional ads for one of its R-rated films not air during programs with a 35% or higher under-17 audience.

### c.  Trailers

In its September 2000 Report, the Commission found that trailers for R-rated films were shown to audiences containing substantial numbers of youngsters attending PG-13 films – including PG-13 films marketed to children aged 11 years and younger – and that trailers for R-rated films were shown before

features rated PG.[36] At the time, the major theater chains had a policy limiting trailer placement to within one rating of the feature presentation.[37] The Commission recommended that the industry prohibit placing advertisements for R-rated films in venues with a substantial under-17 audience.[38]

In response, MPAA member studios pledged to ask theater owners not to show trailers advertising films rated R for violence in connection with a G-rated feature film.[39] Several studios extended this commitment to apply to PG-rated films as well.[40] NATO member theaters went further. They pledged not to show trailers for R-rated films before G- or PG-rated films, and, before showing such trailers in connection with PG-13-rated films, promised to ensure that the trailers are consistent in tone and content with the feature film.[41]

The Commission's review of studio documents indicated that the studios largely are complying with their commitments. With respect to the films studied, marketing and other documents show that the studios attached or requested that trailers for those films be shown only before features rated R or PG-13,[42] with one exception.[43] With respect to DVD and home video releases, documents indicated that the three studios attached trailers for R-rated films only to features rated R or PG-13, again with one exception.[44]

### d.  Promotions

In its September 2000 Report, the Commission found that promotions for R-rated films, including the distribution of free passes to movie screenings or film-related merchandise, were sometimes conducted at places where teens congregate.[45] The December 2001 Report noted significant improvement in this area.[46]

The marketing plans reviewed for this Report indicate that the studios' promotional activities for the R-rated films studied generally have not been expressly targeted to under-17 audiences. The marketing documents reveal, however, that two studios conducted some promotions and other advertising at locations or events that likely attracted substantial numbers of teens, including: music and gaming stores, an amusement park, comic book stores, arcades, skateboard stores and skate parks, and recreation centers. One of the studios also arranged to have posters and doorknob hangars for one of its R-rated films distributed at high schools, as well as at a July 4th event described as being "for families."

### e.  Internet advertising

Internet advertising by studios on third-party websites remained a relatively small, but growing, component of the advertising campaigns for the films reviewed for this Report. All three of the studios advertised online for the R-rated films studied,[47] and for the most part this advertising did not specifically target youth audiences.[48] Nonetheless, all three studios did advertise on websites with youth audiences of at least 35%, and in one case a majority, including: gamespy.com (36%), IGN.com (40%), MTV.com (38%), teenpeople.com (53%), and ugo.com (44%).[49]

### f. Other steps

The studios submitted documents describing additional steps taken in response to the Commission's recommendation that they avoid targeting their marketing of violent R-rated films to children under 17. Most of these steps have been noted in previous Commission reports.[50] For example, one studio's policy prohibits the licensing of certain products based on films rated R for violence if the products are "specifically targeted for sale to children under the age of 17" and prohibits the distribution of such products through any outlet that "specifically targets children under 17 as their primary demographic." Another studio appears to require that licensed products based on R-rated films contain a clear indication on their packaging that they are "not for children under the age of 17," and further that such products be sold "only through segregated adult collector areas" in retail outlets.

The studio documents generally confirm continued compliance with these policies. For the most part, studios did not appear to cross-promote their R-rated films with companies selling products intended for a younger age group. The one exception was an R-rated film promoted in conjunction with other media products carrying a lower appropriate age, including a video game rated T (for Teen).[51]

## B. Ratings and Reasons for Ratings in Advertising

### 1. Self-regulatory programs governing disclosure of ratings and reasons

In its September 2000 Report, the Commission found that motion picture advertisements generally provided the films' rating but did not provide the reasons for the rating.[52] The Commission recommended that the studios clearly and conspicuously disclose both the rating and the reasons in all advertising.[53] In response, MPAA member studios pledged to "seek ways to include" ratings reasons in print advertising and official movie websites.[54] Among the specific requirements implemented by the MPAA in this regard is the inclusion of rating reasons for all films (other than those rated G) in newspaper ads above a certain size, websites, posters, and billboards.[55] Member studios also vowed to encourage newspapers and theaters to provide or include rating reasons,[56] and NATO members pledged to seek ways to disseminate rating reasons.[57]

Since then, the Commission has noted progress by the studios in disclosing ratings and rating reasons clearly and prominently.[58] For this Report, the Commission reviewed studio documents and conducted its own monitoring of studio and retailer advertisements in various media.

### 2. Advertising of rating information: current practices

#### a. Television advertising

Although the MPAA Advertising Handbook only requires member studios to disclose a film's rating and its definition, legibly, in television advertisements,[59] the Commission's review of television advertisements provided by the three studios studied suggests that the studios nearly always included both the letter rating (with its definition) and the reasons for the rating in their commercials for the R-rated films studied. With the exception of ads for films not yet rated, the television ads presented the

film's rating both visually and audibly, and also provided the rating reasons, usually visually.[60]  The ratings themselves were typically readable but the reasons were less so.

### b.  Print and radio advertising

Among the commitments the MPAA member studios made in response to the Commission's September 2000 Report was to seek ways to include a film's rating reasons in print advertising.[61]  For this Report, the Commission reviewed more than 1,700 newspaper and magazine advertisements for films rated PG-13 or R[62] to determine the extent to which the rating and rating reasons were disclosed and legible.[63]

Consistent with the Commission's most recent findings,[64] nearly all of these ads contained both the rating and reasons,[65] and, in most of those cases, the rating and reasons were clearly displayed.[66]  The reasons in some ads were notably prominent, such as those for MGM's *Die Another Day* and Columbia's *Tears of the Sun*.  In other ads, however, the reasons were much smaller or less conspicuous, often due to placement over the ad's graphics or to the use of colored or gray print rather than black on white.  Some of the ads had rating reasons that were so small or obscured that they were very difficult to decipher, and in others the reasons were so tiny or blurred that they were literally unreadable, including some ads from Fox Searchlight, Sony Pictures Classics, Focus Features, and Lions Gate Films.[67]  Finally, consistent with past reviews,[68] some studios provide legible rating reasons in ads less than five inches in height, although the MPAA Guidelines do not require them.

The Commission also reviewed magazine print ads for DVD and home video releases, and found that the majority of these ads contained both the film's rating and its rating reasons.[69]  Of the 55 advertisements for movies rated PG-13 or R at least in part for violence, about half displayed the ratings and rating reasons clearly, while another ten displayed clear ratings but the rating reasons were either difficult to read or obscured by their placement.  Eleven ads contained ratings but no reasons, and six contained neither ratings nor rating reasons.

The Commission's review of retailer DVD ads yielded more mixed results.[70]  Consistent with previous Commission findings,[71] Target and Best Buy continued to display prominently the R rating for movies featured in their inserts and to include the words "Restricted Rating" next to or near R-rated DVD clip art.  Toys "R" Us prominently displayed movie ratings for all the DVDs it advertised.[72]  Half the retailers, however – Amazon, Circuit City, Kmart, and Tower – did not disclose ratings for any of the R-rated DVDs they advertised.  CompUSA only sometimes disclosed R ratings; in one instance, an ad featuring two R-rated DVDs side by side disclosed the rating for only one of them.

Finally, the Commission also reviewed the studios' disclosure practices with respect to radio advertising.  The studio documents indicated that ads for the R-rated films studied did provide the film's rating in audio.  Ads for two of the films also provided the rating reasons.[73]

### c. Internet advertising

#### (1) Motion picture websites

For its June 2002 Report, the Commission's review of 20 official movie websites showed that nearly all displayed the film's rating symbol and rating reasons, and linked to at least one of three rating information sites.[74] For this Report, the Commission again reviewed the rating information practices of 20 official movie websites.[75]

The Commission's review indicated that the studios are substantially complying with the Commission's recommendations in this area.[76] All of the sites displayed the R rating symbol and rating reasons somewhere on the site, and nearly all (18 of 20) displayed the rating and reasons on either the teaser page or home page.[77] In a notable improvement, more than half the sites displayed the rating symbol and rating reasons on every page or nearly every page – often in a frame that remained constant on part of the screen as the visitor navigated through the site.

Virtually all of the sites linked to at least two of three rating information sites, and all but four sites linked to all three.[78] Four sites offered the opportunity to purchase movie tickets through a third-party site, and displayed the R rating in close proximity to the link to the third-party site; two sites also displayed the rating reasons close to the link.[79] All of the sites had a trailer of the film available for viewing and/or downloading.[80]

#### (2) Theater and movie ticket websites

The Commission also reviewed the rating information practices of websites for 15 major movie theater circuits and three online movie ticket sellers and found mostly positive results.[81] All of the theater sites displayed the movies' ratings and the rating reasons.[82] Particularly with respect to rating reasons, this finding marks a significant improvement over previous reports. Six sites (40%) provided information about the MPAA rating system, and five of those sites (33% of total sites) also linked to rating information sites – comparatively lower percentages than previous reports found.[83] One of the theater sites offered movie tickets for sale directly, and nine others offered visitors the opportunity to purchase tickets through a third-party site.[84]

The Commission's review of three movie ticket sites yielded comparable results. All three websites displayed the films' official ratings, and Movietickets.com and Fandango.com also displayed the rating reasons. All three provided information about the MPAA rating system, although none linked to any of the rating information sites.

#### (3) Home video/DVD retailer and rental websites

The Commission surveyed five online movie retailers' sites to determine their rating information practices with respect to five movies rated R for violence, and found that these retailers' practices have improved relative to previous Commission findings.[85] All five websites provided each movie's correct MPAA rating, and four of the sites provided the official rating reasons for each of the five films

examined. Amazon.com did not provide rating reasons but specified that R-rated movies are "Not for sale to persons under age 18."[86] None of the sites linked to film rating information sites, although BestBuy.com and TowerRecords.com provided information on their sites about the movie rating system.

For the first time, the Commission reviewed the practices of three websites that allow consumers to rent movies via the Internet.[87] Two of the sites allow users to rent films online that are then mailed to their homes,[88] while the third site allows users to download movies for viewing on the computer.[89] All three of these sites displayed the movies' official ratings, and two of the three also displayed the films' rating reasons. None of the sites linked to any of the rating information sites, although one site did provide information about the MPAA rating system on its own website. That same site also required users to check a box to indicate that they are at least 17 years of age.

## C. Efforts to Enforce Rating System in Movie Theaters and at Stores

In connection with two previous reports, the Commission conducted nationwide undercover studies to determine the extent to which unaccompanied children under 17 were able to purchase tickets to R-rated films. In its September 2000 Report, the Commission reported that almost half of the theaters studied sold tickets to the "mystery shoppers," and the Commission found a similar result in its December 2001 Report.[90] In response to these reports, the MPAA, the NATO, the VSDA, and individual motion picture studios have continued to urge theater owners and video retailers to improve their enforcement of the rating system.[91]

The Commission conducted its third undercover survey in July and August 2003.[92] The results indicate an improvement in theaters' performance in restricting children's access to R-rated motion pictures: only 36% of the "mystery shoppers" were able to buy tickets to R-rated films, as compared to 48% in the 2001 survey.[93] In addition, more theaters checked the ages of the teen shoppers, increasing from 39% in the 2001 survey to 48%.[94] For the first time in this survey, the Commission also surveyed practices at stores selling R-rated movies on DVD: 81% of the teen shoppers were able to purchase the product, and in only 19% of cases did the cashier or clerk ask the shopper's age.

### FTC Mystery Shop Results - Movies
### Q. Was the shopper able to make the purchase?

**Movie Theaters**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 49<br>75% | 34<br>71% | 42<br>65% | 18<br>38% | 143<br>64% |
| Yes | 16<br>25% | 14<br>29% | 23<br>35% | 29<br>62% | 82<br>36% |
| # of Shoppers | 65 | 48 | 65 | 47 | 225 |

**DVD Movie Stores**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 18<br>27% | 9<br>18% | 13<br>21% | 4<br>8% | 44<br>19% |
| Yes | 49<br>73% | 40<br>82% | 49<br>79% | 44<br>92% | 182<br>81% |
| # of Shoppers | 67 | 49 | 62 | 48 | 226 |

To help evaluate current industry practices, the Commission also obtained information from a number of DVD/home video retailers regarding the retailers' policies, if any, governing the sale of R-rated movies to children under 17.[95] Several major retailers indicated that they do have such policies. Some of these policies require clerks or cashiers to check the identification of anyone seeking to purchase an R-rated movie who is suspected of being under 17, and at least one retailer stated that it uses a cash register prompt that reminds the clerk, when a restricted product is scanned for purchase, to perform the ID check. Another policy restricts the sale of R-rated movies to children under 17 unless a parent previously has provided consent. One retailer does not require ID checks at all, and another leaves the decision up to individual stores. Some of the companies also indicated that they display in-store signage explaining the MPAA rating system or the store's restrictions on sales to children under 17. Notwithstanding the existence of such policies, mystery shop data obtained by the Commission indicates, as discussed above, that four out of five children under 17 are able to purchase R-rated DVDs from retailers.

## D. Analysis of Current Industry Practices

On the whole, the motion picture industry has continued to comply with its pledge not to specifically target children under 17 when advertising films rated R for violence. In addition, the studios generally are providing clear and conspicuous ratings and rating information in advertisements for their R- and PG-13-rated films. However, the studios continue to advertise and promote R-rated films in some media and venues popular with youth. In addition, retailers commonly are not providing ratings and rating reasons in advertisements for DVDs, and do not appear to be effectively restricting youth from purchasing R-rated DVDs, despite the existence of policies adopted by some retailers. Movie theaters have shown improvement in barring unaccompanied children under 17 from purchasing tickets to R-rated films.

## III. Music Recordings

### A. Marketing to Children: Advertising Placement

#### 1. Self-regulatory programs restricting placement of advertising in media popular with children

The Recording Industry Association of America's ("RIAA") Parental Advisory Program Guidelines do not indicate that a sound recording is either appropriate or inappropriate for any particular age group. Instead, according to the RIAA, the parental advisory label is a clear "heads-up" to all consumers that a sound recording contains explicit content, and a method to empower parents to make their own determinations about what content is appropriate for their particular child.[96] Accordingly, the RIAA's guidelines do not prohibit companies from placing, or even recommend that they refrain from placing, advertising for explicit-content labeled recordings in media popular with children.

Not surprisingly, therefore, in previous reports the Commission consistently has found that the music industry advertises on television shows and in print magazines popular with teens. Even though the parental advisory system does not purport to be an age-based system, such marketing appears inconsistent with a label that advises parents that some material may not be appropriate for children.[97] For this Report, the Commission requested that three music recording companies provide information, including marketing plans, about 14 explicit-content labeled recordings.[98]

#### 2. Advertising placements: current practices

##### a. Television advertising – cable music channels

Television cable channels that show music videos and other music-related programming continue to figure prominently in the marketing of explicit-content labeled recordings to children under 17. Marketing documents the Commission examined for each of the 14 explicit-content labeled recordings discussed placing advertisements on some or all of the following music cable channels that have substantial youth audiences in many day-parts: MTV; MTV2; BET; and Much Music USA.[99] Nine of the 14 marketing plans examined specifically discussed placing this advertising on popular after-school and early-prime-time shows such as MTV's *Total Request Live* ("*TRL*") and *Direct Effect* and BET's *Rap City* and *106th & Park*.[100] In addition, marketing documents for 10 of the 14 recordings discussed promoting the recording on these cable music channels in other ways, either through rotation of videos associated with the recording, contests, or artist appearances on programming such as *TRL*, *Direct Effect* and *106th & Park*.[101]

To supplement information from the marketing plans, the Commission obtained additional information on advertising for explicit-content labeled recordings aired during popular teen programs on cable television during the months of May and June 2003.[102] Four of the five major recording companies[103] as well as three independent record labels placed advertising for 13 different explicit-content labeled recordings on cable music programming popular with teens.[104] First airing data for June 2002 through September 2003[105] reviewed by the Commission showed that the five major recording

companies advertised 35 different explicit-content labeled recordings on programs with a substantial youth audience such as *106th & Park*,[106] *Direct Effect*,[107] and MTV's *WWE Heat*.[108]

### b.   Other television advertising

As indicated in earlier Commission reports, marketing plans for explicit-content labeled recordings place much less emphasis on network and non-music cable channel advertising and promotions. This continues to be the case. Five of the 14 marketing plans indicated plans to advertise explicit-content labeled recordings on wrestling programs. A sixth marketing plan indicated that it would advertise an explicit-content labeled recording on *Yugioh*, a children's cartoon program that airs on the WB channel daily at 4:30 p.m.[109] None of the other marketing plans examined discussed placing advertising on network television.

Additional advertising information the Commission obtained for popular television programs aired on network and non-music cable programming revealed that two recording companies ran advertising for two different explicit-content labeled recordings during *WWF Smackdown* and syndicated airings of *The Simpsons*.[110] First airing data obtained by the Commission also showed that a third recording company advertised an explicit-content labeled recording on the WB's *The Gilmore Girls*.[111]

### c.   Print advertising

Since the Commission's initial report in September 2000, the recording industry has shown steady improvement in the area of ad placement in print media with substantial teen audiences. The Commission's most recent review shows that only 21% (three of 14) of the marketing plans examined discussed placing advertising in magazines with a majority or substantial teen audience, compared to 70% of the marketing plans reviewed for September 2000 Report.[112]

The Commission's monitoring of print advertising confirms the trend toward fewer advertising placements in popular teen magazines. Over a four-month period, the Commission reviewed advertisements in seven magazines with a majority or substantial readership under 18,[113] and found that two of the five recording companies – EMI and UMG – each ran one advertisement for an explicit-content labeled recording.[114] Over the same time period, independent record companies ran four ads for explicit-content labeled recordings in *Thrasher* and one in *Right On!* These results show marked improvement from the results reported in April 2001 where 77 ads were placed in four magazines, and June 2002, where 14 ads were placed in three magazines.[115]

### d.   Internet marketing

As noted in previous reports, Internet advertising and promotion is an integral part of the marketing of explicit-content labeled recordings.[116] Twelve of the 14 marketing plans reviewed for this Report discussed efforts to promote explicit recordings on websites with significant teen audiences, including Alloy.com, MTV.com, BET.com, Teenpeople.com, Katrillion.com, and AOL Teens Music.[117] These

promotional efforts included artist interviews and online chats, "first listens" and premieres of music videos and singles, contests, music downloads, streaming concerts, and listening parties.

## B.   Advisory Labels and Reasons for Labels in Advertising

### 1.   Self-regulatory programs governing disclosure of parental advisory label and reasons

The RIAA's revised guidelines, effective April 1, 2002, enhanced the disclosure of the explicit-content designation in consumer advertising by requiring that, in addition to print advertising, radio and television advertising for explicit-content recordings also must "communicate the presence of explicit content."[118]  The guidelines note that this may be achieved by the use of an actual depiction of the parental advisory label ("PAL") in the ad, or by prominently displaying the exact wording of the PAL – "Explicit Content - Parental Advisory" – in the consumer advertisement.  In addition, if the advertisement contains a miniature depiction of the album cover, the guidelines suggest that, at a minimum, the words "Explicit Content - Parental Advisory" be placed nearby.[119]  In these instances, the guidelines require that the use of the PAL logo or the wording "Explicit Content - Parental Advisory" be legible.[120]

As noted in previous reports, unlike the motion picture and electronic game industries rating systems, the PAL does not provide the reasons for the advisory.  One of the major recording companies, BMG, began placing "enhanced" advisory labels on its explicit-content labeled recordings as of August 2002.  The parental advisory label that BMG uses indicates, when applicable, whether the recording has been stickered because of "Strong Language," "Sexual Content," "Violent Content," or "Sexual + Violent Content."[121]  The Commission is not aware that other recording companies have followed BMG's lead and adopted an expanded label that includes the particular reasons why the recording has an advisory.

### 2.   Advertising of advisory label: current practices

#### a.   Television and radio advertising

As noted above, the RIAA's policy to require advisories in television and radio advertisements became effective on April 1, 2002, and it appears advisory language is frequently included in television advertising.  The Commission obtained additional information about advertisements for explicit-content labeled recordings that aired during popular teen programs on cable, network, and syndicated television during May and June 2003.[122]  This data shows improvement in usage of the PAL logo:  all but one of the 25 ads contained the PAL logo,[123] a substantial improvement from the June 2002 Report, which showed that only about half of the 49 television ads for explicit-labeled recordings contained the PAL logo.[124]

A review of the sample television ads received by the Commission for this Report indicated that six of nine contained a legible PAL logo at the end of the advertisement.[125]  The PAL logos for the six ads

were prominent and legible, some extremely so.  In addition, advertising for two different recordings by one recording company also indicated that an edited version was available.  By contrast, sample advertising submitted by recording companies for the Commission's December 2001 Report did not include any advisory information.[126]  Neither of the two sample radio advertisements for explicit-content recordings submitted by one recording company to the Commission for this Report, however, communicated parental advisory information.

### b.   Print advertising

The recording industry also continues to show improvement in placing PAL logos in print advertising for explicit-content recordings.  For this Report, the Commission reviewed ten magazines covering a 15-month period.[127]  The review showed that 60% (58 of 96) of the ads placed by the recording industry contained a PAL logo.  Only 74% of those advisories (43 of 58), however, were clear and conspicuous.[128]  An analysis of the most recent four months of monitoring period shows better results:  69% (9 of 13) of the ads placed by the recording industry for explicit-content recordings contained a PAL logo and all of the ads that contained the PAL logo used it in a clear and conspicuous fashion.[129]  These results show continued improvement since the Commission began monitoring print advertising in conjunction with the September 2000 Report.  At that time, the Commission's review of print advertising showed that only 8% (18 of 234) of ads in magazines popular with teens displayed the parental advisory.[130]  By the time of the June 2002 Report, 48% (12 of 25) of the ads placed by major recording companies for explicit-content recordings contained a PAL logo, all of which were clear and conspicuous.[131]

This recent review of magazines also showed fairly consistent usage of the PAL logo by retailers when placing ads for explicit-content labeled recordings.  Over the most recent four-month review period, two retailers placed six ads for explicit-content recordings; all of the ads contained the PAL logo.  In four instances the PAL logo was clear and conspicuous, while in the other two instances, it was small, but readable.[132]

A review of free-standing inserts in Sunday newspapers showed that most ads included a PAL logo on the clip art for the music promoted.  As pointed out in the June 2002 Report, however, these labels are frequently too small, blurry, or inconspicuously placed to be easily noticed or read.[133]  Progress in this area was lacking despite RIAA's specific acknowledgment of this potential problem and its suggestion that the wording "Explicit Content - Parental Advisory" be placed near the miniature depiction of the album in advertising.[134]  Two exceptions were ads for Target and Best Buy, which had larger, conspicuous labels and the addition of the words "Parental Advisory" next to the clip art for explicit titles.

### c.   Internet promotions and sales

The current labeling program, updated in April 2002, provides guidelines for online sales of physical recordings and digital downloads.  The RIAA recommends that all online retail sites

prominently display the PAL logo when a shopper is searching for or reviewing recordings that are explicit-content labeled and suggests that an indication that a recording contains explicit content "appear in **all** stages of the purchases process – from search results to the shopping cart."[135]  The guidelines offer three ways to accomplish this:  using the PAL logo in a sufficiently legible size; prominently displaying the words "Explicit Content – Parental Advisory" in the product description; or including the same wording near the miniature depiction of the album.  The guidelines specifically recommend that companies avoid using inconsistent or unclear descriptions such as "E" (for explicit) or "PA" (for parental advisory).[136]  Finally, the RIAA recommends that individual sites, whether those of record companies or members of the online retail community, link to or otherwise incorporate information from the entertainment industry's informational website, www.parentalguide.org.

During the Commission's Workshop held in October 2003, the RIAA recognized the growing importance of the online distribution model for music, and identified the Internet as one of the methods that children are increasingly using to obtain music.[137]  In light of this development, the RIAA committed to revise its parental advisory guidelines to encourage online music downloading sites to provide effective parental control mechanisms and to reinforce the importance of using consistent parental advisory descriptors on these sites.[138]

For this Report, as it has done for the last three previous reports, the Commission surveyed websites to determine whether industry members are providing online disclosures about explicit content.  It surveyed 20 artist and recording company sites and five major online retailer sites.  For the first time, the Commission also surveyed six popular online music downloading services as well as four peer-to-peer file-sharing services.

### (1)  Artist or recording company websites

Despite the extension of the RIAA guidelines to include the online distribution and promotion of explicit-content labeled recordings on the Internet, the recording industry's performance in this area showed little, if any, improvement.  For this Report, the Commission examined 20 official artist and recording company websites.[139]  Sixty percent (12 of 20) of the sites displayed the PAL logo,[140] compared to 50% (10 of 20) in the June 2002 Report.[141]  Eight of those 12 sites (about 67%) displayed the PAL logo on the home page and/or teaser page,[142] compared to 80% (8 of 10) in the June 2002.[143]  In addition, the percentage of sites that provided a legible PAL logo shrank from 90% (9 of 10) in June 2002 to 67% (8 of 12) in this review.

Fewer websites provided lyrics for the explicit-content labeled recordings, although the number of sites that allowed the visitor to listen to audio samples and play downloadable video clips stayed about the same.[144]  Furthermore, while 25% of the sites in June 2002 provided a link to riaa.org or parentalguide.org, only 15% percent of the sites surveyed for this Report did.

Seventy-five percent (15 of 20) of the music company and artist websites examined offered the opportunity to purchase the explicit-content labeled recording, either from an official recording company website or through a link to a third-party online retailer.[145]  The PAL logo or other advisory language

about the explicit content of the recording was visible some time during the search or purchase process for about 67% (10 of 15) of the sites.[146]  In six out of ten of those cases, however, the website merely showed a PAL logo on the cover art and once the recording was placed in the shopping cart, there was no indication of explicit content.[147]  In comparison, the websites for Sony and Atlantic Records were particularly effective in providing the PAL logo as well as other advisory language about the content of the recording through most, if not all, of the entire purchase process as recommended by the RIAA's guidelines.

### (2)  Retailer websites

The review of the five major online retailers' websites showed results somewhat similar to those found in past surveys.[148]  In nearly all cases (22 out of 24 recordings), the websites either displayed the PAL logo on the album art, or used other language indicating explicit content.[149]  Both Circuit City and Sam Goody relied solely on the PAL logo on the album cover art to relay information about the explicit-content status of the recording.  In many of these cases, the PAL logo was difficult to read, although Sam Goody indicated that the recordings contained "Explicit Lyrics" during the checkout process.  Nearly two-thirds of the time (in 15 of 24 instances), the visitor, regardless of age, could play either part or the full version of songs from the album.  This was similar to the findings made in the June 2002 Report.[150]

None of the websites linked to the entertainment industry's informational site, parentalguide.org, although Bestbuy.com did provide detailed information about the parental advisory label system when the visitor clicked on the words "Parental Advisory."  Towerrecords.com was the only website reviewed that consistently provided advisory language throughout the purchasing process, for all albums surveyed.

Although not examined as part of the music retailer survey, the Commission also reviewed the online shopping portions of MTV.com and VH1.com for each of the same five explicit-content labeled recordings.  In all instances, both MTV.com and VH1.com indicated that the recording had a parental advisory.  VH1.com used the PAL logo on the album cover art,[151] while MTV.com used large lettering indicating "Explicit Version."  Both sites also indicated explicit content during the search function – VH1.com used "PA" while MTV.com noted that the recording was the "Explicit Version."  In addition, MTV.com provided advisory language for all five albums during the checkout process, as recommended by the RIAA's guidelines.  Neither site linked to parentalguide.org or otherwise provided information about the industry's parental advisory labeling program.

### (3)  Music downloading websites

For the first time, the Commission examined the online disclosure practices of several online digital music providers.[152]  For this Report, the Commission examined six popular online music downloading sites to determine whether these services followed the RIAA's guidelines regarding the notice of the parental advisory for Internet-based sales and promotions.[153]

Although all six of the online music downloading services labeled explicit-content music with a parental advisory, the method for doing so varied from one service to another. Three services used the terminology "Explicit" when a track or album had received an explicit-content designation,[154] while the other three services merely used the initials "PA."[155] These designations were displayed either next to the track title or next to the album title. All of the services also offered edited versions of explicit-content labeled recordings and provided this information through the use of the words "Edited" or "Clean." In addition, five of the six services also used album cover art displaying the PAL logo on their websites.[156] The logo was often barely legible, however, and in some cases it was completely illegible.

Four of the six services provided information about the explicit content of a song while it was being played.[157] In particular, Napster depicted a very noticeable PAL logo on the toolbar during song playback. Three of the six services indicated that a track contained explicit content during download to a user's hard drive.[158]

Half of the services provided information about the Parental Advisory system by linking to parentalguide.org as recommended by the RIAA's guidelines.[159] On the iTunes service, clicking on the "Explicit" or "Clean Lyrics" icon located next to the album cover art brought the user to a pop-up screen that displayed a detailed description of the Parental Advisory system and linked to the RIAA's website, riaa.org. Although not required by the RIAA's guidelines, only Napster and MusicNet provided any sort of parental control mechanism to allow the parent to prevent a child's access to explicit-content labeled music.[160]

### (4)  Peer-to-peer file-sharing services

The Commission examined the software and websites of four popular peer-to-peer file-sharing services for this Report, to assess what on-line disclosures, if any, are made regarding the content of individual files shared by users of these services.[161] All four services offer consumers the ability to download free software that enables them to share files, including music downloads, with other users.[162] The files do not reside in a central location, but rather are stored on the hard drives of the users of the software. None of the peer-to-peer file-sharing services themselves label or otherwise provide notice of explicit content for music recordings that had been designated with a parental advisory by a recording company. Instead, each user of a particular peer-to-peer file-sharing program uploads files to a shared folder on his or her own hard drive and thus can label or designate the file in any manner he or she chooses. Accordingly, each file, if labeled or otherwise described as having explicit content, would have been labeled by the individual user. Thus, as industry correctly notes, this means of distribution effectively circumvents the parent advisory labeling system.[163]

Each of the peer-to-peer file-sharing programs offered some type of filter to exclude unwanted content. Kazaa and LimeWire provided filters that blocked access to materials that contained offensive or otherwise adult words in the description of the file.[164] In addition, all four services gave users the ability to create their own filters by manually entering all the words that they wanted blocked from search results. All of these filters, however, operate by filtering language found in the title or descriptor

of the file, rather than the content of the file. For example, music recordings that have been designated with a parental advisory by a recording company would only be blocked by the filter if a word in the title or descriptor of the file happened to be offensive. A recording company may have decided to apply the Parental Advisory Label to a particular recording for any number of reasons other than the presence of offensive words in the title. Substituting the use of a filter in place of the Parental Advisory Label undermines the recording company's own determination of whether to label a particular recording.

The limitation of this type of filter is also an issue when files have been mislabeled. As reported frequently in the press and in government reports, many files are labeled inaccurately, sometimes intentionally, and even though the descriptor may be innocuous, the file may be explicit or pornographic in nature and may contain viruses and spyware.[165] To caution computer users about the potential privacy and security risks associated with peer-to-peer file-sharing, the Commission issued a consumer alert in July 2003.[166]

## C. Efforts to Enforce the Labeling System at Point-of-Sale

In its December 2001 Report, the Commission reported that its nationwide undercover study had found that 90% of unaccompanied children ages 13-16 were able to buy explicit-content labeled recordings at retail stores.[167] A similar survey conducted for this Report shows a slight decrease in the percentage of sales: 83% of unaccompanied teens, ages 13-16, were able to buy an explicit recording.[168] Furthermore, there appears to be some improvement in preventing the sale of explicit-content labeled recordings to the youngest shoppers: 69% of 13-year-olds were able to buy explicit-content labeled recordings, as compared to 87% of 13-year-olds as reported in the December 2001 Report. A breakout by age of the mystery shop results follows:

**FTC Mystery Shop Results by Age – Music**
**Q. Was the shopper able to make the purchase?**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 31% | 15% | 14% | 4% | 17% |
| Yes | 69% | 85% | 86% | 96% | 83% |
| # of Shoppers | 65 | 48 | 63 | 47 | 223 |

## D. Product Packaging

Once a recording company or an artist determines that a sound recording warrants a Parental Advisory Label, the RIAA guidelines require that the label "be plainly displayed in nonremovable form on the album cover" and be placed beneath the cellophane shrink wrap.[169] The RIAA also requires that the label measure 1" x 5/8."[170]

A review of the packaging of the 14 CDs produced to the Commission by three recording companies for this Report reveals a lack of compliance with the RIAA's labeling guidelines, primarily

with the RIAA's size requirement for the Parental Advisory Label. Only 29% (4 of 14) of the CDs were in full compliance with requirements that the PAL logo be permanently affixed to the cover art of the album and that the logo measure 1" x 5/8."[171]  For nine of the 10 non-compliant CDs, the Parental Advisory Label logo was too small; for the remaining CD, the sticker was not permanently affixed.  In comparison, the September 2000 review of the packaging of CDs produced to the Commission showed that 50% (27 of 55) met the RIAA recommendations for size, placement, and format.[172]

The Commission's separate examination of the packaging of 25 top-selling CDs[173] that bore the Parental Advisory Label, however, suggested better compliance with the RIAA's guidelines:  48% (12 of 25) of the CDs examined fully complied with the requirements for size and placement of the Parental Advisory Label.  This is an improvement from September 2000, when only 36% (nine of 25) top-selling explicit recordings fully complied with the RIAA guidelines.[174]

**Product Packaging Review Results**

| Report | Origin of CDs | Size | Affixation |
|--------|---------------|------|------------|
| **Sept. 2000** | 55 produced by companies | 61% met size requirement (33/55) 39% too small (22/55) | 75% were part of cover art (41/55) 25% were stickers (14/55) |
| **Sept. 2000** | 25 purchased | 48% met size requirement (12/25) 52% were too small (13/25) | 84% were part of cover art (21/25) 16% were stickers (4/25) |
| **June 2002** | 12 purchased | 83% met size requirement  (10/12) 17% were too small (2/12) | 92% were part of cover art (11/12) 8% were stickers (1/12) |
| **Dec. 2003** | 14 produced by companies | 36% met size requirement  (5/14) 64% too small (9/14) | 93% were part of cover art (13/14) 7% were stickers (1/14) |
| **Dec. 2003** | 25 purchased | 60% met size requirement (15/25) 40% too small (10/25) | 80% were part of cover art (20/25) 20% were stickers (5/25) |

## E. Analysis of Current Industry Practices

Overall, the practices of the music industry show some improvement.  In particular, the industry has made progress in decreasing the amount of advertising placed in magazines popular with teens.  Although industry members continue to advertise explicit-content labeled recordings on cable music channels and wrestling programs popular with teens, advertising on other television shows is virtually nonexistent.  In addition, the industry continues to improve the frequency with which print and television ads for explicit-content labeled recordings contain the Parental Advisory Label.

The industry needs to ensure that the application of the Parental Advisory Label continues to improve in every venue:  compliance with RIAA guidelines for placement of the Parental Advisory Label on the packaging of top-selling recordings has increased only slightly, and little, if any, improvement has been shown in placing the Parental Advisory Label on websites.  Providing notice of the parental advisory is an important component of the RIAA's system, and the Commission encourages the recording industry to improve its performance in complying with this requirement.  Finally, retailers need to take additional steps to limit the sale of music with a parental advisory to children.

# IV. Electronic Games

## A. Marketing to Children:  Advertising Placement

### 1.  Self-regulatory programs restricting placement of advertising in media popular with children

In its September 2000 Report, the Commission found widespread marketing of Mature ("M")-rated electronic games to children under 17[175] – a practice that violated the anti-targeting provision of the game industry's self-regulatory advertising and marketing code ("AdCode").  Following issuance of that report, the electronic game industry amended its anti-targeting provision to add specific standards defining targeting.  Under those provisions, ads for M-rated games cannot appear on TV and radio programs with a 35% or more under-17 audience, or in print media or on Internet sites with a 45% or more under-17 audience.[176]  In addition, on October 31, 2001, the ESRB implemented an expanded enforcement system premised on the severity of a particular violation and the number of points accrued by a publisher for past and current violations of the industry code.  Sanctions range from requiring corrective action to monetary fines for inappropriate target marketing.  In the first nine months of 2003, thirty-two companies were found to have violated the ESRB's requirements and were assessed points and, in four instances, fines.[177]

As a complement to restricting the marketing of M-rated electronic games to children under 17, the Commission's prior reports have noted programs developed by the VSDA and the ESRB for retailers that wish to restrict sale or rental of products.  Those programs continue.[178]  In addition, the IEMA has just announced a new initiative by its member retailers to restrict sales by the end of 2004.[179]

### 2.  Advertising placements:  current practices

For this Report, the Commission monitored industry advertising placements on television and in print media.  In addition, the Commission reviewed marketing plans from three companies that had released and promoted several M-rated games in the last year, including information on where ads for those products were placed in major media, including television, print, and online.[180]

#### a.  Television advertising

None of the plans submitted to the Commission for the M-rated games expressly targeted an under-17 audience, although all that specified a target audience included youth as young as 17 or 18.[181]  In seeking to reach that 17- and 18-year-old audience, several of the marketing plans included at least some planned ad placements for M-rated games on television shows popular with teens, including *Jackass, Total Request Live, WWE Smackdown, Smallville*, and *King of the Hill*.[182]  Placements on MTV's *Total Request Live* would appear to run afoul of the industry's advertising code's prohibition against placing ads for M-rated games on shows with a 35% or greater under-17 audience, but the other shows are permitted under the code.[183]

To supplement information from the marketing plans, the Commission monitored advertising on network, cable, and syndicated programs popular with teens for an eight-week period commencing in May 2003.[184] That monitoring found that ads were placed for two M-rated games (Midway's *Mortal Kombat*, and Microsoft's *Brute Force*) on *WWE Smackdown*. In addition, ad monitoring data provided by The Parents Television Council for the period January to August 2003 showed several more ad placements for M-rated games on programs popular with teens, including MTV's *Making the Band 2* and *Sorority Life 2;* Fox's *Cedric the Entertainer;* UPN's *Girlfriends;* and WB's *Smallville*.[185] The five M-rated games promoted on one or more of those programs were: Activision's *Tenchu: Wrath of Heaven*; Capcom's *Devil May Cry 2*; Microsoft's *Brute Force*; and SCEA's *Primal* and *The Getaway*. Although these ad placements would appear to comply with the AdCode's 35% requirement, all are on shows with large teen audiences.

### b.  Print advertising

In the September 2000 Report, the Commission found that game companies' marketing documents revealed plans to advertise M-rated games repeatedly in magazines with a substantial readership under 17. The media plans submitted for this Report continue to show advertising in print media popular with teens, although virtually none of the print ad placements would violate the AdCode's standard that ads for M-rated games not be placed in print media with a 45% or greater under-17 audience. Ads were often placed in print media that came very close to the 45% limit. In only one instance did the media plans show that a company placed ads in a magazine with a majority under-17 readership. The ESRB challenged that placement, but the company appealed ESRB's challenge on the basis that its media buyer had placed the ads in error.

To monitor industry-wide ad placements, the Commission reviewed *Electronic Gaming Monthly* and *Playstation 2 Magazine* over a four month period (June - September 2003). Although neither of these magazines have a readership that is 45% or more under 17, each has a sizeable readership among teens and older children.[186] The Commission's review found that ads for M-rated games made up 33% of the game ads placed in those magazines, even though M-rated games account for less than 10% of the game titles published in the last year. A breakout of the magazine ads by rating is presented here.



**Playstation 2 Magazine and Electronic Gaming Monthly Advertising Composition by Rating June – September 2003**

E Rated 31%

M Rated 33%

T Rated 36%

"Rating Pending" ads are grouped by the rating they later received.

In addition to the large percentage of M-rated game ads found in *Electronic Gaming Monthly* and *Playstation 2 Magazine*, the Commission reviewed *Tips & Tricks*, which has a 43% readership under 17. In the *Tips & Tricks* issues from June to September 2003, 13% of the ads were for M-rated games.[187]

As noted in the Commission's June 2002 Report, the publisher of *GamePro* instituted a change to its M-rated game ad placement policy: ads for M-rated games are not allowed in its subscription edition because of its large under-17 readership (59%). Nonetheless, the Commission's review of the subscription edition of *GamePro* found ads by five different game publishers for six games that ultimately were rated M. These eight ads all carried a Rating Pending icon; each placement would, nonetheless, violate the AdCode if the game maker were aware at the time of placement that the game would likely be rated M.[188] Ads appeared in *GamePro* for: UbiSoft's *XIII*; Rockstar's *Grand Theft Auto Vice City*; THQ's *Pride Fighting Championships*; Gotham Games' *The Great Escape* and *Celebrity Deathmatch*; and Eidos's *Backyard Wrestling*. This finding is in contrast to the finding in the Commission's June 2002 Report, where a review of the *GamePro* subscription issues did not find any ads for M-rated games.[189]

One additional concern relates to the placement of ads for T-rated games in publications with a large pre-teen readership, such as *Nintendo Power*. The AdCode requires that "Companies . . . not specifically target advertising for entertainment software products rated "Teen," "Mature," or "Adults Only" to consumers for whom the product is not rated as appropriate." The Commission's review of *Nintendo Power* found many ads for T-rated games (suitable for those 13 and over) with violent content descriptors, even though 43% of its readership is 12 and under and the median age of its readers is 13.

Although the AdCode does not define what percentage of magazine readership might put a publication off limits for ads for T-rated games, the ESRB indicates that ads for T-rated games should not appear in publications that are targeted to children under 13. This would appear to cover magazines like *Boys Life* (Cub Scout Edition), *Nickelodeon Magazine*, *Disney Adventures*, and *Sports Illustrated for Kids*. None of those magazines were reviewed for this Report, except for the December 2003 issue of *Sports Illustrated for Kids*. Sixty-six percent of *Sports Illustrated for Kids*' readership is under 13. Contrary to the ESRB policy, there were four T-rated game ads − TDK Interactive's *The Haunted Mansion*, Namco's *I-Ninja*, Sony Computer Entertainment's *JAK II*, and Crystal Dynamics' *Whiplash*. In 2002, the Children's Advertising Review Unit ("CARU") of the Council of Better Business Bureaus challenged ad placements in *Sports Illustrated for Kids* for a T-rated game, *Tom and Jerry in War of the Whiskers*. The advertiser, NewKidCo., agreed not to make similar ad placements in the future.[190]

### c. Internet advertising

In the September 2000 Report, the Commission found that nearly all of the game publishers studied had placed ads for M-rated games on websites popular with teens.[191] Marketing documents reviewed for this Report show that these practices continue. Nonetheless, none of these ads placements would violate the AdCode's requirement that ads for M-rated games not appear on websites with a 45% or greater under-17 audience.[192] The marketing plans do, however, show ad placements on websites where

youth visitors constitute one third or more of the audience. These sites include gamespot.com (33%), gamespy.com (36%), and IGN.com (40%).[193]

### d. Cross-promotions

The AdCode addresses cross-promotions and cross-sells. Cross-promotions are defined as "promotions that feature entertainment software products in conjunction with another company's brand, products or event." The AdCode prohibits such promotions for M-rated games with another company's event if it is reasonable to assume that the event will reach a "substantial audience of persons under 17 years old."[194] Cross-sells are defined as "ancillary or separate entertainment software products that are being sold or promoted in conjunction with a core entertainment software or hardware product."[195] Under its cross-sell requirements, the AdCode prohibits the use of a T-rated product to market a game that is M-rated.[196]

Two promotions involving video games occurred in 2003 that concern cross-promotions and cross-sells. The first, the Lollapalooza music festival, involved a cross-promotion with video games. Part of the festival's appeal was GameRiot, essentially a tent in the middle of the concert area that allowed festival attendees to play various video games and compete in game contests. The games available for play at GameRiot were of various ratings, and included several popular and violent M-rated games.[197] Although the festival was billed as targeting 14-34 year-olds, festival promoters made efforts to ensure that tournament players of the M-rated games were at least 17.

A second promotion involved a cross-sell where a video game was used to promote a movie. According to various reports, the T-rated *Enter the Matrix* video game contains a trailer for the R-rated movie, *Matrix Revolutions*.[198] The cross-sell prohibitions of the AdCode prohibit an industry member from using a T-rated game to promote an M-rated (17+) game. Here the promotion was for an R-rated (17+) movie. With the increasing cross-promotions across entertainment media, questions can be raised about whether members in one industry could use promotions of another industry's products to market to an audience that it could not directly reach in its own promotions.[199]

## B. Ratings and Reasons for Ratings in Advertising

### 1. Self-regulatory programs governing disclosure of ratings and reasons

In the September 2000 Report, the Commission recommended that all advertising contain both the rating and the reasons for that rating, also known as content descriptors. The ESA and the ESRB require that such information be included in print advertisements, and that the rating (but not the content descriptors) be included in televison and radio advertising. In addition, some game publishers have gone beyond the ESRB requirements to include content descriptors in television ads.[200] The ESRB also continues substantial efforts to educate parents about the rating system.

The ESRB has made several revisions to its Adcode since the Commission's June 2002 Report, including increasing the size of the rating icon in print ads, changing the size and design of the

requirements for descriptors on the back of packaging, and requiring age identifiers on the Mature and Adults Only icons (Mature icon now says "MATURE 17+").[201]

### 2. Advertising of rating information: current practices

#### a. Television advertising

For this Report, the Commission reviewed a selection of ads for M-rated games that aired in 2003. This review found that all but one of the 10 game ads included the AdCode's required voice-overs and rating icons. One 30-second ad incorrectly used the abbreviated voice-over intended for shorter, 15-second ads.[202] These results suggest game industry advertisers are generally complying with industry requirements for disclosing rating information in television advertising.

#### b. Print advertising

In its review of print ads in the June 2002 Report, the Commission found nearly all game advertisers either fully or substantially complied with industry requirements for rating disclosure, with 2% of ads containing a very small icon or descriptor and 1% missing or containing an incorrect icon or descriptor.[203]

For this Report, the Commission conducted a review of print ads running between June 2002 and October 2003[204] in the following six popular game enthusiast magazines: *100% Independent PlayStation 2 Magazine, GamePro, Computer Gaming World, Electronic Gaming Monthly, Tips & Tricks,* and *Nintendo Power.* Overall, 4% of the ads reviewed contained an icon that was sized substantially below the ESRB requirements and



another 2% of the ads contained a missing or incorrect icon or descriptor.[205]

A large majority of the major advertisers were in compliance with industry standards. Of the 52 companies that placed four or more ads during the eighteen-month review period, 39 adhered to the industry standards. The companies that did not comply placed at least some ads that had icons and descriptors that were incorrect or missing altogether.[206]

The Commission also reviewed retailer ads in these same publications from Best Buy, Electronics Boutique, Wal-Mart, Ebay, Amazon.com, CompUSA, Virgin Megastore, Kmart, and Pricegrabber.com. Each of the retailers displayed the rating icon on the cover art of the product packaging shown in

the ad. Two retailers, Wal-Mart and Best Buy, also included an ESRB icon in their ads showing the range of ratings displayed in the ad like "RP-T." None of the retailer ads displayed the games' content descriptors.

A review of free-standing Sunday newspaper inserts showed that most of the retailer ads included the game's rating on the clip art, although the rating was often hard to find and read. Target and Best Buy were the most consistent in displaying conspicuous or enlarged M ratings on M-rated games. In addition, Best Buy included the words "Mature Rating," and Target added "Rated M for Mature" next to the clip art for M-rated games. Toys "R" Us prominently displayed an explanation of each of the ratings on the page where the game ads appeared. Best Buy, Circuit City, and Toys "R" Us disclosed the ESRB toll-free phone number near advertisements for games, and Circuit City and Toys "R" Us included the address for the ESRB website. None of the retailer ads displayed the games' content descriptors.

### c.   Internet advertising

#### (1)  Game publisher websites

The Adcode requires a number of specific disclosures for game publishers' websites. If the publisher's advertisement is one-fourth of a screen page or larger, the rating icon and content descriptors must be visibly and prominently displayed directly on the advertisement.[207] If the publisher is selling the game online, both the rating icon and content descriptors must appear on any page where a game can be purchased.[208] For game "demos," the rating icon and content descriptors or text of rating information (*e.g.*, "ESRB Rating: EVERYONE with COMIC MISCHIEF") must be displayed adjacent to the name of the title on the page where the demo is accessed or on the page prior to download.[209]

Twenty game websites were surfed to determine their compliance with the ESRB's requirements.[210] Seventy-five percent of the websites displayed the ESRB rating and icon somewhere on the site, and 14 out of 15 displayed the rating on either the home page or teaser page. Two of the sites, *Hunter the Reckoning – Wayward* and *Silent Scope Complete*, still displayed an "RP" rating instead of the correct "M" rating. Nine of the 15 required the visitor to scroll down the screen to view the rating.

Nine of the game websites displayed content descriptors and two-thirds of those sites required the visitor to hold the cursor over the rating icon to view the content descriptors. Fourteen of the sites had a demo available either to view or to play. However, only three of the demos displayed the rating and content descriptors. The sites that did display the rating and descriptor were *Return to Castle Wolfenstein*, *SWAT: Global Strike Team* and *True Crime: Streets of LA*. The site for *Postal 2* contained a facetious "warning" statement about the content of the site.[211]

Twelve of the sites allowed the visitor to purchase the game, either at the site or through a third-party site. Eleven of the games that could be purchased displayed a rating on a page that the visitor had to view at some point during the purchase process of the game, but only three displayed content descriptors on a page that the visitor had to view during the purchase process. Forty percent of the game sites provided a link to the ESRB website.

The site for *X Files* was the only site that provided specific information about the ESRB ratings. None of the sites linked to parentalguide.org. The homepage for *Outlaw Volleyball* linked to a section of the site containing sexually explicit imagery, although there was a disclosure stating that this section may not be suitable for children under 18.

### (2) Retailer websites

For this Report, the Commission reviewed five retailer sites – Amazon.com, BestBuy.com, CircuitCity.com, EBGames.com, and GameStop.com – to see if they included rating information for five M-rated games.[212] Parents looking on major retailers' sites for a game's rating can usually find it easily. The rating was usually prominently placed near the box art. The retailers linked from the web page with information on the game to helpful information on the ESRB rating system – Circuit City also linked to the ESRB's website, www.esrb.org. Some of the sites also provide additional information, such as reviews or descriptions of the game, that may give more details about game play and content.

Aside from EBGames, however, only one site provided the ESRB content descriptors in addition to the rating – and then only for one of the five games checked. Also, while the rating itself was usually provided, the ratings given were not always accurate. One site erroneously categorized a game as not having been rated, when it was actually rated "Mature"; another site indicated that a Mature-rated game was rated "Teen." Two sites provided a rating in writing that was inconsistent with a rating icon visible on the game's box art. In one case the site indicated that the game had been rated "Mature," when the icon on the game's box art indicated "RP" (rating pending); in the other, the reverse situation occurred, as the site indicated the game had not yet been rated, when the icon on the box indicated that the game was rated "M." Similarly, the content descriptors that were provided were often different, though usually subtly, from the official content descriptors assigned by the ESRB. One game that the ESRB assigned an "intense violence" descriptor was instead described as containing "violence."

The EBGames site was exemplary in providing information about the rating system and the ratings process and in providing the content descriptors, both in text and in several instances in a screen shot of the back of the box art.

## C. Efforts to Enforce the Rating System at Point-of-Sale

The Commission's prior nationwide undercover surveys in 2000 and 2001 found that unaccompanied children ages 13-16 were able to buy M-rated games 85% (2000) and 78% (2001) of the time. The survey conducted for this Report shows continued, modest improvement. Sixty-nine percent of the children were able to purchase M-rated games, and more than half (56%) of the youngest shoppers – 13-year-olds – were able to buy an M-rated game. A breakout by age of the mystery shop results follows:

**FTC Mystery Shop Results by Age - Electronic Games**
**Q. Was the shopper able to make the purchase?**

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 44% | 23% | 34% | 15% | 31% |
| Yes | 56% | 77% | 66% | 85% | 69% |
| # of Shoppers | 68 | 47 | 62 | 48 | 225 |

Even among those retailers with programs in place to restrict sales,[213] 55% of the unaccompanied children were able to buy violent M-rated games. Although the results reflect improvement from the Commission's last survey two years ago and indicate that some retailers are enforcing policies to restrict sales, the numbers still fall short of what might be expected given the multi-year effort by the ESRB to encourage retailers to adopt restrictive sales policies. The trade group representing game retailers, the IEMA, indicated at the Workshop that the industry was considering additional steps and would have some announcement in the near future.[214] On December 8, 2003, the IEMA announced that all merchants belonging to the association will have in place by the "Holiday Season of 2004" a national carding program and an identification check process for all M-rated games.[215]

Such steps are important because M-rated games continue to be very popular with young teens, especially boys. A recent Gallup poll reported that 75% of boys 17 and under indicated that they had played at least one of the games in the *Grand Theft Auto* series.[216] Additional data from Gallup suggests as well that the younger respondents (those age 13 to 15) were more likely to say they had played a game in the series than the older respondents (age 16 or 17).[217] The latest *Video Game Report Card* issued by the National Institute on Media and the Family notes that its own survey, conducted in the summer of 2003, showed that 87% of tween and teen boys (and 46% of girls) say they have played M-rated games, and that most indicate that M-rated games are among their favorites.[218] According to industry data, nearly 40% of M-rated games purchased in 2002 were for children under 17.[219]

## D.  Product Packaging

To obtain a rating from the ESRB, companies must agree to place the assigned ESRB rating icon on the lower portion of the front of the package, and any content descriptors on the lower portion of the back of the package.[220] The size of the rating icon varies with the size of the box.[221] The rating icon also must be displayed legibly and prominently on game cartridges, compact discs, and smart cards, and on or in the game's manual or an accompanying insert.[222] In June 2003, the ESRB improved these requirements (enforcement of these new provisions began on September 30, 2003). The ESRB now requires that a game's content descriptors be placed in a rectangular box attached to the rating icon on the lower portion of the back of the product package.[223] This change enhances the readability and prominence of the descriptors. Still, the Commission is aware of research that suggests that most parents would prefer to have a game's content descriptors on the front of the package.

### E. Analysis of Current Industry Practices

As the Commission has recognized in its prior reports, the electronic game industry has adopted numerous standards that limit children's exposure to ads for Mature-rated products and require the disclosure of rating information in most forms of advertising. The industry is actively enforcing those standards and penalizing those companies found to be in noncompliance. Yet those standards permit, and, in fact, industry members continue to place, advertisements in television and print media with substantial youth audiences.

The industry, with the exception of some retailers, continues in nearly all instances to include in its advertising rating information that would be helpful for parents. Retailers, while doing a better job in restricting sales to children of Mature-rated products, still routinely make such sales to most buyers. These sales should diminish substantially, however, if promised industry improvements in adopting and enforcing restrictive sales policies are put into place by the end of this year.

## V. Conclusion

The Commission's review of marketing practices by the motion picture, music recording, and electronic game industries reveals that the movie and game industries continue to comply, for the most part, with their self-regulatory limits on ad placement, and that the music industry has made some progress in this area as well. In addition, the industries are disclosing rating information in most forms of advertising, and generally are doing so in a clear and conspicuous manner; this practice is not widespread among retailers, however.

Nonetheless, the Commission finds that all three industries continue to advertise violent R-rated movies, explicit-content labeled recordings, and M-rated games in media with large teen audiences. The Commission has noted this practice in earlier reports.[224] In addition, despite the existence of restrictive policies among some retailers, the Commission continues to find that teens can purchase rated or labeled entertainment products at a significant number of stores and theaters. The movie theater industry has made real progress in this area, and to a lesser extent so have game retailers, compared to the Commission's prior "mystery shops," but there remains room for improvement across the board.

The Commission recommends that all three industries continue to improve compliance with existing ad placement guidelines and rating information practices, with particular attention to avoiding advertising in venues popular with under-17 audiences, regardless of whether those audiences reach or exceed 35%.[225] All three industries should also consider developing "best practices" to avoid advertising in venues popular with teen audiences, such as recommending that promotions for R-rated films not take place in venues likely to attract significant numbers of young teens or that advertisements not be placed on websites that have a substantial teen audience.

The Commission also recommends that the industries continue to improve their rating information disclosure practices. Although there has been notable progress in both the frequency and legibility of rating information disclosures, there remains room for improvement in both areas. With respect to

retailers, both in-store and online, the Commission encourages better disclosure of ratings and reasons in advertising, and more widespread implementation and enforcement of sales policies restricting children's access to restricted or labeled entertainment media, and, in particular, to R-rated DVDs and home videos, music with a parental advisory, and M-rated games.[226] It is particularly noteworthy that although movie theaters are doing much to restrict children's access to R-rated motion pictures, DVD retailers of the same movies appear to be doing little to prevent such sales.

Currently, the movie industry typically places the movie's rating and ratings reasons on the back of each video and DVD. In addition, although the electronic game industry does place the game's rating on the front of product packaging, it still puts the game's content descriptors on the back. Having both industries consider placing all of the rating information prominently on the front of product packaging would not only make that information more visible for parents and children, it would also assist retail store clerks who might be enforcing a policy not to sell R-rated videos or DVDs and M-rated video games to children. Moreover, the Commission repeats the recommendation it has made in prior reports that the music industry consider providing more information on product packaging and in advertising as to why a particular recording has been labeled with a parental advisory.[227] BMG's use of an enhanced label that includes such information provides a good model for others to follow.

Further, as directed by Congress, the Commission will work with video game publishers and retailers toward ensuring that games rated T and M are not marketed or sold to children in a manner inconsistent with the rating's age guideline. The Commission also will undertake efforts to educate parents about the content included in T and M games. Finally, the Commission has made its toll-free consumer complaint line and its website complaint form available for consumer complaints regarding media violence, and is publicizing to consumers the availability of these complaint mechanisms. Following implementation of these steps and a one-year period of monitoring industry practices and consumer concerns, the Commission believes that a follow-up report would be appropriate.

Because of First Amendment issues, the Commission supports private sector initiatives by industry and individual companies to implement these suggestions. All three industries have taken positive steps in response to many of the Commission's past recommendations. Nonetheless, more progress is needed in several important areas, and the Commission will work with industry and parent groups to encourage such change.

# Endnotes

1.  See June 2002 Report at 1, nn.1-2.

2.  The MPAA's system designates movies with one of the following ratings: **G** (General Audiences. All ages admitted); **PG** (Parental Guidance Suggested. Some material may not be suitable for children); **PG-13** (Parents Strongly Cautioned. Some material may be inappropriate for children under 13); **R** (Restricted. Under 17 requires accompanying parent or adult guardian); and **NC-17** (No one 17 and under admitted). Each film assigned a rating other than G also receives a brief explanation for the film's rating, *e.g.*, "Rated R for terror, violence and language," or "Rated PG-13 for intense sci-fi violence, some sexuality and brief nudity."

    The ESRB's system designates electronic games with one of the following ratings: **EC** (Early Childhood. Suitable for ages 3 and older. Contains no material that parents would find inappropriate); **E** (Everyone. Suitable for persons ages 6 and older. Titles in this category may contain minimal violence, some comic mischief and/or mild language); **T** (Teen. Suitable for persons ages 13 and older. May contain violent content, mild or strong language, and/or suggestive themes); **M** (Mature. Suitable for persons ages 17 and older. Titles in this category may contain mature sexual themes, more intense violence and/or strong language); **AO** (Adults Only. Suitable only for adults. Titles in this category may include graphic depictions of sex and/or violence. Adults Only products are not intended for persons under the age of 18.); and **RP** (Rating Pending. As in the motion picture rating system, a descriptive phrase may be assigned to the letter rating to indicate content that might be of concern to parents, such as language, sexual themes, or violence. Current descriptors reflecting violent content include "Animated Blood," "Blood," "Blood and Gore," "Cartoon Violence," "Comic Mischief," "Fantasy Violence," "Intense Violence," "Mild Violence," "Sexual Violence," and "Violence."

    The RIAA encourages its members to use a parental advisory label, a black and white label that says "Parental Advisory, Explicit Content."

    RIAA's labeling program does not provide reasons for the advisory label or "content descriptors" indicating the nature or the amount of the explicit content (*e.g.*, strong language or graphic references to violence, sex, or substance abuse). Instead, one advisory covers a broad spectrum of content, including violence and/or sex. Also, it is not an age-based system, and the label does not specify the age groups for which an explicit-content labeled recording may be inappropriate.

3.  The Commission's prior follow-up reports described the following industry-wide initiatives:

    *   The MPAA's 12-point initiative promised: to avoid running trailers for violent R-rated films before G-rated feature films; to review policies regarding marketing violent R-rated movies to children; to avoid using children in research for R-rated films; to install compliance officers to review their marketing practices; to encourage movie theaters to enforce the R-rating restriction; and to take steps to include the reasons for ratings in print advertisements, on websites, and in home videos. The MPAA member studios – the Walt Disney Company, Metro-Goldwyn-Mayer, Paramount Pictures, Sony Pictures Entertainment, Twentieth Century Fox Film Corp., Universal City Studios, and Warner Bros. – plus Dreamworks SKG, which is not an MPAA member, signed on to the initiative. *See* Motion Picture Association of America, *A Response to the FTC Report* (Sept. 26, 2000).

    *   NATO's 12-point initiative: reaffirmed its ID-check policy for R and NC-17 films; promised not to show trailers advertising R films before any G or PG films, and only before PG-13 films if consistent in tone and content with the feature film; and committed to appoint an executive compliance officer and seek additional ways to disseminate rating information. *See* National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission).

    *   The RIAA's revised Parental Advisory Labeling system recommended the use of: broad standards for making the explicit-content labeling decisions and guidelines for placing the advisory in print advertising and on retail websites. In July 2001, the RIAA announced that its members supported placing the advisory label in *all* advertising for explicit content recordings, as well as increasing efforts to provide parents with information about the labeling system. *See* Testimony of Hilary B. Rosen, President and CEO, Recording Industry Association of America, House Subcommittee on Telecommunications and the Internet (July 20, 2001).

    *   The IDSA's revised Advertising Code of Conduct ("AdCode") limited ad placements in magazines, television shows, and Internet sites popular with teens. The Entertainment Software Rating Board ("ESRB") stepped up its enforcement of the AdCode and began to develop additional sanctions for repeat violators of its provisions. *See*

Testimony of Douglas Lowenstein, President, Interactive Digital Software Association, House Subcommittee on Telecommunications and the Internet (July 20, 2001).

4.  The Commission sent requests to Warner Bros., Twentieth Century Fox, and Sony Pictures Entertainment. These studios were selected because, during the period of review, they were among those that released the most films rated R based, at least in part, on violent content. Each studio cooperated in supplying its marketing materials.

5.  These films were selected after taking into account factors such as the extent of the marketing of the film during the review period, the amount the film grossed, and whether the film had been released on DVD/home video.

6.  Because the recording companies do not keep track of which recordings received the parental advisory label due to violent content, as opposed to some other explicit content, the Commission requested materials for recordings labeled for any reason due to their "explicit" content (which could include strong language and/or depictions of sex, violence, or substance use). The Commission did not attempt to evaluate which recordings contained violent lyrics. Recordings were selected based on their appearance as a top-selling album on "The Billboard 200" chart for the week of May 3, 2003.

7.  The Commission sent requests to Sony Music Entertainment, Inc., Universal Music Group, and Warner Music Group. The companies were selected on the basis of industry data showing that they were the largest distributors of explicit-content labeled music during the review period. Each company cooperated in supplying materials.

8.  The Commission sent requests to Activision, Inc., Capcom Entertainment, Inc., and Take-Two Interactive, Inc. The companies were selected on the basis of their size and the extent of marketing of M-rated games during the review period. Each company cooperated in supplying its marketing materials.

9.  The Commission selected all the games rated M for violence that were marketed in the review period and not previously reviewed by the Commission.

10.  September 2000 Report at 13-14.

11.  *See* Motion Picture Association of America, *A Response to the FTC Report*, Sept. 26, 2000. Not every movie studio is an MPAA member. Studios who subscribed to the MPAA's 12-Point Initiatives are: Walt Disney Company, Dreamworks SKG, Metro-Goldwyn-Mayer, Paramount Pictures, Sony Pictures Entertainment, Twentieth Century Fox Film Corporation, Universal Studios, and Warner Bros.

12.  *Id.*

13.  *Id.* The studios further committed not to attach trailers for films rated R for violence to G-rated movies released on videocassette or on DVD. *Id.*

14.  *Marketing Violence to Children II: Hearing Before the Senate Comm. on Commerce, Science and Transp.*, 106th Cong. (Sept. 27, 2000), Fed. New Serv., LEXIS, Legis Library, Hearng [sic] File.

15.  National Association of Theatre Owners, *Response of the National Association of Theatre Owners (NATO) to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission). In addition, with respect to trailers for R-rated films shown in connection with PG-13-rated features, NATO members also pledged to "examine the trailers to ensure that their tone and content are consistent with the feature film." *Id.*

16.  September 2000 Report at 14. Studio documents reviewed for this Report, including film audience "exit" surveys, confirmed that television commercials remain one of the most-cited sources of awareness of a film. MPAA member studios spent just over 40% of their total advertising costs for theatrical releases on network and spot television alone in 2002. *See* Motion Picture Association Worldwide Market Research, *U.S. Entertainment Industry: 2002 MPA Market Statistics* at 21 (citing MPAA).

17.  *Marketing Violence to Children II: Hearing Before the Senate Comm. on Commerce, Science and Transp.*, 106th Cong. (Sept. 27, 2000), Fed. New Serv., LEXIS, Legis Library, Hearng [sic] File.

18.  One studio, for example, pledged to adhere to network standards and practices, and also not to advertise films rated R for violence on certain programs, channels, and/or time periods, including Saturday morning children's cartoons, MTV before 7:00 p.m., Nickelodeon, and the Cartoon Network.

Many television networks have their own advertising standards or guidelines, which may affect studios' marketing plans for R-rated films. For example, according to documents produced by the studios, some networks allow advertising for R-rated films only during certain specified times of the day (*e.g.*, weekday "daytime" or after 9:00 p.m.) or during certain types of programming (*e.g.*, sports). Other networks prohibit ads for R-rated films during any "family programming," "children's programs," or any program with an anticipated under-17 audience of 35% or more.

19. The Commission found, nevertheless, that studios continued to place some ads for those films on some of the programs most watched by teens. June 2002 Report at 3.

20. The Commission purchased data from Video Monitoring Service ("VMS"), which monitored certain shows for an eight-week period between May and July 2003. These shows included programs with a significant under-17 audience share, and, in some cases, with an under-17 audience share over 35%. *See* Appendix C for demographic information pertaining to these shows.

   The network programs monitored were: *7th Heaven, The Bernie Mac Show, Cedric the Entertainer, Gilmore Girls, King of the Hill, Malcolm in the Middle, Oliver Beene, The Simpsons, Smallville,* and *WWE Smackdown.* The cable shows monitored were: on BET, *Rap City* and *106th & Park,* and on MTV, *Direct Effect* and *Total Request Live.* For syndicated shows, the Commission monitored the following programs during the 5:00 p.m. to 7:30 p.m. time slots on Mondays in Los Angeles and New York: *Drew Carey, The Fresh Prince of Bel Air, The Hughleys, The Jamie Foxx Show, King of the Hill, Sabrina the Teenage Witch, The Simpsons,* and *The Steve Harvey Show.* The Commission ultimately did not count ad placements occurring on *Drew Carey, The Fresh Prince of Bel Air,* and *The Jamie Foxx Show* because the first two had less than 23% under-17 audiences, and demographic data was not obtained for *Jamie Foxx.*

21. For purposes of this Report, *WWE Smackdown* and *WWF Smackdown* refer to the same television program; the name was changed.

22. Ads for Warner Bros.' *The Matrix Reloaded* and *Terminator 3: Rise of the Machines* aired on the monitored programs a total of 21 times; Twentieth Century Fox's *Wrong Turn* was advertised 19 times and its subsidiary Fox Searchlight's *28 Days Later* 10 times; and Columbia (a subsidiary of Sony Pictures Entertainment) advertised *Bad Boys 2, Identity,* and *Gigli* a total of 9 times.

23. Advertising for home video and DVD release is substantial. Recent press reports have cited figures ranging from $641 million to $800 million in 2002, an increase of 63-72% over 2001. *See* "See Spots Run: Ads for DVD Proliferate," VB in DEPTH (June 13, 2003), *available at* www.videobusiness.com/article.asp?articleID=5637&query=see+spots+run&c atType=NEWS. One studio executive recently stated that 50% of a movie's revenues derive from DVD and home video release, and DVD sales reportedly have exceeded box office revenues for the first half of 2003 – $4.8 billion to $4.4 billion. "Pirates of the Internet," CBSNEWS.com (Nov. 2, 2003), www.cbsnews.com/stories/2003/10/31/60minutes/ main581153.shtml; Hugh Hart, "It's 'Pie' Taken to the Nth Degree," *Los Angeles Times* (Jul. 29, 2003).

24. The Commission obtained information as to the date, time, station, and program on which advertisements for violent R-rated films or DVD/home videos first aired during the time period June 2002 through early September 2003. *See* Appendix C for a full description of the first airing monitoring.

25. The Parents Television Council is a non-profit research and education organization concerned with the content of entertainment programming. The Council conducts its own ongoing monitoring program and tracks, among other things, advertisements for R-rated films that air on various networks and cable channels during prime time. As a courtesy, the Council made its information available to the Commission. The Commission examined the Council's data on advertisements for R-rated films that aired between January and August 2003.

26. Commercials for violent R-rated films airing on programs with substantial youth audiences included, for example: Fox's *28 Days Later* on *Smallville;* Fox's *Wrong Turn* on *Smallville* and *Cedric the Entertainer;* Sony Picture's *Basic* on *Smallville, The Bernie Mac Show,* and *Cedric the Entertainer;* Warner Bros.' *Cradle 2 the Grave* on *Cedric the Entertainer, Smallville,* and *The Bernie Mac Show;* Sony Picture's *Bad Boys II* on *Smallville;* New Line Cinema's *Final Destination 2* on *Smallville;* Columbia Pictures' *Gigli* on *Smallville;* and Universal's *The Life of David Gale* on *Smallville* and *The Bernie Mac Show.*

   Commercials promoting the DVD/home video release of R-rated films that aired on programs with substantial youth audiences included Universal's *8 Mile* on *The Bernie Mac Show* and *Smallville,* and Warner Bros.' *Cradle 2 the Grave* on *Smallville.*

27. As noted previously, the Commission requested documents relating to three R-rated and one PG-13-rated film released by each studio, as well as documents relating generally to the studios' marketing practices.

28. All three studios signed on to the MPAA's 12-point Initiatives. In addition, one studio committed to avoid advertising its R-rated films during any time period or program which has an audience share of children under 17 exceeding 35%. Another studio implemented a policy not to advertise on any broadcast network programs with a 35% or higher anticipated under-17 audience size. Both of these studios state that they conduct ongoing reviews of audience demographics for relevant programming to ensure compliance. The third studio adheres to network standards and has further pledged not to advertise during specified times on certain channels, and excludes some channels altogether.

29. Documents produced by the studio indicated that advertising on BET was "unacceptable" during the time periods those programs aired. In addition, Nielsen data indicates that both of these programs garner under-17 audiences well above 35%. *See* Appendix C. The studio also appears to have advertised these films on MTV during times that attract significant under-17 audiences.

30. The television shows included *Smallville*, *Buffy the Vampire Slayer*, *Dawson's Creek*, and *Malcolm in the Middle*.

Studio documents and first airing data also revealed that a few ads for violent, PG-13-rated films were placed on television programming directed at or appealing to youth audiences under 13. For example, one studio advertised a PG-13-rated film on cable channels such as the Cartoon Network, ABC Family, and Nickelodeon, which are popular with very young audiences. In addition, ads for PG-13-rated films first aired on programs such as *Scooby Doo*, *Pokemon*, and *The Grim Adventures of Billy and Mandy* – shows with substantial or majority 2-11 audiences. Although the motion picture industry's self-regulatory code does not directly address the marketing of PG-13-rated films to children under 13 – nor does it restrict children under 13 from attending such films at theaters – the industry's PG-13 rating signifies "Parents Strongly Cautioned – Some material may be inappropriate for children under 13."

31. September 2000 Report at 17-18.

32. *E.g.*, December 2001 Report at 5-6 (no ads for R-rated films in magazines surveyed); June 2002 Report at 4 (same).

33. The Commission monitored: *100% Independent Playstation 2 Magazine*, *CosmoGirl!*, *Electronic Gaming Monthly*, *GamePro*, *Metal Edge*, *Nintendo Power*, *Right On!*, *Seventeen*, *Teen People*, *Thrasher*, *Tips & Tricks*, *World Wrestling Entertainment Magazine* and *YM*. *See* Appendix C for demographic data pertaining to these magazines.

34. Data in industry documents indicates that the under-17 audience share may currently be between 30% and 40%. *See* Appendix C at C-4.

35. However, in listing the "highlights" of its national publicity campaigns, one of the studios cited feature stories, previews, and other mentions of two of its R-rated films in some youth-oriented magazines that it had listed as not appropriate for advertising such films. It is not clear from the documents whether such stories and other mentions resulted from the studio's publicity campaigns or from the magazines' own editorial decisions.

36. September 2000 Report at 16-17.

37. *Id.* Under this policy, a trailer for an R-rated film could be shown before a feature rated R or PG-13, and a trailer for a PG-13-rated film could be shown before a feature rated R, PG-13, or PG.

38. September 2000 Report at 54.

39. Studios further committed not to attach trailers for films rated R for violence to G-rated movies released on videocassettes or to DVDs containing G-rated movies. Motion Picture Association of America, *A Response to the FTC Report*, Sept. 26, 2000.

40. Some studios took additional steps, such as sending letters to theater owners urging them to improve enforcement of the rating system. One of those studios also implemented a program whereby each trailer shipped to an exhibitor bears a sticker indicating the film's rating and, for films rated R, requesting that the theater not show the trailer in connection with feature films rated G or PG.

41. National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission).

42. Motion picture exhibitors ultimately determine which trailers run before feature films, but studios can influence those determinations. For example, a studio can physically "attach" a trailer to a specific film, or the studio can send a trailer to a theater with a request that the theater show the trailer before a particular feature. Two of the studios provided extensive lists of all feature films to which trailers for the studied R-rated films were attached or requested to be shown. The third studio did not provide such detailed information, but the documents produced did not indicate that trailers for the R-rated films, once the films were rated, were shown before features rated PG or G.

43. Documents indicated that a trailer for one film, not yet rated but ultimately rated R, was shown before the PG-rated film *Star Wars Episode II: Attack of the Clones*. It is not clear whether the studio requested that the trailer be shown or the theater decided to show it.

44. A trailer for one R-rated film was attached to the home video for the PG-rated film *Chasing Papi*.

45. September 2000 Report at 17.

46.  December 2001 Report at 6-7.  The Commission's April 2001 and June 2002 Reports did not review promotional activities.

47.  All three studios also advertised online for the PG-13 rated films studied.

48.  One of the studios has a policy prohibiting advertising for films rated R for violence on any online sites "specifically targeted for children or teens."

49.  The Commission reviewed Nielsen//NetRatings demographic data on these and several other websites on which the studios, electronic game publishers, and music recording companies advertised products rated or labeled as potentially inappropriate for children.  A number of these sites had youth audiences over 35%, and others had between 25% and 35%.  See Appendix C for a list of these sites and demographic information pertaining to each.  In this regard, the Commission notes that documents the studios produced indicate that some Internet portals – including ones on which the studios also advertised – have implemented advertising guidelines that apply to motion pictures advertisements, which may affect advertising in this medium.

50.  For example, the studios sent letters to theater owners, newspapers, media agencies, and others encouraging those third parties to increase compliance with the MPAA rating system and applicable advertising guidelines.  One studio adopted a policy prohibiting actor appearances and interviews on certain youth-oriented television programming, and prohibiting the provision of publicity material to certain youth-oriented publications.  In addition, for R-rated films, the studios stopped testing television ads and trailers, and stopped conducting focus groups, on children under 17 who are not accompanied by a parent or adult guardian.  Prior to the September 2000 Report, studios had conducted research for R-rated films, such as focus groups and trailer tests, on children under 17.  See September 2000 Report at 14.

Documents reviewed for this Report revealed that one studio tested a television ad for an unrated film, which was ultimately rated PG-13, on children 8-11 years old; according to the documents, the film – a sequel to a PG-13 film – was expected to be rated either PG or PG-13.

51.  Both the film and video game were released on the same day, and the game was marketed as one component of "the most integrated entertainment experience to date."  Other components of the "multi-media experience" included a soundtrack, a website, and a PG-13-rated DVD of animated "shorts" inspired by the R-rated film.

The studio also granted licenses for figurines and posters for sale in toy stores, including KB Toys and Toys "R" Us, among other distribution channels.  The figurines were intended to be sold at toy stores.  The studio documents suggest that steps were taken to ensure that the movie-related products be sold only through segregated adult sections of the stores, not co-mingled with children's toys, and that the products be labeled as not for children under 17.

52.  See September 2000 Report at 10.

53.  Id. at 55.

54.  Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

55.  2002 MPAA Advertising Handbook at 5, 23.  Some studios further committed to include rating reasons in magazine advertisements of a certain size.  Films rated G are not assigned rating reasons.  Id. at 5.

56.  Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

57.  National Association of Theatre Owners, Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission (Nov. 2, 2000) (on file with the Commission).

58.  See, e.g., June 2002 Report at 4-6, 9-10; December 2001 Report at 9-12.

59.  2002 MPAA Advertising Handbook at 21.

60.  Television ads for all three PG-13 movies studied also presented the rating both visually and in audio.  Ads for two of the three films also displayed the rating reasons visually, but for the third film only two of approximately 25 ads displayed the rating reasons.

61.  Motion Picture Association of America, A Response to the FTC Report, Sept. 26, 2000.

62.  These ads included films that had violence as a rating reason, as well as films that did not.

63.  The Commission reviewed ads placed in the magazines discussed in the Advertising Placement section, see note 33 supra, as well as Computer Gaming World, Rolling Stone, Spin, Vibe, and Wizard.  The Commission also examined ads in the following six general circulation newspapers: Chicago Sun-Times, Chicago Tribune, Los Angeles Times, New York Daily News, New York Post, and New York Times.  See Appendix C.  The advertisements reviewed were at least

five inches (excluding space for theater listings), which triggers the MPAA's requirement to disclose rating information. *See* 2002 MPAA Advertising Handbook at 5.

64. *See* June 2002 Report at 9-10.

65. Less than ten percent of the ads (111) were found without a rating or rating reasons, or had a rating but not the reasons for the rating. A number of these ads were for movies distributed by MPAA member studios or their subsidiaries, including Fox Searchlight's *Bend It Like Beckham*.

66. Of the 1,700 newspaper ads reviewed, 1,597 contained both a rating and rating reasons, and 1,380 displayed that information clearly.

67. There were 227 ads that fell into these two categories.

68. *See* June 2002 Report at 10.

69. *See* Appendix C for a complete list of, and demographic information for, the magazines reviewed.

70. The Commission reviewed free-standing inserts from eight retailers – Amazon, Best Buy, Circuit City, CompUSA, Kmart, Target, Tower, and Toys "R" Us – placed in the Sunday edition of two major newspapers – the *Los Angeles Times* and *The Washington Post* – over the 18-month period between June 2002 and September 2003.

71. *See, e.g.,* June 2002 Report at 10.

72. Toys "R" Us did not advertise any R-rated DVDs.

73. Radio ads for the two of the PG-13 movies studied also conveyed the film's rating but not the reasons. No radio ads were provided for the third PG-13-rated film.

74. June 2002 Report at 5-6.

75. The Commission examined the following 20 motion picture websites in August 2003: *28 Days Later, Bad Boys II, Better Luck Tomorrow, Buffalo Soldiers, City of Ghosts, The Dancer Upstairs, Freddy vs. Jason, Gigli, The Hard Word, House of 1000 Corpses, Identity, Jeepers Creepers 2, The Magdalene Sisters, A Man Apart, The Matrix Reloaded, Open Range, Phone Booth, Swimming Pool, Terminator 3: Rise of the Machines,* and *Wrong Turn.* The movies were selected based on the following criteria: they had a release date between April 1, 2003 and August 31, 2003, received an R-rating, and had a rating reason that involved violence. The studios that released these films included MPAA members as well as non-MPAA members.

76. *See* Appendix D for more detailed results of the survey.

77. The site for Fox's *Wrong Turn* had a prominent rating reasons display. Before a visitor could enter the website, a pop-up screen with a large warning appeared, reading: "Warning! Strong violence and gore. Some language and drug use. Under 17 requires an accompanying parent or guardian." *Wrong Turn,* at www.wrongturnmovie.com (visited Aug.7, 2003). The R rating was not displayed, however. The *Wrong Turn* website allowed visitors to view a red-banded trailer (*i.e.,* approved for adult audiences only) for the film; it was the only website examined that contained such a trailer. Before a visitor could view the trailer, a box appeared asking if the viewer is over 17. If the viewer checked the box, a pop-up appeared stating again that the viewer must be 17 to view the trailer.

78. The official website for Focus Feature's *Swimming Pool* did not link to any of the three rating information sites. The sites for three other films – Buena Vista's *Open Range* and New Line Cinema's *A Man Apart* and *Freddy v. Jason* – linked to filmratings.com and parentalguide.org, but not to MPAA.org.

79. The rating information practices of three movie ticket websites are reviewed in Section II.B.2.c(2), below.

80. Nineteen of the sites offered trailers that were approved for all audiences. The site for Fox's *Wrong Turn* offered a red-banded trailer, which is approved only for audiences 17 and older. *See* note 77, *supra.*

81. The Commission examined websites for the following motion picture theater chains: AMC, Carmike, Century Theatres, Cinemark, Clearview Cinemas, GKC Theaters, Goodrich Quality Theaters, Kerasotes Theatres, Landmark Theatres, Loews Cineplex, Marcus Theatres, National Amusement, Regal Cinemas, United Artists, and Wallace Theater Corp. With the exception of AMC, these theater chains are members of the NATO. The online movie ticket sites examined were movietickets.com, fandango.com, and moviefone.com. The Commission conducted its review of the theater and ticket sites in September and October 2003. *See* Appendix D for more detailed results of the survey.

82. Some of the sites provided rating reason information through a third-party site, to which a visitor was linked after clicking on a movie name.

83. The December 2001 and June 2002 Reports found that 67% and 69% of sites provided detailed information about the rating system, respectively, and 56% and 44% linked to at least one rating website. December 2001 Report at 12; June 2002 Report at 6-7.

84. Cinemark's website offered tickets for sale directly through the site. The other nine theater sites linked to one or more of the following third-party ticket vendor sites: movietickets.com, fandango.com, and moviefone.com.

85. The Commission examined the following retailer websites in September and October 2003: Amazon.com, BestBuy.com, CircuitCity.com, SamGoody.com, and TowerRecords.com. The Commission surveyed these same sites in connection with the June 2002 Report. *See* June 2002 Report at 7-8. In this instance, the Commission reviewed the sites' rating information practices pertaining to the following movies rated R at least in part for violence: *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition.* The Commission notes that, since the surf was conducted, information about DVDs available from Sam Goody and Circuit City sites is now provided in a common format by a third-party site. *See* Appendix D for more detailed results of the survey.

86. All five of the sites required a form of payment, such as a credit card, to which many children may not have access.

87. The rental sites were Netflix.com, Filmcaddy.com, and Movielink.com. The Commission reviewed practices pertaining to the same five movies reviewed for DVD retailer sites – *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition* – in September and October 2003. *See* Appendix D for more detailed results of the survey.

88. These sites are Netflix.com and Filmcaddy.com. Upon signing up for these services and paying a monthly membership fee, consumers can rent a number of DVDs at one time. These services are beginning to grow: Netflix, for example, recently reported that it has over 1 million subscribers. *See* "Netflix Subscribers Rise 74 Percent," Reuters (Oct. 1, 2003), www.reuters.com/newsArticle.jhtml?type=internetNews&storyID=3543321.

89. This site is Movielink.com, a joint venture by major motion picture studios Metro-Goldwyn-Mayer Studios, Paramount Pictures, Sony Pictures Entertainment, Universal Studios, and Warner Bros. Studios. Once a film is downloaded from Movielink, a user has 24 hours to view it.

90. September 2000 Report at 20; December 2001 Report at 13.

91. Specifically, the MPAA member studios pledged to "strongly encourage theater owners and video retailers to improve compliance with the rating system." Motion Picture Association of America, *A Response to the FTC Report,* Sept. 26, 2000. Members of the NATO promised to take steps to reaffirm NATO's existing ID-check policy for R-rated films, which was announced in 1999. *See* National Association of Theatre Owners, *Response of the National Association of Theatre Owners to the Report and Recommendations of the Federal Trade Commission* (Nov. 2, 2000) (on file with the Commission); comments of John Fithian, President, National Association of Theatre Owners, at Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 176-77 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

The VSDA had an existing "Pledge to Parents" program, through which participating retailers committed, among other things, not to rent or sell R-rated movies to children under 17 without parental consent. *See* Statement of the Video Software Dealers Association, Senate Comm. on Commerce, Science and Transp. (Mar. 21, 2000) (on file with the Commission). Finally, some studios sent letters to individual theater owners and video retailers urging them to improve compliance with the rating system by not selling tickets or granting admission to R-rated movies, or selling or renting R-rated videos or DVDs, to any persons under 17 not accompanied by a parent or adult guardian.

92. *See* Appendix B for a discussion of the survey methodology and results.

93. *Compare* December 2001 Report at 13.

94. *Id.*

95. In all, the Commission sought information from nine retailers: Best Buy Co., Inc., Target Corporation, Wal-Mart Stores, Inc., Blockbuster, Inc., Circuit City Stores, Inc., GameStop Corp., Musicland Group, Inc., Trans World Entertainment Corp., and Wherehouse Entertainment, Inc. (Wherehouse Entertainment subsequently was acquired by Trans World Entertainment.) These companies were selected based on the following criteria: each retailer sells at least one type of restricted product R-rated movies, Parental Advisory-labeled recordings, or M-rated video games) and each has a large number of retail outlets. The Commission requested information about the companies' policies affecting the sale or rental of restricted products, and about efforts to inform and educate parents regarding the rating and labeling systems for movies, music, and electronic games.

96. *See* RIAA Parental Advisory Program Guidelines, effective April 1, 2002, at 2.