97. In response to the Commission's "continued criticism of the recording industry for advertising to teens," the RIAA has noted that most recordings are available in an "edited version" and that recording companies advertise these edited versions "as well as and along with" the versions carrying the parental advisory label. Letter from Hilary Rosen, President and CEO, Recording Industry Association of America, to the Honorable Timothy J. Muris, Chairman, Federal Trade Commission (Apr. 26, 2002) (on file with the Commission). During testimony, Ms. Rosen explained, "[s]ince much of the reason that music marketing is different from other media is the existence of edited versions of the same product which is sold with explicit versions, we have significantly increased awareness of edited versions of these recordings." Statement of Hilary B. Rosen, Chairman and CEO, Recording Industry Association of America, House Committee on Telecommunications and the Internet, "Recording Industry Marketing Practices: A Check-Up," (Oct. 9, 2002) at 18.

The RIAA guidelines note that "[i]f an edited version is also available for sale, consumer advertising may also contain language indicating such a version of the recording is available." *See* RIAA Parental Advisory Program Guidelines at 5.

98. *See* note 7, *supra.*

99. For all the recordings reviewed, marketing plans or other documents indicated that the music companies would place paid advertising on one or all of these cable channels.

100. *See* Appendix C for demographic information for these programs.

101. Although cable music channels may air edited versions of some of these music videos, the marketing materials for explicit-labeled recordings frequently stress the importance of placing music videos on these channels. As noted in past Commission reports, these videos, even if edited to remove some explicit content, continue to play a key role in promoting the sale of explicit recordings to an under-17 audience. *See* December 2001 Report at 15 n.84.

102. The Commission purchased this data from VMS. *See* Appendix C for a list of cable shows monitored by VMS.

103. The five major recording companies are: Universal Music Group ("UMG"), Warner Music Group ("WMG"), Sony Music Entertainment ("SME"), EMI Recorded Music ("EMI"), and BMG Entertainment ("BMG").

104. Five of these recordings were associated with independent labels while the remaining eight were associated with UMG, WMG, SME or BMG. UMG ran ads for: *Mississippi: The Album* on *106th & Park* and *Rap City*; *Joe Budden* on *106th & Park, Rap City, Total Request Live* and *Direct Effect*; and *2 Fast 2 Furious Soundtrack* on *Rap City* and *Direct Effect.* WMG ran ads for *14 Shades of Grey* on *Total Request Live* and *Direct Effect.* SME ran ads for *Da Unbreakables* on *Rap City* and for *Streetsweeper* on *106th & Park* and *Rap City.* BMG ran an ad for *Best of UGK* on *Rap City* and one ad for *Bittersweet* on *106th & Park.* EMI ran no ads for explicit-content recordings during the monitoring time period.

Independent record companies (Koch, FUBU, Ready! Set! Go!, and Landspeed) ran ads for *All or Nothing, Murda Mix Tape, Firestarr, Movement* and *Headphone Masterpiece* on *106th & Park, Rap City,* and *Total Request Live.*

105. These data provide information about the first time a television ad is aired and was obtained from VMS.

106. UMG ran ads on *106th & Park* for *From Me to You, A Gangster and a Gentleman, Aziatic, Better Dayz, Diplomatic Immunity, Electric Circus, From Tha Roota to Tha Toota, Legend of the Liquid Sword, Get Rich or Die Tryin', Ghetto Heisman, Girl Interrupted, God's Favorite, Mississippi: The Album, Nellyville, Philadelphia Freeway, Power in Numbers, The Blueprint 2: The Gift & The Curse, The Fix, The Last Temptation, Truthfully Speaking,* and *Snoop Dogg Presents: Doggy Style All-Stars – Welcome to Tha House Vol. 1.* SME ran ads on *106th & Park* for *10 Years and Gunnin* and *God's Son.* BMG ran three ads on *106th & Park* for *Lord Willin Loud Records: The Early Daze,* and *Breaking News.* WMG ran ads on *106th & Park* for *Animal House, Redemption, Street Dreams,* and *Under Construction.* EMI ran one ad on *106th & Park* for *The Ownerz.*

107. UMG ran an ad for *Get Rich or Die Tryin'* on *Direct Effect.*

108. BMG ran ads for *Insomniacs Dream* and *It Ain't Safe No More,* SME ran an ad for *Steal This Album!,* and EMI ran an ad for *Tropical Storm* on *WWE Heat.*

109. Demographic information about *Yugioh,* which indicated an audience of over 70% under the age of 17, was included in the marketing documents produced by the recording company.

110. UMG ran an ad on UPN's *WWF Smackdown* for *Year of the Spider.* WMG ran ads for *14 Shades of Grey* on *WWF Smackdown* and syndicated airings of *The Simpsons.*

111. EMI ran an ad on *Gilmore Girls* for *Escapology.*

112. *See* September 2000 Report at 31. The Commission found in its review for this Report that recording companies still closely track the placement in these publications of feature stories about their artists who had released explicit-content

Dockets.Justia.com

labeled recordings, although this tracking is not a prominent aspect of the companies' marketing plans. Seven of the 14 marketing plans for explicit-content labeled recordings that the Commission reviewed indicated that features such as interviews or CD reviews were scheduled to run in publications with a majority or substantial teen audience, such as: *J-14, Metal Edge, Teen People, Right On!, YM, Alloy Girl, Seventeen,* and *Strength.*

113. *Metal Edge, Right On!, CosmoGirl!, Thrasher, Teen People, YM,* and *Seventeen* were reviewed from July 2003 through October 2003.

114. EMI ran one ad in *Right On!* and UMG ran one ad in *Thrasher.*

In its review of these same seven magazines over a 15-month period (June 2002 through December 2002 and March 2003 through October 2003), the Commission found that recording companies ran a total of 50 ads for explicit-content recordings in issues of *Metal Edge, Right On!,* and *Thrasher.* Specifically, BMG ran two ads in *Metal Edge,* one ad in *Right On!* and one ad in *Thrasher.* EMI ran one ad in *Right On!,* two ads in *Thrasher* and two ads in *Metal Edge.* SME ran two ads in *Right On!* and one ad in *Metal Edge.* UMG ran fourteen ads in *Metal Edge,* two in *Right On!* and three ads in *Thrasher.* Independent recording companies ran twelve ads in *Metal Edge,* two in *Right On!* and five in *Thrasher.* No ads for explicit content recordings were found in *Teen People, CosmoGirl!, Seventeen,* or *YM.*

115. *See* April 2001 Report at 14 n.81; June 2002 Report at 39 n.55.

116. *See* September 2000 Report at 33; December 2001 Report at 16.

117. See Appendix C for website demographic information from Nielsen//NetRatings. Although demographic information was not obtained for Katrillion.com and AOL Teens Music, both of these sites are directed to teen audiences.

118. RIAA Parental Advisory Program Guidelines at 5.

119. The guidelines acknowledge that "[o]therwise, the small size of the album 'mini' may result in the Label appearing as an illegible black dot, or in confusion regarding the album designation." RIAA Parental Advisory Program Guidelines at 5.

120. In addition, the revised guidelines now suggest that consumer print advertising contain language alerting consumers that an "edited" version of the recording is also available for sale, when that is the case. The RIAA recommends that this be accomplished by placing the wording "Edited Version Also Available" near the specific album or recording that has been designated with the explicit-content label. Finally, the revised guidelines added recommendations with respect to labeling the edited versions of explicit-content recordings and now suggest that an edited version of an album include an "Edited Version" label plainly displayed on either the front of the album (either on the cellophane or on the album cover) or on the top spine of the CD. *Id.*

121. A spot-check of explicit-content labeled recordings showed that the enhanced label is being placed on certain BMG recordings. In addition, the Commission found that the additional descriptive information for certain recordings was also displayed by some online retailers as part of the cover art. A review of product packaging, however, which included two BMG recordings, showed that, although the enhanced label was being used, neither label was part of the permanent cover art (they were removable stickers), nor did they meet the RIAA's size specifications. *See* Section III.D, *infra.*

122. The Commission purchased this data from VMS. *See* Appendix C for a list of shows monitored by VMS.

123. SME ran an ad for *Da Unbreakables* containing no Parental Advisory Label. Five out of eight ads for explicit content recordings placed by independent companies contained a Parental Advisory Label.

124. *See* June 2002 Report at 13. A spot-check done for the Commission's December 2001 Report showed that 19 of the 48 television ads reviewed contained the PAL logo. *See* December 2001 Report at 18.

125. Three of the four ads submitted by one recording company contained a legible PAL logo at the end of the ad while three of the five ads submitted by the other recording company displayed the PAL logo.

126. *See* December 2001 Report at 18.

127. The Commission reviewed *CosmoGirl!, Metal Edge, Right On!, Rolling Stone, Spin, Seventeen, Teen People, Thrasher, Vibe,* and *YM* from June 2002 through December 2002 and from March 2003 through October 2003.

128. Specifically, BMG ran seven ads, three without Parental Advisory Labels. Of the four ads displaying Parental Advisory Labels, two were clear and conspicuous and two were blurry. EMI ran 14 ads, three without Parental Advisory Labels, 11 with Parental Advisory Labels. Of those 11, eight were clear and conspicuous and three were readable but small. SME ran five ads, all of which contained Parental Advisory Labels, three of which were clear and conspicuous and two of which were blurry. UMG ran 40 ads, eight without Parental Advisory Labels, 32 with Parental Advisory

Labels, 27 of which were clear and conspicuous and five of which were blurry. WMG ran six ads, one with a clear and conspicuous Parental Advisory Label, and five without Parental Advisory Labels. Independent labels ran 24 ads, 19 without Parental Advisory Labels, five with the label. Of those five, two were clear and conspicuous and three were readable but small.

129. The most recent four-month period was from July 2003 through October 2003. UMG placed four ads, all with clear and conspicuous PAL logos. BMG and WMG placed one ad each with a clear and conspicuous PAL. EMI placed three ads, two with clear and conspicuous PAL logos and one with no PAL logo. Independent labels placed four ads – three with no PAL logo (Beer City) and one with a clear and conspicuous PAL logo (Big Cat).

130. *See* September 2000 Report at 29.

131. *See* June 2002 Report at 13-14.

132. Virgin Megastore placed two ads in *Vibe* and used a clear and conspicuous PAL logo in both. Coalition Music Stores placed four ads in *Thrasher* – two with clear and conspicuous PALs and two with small, but readable, PALs.

A review of the same ten magazines over the 15-month period shows better results: 42 ads were placed by five different retailers, and in 79% (33 of 42) of the cases, the ad contained a clear and conspicuous PAL. Best Buy placed two ads in *Rolling Stone* with clear and conspicuous PALs, and 11 ads in *Spin* with clear and conspicuous PALs. Coalition Music Stores placed two ads in *Thrasher*, Target placed 15 ads in *Spin*, and Virgin Megastore placed three ads in *Vibe* – all with a clear and conspicuous PAL. In four cases, the ad contained a small but readable PAL, while five ads contained no PAL. Virgin Megastore placed one ad in *Spin* with a PAL that was small but readable. Coalition Music placed two ads in *Thrasher* that carried small but readable PALs. Best Buy placed one ad in *Spin* with a small but readable PAL. Ballbuster Hard Music placed two ads in *Metal Edge* without PALs and Virgin Megastore placed three ads in *Vibe* without PALs.

133. *See* June 2002 Report at 14.

134. RIAA Parental Advisory Program Guidelines at 5.

135. *Id.* at 7 (emphasis in original).

136. *Id.* at 6-7.

137. FTC's Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 29 and 33 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

138. *Id.* at 33.

139. The websites reviewed were: www.daunbreakables.com, www.metallica.com, www.lizphair.com, www.staind.com, www.joebudden.com, www.50cent.com, www.blucantrell.com, www.crookedlettaz.com, www.coldonline.com, www.intothematrixmusic.com, www.madonna.com, www.typeonegative.net, www.3eb.com, www.mestcrapp.com, www.djkayslay.com, www.smileemptysoul.com, www.gangstarronline.com, www.godsmack.com, www.marilynmanson.com, and www.lilkim.com.

*See* Appendix D for more detailed results of the survey.

140. Only one of the sites used descriptive advisory language, *i.e.*, "Explicit," in addition to displaying the PAL logo to indicate that the site was promoting an explicit-content labeled recording.

141. *See* June 2002 Report at 15.

142. Some websites displayed the PAL logo on every page of the website, although it was not always legible. For example, the Godsmack and Joe Budden websites both displayed the PAL logo on every page, although the logo on the Joe Budden site was unreadable. The Marilyn Manson and 50 Cent websites also displayed the logo on nearly every page, although the label was quite small on some pages.

143. *Id.*

144. Ninety-five percent of the sites allowed the visitor to play all or part of the album at the site, while 90% allowed visitors to download music video clips. In June 2002, all the sites surveyed allowed visitors to listen to music, and 95% provided downloadable video clips. *See* June 2002 Report at 14-15.

145. The websites included: sonymusicstore.com, atlantic-records.com/store, artistdirect.com, circuitcity.com, amazon.com, awarestore.com, musictoday.com, and interpunk.com.

146. The sites that gave some indication of explicit content during the purchase process were: sonymusicstore.com (linked from djkayslay.com, daunbreakables.com); atlantic-records.com/store (linked from lilkim.com); artistdirect.com (linked

from coldonline.com and staind.com); circuitcity.com (linked from joebudden.com); musictoday.com (linked from metallica.com and 50cent.com); and interpunk (linked from mestcrapp.com). Several online retailers were linked from intothematrixmusic.com.

Sites that did not indicate explicit content for the recording included: amazon.com (linked from smileemptysoul.com, and typeonegative.net); awarestore.com (linked from lizphair.com); and musictoday.com (linked from madonna.com).

147. These sites were: artistdirect.com (linked from coldonline.com and staind.com); circuitcity.com (linked from joebudden.com); musictoday.com (linked from metallica.com and 50cent.com); and interpunk (linked from mestcrapp.com).

148. The sites reviewed were: Amazon.com, Bestbuy.com, Circuitcity.com, Samgoody.com, and TowerRecords.com. Cdnow.com, which had been reviewed in the past, is now teamed with Amazon.com and for this review was replaced with Circuitcity.com. The recordings examined at these retailers' websites were *Get Rich or Die Tryin'* by 50 Cent; *Liz Phair* by Liz Phair; *The Street Sweeper Vol. 1* by DJ Kayslay; *Smile Empty Soul* by Smile Empty Soul; and *Life is Killing Me* by Type O Negative.

*See* Appendix D for more detailed results of the survey.

149. Language used by the websites included: "Explicit Lyrics," "Parental Advisory," and "Explicit Content."

150. The June 2002 review found that visitors, regardless of age, could play either part or the full-version of songs from the explicit-content labeled recording in 16 out of 25 instances. June 2002 Report at 16.

151. The PAL logo was legible in all but one instance.

152. These online services distribute music via the Internet in a legal, industry-approved manner.

153. The following online services were reviewed: Apple's iTunes, MusicMatch, AOL's MusicNet, Full Audio's MusicNow, Napster (formerly operating as PressPlay), and RealNetworks' RealOne Rhapsody. MusicNet, MusicNow, Napster, and Rhapsody are subscription-based services that cost approximately $10 a month. These services allow users to purchase and download music (*i.e.*, to a listening device such as an MP3 player) for an additional charge per song. iTunes and MusicMatch allow users to purchase music on a song-by-song basis. All six services require the use of a credit card.

154. iTunes, MusicMatch and MusicNet.

155. Napster, Rhapsody and MusicNow.

156. MusicMatch displayed a picture of the recording artist instead of the album cover art, and did not use the PAL logo.

157. MusicNet, MusicNow, iTunes and Napster.

158. MusicNet, iTunes and Napster.

159. Napster, Rhapsody and MusicMatch.

160. Napster gave the user the option of installing a parental password, which then allowed the user to "exclude" explicit-content labeled recordings from search results and prevent access. MusicNet excluded explicit content when the parental controls were set using the AOL software. Any setting other than "General 18+" excluded explicit-content labeled recordings.

161. These services are Kazaa, Morpheus, LimeWire, and Overnet.

162. Peer-to-peer file-sharing is a "type of transient Internet network that allows a group of computer users with the same networking program to connect with each other and directly access files from one another's hard drives." *See* SearchSecurity.com website at searchsecurity.techtarget.com/gDefinition/0,294236,sid14_gci212769,00.html (visited Dec. 10, 2003).

163. The RIAA has called attention to the fact that peer-to-peer file-sharing services do not utilize the parental advisory labeling system. *See, e.g.,* Testimony of Hilary B. Rosen, Chairman and CEO, Recording Industry Association of America, House Subcommittee on Telecommunications and the Internet, "Recording Industry Marketing Practices: A Check-Up" (October 9, 2002), at 18-19.

Mitch Bainwol, current Chairman and CEO of the RIAA, recently commented during the Commission's Workshop that, in light of the popularity of file-sharing services with children for swapping music files, the lack of labeling on these services "blows a gaping hole through the labeling regime." FTC's Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 30 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

164. The Kazaa service provided password protection on its filter to prevent the setting from being altered by another user.

165. *See, e.g.,* "File-Sharing Programs: Peer-to-Peer Networks Provide Ready Access to Child Pornography," General Accounting Office Report to the Chairman and Ranking Minority Member, Committee on Government Reform, U.S. House of Representatives (Feb. 2003); and "Children's Access to Pornography Through Internet File-Sharing Programs," Prepared for Rep. Henry A. Waxman and Rep. Steve Largent by Minority Staff, Special Investigations Division, Committee on Government Reform, U.S. House of Representatives (July 27, 2001).

166. *See* "File-Sharing: A Fair Share? Maybe Not," at www.ftc.gov/bcp/conline/pubs/alerts/sharealrt.htm. In addition, in April 2004, the Commission held a public workshop on spyware, at which the relationship between peer-to-peer file-sharing software and spyware was discussed. Later this year, the Commission will issue a comprehensive report on the workshop, including the peer-to-peer software and spyware relationship.

167. *See* December 2001 Report at 22. In its September 2000 Report, the Commission reported that 85% of unaccompanied children ages 13-16 were able to buy explicit-content labeled recordings at retail stores. September 2000 Report at 36.

168. *See* Appendix B.

169. *See* RIAA Parental Advisory Program Guidelines at 2.

170. *See* RIAA Parental Advisory Program, *Usage Guidelines for Audio and Music Video Product, available at* www.riaa.com/issues/parents/advisory2.asp (visited December 18, 2003).

171. Although all of the PAL logos on the CDs used the standardized language recommended by the RIAA – "Parental Advisory - Explicit Content," nine of the14 labels failed to satisfy the recommended size requirement. All but one of the labels was a permanent part of the album cover art and not a removable sticker. One CD used a removable sticker under the cellophane shrink wrap; in this case, the use of a sticker was probably due to the absence of album cover art, and the CD was packaged and sold in a clear jewel case.

172. *See* September 2000 Report at 24 & n.135.

173. As determined by *Billboard* magazine, for the week of November 15, 2003.

174. *See* September 2000 Report at n.136. However, a review of a smaller sample of recordings in June 2002 showed that 83% (10 of 12) of the CDs examined complied with RIAA guidelines regarding size and permanent affixation. *See* June 2002 Report at 17.

175. September 2000 Report at 45.

176. The Advertising Code of Conduct ("Adcode") at 23, 29 & 31 (2003).

177. Letter from Patricia Vance, President, ESRB, to Richard F. Kelly, Staff Attorney, Federal Trade Commission (Oct. 27, 2003) at 6 (on file with the Commission).

178. As noted in the Commission's June 2002 Report, the VSDA had expanded its Pledge to Parents program to include a certification program – Parents in Control. Participating retailers attest that they will allow parents to restrict the ability of their children to rent video games that the parents determine are inappropriate for them. As part of VSDA's Parents in Control Certification program, retailers also commit not to rent or sell to children any video games that are rated "Adults Only" or are "harmful to minors." VSDA's Pledge to Parents program goes further and asks retailers not to rent or sell M-rated video games to persons under age 17 without parental consent. That pledge, however, is not part of VSDA's Parents in Control program. *See* June 2002 Report at 19.

179. *See* "Major Retailers Announce New Campaign to Enforce Video Game Rating System," at releases.usnewswire.com/GetRelease.asp?id=121-12082003 (visited Feb. 17, 2004).

180. The marketing plans for several games indicated that radio promotions had been planned. The Commission was not provided with sufficient information to determine whether these promotions were targeted to a substantial under-17 audience.

181. Many plans targeted either males 17-24 or males 18-24. Several included males 25-34 as a "secondary target audience." Others targeted 18-35 year old males.

182. *See* Appendix C for demographic data on most of these programs. *Jackass* has a 30% under-17 audience share, according to Nielsen data.

183. AdCode at 29.

184. The Commission purchased this data from VMS. *See* Appendix C for a list of shows monitored by VMS.

185. *See* Appendix C for demographic data on some of these programs. According to Nielsen data, the other programs have the following under-17 audience share: *Making the Band 2* (36%), *Sorority Life* (29%), and *Girlfriends* (30%).

186. Information available in early 2003 indicated that approximately 41% of *Electronic Gaming Monthly's* readership was under 17 and 39% of *Playstation 2 Magazine's* readership was under 17. *Electronic Gaming Monthly's* latest readership survey released late this summer indicates that EGM's under-17 audience has dropped to 30%. *See* Appendix C.

187. Three of the 24 video game ads were for M-rated games.

188. The AdCode states: "If a title has a Rating Pending status, a company must use its best efforts to place ads for that title only in publications or outlets with an audience that is appropriate for the content within the title. Such efforts should be based on the company's good faith expectations and reasonable discretion regarding the anticipated rating." AdCode at 26.

189. June 2002 Report at 21. Moreover, publications that have majority under-17 audiences, like *GamePro* (subscription edition) and, to a lesser extent, *Nintendo Power*, continue to feature stories, covers, and other news regarding the development and release of M-rated games, despite their stated policies not to accept ads for such products. The Commission's review of marketing plans indicates that game makers often solicit and encourage such stories and product placements. Often such solicitations are highlighted as part of the marketing strategy for the game.

190. NAD/CARU Case Reports (November 2002), at 522-23. CARU had also questioned as inappropriate a claim in the ad that the game is the "First All-Ages Brawler for the PlayStation2," noting that the game was "clearly not for all ages according to the ESRB rating system." The advertiser agreed to no longer use that claim. *Id.*

191. Ten of 11 game publishers had placed ads on popular teen websites. *See* September 2000 Report at 49.

192. AdCode at 31.

193. *See* Appendix C at C-7.

194. The AdCode expressly prohibits companies from promoting Mature-rated products at concerts or events where a "substantial portion" of the audience is likely to be under 17 years old. AdCode at 35.

195. *Id.* at 36.

196. *Id.*

197. As one story noted, "Microsoft X-box sponsored this summer's Lollapalooza tour and set up 'GameRiot' tents to let ticket holders play against each other in games such as '*Tony Hawk's Underground*,' '*Midtown Madness 3'* and '*Return to Castle Wolfenstein.*'" *Return to Castle Wolfenstein* is rated M. *See* apps.lollapalooza.com/a_gameriot_comp.jsp (visited Nov. 11, 2003). This page contains an on-line registration form for game competitions. Under "Rules," it states that "Brute Force and Castle Wolfenstein competitions require a valid ID and will be restricted to 17 or older." Both games are rated M. The other games listed for the competition are rated T.

198. *See* "Infogrames announces Enter the Matrix," at www.gamershell.com/news_InfogramesannouncesbEnte.shtml (visited on Feb. 19, 2004): "There has been extensive creative crossover that has taken place in the development of the film and the game. Warner Bros., Joel Silver, the film's producer, and Larry and Andy Wachowski, the film's writers, creators, and directors, have clearly shown their appreciation for the connection between the interactive world and THE MATRIX audiences. We are thrilled to unite the two with the screening in our E3 booth of the first official trailer for THE MATRIX RELOADED and THE MATRIX REVOLUTIONS."

*See also,* "Enter The Matrix Review for Xbox," at www.gamer-talk.net/review33.html (visited Feb. 19, 2004): "At the end of the game there is a new movie trailer for the last and final Matrix movie, 'Matrix Revolutions' (due out in Nov 2003)."

199. At the Commission Workshop, Dr. David Walsh of the National Institute on Media and the Family noted that: "Because of the power of marketing and because of the power of advertising, products that are cross-marketed . . . in very different ways are, I think, inevitably going to create an interest among kids for products that may not be appropriate for them." FTC's Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 133-34 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

In its September 2000 Report, the Commission recommended that the movie and video game industries "(p)rohibit licensees from marketing action figures, toys, and other products associated with R movies and M games to under-age audiences and require a disclosure that the product is based on an entertainment product rated R or M." September 2000 Report at 54. The ESRB has not prohibited such marketing, although its AdCode does require licensors to ensure that licensees disclose on the product that "This [*state item*] is based on a Mature rated product." AdCode at 22.

200. In the June 2002 Report, the Commission noted that the IDSA (now the ESA) had avoided imposing such a requirement for television because the descriptors can be difficult to read on a television screen and because it does not believe that descriptors can be displayed in a 30-second ad in a way that permits viewers to absorb the information. The IDSA had stated, however, that it would continue to consider this issue. *See* June 2002 Report at 22 n.95.

201. Vance Letter, *supra* note 177 at Attachment D.

202. The ad was for Capcom's *Devil May Cry.* The required voice-over, "Rated M for Mature," applies to television ads longer than 15 seconds. For ads 15 seconds or less, the required voice-over is shortened to "Rated Mature." ESRB requires the rating icon to be 22 scan lines in size. *See* December 2001 Report at 3 n.138.

203. *See* June 2002 Report at 24.

204. *See* Appendix A.

205. These ads either: (a) omitted a descriptor assigned to the game; (b) changed the wording of the descriptor in a way that understated the level of violence, sex or strong language in the game; (c) for Rating Pending ads, left off the ESRB-required box containing the phone number and website address for the ESRB that could be called or visited to check if the game had subsequently received a rating; or (d) used rating icons substantially smaller than the size required by ESRB.

206. Three companies placed poster inserts into the gaming magazines, one of which did not include an icon or descriptor. A poster in *Nintendo Power* for Universal Interactive's *The Scorpion King: Rise of the Akkadian* did not include an icon or a descriptor. Universal Interactive's inserts for *Lord of the Rings: The Fellowship of the Ring* and *Bruce Lee: Quest of the Dragon* both had icons. A poster for Atari's *Godzilla: Destroy All Monsters* had an icon on both sides of the poster. The poster insert for Crave Entertainment's *The Lost* contained an icon. Another poster insert by Crave for *UFC Throwdown* displayed a large and prominent icon.

207. AdCode at 32. If the publisher's advertisement is smaller than one-fourth of a screen page (such as standard banner advertisement), the rating icon and content descriptors must be visibly and prominently displayed either directly on the advertisement and/or on a web page or product specific page that links directly from the advertisement. *Id.*

208. *Id.* Because a game often can be purchased from several different pages, the AdCode would appear to require disclosures on multiple pages. For purposes of this review, however, the Commission deemed a site compliant with the AdCode so long as the appropriate rating information was displayed on a page that a visitor must click through to make a purchase.

209. *Id.* at 33. The Commission's review showed that a visitor might navigate through several pages after requesting a download. Accordingly, as was done in its prior reports, the Commission deemed a site compliant with the AdCode's demo disclosure requirement, so long as the appropriate rating information was disclosed adjacent to the title of the game and either (a) in close proximity to the link that initiated the download, or (b) on any subsequent page through which a visitor must navigate during the download process.

210. The Commission examined the following 20 electronic game websites: *Aquanox 2: Revelation, Casino, Inc., Chrome, Codename Nina, Counter-Strike: Condition Zero, Crimsonland, Devastation, Die Hard Vendetta, Dino Crisis 3, Hunter the Reckoning - Wayward, Outlaw Volleyball, Postal 2, Purge, Return to Castle Wolfenstein, Silent Scope Complete, Soldier of Fortune 2: Double Helix, SWAT: Global Strike Team, The X-Files: Resist or Serve, Tom Clancy's Rainbow Six 3,* and *True Crime: Streets of L.A.*

   *See* Appendix D for more detailed results of the survey.

211. The notice reads in part: "DANGER. This site contains content not approved for consumption by children, senators, religious leaders and/or other easily damaged psyches, those seeking to enhance or establish political careers and/or possessed of delusions of grandeur." For the entire disclaimer, see www.gopostal.com/home.

   The site for *Postal 2* had the "M" rating displayed at the time of the surf; two weeks later the rating had been removed from all sections of the site. The rating was subsequently restored.

212. CircuitCity.com was substituted for ToysRUs.com in this Report because Amazon.com and ToysRUs.com use the same Amazon.com site.

   *See* Appendix D for more detailed results of the survey.

213. Toys "R" Us, Kmart, Wal-Mart, Target, Circuit City, Staples, and CompUSA.

214. *See* Statement of Hal Halpin, President of the IEMA, Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation (Oct. 29, 2003), transcript at 183 (*available at* www.ftc.gov/bcp/workshops/violence/index.html).

215. *See* "Major Retailers Announce New Campaign to Enforce Video Game Rating System," at releases.usnewswire.com/GetRelease.asp?id=121-12082003 (visited Feb. 17, 2004).

IEMA members are: Best Buy, Blockbuster Entertainment, Circuit City, CompUSA, Gamesource, Electronics Boutique, Hastings Entertainment, Hollywood Video, KB Toys, Kmart, Meijer, Movie Gallery, Musicland, Shopko Stores, Target, Toys "R" Us, Transworld Entertainment and Wal-Mart. Taken together, these retailers sell approximately 85% of all computer and video games sold in the United States.

216. *See* "Game Questions Frequency Table," Gallup Annual Teen Survey 2003, The Gallup Organization (on file with the Commission).

The M-rated *Grand Theft Auto III* was the number-one selling video game in 2001, *see* www.npd.com/press/releases/press_020207.htm; its M-rated sequel, *Grand Theft Auto: Vice City* was the top seller in 2002, with *Grand Theft Auto III* at number two. *See* www.npd.com/press/releases/press_030128a.htm. Through August of 2003, *Grand Theft Auto: Vice City* was number six on the list of best selling video games in 2003, some ten months after its release in October of 2002. *See* www.npd.com/press/releases/press_031001.htm.

Most of the games in the *Grand Theft Auto* series are rated M.

217. Forty-eight percent of the younger respondents (males and females aged 13 to15) indicated that they had played a game in the Grand Theft Auto series, as compared to 37% of those 16 or 17. *See Game Questions Frequency Table*, Gallup Annual Teen Survey 2003, The Gallup Organization (on file with the Commission).

218. Seventy-eight percent of boys reported that M-rated games were among their top five favorites. Forty percent said their favorite game is rated M. *See* The National Institute on Media and the Family, *Eighth Annual Media Wise Video Game Report Card* (December 2003) *available at* www.mediafamily.org/research/report_vgrc_2003-2.shtml.

219. *See* The NPD Group, Inc., *NPD's Annual 2002 Consumer Purchase Data for the Video Game Industry* (on file with the Commission).

220. AdCode at 7-10.

221. *Id.*

222. *Id.*

223. Vance Letter, *supra* note 177 at 8 of Attachment D.

224. As the Commission has noted in its prior reports, the music industry rejects any suggestion that its Parental Advisory Label system should be age-based. The Commission is aware that such a suggestion would require fundamental changes in the music industry's labeling program. Nonetheless, the industry could still adopt standards that lessen children's exposure to ads for such recordings with a Parental Advisory. *See* June 2002 Report at 31.

225. The Commission previously has suggested that the industries consider adopting ad placement standards that take into account a range of factors, including the percentage of the audience under 17, the total number of children reached, whether the content is youth-oriented, and the popularity with children and apparent ages of the characters or performers. *See* December 2001 Report at 35.

226. The Commission encourages the music industry to consider implementing parental control mechanisms that would limit children's on-line access of explicit-content material. *See supra* note 160.

227. *See* June 2002 Report at 18; December 2001 Report at 35-36. Although the recording industry's labeling program does not provide the reasons for the advisory, one industry member, BMG, does include on its explicit-content labeled recordings an "enhanced" advisory label that indicates whether the recording has been stickered because of "Strong Language," "Sexual Content," "Violent Content," or "Sexual + Violent Content."

## Appendix A:  Marketing Violent Entertainment To Children: A Workshop On Industry Self-regulation

### I.  Introduction

On October 29, 2003, the Federal Trade Commission (FTC) sponsored *Marketing Violent Entertainment to Children: A Workshop on Industry Self-Regulation*, a one-day public forum to discuss the state of self-regulation in the entertainment industry, including children's access to movies, music, and electronic games that have been rated or labeled as potentially inappropriate for them.  The workshop featured five panels made up of representatives from industry associations, rating and labeling boards, retailers and retailer trade associations, parent and consumer advocacy groups, and other interested parties.  Panel topics included:

- An Overview of the Rating and Labeling Systems;
- Discussion of Rating and Labeling Systems Among Industry, Consumer, and Research Groups;
- Cross-Marketing and Merchandising of Branded Products;
- Retailers' In-Store and Online Practices; and
- Next Steps: The Future Direction of Self-Regulation.[1]

The workshop opened with introductory remarks from FTC Chairman Timothy J. Muris, the Honorable Frank Wolf (R-VA), and the Honorable Joe Baca (D-CA).  Noting the Commission's four earlier Reports to Congress on the marketing of violent entertainment to children, Chairman Muris outlined three basic principles that underlie the effectiveness of self-regulation: 1) that industries should market products consistent with their ratings and parental advisories; 2) that parents should have access to useful information on products ratings before purchase; and 3) that retailers should consider ratings and labels in adopting sales policies.  Workshop Transcript, pp. 4-5 (hereinafter Tr. 4-5).[2]  Showing a videotape of excerpts from several violent video games, Congressman Wolf raised concerns about the difficulty of shielding minors from depictions of graphic violence in entertainment media.  Tr. 6. Congressman Baca discussed the reasons why he has proposed federal legislation to restrict the sale to children of certain violent video games, HR-669, the Protect Our Children from Video Game Sex and Violence Act.  Tr. 13.

### II.  An Overview Of The Rating And Labeling Systems

The first panel of the workshop featured representatives of the movie, recording, and electronic game industries discussing their perspectives on the issue of self-regulation.  Jack Valenti, President and CEO of the Motion Picture Association of America (MPAA), cited a study that its ratings system, now in its thirty-fifth year, enjoys 98% recognition by American consumers.[3]  Among parents with children under 13, 76% described the system as "very useful" or "fairly useful" in helping them decide what movies are appropriate for their children to see.  Tr. 25-26.

Mitch Bainwol, Chairman and CEO of the Recording Industry Association of America (RIAA), discussed his industry's approach to self-regulation. In contrast to the methods used by the movie and electronic game industry, the RIAA's system does not include information about the appropriateness of a particular product for children of certain age groups. Music deemed to contain "strong language or depictions of violence, sex or substance abuse" is simply labeled "Parental Advisory Explicit Content." According to Mr. Bainwol, the biggest development in the recording industry is the frequency with which youngsters acquire music by downloading it from peer-to-peer (P2P) networks such as Kazaa and Grokster instead of acquiring it from brick-and-mortar retailers or from authorized online sites such as Apple iTunes, Music Now, or AOL's MusicNet. Tr. 29. Mr. Bainwol pointed to three major challenges posed by this shift in the acquisition of music: 1) P2P networks contain no labeling or parental advisories whatsoever; 2) P2P networks bypass the point-of-sale barriers to acquisition imposed by salesclerks or parents; and 3) as many as half of the P2P files that include the names of major artists are actually pornographic material that merely use the name of the artists to lure consumers, including youth. Tr. 30, 108. Mr. Bainwol also announced at the workshop changes to the RIAA's parental advisory system, including encouraging the use of parental control filters on sites that allow the authorized downloading of music, improving the consistency of terminology used on websites to differentiate between explicit-content labeled recordings and non-labeled music,[4] and working with the FTC and other groups to improve www.parentalguide.org, a "one-stop" website offering parents information about the rating and labeling programs of the movie, electronic game, music, and television industries. Tr. 33-34.

Patricia Vance, President of the Entertainment Software Rating Board (ESRB), emphasized three components of the ESRB's self-regulatory system: 1) rating symbols, which provide general guidance about age appropriateness;[5] 2) content descriptors – thirty standardized phrases that alert parents to content elements that may be of interest or concern;[6] and 3) a code of conduct covering certain aspects of the industry's advertising and marketing practices. Tr. 35, 39. In recent months, the ESRB has added several new content descriptors intended to give consumers greater insight into the specific type of violence in a game, *e.g.*, cartoon violence, fantasy violence, or intense violence. In addition, the industry increased the visibility of ratings by repeating on the back of the game box the ratings symbols already included on the front of the box and by placing the rating next to the content descriptors in an authoritative seal. The ESRB also added the age "17+" to the Mature rating symbol and "18+" to the Adults Only rating symbol. Tr. 38. Ms. Vance showed examples of new public service announcements using celebrities to educate parents about the rating system for electronic games. Tr. 40-41. She noted that ESRB's Code of Conduct extends beyond rating and labeling to cover other marketing practices. For example, the code requires members to ensure that ratings information is legible on all advertising materials, prohibits publishers from targeting ads for M-rated games to those under 17, and imposes sanctions – including relabeling and fines – for code violations. Tr. 39-40. Ms. Vance cited opinion polls that 90% of parents surveyed believe that the ESRB's rating system provides the kind of

information they need and that 75% find it to be an effective tool in helping them shield their children from inappropriate material. Tr. 39.

## III. Discussion Of Rating And Labeling Systems Among Industry, Consumer, And Research Groups

In the second panel, the MPAA, the RIAA, and the ESRB were joined by consumer and research groups to discuss their observations and concerns about the rating and labeling systems.[7] Vicky Rideout of the Kaiser Family Foundation announced a new study released the day before the workshop demonstrating the pervasiveness of media in the lives of youngsters.[8] According to the study, more than 80% of parents say they have used the movie ratings, as compared with half who have used the music, video game, or television ratings.

Criticisms about the current systems fell into four general categories: 1) confusion about the meaning of terms used to rate or label entertainment products; 2) a lack of transparency and accountability in the systems; 3) the advertising and marketing to young audiences of materials rated or labeled as unsuitable for children; and 4) lax enforcement at the retail level.

One common theme voiced by members of this panel was the tension between keeping systems easy for parents to understand and providing the more detailed reasons for the ratings that many parents find helpful. Although parents appear to prefer content-based systems (ratings that disclose the nature of the material, *e.g.*, the presence of violence, objectionable language, or sexual content) to age-based systems (ratings that give a minimum age for which the product is suitable), the Kaiser Family Foundations's research suggests that parents understand age-based systems better than content-based systems. Tr. 49. David Kinney of PSVratings, Inc., pointed to the difficulty that parents have in grasping the intricacies of separate ratings systems for each form of entertainment.[9] Tr. 75. For example, Nell Minow of Common Sense Media raised concerns with what she perceived to be vague descriptors in the movie ratings system, *e.g.*, "mild thematic elements." Tr. 62. Warren Buckleitner of *Children's Software Revue* cited an instance in which a parent misunderstood the ESRB's "Mature" rating to refer to whether a particular child was mature for his or her age group. Tr. 70. He also suggested that putting content descriptors on the front of the video game box would make it more likely that parents would read and understand the information conveyed by the descriptors. Tr. 70. Vicky Rideout of the Kaiser Family Foundation mentioned that the television rating TV-Y7-FV – which alerts parents to the existence of fantasy violence – was occasionally misinterpreted to mean "family viewing." Tr. 49.

Other panelists pointed to seeming inconsistency within the systems themselves. Daphne White of The Lion & The Lamb Project noted that the ESRB descriptor on the E-rated version of "The Hulk" video game was "violence," whereas the descriptor on the T-rated version of the same game was "mild violence." Tr. 53. She also expressed concern that descriptors such as "blood and gore," "mature humor," "strong language," "use of drugs," or "violence" are insufficient to alert parents to the acts depicted in some popular video games, such as decapitation or urinating on corpses. Tr. 113. Several panelists expressed the opinion that parents would find it easier to use the ratings were the movie, music,

and electronic game industries to adopt one uniform system for evaluating products.[10] Tr. 63-64, 74-75, 96.

Another critique raised by some panelists was what they perceived as the lack of clarity in the criteria by which products are rated or labeled. The Lion & Lamb Project's Daphne White noted that there are no published standards to explain to parents the line between a PG and PG-13 movie or a T- and M-rated video game. Tr. 52, 85-86. She also expressed concern that the ESRB descriptors give parents insufficient information to differentiate the meaning and significance of phrases such as "blood," "animated blood," and "blood and gore." Tr. 53. Ms. White and Nell Minow of Common Sense Media commented that there is no system whereby ratings can be challenged by members of the public.[11] Tr. 238-39, 62. Some panelists expressed concerned about "ratings creep," a downgrading over time that results in violent material receiving more lax treatment. Tr. 52, 62-63.

The ESRB's Patricia Vance cited research commissioned by her organization demonstrating that parents generally agree with how video games have been rated. Tr. 38. She also noted the finding in the FTC's 2000 Report that 83% of video game purchases are made by or with adults.[12] Tr. 34, 233. However, Dr. David Walsh of the National Institute on Media and the Family cited a peer-reviewed 2001 study suggesting some disagreement on the rating of violent entertainment.[13] Tr. 99. According to the study, if a movie is rated R or a video game is rated M, virtually 100% of parents agree with the designation. However, when a movie or game is rated PG-13 or T, parents are more likely to believe that the rating was too lenient. Parents surveyed found only 60% of the PG-13-rated movies and fewer than half of the T-rated video games to be suitable for children between 13 and 17. A common reason parents had for disagreeing with the industry rating was a belief that the industry rating was too lax with regard to the depiction of violence.[14] Dr. Walsh also voiced concern that because many major retailers will not carry products with AO or NC-17 ratings, economic considerations may dissuade ratings groups from using these designations even for products depicting the most violence. Tr. 100.

Although a number of panelists voiced appreciation for independent organizations that provide detailed information about content, David Kinney of PSVratings, Inc., expressed frustration that rating groups that are not affiliated with the industry are often denied advance access to new products, thereby making it difficult for them to provide timely information to parents. Tr. 89-90, 109. The Lion & Lamb Project's Daphne White and Common Sense Media's Nell Minow criticized the existing industry systems for not factoring in the opinions of experts in child development or considering the effect of violence on children.[15] Tr. 52, 61. Patricia Vance of the ESRB countered that specialists in child development had been consulted in the establishment of the rating system for electronic games. Tr. 35, 228. Ms. White, Ms. Minow, and Dr. Walsh of the National Institute on Media and the Family also questioned whether the rating and labeling process can ever be transparent as long as it is dominated by members of the industry. Tr. 51, 57, 60.

A third concern related to the advertising and marketing of material rated unsuitable for children in media with a high youth audience. Lara Mahaney of Parents Television Council cited data compiled by her organization demonstrating that some networks regularly advertised R-rated movies and M-rated

video games in the prime time "family hour" or during programs with the highest number of viewers under 17. Tr. 65-68. The ESRB's Patricia Vance cited her industry's policy of not advertising M-rating products in print media with more than a 45% readership of children under 17 and on television programs with a viewership of more than 35% in that age group. Tr. 106. She noted, however, that even for programming with a large underage audience, *e.g.*, the Superbowl, the Grammy Awards, or "Survivor," the percentage of young viewers is 15% or less. Therefore, even if children are exposed to advertisements for products deemed potentially inappropriate for them, Ms. Vance maintained that it would be incorrect to suggest that the industry was targeting them. Tr. 106-07. Ms. Mahaney responded that, given that the total viewing audience is 80% adult, the ESRB's percentages are too high because virtually no prime time television program has enough children's viewership to meet the 35% figure. Tr. 107.

Some panelists raised a fourth concern: that even the best rating or labeling system can be circumvented by lax enforcement at the retail level. Tr. 104-05, 211, 234-35. *Children's Software Revue's* Warren Buckleitner noted that parents' access to useful information was being hindered by something as simple as retailers' placement of price tags over descriptors on packaging. Tr. 70. In response to evidence from the Commission's mystery shopper study demonstrating the ease with which many children could purchase products that have been rated as potentially inappropriate for them due to violent content, the ESRB's Patricia Vance cited efforts her industry has taken to train sales staff. Tr. 41, 105. However, she doubted that any system would be perfect, given the pressures that clerks have to move customers through the check-out line quickly. Tr. 105. Daphne White of The Lion & Lamb Project argued that retailers would have stronger incentives to stop the sale to children of movies, music, and electronic games deemed inappropriate for them if, like retailers of tobacco and alcohol, they faced fines or other legal sanctions for non-compliance. Tr. 114.

## IV. Cross-marketing And Merchandising Of Branded Products

The third panel of the day explored the growing phenomenon of the cross-marketing and merchandising of branded entertainment products to children. Representatives of the MPAA, the RIAA, and the ESRB were joined by experts in youth and media advertising and members of consumer groups.[16] As background for the discussion, Michelle Erskine of Solutions Research Group pointed to statistics suggesting the overall pervasiveness that media has in the life of children. Tr. 124-25. Pete Snyder of New Media Strategies cited a recent study done by his company that suggested that 67% of video game consumers are more likely to buy a game with a movie tie-in than a game without a tie-in. Tr. 129. His study of 350 teens and tweens also suggested that for 55% of them, the fact that a video game has been rated M makes it more likely that they will want to buy the product. Tr. 130-31.

Daphne White of The Lion & Lamb Project discussed the growing phenomenon of the sale of multiple entertainment products deemed appropriate for different age groups and yet marketed under the same title or brand, *e.g.*, a video game based on an R-rated movie may receive a T-rating and might have a soundtrack with or without a parental advisory on it. She cited examples of this form of cross-

merchandising: an ice cream sundae tied to a PG-13 movie, Tr. 140; children's educational software featuring the same title character as a PG-13 movie, Tr. 138; nationally advertised brands of cookies and crackers with cross-promotions to PG-13 movies, Tr. 141; and a T-rated video game for a movie rated R for violence, Tr. 141-42. Dr. David Walsh of the National Institute on Media and the Family suggested that given the importance cross-marketing plays in a product's financial success, considerations regarding the potential negative effect of cross-marketing on child development will not likely be a part of the calculus. The issue becomes one of profit maximization and not whether playing the E-rated version of a video game tied to an R-rated movie would encourage children to want to see a movie that has been deemed inappropriate for them. Tr. 133-34.

The ESRB's Patricia Vance cited the electronic game industry's self-regulatory code that forbids the inclusion of an M-rated demo on a product rated E or T. She also cited industry standards prohibiting the advertising of M-rated products in print media with more than a 45% readership of children and on television programs with a viewership of more than 35% children. Tr. 143-44. The MPAA's Fritz Attaway commented that part of the movie industry's 12-point code is that studios will review their practices to further the goal of not inappropriately targeting children through the advertising and marketing of films, including promotional activities such as cross-marketing. Tr. 144-45. He also noted that some of the illustrations cited by Ms. White involved characters popularized in comic books or television shows long before the movie tie-ins were created. He believed that it was erroneous to presume that an action figure based on a character such as Spiderman would entice children to see the movie any more than the pre-existing comic strip would. Tr. 145.

It was noted that although internal industry documents indicate that some companies are careful in their licensing agreements to require age-appropriate labeling of products based on R-rated movies or M-rated video games or to specify that such products should not be offered for sale in toy stores, similar restrictions were not found in licensing agreements for products based on PG-13-rated movies. Tr. 146-47. Dr. Walsh applauded the ESRB's advertising code for forbidding the marketing of products to children based on M-rated video games and suggested that the ESRB's standard should be adopted by other industries. Tr. 151. Industry representatives disagreed with any intimation of a concerted effort to use products rated appropriate for children to attract their interest in entertainment rated or labeled as unsuitable for youngsters of that age. Tr. 148. Daphne White responded that the convergence of entertainment – especially movies and video games – suggests that if the brand is rated as inappropriate for children, all products based on that brand should receive the same rating. Tr. 151-52.

## V. Retailers' In-store And Online Practices

The panel opened with a discussion of the results of the Commission's most recent mystery shopper survey, which indicated that 69% of the teenage shoppers were able to buy M-rated video games, 81% were able to buy R-rated DVDs, 83% were able to buy explicit-content labeled recordings, and 36% were successful in purchasing tickets for R-rated films at movie theaters.[17] Members of the panel

included national online and brick-and-mortar retailers, as well as representatives of retailer trade associations.[18]

Trade association representatives spoke about their industries' enforcement policies. According to the representatives, retailers in the DVD, electronic game, and theater industries generally enforce policies restricting access by children under 17 to M-rated video games or R-rated movies. Among music retailers, some simply do not stock explicit-content labeled recordings. Other music retailers enforce an age-based sales policy, and ask for proof of age or incorporate a prompt in the store's check-out system. Still others simply sell recordings without regard to age. Tr. 169-70. According to Jonathan Potter of the Digital Music Association and Jules Polonetsky of America Online, authorized purveyors of online music lack the ability to check a purchaser's age in the same fashion as brick-and-mortar retailers; however, many attempt to limit children's access to inappropriate material by, for example, featuring only the non-parental advisory labeled versions of songs on websites geared to youngsters or offering filtering software that will tailor a child's online experience in accordance to a parent's wishes – by preventing a child from downloading music labeled with a parental advisory, for example. Tr. 187, 200-01. Mr. Polonetsky also explained that AOL does not allow advertising for R-rated movies or music labeled with a parental advisory on Internet radio channels geared to teens. Similarly, online retailers' requirement of a credit card can act as an age filter. Tr. 204.

Representatives of the trade associations cited a number of steps their members have taken to educate parents about the rating or labeling systems and to prevent the sale to children of products that may warrant parental caution. Panelists discussed a variety of methods used to educate parents; many distribute in-store educational materials such as posters, shelf talkers, brochures, kiosks, counter cards, etc. Tr. 164-65, 168, 176, 182. In addition, many industry members incorporate ratings education into employee training programs. Tr. 165, 170, 178, 183, 192.

John Fithian of the National Association of Theatre Owners said that his organization sends periodic updates to member theaters explaining the reasons for the rating of upcoming movies so that sales personnel can answer questions from parents. Tr. 178. He also mentioned that NATO members must designate a corporate compliance manager responsible for ensuring enforcement with industry codes at their theaters and send them to semi-annual compliance training. Tr. 179. Raymond Smith, Senior Vice President of NATO member Regal Entertainment Group, discussed practical ratings enforcement approaches adopted by his company. For example, if a child is denied a ticket to an R-rated movie and purchases another ticket instead, the ticket is marked in a way that alerts the usher to monitor the child's movements in case he or she attempts to sneak into the R-rated movie. Mr. Smith's company also requires that parents who purchase tickets for R-rated movies for their children actually attend the movie with them. Tr. 197-98.

Beverly Porway of Toys 'R' Us discussed changes to the physical lay-out of retail stores designed to reduce the sale to children of material deemed inappropriate for them, such as the stocking of M-rated video games on higher shelves or behind sales counters so that they are inaccessible unless a patron specifically asks for them. Tr. 205-06. In addition, whenever sales personnel scan M-rated games in the

check-out line, a cash register prompts them: 1) to ask for proof of age if the purchaser looks to be under 25; and 2) to inform adults that the game they are purchasing is M-rated. Tr. 191-92.

Panelists and members of the audience raised a number of issues, including the rating of music videos, Tr. 189; the rating of individual tracks – as opposed to entire albums – in a manner that would differentiate among songs warranting and not warranting a parental advisory, Tr. 188-89; the rating of supplemental materials included on DVDs, Tr. 207; and the ongoing problem of children downloading inappropriate materials from illegal P2P file sharing sites, Tr. 189-90. Another panelist pointed out that the mystery shop results – for the music, DVD, and game industries, at least – show that the industries have a long way to go to improve enforcement at point of sale. Tr. 211.

## VI. Next Steps: The Future Direction Of Self-regulation

The purpose of the final panel of the day was to begin a dialogue on ways to address the issues raised in earlier sessions. Panelists included industry representatives, consumer groups, and health advocates.[19] Dr. Michael Rich of the American Academy of Pediatrics and the Center on Media and Child Health opened the discussion by applauding the collaborative spirit exhibited by workshop participants and expressing optimism that new technologies will allow the focused delivery of media content to appropriate audiences. Tr. 215. Commenting on the Kaiser Family Foundation's finding that children between the ages of eight and eighteen are exposed to almost eight hours a day of media, he gave a brief overview of research on the effects of media violence on children. Tr. 219-21.

Panels offered a number of suggestions for future efforts:

- more careful scientific study about whether industry rating systems accurately reflect how parents would rate the movie, music, or video game, Tr. 225;
- wider dissemination and use of www.parentalguide.org, a joint parent education project of the music, electronic game, movie, and television industries, Tr. 226-27;
- more detailed rating information in advertisements and at the point of purchase, Tr. 226, 111;
- closer cooperation among industry members, consumer groups, health advocates, and government agencies on educating the public about rating systems,[20] Tr. 71, 183-84, 225, 242-43;
- more effective self-regulation regarding the advertising and marketing to children of material deemed inappropriate for them, Tr. 105;
- links from industry websites to independent organizations that offer parents in-depth information about the content of movies, video games, or recordings, Tr. 227;
- parental access to alternate sources of information, including educational materials from pediatricians, Tr. 228-29;
- additional encouragement of parents to inform themselves on the influence of media on child development, Tr. 231-32;

- additional encouragement of parents to inform themselves on the use of ratings and labels, Tr. 241;
- continued encouragement of retailers to improve their performance in the FTC's periodic mystery shopper surveys, Tr. 234; and
- continued research on the effect of media violence on children.  Tr. 220-21, 225.

# Endnotes

1. The Commission initially planned to include an additional panel of academics to present an overview of the research on the effects of violent media on children. After some of scheduled participants withdrew within days of the event, the panel was cancelled.

2. The workshop transcript is available on the FTC website at www.ftc.gov/bcp/workshops/violence/transcript.pdf.

3. The MPAA's system designates movies with one of the following ratings: **G** (General Audiences. All ages admitted); **PG** (Parental Guidance Suggested. Some material may not be suitable for children); **PG-13** (Parents Strongly Cautioned. Some material may be inappropriate for children under 13); **R** (Restricted. Under 17 requires accompanying parent or adult guardian); and **NC-17** (No one 17 and under admitted).

4. According to Mr. Bainwol, sites now use terms such as "PA" or "explicit" to designate explicit-content labeled recordings and terms such as "clean" or "edited" to designate non-labeled music. Given the variety of language currently in use, the RIAA pledged to work with sites to encourage consistency in this area. Tr. 33.

5. The ESRB's system designates electronic games with one of the following ratings: **EC** (Early Childhood. Suitable for ages 3 and older. Contains no material that parents would find inappropriate); **E** (Everyone. Suitable for persons ages 6 and older. Titles in this category may contain minimal violence, some comic mischief and/or mild language); **T** (Teen. Suitable for persons ages 13 and older. May contain violent content, mild or strong language, and/or suggestive themes); **M** (Mature. Suitable for persons ages 17 and older. Titles in this category may contain mature sexual themes, more intense violence and/or strong language); **AO** (Adults Only. Suitable only for adults. Titles in this category may include graphic depictions of sex and/or violence. Adult Only products are not intended for persons under the age of 18.); and **RP** (Rating Pending). In 2002, of the 1229 games rated by the ESRB, almost two-thirds were rated E, slightly more than 25% were rated T, and less than 10% were rated M. Tr. 36.

6. The ESRB's descriptors include: **Alcohol Reference** (Reference to and/or images of alcoholic beverages); **Animated Blood** (Cartoon or pixilated depictions of blood); **Blood** (Depictions of blood); **Blood and Gore** (Depictions of blood or the mutilation of body parts); **Cartoon Violence** (Violent actions involving cartoon-like characters. May include violence where a character is unharmed after the action has been inflicted); **Comic Mischief** (Scenes depicting slapstick or gross vulgar humor); **Crude Humor** (Moderately vulgar antics, including "bathroom" humor); **Drug Reference** (Reference to and/or images of illegal drugs); **Edutainment** (Content of product provides user with specific skills development or reinforcement learning within an entertainment setting. Skill development is an integral part of product); **Fantasy Violence** (Violent actions of a fantasy nature, involving human or non-human characters in situations easily distinguishable from real life); **Gambling** (Betting-like behavior); **Informational** (Overall content of product contains data, facts, resource information, reference materials or instructional text); **Intense Violence** (Graphic and realistic-looking depictions of physical conflict. May involve extreme and/or realistic blood, gore, weapons, and depictions of human injury and death); **Mature Humor** (Vulgar and/or crude jokes and antics including "bathroom" humor); **Mature Sexual Themes** (Provocative material, possibly including partial nudity); **Mild Language** (Mild references to profanity, sexuality, violence, alcohol, or drug use); **Mild Lyrics** (Mild references to profanity, sexuality, violence, alcohol, or drug use in music); **Mild Violence** (Mild scenes depicting characters in unsafe and/or violent situations); **Nudity** (Graphic or prolonged depictions of nudity); **Partial Nudity** (Brief and mild depictions of nudity); **Sexual Violence** (Depictions of rape or other sexual acts); **Some Adult Assistance May Be Needed** (Early Childhood Descriptor only); **Strong Language** (Profanity and explicit references to sexuality, violence, alcohol, or drug use); **Strong Lyrics** (Profanity and explicit references to sex, violence, alcohol, or drug use in music); **Strong Sexual Content** (Graphic depiction of sexual behavior, possibly including nudity); **Suggestive Themes** (Mild provocative references or materials); **Tobacco Reference** (Reference to and/or images of tobacco products); **Use of Drugs** (The consumption or use of illegal drugs); **Use of Alcohol** (The consumption of alcoholic beverages); **Use of Tobacco** (The consumption of tobacco products); and **Violence** (Scenes involving aggressive conflict).

7. Representatives of the MPAA, the RIAA, and the ESRB were joined by Warren Buckleitner, editor of *Children's Software Revue*; David G. Kinney, President and CEO of PSVratings, Inc.; Lara Mahaney, Director of External Affairs of the Parents Television Council; Nell Minow of Common Sense Media; Vicky Rideout, Vice President of the Kaiser Family Foundation; Dr. David Walsh, President of the National Institute on Media and the Family; and Daphne White, Executive Director of The Lion & Lamb Project.

8. Kaiser Family Foundation, Zero to Six: Electronic Media in the Lives of Infants, Toddlers and Preschoolers (2003), www.kff.org/entmedia/3378.cfm. According to the study, approximately 25% of two-year-olds have televisions in their bedrooms. *Id.* at 5. By the time they are in the four-to-six-year-old age range, half of all children have played video games and 70% have used computers. *Id.*

9.  Although not the topic of this workshop, the television industry uses its own rating system that designates programs as **TV-Y** (appropriate for all children), **TV-Y7** (directed to children age 7 and above), **TV-Y7-FV** (directed to children age 7 and above and containing scenes of fantasy violence), **TV-G** (suitable for all ages), **TV-PG** (parental guidance suggested), **TV-14** (parents strongly cautioned), and **TV-M** (for mature audiences only).

10. According to David Kinney, in focus groups conducted by PSVratings, parents found multiple rating systems to be confusing and expressed a preference for a system that would provide more information about content and would apply across the board to movies, music, video games, and television. Tr. 74-75. Nell Minow of Common Sense Media cited a study conducted by her organization showing that 78% of parents surveyed favor a single rating system applied to all media. Tr. 96.

11. The ERSB's Patricia Vance noted that her organization has a toll-free telephone number and consumer hotline for feedback from parents and other interested parties. Tr. 240.

12. *See* Federal Trade Commission, *Marketing Violent Entertainment To Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*, Appendix F (Sept. 2000), available at www.ftc.gov/reports/violence/appendicesviorpt.pdf.

13. David A. Walsh & Douglas A. Gentile, *A Validity Test of Movie, Television, and Video-Game Ratings*, 107 PEDIATRICS 1302 (June 2001).

14. *Id.* at 1305-06.

15. During the question-and-answer period, Milwaukee Alderman Joe Davis observed that children's exposure to violent media was having deleterious effects on their behavior and could ultimately raise issues of national security. Tr. 115-16.

16. Panelists included Dean Garfield, Associate Counsel of the RIAA; Michele Erskine, Vice President of Solutions Research Group, Inc.; Pete Snyder, CEO of New Media Strategies; Fritz Attaway, Executive Vice President of the MPAA; Patricia Vance of the ESRB; Dr. David Walsh of the National Institute on Media and the Family; and Daphne White of The Lion & Lamb Project.

17. Federal Trade Commission, *Results of Nationwide Undercover Survey Released* (Oct. 14, 2003), available at www.ftc.gov/opa/2003/10/shopper.htm.

18. Panelists included Sean Bersell, Vice President-Public Affairs of the Video Software Dealers Association (VSDA); Jim Donio, Executive Vice President of the National Association of Recording Merchandisers (NARM); John Fithian, President of the National Association of Theatre Owners (NATO); Hal Halpin, President of the Interactive Entertainment Merchants Association (IEMA); Jules Polonetsky, Vice President-Integrity Assurance of America Online; Beverly Porway, Regulatory and Litigation Counsel for Toys 'R' Us, Inc.; Jonathan Potter, Executive Director of the Digital Media Association (DiMA); and Raymond L. Smith, Jr., Senior Vice President & Human Resources Counsel of Regal Entertainment Group.

19. Panelists included Mitch Bainwol of the RIAA; Douglas Lowenstein, President of the Entertainment Software Association (ESA); Dr. Michael Rich of the American Academy of Pediatrics; Jack Valenti of the MPAA; Patricia Vance of the ESRB; Dr. David Walsh of the National Institute on Media and the Family; and Daphne White of The Lion & Lamb Project.

20. One industry member voiced concern that attempts to work cooperatively with other groups had not been successful in the past, but expressed optimism that future efforts would be more successful. Tr. 41.

# Appendix B: Mystery Shopper Survey

This Appendix reports on the third nationwide undercover or "mystery shopper" survey that the Commission has conducted to determine the extent to which the entertainment industries restrict children's access to R-rated movies, explicit-content labeled music recordings, and M-rated games at the retail level. The Commission first conducted an undercover "mystery" shopper survey for the September 2000 Report to determine whether unaccompanied 13- to 16-year-olds could purchase tickets to R-rated movies, explicit-content labeled recordings, and M-rated games.[1] A follow-up survey was published in the December 2001 Report.[2] For the first time in this survey, the Commission also surveyed practices at stores selling R-rated movies on DVD.

## A. Industry Self-Regulatory Policies for Limiting Access

It is the retailers who implement any sales restrictions included in the self-regulatory rating and labeling programs. For movies, in response to the September 2000 Report, the National Association of Theatre Owners ("NATO") adopted a twelve-point initiative that, among other things, reaffirmed its existing ID-check policy for R and NC-17 films and promised to take steps to encourage theaters to enforce the rating system. In addition, NATO members appointed compliance officers to strengthen enforcement of the program. The Video Software Dealers Association ("VSDA") encouraged retailers to review their ratings education and enforcement polices to ensure compliance with VSDA's standard that R-rated movies and M-rated video games not be sold or rented to persons under age 17 without parental consent.[3]

The International Digital Software Association ("IDSA," now the Entertainment Software Association or "ESA") encouraged retailers to consider adopting a program not to sell M-rated games to persons under 17. The Interactive Entertainment Merchants Association, which supports member retailers' rating education efforts, has indicated that many of its members, including Wal-Mart, Blockbuster, Toys 'R' Us, Electronics Boutique, Target, and Circuit City, have adopted policies restricting the sale of M-rated games.[4] Retailers such as Kmart, Staples, and CompUSA have also adopted policies restricting sales to those under 17. With respect to retailer efforts to limit sales of M-rated games, IDSA previously noted that it "supported these efforts even though the Mature rating itself does not say that a title is not appropriate for a person under 17; rather, the rating says that the content 'may not be suitable' for a person under 17."[5]

For music recordings, the industry's labeling program provides no age-based guidance. According to the National Association of Recording Merchandisers, some music retailers choose not to carry explicit-content labeled recordings or stock only an edited version, while others restrict sales to children. Still other retailers "choose not [to] interfere with parenting decisions and sell entertainment products without regard to age."[6] Some music recording retailers have indicated that they have policies not to sell such recordings to children.

## B. The Mystery Shopper Surveys

The 2003 mystery shopper survey followed substantially the same methodology as the two previous surveys. For each, the Commission, through a contractor,[7] recruited 13- to 16-year-olds across the country to attempt to purchase movie tickets, music, or electronic games. Each teenage shopper visited one retail location for one or more of the entertainment products.[8] In all three surveys, shoppers attempted to purchase either a ticket to an R-rated movie, an explicit-content labeled CD,[9] or an M-rated electronic game; for the first time in the 2003 survey, the shoppers also attempted to purchase an R-rated movie on DVD. Parents transported the children to the store or theater but were instructed not to accompany the children during the transaction. The contractor required shoppers to submit proof of age and verification for completed purchases by submission of a receipt.[10] In each survey, the panel was divided almost exactly between boys and girls and between younger and older shoppers (13 or 14 versus 15 or 16).

After attempting purchase, the shopper completed a questionnaire on the contractor's proprietary website.[11] In each survey, the questionnaire asked three questions:

1. Was there a sign, poster, or other information to inform customers of the rating/advisory system or the store/theater's policy on rating/advisory enforcement?
2. Was the child able to buy the product or admission ticket?
3. Did the cashier or clerk ask the child's age before purchase?

## C. The 2003 Mystery Shopper Survey

In the 2003 survey, shoppers from 39 states attempted to purchase movie tickets, DVD movies, music recordings, and electronic games at 899 theaters and stores during July and August 2003. The sample size for each industry was 225, with slight variation. Almost half (49%) of the shoppers were female; about half (51%) were younger shoppers (13 or 14 years old). The results of the 2003 survey are reported in Table 1.

**Table 1**
**Total Percentages of Yes and No Responses to 2003 Survey Questions**

| Product | | Movies at the Theater (in percent, of 225 shoppers) | Movies on DVD (in percent, of 226 shoppers) | Music (in percent, of 223 shoppers) | Games (in percent, of 225 shoppers) |
|---|---|---|---|---|---|
| **Question 1** | NO | 38 | 74 | 79 | 73 |
| Was Rating Information Posted? | YES | 62 | 26 | 21 | 27 |
| **Question 2** | NO | 64 | 19 | 17 | 31 |
| Was the Child Able to Make a Purchase? | YES | 36 | 81 | 83 | 69 |
| **Question 3** | NO | 52 | 81 | 87 | 76 |
| Did an Employee Ask the Child's Age? | YES | 48 | 19 | 13 | 24 |

**Key Findings**

The key finding in this survey was the statistically significant, across-the-board improvement in retailers' performance in restricting children's access to potentially inappropriate content, in comparison with prior surveys (as shown in Table 2). Each of the industries that were previously surveyed were significantly[12] more successful in limiting children's access to potentially inappropriate content in 2003 than they had been in the 2001 survey. Both the electronic game retailers and movie theaters – but not music stores – were significantly more successful in limiting children's access than they had been in the initial survey in 2000.

**Table 2**
**Was the child able to buy the product or admission ticket?  (Percent "Yes")**

| Entertainment Product Type | 2000 Survey Results | 2001 Survey Results | 2003 Survey Results |
|---|---|---|---|
| Movie Theater Ticket | 46% | 48% | 36% |
| Movie on DVD | n/a | n/a | 81% |
| Music Recording | 85% | 90% | 83% |
| Electronic Game | 85% | 78% | 69% |

For each type of entertainment product, more shoppers noted that rating information was posted, and reported that the retail clerk or cashier had asked the shoppers' age. While these changes were not statistically significant in most cases, as shown in Table 3, they were in the same positive direction for each industry. Comparing the current survey to the first survey in 2000, for each of the industries previously surveyed, more teen shoppers noted signs or other information informing customers of the rating or advisory system or the venue's policy on enforcement in 2003 than in 2000; these differences were significant in each case. Another statistically significant difference from the 2000 survey was that more game retailers asked the shoppers' age.

**Table 3**
**Results on Availability of Rating Information/"Ask Age" Questions**

| Entertainment Product Type | Does the venue provide information about ratings or ratings enforcement?  (Percent "Yes") | | Did the cashier or clerk ask the child's age?  (Percent "Yes") | |
|---|---|---|---|---|
| | 2001 | 2003 | 2001 | 2003 |
| Movie Theater Ticket | 59% | 62% | 39% | 48%* |
| Movie on DVD | n/a | 26% | n/a | 19% |
| Music Recording | 12% | 21%* | 10% | 13% |
| Electronic Game | 26% | 27% | 21% | 24% |

* Denotes a statistically significant difference from the 2001 survey.  Data for comparison were not available for DVD retailers.

As in the previous surveys, theaters displayed rating information, asked young shoppers their ages, and restricted purchases more consistently than other entertainment retailers. Music retailers again were the least likely to provide information about the parental advisory, check shoppers' ages, and restrict purchases. DVD retailers' practices, surveyed for the first time, were approximately comparable to the music retailers' results for each measure, with slightly more DVD retailers posting rating information, asking age, and restricting purchase.

### Availability of Information about the Rating or Labeling Systems

At theaters, 62% of the shoppers reported seeing posters, signs, or other information about the rating system. The figures for the other three industries were in a lower range: 27% saw rating information at electronic game retailers, 26% at DVD retailers, and 21% at music retailers.[13] More shoppers at music stores (21%) reported that they had seen rating information than in the 2001 survey (12%).

### Purchase Data

While there is room for improvement in each industry, theaters have the best record in limiting sales of rated or labeled entertainment to children under 17. The 2003 survey results show that 36% of the teenage shoppers were successful in purchasing tickets for admission to an R-rated film at movie theaters. By contrast, 69% of the teenage shoppers were able to buy M-rated games, 81% were able to buy R-rated movies on DVD, and 83% were able to buy explicit-content labeled recordings. As noted earlier, sales restrictions are not part of the music industry's parental advisory program but individual retailers may adopt policies on their own initiative.

### Age-Check Data

As a corollary to the purchase question, shoppers also noted whether the store or theater asked the shopper's age when the teen approached the cashier to purchase the product or ticket. Music retailers asked the age of 13% of the shoppers, DVD retailers 19%, game retailers 24%, and movie theaters 48%. The extent to which movie theaters checked the ages of the teen shoppers increased from 39% in the 2001 survey to 48%, a significant difference. More stores selling music and games also asked age, although these changes were not significant.

### Age, Gender, and Major Chain Comparisons

As one would expect, older shoppers were more successful in purchasing a ticket to an R-rated movie, an explicit-content labeled recording, or an M-rated electronic game than younger shoppers. Shoppers' success in purchasing R-rated movies on DVD, by contrast, did not vary significantly according to the age of the shopper. The youngest shoppers, 13-year-olds, were able to purchase rated or labeled entertainment at 73% of DVD retailers and 69% of the music retailers, compared to 56% of

electronic game retailers and 25% of movie theaters.[14]  More girls than boys were able to purchase R-rated DVDs – possibly because cashiers asked only 15% of girls their age, compared to 23% of boys.

A comparison of major[15] chains in each industry showed that the largest theater circuits, DVD retailers, and music retailers were more likely to display signs, posters, or other information about the rating system than non-majors.  Moreover, major movie theater chains and DVD sellers were more likely to restrict sales to minors and to ask age.  Major music retailers were less likely to restrict sales and to ask age than non-majors.  At major theater chains, 28 of 99 shoppers (28%) attempting to buy tickets to an R-rated movie were successful;[16] at large music retailers, 114 of 127 shoppers (90%) were able to purchase explicit content-labeled recordings;[17] and at large electronic game retailers, 92 of 132 shoppers (70%) were able to purchase M-rated electronic games.[18]  At large DVD retailers, 89 of 120 shoppers (74%) were able to purchase R-rated DVDs.[19]

There were no statistically significant differences between major and non-major game retailers.  The Commission also analyzed separately, as in the December 2001 Report, the results for seven major game retailers that were recognized in the December 2001 Report as having policies to restrict sales of electronic games to minors.  Toys 'R' Us, Kmart, Wal-Mart, Target, Circuit City, Staples, and CompUSA were more likely than other game retailers to post information about the rating system (42% vs. 22%), to restrict sale (45% vs. 26%),[20] and to ask age (36% vs. 19%).  These seven chains allowed 29% of the 13-year-olds (5 of 17) to purchase M-rated games.  While other retailers have announced enforcement policies since 2001 – so the results cannot be characterized as a comparison of stores with policies versus those without – the relative success of these retailers' enforcement in relation to the industry as a whole suggests that retailers' commitment to enforce restrictive age policies can make a difference.  Still, even at these retailers, a majority of teen shoppers (55%) were able to purchase an M-rated game.

### Comments on the Undercover Shops

As part of the mystery shopper survey, the parents were asked to provide one or two sentences of commentary about the purchase attempt and describe any interaction that occurred between the child and the employees at the store or theater.  The comments shed light on industry practices in a way that numbers alone do not.  Many of the comments reflect that the cashier sold the product without a second thought.  In contrast, some teen shoppers came across cashiers who told them that they (the cashiers) would lose their jobs for selling the product to the teen.  Other shoppers encountered clerks who were complicit in the process, selling the product with full knowledge that the child was below the restricted age.  One phenomenon was that strangers sometimes offered to stand in for the parent so that the child could purchase the product.  Selected verbatim comments follow:[21]

–  When the child asked for tickets to Terminator 3, the cashier seemed astonished that she wanted to see this movie at her age and asked, "Do you know that is an R-rated movie?"  The cashier did not allow the child to buy the product.  (Movie at theater, age 15)

–   The employee asked to see the child's ID.  She looked around, said he was close enough, and sold him the ticket.  (Movie at theater, age 16)

–   The child attempted to purchase an M-rated video game but the cashier asked for a parent [sic] consent.  The cashier offered to hold the game until a parent was present.  (Game, age 13)

–   The clerk even asked another clerk if it was okay to sell an R-rated movie.  [The purchase attempt was successful.]  (DVD, age 13)

–   My child asked for a copy of Soldier of Fortune II, which was in a locked display case.  The clerk got it for him, sold it to him, and asked him to come back in to let him know how he liked the game.  (Game, age 14)

–   Child presented the CD to cashier and made the purchase with no questioning.  (Recording, age 13)

–   This employee successfully stopped my son from making this purchase.  There was a replacement item purchased.  (Game, age 13)

–   When the employee discovered the child was only 13, he asked if his parents were with him.  Once he established that the child was alone, he said, "Sorry buddy, I can't sell you this, or I'll get fired."  (DVD, age 13)

–   The employee asked the child to which movie he wanted to buy a ticket.  The child said, "Bad Boys II."  He sold the child the ticket.  Another employee was asking for identification from customers.  (Movie at theater, age 16)

–   The employee asked if the child was 17.  He said he was almost 16 and the employee continued with the transaction.  (Game, age 15)

–   The store clerk asked if he could help my daughter and her friend, who was also 13 years old.  They said they were looking for a birthday gift for their little brother, and the store clerk suggested the above M-rated title.  (Game, age 13)

–   The employee did not ask the child's age.  The employee said, "I'll put you in as a child so you can get the cheaper price."  (Movie at theater, age 15)

–   The man behind the counter was worried about the age of the child.  In fact he was trying to save him money by having him buy a pre-viewed [sic] one.  (Game, age 14; purchase attempt was successful)

–   There was a woman with a yellow Granger T-shirt, that neither [the child] or I knew who said, "I will vouch for her."  She did tell the cashier that she was not with her.  (DVD, age 13; purchase attempt was successful)

–   The clerk asked the child his age and very politely informed him that she could not sell him the movie. A customer behind him in line said that she was his neighbor, she isn't, and would vouch for him but the clerk declined. (DVD, age 14)

–   The package had a white sticker over the rating. The employee did not ask for my child's age, and the child was allowed to buy the product. (DVD, age 15)

–   The employee asked the child if it was "cool with his mom" that he bought the CD even though it carried the parental advisory. No further inquiries or proof of age were asked, and the child was allowed to purchase the product. (Recording, age 15)

–   My child was able to purchase an R-rated DVD. The clerk did not ask for an age, and there were no signs posted stating they would not sell R-rated DVD's to minors. (DVD, age 14)

–   There were three employees at the counter when my daughter asked for the ticket to the 9:30 show. They did not ask her age, and they gave her the student rate without asking for her ID. The theater was showing two PG-13 films also. (Movie at theater, age 14)

–   She asked for the game, and then this conversation followed: "Are you 18?" "No." "Are you 17?" "No." "OK, well technically I can't sell this to you, but if anyone asks, you didn't get it here." (Game, age 14)

–   My son was informed that he was not old enough to purchase the ticket, and that he would have to be accompanied by an adult. Also, he was told the movies he could see for his age. (Movie in theater, age 13)

–   The employee asked for proof of age and told my son, "No one here will sell you a ticket to that movie." (Movie in theater, age 15)

–   The employee did not look at the game while selling it. The employee just scanned it and took my child's money. (Game, age 14)

–   My child went through the U-scan, and it said to show verification of age to the cashier, but it went away without the child having to show her driver's license in order to complete the purchase. (Recording, age 16)

–   My son took the CD to the register. He had his money out as he handed the CD to the clerk. She looked at the CD, and asked if he had identification. He said he didn't. She said he couldn't buy it. (Recording, age 14)

–   My child observed a sign stating they didn't allow teens under 17 to enter R-rated films. The ticket was purchased during a slow period, and there were no adults in sight. No one asked his age. (Movie in theater, age 15; purchase attempt was successful)

–   My child was able to purchase a CD with the parental advisory label. There were no signs posted, and the clerk did not ask for age or identification. (Recording, age 15)

–   The employee told my daughter that the video game was Mature in case it made any difference to her. The employee did not ask my daughter how old she was, and she was allowed to buy the product. No signage was visible that explained the rating system. (Game, age 15)

–   The cashier in the music/movie department did not question my daughter when she purchased the R-rated DVD. There were signs posted at multiple registers saying they required proof of age for such purchases. (DVD, age 16)

–   No information regarding a rating/advisory system was offered on the sales floor. At the checkout an associate completed the child's CD transaction without asking his age. (Recording, age 15)

–   The cashier said, "Hello, will there be anything else?" When the child said no, she rang up the sale, saying thank you as she gave him the change and the R-rated DVD purchase. (DVD, age 16)

–   The child asked an associate for assistance in removing the video game from the locked case. The child then walked over to the cash register, and was able to purchase the video game with no questions asked. (Game, age 16)

**Mystery Shopper 2003 Survey Questionnaire**

1. Item child attempted to purchase
   ____ R-rated DVD
   ____ R-rated Movie Ticket
   ____ M-rated Video Game
   ____ Music Recording with Parental Advisory

2. Name of motion picture at theater, music recording, video game, or DVD the child attempted to purchase: _____
   For movie theaters and DVD's: provide title; For music recordings: provide artist's name and title; For video games: provide manufacturer name and title

3. Did you see any sign, poster, or other information to inform customers of the rating/advisory system or the store/theater's policy on rating/advisory enforcement?
   ____ Yes
   ____ No

4. Was the child able to buy the product?
   ____ Yes
   ____ No

5. Did the employee at the store/theater ask your child's age?
   ____ Yes
   ____ No

6. Purchase Comments
   Provide 1-2 sentences of commentary about purchase. Describe any interaction that occurred between your child and store/theater employees.

7. Name of store/theater visited: _____

8. City/State where store/theater is located: _____

9. ZIP Code where store/theater is located: _____

10. For movie theaters:  Number of movies currently shown at the theater
    _____ One
    _____ Two
    _____ More than two

11. Identifying information appearing on receipt/ticket
    Enter information that details the name and location of the store/theater exactly as it appears
    on the receipt/ticket.  If the original purchase was refused and an alternate purchase was made,
    enter the information from that purchase.

Evaluator Profile:

12. Parent's Evaluator ID _____

13. Child's Age _____

14. Child's Gender
    _____ Male
    _____ Female

15. Child's Ethnicity
    _____ Hispanic Origin (of any race)
    _____ American Indian, Eskimo or Aleut
    _____ Asian or Pacific Islander
    _____ Black
    _____ White

# Tables of Mystery Shopper Survey Data

## 1. Tables of Mystery Shopper Results by Age of Shopper

**Was the shopper able to make the purchase?**

### a. Movie Theaters

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 49 <br> 75%  | 34 <br> 71%  | 42 <br> 65%  | 18 <br> 38%  | 143 <br> 64% |
| Yes   | 16 <br> 25%  | 14 <br> 29%  | 23 <br> 35%  | 29 <br> 62%  | 82 <br> 36% |
| Total | 65           | 48           | 65           | 47           | 225   |

### b. Music Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 20 <br> 31%  | 7 <br> 15%   | 9 <br> 14%   | 2 <br> 4%    | 38 <br> 17% |
| Yes   | 45 <br> 69%  | 41 <br> 85%  | 54 <br> 86%  | 45 <br> 96%  | 157 <br> 83% |
| Total | 65           | 48           | 63           | 47           | 223   |

### c. Electronic Game Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 30 <br> 44%  | 11 <br> 23%  | 21 <br> 34%  | 7 <br> 15%   | 69 <br> 31% |
| Yes   | 38 <br> 56%  | 36 <br> 77%  | 41 <br> 66%  | 41 <br> 85%  | 156 <br> 69% |
| Total | 68           | 47           | 62           | 48           | 225   |

### d. DVD Movie Stores

|       | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|-------|--------------|--------------|--------------|--------------|-------|
| No    | 18 <br> 27%  | 9 <br> 18%   | 13 <br> 21%  | 4 <br> 8%    | 44 <br> 19% |
| Yes   | 49 <br> 73%  | 40 <br> 82%  | 49 <br> 79%  | 44 <br> 92%  | 182 <br> 81% |
| Total | 67           | 49           | 62           | 48           | 226   |

**Was the shopper asked his/her age?**

a.  Movie Theaters

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 32<br>49% | 23<br>48% | 31<br>48% | 31<br>66% | 117<br>52% |
| Yes | 33<br>51% | 25<br>52% | 34<br>52% | 16<br>34% | 108<br>48% |
| Total | 65 | 48 | 65 | 47 | 225 |

b.  Music Stores

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 55<br>85% | 43<br>90% | 53<br>84% | 44<br>94% | 195<br>87% |
| Yes | 10<br>15% | 5<br>10% | 10<br>16% | 3<br>6% | 28<br>13% |
| Total | 65 | 48 | 63 | 47 | 223 |

c.  Electronic Game Stores

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 54<br>79% | 38<br>81% | 40<br>65% | 40<br>83% | 172<br>76% |
| Yes | 14<br>21% | 9<br>19% | 22<br>35% | 8<br>17% | 53<br>24% |
| Total | 68 | 47 | 62 | 48 | 225 |

d.  DVD Movie Stores

|  | 13 years old | 14 years old | 15 years old | 16 years old | Total |
|---|---|---|---|---|---|
| No | 54<br>81% | 39<br>80% | 45<br>73% | 44<br>92% | 182<br>81% |
| Yes | 13<br>19% | 10<br>20% | 17<br>27% | 4<br>8% | 44<br>19% |
| Total | 67 | 49 | 62 | 48 | 226 |

## 2. Tables of Mystery Shopper Results by Gender

**Was the shopper able to make the purchase?**

|  | Males | Females |
|---|---|---|
| Movies at Theater | | |
| Respondents | 114 | 111 |
| Respondents Able to Purchase | 36 | 46 |
| Percent Able to Purchase | 32% | 41% |
| Music | | |
| Respondents | 112 | 111 |
| Respondents Able to Purchase | 90 | 95 |
| Percent Able to Purchase | 80% | 86% |
| Games | | |
| Respondents | 114 | 111 |
| Respondents Able to Purchase | 73 | 83 |
| Percent Able to Purchase | 64% | 75% |
| Movies on DVD | | |
| Respondents | 115 | 111 |
| Respondents Able to Purchase | 86 | 96 |
| Percent Able to Purchase | 75% | 86% |

**Was the shopper asked his/her age?**

|  | Males | Females |
|---|---|---|
| Movies | | |
| Respondents | 114 | 111 |
| Respondents Who Were Asked Their Age | 60 | 48 |
| Percent Who Were Asked Their Age | 53% | 43% |
| Music | | |
| Respondents | 112 | 111 |
| Respondents Who Were Asked Their Age | 15 | 13 |
| Percent Who Were Asked Their Age | 13% | 12% |
| Games | | |
| Respondents | 114 | 111 |
| Respondents Who Were Asked Their Age | 27 | 26 |
| Percent Who Were Asked Their Age | 24% | 23% |
| Movies on DVD | | |
| Respondents | 115 | 111 |
| Respondents Who Were Asked Their Age | 27 | 17 |
| Percent Who Were Asked Their Age | 23% | 15% |

### 3. Tables of Purchase Behavior by "Major" Chain vs. Non-"Major" Chain

**Did the shopper see any sign, poster, or other information to inform customers of the rating/ advisory system or the store/theater's policy on rating/advisory enforcement?  (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 55% | 14% | 30% | 17% |
| Major chain | 72% | 26% | 25% | 33% |

**Was the shopper able to purchase the item?  (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 43% | 74% | 69% | 88% |
| Major chain | 28% | 90% | 70% | 74% |

**Was the shopper asked his/her age?  (Percentage of "YES" Responses)**

| Type of Store or Theater | Movies | Music | Games | DVDs |
|---|---|---|---|---|
| Non-Major | 41% | 20% | 24% | 13% |
| Major chain | 57% | 7% | 23% | 25% |

# Endnotes

1.  *Appendix F, Marketing Violent Entertainment to Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries* ("September 2000 Report"), *available at* www.ftc.gov/reports/violence/appendicesviorpt.pdf. The September 2000 survey comprised 1,158 theaters and stores.

2.  *Marketing Violent Entertainment to Children: A One-Year Follow-Up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries* ("December 2001 Report"), *available at* www.ftc.gov/os/2001/12/violencereport1.pdf.

    The 2001 Mystery Shopper Survey comprised 900 theaters and stores.

3.  Retailers that participate in the program, titled "Pledge to Parents," also agree not to rent or sell NC-17 movies or AO-rated electronic games to anyone under 18.

4.  *See* Statement of Hal Halpin, President, Interactive Entertainment Merchants Association, FTC Workshop on Industry Self-Regulation (October 29, 2003), *available at* www.iema.org/news.php# (visited Nov. 4, 2003).

5.  *See* Testimony of Douglas Lowenstein, President, Interactive Digital Software Association, House Subcommittee on Telecommunications and the Internet, July 20, 2001. IDSA also stated that "the ultimate decision on what policies to adopt in stores properly lies with the individual retailers who are the best judge of the relationship they want with their own customers." *Id.*

6.  NARM also indicated that many retailers will accept returns if a parent concludes that a recording is inappropriate for his or her child. *See* NARM, *Parental Advisory: A Message to Parents About Children and Music*, *available at* www.narm.com/Content/NavigationMenu/P ublic_Affairs/Parental_Advisory2/Parental_Message/Parental_ Message.htm (visited Nov. 4, 2003).

7.  Second to None was the contractor.

8.  No shopper visited more than one location for each type of entertainment product.

9.  For music, one shopper went to Wal-Mart, which does not carry explicit-content labeled recordings. That attempt was excluded from the sample.

10. The contractor required shoppers to submit proof of age and verification for completed purchases by submission of a receipt; if they were not able to make a purchase, the shoppers were to buy another item at the store or a ticket to another movie to get a receipt, except in cases where the shopper went to a movie theater showing only one R-rated movie.

11. Parents completed the questionnaire on the website after getting the information from the child (*e.g.*, whether the child was able to purchase the product).

12. Note that differences cited in the analysis of the mystery shopper data are statistically significant differences, with $p<0.05$, unless otherwise noted. The terms "significant" or "significantly" are used in the statistical sense only.

13. Rating information may have been posted in additional stores and theaters, but not noticed.

14. By comparison, in the 2001 survey, 13-year-olds were able to purchase at 87% of music stores, 66% of electronic game stores, and 33% of movie theaters.

15. For purposes of this appendix, so-called "major" chains include only the very largest theater circuits and retailers in each industry. The "non-major" category includes independent stores as well as chains – including some large chains – that are not among the nation's very largest sellers of that category of product.

16. "Major" theater chains visited by the shoppers: American Multi-Cinema, Inc. (including General Cinema), Carmike Cinemas, Inc., Century Theatres, Cinemark USA, Inc., Loews Cineplex Entertainment Corp. (including Cineplex Odeon), Marcus Theaters, National Amusements, Inc., and Regal Cinemas, Inc. (including Hoyts Cinemas Corp. and United Artist Theatre Circuit, Inc.).

17. The "major" stores visited by shoppers were owned by the following companies: Best Buy Co., Circuit City Stores Inc., Kmart Corp., MTS, Inc. (Tower Records), Musicland Group, Inc., Target Stores, Inc., Trans World Entertainment Corp., and Wherehouse Entertainment, Inc.

18. The "major" retailers visited by the shoppers: Best Buy Co., Inc., Electronics Boutique Holdings Corp., GameStop Corp. (including Babbage's, FuncoLand, and Software Etc.), KB Toys, Kmart Corp., Target Stores, Inc., Toys 'R' Us, Inc., and Wal-Mart Stores, Inc.

19. "Major" DVD retailers were Best Buy Co., Inc., Blockbuster Inc., Circuit City Stores Inc., Kmart Corp., MTS, Inc. (Tower), Musicland Group (including Suncoast Motion Picture Company), Target Stores, Inc., and Wal-Mart Stores, Inc.

20. In 2001, 73% of the shoppers were able to purchase at these seven chain stores.

21. Note that these comments are not necessarily representative of the shoppers' experiences as a group. The shopper's age is provided in the parenthetical following each comment.

# Appendix C:  Data Collection Methodology And Television And Print Demographics

In this Report, the Commission has examined whether violent R-rated films, explicit-content labeled music, and M-rated video games continue to be marketed to children under the age designated in the rating (or, in the case of labeled music, to children under 17), and also whether rating information is included in advertisements for these products.  The Commission examined numerous media sources, including media popular with teens in terms of total teen audience or percentage of viewers under 18. This Appendix describes these sources and the media monitoring the Commission undertook to gather data for this Report, and sets forth demographic data for the audiences for the television programs, websites, and publications discussed in the Report.

## I.  Popular Televison Shows Among Teenagers

The Commission monitored advertising that occurred during eight weeks between May and July 2003 on network and cable television, including programs in syndication, with a particular focus on the after-school and early-prime time slots when youth are most likely to watch television.  The Commission also reviewed data showing where each particular ad for an R-rated movie, M-rated game, or explicit-content labeled recording first aired between June 2002 and early September 2003.

### A.  Network, Cable, and Syndicated Television Monitoring

The Commission contracted with a commercial advertising tracking firm, Video Monitoring Service ("VMS"), to track advertisements for R-rated, M-rated or explicit-content labeled products on popular teen television programs.  In selecting which television shows to review, the Commission focused on programs that were among the most popular with teens in terms of total teen audience or percentage of viewers under 18.  For a period of eight weeks between May and July 2003, VMS continuously monitored the cable, network, and syndicated[1] programs set out in Tables A and B.  All of these programs aired between 5 and 10 p.m.  The television audience data reported in the tables below is for audiences under age 18, or for audiences aged 2-17, as indicated.  Given that R-rated movies and M-rated electronic games are restricted only for children under 17, data for audiences under 17 would be most relevant; however, the age breakdowns set forth in the tables are the standard categories used for television audience measurement.

There were 59 ads for 7 violent R-rated films,[2] 31 ads for 13 different explicit-content labeled recordings, and 11 ads for 2 violent M-rated electronic games aired on the monitored programs.

**Table A:  Network and Cable Television Shows Monitored**

| Program | Average[3] Audience Age 2-17 (thousands) | Average Total Audience (thousands) | Audience Under 18 (%) | Network |
|---|---|---|---|---|
| 7th Heaven | 1624 | 6555 | 25% | WB |
| 106th & Park | 233 | 535 | 44% | BET |
| The Bernie Mac Show* | 2496 | 9163 | 27% | FOX |
| Direct Effect | 122 | 317 | 38% | MTV |
| Gilmore Girls | 1310 | 5159 | 25% | WB |
| King of the Hill* | 2971 | 9978 | 30% | FOX |
| Malcolm in the Middle* | 3438 | 10636 | 32% | FOX |
| Oliver Beene* | 3054 | 9907 | 31% | FOX |
| Rap City | 186 | 423 | 44% | BET |
| The Simpsons* | 4184 | 13825 | 30% | FOX |
| Smallville | 1618 | 6642 | 24% | WB |
| Total Request Live | 251 | 545 | 46% | MTV |
| WWE Smackdown | 1702 | 5541 | 31% | UPN |

\* Due to scheduling changes during the monitoring period, the television programs marked with an asterisk deviated at times from the time slot for which Nielsen data was obtained.  As a result, VMS monitored also some additional programs, a few of which had substantial teen audiences, including *American Idol* (Wednesday nights) (23% under 18) and *Cedric the Entertainer* (27% under 18).  Advertisements for rated or labeled products that aired during these programs were included in the totals reported above.

The syndicated programs monitored by VMS are set out below in Table B.  VMS also monitored ad placements on *The Simpsons*.  Although demographic data are not available for that program, it is perennially ranked as one of the most popular programs for youth.[4]

**Table B:  Syndicated Television Programs Monitored**

| Program | Average Audience Age 2-17 (thousands) | Average Total Audience (thousands) | Audience Under 18 (%) | Network |
|---|---|---|---|---|
| The Hughleys | 597 | 2072 | 29 | Syndicated |
| King of the Hill | 1512 | 5275 | 29 | Syndicated |
| Sabrina the Teenage Witch | 726 | 1619 | 45 | Syndicated |
| Steve Harvey | 661 | 2491 | 27 | Syndicated |

### B.  "First Airing" Data for Television Advertisements

To supplement the television advertising monitoring described above, the Commission obtained "first airing" data from VMS.  These data provide, among other information, the date, time, station, and program on which each different advertisement for a violent R-rated movie, explicit-content labeled recording, or violent M-rated game first aired.  These data document only the first showing of an advertisement, and provide no information about additional airings of the ad on that program or others.

The Commission reviewed first airing data for the period June 2002 through early September 2003. Focusing on advertisements initially shown on programs airing between 4:00 p.m. and 10:00 p.m., the Commission found that 19 ads[5] for 17 violent R-rated films or DVDs/home videos premiered on monitored programs – identified in Tables A and B above – or on other programs with substantial youth audiences.[6]  Advertising for 33 different explicit-content labeled albums appeared on the monitored programs or on other programs with substantial youth audiences.[7]  Fifteen ads for 11 violent M-rated games appeared on the monitored programs or on other programs with substantial youth audiences.[8]

## II.  Print Media

### A.  Magazines Reviewed to Assess Ad Placement

From June 2002 through October 2003, the Commission reviewed magazines with majority or substantial youth audiences including game enthusiast magazines, skateboarding magazines, music publications, wrestling magazines, and general interest teen magazines.  Many of these magazines had been previously identified in the marketing plans reviewed for the September 2000 Report as magazines used when the industries' target audience included children under 17.  Table C provides the names of the publications, the particular issues reviewed, and the demographics of readers (updated from the Commission's December 2001 Report, unless otherwise noted).

**Table C: Youth-Oriented Print Publications Reviewed**

| Magazine | Issues Reviewed | Age Demographics |
|---|---|---|
| 100% Independent Playstation 2 | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, Holiday 2002, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 | 46% age 12-17<br>Mean Age: 23 |
| CosmoGirl! | 6-7/02, 8/02, 9/02, 10/02, 11/02, 12/02-1/03, 3/03, 4/03, 5/03, 6-7/03, 8/03, 9/03, 10/03 | Median Age: 16.5 (data from December 2001 Report) |
| Electronic Gaming Monthly | 6/02, 7/02, 8/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 | 30% - 40% age 16 and under[9] |
| GamePro | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03 | 57% age 16 and under[10]<br>Mean age: 18 |
| Metal Edge | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03 | Average age: 21 |
| Nintendo Power | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7-8/03, 9/03, 10/03 | Median age: 13.4[11] |
| Right On! | 6/02, 7/02, 8/02, 9/02, 12/02, 5/03, 7/03, 8/03, 10/03 | Female median age: 15<br>Male median age: 18<br>(data from December 2001 Report)[12] |
| Seventeen | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03,  4/03, 5/03, 6/03, 7/03, 8/03, 9/03 | 37% between 12 and 17<br>Median age: 21.2 |
| Teen People | 8/02, 10/02, 11/02, 12/02-1/03, 3/03, 4/03, 5/03, 6-7/03, 8/03, 9/03, 10/03 | Median age: 15.6 |
| Thrasher | 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 | 77% under 18 |
| Tips & Tricks | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03 | 43% under 17<br>Average age: 21[13] |
| World Wrestling Entertainment | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 9/03, 10/03 | Data in industry documents indicates that the under-17 audience share may currently be between 30% and 40%.[14] |
| YM | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 | Median age: 16.1<br>(data from December 2001 Report)[15] |

The Commission also obtained data from Simmons Market Research Bureau, Inc., on the popularity of many of these magazines with young children and teens. As part of its annual National Consumer Survey, Simmons interviews teens and younger children on whether they read certain magazines.[16] These results, aggregated from Simmons surveys in the Fall of 2002 and the Spring of 2003, show several trends.

Game enthusiast magazines such as *GamePro* and *Electronic Gaming Monthly* were much more popular with young males, while magazines such as *Seventeen* and *YM* were much more popular with young females (based on responses of whether they read or looked into all four of four recent issues). For example, *Electronic Gaming Monthly* and *GamePro* consistently ranked in the top 10 magazines read by young males.[17] *Electronic Gaming Monthly* ranked #8 for pre-teen boys 9-11 years old, #6 for younger tween and teen boys 12-14 years old and #2 for older teen males 15-16 years old. *GamePro* ranked #6 with pre-teen boys 9-11 years old, #2 with younger tween and teen boys 12-14, and #9 with males 15-16 years old. Simmons data indicate that younger pre-teen and teen boys (those 9-11 years old and 12-14 years old) appear to prefer *GamePro*, while older teen males (15-16 years old) prefer *Electronic Gaming Monthly*.

Although game enthusiast magazines were some of the least read by young females, *Seventeen, Teen People,* and *YM* were the top magazines read by young females. *Seventeen* ranked #3 with females ages 12-14 and #1 with females ages 15-16. *Teen People* was #1 and #3 with females ages 12-14 and 15-16, respectively. *YM* ranked #2 with females in both the 12-14 and 15-16 year old age groups.

Wrestling and skateboarding enthusiast magazines were more popular with young males than females. *World Wrestling Entertainment* magazine ranked #26 with males 12-14 years old and #6 with males 15-16 years old. *Thrasher* (skateboarding enthusiast magazine) ranked #23 with males 12-14 years old and #26 with males 15-16 years old.

## B. Magazines and Newspapers Reviewed to Assess Rating Information

To assess whether or not a rating or rating reason was displayed clearly and conspicuously in an advertisement for a rated or labeled movie, music recording, or electronic game, the Commission examined the magazines mentioned above as well as the magazines and general circulation newspapers set out in Table D below. Because rating information is primarily for parents, the Commission reviewed general circulation periodicals, and not just periodicals aimed at children. These general circulation periodicals were not used to assess whether or not ads were targeted to children.

**Table D: Other Print Publications Reviewed for Rating Information**

| Magazines | Issues Reviewed |
|---|---|
| Computer Gaming World | 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 10/03 |
| Rolling Stone | 6/20/02, 7/4/02, 8/8/02, 9/19/02, 10/31/02, 11/14/02, 12/12/02, 3/20/03, 4/3/03, 5/15/03, 6/12/03, 7/10/03, 8/21/03, 9/18/03, 10/2/03 |
| Spin | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 |
| Vibe | 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 5/03, 6/03, 7/03, 8/03, 9/03, 10/03 |
| Wizard | 6/02, 7/02, 8/02, 9/02, 10/02, 11/02, 12/02, 3/03, 4/03, 6/03, 7/03, 8/03 |

| Newspapers | Issues Reviewed |
|---|---|
| Chicago Sun-Times | 9/20/02, 9/27/02, 10/4/02, 10/11/02, 10/18/02, 11/1/02, 11/8/02, 11/15/02, 11/22/02, 12/6/02, 12/13/02, 12/20/02, 12/27/02, 6/6/03, 6/13/03, 6/20/03, 7/11/03, 7/18/03, 7/25/03, 8/15/03 |
| Chicago Tribune | 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 5/9/03, 5/16/03, 6/6/03, 6/20/03, 7/4/03, 7/11/03, 7/18/03, 8/15/03 |
| Los Angeles Times | 9/5/02, 9/12/02, 9/19/02, 9/26/02, 10/3/02, 10/10/02, 10/17/02, 10/24/02, 10/31/02, 11/7/02, 11/14/02, 11/21/02, 11/28/02, 12/5/02, 12/12/02, 12/19/02, 12/26/02, 3/13/03, 3/20/03, 3/27/03, 4/3/03, 4/10/03, 4/17/03, 4/24/03, 5/1/03, 5/15/03, 5/22/03, 5/29/03, 6/5/03, 6/12/03, 6/19/03, 6/26/03, 7/10/03, 7/17/03, 7/24/03, 7/31/03, 8/7/03, 8/28/03, 9/4/03, 9/11/03, 9/18/03, 9/25/03 |
| New York Daily News | 10/18/02, 11/8/02, 11/15/02, 8/22/03 |
| New York Post | 10/11/02, 10/18/02, 11/1/02, 11/8/02, 11/15/02, 11/27/02, 12/6/02, 12/13/02, 12/20/02, 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 4/25/03, 5/2/03, 5/9/03, 5/16/03, 5/23/03, 5/30/03, 6/6/03, 6/13/03, 6/20/03, 6/27/03, 7/18/03, 7/25/03, 8/8/03, 9/12/03 |
| New York Times | 10/18/02, 10/25/02, 11/1/02, 11/8/02, 11/15/02, 11/22/02, 11/29/02, 12/6/02, 12/13/02, 12/20/02, 12/27/02, 3/7/03, 3/14/03, 3/21/03, 3/28/03, 4/4/03, 4/11/03, 4/18/03, 4/25/03, 5/2/03, 5/9/03, 5/16/03, 5/23/03, 5/30/03, 6/6/03, 6/13/03, 6/20/03, 6/27/03, 7/4/03, 7/11/03, 7/18/03, 7/25/03, 8/1/03, 8/8/03, 8/15/03, 8/22/03, 8/29/03, 9/5/03, 9/13/03, 9/26/03 |

## III. Website Demographics

Table E below sets out a list of certain websites on which R-rated movies, M-rated games, and/or explicit-content labeled recordings were advertised or planned to be advertised, according to documents submitted for this Report; the average audience share under age 18 for all of these was 30% or greater, as measured by unique visitors, from April to June 2003.[18]

**Table E: Website Audience Demographics**

| Website | % of Visitors Age 2-17 |
|---|---|
| alloy.com | 61% |
| bet.com | 39% |
| comedycentral.com | 35% |
| cosmogirl.com | 59% |
| ea.com | 31% |
| eagames.com | 37% |
| ebgames.com | 33% |
| gamespot.com | 33% |
| gamespy.com | 36% |
| gamestop.com | 37% |
| game-revolution.com | 40% |
| gamezone.com | 35% |
| ign.com | 40% |
| mtv.com | 38% |
| seventeen.com | 60% |
| teenpeople.com | 53% |
| ugo.com | 44% |

# Endnotes

1. The syndicated programs aired in New York City on channels 5, 9 and 11 on Fridays from 5-8 p.m. between May 9, 2003 and July 4, 2003, and in Los Angeles on channels 5 and 11 on Mondays from 5-7 p.m. between May 5, 2003 and June 30, 2003.

2. This total includes two ads for a film that was not rated at the time the ads aired, but ultimately was rated R.

3. The audience numbers appearing in Tables A and B came from data obtained from Nielsen Media Research for the time period of September 23, 2002 until April 22, 2003.

4. *See* April 2001 Report, Appendix A at A-4 and n.7.

5. In cases where more than one different advertisement for a particular motion picture, music recording, or game appeared in the first airing data, each different ad has been counted separately.

6. Using Nielsen data, the Commission identified other programs with substantial youth audiences in addition to those monitored. For motion pictures, these included UPN's *Girlfriends* (30% under 18).

7. For music recordings, the other programs with substantial youth audiences included MTV's *WWE Heat* (24% under 18).

8. For electronic games, the other programs with substantial youth audiences included WB's *Jamie Kennedy* (28% under 18).

9. Two different sources of demographic data indicate under-17 audiences of 30% and at least 40%, respectively.

10. The under-17 audience share reflects data for the subscription version of this magazine.

11. Data in industry documents indicate an under-17 audience share of at least 80%.

12. Data in industry documents indicate an under-17 audience share of more than 60%.

13. Similarly, data in industry documents indicate an under-17 audience share of more than 40%.

14. Data from the Commission's December 2001 Report indicated that 62% of the magazine's audience was aged 12 to 17.

15. Data from industry documents indicate an under-17 audience share between 45% and 50%.

16. The *Simmons Spring 2003 Teen Study*, administered to Teens, 12-17, asked about the frequency in which Teens, aged 12-17, read or look at 84 magazines. The *Simmons Spring 2003 Kids Study*, administered to children, aged 6-11, covered 25 magazines. Copies of the surveys are on file with the Commission.

17. Simmons asked survey participants to indicate how many of every four issues of a selected list of magazines they recently "have read or looked at." *Official U.S. Playstation Magazine* also ranked in the top 10 for boys 9-11, tween and teen boys 12-14, and males 15-16.

18. The Commission reviewed Nielsen//NetRatings data that was based on its panel of Internet users. Nielsen//NetRatings measures and reports Internet audience behavior based on data collected from home users in the United States.

# Appendix D: Internet Surveys

This Appendix sets forth, for the Motion Picture, Movie Recording, and Electronic Game Industries, the results of the Internet website surveys conducted by the Commission during the summer and fall of 2003.

## I. Motion Pictures

### A. Motion Picture Websites

The Commission examined websites advertising the following 20 motion pictures in August 2003: *28 Days Later, Bad Boys II, Better Luck Tomorrow, Buffalo Soldiers, City of Ghosts, The Dancer Upstairs, Freddy vs. Jason, Gigli, The Hard Word, House of 1000 Corpses, Identity, Jeepers Creepers 2, The Magdalene Sisters, A Man Apart, The Matrix Reloaded, Open Range, Phone Booth, Swimming Pool, Terminator 3: Rise of the Machines,* and *Wrong Turn.* The movies were selected based on the following criteria: they had a release date between April 1, 2003 and August 31, 2003, received an R-rating, and had a rating reason that involved violence. The studios that released these films included MPAA members as well as non-MPAA members.

### Motion Picture Website Review Results

|  | Summaries by Sites | | Percentage Yes |
|---|---|---|---|
|  | Yes | No |  |
| **Does the site display the movie's rating?** | 20 | 0 | 100% |
| On the home page or teaser page? | 18 | 2 | 90% |
| Is the word "Restricted" readable? | 20 | 0 | 100% |
| Is the rating visible without scrolling? | 16 | 4 | 80% |
| **Does the site display the movie's rating reason(s)?** | 20 | 0 | 100% |
| On the home page or teaser page? | 18 | 2 | 90% |
| Are the reason(s) readable? | 20 | 0 | 100% |
| Are the reason(s) visible without scrolling? | 16 | 4 | 80% |
| **Can a visitor view a trailer for the movie at the site?** | 20 | 0 | 100% |
| **Does the site provide a link to:** |  |  |  |
| MPAA.org? | 16 | 4 | 80% |
| filmratings.com? | 19 | 1 | 95% |
| parentalguide.org? | 19 | 1 | 95% |
| **Can a visitor purchase tickets to the movie at the site?** | 4 | 16 | 20% |
| **Does the site display the rating during the purchase process?** | 4 | 0 | 100% |
| **Does the site display the rating reasons during the purchase process?** | 2 | 2 | 50% |

## B. Motion Picture Theater Chain Websites

The Commission examined websites for the following motion picture theater chains: AMC, Carmike, Century Theatres, Cinemark, Clearview Cinemas, GKC Theaters, Goodrich Quality Theaters, Kerasotes Theatres, Landmark Theatres, Loews Cineplex, Marcus Theatres, National Amusement, Regal Cinemas, United Artists, and Wallace Theater Corp. With the exception of AMC, these theater chains are all members of the NATO.

### Theater Website Review Results

| | | |
|---|---|---|
| **Does the site display the films' MPAA ratings?** | 15 of 15 | 100% |
| **Does the site display or provide a link to films' rating reason(s)?** | 15 of 15 | 100% |
| **Does the site provide information about the MPAA rating system?** | 6 of 15 | 40% |
| **Does the site link to rating information at MPAA.org, parentalguide.org, or filmratings.com?** | 5 of 15 | 33% |
| **Does the site sell tickets, either directly or through a third-party website?** | 10 of 15 | 66% |

## C. Retailer Websites – Motion Picture DVDs

The Commission examined the practices of five online retailers in September and October 2003 – Amazon.com, BestBuy.com, CircuitCity.com, SamGoody.com, and TowerRecords.com – with respect to five violent R-rated movies: *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition.*

### Motion Picture DVD Retailer Review Results

| | **Amazon** | **Best Buy** | **Circuit City** | **Sam Goody** | **Tower Records** |
|---|---|---|---|---|---|
| **Does the site display the movies' ratings?** | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Is it the correct rating? | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Is the rating visible without scrolling? | 0 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 0 of 5 |
| **Does the site display the movie's rating reasons?** | 0 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Are they the official MPAA reasons? | n/a | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |
| Are the reasons visible without scrolling? | n/a | 5 of 5 | 3 of 5 | 5 of 5 | 5 of 5 |
| **Does the site provide a link to MPAA.org, filmratings.com, or parentalguide.org?** | 0 of 5 | 0 of 5 | 0 of 5 | 0 of 5 | 0 of 5 |
| **Does the site provide any information about the rating system?** | No | Yes | No | No | Yes |

### D. Rental Websites – Motion Picture DVDs

The Commission surveyed these rental sites: Netflix.com, Filmcaddy.com, and Movielink.com. The Commission reviewed practices pertaining to the same five movies reviewed for DVD retailer sites – *Blood Work, Gangs of New York, Identity, Red Dragon,* and *Road to Perdition* – in September and October 2003.

**DVD Rental Website Review Results**

|  | Netflix.com | Filmcaddy.com | Movielink.com |
|---|---|---|---|
| **Does the site display the movie's correct MPAA rating?** | 5 of 5 | 5 of 5 | 5 of 5 |
| Is the rating visible without scrolling? | 5 of 5 | 5 of 5 | 5 of 5 |
| **Does the site display the movie's official rating reasons?** | 5 of 5 | 0 of 5 | 5 of 5 |
| Are the reasons visible without scrolling? | 5 of 5 | n/a | 5 of 5 |
| **Does the site provide a link to MPAA.org, filmratings.com, or parentalguide.org?** | 0 of 5 | 0 of 5 | 0 of 5 |
| **Does the site provide any information about the MPAA rating system?** | No | No | Yes |

## II. Music Recordings

### A. Artist and Recording Company Websites

The Commission reviewed official artist and recording company websites for 20 different explicit-content labeled recordings. The recordings were selected based on their release date and by their appearance in *Billboard*'s list of top-selling music recordings. The websites reviewed were: www.daunbreakables.com, www.metallica.com, www.lizphair.com, www.staind.com, www.joebudden.com, www.50cent.com, www.blucantrell.com, www.crookedlettaz.com, www.coldonline.com, www.intothematrixmusic.com, www.madonna.com, www.typeonegative.net, www.3eb.com, www.mestcrapp.com, www.djkayslay.com, www.smileemptysoul.com, www.gangstarronline.com, www.godsmack.com, www.marilynmanson.com, and www.lilkim.com.

### Artist and Recording Company Website Review

| | YES | | NO | |
|---|---|---|---|---|
| | # | % | # | % |
| Does the site display the album's parental advisory label? | 12 | 60% | 8 | 40% |
| On the home page or teaser page? (of 12) | 8 | 67% | 4 | 33% |
| Are the words in the advisory readable? (of 12) | 8 | 67% | 4 | 33% |
| Is the label visible without scrolling? (of 12) | 9 | 75% | 3 | 25% |
| Can a visitor purchase the album at the site or, through a link, at a third-party site? | 15 | 75% | 5 | 25% |
| Is the album's PAL or other advisory language displayed on any page that must be visited during the purchase process? (of 15) | 10 | 67% | 5 | 33% |
| Can a visitor play all/part of a music video at the site? | 18 | 90% | 2 | 10% |
| Can a visitor play all/part of the album at the site? | 19 | 95% | 1 | 5% |
| Does the site provide a link to RIAA.org or parentalguide.org? | 3 | 15% | 17 | 85% |
| Does the site provide any detailed information about the Parental Advisory Label system? | 0 | 0% | 20 | 100% |
| Does the site provide lyrics? | 5 | 25% | 15 | 75% |

## B. Retailer Websites – Music Recordings

The Commission reviewed five music retailer sites: Amazon.com, Bestbuy.com, Circuitcity.com, Samgoody.com, and TowerRecords.com. Cdnow.com, which had been reviewed in the past, is now teamed with Amazon.com and for this review was replaced with Circuitcity.com. The recordings examined at these retailers' websites were *Get Rich or Die Tryin'* by 50 Cent; *Liz Phair* by Liz Phair; *The Street Sweeper Vol. 1* by DJ Kayslay; *Smile Empty Soul* by Smile Empty Soul; and *Life is Killing Me* by Type O Negative.

### Music Retailer Website Review

| | Amazon | Best Buy[1] | Circuit City | Sam Goody | Tower Records |
|---|---|---|---|---|---|
| Does the site indicate, either through a Parental Advisory Label or by other language, that the album has explicit content? | 3 of 5 | 4 of 4 | 5 of 5 | 5 of 5 | 5 of 5 |
| Does the site display at checkout the Parental Advisory Label or other language indicating explicit content? | 2 of 5 | 1 of 4 | 0 of 5 | 5 of 5 | 5 of 5 |
| Can visitors play at the site audio or video clips from explicit albums? | 5 of 5 | 0 of 4 | 0 of 5 | 5 of 5 | 5 of 5 |
| Does the site provide a link to parentalguide.org? | No | No | No | No | No |
| Does the site otherwise provide any detailed information about the Parental Advisory Label system? | 0 of 5 | 4 of 4 | 0 of 5 | 0 of 5 | 0 of 5 |

## III. Electronic Games

### A. Game Publisher Websites

The Commission examined the following 20 electronic game websites in August 2003: *Aquanox 2: Revelation*, *Casino, Inc.*, *Chrome*, *Codename Nina*, *Counter-Strike: Condition Zero*, *Crimsonland*, *Devastation*, *Die Hard Vendetta*, *Dino Crisis 3*, *Hunter the Reckoning - Wayward*, *Outlaw Volleyball*, *Postal 2*, *Purge*, *Return to Castle Wolfenstein*, *Silent Scope Complete*, *Soldier of Fortune 2: Double Helix*, *SWAT: Global Strike Team*, *The X-Files: Resist or Serve*, *Tom Clancy's Rainbow Six 3*, and *True Crime: Streets of L.A.* Each of the games selected was released in 2003 with an M-rating and a violence descriptor.

**Electronic Game Websites**

| Electronic Game Publisher Questions | Summaries by Sites | | Percentage |
|---|---|---|---|
| | Yes | No | Yes |
| **Does the site display the ESRB rating icon?** | 15 | 5 | 75% |
| On the home page or teaser page? [of 15] | 14 | 1 | 93% |
| Is the rating icon correct? [of 15] | 13 | 2 | 87% |
| Is the word "Mature" readable? [of 13] | 11 | 2 | 85% |
| Is the rating icon visible without scrolling? [of 15] | 6 | 9 | 40% |
| **Does the site display the game's content descriptors?** | 9 | 11 | 45% |
| Are the descriptors readable? [of 9] | 9 | 0 | 100% |
| Are the descriptors readable without scrolling? [of 9] | 4 | 5 | 44% |
| Is the visitor required to hold the cursor over the rating icon to view the descriptors? [of 9] | 6 | 3 | 67% |
| **Can a visitor play or view at the site a demo for the game?** | 15 | 5 | 75% |
| Is the rating icon displayed adjacent to name of game? [of 15] | 3 | 12 | 20% |
| Are the game's content descriptors displayed adjacent to the name of the game? [of 15] | 3 | 12 | 20% |
| **Does the site provide a link to:** | | | |
| ESRB.org? | 8 | 12 | 40% |
| parentalguide.org? | 0 | 20 | 0% |
| **Does the site provide any information about the ESRB rating system?** | 1 | 19 | 5% |
| **Can a visitor purchase the game at the site?** | 12 | 8 | 60% |
| Is the game's rating displayed on any page that must be visited during the purchase process? [of 12] | 11 | 1 | 92% |
| Are the game's content descriptors displayed on any page that must be visited during the purchase process? [of 12] | 3 | 9 | 25% |

## B. Retailer Websites – Electronic Games

The Commission reviewed five retailer websites: Amazon.com, BestBuy.com, CircuitCity.com, EBGames.com, and GameStop.com. CircuitCity.com was substituted for ToysRUs.com in this Report because Amazon.com and ToysRUs.com use the same Amazon.com site.

### Electronic Game Retailer Websites

| Electronic Game Retailer | Amazon | Best Buy | Circuit City | EB Games | Game Stop |
|---|---|---|---|---|---|
| **Does the site provide the game's ESRB rating in either icon or written form?** | 5 of 5 | 5 of 5 | 5 of 5 | 4 of 5 | 4 of 5 |
| Is it the correct rating? | 5 of 5[2] | 5 of 5 | 4 of 5[3] | 4 of 4 | 4 of 5 |
| Is the word "Mature" readable? | 3 of 5 | 5 of 5 | 5 of 5[4] | 4 of 4 | 5 of 5[5] |
| Is the rating visible without scrolling? | 5 of 5 | 5 of 5 | 5 of 5 | 4 of 4 | 5 of 5 |
| **Does the site display the game's content descriptor?** | 0 of 5 | 0 of 5 | 1 of 5 | 4 of 5 | 0 of 5 |
| Is it the official ESRB content descriptor? | | | 0 of 1 | 2 of 4 | |
| Is the descriptor visible without scrolling? | | | 1 of 1 | 4 of 4 | |
| **Does the site link to ESRB.org or to other information about the rating system?[6]** | 4 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |

## Endnotes

1. Best Buy sold only the "clean" version of one of the five recordings examined.

2. One game had the correct "Mature" rating on the Web page but also had a small "RP" icon on the game box that was visible when magnified.

3. One game was mistakenly identified as "Rating Pending" on the Web page, although an image of the box art did display a small "Mature" icon.

4. One game was assigned an incorrect "Rating Pending." That rating was readable.

5. One game was assigned an incorrect "Teen" rating, when it was actually rated "Mature." That "Teen" rating was readable.

6. Circuit City linked to the ESRB website and provided information on the rating system on an internal web page. The other sites did not link to ESRB.org but did link to information about the ESRB rating system on an internal web page.

| FEDERAL TRADE COMMISSION | FOR THE CONSUMER |
|---|---|
| 1-877-FTC-HELP | www.ftc.gov |