UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS ASSOCIATION,

                  Plaintiffs,

vs.

Case No. 05-CV-73634

HON. GEORGE CARAM STEEH

JENNIFER GRANHOLM, in her official
capacity as Governor of the State of
Michigan; MICHAEL A. COX, in his
official capacity as Attorney General
for the State of Michigan, et al., and
KYM L. WORTHY, in her official capacity
as Wayne County Prosecuting Attorney,

                  Defendants.
_____/

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This case questions the constitutionality of Michigan 2005 Public Act 108 ("P.A. 108" or "the Act"), which was signed into law by Gov. Granholm on September 14, 2005, and is to go into effect on December 1, 2005. The Act is designed to prohibit the dissemination, exhibiting, or display of certain sexually explicit and ultra-violent explicit video games to minors without the consent of their parents or guardians, and provides civil and criminal penalties against those who violate the Act. For purposes of this action, plaintiffs are not contesting the constitutionality of Part I of the Act relating to sexually explicit video games. The focus is on Part II, which relates to ultra-violent explicit video games. Oral argument was held on October 31, 2005. For the reasons

1

stated below, plaintiffs' motion for preliminary injunction preventing defendants and their officers, employees and representatives from enforcing Part II of the Act is GRANTED.

## FACTUAL BACKGROUND

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA") are associations of companies that create, publish, distribute, sell, and/or rent video games.

The Act makes it a state civil infraction for a person to "knowingly disseminate to a minor an ultra-violent explicit video game that is harmful to minors." Act, pt. II, § 17. A person who violates this provision is liable for a civil fine ranging from $5,000 to $40,000, depending on the number of violations. Id. The Act also provides misdemeanor criminal penalties of up to 93 days in prison, a fine of $25,000, or both, for store managers who permit a minor to "play or view the playing" of a prohibited video game. Id. § 20. "Ultra-violent explicit video games" under the Act are those that "continually and repetitively depict[] extreme and loathsome violence." Id. § 16(l). "Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture." Id. § 16(g). An "ultra-violent explicit video game" is "harmful to minors" under the Act if it has all the following characteristics:

> (I) Considered as a whole, appeals to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standards.
> (ii) Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.

>(iii) Considered as a whole, lacks serious literary, artistic, political, education, or scientific value for minors.

Id. § 16(h).

The Act's stated purposes for its restrictions on "ultra-violent explicit" video games are: "safeguarding both the physical and psychological well-being of minors," "preventing violent, aggressive and asocial behavior from manifesting itself in minors," and "directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, §§ 15(e), (f), (g). The Act finds that "minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression" and that "the effects of media violence on minors 'are measurable and long-lasting.'" Id. §§ 15(a), (b).

Plaintiffs make the following allegations in their complaint, as well as in their motion for preliminary injunction: (I) the Act violates freedom of speech under the First Amendment, because video games are fully protected speech; (ii) the Act violates the Fourteenth Amendment's Equal Protection Clause, because the Act restricts video games, but not other forms of media violence; (iii) the Act is unconstitutionally vague in that it fails to provide a standard to distinguish video games which are covered under the Act; and (iv) the Legislature's reliance of the industry's rating system is an unconstitutional delegation of powers by the Michigan legislature.

## STANDARD FOR PRELIMINARY INJUNCTION

The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court. CSX Transp., Inc. v. Tennessee State Bd. of

Equalization, 964 F.2d 548, 552 (6th Cir. 1992). In determining whether to grant or deny an injunction, the district court is required to consider four factors:

1. whether the movant is likely to prevail on the merits;

2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. whether a preliminary injunction would cause substantial harm to others; and

4. whether a preliminary injunction would be in the public interest.

G & V Lounge v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1076 (6th Cir. 1994) (citing International Longshoreman's Ass'n v. Norfolk S. Corp., 927 F.2d 900, 903 (6th Cir. 1991), cert. denied, 502 U.S. 813 (1991).

The primary purpose of a preliminary injunction is to maintain the status quo until a decision on the merits can be made. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). The court is to be flexible in its consideration, and the four factors are not individual prerequisites to be met, but are viewed as a whole, with each leg of the test balanced against and among the others. In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).

## ANALYSIS

1. Likelihood of Success on Merits

The Sixth Circuit has held that video games constitute expression protected by the First Amendment. James v. Meow Media, 300 F.3d 683 (6th Cir. 2002) (video games can be constitutionally protected free speech in the context of a negligence action in which plaintiff sought to attach tort liability to communicative aspects of defendant's video games). Furthermore, depictions of violence are entitled to full

constitutional protection.  See, <u>American Amusement Machine Ass'n (AAMA) v. Kendrick</u>, 244 F.3d 572, 575-76 (7th Cir. 2001).

The Act regulates video games based on their content, specifically those games that depict "extreme and loathsome violence."  Therefore, the Act is subject to review under the strict scrutiny standard.  A content-based restriction on speech is presumptively invalid, so defendants have the burden of demonstrating that the Act is necessary to serve a compelling state interest and that it is narrowly tailored to achieve that end.  See, <u>IDSA v. St. Louis County</u>, 329 F.3d 954, 958 (8th Cir. 2003).

    a. <u>Compelling State Interest</u>

The Michigan Legislature considered evidence regarding the negative effects of violent video games on the brain function and behavior of minors.  For example, the Michigan Legislature looked at studies by Dr. William Kronenberger which indicate that exposure to media violence is related to poorer executive functioning in adolescents.  Dr. Kronenberger's team concluded that both video game and television media violence exposure are related to aggression in adolescents.  However, this research did not evaluate the independent effect of violent video games, and thus provides no support for the Act's singling out of video games from other media.  More recent research by the Kronenberger team on the relation between media violence exposure and brain activation as measured by functional magnetic resonance imaging (fMRI) allegedly suggests that media violence exposure may be associated with alterations in brain functioning.  However, these findings are called into question by plaintiff's expert. (Declaration of Dr. Howard C. Nusbaum).

The Michigan Legislature also considered social science evidence regarding a relationship between video game violence and aggressive feelings and behavior, relying largely on the work of Dr. Craig Anderson. (Defendant's Appendix 10A - 10FFF). Dr. Anderson's work has been rejected as a basis for restricting expression by other courts considering similar laws. Citing Dr. Anderson's work, the Seventh Circuit held that the "studies do not support the ordinance," for two reasons. First, the studies did not show that "video games have ever caused anyone to commit a violent act . . . or have caused the average level of violence to increase anywhere." AAMA, 244 F.3d at 578-79. Second, they do not show "that violent video games are any more harmful to the consumer or to the public safety than violent movies or other violent, but passive, entertainments." Id. at 579. In addition, many experts disagree with the claims asserted by Dr. Anderson and others. See, e.g., Declaration of Jeffrey H. Goldstein.

A cursory review of the research relied upon by the state shows that it is unlikely that the State can demonstrate a compelling interest in preventing a perceived "harm."

   b. Narrowly Tailored

Even assuming defendants could demonstrate a compelling state interest, there are defects which prevent them from satisfying the other demand of strict scrutiny, that the Act be narrowly tailored to achieve its legitimate purpose. The State suggests the Act is narrowly tailored because it does not ban adult speech. However, the Act will likely have a chilling effect on adults' expression, as well as expression that is fully protected as to minors. The response to the Act's threat of criminal penalties will likely be responded to by self-censoring by game creators, distributors and retailers, including ultimately pulling "T" and "M"-rated games off store shelves altogether.

There is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act. Without wholesale, indiscriminate refusals to sell video games to minors by store operators it appears impossible to protect sellers from prosecution. Store clerks cannot rely on the industry's voluntary rating system, other than potentially to invoke one of the affirmative defenses provided in the Act. Nor is it reasonable to expect store clerks to play each level of each game to determine if it falls within the Act's definition of ultra-violent explicit. Indeed, very few experienced video players can successfully reach the highest levels of many games in order to view their content. At oral argument, when asked by the court how a retailer could avoid criminal penalties under the Act, the attorney for the State suggested that a video retailer could call plaintiff's attorney to determine if a particular video game has ultra-violent explicit content. This is all but a direct concession that a retailer cannot reasonably, economically, or easily make a determination whether the content of a particular video game is prohibited under the Act as to minors.

This court concludes that defendants are not likely to succeed on the merits.

2. Irreparable Injury

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998). The harm stems from the fact that people will be deterred from exercising their rights in the future. United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority ("SORTA"), 163 F.3d 341, 363 (6th Cir. 1998).

3. Harm to Others / Public Interest

      Considerations of the public interest and the relative harm to others resulting from the entry of a preliminary injunction in this case are subsumed in the court's consideration of the likelihood of success on the merits. First, the State has been unable to demonstrate the perceived harm it seeks to protect against. Second, there is an obvious risk of harm with enforcement of the Act, including the prosecution of individuals for selling offending video games. In addition, there is the obvious harm that results from stifling free speech. A consideration of these factors weighs in favor of granting a preliminary injunction.

## CONCLUSION

      For the reasons stated above, plaintiffs have demonstrated that the Act is unlikely to survive strict scrutiny, and that irreparable harm follows from the loss of First Amendment freedoms. The court therefore GRANTS plaintiffs' motion for preliminary injunction, and enjoins enforcement of Part II of Michigan 2005 Public Act 108.

                                          s/George Caram Steeh
                                          GEORGE CARAM STEEH
                                          UNITED STATES DISTRICT JUDGE

Dated: November 9, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on November 9, 2005, by electronic and/or ordinary mail.

                                          s/Josephine Chaffee
                                          Secretary/Deputy Clerk