## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

        Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

        Defendants.

_____ /

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

        and

JENNER & BLOCK LLP
By:    Paul M. Smith
        Katherine A. Fallow
        Kathleen R. Hartnett
        Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

_____ /

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By:    Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Detroit_665522_1

Dockets.Justia.com

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Entertainment Software Association, Video Software Dealers Association, and Michigan Retailers Association (collectively, "Plaintiffs") respectfully move for summary judgment against Governor Granholm, Attorney General Cox, and Prosecuting Attorney Worthy, (collectively "Defendants") and ask that Bill No. 416 (Mich. 2005) (hereinafter, the "Act") be permanently enjoined.

In support of this Motion, Plaintiffs state as follows:

1.      The Act was signed into law on September 14, 2005, and was due to take effect on December 1, 2005.  The Act places civil and criminal penalties on the sale, rental and viewing of "ultra-violent explicit video games" to individuals under age 17 and imposes other burdens on the expression of consumers, video game retailers, and video game creators.

2.      Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games.  On September 21 2005, Plaintiffs filed a five-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.  As set forth in each count of the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression, equal protection, and due process, and because it is unconstitutionally vague.

3.      Plaintiffs also filed a motion for a preliminary injunction, which this Court granted on November 9, 2005.  In that order, this Court concluded that Defendants "are not likely to succeed on the merits."  This Court noted the weaknesses in the evidence Defendants presented, and recognized that the Seventh Circuit had already rejected such evidence as failing to demonstrate that video games are harmful to minors in *American Amusement Machine Ass'n*, 244 F.3d 572, 578-79 (7th Cir. 2002).  This Court also emphasized the ambiguity of the Act's

Detroit_665522_1

terms and found that "there is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act."

4.      Plaintiffs are now entitled to summary judgment.  There is no genuine dispute of material fact here requiring further factual development.  The Act imposes a content-based regulation on protected speech and is subject to strict scrutiny.  Defendants cannot meet this standard.  The Act cannot be justified by a concern with preventing aggressive or violent behavior in minors because there is no evidence suggesting the Act meets the standard of *Brandenburg v. Ohio*, 395 U.S. 444 (1969).  Nor does the Defendant's alternative justification for the Act—protecting the psychological well-being of minors—pass constitutional muster.  The State may not regulate protected speech because it affects listeners' attitudes, and there is no evidence in any case that video games are psychologically harmful.      .

5.      In addition, the Act is unconstitutionally vague, as Defendants all but admitted at the hearing on Plaintiffs' motion for a preliminary injunction.

6.      In support of this Motion, Plaintiffs are submitting a memorandum of law, explaining in more depth why summary judgment is warranted.

7.      Pursuant to E.D. Mich. L.R. 7.1, counsel for Plaintiffs sought concurrence in this motion.  Concurrence was not obtained.

Detroit_665522_1

WHEREFORE, Plaintiffs request that this Court enter summary judgment against Defendants and permanently enjoin the Act as unconstitutional under the First and Fourteenth Amendments.

Respectfully submitted,

BODMAN LLP


By:    /s/ Alicia J. Blumenfeld_____
       Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone:  (313) 259-7777
Facsimile:  (313) 259-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

and

JENNER & BLOCK LLP
By:    Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

December 23, 2005

Detroit_665522_1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

               Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

               Defendants.

_____/

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

       and

JENNER & BLOCK LLP
By:    Paul M. Smith
        Katherine A. Fallow
        Kathleen R. Hartnett
        Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

_____/

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By:    Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Detroit_665529_1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................1

BACKGROUND ......................................................................................................................3

ARGUMENT ...........................................................................................................................5

I.    STANDARD OF REVIEW ...........................................................................................5

II.   THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE
      VIOLATES THE FIRST AMENDMENT .....................................................................6

      A.  The Act Fails The *Brandenburg* Standard .......................................................7

      B.  The Act Cannot Be Justified By The State's Purported Interest In Shaping The
          Psychological Development Of Minors............................................................11

      C.  The Act Does Not Advance The State's Interests And Is Not Narrowly
          Tailored ............................................................................................................14

III.  THE ACT IS UNCONSTITUTIONALLY VAGUE ....................................................16

CONCLUSION......................................................................................................................20

i

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ............................................................16

*American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572 (7th Cir. 2001) .....2, 6, 9, 13, 15

*Ashcroft  v. Free Speech Coalition,* 535 U.S. 234 (2002) ...................................................7, 11, 12

*Banks v. Principi,* 386 F. Supp. 2d 921 (E.D. Mich. 2005) ............................................................5

*Boos v. Barry,* 485 U.S. 312 (1988)..............................................................................................12

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).....................................................................................7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...............................................................................5

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ......................................................................7

*Entertainment Software Ass'n v. Blagojevich,* No. 05C4265, ___ F. Supp. 2d ___, 2005
        WL 344810 (N.D. Ill. Dec. 2, 2005)................................................................................ *passim*

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ...............................................................12

*Florida Star v. B.J.F.,* 491 U.S. 524 (1989) .................................................................................15

*Ginsberg v. New York,* 390 U.S. 629 (1968). ...............................................................................13

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ......................................................................17

*Interactive Digital Software Ass'n v. St. Louis County,* 329 F.3d 954 (8th Cir. 2003) ...2, 6, 13, 14

*James v. Meow Media, Inc.,* 300 F.3d 683 (6th Cir. 2002)................................................3, 6, 7, 13

*Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495 (1952). ..................................................................12

*Kolender v. Lawson,* 461 U.S. 352 (1983)....................................................................................17

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) .................................................12

*NAACP v. Button,* 371 U.S. 415 (1963)........................................................................................17

*R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992) ...................................................................6, 14, 15

*Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997) .....................................................17

ii

*Sable Communications of California, Inc. v. FCC,* 492 U.S.115 (1989) ......................................16

*Texas v. Johnson,* 491 U.S. 397 (1989) .............................................................................7, 12

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) ...............................5, 15, 16

*Video Software Dealers Ass'n v. Maleng,* 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ......................................................................................................2, 6, 13, 14, 19

*Video Software Dealers v. Schwarzenegger,* No. 05-04188, ___ F. Supp. 2d ____ (N.D. Cal. Dec. 21, 2005) .............................................................................................1, 6, 8, 13

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) ....................................18

*Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275 (W.D. Mo. 1991), *aff'd,* 968 F.2d 684 (8th Cir. 1992) .....................................................................................................19

## Statutes

2005 Mich. Legis. Serv. P.A. 108.........................................................................................*passim*

## Other Authorities

Kronenberger*, et al., Media Violence Exposure in Adolescents*, 31 AGGRESSIVE BEHAVIOR 213 (2005) ..............................................................................................................9

iii

# INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment invalidating the 2005 Michigan Public Act 108 (Mich. 2005) (hereinafter, the "Act"), 2005 Mich. Legis. Serv. P.A. 108, as an unconstitutional abridgement of speech under the First and Fourteenth Amendments, and as unconstitutionally vague under the Fourteenth Amendment.[1]

This Court has already granted Plaintiffs a preliminary injunction enjoining enforcement of the Act by Defendants (the "State"). *See* Order Granting Plaintiffs' Mot. for Prelim. Inj., *Entertainment Software Ass'n v. Granholm*, No. 05-CV-73634, 2005 WL 3008584 (E.D. Mich. Nov. 9, 2005) ("PI Order"). As this Court recognized, the Act imposes a content-based ban on "violent" video games subject to strict scrutiny. *Id.* at *3. And as the Court also preliminarily recognized, the Act fails strict scrutiny. The justifications offered by the State are insufficient both on their face and because of a lack of evidence that the Act actually serves those purposes in a narrowly tailored way. Moreover, the Act's vagueness – which the State has all but conceded – provides an independent basis for the Court to rule in Plaintiffs' favor.

The current record establishes these constitutional infirmities, and no evidence the State can offer will suggest that a trial might lead to another outcome. This conclusion is consistent with that of all federal courts addressing similar attempts at regulating "violent" video games, including two decisions that were issued since this Court entered its preliminary injunction: *Entertainment Software Ass'n v. Blagojevich*, No. 05C4265, 2005 WL 344810 (N.D. Ill. Dec. 2,

---

[1] Plaintiffs at this time do not move for summary judgment on their equal protection and due process claims.

1

2005) ("*Blagojevich*") (attached as Exhibit 1), which permanently enjoined a similar law in

Illinois, and *Video Software Dealers v. Schwarzenegger*, No. 05-04188, ___ F. Supp. 2d ____

(N.D. Cal. Dec. 21, 2005) ("*Schwarzenegger*") (attached as Exhibit 2), which entered a

preliminary injunction against a similar law pending further proceedings.  These rulings join the

many others striking down similar laws.  *See Interactive Digital Software Ass'n v. St. Louis

County*, 329 F.3d 954, 960 (8th Cir. 2003) ("*IDSA*"); *Am. Amusement Mach. Ass'n v. Kendrick*,

244 F.3d 572, 580 (7th Cir. 2001) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F.

Supp. 2d 1180, 1186-88 (W.D. Wash. 2004) ("*VSDA*").

     In *Blagojevich*, the State of Illinois relied on the research of Dr. Craig Anderson and Dr.

William Kronenberger, the same researchers cited by the State in defense of the Michigan Act.

In a lengthy opinion discussing this research, the district court found that the research of Dr.

Anderson and Dr. Kronenberger fell far short of the "substantial evidence" needed to support the

restriction on video game expression.  *Blagojevich* at *19-20.  The court held that the Illinois law

was unsupported by a compelling state interest, concluding that the law could not meet the strict

standard of *Brandenburg v. Ohio*, and that the state lacked any legitimate interest in regulating

minors' thoughts or attitudes.  *Id.* at *20.  The court further held that the Illinois law was not

narrowly tailored and was unconstitutionally vague.  *Id.* at *22-23.

     The Michigan Act fails for the same reasons the Illinois law was held to be

unconstitutional.  Critically, the only legitimate government interest advanced by the State – that

exposure to "violent" video games causes increased aggression in some minors – utterly fails the

*Brandenburg* standard.  For that reason alone, the Act fails strict scrutiny and must be

invalidated.  In any event, the Act's restrictions on speech are entirely unsupported by the record

in this case.  Further factual development will not make the Act's content-based regulation more

Detroit_665529_1

legitimate or more well-founded.  Nor will it make the Act's unconstitutionally vague terms clearer.  Because the State cannot show that there is a genuine dispute of fact remaining in the case, Plaintiffs respectfully ask for summary judgment and that the Ace be permanently enjoined.

## BACKGROUND

Plaintiffs are associations of companies that create, publish, distribute, sell and/or rent video games.  Andersen Decl. ¶ 3 (attached as Exh. 1 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.); Lowenstein Decl. ¶ 2 (attached as Exh. 3 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.).  In this facial challenge, Plaintiffs also assert the rights of willing listeners.  Compl. ¶ 14.

In granting a preliminary injunction to enjoin the Act, this Court has already recognized that "video games constitute expression protected by the First Amendment" under Sixth Circuit precedent.  PI Order at *2 (citing *James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002)).  Video games are a modern form of artistic expression.  Like film and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text.  *See* Price Decl. ¶¶ 3-4 (attached as Exh. 2 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.).

The Act makes it a state civil infraction for a person to "knowingly disseminate to a minor an ultra-violent explicit video game that is harmful to minors."  Act, pt. II, § 17.  A person who violates this provision is liable for a civil fine ranging from $5,000 to $40,000, depending on the number of violations.  *Id.*

The Act also provides misdemeanor criminal penalties of up to 93 days in prison, a fine of $25,000, or both, for store managers who permit a minor to "play or view the playing" of a prohibited video game. Id. § 20.  "Ultra-violent explicit video game[s]" under the Act are those that "continually and repetitively depict[] extreme and loathsome violence."  Id. § 16(l).

3

"Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical

injuries or physical violence against parties who realistically appear to be human beings,

including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming,

disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture."

Id. § 16(g).  An "ultra-violent explicit video game" is "harmful to minors" under the Act if it has

all the following characteristics:

> (i)  Considered as a whole, appeals to the morbid interest in
> asocial, aggressive behavior of minors as determined by
> contemporary local community standards.
>
> (ii)  Is patently offensive to contemporary local community
> standards of adults as to what is suitable for minors.
>
> (iii)  Considered as a whole, lacks serious literary, artistic,
> political, education, or scientific value for minors.
>
> *Id.* § 16(h).

The Act's stated purposes for its restrictions on "ultra-violent explicit" video games are:

"safeguarding both the physical and psychological well-being of minors," "preventing violent,

aggressive and asocial behavior from manifesting itself in minors," and "directly and

substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit

video games."  Act, pt. II, §§ 15(e), (f), (g).  The Act purports to make "findings" that "minors

who play ultra-violent explicit video games are consistently more likely to exhibit violent,

asocial, or aggressive behavior and have feelings of aggression" and that "the effects of media

violence on minors 'are measurable and long-lasting.'"  *Id.* §§ 15(a), (b).

Plaintiffs filed a complaint on September 23, 2005, seeking to enjoin the Act from taking

effect.  Plaintiffs also sought preliminary relief, which this Court granted on November 9, 2005.

In opposing Plaintiffs' motion for a preliminary injunction, the State argued that the Legislature

Detroit_665529_1

relied on substantial social scientific research in passing the law.  The State's argument that it has compelling state interests in protecting minors from "physical and psychological" harm was based primarily upon the research of Dr. Anderson and Dr. Kronenberger.  State Opp. Mot. Prelim. Inj. at 13-15, 17.  Since the completion of the preliminary injunction proceedings in this case, both Dr. Anderson and Dr. Kronenberger have testified before the district court in the Illinois case.  During that proceeding, Dr. Anderson and Dr. Kronenberger made critical concessions on the record that underscore the deficiency of the research relied upon by the State here.  And in striking down the law in its December 2nd decision, the district court in Illinois specifically found that the research of Dr. Anderson and Dr. Kronenberger fell far short of the level of evidence needed to support the law's restriction on speech.  *Blagojevich* at *20.

## ARGUMENT

## I.    STANDARD OF REVIEW.

The State has the burden of proof at trial to establish that the Act passes First Amendment scrutiny.  *See, e.g.*, *United States v. Playboy Entm't Group*, 529 U.S. 803, 816-17 (2000).  Thus, to survive Plaintiffs' summary judgment motion, the State must come forward with sufficient evidence to create a genuine issue of material fact on each and every "element essential to [its] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A fact is material only if it might affect the outcome of the case under the governing law."  *Banks v. Principi*, 386 F. Supp. 2d 921, 925 (E.D. Mich. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The State thus must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  And the Court "has some discretion to determine whether [the State's] claim is plausible."  *Id*. (citing *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996)).

5

The State cannot meet its burden because there is no genuine dispute of fact with respect to *any* element of the State's case, much less all of them.

## II. THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE VIOLATES THE FIRST AMENDMENT.

This Court has already determined, consistent with the Sixth Circuit and numerous other courts, that video games are speech protected by the First Amendment.  PI Order at *4.  *James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002); *AAMA*, 244 F.3d at 577-78; *IDSA*, 329 F.3d at 957; *Blagojevich* at *17-18; *Schwarzenegger*, Slip Op. at 11; *VSDA*, 325 F. Supp. 2d at 1184-85.  There can be no doubt that the Act's restriction on games containing "extreme and loathsome violence" is content-based.  As a result, the restriction is "presumptively invalid" and subject to strict scrutiny.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

Plaintiffs are entitled to summary judgment because the Act fails every stage of the strict scrutiny analysis.  Strict scrutiny requires the State to demonstrate that the Act "is necessary to further a compelling state interest."  *Id.* at 403.  In making this showing, the State cannot just simply 'posit the existence of the disease sought to be cured.'"  *Blagojevich* at *18 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994)).  Instead, it must point to "substantial evidence" supporting its claim.  *Id*.  Because the State's goals are illegitimate and not supported by substantial evidence, summary judgment is warranted.  *Infra*, §§ II.A; II.B.  Strict scrutiny also requires the State to demonstrate that the Act is narrowly-tailored and materially advances its interests.  The record is clear that the Act fails these aspects of strict scrutiny, *infra*, §§ II.C, and thus Plaintiffs are entitled to summary judgment on these grounds as well.

Detroit_665529_1

A.    **The Act Fails The *Brandenburg* Standard.**

Summary judgment is warranted because the core purpose of the Act – to prevent minors from engaging in violent or aggressive behavior and related harms supposedly caused by exposure to "violent" video games, Act, pt. II, §§ 15(a), (b), (f), (g) – cannot meet the stringent standards established by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" that meets the *Brandenburg* standard.); *id*. at 698 ("all expression [whether] advocacy or not, [must] meet the Brandenburg test before its regulation for its tendency to incite violence is permitted.") *Id.* at 699.

Under *Brandenburg*, the government must prove that the targeted expression "is directed to inciting or producing the imminent lawless action and is likely to incite or produce such action." *Ashcroft v. Free Speech Coal*., 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S., at 447) (emphasis added); *James*, 300 F.3d at 698. As the Supreme Court has explained, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Texas v. Johnson*, 491 U.S. at 409 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). In other words, the government may not punish speakers simply because it suspects their words might, on the whole and at some point, lead to violence.

The State has not – and cannot – show that the Act meets the strict *Brandenburg* standard. At the outset, nothing in the materials submitted by the State even suggests that Plaintiffs *intend* video games to cause violence. *See James*, 300 F.3d, at 698 (video game makers do not "intend to produce violent actions by the consumers, as required by the

7

*Brandenburg* test"). Video games are intended to entertain, not to cause violence. Price Declr. ¶ 4. On that point alone, the Act fails the *Brandenburg* standard.

Nor can the State plausibly claim that video games are "likely" to cause "imminent" violence. The State relies largely on the work of Dr. Craig Anderson, but as this Court and others have recognized, Dr. Anderson's studies, even taken at face value, do not show that "video games have ever caused anyone to commit a violent act . . . or have caused the average level of violence to increase anywhere." PI Order at *3 (quoting *AAMA*, 244 F.3d at 578-79). The court in *Blagojevich* recently reached the same conclusion in flatly rejecting the very same studies of Dr. Anderson that the State offers here: "defendants have failed to present substantial evidence showing that playing violent video games *causes* minors to have aggressive feelings or engage in aggressive behavior." *Blagojevich* at *20 (emphasis added). *Blagojevich* also found that "Dr. Anderson provided no evidence supporting the view that playing violent video games has a lasting effect on aggressive thoughts and behavior – in other words, an effect that lingers more than a short time after the player stops playing the game." *Id*. at *8; *Schwarzenegger*, Slip Op. at 13 (After reviewing Dr. Anderson's testimony, "[t]his court anticipates that the defendants may face similar problems [to the *Blagojevich* defendants] proving the California legislature made 'reasonable inferences based on substantial evidence'") (quoting *Turner*, 512 U.S. at 666). Indeed, Dr. Anderson conceded this point in his testimony in *Blagojevich*, admitting that "violent" video games do not cause immediate acts of extreme violence, and stating that "the vast majority of the kids . . . playing violent video games right now . . . are going to grow up and be just fine." Transcript of Testimony of Dr. Craig A. Anderson, *Blagojevich*, 11/15/05 Tr. at 283 (attached as Exhibit 3).

The research of the State's other primary expert, Dr. William Kronenberger, comes no closer to demonstrating that video games are likely to incite imminent violence.  On its face, Dr. Kronenberger's research does not even attempt to claim that exposure to "violent" video games *causes* minors to act aggressively – either in the short- or long-term.  *E.g.*, State Opp. Mot. Prelim. Inj., App. 10S,  William Kronenberger, et al., *Media Violence Exposure in Adolescents*, 31 AGGRESSIVE BEHAVIOR 213 (2005) ("[T]he study design was correlational, which does not allow for causal conclusions to be drawn.") (attached as Exhibit 4)  Moreover, as the court in *Blagojevich* found, Dr. Kronenberger's limited research does not come close to the "substantial evidence" needed to support the Act.  *Blagojevich* at \*20 ("[T]here is barely any evidence at all, let alone substantial evidence, showing that playing violent video games causes minors to 'experience a reduction of activity in the frontal lobes of the brain which is responsible for controlling behavior.'").  Notably, as this Court has already observed, Dr. Kronenberg's research "did not evaluate the independent effect of violent video games" as compared to violent media in general, and thus can say nothing about whether video games themselves are likely to cause imminent violence.  PI Order at \*3.

The Act's justifications are fatally flawed for another reason:  lack of "fit" with the supposed evidence.  Although the Act posits that children are especially vulnerable to the supposed harm of "violent" video games, the record is devoid of evidence demonstrating that video games are any more "harmful" than other violent media.  The Seventh Circuit specifically found in considering Dr. Anderson's research that there was no evidence that video games "are any more harmful to the consumer or to public safety than violent movies or other violent, but passive entertainments." *AAMA*, F.3d at 579.  *Blagojevich* reached the same conclusion, finding that Dr. Anderson's research did not show that video games were more harmful than other

9

media.  See *Blagojevich* at *9 ("Dr. Anderson also has not provided evidence to show that the

purported relationship between violent video game exposure and aggressive thoughts or behavior

is any greater than with other types of media violence, such as television or movies, or other

factors that contribute to aggression, such as poverty.").  This conclusion was inescapable given

that Dr. Anderson conceded in his *Blagojevich* testimony that the "effect sizes" for television and

video game "violence" are essentially the same. Transcript of Testimony of Dr. Craig A.

Anderson, *Blagojevich*, 11/15/05 Tr. at 279-80.  And Dr. Anderson's testimony revealed another

lack of fit between the Act and its goals when he conceded that his research showed no

difference in "vulnerability" to violent images as between adults and children.  *Id.* at 324-25.[2]

Ultimately, all of the research relied upon by the State is wholly inadequate to satisfy the

*Brandenburg* standard because that research is concerned with the "glacial process of personality

development" rather than the "temporal imminence . . . required to satisfy the Brandenburg test."

*James*, at 699.  Claims about brain wave patterns and psychological stimuli are miles away from

demonstrating that "violent" video games cause imminent violence under *Brandenburg*.  And,

given that video games are played by millions of people every day, it is not even remotely

plausible to claim that they are "likely" to cause imminent violence.

Because the State's evidence shows no connection between video games and real-world

violence, let alone the intentional, likely, and imminent connection that *Brandenburg* requires,

---

[2] Dr. Anderson's theory is so broad that he has testified that *merely viewing a photograph of a gun*, without more, could cause the same alleged "effects" as playing "violent" games or viewing "violent" television programs.  *See, e.g.*, Transcript of Testimony of Dr. Craig A. Anderson, *Blagojevich*, 11/14/05 Tr. at 221 (attached as Exhibit 5) (claiming similar effects from "simply seeing a photo of a gun – a handgun, a rifle, whatever"); *Id.*, 11/15/05 Tr. at 328 (stating that "a very large number" of stimuli would have the same alleged impacts of "violent" video games). If Dr. Anderson's theories were a sound basis for regulating speech, the State could freely censor images with the most tangential connection to violence.  Such an outcome would violate the basic principle of *Brandenburg*.

Detroit_665529_1

the State's purported interest in preventing aggression and harms related to aggression fails. Indeed, the entire Act fails because all three of the State's asserted interests – "safeguarding both the physical and psychological well-being of minors," "preventing violent, aggressive and asocial behavior from manifesting itself in minors," and "directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games," Act, pt. II, §§ 15(e), (f), (g) – boil down to an interest in preventing violence and related harms. Because the State has no other real "compelling interest" supporting the Act – other than a wholly illegitimate interest in thought control, discussed below – the Act fails strict scrutiny and Plaintiffs are entitled to summary judgment.

> **B.    The Act Cannot Be Justified By The State's Purported Interest In Shaping The Psychological Development Of Minors.**

Although the State attempts to suggest that interests other than preventing violence underlie the Act, a brief review of the evidence cited by the State shows that the overwhelming concern is with the prevention of actual aggression. Indeed, of the thirteen studies cited by the State in its defense of the Act, eleven deal with the effect of video games on aggression or violence. *See* State Opp. Mot. Prelim. Inj. at 13-18. Therefore, and for the reasons just discussed, summary judgment should be granted because the State's asserted interest in preventing violence does not satisfy the *Brandenburg* standard. Nevertheless, to the extent the State has articulated any other justification for the Act apart from preventing violence – such as an amorphous interest in protecting the "psychological well-being of minors" and preventing an "asocial" mentality, Act, pt. II, § 15(e) – such an rationale is not a legitimate state interest, let alone a compelling one.

The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Free Speech Coalition*, 535 U.S. at 253 (quoting *Stanley*

Detroit_665529_1

*v. Georgia*, 394 U.S. 557, 566 (1969)).  Whether the State describes its remaining interest as preventing "asocial" attitudes or fine-tuning minors' "psychological well-being," the First Amendment generally does not allow the State to ban speech based on how listeners will react to it.  See *Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens & Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression).

Expressive works like video games, film or literature certainly "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).  But with the exception of speech that is intended and likely to incite imminent violence, the State has *no* legitimate interest in censoring protected speech simply because it believes that it could lead to disfavored attitudes on the part of the listener.  To the contrary, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end."  *Free Speech Coalition*, 535 U.S. at 253.

This analysis is unchanged by the fact that listeners at issue here are minors.  First Amendment limitations on governmental action are in general "no less applicable when [the] government seeks to control the flow of information to minors."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *see McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment."); *Blagojevich* at *21 ("[Concerns about thought control] apply to minors just as they apply to adults.").  As the Seventh Circuit explained, preserving children's First Amendment rights is "not merely a matter of pressing the First Amendment to a dryly logical extreme. . . . People are unlikely to become

Detroit_665529_1

well-functioning, independent-minded adults, and responsible citizens if they are raised in an intellectual bubble." *AAMA*, 244 F.3d at 576-77. The State has no authority to censor material in order to achieve a desired effect in minors.[3] "If controlling access to allegedly 'dangerous' speech is important in promoting the positive psychological development of children, in our society that role is properly accorded to parents and families, not the State." *Blagojevich* at *21.

Not only is the State's interest facially illegitimate, it is not supported by substantial evidence. While the record in this case contains dozens of studies, there is almost no evidence speaking to the psychological harm of video games outside of their supposed tendency to increase violence or aggression. For example, in opposing Plaintiffs' motion for a preliminary injunction, the State relied on thirteen studies in the record. All but *two* of those studies purported to link video games to violence.

The two remaining studies come nowhere close to establishing "substantial evidence" that video games are psychologically harmful to children. The first study is by Dr. Kronenberger and purports to show that exposure to media violence is related to "poorer executive functioning," defined as the ability of the individual to plan and regulate behavior. PI Order at

---

[3] A single narrow exception exists for this rule in the case of certain sexually explicit material, which can regulated as "harmful to minors" even if it enjoys protection when viewed by adults. See *Ginsberg v. New York*, 390 U.S. 629, 650 (1968). The Act attempts to employ the *Ginsberg* "harmful to minors" standard for sexual obscenity and extend it to "violent" video games. See Act, §§ 15(a), 16(h). But the State cannot regulate violent expression under the more relaxed standards associated with sexual obscenity. Indeed, every court to have considered the question has held that the "harmful to minors" exception for sexual obscenity cannot be extended to regulations banning only "violent" video games. *IDSA*, 329 F.3d at 958 ("Simply put, depictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding . . . pictures of violence . . . is a novelty, whereas concern with pictures of graphic sexual conduct is the essence of the traditional concern with obscenity."); *VSDA*, 325 F. Supp. 2d at 1185 ("No court has accepted such an argument, probably because existing case law does not support it."); *Blagojevich* at *22; *Schwarzenegger*, Slip Op., at 12; *see also James*, 300 F.3d at 698 ("declin[ing] to extend . . . obscenity jurisprudence to violent, instead of sexually explicit, material" in a case involving tort liability for "violent" video game manufacturers).

Detroit_665529_1

*3.  But as this Court has already observed, and as the court in Illinois recently confirmed, Dr.

Kronenberger's research "did not evaluate the independent effect of violent video games, and

thus provides not support for the Act's singling out of video games from other media."  *Id.*;

*Blagojevich* at *20.  The second study, by Dr. Mark I. Singer, is even less relevant – it deals with

the effect of violent *television*, not video games.  State Opp. Mot. Prelim. Inj., App. 10Y

(attached as Exhibit 6).  A study about the effect of television is not substantial evidence in

support of regulations of video games.

      Every court to have considered the issue has rejected the psychological harm rationale as

a basis for restricting video games.  As the court in *Blagojevich* recently stated, "the State lacks

the authority to ban protected speech on the ground that it affects the listener's or observer's

thoughts and attitudes."  *Blagojevich* at *21.  And the Eighth Circuit rejected a materially

indistinguishable "psychological harm" justification, holding that "[t]he [government's]

conclusion that there is a strong likelihood that minors who play violent video games will suffer

a deleterious effect on their psychological health is simply unsupported in the record," and

expressly rejecting Dr. Anderson's research as "fall[ing] far short of a showing that video games

are psychologically deleterious."  *IDSA*, 329 F.3d at 959; *see also VSDA*, 325 F.Supp. 2d at 1188.

**C.  The Act Does Not Advance The State's Interests And Is Not Narrowly Tailored.**

      Beyond its illegitimate and unsubstantiated goals, the Act fails the other prongs of the

strict scrutiny standard.  In order to survive strict scrutiny, the State must show that the Act

materially advances the State's purported goals, and that it does so in a narrowly tailored way.

*R.A.V.,* 505 U.S. at 395.  The State cannot satisfy its burden on either count.

      First, the Act does not materially advance its stated goals.  The State has singled out a

subset of video games for regulation, despite the fact that a wide range of media contain

comparable violent expression.  *See AAMA*, 244 F.3d at 579 (noting that "violent" video games

14

"are a tiny fraction of the media violence to which modern American children are exposed"); *see also Blagojevich* at *9 (finding no evidence demonstrating that video games are more harmful than any other media); Transcript of Testimony of Dr. Craig A. Anderson, *Blagojevich*, 11/15/05 Tr. at 279-80 (conceding that the "effect sizes" are approximately the same for television and video game "violence").  No one could think that the Act materially advances its goals by preventing a 16-year-old from buying or renting the Resident Evil IV or Tom Clancy's Rainbow Six 3 video games, *see* Price Decl. ¶¶ 11-17, 38-43, when it would be entirely lawful for that same teen to buy or rent Resident Evil and Tom Clancy movies, and to purchase Tom Clancy books.  Such differential treatment of similarly situated media is strong evidence that the Act's true goal is to punish a disfavored speaker – not to advance the State's asserted interests.  *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989); *AAMA*, 244 F.3d at 578-79 (expressing skepticism about whether singling out video games for regulation would achieve purported goals if other violent media still available).  *Cf. Blagojevich* at *9 ("[T]the underinclusiveness of this statute – given that violent images appear more accessible to unaccompanied minors in other media – indicates that regulating violent video games is not really intended to serve the proffered purpose [of giving parents the power to protect children from harmful images].")

Second, the Act is not narrowly tailored.  "Narrow tailoring" in the constitutional sense requires that regulation of speech be limited to what is necessary to achieve the legislature's end, and that the State justify the rejection of less speech-restrictive alternatives, *see, e.g.*, *R.A.V.*, 505 U.S. at 395; *Playboy*, 529 U.S. at 813.  As discussed in more detail below, *infra* § III, retailers cannot know in advance if games they seek to sell contain illegal depictions of "extreme and loathsome violence."  Thus, they will likely steer far clear of games that have even a chance of running afoul of the Act, with the result that adults and minors alike are denied expression to

15

which they are constitutionally entitled.  *See* PI Order at *3; *Blagojevich* at *22.  Due to this chilling effect, the Act will suppress a broad swath of speech that is unrelated to the State's purported interests.

Moreover, regardless of vagueness, the narrow tailoring requirement requires the State to prove that a "plausible, less restrictive alternative . . . will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.  The State cannot satisfy its burden here, where such an alternatives such as educational efforts concerning the voluntary video game rating system, or technological measures designed to help parents guide their children's choices, exist.  *See id.* at 824 ("A court should not . . . presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down advertising ban because of less restrictive alternatives such as an "educational campaign" or "counterspeech"). In any event, the State was required at least to have considered the efficacy of less restrictive alternatives, *see Sable Comm. of California, Inc. v. FCC*, 492 U.S.115, 129-30 (1989), but never did so.

## III.    THE ACT IS UNCONSTITUTIONALLY VAGUE.

The Act is unconstitutional on an independent ground:  vagueness.  As this Court has noted, "[t]here is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act."  PI Order, at *3.  Indeed, the State implicitly conceded the Act's impermissible vagueness by suggesting that video game retailers should seek guidance from Plaintiffs' counsel to determine whether a particular game would be subject to the Act.  PI Order, at *3; Transcript of Preliminary Injunction Hearing at 19-20 ("[A]s to those [video games about] which there might be a question, they have counsel.") (attached as Exhibit 7).  The State's proposal not only is impractical, but it resoundingly demonstrates that an ordinary person simply cannot discern which materials are prohibited by the Act.

16

The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72 (1997) (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963). The Act fails to provide these basic constitutional protections.

Several of the Act's key terms either are inherently vague or are defined so as to fail to provide fair notice. To begin with, the Act's prohibitions target violence "against parties who realistically appear to be human beings." Act, pt. II, § 16(g). But "human beings" is a term particularly ill-suited to a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some "human" characteristics, or which may be "human" at some times and not others. As Plaintiffs have explained in their preliminary injunction briefs, given the fantastical nature of many video games – examples of which were submitted along with Plaintiffs' motion for a preliminary injunction – it will be often be difficult if not impossible to discern whether particular characters will be viewed as "human" within the meaning of the Act. *See* Price Decl. ¶¶ 26-32; 33-40; 41-49.

For essentially these reasons, the court in *Blagojevich* held that the Illinois statute's use of the term "human-on-human" violence was unconstitutionally vague. As the court observed: "As a mechanism for regulating a fanciful medium . . . this definition leaves video game creators,

17

manufacturers, and retailers guessing about whether their speech is subject to criminal sanctions." *Blagojevich* at *23. "It is also open to subjective interpretation and enforcement by law enforcement officers who may apply the law in an 'arbitrary and discriminatory' way." *Id.* (quoting *Grayned*, 408 U.S. at 109).

Many of the Act's other definitional terms are also hopelessly vague. For example, an "ultra-violent explicit video game" is defined as one that "continually and repetitively depicts extreme and loathsome violence." Act, pt. II, § 16(*l*). What is meant by "continually and repetitively"? Is there a threshold number of acts that establishes liability under the Act? What if the game permits each player to determine how much "violence" occurs in a game (as many do)? *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. If it is merely possible to engage in "continual and repetitive" "violence," will the game be censored for all? *Id.*

The Act's "harmful to minors" definition suffers from equally substantial vagueness problems. Putting aside that the "harmful to minors" standard for sexually explicit speech cannot be expanded to cover depictions of violence, the Act fails to provide explanations of what constitutes a "morbid interest in asocial, aggressive behavior," "morbid interest in uncontrolled aggression against an individual," and "what is suitable for minors" with respect to depictions of violence. *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. As with the other provisions of the Act, the "harmful to minors" definition fails to give reasonable notice of what conduct is proscribed by the Act. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter alia*, term "morbid" was not defined); *see also Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275, 1281 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684, 689 (8th Cir. 1992).

18

As in *Blagojevich*, the Michigan Act fails to provide sufficient notice about what falls within its sweeping prohibitions. This lack of precision will subject Michigan retailers to steep civil and criminal liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any* potentially offending video game title, or, conceivably, by pulling a wide range of games off the shelves altogether. *See, e.g.*, Lowenstein Decl. ¶¶ 13-14; Andersen Decl. ¶¶ 12, 17-18, 20-21; Price Decl. ¶¶ 15. As the court stated in striking down Washington's "violent" video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adults as well — whose right to access "violent" video games could not be questioned by the State.

Detroit_665529_1

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask that this Court enter summary

judgment against the Defendants, and permanently enjoin the Act.


Respectfully submitted,

BODMAN LLP


By:    /s/ Alicia J. Blumenfeld_____
       Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone:  (313) 259-7777
Facsimile:  (313) 259-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

and

JENNER & BLOCK LLP
By:    Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

December 23, 2005

Detroit_665529_1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

                Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

                Defendants.             /

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

## PROOF OF SERVICE

       Alicia J. Blumenfeld certifies that she is an employee of Bodman LLP, that on December

23, 2005 she caused to be served a copy of **Plaintiffs' Motion for Summary Judgment** and this

Proof of Service upon the person(s) listed below via electronic filing:

Denise C. Barton, Esq.
Jason R. Evans, Esq.
Assistant Attorney General
Department of Attorney General
525 W. Ottawa Street, Floor 5
P.O. Box 30736
Lansing, Michigan 48909

       I declare under penalty of perjury that the foregoing statement is true and correct to the

best of my information, knowledge and belief.

                               __/s/ Alicia J. Blumenfeld_____
                                   Alicia J. Blumenfeld