Exhibit 2

Dockets.Justia.com

E-FILED on ___12/21/05___

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION, and ENTERTAINMENT SOFTWARE ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney; RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose; and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara,<br><br>Defendants. | No. C-05-04188 RMW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION<br><br>**[Re Docket No. 5, 27, 28, 41, 48]** |

Plaintiffs move for a preliminary injunction prohibiting California state and local officials from enforcing a recently passed law, effective January 1, 2006, which requires violent video games to be labeled and prohibits the rental or sale of those games to minors ("Act"). The Act includes a narrow

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION—No. C-05-04188 RMW
JAH

definition of "violent video games," requires specified labeling of such games and imposes a civil penalty of up to $1,000 for violations. For the reasons given below, the court grants the plaintiffs' motion for a preliminary injunction.

## I. BACKGROUND

The plaintiffs are the Video Software Dealers Association ("VSDA") and the Entertainment Software Association ("ESA"), two groups who describe themselves as associations of companies in the video game industry. The defendants are California Governor Arnold Schwarzenegger, California Attorney General Bill Lockyer, Santa Clara County District Attorney George Kennedy, Santa Clara County Counsel Ann Ravel, and San José City Attorney Richard Doyle. Kennedy and Ravel ("County defendants") joined the opposition filed by Schwarzenegger and Lockyer ("State defendants"), so the court can generally consider the defendants as a group for the purposes of the plaintiffs' motion for a preliminary injunction.[1]

On October 7, 2005, Schwarzenegger signed into law Assembly Bill 1179, which is to take effect on January 1, 2006, as new California Civil Code §§ 1746-1746.5. The Act will restrict the sale and rental of certain violent video games to minors. *Id*. § 1746.1(a). The Act contains a two-part definition of a "violent video game":

> (d)(1) "Violent video game" means a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted in the game in a manner that does either of the following:
>
> > (A) Comes within all of the following descriptions:
> >
> > > (i) A reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors.
> > >
> > > (ii) It is patently offensive to prevailing standards in the community as to what is suitable for minors.
> > >
> > > (iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.
> >
> > (B) Enables the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel, or depraved in that it involves torture or serious physical abuse to the victim.
>
> (2) For purposes of this subdivision, the following definitions apply:

---

[1]     Two weeks late, City Attorney Doyle filed a motion joining in the State and County defendants' oppositions. Doyle raises no new arguments and plaintiffs have not objected to his untimely joinder.

(A) "Cruel" means that the player intends to virtually inflict a high degree of pain by torture or serious physical abuse of the victim in addition to killing the victim.

(B) "Depraved" means that the player relishes the virtual killing or shows indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

(C) "Heinous" means shockingly atrocious. For the killing depicted in a video game to be heinous, it must involve additional acts of torture or serious physical abuse of the victim as set apart from other killings.

(D) "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse, unlike torture, does not require that the victim be conscious of the abuse at the time it is inflicted. However, the player must specifically intend the abuse apart from the killing.

(E) "Torture" includes mental as well as physical abuse of the victim. In either case, the virtual victim must be conscious of the abuse at the time it is inflicted; and the player must specifically intend to virtually inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

(3) Pertinent factors in determining whether a killing depicted in a video game is especially heinous, cruel, or depraved include infliction of gratuitous violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's body, and helplessness of the victim.

*Id*. § 1746(d).

On October 17, 2005, the plaintiffs filed a complaint, and two days later, a motion for a preliminary injunction, seeking to prevent enforcement of this new law. The plaintiffs claim the Act is unconstitutional and specifically assert that: (1) video games are a form of expression protected by the First Amendment of the U.S. Constitution, even for minors, (2) the Act's definition of "violent video game" is unconstitutionally vague, and (3) the labeling provisions of the Act run afoul of the First Amendment. The State and County defendants assert that the Act is narrowly tailored to further a compelling state interest, and that it is neither impermissibly vague nor violative of the First Amendment.

California is not the first state to attempt to limit minors' access to violent video games. While the Ninth Circuit has yet to consider the the legislature's ability to implement such regulation, the Seventh and Eighth Circuits have found specific ordinances on the subject run afoul of the First Amendment. *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003). Several district courts have also struck down similar ordinances. *See Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash.

2004), *Entm't Software Ass'n v. Blagojevich*, 2005 U.S. Dist. LEXIS 31100 (E.D. Ill. Dec. 2, 2005) (granting permanent injunction); *Entm't Software Ass'n v. Granholm*, 2005 WL 3008584 (E.D. Mich. Nov. 9, 2005) (granting preliminary injunction).[2]

## II. ANALYSIS

### A. Standard for Preliminary Injunction

The decision to grant a preliminary injunction is within the discretion of a district court. *United States v. Peninsula Communications, Inc*., 287 F.3d 832, 839 (9th Cir. 2002). There are two tests for determining whether a district court may grant a preliminary injunction. Under the traditional test for granting preliminary injunctive relief, the applicant must demonstrate: "(1) a likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir. 1985). Alternatively, the moving party must show "that serious questions are raised and the balance of hardships tips sharply in favor of the moving party." *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839-40 (9th Cir. 2001). These alternative showings "represent extremes of a single continuum, rather than two separate tests." *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003) (internal citation and quotation marks omitted).

### B. Analysis of Preliminary Injunction Factors

#### 1. Likelihood of Success on the Merits

First, the court considers the plaintiffs' claim that the Act is unconstitutionally vague, as an impermissibly vague definition of "violent video game" would leave nothing for the defendants to enforce and render the Act unconstitutional as a whole.

##### a. Vagueness

The plaintiffs claim the Act is unconstitutional because it is impermissibly vague. The Act's definition of "violent video game" is a unique amalgam, but this alone does not make it unconstitutionally vague.

---

[2]    The court notes that, as in the instant case, VSDA and ESA were plaintiffs in *Maleng*, *Blagojevich*, and *Granholm*. *Maleng*, 325 F. Supp. 2d at 1180; *Blagojevich*, 2005 U.S. Dist. LEXIS 31100 at *1; *Granholm*, 2005 WL 3008584 at *1. VSDA was also a plaintiff in *Interactive Digital*. 329 F.3d at 954, 956.

Section 1746(d)(1)(A) is essentially the obscenity standard from *Ginsberg v. New York*, 390 U.S. 629 (1968), but directed towards depictions of violence instead of depictions of nudity or sex. Section 1746(d)(1)(B) uses the phrase "especially heinous, cruel, or depraved," which appears to have been taken from Arizona's statutory list of aggravating factors for considering whether to impose the death penalty. *See* Ariz. Rev. Stat. § 13-703.F.6 (2005).[3] The defendants submit that the definition under the Act is "exceedingly narrow." State Opp'n at 18.

Although "we can never expect mathematical certainty from our language," a restriction must be particularly clear if it "abuts upon sensitive areas of basic First Amendment freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (parentheses removed). This precision is required even for regulations designed to protect children:

> It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application.

*Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (ellipses omitted). No court has considered whether a definition of "violent video game" identical to the one in the Act is unconstitutionally vague, but courts have found a number of other legislative enacted definitions impermissibly vague. *See Maleng*, 325 F. Supp. 2d at 1190-91; *Blagojevich* 2005 U.S. Dist. LEXIS 31100 at *66-70; *see also Granholm*, 2005 WL 3008584 at *3-4.

The plaintiffs' primary argument here is that the Act's definitions are ill-suited to a medium divorced from everyday reality. Video game characters can deviate from human norms to greater or lesser degrees, and the plaintiffs claim this makes the second prong of the definition, which refers to "images of human beings or characters with substantially human characteristics," impossible for a reasonable person to apply. However, the plaintiffs overlook the limitation contained in § 1746(d)(1) of the Act, which applies to both prongs of the definition: "'Violent video game' means a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting *an image of a human being*, if those acts are depicted in the game in a manner that does either of the following." (emphasis added). The language with which plaintiffs take issue, "images of human beings or characters with substantially human

---

[3] That there is case law on the meanings of these phrases, albeit in other contexts, makes it more likely that they define a standard that an ordinary person can understand and apply.

1  characteristics," thus only comes into play once the acts depicted have already been determined to be

2  "killing, maiming, dismembering, or sexually assaulting an image of a human being." This does make the

3  phrase "upon images of human beings or characters with substantially human characteristics" in the second

4  prong superfluous, but "assaulting an image of a human being" appears, nevertheless, to be the express

5  requirement of the statute as written. Thus, the Act restricts only certain forms of violence against "an image

6  of a human being;" there are no restrictions on violence against non-humans.

7       The plaintiffs also complain that "the Act generally uses the word 'includes' to modify the specific

8  examples of behavior covered by the definition. This open-ended definition, say plaintiffs, does not confine

9  the range of depictions that trigger the 'violent video game label.'" Mot. at 17. Contrary to plaintiffs'

10  assertion, the Act uses "includes" only once, in § 1746(d)(2)(E): "'Torture' includes mental as well as

11  physical abuse of the victim. In either case . . . ." "Either," according to WEBSTER'S NINTH NEW

12  COLLEGIATE DICTIONARY, means "being the one or the other of two." Any open-endedness introduced by

13  "includes" is immediately limited by "either" in the next sentence. Torture, for the purposes of the Act, is

14  either mental or physical abuse of a victim.

15       The Act also uses "include" once, in § 1746(d)(3): "Pertinent factors in determining whether a

16  killing depicted in a video game is especially heinous, cruel, or depraved *include* infliction of gratuitous

17  violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's

18  body, and helplessness of the victim." (emphasis added). While this does not limit what may be considered

19  to determine whether a killing is "especially heinous, cruel, or depraved," "heinous," "cruel," and "depraved"

20  are each cabined by the definitions of those terms in § 1746(d)(2)(A)-(C).

21       The plaintiffs further object that other parts of the definition, such as "virtually inflict,"

22  "consciousness" of the "virtual victim," and "high degree of pain," have no readily-ascertainable meaning in

23  the context of a video game. While such semantic considerations do show the difficulty of using language

24  with "mathematical certainty," they do not show the Act is unconstitutionally vague. It should be readily

25  apparent to an ordinary person that with such language the Act was intended to cover games in which it

26  looks like a player can harm people in the ways described.

27       The parties submitted to the court video games and videotapes of video games being played. *See*

28  Jimenez Decl., Exs. A, B; Waldman Decl., Exs. A, B; Chan Decl., Exs. A, B; Carraway Decl., Exs. A, B;

Borasi Decl., Exs. A, B; Rosen Decl., Exs. A, B; Morazzini Decl., Ex. A.  Before oral argument, the court asked the parties to attempt to apply each prong of the Act's definition of "violent video game" to seven of the games included in the parties' submissions.  The plaintiffs, somewhat predictably, claimed that the Act was too vague to hazard a guess as to which games were covered and which games were not.  The defendants were not much more helpful.  The State defendants asserted that *Postal II* would be covered by the Act.  They also pointed out that another of the games was discussed in a declaration the plaintiffs submitted; one of the plaintiffs' witnesses stated that *Medal of Honor: Frontline* "may" be covered by the Act.  *See* Price Decl. ¶ 19.

Despite the parties' reluctance to attempt to apply the Act's definition of "violent video game" to the games submitted, the court will nonetheless analyze two of the games as part of its inquiry into whether the Act is impermissibly vague.  As the following analyses show, the Act should be simple enough for an ordinary person to apply to the games submitted to the court.[4]

*Postal II* involves a character who has apparently "gone postal" and decided to kill everyone he encounters.  Morazzini Decl., Ex. A.  The game involves shooting both armed opponents, such as police officers, and unarmed people, such as schoolgirls.  *Id*.  Girls attacked with a shovel will beg for mercy; the player can be merciless and decapitate them.  *Id*.  People shot in the leg will fall down and crawl; the player can then pour gasoline over them, set them on fire, and urinate on them.  *Id*.  The player's character makes sardonic comments during all this; for example, urinating on someone elicits the comment "Now the flowers will grow." *Id.*

The court agrees with the State defendants that *Postal II* would fall within the Act's definition of "violent video game".  First, "the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being," as required by § 1746(d).  The game also meets both prongs of the definition (though either alone is sufficient).  Shooting schoolgirls in the knee and then setting them afire appeals to the deviant interests of minors, satisfying § 1746(d)(1)(A)(i).  Whether something is "patently offensive" under community standards is a question of fact, *see Reno v. ACLU*, 521 U.S. 844, 873-74 (1997), but the court can easily imagine that *Postal II* "is patently offensive to the

---

[4]    The court has generally only considered the videotape evidence.  However, two of the games, *Jade Empire* and *Full Spectrum Warrior*, were also played.

standards" of some communities "as to what is suitable for minors," satisfying § 1746(d)(1)(A)(ii).  The

game appears to have no "literary, artistic, political, or scientific value for minors," satisfying

§ 1746(d)(1)(A)(iii).  The game thus is a "violent video game" under the first definition in the Act.

Furthermore, shooting schoolgirls in the kneecap is inflicting serious injury, and then setting them afire and

urinating on them as they crawl about is especially cruel and depraved (as those terms are defined in the

Act) and constitutes torture.  This satisfies § 1746(d)(1)(B).

Conversely, *Full Spectrum Warrior* would not be a "violent video game" under the Act.  The

player controls two four-man U.S. Army squads fighting in an Afghanistan-like urban environment.

Carraway Decl., Exs. A, B.  The squad members have personalities; they complain about their mission and

use profanity when they come under heavy fire.  *Id*.  Careful planning is necessary to succeed; much of the

game is spent using one squad to distract an enemy while the other squad circles around him to get a good

shot.  *Id*.  Enemies are usually shot at a distance, and they fall down bloodlessly when shot or killed with

grenades.  *Id*.

In *Full Spectrum Warrior*, "the range of options available to a player includes killing, maiming,

dismembering, or sexually assaulting an image of a human being," as required by § 1746(d).  However, it

would be hard to say that U.S. military operations appeal to the deviant or morbid interests of minors.

Also, the game has some political value.  It thus does not satisfy the first part of the Act's definition,

§ 1746(d)(1)(A).  Also, there is no way to kill enemies that is especially heinous, cruel, or depraved;

killings are generally at a distance and fairly impersonal.  This does not satisfy the second part of the Act's

definition, § 1746(d)(1)(B).

The plaintiffs have not shown they are likely to succeed on their claim that the Act is

unconstitutionally vague.

### b. First Amendment

The court next considers the plaintiffs' claim that the Act runs afoul of the First Amendment.

Because the statutes and ordinances at issue in *Kendrick*, *Interactive Digital*, *Blagojevich*, and

*Granholm* are not materially distinguishable from the Act, the court finds that the plaintiffs are likely to

succeed on the merits or at least that serious questions are raised in this portion of their case.

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION—No. C-05-04188 RMW
JAH

1
### i. Survey of Prior Cases

2          As several courts have recently considered to what extent the First Amendment allows

3   governments to limit minors' access to video game violence, the court will summarize the relevant cases.

4          In *Kendrick*, the Seventh Circuit reversed a district court's denial of a preliminary injunction against

5   enforcement of a city ordinance.  244 F.3d at 573-4, 580.  This ordinance required parents to accompany

6   minors who wished to play video games containing "graphic violence" in public places.  *Id*. at 573.  Judge

7   Richard Posner, writing for the panel, explored the difference between sexual obscenity and violence.  *Id*.

8   at 574-76.  Judge Posner did not explicitly select a standard of review for the ordinance at issue, though he

9   did state that the city's grounds for promulgating it had to "be compelling and not merely plausible."  *Id*. at

10  576.  He also expressed doubt that a government could have a compelling interest in preventing minors

11  from playing violent video games.  244 F.3d at 576-79.  Judge Posner noted that the City had little data to

12  compel a conclusion that the games covered by the ordinance increased aggressive behavior in minors.  *Id*.

13  at 578-79.  Among the evidence was some of the work of Craig Anderson.  *Id*. at 578.  Judge Posner

14  concluded that a preliminary injunction was appropriate because the ordinance's "conjectural" benefits were

15  outweighed by the risk of infringing on First Amendment rights.  *Id*. at 580.

16         In *Interactive Digital*, the Eighth Circuit reversed a district court and ordered a permanent

17  injunction against enforcement of a county ordinance that forbade anyone to "sell, rent, or make available

18  graphically violent video games to minors."  329 F.3d at 956.  The court expressly held that the ordinance

19  should be analyzed using strict scrutiny, rejecting the County's suggestion to use the less stringent standard

20  from *Ginsberg*.  *Id*. at 958-60.  The County presented a psychologist who claimed that playing violent

21  video games increased aggressive thoughts and behavior, but the court found this testimony fell short of the

22  required "substantial supporting evidence" necessary to justify the ordinance.  *Id*. at 958-59.

23         In *Maleng*, Chief Judge Robert S. Lasnik of the Western District of Washington ruled on cross-

24  motions for summary judgment that a Washington state statute violated the First Amendment.  325 F.

25  Supp. 2d at 1183, 1190.  The statute at issue forbade the distribution to minors of video games involving

26  violence against law enforcement personnel.  *Id*. at 1190.  The court found that the obscenity standard from

27  *Ginsberg* was inappropriate because the statute did not cover sexually explicit material, and instead applied

28  strict scrutiny.  *Id*. at 1185-86.  The court found that the State had not carried its burden of proving that

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION—No. C-05-04188 RMW
JAH
9

games covered by the statute caused aggressive feelings or behavior. *Id*. at 1189. The court further ruled that the statute was "both over-inclusive and under-inclusive" because the set of games covered by the statute did not reflect the harms the legislature sought to alleviate; the statute was therefore not narrowly tailored. *Id*.

In *Granholm*, a district court preliminarily enjoined enforcement of a statute that would prohibit distribution of certain violent video games to minors. 2005 WL 3008584 at *1. The statute applied only to games that satisfied both parts of a two-part definition of "ultra-violent explicit video game;" one of these parts was modeled on the statute upheld in *Ginsberg*. 2005 WL 3008584 at *1. The court ruled that the statute under consideration, as a content-based restriction on expression, was subject to strict scrutiny. *Id*. at 2. The court found that the evidence considered by the legislature, including studies by Anderson, were unlikely to be sufficient to "demonstrate a compelling interest in preventing a perceived harm." *Id*. at *3 (quotation marks removed). The court found that the statute was not narrowly tailored and was likely to have a chilling effect on adults' free expression because it would cause video game creators to steer clear of the boundaries of the statutory definition. *Id*.

Finally, in *Blagojevich*, a district court permanently enjoined enforcement of an Illinois statute criminalizing the sale or rental of certain violent video games to minors. 2005 U.S. Dist. LEXIS 31100 at *2-3, 7-8. The court interpreted *Kendrick* as applying strict scrutiny and found that the statute was "a content-based regulation subject to the strictest scrutiny under the First Amendment." *Id*. at 52, 55. Among the justifications for the statute were "preventing violent, aggressive, and asocial behavior" and "preventing psychological harm to minors." *Id*. at *53. The proffered evidence justifying the statute included fourteen studies by Anderson. *Id*. at *10-11. The court, after a trial, found Anderson's studies unpersuasive, stating "that neither Dr. Anderson's testimony nor his research establish a solid causal link between violent video game exposure and aggressive thinking and behavior." *Id.* at *24-25. The court was concerned that Anderson's research did not establish a causal link between violent video games and violent behavior, did not assess the significance of any link, and did not compare video games to other forms of media violence to which minors are exposed. *Id*. at *25-27.

The court in *Blagojevich* also considered the constitutionality of a provision requiring violent games covered by the statute to bear a two-square-inch label stating "18". *Id*. at *7, 83. The court rejected the

1    argument that the labeling provision should be analyzed under the commercial speech standard of *Zauderer*

2    *v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). *Id*. at *83-85. The court instead found the

3    labeling requirement to be constitutionally-impermissible compelled speech under *Riley v. National*

4    *Federation of Blind, Inc*., 487 U.S. 781 (1988). *Id*. at *85-86.

5                                    **ii. The California Statute**

6            The Act will regulate video games, which, even though mere entertainment, are nonetheless

7    protected by the First Amendment. *See Interactive Digital*, 329 F.3d at 957-58. Children "are entitled

8    to a significant measure of First Amendment protection." *Erznoznik v. City of Jacksonville*, 422 U.S.

9    205, 212 (1975). The Act seems primarily designed to restrict minors' access to a class of particularly

10   violent video games.

11           As an initial matter, the parties dispute what analytical framework the court should use to evaluate

12   the Act. The plaintiffs suggest that of *Bradenburg v. Ohio*, 395 U.S. 444 (1969). Under *Brandenburg*, a

13   state may regulate expression it fears will cause unlawful or violent behavior only if it can prove the

14   expression "is directed to inciting or producing imminent lawless action and is likely to incite or produce"

15   such action. *Id*. at 447. The Act seems to be intended more to prevent harm to minors than preventing

16   minors from engaging in real-world violence. *See* Cal. A.B. 1179 § 1.

17           The defendants claim the Act should be analyzed using the Supreme Court's decision in *Ginsberg*

18   *v. New York*, 390 U.S. 629 (1968). In *Ginsberg*, the Court allowed New York to restrict the access of

19   minors to material with nudity or sexual content, even though such a restriction on adults would have been

20   invalid. *Id*. at 634-43. The New York statute forbade the sale of material deemed "harmful to minors" to

21   those under seventeen years of age, and defined

22           "[h]armful to minors" [as] any description or representation, in whatever form, of nudity,
             sexual conduct, sexual excitement, or sadomasochistic abuse, when it:

23

24                  (i)  predominantly appeals to the prurient, shameful or morbid interest of minors,
                    and

25                  (ii)  is patently offensive to prevailing standards in the adult community as a whole
                    with respect to what is suitable material for minors, and

26

27                  (iii)  is utterly without redeeming social importance for minors.

28   *Id*. 646. The Court allowed the statute at issue in *Ginsberg* to stand because the New York legislature

     had a rational basis for limiting minors' access to such obscene material. *Id*. 643. Neither the Supreme

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION—No. C-05-04188 RMW
JAH                                              11

Court nor the Ninth Circuit has ever extended the *Ginsberg* analysis beyond sexually-obscene material. *Maleng*, 325 F. Supp. 2d at 1186.  Nor, on the other hand, have the plaintiffs shown that either the Supreme Court or the Ninth Circuit has ever held that sexual obscenity represents a unique category of expression that is the only category to which a state may permissibly restrict minors' access without running afoul of the First Amendment.

The defendants have been unable to explain why the deferential standard of *Ginsberg* should also be used to analyze California's attempt to limit minors' access to violent video games.  At oral argument, the County defendants expressed the view that there are few constitutional boundaries to a state's power to limit minors' access to expression that the State can establish is harmful to minors.  As examples, the County defendants suggested that a state could regulate a minor's access to games about embezzling, bomb building, and shoplifting, without violating the First Amendment, if a causal connection with harm to children could be established.  No court has previously endorsed such a limited view of minors' First Amendment right.  The prevailing view, and the one this court will follow, is that limitations on a minor's access to violent expression are subject to strict scrutiny. However, even under strict scrutiny analysis, a court must consider the potential harm to a child that is being addressed by any legislation that limits a child's access to expression.

"Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  A state may limit expression based on content only if the state (1) has a compelling interest and (2) "chooses the least restrictive means to further the articulated interest." *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).  "[T]here is a compelling interest in protecting the physical and psychological well-being of minors." *Id*.  The Seventh Circuit in *Kendrick* nevertheless expressed doubt that government could have a compelling interest in preventing minors from playing violent video games.  244 F.3d at 576-79.  Judge Posner, writing for the panel, stated that "shield[ing] children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id.* at 577.  It is uncertain that even if a causal link exists between violent video games and violent behavior, the First Amendment allows a state to restrict access to violent video games, even for those under eighteen years of age.

1    Also, a state "must demonstrate that the recited harms are real, not merely conjectural, and that the

2    regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting Sys., Inc. v.*

3    *F.C.C.*, 512 U.S. 664, 622 (1994). The State defendants point to a four-and-a-half-page bibliography as

4    compelling evidence the California legislature considered when passing the Act. *See* Notification of Manual

5    Filing, App. A at 14-18. This bibliography lists two pages of articles by Craig Anderson dealing with the

6    relationship between violence and video games. *Id*. at 14-16. (It also lists material on the questionable

7    constitutionality of restricting minors' access to violent video games, *id*. at 14,[5] 18,[6] and websites for

8    interest groups, *id*. at 17,[7] 18.[8]) The court in *Blagojevich*, after a trial, found Anderson's studies

9    unpersuasive, stating "that neither Dr. Anderson's testimony nor his research establish a solid causal link

10   between violent video game exposure and aggressive thinking and behavior." 2005 U.S. Dist. LEXIS

11   31100 at *25-26. The court was concerned that Anderson's research did not establish a causal link

12   between violent video games and violent behavior, did not assess the significance of any link, and did not

13   compare video games to other forms of media violence to which minors are exposed. *Id*. at 23-27. This

14   court anticipates that the defendants here may face similar problems proving the California legislature made

15   "reasonable inferences based on substantial evidence." *See Turner*, 512 U.S. at 666.

16   To be valid, the Act must pass muster under strict scrutiny. Whether, as the court in *Kendrick*

17   indicated, the First Amendment may prevent a state from having a legitimate compelling interest in

18   restricting the access of minors to violent video games, or, as the court in *Blagojevich* ruled, Anderson's

19   research is insufficient to show such a compelling interest, the plaintiffs have shown they are likely to

20   succeed on the merits of their claim that the Act violates the First Amendment, or at least that serious

21   questions are raised.

22

23

---

24   [5]   Vikram David Amar, Alan Brownstein, *Can States Constitutionally Regulate Video Games, As California Is Considering Doing?:The First Amendment Framework That Would Probably Apply*, FindLaw (Apr. 30, 2004) *at*
25   http://writ.news.findlaw.com/commentary/20040430_brownstein.html.

26   [6]   *Maleng*, 325 F. Supp. 2d 1180.

27   [7]   Mothers Against Violence in America, http://www.mavia.org.

28   [8]   National Institute on Media and the Family, http://www.mediafamily.org.

1        **c.  Labeling Requirement**

2        In *Central Hudson Gas & Electric v. Public Service Commission of New York*, the Supreme

3    Court explained the strength of the First Amendment in the commercial context:

> For commercial speech [to be protected by the First Amendment,] it at least must concern
> lawful activity and not be misleading.  Next, we ask whether the asserted governmental
> interest is substantial.  If both inquiries yield positive answers, we must determine whether
> the regulation directly advances the governmental interest asserted, and whether it is not
> more extensive than is necessary to serve that interest.

7    447 U.S. 557, 566 (1980).

8        The Act requires video games that meet its definition of "violent" to be labeled, on the front of the

9    package, with a white "18" outlined in black and at least two inches square.  § 1746.2.  This provision is

10   not unconstitutional, despite  plaintiffs' suggestion otherwise, merely because it conflicts with the industry's

11   voluntary ratings system.  However, the Supreme Court has stated that "[a] court should not assume a

12   plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full

13   information, will fail to act."  *United States v. Playboy Entm't Group, Inc*., 529 U.S. 803, 824 (2000).

14   The parties disagree whether the labeling provision affects commercial speech and thus is to be analyzed

15   under *Zauderer*, or whether the provision compels speech and is to be analyzed under *Riley*.  The court in

16   *Blagojevich* found a very similar labeling provision to be compelled speech and violative of the First

17   Amendment.  2005 U.S. Dist. LEXIS 31100 at *85, 86.  Defendants here have made no argument that the

18   Act's labeling requirement is permissible under *Riley*, and the court finds that the plaintiffs have shown they

19   are likely to succeed on the merits of their claim that, or at least have raised serious questions about

20   whether, the Act's labeling provision violates the First Amendment.

21       **2.  Threat of Irreparable Injury**

22       The Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal

23   periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

24   To the same extent plaintiffs are likely to succeed on their claim the Act violates the First Amendment, they

25   have shown a threat of irreparable harm.  On the other hand, a court should not freely enjoin an action of a

26   legislature, because "it is clear that a state suffers irreparable injury whenever an enactment of its people or

27   their representatives is enjoined."  *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir.

28   1997).  Further, a state has an "interest in the well-being of its youth."  *ACLU*, 521 U.S. at 865.  However,

a preliminary injunction would, if defendants ultimately prevail, only slightly delay enforcement of the Act, and the Supreme Court has noted that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs have shown potential irreparable harm.

### 3. Balance of Hardships

If this court does not preliminarily enjoin enforcement of the Act, the plaintiffs' members will have to institute labeling and monitoring as mandated by the Act, which plaintiffs claim will infringe upon their members' First Amendment rights, as well as the First Amendment rights of minors in California. It will also involve considerable expense to implement. If the court does preliminarily enjoin enforcement of the Act, the defendants will merely be delayed a short time in implementing the Act, if it is ultimately found to be constitutional. The court finds that the balance of hardships weighs in favor of the plaintiffs.

### 4. Public interest

There is a definite public interest in First Amendment freedoms, but this has been discussed already in the section on the plaintiffs' likelihood of success on the merits. The defendants claim there is a substantial public interest in protecting minors from the psychological harms they claim violent video games inflict. The public interest also would favor allowing the public's elected officials legislate, as the public elected them to do. The public also has a strong interest in enjoying its First Amendment freedoms. This factor does not significantly weigh in favor of either side.

### C. Conclusion

The plaintiffs have shown at least that serious questions are raised concerning the States' ability to restrict minors' First Amendment rights in connection with exposure to violent video games, including the question of whether there is a causal connection between access to such games and psychological or other harm to children. The balance of hardships tips sharply in the plaintiffs' favor as the potential infringement of First Amendment rights and the costs in time and expense of implementing the Act outweigh the potential harm of a short delay in the implementation of the Act, if ultimately held constitutional.

1

2
3
4

### III. ORDER

      For the foregoing reasons, the court grants the plaintiffs' motion for a preliminary injunction.  The defendants and their agents are hereby preliminarily enjoined from enforcing any provision of the Act (future California Civil Code §§ 1746-1746.5) until further order of this court.

5

6

7    DATED:        12/21/05                                      /s/ Ronald M. Whyte

8                                                          RONALD M. WHYTE
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

Theodore J. Boutrous, Jr.
Amy L. Tenney
Ethan D. Dettmer                    edettmer@gibsondunn.com
H. Mark Lyon                        mlyon@gibsondunn.com
Katherine A. Fallow
Paul M. Smith

**Counsel for Defendants:**

Zackery P. Morazzini               zackery.morazzini@doj.ca.gov
Kathryn J. Zoglin                  kathryn_zoglin@mail.cco.co.santa-clara.ca.us
Robert R. Fabela                   Main@sanjoseca.gov


Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.




**Dated:** _____12/21/05_____         _____/s/ JH_____
                                                   **Chambers of Judge Whyte**

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION—No. C-05-04188 RMW
JAH                                          17