Exhibit 3

Dockets.Justia.com

```
                                                             223

 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
    ENTERTAINMENT SOFTWARE          )
 4  ASSOCIATION, et al.,            )
                                    )
 5                 Plaintiffs,      )  No. 05 C 4265
                                    )
 6        v.                        )  Chicago, Illinois
                                    )  November 15, 2005
 7  ROD BLAGOJEVICH, et al.,        )  9:45 a.m.
                                    )
 8                 Defendants.      )

 9

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11
    APPEARANCES:
12
    For the Plaintiffs:  JENNER & BLOCK, LLC
13                       One IBM Plaza
                         330 North Wabash Avenue
14                       40th Floor
                         Chicago, IL   60611, by
15                       MS. KATHERINE A. FALLOW
                         MS. KATHLEEN R. HARTNETT
16                       MR. DAVID P. SANDERS

17                       JENNER & BLOCK, LLP
                         601 13th Street
18                       1200 South
                         Washington, D.C.   20005, by
19                       MR. PAUL M. SMITH

20
    For the Defendants:  FLETCHER, TOPOL, O'BRIEN & KASPER, P.C.
21                       222 North LaSalle Street
                         Suite 300
22                       Chicago, IL   60601, by
                         MR. MICHAEL J. KASPER
23

24

25
```

```
                                                                    224
    1                          HOGAN MARREN, LTD.
                               180 North Wacker Drive
    2                          Suite 600
                               Chicago, IL   60606, by
    3                          MR. PATRICK E. DEADY
                               MS. LAURA C. LIU
    4
                               OFFICE OF THE ILLINOIS ATTORNEY GENERAL
    5                          100 West Randolph Street
                               13th Floor
    6                          Chicago, IL   60601, by
                               MR. ANDREW L. DRYJANSKI
    7                          MS. ELLECIA L. PARSELL-BURKE

    8                          COOK COUNTY STATE'S ATTORNEY
                               500 Richard J. Daley Center
    9                          Chicago, IL   60602, by
                               MR. STEPHEN L. GARCIA
   10

   11
        COURT REPORTER:        LAURA M. BRENNAN
   12                          219 South Dearborn Street, Room 2102
                               Chicago, IL   60604
   13                          (312) 427-4393

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

```
                                                                225
 1        (The following proceedings were had in open court:)
 2             THE CLERK:  05 C 4265, Entertainment v. Blagojevich.
 3             THE COURT:  Well, so much for 9:45.
 4             All right, can the lawyers please give your names for
 5   the record?
 6             MR. SMITH:  Paul Smith for the plaintiffs.
 7             MS. FALLOW:  Katherine Fallow for the plaintiffs.
 8             MS. HARTNETT:  Kathleen Hartnett for the plaintiffs
 9             MR. SANDERS:  David Sanders for the plaintiffs.
10             MR. KASPER:  Michael Kasper for defendant Blagojevich.
11             MR. DEADY:  Patrick Deady for defendant Blagojevich.
12             MR. DRYJANSKI:  Andrew Dryjanski for defendants
13   Madigan and Blagojevich.
14             MR. GARCIA:  And Stephen Garcia for defendant Devine.
15             THE COURT:  Are we ready to resume with Professor
16   Anderson?
17             MR. KASPER:  Yes, we are.
18             THE COURT:  Come on right back up here and we will get
19   going.
20             Do you understand you are still under oath?
21             THE WITNESS:  Yes.
22             THE COURT:  Okay, you can start.
23                  CRAIG ANDERSON, DEFENDANTS' WITNESS
24                            PREVIOUSLY SWORN

                                 ***
```

274

1  Q   Thank you.  Have you reviewed the findings of the
2  legislation at issue in this case?
3  A   Yes, I have.
4  Q   And in your opinion are those findings supported by the
5  research and authority in your field?
6  A   Yes, they are supported.
7  Q   Thank you.
8          MR. KASPER:  Nothing further.
9          THE COURT:  Mr. Smith.
10                   CROSS EXAMINATION
11 BY MR. SMITH:
12 Q   Good morning, Professor.
13 A   Good morning.
14 Q   I want to begin, if I might, by just being clear about the
15 particular effects that you are pointing to here so we can
16 understand that.
17         You mentioned I think in your summary that video game
18 exposure causes aggressive thoughts and aggressive feelings and
19 aggressive behavior, putting aside the issue of physiological
20 arousal.  Those thoughts and feelings are short term phenomena?
21 A   My judgment is, again, based on both the TV literature and
22 existing video game literature, that it's reasonable to
23 conclude that those are going to be longer term effects, as
24 well.
25 Q   Well, do you have your declaration in this case in front of

275

1  you by any chance?
2  A    No.
3  Q    Handing you a copy of your declaration submitted to the
4  court in support of the motion and asking you to refer to
5  paragraph 12 at the bottom of Page 4, you've just listed short
6  term effects of exposure to video games there, right?  Do you
7  see the four bullet points?
8         MR. SMITH:  Would you like us to get another copy,
9  your Honor?  I think we probably have one.
10        THE COURT:  I think I've got it right here.  What
11 page?  I've got it right here.  It's Tab 1 in the response.
12 Which paragraph?
13        MR. SMITH:  I'm looking at paragraphs 11 and 12.
14 BY MR. SMITH:
15 Q    You've just listed four of what you call short term effects
16 of most relevance to this case.  Do you see that?
17 A    Um-hm.
18 Q    And then you say, "It is generally believed by media
19 violence researchers that the last three of these four short
20 term effects of exposure usually dissipate fairly quickly."
21 And those three are an increase in aggressive behavior, an
22 increase in aggressive thinking, and an increase in aggressive
23 emotions.
24        So, it is true, is it not, that your belief is that
25 aggressive thinking and aggressive emotions triggered by

5

276

1  exposure dissipate fairly quickly?

2  A   No.  This section specifically refers to short term

3  effects.

4  Q   Okay.  Let's turn over then to the next section, which

5  refers to the long term effects.  That would be paragraph 14.

6  And you say there that the most relevant long term effects of

7  repeated exposure to violent media are an increase in

8  aggressive behavior, an increase in positive attitudes,

9  beliefs, and thought processes, and a reduction of normal

10 inhibitions against aggression; is that right?

11 A   Yes.

12 Q   Okay.  So, now, we understand the increase in aggressive

13 behavior.  The other two are effectively mechanisms that lead

14 to an increase of aggressive behavior?  Is that fair to say?

15 A   Yes.

16 Q   And essentially what those are are part of your model over

17 here, the part that reflected how exposure to particular media

18 lead to a more aggressive set of attitudes or beliefs or

19 perceptions about the word, right?

20 A   Yes.

21 Q   Okay.  So, just so I understand it, ultimately all of that

22 part of your testimony, in terms of attitudes and beliefs and

23 perceptions, effectively those are all things which you

24 ultimately say are harmful because those ways of thinking and

25 feeling lead to aggressive behavior; is that right?

277

1  A   Yes and no.  Yes in the sense that they are what seems to
2  lead to increases in aggressive behavior.  What's less -- I
3  guess the part that I wouldn't necessarily agree with is
4  whether or not that's the only harm.
5  Q   I guess that's what I'm trying to isolate, if I could, so
6  we know what's at stake here, Professor.
7          Is there some long term serious effect of playing
8  video games other than this behavioral effect which you're
9  telling us about that the court should be taking into account?
10 A   If, in fact, one views thinking of the world in a more
11 aggressive kind of way as harmful and getting into more fights,
12 what does that impact -- what impact does that have on other
13 sort of psychological things, presumably there could be other
14 harms, as well.
15 Q   So, just so I understand it, you've now identified in
16 addition to aggressive behavior thinking about the world in a
17 more aggressive way --
18 A   Aggressive cognitions.
19 Q   -- and then the psychological effects of getting into
20 fights?  What did you mean by that?
21 A   Again, this is hypothetical.  We don't have -- well, there
22 is at least one study, correlational study, showing
23 increased -- showing an association between violent video game
24 play and problems, sort of psychological problems.
25 Q   You mean clinical problems?

278

 1  A    Yes.  Well, yeah, identified by a clinical instrument.
 2  Q    But you've certainly never testified here or in any other
 3  place that the courts of this country or the legislatures of
 4  this country should suppress video games because they cause
 5  clinical problems, have you?
 6  A    Oh, no.  Never.
 7  Q    And that's not your opinion today?
 8  A    That's not my opinion, no.
 9  Q    Now, going back to the aggressive model then, is it fair to
10  say that all of that portion of your testimony was an
11  explanation of the kinds of psychological effects in terms of
12  feelings and thinking that leads ultimately to what you predict
13  would be greater aggressive behavior down the road?
14  A    Yes.
15  Q    And that is really the gist of what that whole model is
16  about is explaining behavior ultimately?
17  A    Yes.
18  Q    Now, you would agree, wouldn't you, that the evidence that
19  exposure to a violent medium is clearer with respect to other
20  media, like TV and movies, than it is with respect to violent
21  video games?
22  A    Yes.
23  Q    And the effect sizes, putting aside the fact that there's
24  vastly more research on the TV side and that the evidence is
25  much clearer, the effect sizes that have been calculated by

279

1  people in your field are about the same on both sides of that
2  line?
3  A   Yes, for the most part.
4  Q   So, that's about a .2 correlation, you said --
5  A   Right.
6  Q   -- is roughly where we are?
7  A   Yeah, roughly.
8  Q   Or about 4 percent of the variance; is that right?
9  A   Four percent of the variance here is a statistical concept.
10 It's not easily translated into understandable terms, but yes.
11 Q   But that is, in fact, the statistical concept.  You square
12 the correlation, and you get the R squared, and that gives you
13 the 4 percent of the variance.  Now, you were about to clarify
14 that that's --
15         THE COURT:  Hang on just one second, Mr. Smith.
16     (Brief pause.)
17         THE COURT:  Go ahead.
18 BY MR. SMITH:
19 Q   That 4 percent of the variance, roughly speaking, doesn't
20 mean that exposure to violent media causes 4 percent of the
21 aggression among people who'd had that exposure, does it?
22 A   Right.  It does not mean that.
23 Q   What it means is if you could somehow -- for example, in
24 the experimental context, if you expose a pool of people to
25 games, either a violent game or a less violent game, and then

280

1  you give them sort of a test, like the noise blast, you're
2  going to have a vast range of difference in terms of how long
3  they hold that button down or how hard they push it, and of
4  that vast range, only 4 percent of that variation is in any way
5  statistically linked to the fact that they've just either
6  played a violent game or a nonviolent game?
7  A    Yes.
8  Q    96 percent of that variation has to do with something else
9  altogether in what they brought into the room?
10 A    Yes.
11 Q    And, in fact, just so we understand it, if you look at the
12 research overall, in your judgment, if you're trying to predict
13 not immediate aggressive behavior like noise blasts, but long
14 term criminal behavior, serious violence, the effect size is
15 actually quite a bit less than .2; isn't that right?
16 A    If you're trying to predict -- yeah.  It tends to go down
17 the more severe form of aggressive behavior one is looking at,
18 and that would be true of any predictor.
19 Q    Right.  Because it's farther away and because it's a rare
20 event?
21 A    Essentially, yes.
22 Q    Now, just so I understand it, this .1 or -- it's more like
23 .1 for the more serious violence?
24 A    It ranges from about .13 to a little bit larger, but the
25 .13 is one estimate that gets used a lot.

***

328

1  A   That is correct.
2  Q   Now, you mentioned a couple of times that there are other
3  kinds of stimuli other than video games that can kind of
4  trigger this GAM model that you have, and I think you've
5  mentioned a couple times that just viewing a picture of a gun
6  can lead somebody in experimental research to be more
7  aggressive?
8  A   Yes, that's true.
9  Q   In fact, you did a study like that and published it, right?
10 A   Yes.
11 Q   And what that illustrates is that there are probably almost
12 an infinite number of stimuli that you could give somebody in
13 one of these experimental situations and show some immediate
14 priming of slightly more aggressive behavior in the aftermath,
15 right?
16 A   Infinite is very big, but yes.  Stimuli that are associated
17 with aggressive thinking.
18 Q   Yes.
19 A   It would be a very large number.
20 Q   So, the fact that you have focused on video games is
21 largely a matter of your choice rather than some suggestion
22 that they're different from the large number of other things
23 that could have exactly the same effect in the experimental
24 context, right?
25 A   Yes.