Exhibit 5

```
                                                                    1

 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     ENTERTAINMENT SOFTWARE         )
 4   ASSOCIATION, et al.,           )
                                    )
 5              Plaintiffs,         )  No. 05 C 4265
                                    )
 6       v.                         )  Chicago, Illinois
                                    )  November 14, 2005
 7   ROD BLAGOJEVICH, et al.,       )  10:00 a.m.
                                    )
 8              Defendants.         )

 9

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11
     APPEARANCES:
12
     For the Plaintiffs:  JENNER & BLOCK, LLC
13                        One IBM Plaza
                          330 North Wabash Avenue
14                        40th Floor
                          Chicago, IL  60611, by
15                        MS. KATHERINE A. FALLOW
                          MS. KATHLEEN R. HARTNETT
16                        MR. DAVID P. SANDERS

17                        JENNER & BLOCK, LLP
                          601 13th Street
18                        1200 South
                          Washington, D.C.  20005, by
19                        MR. PAUL M. SMITH

20
     For the Defendants:  FLETCHER, TOPOL, O'BRIEN & KASPER, P.C.
21                        222 North LaSalle Street
                          Suite 300
22                        Chicago, IL  60601, by
                          MR. MICHAEL J. KASPER
23

24

25
```

```
                                                                  2

 1                         HOGAN MARREN, LTD.
                           180 North Wacker Drive
 2                         Suite 600
                           Chicago, IL   60606, by
 3                         MR. PATRICK E. DEADY
                           MS. LAURA C. LIU
 4
                           OFFICE OF THE ILLINOIS ATTORNEY GENERAL
 5                         100 West Randolph Street
                           13th Floor
 6                         Chicago, IL   60601, by
                           MR. ANDREW L. DRYJANSKI
 7                         MS. ELLECIA L. PARSELL-BURKE

 8                         COOK COUNTY STATE'S ATTORNEY
                           500 Richard J. Daley Center
 9                         Chicago, IL   60602, by
                           MR. STEPHEN L. GARCIA
10

11
     COURT REPORTER:       LAURA M. BRENNAN
12                         219 South Dearborn Street, Room 2102
                           Chicago, IL   60604
13                         (312) 427-4393

14

15

16

17

18

19

20

21

22

23

24

25

                              ***
```

212

1          Please raise your right hand.
2      (Witness duly sworn.)
3          THE COURT:  Please have a seat.
4          MR. KASPER:  Your Honor, I'm going to use
5   demonstrative exhibits.  Should I just set it up over there?
6          THE COURT:  Whatever you want to do.
7            CRAIG ANDERSON, PLAINTIFFS' WITNESS, SWORN
8                       DIRECT EXAMINATION
9   BY MR. KASPER:

                              ***

217

13  Q   Excuse me.  What is social learning theory?
14  A   Social learning theory is a theory about how people in
15  general, especially children, but adults, as well, learn lots
16  of their behaviors, attitudes, beliefs, and so on by observing
17  events around them, including watching television and so on.
18  Al Bandura is most closely identified with that work, and that
19  theory goes back to the 1960s, actually, some of that work.
20          So, again, the model is an attempt to kind of
21  integrate the insights from social learning theory and a number
22  of other sort of social cognitive theories in this domain,
23  including work by Leonard Berkowitz, who is an emeritus
24  professor at the University of Wisconsin, Ken Dodge and his
25  work on social information processing, and Russ Geen and his

218

1  work on affect aggression.
2          Again, the idea was to try to pull together a number
3  of theories that really seemed to have many of the same
4  underlying ideas and to try to pull it together in a way that
5  would be useful to researchers as a way of organizing lots of
6  information and lots of theoretical thoughts.
7          What this figure illustrates here, this is what we
8  call an episode, a social episode of some kind, of a social
9  encounter.  And we can start at the top where we talk about
10 what kind of input variables we have, and we have person
11 variables and situation variables.
12         By person variables we mean things that the person
13 brings to the situation with them.  So, it would be their
14 personality traits, their attitudes, their skills, beliefs, and
15 so on, but it would also include temporary mood states, things
16 like that.  Situation variables would include whatever is
17 present in the situation.  So, are there other people around or
18 is this person alone, are they in a bar, are they in a church,
19 have they been recently provoked, have they recently played a
20 violent video game, things like that.  And these variables then
21 combine to influence a person's present internal state, which
22 is represented by cognition, cognitive variables of one kind or
23 another, affects, and arousal.
24         So, if I can get concrete, imagine a situation where a
25 child is in a lunchroom and while carrying their lunch tray,

219

1  someone bumps into them causing them to spill their milk or
2  juice or whatever it is they're drinking in lunchrooms these
3  days.  One way the person variables can come into play here is
4  some children have this tendency to attribute such ambiguous
5  kind of events to hostile intent on the part of the person that
6  bumped them.  So, there's a tendency for them to say, oh, that
7  was done on purpose, whereas others are less likely to draw
8  that kind of a conclusion, and this happens pretty quickly and
9  automatically.  This is not necessarily a thoughtful process.
10           So, anyway, that can again influence this present
11  internal state.  They may think this person did this on
12  purpose.  They may get angry as a result of that.  And down
13  here at this stage what we're talking about is a host of what
14  we call appraisal and decision processes.  I think appraisal is
15  spelled wrong.
16           THE COURT:  You need two "P"s.  That's okay.  So,
17  you'll get graded down.
18           THE WITNESS:  Yes.
19           MR. KASPER:  The lawyers will note that the mistake is
20  in the original, not in the blowup.
21           THE WITNESS:  That's right.
22           THE COURT:  So much for peer review.
23           THE WITNESS:  That's right.
24  BY THE WITNESS:
25  A    Okay.  Some of these appraisal decision processes occur

5

220

1 very quickly without much awareness or thought.  Some take more
2 time and thought.  The idea, though, is that as a result of
3 these processes, at some point some kind of thoughtful action
4 emerges or some kind of impulsive action emerges, which in turn
5 then, of course, influences in some sense the outcome of this
6 social encounter.  But, of course, that's not the end of the
7 story because what happens -- I mean, if a child interprets
8 this bump as intentional and then responds aggressively in some
9 way, then that becomes a provocation that enters into sort of
10 the next part of this continuing interaction cycle.
11          So, the way that aggression or nonaggression sort of
12 occurs here is dependent on, again, person variables, as well
13 as what's going on in the immediate situation.  And in a sense
14 we can think of each time one of these events occurs, it is in
15 some sense a learning trial where one can learn what are the
16 consequences of certain kinds of actions, attitudes, beliefs,
17 things like that.
18 BY MR. KASPER:
19 Q   And will you describe the concept of priming as it relates
20 to that?
21 A   Yes.  Priming in this context refers to the case where
22 certain kinds of situational cues can increase the likelihood
23 or increase the accessibility of certain kinds of thoughts or
24 certain kinds of knowledge structures.
25          Not in a video context, but in a somewhat different

                                                                    221

1  aggression context, there's research showing that simply seeing

2  a photo of a gun -- a handgun, a rifle, whatever -- primes

3  aggressive thoughts, that is, it increases the accessibility of

4  aggressive thoughts, and that priming itself can lead to an

5  increase in the likelihood that aggressive behavior will occur

6  sometime fairly shortly after the prime took place.

7  Q   Okay.  And how many of these episodes that you're talking

8  about does a person have every day?

9  A   Well, a lot of these kind of interactions take place very,

10 very quickly.  And so, it could easily be thousands, certainly

11 hundreds, sort of depending on how big a scale you want to

12 draw.

13 Q   And how does repeated exposure to media and video game

14 violence affect long term propensity for aggression?  I think

15 that requires us to move over here.

16         THE COURT:  Let me ask you this.  If using this other

17 chart is going to take more than a few minutes, I'd rather hold

18 it until tomorrow morning.

19         MR. KASPER:  This is probably a good place to stop.

20         THE COURT:  Let's hold it until tomorrow.

21         MR. KASPER:  Okay.

22         THE COURT:  Okay.  We'll be able to start at 9:45.

23 So, I'll see you then.

24         MR. SMITH:  Thank you, your Honor.

25         THE COURT:  This is Mr. Dryjanski.  She wasn't there

222

1  when we gave the names.  Give your name for the record.
2         MR. DRYJANSKI:  Andrew Dryjanski.  I represent
3  Attorney General Madigan and the Governor.
4         Earlier you had talked a little bit about the motions
5  to dismiss and how you might deal with those after this.  Are
6  you --
7         THE COURT:  No.  I said as part of.
8         MR. DRYJANSKI:  Are you going to hear --
9         THE COURT:  Together with.  I expect people to argue
10 whatever they want to argue at the end of this.
11        MR. DRYJANSKI:  Okay.  Thank you.
12    (Whereupon, the within trial was adjourned to Tuesday,
13     November 15, 2005, at 9:45 o'clock a.m.)
14
15
16
17
18
19
20
21
22
23