Exhibit 7

Dockets.Justia.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

                    Plaintiffs,

        v.                                    HONORABLE GEORGE CARAM STEEH

                                              No. 05-73634
JENNIFER GRANHOLM, in her
official capacity as Governor
of the State of Michigan;
MICHAEL A. COX, in his
official capacity as Attorney
General for the State of
Michigan, et al, and KYM L.
WORTHY, in her official
capacity as Wayne County
Prosecuting Attorney,

                    Defendants.
_____/


HEARING ON MOTION FOR PRELIMINARY INJUNCTION


Monday, October 31, 2005

                    -    -    -

APPEARANCES:

For the Plaintiffs:            DENNIS J. LEVASSEUR, ESQ.


For the Defendants:           DENISE C. BARTON, ESQ.

                    -    -    -

*To Obtain Certified Transcript, Contact:*
*Ronald A. DiBartolomeo, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 740*
*Detroit, Michigan  48226*
*(313) 962-1234*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

3

1

2                                   I  N  D  E  X

3 _____ Page

4

5  Motion                                              5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    E X H I B I T S

 2   Identification                    Offered    Received

 3

 4

 5               N       O       N       E

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

05-73634; *ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
            *JENNIFER GRANHOLM, ET AL*

1          Detroit, Michigan

2          Monday, October 31, 2005

3

4                    -    -    -

5          **THE COURT:**  Okay.  This is Entertainment

6     Software versus Jennifer Granholm.  This is plaintiff's

7     motion for preliminary injunction.

8              MR. LEVASSEUR:  The question before the Court

9     today is, of course, is whether to allow or to go into

10    effect a law which expressly bands the distribution and

11    display of fully protected speech based on a disfavored

12    content, and I think it is fair to say that it is a rare

13    day, indeed, when that is the right answer to allow such

14    law to go into effect under the First Amendment, but I

15    thought before we get further into the issue on the

16    constitutional provision of a preliminary injunction, I

17    just want to talk a little bit about the practical aspects

18    of this, the equities that ought to be considered as well

19    by the Court if I could.

20            It is, of course, clear that the allowing an

21    unconstitutional law to go into effect causes irreparable

22    harm to -- under the First Amendment.  That's pretty well

23    established.

24            In addition though, if this law is allowed to go

25    into effect, there will be a lot of practical problems

1    with the many retailers across the state who are suddenly

2    going to have to figure out which games are and are not

3    covered by the statute, deciding which ones will be

4    displayed in the stores, which ones that have to require

5    I.D.'s for to sell as they are just about to get ready for

6    the Christmas season.  There is only four weeks before the

7    law takes affect.  So there are very serious practical

8    problems.

9          In terms of the equities on the other side, I

10    think it is important to recognize that it is not as if

11    the state or the country are facing some intimate public

12    health emergency that the Court needs to take  into

13    account.  In many ways the crime situation in this country

14    cuts against it in claim of necessity to for this kind of

15    ever regulation of speech in accepting the proposition

16    which I don't accept, that there is any evidence out there

17    that these games are causing any bad behavior in the

18    world.

19          With the Court's indulgence, I went to the

20    Department of Justice web site the other day, and I would

21    proffer one more piece of evidence if I could, which is

22    just evidence about crime statistics in this country, both

23    juvenile statistics and overall violent crime statistics.

24    With the Court's indulgence, I will hand it up.

25                **THE COURT:**  All right.

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1           MR. LEVASSEUR:  What these two documents

2     show, the first of all the single page document deals with

3     overall violent crime rates in this country.  As you'll

4     see, the Justice Department reports that there was a

5     precipitant decline in violent crimes in this country

6     every year since 1994 to the point where in 2004 violent

7     crime reached the lowest level reported by the Department

8     of Justice.  And over on the second document dealing with

9     violent crime for juveniles, on Page 5 of that document,

10    there's a graph that says -- this shows that the juvenile

11    violent crime index in 2003 was lower than any years since

12    at least 1980 and 48 percent below the peak year of 1994.

13          That year 1994 is significant because that's, as

14    the articles that the state has put in the record reflect,

15    that's about the time when these are more realistic and

16    more graphic violent video games became popular and began

17    to be sold.

18          So what we have here is a phenomenon in this

19    country where this particular medium has been singled out

20    as having cause some great problem in the country and in

21    reality there's no indication, at least in terms of

22    overall crime rates, that there is correspondence between

23    reality and the claims that are being made about that

24    particular medium.

25          Finally, just one more point about the practical

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.
JENNIFER GRANHOLM, ET AL*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

                    Plaintiffs,

          v.

JENNIFER GRANHOLM, in her
official capacity as Governor
of the State of Michigan;
MICHAEL A. COX, in his
official capacity as Attorney
General for the State of
Michigan, et al, and KYM L.
WORTHY, in her official
capacity as Wayne County
Prosecuting Attorney,

                    Defendants.
_____/

HONORABLE GEORGE CARAM STEEH

No. 05-73634


HEARING ON MOTION FOR PRELIMINARY INJUNCTION


Monday, October 31, 2005


        -     -     -


APPEARANCES:

For the Plaintiffs:              DENNIS J. LEVASSEUR, ESQ.


For the Defendants:              DENISE C. BARTON, ESQ.

        -     -     --

*To Obtain Certified Transcript, Contact:*
*Ronald A. DiBartolomeo, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 740*
*Detroit, Michigan 48226*
*(313) 962-1234*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

3

1

2                          I  N  D  E  X

3 _____ Page

4

5    Motion                                              5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          E X H B I T S

2    Identification                        Offered      Received

3

4

5                          N      O     N      E

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.
                  JENNIFER GRANHOLM, ET AL

5

1                                          Detroit, Michigan

2                                    Monday, October 31, 2005

3

4                              -    -    -

5              **THE COURT:**  Okay.  This is Entertainment

6     Software versus Jennifer Granholm.  This is plaintiff's

7     motion for preliminary injunction.

8              MR. LEVASSEUR:  The question before the Court

9     today is, of course, is whether to allow or to go into

10    effect a law which expressly bands the distribution and

11    display of fully protected speech based on a disfavored

12    content, and I think it is fair to say that it is a rare

13    day, indeed, when that is the right answer to allow such

14    law to go into effect under the First Amendment, but I

15    thought before we get further into the issue on the

16    constitutional provision of a preliminary injunction, I

17    just want to talk a little bit about the practical aspects

18    of this, the equities that ought to be considered as well

19    by the Court if I could.

20             It is, of course, clear that the allowing an

21    unconstitutional law to go into effect causes irreparable

22    harm to -- under the First Amendment.  That's pretty well

23    established.

24             In addition though, if this law is allowed to go

25    into effect, there will be a lot of practical problems

                    *05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
                              *JENNIFER GRANHOLM, ET AL*

1    with the many retailers across the state who are suddenly

2    going to have to figure out which games are and are not

3    covered by the statute, deciding which ones will be

4    displayed in the stores, which ones that have to require

5    I.D.'s for to sell as they are just about to get ready for

6    the Christmas season.  There is only four weeks before the

7    law takes affect.  So there are very serious practical

8    problems.

9         In terms of the equities on the other side, I

10   think it is important to recognize that it is not as if

11   the state or the country are facing some intimate public

12   health emergency that the Court needs to take  into

13   account.  In many ways the crime situation in this country

14   cuts against it in claim of necessity to for this kind of

15   ever regulation of speech in accepting the proposition

16   which I don't accept, that there is any evidence out there

17   that these games are causing any bad behavior in the

18   world.

19        With the Court's indulgence, I went to the

20   Department of Justice web site the other day, and I would

21   proffer one more piece of evidence if I could, which is

22   just evidence about crime statistics in this country, both

23   juvenile statistics and overall violent crime statistics.

24   With the Court's indulgence, I will hand it up.

25              **THE COURT:**  All right.

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1          MR. LEVASSEUR:  What these two documents

2     show, the first of all the single page document deals with

3     overall violent crime rates in this country.  As you'll

4     see, the Justice Department reports that there was a

5     precipitant decline in violent crimes in this country

6     every year since 1994 to the point where in 2004 violent

7     crime reached the lowest level reported by the Department

8     of Justice.  And over on the second document dealing with

9     violent crime for juveniles, on Page 5 of that document,

10    there's a graph that says -- this shows that the juvenile

11    violent crime index in 2003 was lower than any years since

12    at least 1980 and 48 percent below the peak year of 1994.

13         That year 1994 is significant because that's, as

14    the articles that the state has put in the record reflect,

15    that's about the time when these are more realistic and

16    more graphic violent video games became popular and began

17    to be sold.

18         So what we have here is a phenomenon in this

19    country where this particular medium has been singled out

20    as having cause some great problem in the country and in

21    reality there's no indication, at least in terms of

22    overall crime rates, that there is correspondence between

23    reality and the claims that are being made about that

24    particular medium.

25         Finally, just one more point about the practical

1    affects.  Even taking this study at face value, they are

2    talking about long term effects over years not any

3    immediate thing.  So allowing the law to go into effect

4    they are not going to effect -- isn't going to do anything

5    in the short run while we take the time to litigate rest

6    of this case.  They can't claim that sometime in the next

7    two weeks if that law doesn't go into effect, there is

8    going to be any affect on the way people behave or the way

9    their psyche are affected.

10       Now taking -- since I'm giving up value on

11   equities, I think all we have to do is have a reasonable

12   likelihood of success on the merits, but the reality is we

13   have highlighted the success on the merits, and the reason

14   for that I think is because of law is very clear,

15   including the binding decision of the Sixth Circuit in the

16   James case which largely answers the questions before this

17   Court.  It holds first of all, that a law like this --

18   it's equivalent for many purposes -- this kind of law

19   would subject to the strict scrutiny of violent video

20   games.  Like any of the video games are protected

21   expression, and when we try to sensor them based on their

22   violent content, that requires constitutional scrutiny of

23   the highest burden.

24       The other important point that the James case

25   makes is that when you -- if you're trying to justify such

1  a law based on the supposition that these games are going

2  to cause people to go out and be violent, be aggressive to

3  commit crimes, then you get into the whole category of

4  Brandenbrug where there is a strong, strong presumption

5  against sensored speech in order to affect the conduct of

6  those people who would be the recipients of the speech.

7      The usual rule that almost in every circumstance

8  is that you punish the conduct, you regulate the conduct.

9  You don't regulate the speech.  Even if you think that it

10  might, in fact, have some role in motivating that conduct,

11  that is not the way our system works.  The only exception

12  under Brandenburg where you have incitement which means

13  speech aimed at inciting imminent law as violence and

14  likely to cause imminent law as violence, a claim that is

15  not even being made here.

16      All of those points are made in the James case

17  where Judge Balk explained all the reasons why a tort suit

18  seeking to punish the sellers of these same kinds of games

19  would be unconstitutional, and I think the law does the

20  same thing would have to meet the same standards, the

21  standards which on its face the evidence of the state has

22  come forward with doesn't even not come close to meeting.

23      What do they do then?  They say, we're not trying

24  to prevent violence.  We're trying to prevent

25  psychological harm, but if you push a little bit of what

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.
JENNIFER GRANHOLM, ET AL*

1    it is they mean when they say "psychological harm", what

2    the brief says, what the studies say, psychological harm

3    makes people more aggressive, more violent.  So it is all

4    circular, and to the extent it means anything else other

5    than that, other than behavior, what they're saying, we

6    think we should be able to regulate this speech because it

7    makes people feel a certain way, think a certain way, a

8    very, very problematic justification for a law under the

9    First Amendment.

10        Another case that I think is very helpful in that

11   regard is the Supreme Court decision in Ashcroft versus

12   Free Speech Coalition that we cite in our papers.  That

13   was a case about what they called virtual child

14   pornography, which looked like child pornography, but were

15   not made with actual children.  They were computer

16   generated or made with young adults who looked like

17   children.  The Supreme Court said that material is fully

18   protected under the First Amendment, and validated a

19   federal law that attempted to sensor that material, and

20   one of the justifications that was offered there was that

21   this material will encourage people to out and commit

22   crimes against children.  It is also psychologically

23   harmful to people, and the court said no.  Brandenburg

24   controls.  We have to be very careful.  We certainly don't

25   think it is thought control by itself which is something

05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.
JENNIFER GRANHOLM, ET AL

1    that the First Amendment allows, it contemplates, and so I

2    see between the James case and the Free Speech Coalition

3    case and, of course, the decisions of the Seventh and

4    Eighth Circuits, and other courts who have had cases

5    almost exactly like this case, the law is very clear that

6    these kinds of justifications, these kinds of arguments

7    are not going to satisfy strict scrutiny.  Much of what

8    they are saying is that it is wholly legitimate under

9    First Amendment.  You can't come in and say we don't think

10   it would be good for people to have these feelings.  We

11   don't think it would be good for people to have these

12   thoughts.

13        There are a whole variety of other problems that

14   Judge Posner pointed out in his opinion in the Seventh

15   Circuit.  One of the problems with these kinds of laws is

16   that they completely ignore the fact that there are a

17   whole lot of other media out there that have just as much

18   violence or more violence than what we are talking about

19   in video games.

20        What this law would mean potentially, depending on

21   how you would apply it -- and I'm not sure how you can

22   ever be sure on how the law cuts on any one game -- but it

23   might well mean that it is illegal for a 16 year old to

24   buy the Lord of the Rings game even though you go buy him

25   the video or the movies.  There's an enormous amount of

1    violence in those movies and there is violence in the

2    games too, but that makes very little sense to try to

3    limit sales or access to one and not the other, because

4    for one thing it means it is unlikely to actually have any

5    impact even if you assume that media do turn kids into

6    more violent kids, which if we ever have to have an

7    analysis of all of that, believe me, there is a whole lot

8    of expert testimony on the other side and cross

9    examination.

10          I guess my point today is not that you should be

11   sifting through all of the studies and trying to decide

12   who's right or who's wrong about the science.  The science

13   does not on its face justify the law because it doesn't

14   satisfy the incitement standard.  It doesn't show anything

15   else which would justify sensoring protected speech.

16          THE COURT:  It wasn't clear to me that the --

17   your opponent in this case would concede that incitement

18   is not an issue relative of some evidence to support that

19   contention that this violent crime is not designed to

20   incite --

21          MR. LEVASSEUR:  I don't think they claim

22   there is a design to incite violence, which is one of the

23   elements that you have to satisfy.  The only thing that I

24   read them to say about that is they found some example of

25   a car accident that occurred where some crazy teenager got

1   in the car and tried to imitate this driving game that he

2   had been playing and he drove and caused an accident, and

3   somehow that satisfies the Brandenburg standard.  It

4   doesn't make the speech incitement that somebody reacted

5   to it.  People have been trying to do these copycat

6   arguments for years on TV, on movies, video games.  They

7   are never allowed because it's just one person's reaction,

8   and if we are going to sensor things on the basis of that,

9   where does it stop?

10          THE COURT:  The other thing that your

11  opponent argues is that these games are somehow

12  distinguishable from the other media by their interactive

13  nature.

14          MR. LEVASSEUR:  They don't have any evidence

15  of that.  There is nothing even in their own scientific

16  studies.  It is Professor Anderson who is the guy that

17  comes to each of these places and testifies.  He doesn't

18  claim that he has any scientific evidence.  He says, well

19  it stands for reason that it might be worst, but other

20  articles which they included show that TV effects are

21  stronger than the video game effects.  I don't see any

22  basis for, in fact, for doing that, for saying that.  It

23  certainly they are not more violent.  I mean, if you watch

24  the same movie as the game, it is probably more realistic

25  to see the Lord of the Rings movie than it is to play the

1     Lord of the Rings game which is a cartoon.  It is not a

2     movie.  So I don't see how you can rally do that.

3             There is a whole other problem of vagueness which

4     is how you apply a standard which says extreme violence

5     and graphic depiction which has to be -- the victim has to

6     be real, appearing to be a human, which in the video game

7     world is a very difficult problem.  People go and come

8     between human and other forms.  There are zombies,

9     there's -- you know, how do you figure out who exactly

10    qualifies, but the primary problem here is it is just

11    plainly content base sensorship of speech that is not in

12    any way lesser protection than any other speech, and they

13    don't have a basis for this either legitimate -- even

14    legitimate let alone sufficiently compelling that you can

15    get over the strict scrutiny standards.

16             THE COURT:  This general proposition of the

17    Court would be considering constitutional challenges to

18    the statute as applied as distinguished from finding that

19    it is unconstitutional on its face preliminary injunctive

20    relief would not be appropriate, is that a fair statement?

21             MR. LEVASSEUR:  I suppose that -- depends on

22    what kind of challenge it was, your Honor.  I mean, in

23    some situations I think it might still be appropriate, but

24    clearly here we're talking on its face.  The entire law

25    needs to be held -- needs to be narrow.  Here we're saying

1    enjoin the entire operation of the law because on its face

2    in its entirety it is unconstitutional, and the equities

3    certainly argue in favor of maintaining the status quo in

4    the meantime given all the things that I mentioned at the

5    outset.

6        Your Honor, perhaps it make sense, since the

7    burden justifying this law under the First Amendment falls

8    on the state, the burden of coming forward with sufficient

9    state interest and explaining why that's the least

10   restrictive method.  Perhaps I should at this point turn

11   over the podium and see what kind of justification they

12   want to emphasize today, and perhaps come back and do

13   rebuttal.

14           **THE COURT:**  That's fine.  Thank you.

15           **MS. BARTON:**  Good afternoon.  Denise Barton

16   on behalf of the state defendants.

17       I would like to respond -- or at least address the

18   first point which is that the plaintiffs are asking for--

19   enjoin the implementation of the entire statute.  In this

20   case they are actually only challenging one part of the

21   statute.  Plaintiffs are not challenging the sexually

22   explicit nature of the statute and so I don't see how they

23   justify enjoining the entire statute when they conceded

24   that at least part of the statute does comply with the

25   law.

1            Now with respect to the ultra-violent explicit

2    video game aspect of the statute, that's part two of the

3    law, and that's essentially why we're here today.

4            Now plaintiffs have submitted some crime

5    statistics which by having them presented today, obviously

6    I have not had an opportunity to look at them, but in

7    essence, our argument is not that because crime is going

8    down, that's why the legislature considered this evidence

9    when it was deciding whether to pass the statute.   In

10   fact, if you look at findings of the statute, you will

11   find that the legislature specifically had before it a

12   number of studies which talked about the juvenile brain is

13   not only different from the adult brain, but the level of

14   maturity of an individual who is a juvenile means that

15   person is subject to peer pressure, that person's brain is

16   more malleable.  If anybody had any teenagers, you would

17   well see how sometimes they are impacted by other

18   influences which in an adult would not be, and I call this

19   Court's attention to the case of Roper v Simmons, which is

20   the death penitentiary case which the Supreme Court

21   decided, and the reason why I would like this Court to

22   look at this case very closely is because in Roper, the

23   Court relied on social science research, and that social

24   science research provided three reasons why the court said

25   you cannot execute a juvenile under th age of 18, and

1    those three reasons are that the juvenile has a lack of

2    maturity and an underdevelop sense of responsibility.

3    Juveniles are more vulnerable or susceptible in the way of

4    influences and outside pressures, and the character of a

5    juvenile is not the same as that of an adult.

6        Now there has been no court that has addressed

7    this video came issue since Roper v Simmons was handed

8    down, and there has been no U.S. Supreme Court decision

9    that says that the Michigan legislature could not adopt

10    the statute which limits access of altra violent explicit

11    video game to minors.

12        I would like bring special attention to the fact

13    that what the law is not saying, it is not saying that a

14    juvenile can never look at mature rated video, or that a

15    parent cannot buy a mature rated video for an adult (sic).

16    What the legislature says, we do not want retailers making

17    the decision of what kind of video games are being played

18    in the home, and this Court -- the U.S. Supreme Court

19    rather in Ginsberg recognizes that parents do have a

20    special role in rearing the morals and values of their

21    children.

22        Now with respect to whether Brandenburg applies,

23    as our brief makes clear, the state does not need to

24    revive world war harms despite the fact that we do have

25    one fatal accident which occurred in Ingham County in

1    which one individual was killed after having watched a

2    violent video game and another person, as we understand

3    it, is in a coma and will not -- and is not likely to

4    recover.

5        And as to who has the burden of proof, the

6    plaintiffs have the burden of proof in seeking an

7    injunctive relief, and even though the Christmas season is

8    coming up, and the fact that, in terms of the equities,

9    the industry even admitted when they presented testimony

10   at the hearing in Lansing, that we're only talking about a

11   seven percent of all the video games are rated mature.

12   You're not talking about this law impacting the entire

13   realm of video games.

14        **THE COURT:**  Wait a minute.  Rated mature by

15   whom?

16        **MS. BARTON:**  Rated mature by their own

17   industry.

18        **THE COURT:**  So is it then that rating system

19   the system that would be employed to decide whether theses

20   videos are too explicitly violent or not?

21        **MS. BARTON:**  Well, in terms of the rating

22   system, the rating system is used -- can be used in the

23   affirmative defense part of the statute, and the industry

24   at least back when the legislature was considering the

25   statute, we're only talking about the mature rated videos

1    because by their own rating system, a mature video is one

2    that should not be look at by someone under the age of 17.

3    So we're talking only about a narrow percentage of the

4    video games that would be involved in this case.

5              THE COURT:  I don't really know, but I would

6    suspect that seven percent sounds like a small proportion

7    of the video games, but nevertheless it would amount to a

8    lot of video games in absolute numbers.

9              MS. BARTON:  They have not come forth and

10   shown any statistics of how many games we are talking

11   about.  What they are saying is no, you should not make

12   any change in the law.  Keep the law status quo because

13   seven percent of the games, a particular retail

14   establishment might have some difficulty in applying the

15   law.

16             THE COURT:  If you're a retailer in the

17   business, how would you apply the law?  Wouldn't you

18   simply to be safe to avoid going to jail decide not to

19   sell any mature rated video games to minors?

20             MS. BARTON:  What would I do if I was

21   retailer?

22             THE COURT:  Yes, assuming you didn't want to

23   go to jail.

24             MS. BARTON:  I think what I would do is look

25   at the rating system, read the statute, and as to those

1    which there might be a question, they have counsel.
2    Mr. Smith been retained.  In fact, he's in litigation now
3    in the Seventh Circuit on this issue, and they call upon
4    him for his advise and counsel.  In fact, when the
5    plaintiffs filed their reply brief, they attached two
6    expert reports which we would like the Court to disregard
7    those two reports for one, the reports are submitted in a
8    reply.  We have not had an opportunity to take those
9    depositions of the individuals whom are proffering as
10   experts, at least in their reply.

11          Additionally, their reports refer to paragraphs
12   from other reports which have not been provided.  So I am
13   at a loss and this Court is at a loss as to the strength
14   of those expert reports.

15          THE COURT:  I guess -- let's assume that you
16   have established the compelling state interest, and assume
17   that the -- that the -- that you even establish the law to
18   be narrowly tailored to meet the interest that you
19   defined, and again, as you would define the state interest
20   involved in this case it is how?  How would you--

21          MS. BARTON:  I would direct the Court's
22   attention to the legislative findings, and that's attached
23   to the plaintiff's first amended complaint, and what it
24   talks about is that there is a psychological harm to
25   children by being exposed to altra violent explicit

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

 1    videos.  Even though the legislative history refers to the
 2    fact that protecting minors from possibly aggressive
 3    behavior, we do not have to meet the Brandenburg test
 4    because of Brandenburg test does not apply when talking
 5    about psychological harm to a minor.
 6              THE COURT:  So assuming I buy all of your
 7    argument up to that point, how in the world can you argue
 8    that this statute is sufficiently definite for retailers
 9    to put them on notice of their obligation not to sell in
10    order to avoid jail?
11              MS. BARTON:  Well, your Honor, if you look at
12    the Eighth Circuit court decision in the Interactive
13    Software case, the court in that case specifically talks
14    about the vagueness issue and says, that the test is
15    whether an ordinary person is put on notice as to what's
16    illegal.  It does not have to be mathematical precision or
17    technologically precise, and even the rating system that
18    the industry adopts incorporates some of the same language
19    that the statutes refers to.
20              THE COURT:  So every person, the retailer, is
21    suppose to view and sell for herself all of the video,
22    suppose to be in depth enough at the game to go at every
23    level in the video game, right, because in some of these
24    games the lower levels don't contain presumably altra
25    violent acts, but they have to be able to get to the

1   higher levels, which I consider myself relatively

2   ordinary.  I know there is no chance in the world, since

3   I've never even played one of these games that -- or an

4   interactive video game that I took it to the top level to

5   order to observe what's there, and then suppose to make

6   this judgment about whether this is altra violent or not.

7   Is that what you're saying?

8              MS. BARTON:  Your Honor, that's the same

9   question that they have even in complying with part one,

10  because in part one the store cannot distribute to minor a

11  sexually explicit video.

12             **THE COURT:**  Maybe that should be struck too.

13             **MS. BARTON:**  But they are not challenging

14  that.

15             **THE COURT:**  So what you're saying is because

16  part one might also be unconstitutional, and they are not

17  asking me to strike it, therefore, I should not strike

18  part two?

19             **MS. BARTON:**  No, your Honor.  What I'm saying

20  is that if you look at part one in which based on what

21  you're asking me, a retailer may have to look at a video

22  and decide whether it is sexually explicit material.

23             **THE COURT:**  And in order to look at it, he

24  has to be able to get to all the levels, right?

25             **MS. BARTON:**  That's the same issue that

1    they're going to have in looking at the altra violent

2    explicit video game.  They are not in any different

3    situation when it comes time to enforcing the statute

4    because they are going to have to look at the video in

5    order to comply with the law which they said they are not

6    challenging.

7         So I don't see how there is an incremental

8    ambiguity or incremental step and now saying well, the

9    retailer is going to have difficulty deciding whether

10   altra violent explicit video games, therefore I will

11   enjoin the entire law from being implemented.

12        **THE COURT:**  Isn't it possible counsel, that

13   the challenge to the sexual contents of this material as

14   you go through the levels would be addressed at the time

15   that a prosecution is undertaken as oppose to the

16   challenge here which is to part two only as you say as a

17   facial challenge?

18        **MS. BARTON:**  Well, your Honor, that's the

19   same issue again because under part two, if someone is

20   prosecuted, they can raise the challenge the First

21   Amendment in that particular prosecution.  So they are in

22   no worst position.

23        **THE COURT:**  Right.  I just don't

24   understand -- well, all right.  Go ahead.

25        **MS. BARTON:**  With respect to whether the

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1    retailer is going to have to sit there and actually play

2    the game, they are already saying that the system is

3    working, which is the rating system which they have, and

4    in that the rating system they have to decide whether the

5    material is sexually explicit.  They have to decide

6    whether it is rated T for teens.  They have to decide

7    whether it should be rated for an adult.

8              THE COURT:  Who, the individual retailer?

9              MS. BARTON:  I'm saying that based on what

10   you're questioning, you're saying that someone would have

11   to sit down with video game and keep playing until they

12   access the codes or get to a higher level to determine

13   whether this is an illegal game.

14             THE COURT:  Whether they are subject to going

15   to jail.

16             MS. BARTON:  Exactly.

17             THE COURT:  But that's why I asked you, is it

18   your contention that a retailer should reasonably then

19   just rely on the rating system for determining whether a

20   video is salable or not under the statute?

21             MS. BARTON:  That's obviously not going to be

22   the sole test, but that is one factor that they could look

23   at also obviously and, in fact, within the statute there

24   is a good faith defense if someone complies, if a manager

25   complies with the rating system.  Just because the

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1    statute--

2                    THE COURT:   You acknowledge that the only

3    safe thing for the retailer to do in deciding whether a

4    given video as altra violent contents or not is to just

5    refuse to sell anything that's rated mature?

6                    MS. BARTON:   The only safe thing?

7                    THE COURT:   Because the only defense that

8    they would have -- the only defense that they would have

9    to a prosecution which seeks them to put them in jail for

10   selling altra violent explicit material would be it's not

11   rated mature.   I have not idea that I should even screen

12   it, right?   That's there only defense that the statute

13   provides them.

14                   MS. BARTON:   Well, the other defense that's

15   provided is they ask for the I.D. of the individual who is

16   buying it, and so if someone is under the age of 17, then

17   the retailer is on notice.   It is like buying liquor.

18   They ask for I.D. when you go to the store, and the

19   individual does not sell liquor to someone who is a minor.

20        Now the fact that there is a difficulty in

21   implementing the statute, that's not the standard.   The

22   standard is whether the ordinary person has been put on

23   notice.

24                   THE COURT:   The ordinary person of what age?

25                   MS. BARTON:   Ordinary person --

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1          **THE COURT:**  I would suspect that children

2     have little more tolerance for violence for example, and

3     would view it differently than us oldsters who have not

4     been exposed to it during our upbringing.

5          MS. BARTON:  Well, your Honor, because there

6     are lines that have to be drawn and because there may be

7     some adjustments that have to be felt within the video

8     industry, that does not mean per se that it is an

9     unconstitutional statute, and even though you may

10    sympathize with some of the retailers comply with a new

11    law, they will have to comply with a new law anyways

12    unless this Court enjoins the entire statute, which they

13    are not asking.

14         I would also like the Court to keep in mind that

15    the Seventh Circuit case and the Eighth Circuit cases are

16    not cases that we have today.  For one, the body of

17    research in this area continuously is evolving, and the

18    legislative history refers to some of the more recent

19    studies in -- that have come up to date on the video game

20    industry.

21         The more recent studies, your Honor, show for

22    example that there's a decrease in social behavior.  There

23    are some other studies which talk about aggressive

24    behavior after minors play these altra violent explicit

25    video games, and just like the U.S. Supreme Court paid

1      attention to the social science research in the Roper

2      case, we think that you can also pay attention to the

3      social science research that we submitted before this

4      Court.

5              At this point, your Honor, I would rely on my

6      brief and indicate that the plaintiff has the burden of

7      proving irreparable harm.  They also have the burden of

8      proving the substantial likelihood of the merits.  The

9      Seventh and Eighth Circuit cases are not binding on this

10     Court and, in fact, even in the James case it did not talk

11     about legislative record.  What it did, it examined

12     whether the individual in the Kentucky incident could be

13     liable under Kentucky law for the violent behavior that

14     eventually occurred in that case.  The court did not take

15     an exact scrutiny of the record.  The court did not look

16     at the legislative finding because there was no statute

17     before it.

18             Therefore, this defendant submits that the Sixth

19     Circuit in James is not controlling, at least as it

20     applies to this particular statute.  Obviously, the

21     principle that was held by the court in James is something

22     that this Court should pay attention to.  However, in

23     James the Sixth Circuit did not say that altra violent

24     explicit video games under no circumstances can be

25     regulated.  What it said was it summarized the state of

1    the law up to that point, and since James was decided,

2    there's been an entire body of research that this Court

3    has been directed to pay attention to, and we submit that

4    justifies and proves that the Michigan legislature did

5    have a compelling state interest when it decided to

6    regulate these particular altra violent explicit video

7    games.

8         Thank you.

9              **THE COURT:**  Thank you.

10             **MR. LEVASSEUR:**  Just a couple of quick

11   points.  I thought I might at least start by trying to

12   clarify the relationship between the rating system and

13   what this law does.

14        The rating system as a whole series of age levels

15   which essentially are guidelines for parents in buying the

16   games, and the concern -- a major concern is the fact that

17   it is almost certain that the law as written would apply a

18   lot of games which have been rated T for example, which is

19   for people over 13.  Games which contained violence, games

20   which contained killing, but are less graphic or because

21   they are of a different kind of context in which it

22   appears are viewed as more appropriate for younger

23   teenagers.

24        For example, in the record is the Medal of Honor

25   game landing which has a landing on the beach in Normandy

1   at the beginning.  There is a fair amount of killing in

2   that scene, but it's viewed, at least according to the

3   SRB, as something that's okay for a 14 year old, and I

4   think a lot of people would agree with that.

5        The problem is you can't -- rating system is no

6   aid at all in terms of trying to avoid liability under the

7   statute.  If they wanted to try to do something that would

8   make sense on the rating system, that's one thing, but

9   they don't do that.

10       And the affirmative defense that my colleague

11  mentions does not do that at the back door.  It says that

12  a store manager can't be held liable if the store is

13  following rating system, but it doesn't say anything about

14  the clerk who does the sale.  It is written in a very

15  peculiar manner.  I don't know quite what they were

16  getting at but it said if you have managerial

17  responsibility and you include the rating system, then you

18  can't be held liable, but your employees are still out

19  there exposed to liability for making the sales.  It

20  doesn't make a lot of sense to be frank.

21       Basically the other point that I want to make, is

22  what you're really hearing today and in the brief is a lot

23  of different arguments for the proposition that we created

24  a new exception to the First Amendment for violent speech

25  as applied to kids.  The reference to Ginsberg is

1    basically saying, look.  We need another kind of obscenity

2    exception as it applies to kids which the Ginsberg

3    standard is, and I submit to you that first of all, the

4    James case expressly says we're not doing that, and the

5    Supreme Court said that, and basically this issue keeps

6    coming up and the reality as Judge Posner said in the

7    Seventh Circuit case, you know, it's a nice thing to think

8    about, but violence is part of our culture.  It's part of

9    children's literature.  It's part of everybody's everyday

10   experience.  You try figure out how you would construct a

11   Ginsberg exception on the violence side, and you really

12   can't do it, and there's no real basis for doing it either

13   in the record.

14        Now as to the social science, we submitted two

15   expert records from the Illinois case where the experts

16   were state picked.  So we have a whole debate among the

17   experts there.  We did that as a proper responses to your

18   invitation that we put evidence that we could put in the

19   record, and we put that in.  We didn't attach it to our

20   first motion because we had not seen the response yet and

21   justifications, and the motion had been filed before the

22   Court had us in here to talk about proffer.  So that

23   seemed to us to be the proper timing.

24        The fact that those experts haven't been deposed

25   doesn't mean it can't be a proffer, the kind of evidence

1   that we can put before the Court.  Indeed, what the state

2   has done here is put all the articles in front of you and

3   not had any expert at all.  You are just suppose to sit

4   down and read all of these psychological articles and

5   decide whether Dr. Anderson's analysis of a statistical

6   significance of some experiment is or is not persuasive.

7   It seems to be odd to be criticizing us for not having our

8   experts deposed and they don't have experts to begin, but

9   in any event, the more fundamental point it seems to me is

10  that you don't have to look at all of that and try to

11  parse whether our responses is more persuasive than

12  theirs.  The reality is the psychological evidence does

13  not satisfy the legal standard even taking it at face

14  value.  There's a huge debate out there, but even assume

15  that you take the most aggressive evidence, the ones that

16  they would rely on the most, they say long term over

17  years, what Judge Balk called a glacial process of

18  personality development.  That's not good enough under

19  First Amendment standards.

20       So it seem to us given that, the Court ought to

21  find that we have a high likelihood of success and the

22  equities favor preliminary relief.

23       Does the Court no further questions?

24          **THE COURT:**  No.  Thank you.

25       Ms. Barton, anything else?

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

1          **MS. BARTON:**  The only comment that I would

2     add is Mr. Smith said they are offering these reports as

3     proffers.  Well, first of all, at the status conference he

4     said that he was not offering any experts at all, and he

5     just wanted to know if we would call experts, and then

6     they put these -- slip these expert reports in after the

7     fact when they're involved in the Seventh Circuit

8     litigation, and he represented to this Court that the

9     first time he knew about the existence of these experts is

10    after they received what we received, what we filed in

11    this case?  I don't think so.

12         This case, the Entertainment Software case in the

13    Seventh Circuit is ongoing.  They knew about the experts,

14    and then what they did was wait for the last minute and

15    filed them, and they don't even submit the entire record

16    so we can review them.  They refer to paragraphs from

17    other documents that are filed in the Seventh Circuit

18    litigation.

19         We would ask the Court not consider their reports.

20         **THE COURT:**  One thing you did not address in

21    your argument Ms. Barton was how I would balance the

22    relative harms of granting or not the preliminary

23    injunctive relief that's requested.  Did you want to talk

24    about that?

25         **MS. BARTON:**  The only thing that I would add

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

 1    is that in this case the legislature, who is the policy

 2    making arm for the state, has passed this law.  It will go

 3    into effect unless this Court enjoins the implementation

 4    of that law.  As a matter public policy, statutes are

 5    entitled to a presumption of constitutionality.  So the

 6    harm would be the harm that would be visited on any

 7    particular statute by this Court stopping the

 8    implementation of the law, and what the plaintiffs are

 9    speculating might happened, but they have not presented

10    any evidence to this Court to show that they are going to

11    have difficulties with a particular percentage of the

12    video games that are being displayed.  They want you to

13    take their word for it.

14              THE COURT:  Okay.  All right.  Well, I'm

15    going to issue a written opinion in this case, and I'll

16    get it done hopefully in time so that if either side wants

17    to pursue appellate review of the call, you'll have the

18    opportunity to do so before the December 1st deadline.

19              MR. LEVASSEUR:  Thank you, your Honor.

20              THE COURT:  Thank you both.  It is accurate

21    to say that you're only asking the Court enjoin the --

22              MR. LEVASSEUR:  Title two.

23              THE COURT:  Part two of the statute, is that

24    right.

25              MR. LEVASSEUR:  Yes, your Honor.

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*

34

1       **THE COURT:**  Okay.  And you would not concede

2   that your failure to challenge the part first is a

3   concession?

4       **MR. LEVASSEUR:**  Constitutional considerations

5   are quite different in the obscenity.  That's a matter

6   that's less practical.  We don't think it has any

7   application to real games in the real world.

8       **THE COURT:**  All right.  Thank you.

9

10      (Proceedings concluded.)

11

12          -    -    -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    C E R T I F I C A T I O N
 3          I, Ronald A. DiBartolomeo, official court
 4     reporter for the United States District Court, Eastern
 5     District of Michigan, Southern Division, appointed
 6     pursuant to the provisions of Title 28, United States
 7     Code, Section 753, do hereby certify that the foregoing is
 8     a correct transcript of the proceedings in the
 9     above-entitled cause on the date hereinbefore set forth.
10          I do further certify that the foregoing
11     transcript has been prepared by me or under my direction.
12
13                                              Dec. 6, 2005
14     Ronald A. DiBartolomeo, CSR                  Date
       Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

*05-73634; ENTERTAINMENT SOFTWARE ASSOCIATION, ET AL v.*
*JENNIFER GRANHOLM, ET AL*