UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION ,

          Plaintiffs,

v

JENNIFER GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General for the State of Michigan, et
al, and KYM L. WORTHY, in her official
capacity as Wayne County Prosecuting
Attorney,

          Defendants.

No. 05-73634

HON. GEORGE CARAM STEEH
MAGISTRATE JUDGE PEPE

Dennis J. Levasseur (P39778)
Alicia J. Blumenfeld (P67511)
Bodman LLP
100 Renaissance Center
Detroit MI 48243
(313) 393-7596

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
Jenner & Block LLP
601 Thirteenth Street, NW, Ste 1200
Washington DC 20005
(202) 639-6000

Denise C. Barton (P41535)
Jason R. Evans (P61567)
Ann Sherman (P67762)
Attorneys for Defendants
Michigan Department of Attorney General
Public Employment, Elections & Tort Div.
P.O. Box 30736
Lansing MI 48909
(517) 373-6434

## DEFENDANTS' MOTION IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

Defendants Governor Jennifer Granholm and Attorney General Michael A. Cox oppose

Plaintiffs' Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c) because

Plaintiffs have not demonstrated that the Act violates constitutionally-guaranteed rights. Defendants also file this cross-motion for summary judgment because there is no genuine issue of material fact as to the constitutionality of the Act.

In opposition to Plaintiffs' Motion and in support of Defendants' cross-motion for summary judgment, Defendants state as follows:

1.    2005 Public Act 108 was passed by the People of the State of Michigan through their elected legislators, and signed into law on September 14, 2005.

2.    During the hearing on the motion for preliminary injunction, Defendants presented only a portion of the legislative record in this case.  This Court granted Plaintiffs' motion on November 9, 2005, noting that Defendants "are not likely to succeed on the merits." This Court's Opinion did not, however, foreclose any chance of Defendants' succeeding in demonstrating the Act's constitutionality.  At a minimum, there are genuine issues of material fact as to Plaintiffs' allegations that the Act is unconstitutional.

3.    Additional evidence and testimony presented in the accompanying memorandum demonstrate that Defendants are entitled to summary judgment because Michigan's Act regulating minors' access to ultra-violent video games is constitutional.  This evidence demonstrates that the State has a compelling interest and that the Act is narrowly tailored to achieve that interest.

4.    In support of this Motion, Defendants submit a brief explaining in detail why Plaintiffs' Motion for Summary Judgment should be denied and why Defendants' Motion for Summary Judgment should be granted.

5.    On January 20, 2006, Plaintiffs' attorney was contacted by telephone in order to seek concurrence in this motion, as well as the cross-motion, pursuant to ED Mich LCR 7.1(2). Plaintiffs' attorney did not concur in the relief requested, necessitating this motion.

This Court should not grant permanent injunction of the Act, signed into law by the People of the State of Michigan through their elected officials.  Both the Act's legislative record and the additional evidence presented in the accompanying brief not only defeat Plaintiffs' motion but justify summary judgment in favor of Defendants.  Defendants therefore request that this Honorable Court deny Plaintiffs' Motion for Summary Judgment and enter summary judgment against Plaintiffs on all remaining counts.

# BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## CONCISE STATEMENT OF ISSUES PRESENTED

I.     First Amendment case law recognizes that the State can regulate otherwise-protected speech for the well-being of its minor citizens as long as it demonstrates a compelling interest.  In demonstrating this compelling interest, neither binding First Amendment case law nor binding Sixth Circuit precedent mandate a direct causal connection between video games and aggression, nor proof that video games are the only cause of aggressive thoughts, feelings, or behaviors.  Here, Defendants have offered substantial evidence from the medical community and leading researchers to prove that exposure to ultra-violent video games is deleterious to minors.  Has the State met its burden of proving a compelling interest in protecting its minor citizens?

II.    First Amendment case law recognizes that regulation of otherwise-protected speech must be narrowly tailored to demonstrate a state's compelling interest. Here, Defendants offer evidence demonstrating that the interactive component of ultra-violent video games makes them uniquely more harmful to minors than other entertainment media forms.  The State also does not restrict adult access to ultra-violent video games, or minors' access to the content of these games with appropriate adult supervision.  Has the State met is burden of proving that the Act is narrowly tailored?

III.   To avoid unconstitutional vagueness, a statute must give an ordinary person a reasonable opportunity to know what actions are prohibited so that he may act accordingly, but it does not have to do so with mathematical precision.  The Act contains easily-understood definitions and spells out the specific injuries or violence that would violate the Act.  Does the Act comport with due process?

IV.    States adopt laws to address the problems that confront them, but are not required to solve all problems simultaneously or similarly.  Michigan has identified ultra-violent video games as negatively affecting its minor citizens in harmful ways that other forms of expressive entertainment media do not.  Does the Act comport with equal protection?

V.     The United States Supreme Court has held that Congress's restriction on its own regulation is not an impermissible delegation.  Here, the standard for the Act is not the video industry's rating system, but rather, a "harmful to minors" standard articulated in the Act itself.  Does the Act delegate the Legislature's authority without accompanying legislative standards?

i

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>Cases</u>

*American Machine Ass'n v Kendrick*, 244 F3d 572, 576-79 (7th Cir, 2001)
*Anderson v Liberty Lobby, Inc*, 477 US 242, 249; 106 S Ct 2505; 91 L Ed 2d 202 (1986)
*Brandenburg v Ohio*, 395 US 444: 89 S Ct 1827; 23 L Ed 2d 430 (1969)
*Burson v Freeman*, 504 US 191, 207; 112 S Ct 1846; 119 L Ed 2d 5 (1992)
*Celotex Corp v Catrett*, 477 US 317, 322; 106 S Ct 2548; 91 L Ed 2d 265 (1986)
*City of New Orleans v Dukes*, 427 US 297, 303; 96 S Ct 2513; 49 L Ed 2d 511(1976)
*Connection Distrib Co v Reno*, 154 F3d 281, 191-92 (6th Cir, 1998)
*Currin v Wallace*, 306 US 1, 15-16; 59 S Ct 379; 83 L Ed 441 (1939).
*Cusack Co v Chicago*, 242 US 526, 530; 37 S Ct 190; 61 L Ed 472 (1917)
*Denver Area Educ Telecommunication Consortium, Inc v FCC,* 518 US 727; 116 S Ct 374; 135 L Ed 2d 888 (1996)
*Eddings v Oklahoma*, 455 US 104, 110-112; 102 S Ct 869; 71 L Ed 1 (1982)
*FCC v Pacifica Foundation*, 438 US 726, 749; 98 S Ct 3026; 57 L Ed 2d 1073 (1978)
*Food & Drug Admin v Brown & Williamson Tobacco Corp*, 529 US 120; 120 S Ct 1291; 146 L Ed 2d 121 (2000)
*Ginsberg v New York*, 390 US 629, 630; 88 S Ct 1274; 20 L Ed 2d 195 (1968).
*Grayned v City of Rockford*, 408 US 104; 92 S Ct 2294; 333 L Ed 2d 222 (1972)
*James v Meow Media, Inc.,* 300 F3d 683 (6th Cir, 2002)
*Interactive Digital Software Ass'n v St Louis County*, 329 F3d 954, 957 (8th Cir, 2003)
*Lorillard Tobacco Co v Attorney General of Massachusetts*, 533 US 525, 570-71; 121 S Ct 2404; 150 L Ed 2d 532 (2001)
*Miller v California*, 413 US 15; 93 S Ct 2607; 37 L Ed 419 (1973).
*People v Luera*, 86 Cal App 4th 513, 103 Cal Rptr 2d 438, 442-443 (Cal App 2nd Dist 2001)
*Roper v Simmons*, __US __, 125 S Ct 1189, 1195; 161 L Ed 2d 1 (2005)
*Sable Communications of California, Inc v FCC*, 492 US 115; 109 S Ct 2829; 106 L Ed 2d 93 (1989)
*Turner Broadcasting Sys., Inc v FCC*, 512 US 664, 622; 114 S Ct 2445; 129 L Ed 2d 497(1994)
*United States v Petrillo*, 332 US 1, 7; 67 S Ct 1538; 91 L Ed 1877 (1947)
*Video Software Dealers Ass'n v Maleng*, 325 F Supp 2d 1180, 1186 (W.D. Wash 2004)

## INTRODUCTION

The Act at issue in this case can be reconciled with the demands of the First Amendment. Defendants urge this Court not to be unduly swayed by non-binding case law on the issue before the Court—an unsettled legal and evidentiary issue that not only invites but necessitates open and incisive analysis and factfinding rather than undue or misplaced reliance on other courts' decisions, as Plaintiffs continually urge.

The few appellate decisions that deal with the constitutionality of violent video games have not properly or thoroughly analyzed First Amendment law as it applies to "video game expression."  Further, this appellate case law arose when the state of the research on the issue was significantly less extensive than at present.

As an initial matter, cases at both the appellate and district court levels are less definitive on the overarching legal issue of whether the State can regulate minors' access to violent video games.  Moreover, these cases often demand a level of causation not required by either the First Amendment or the United State Supreme Court on similarly significant issues. Finally, the appellate and district courts decisions that have specifically analyzed the level of evidence required to prove a state's compelling interest in regulating violent video games as to minors, are not binding on this Court.  Only *James v Meow Media, Inc*[1] is binding on this Court, and its holding is only marginally applicable to this case.

The State offers psychological research, expert testimony from the recent Illinois litigation, and strong statements from professional medical organizations—all documenting the fact that ultra-violent video games are harmful to minors.  This evidence satisfies First Amendment standards without the need to meet the unrealistically high evidentiary threshold of

---

[1] *James v Meow Media, Inc,* 300 F3d 683 (6th Cir, 2002).

proving that violent video games always cause aggression, or that they are the only cause of

aggression in minors.

## FACTUAL AND PROCEDURAL BACKGROUND
## STATEMENT OF THE FACTS

2005 Public Act 108 ("the Act") was signed into law on September 14, 2005.  (Ex. 1,

Legislative History Enrolled Senate Bill No. 416.) The Act prohibits the dissemination,

exhibiting, or display of certain sexually explicit and ultra-violent explicit video games to

minors, and provides civil penalties and sanctions against those who violate the Act.  The Act

was supported by both conservatives and liberals, Democrats and Republicans, and passed by an

overwhelming majority.

The Act consists of two parts:  Part I relates to sexually explicit video games, and Part II

relates to ultra-violent explicit video games.  (Ex. 1, Legislative History, Enrolled Senate Bill

No. 416.)  Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers

Association ("VSDA") and Michigan Retailers Association ("MRA") have challenged only

enforcement of Part II of the Act by Defendants Governor Jennifer M. Granholm, Attorney

General Michael A. Cox, and Wayne County Prosecuting Attorney Kym L. Worthy.[2]

Part II states that, in light of the public health and the general welfare of Michigan

citizens, the Legislature finds that:  (1) ultra-violent explicit video games are harmful to minors

because minors who play them are more likely to exhibit violent, asocial, or aggressive behavior

and have feelings of aggression; (2) there is a causal connection between media violence and

aggressive behavior in some children, and that the effects of media violence are "measurable and

long-lasting;" and, (3) that minors are capable of purchasing, and do purchase, ultra-violent

---

[2] *Entertainment Software Ass'n v Granholm,* 2005 US Dist LEXIS 28313, Opinion at 1.

2

explicit video games.  (Ex. 1, Legislative History Enrolled Senate Bill No. 416, Part II, Sec 15(a)-(c), p. 3).[3]

The Legislature articulated three legitimate and compelling interests justifying the Act: (1) safeguarding both the physical and psychological well-being of minors; (2) preventing violent, aggressive, and asocial behavior from manifesting itself in minors; and (3) directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games.  (Ex. 1, Legislative History, Bill 416, Part II, Sec 15(e)-(g)).

The Act was due to take effect on December 1, 2005; however, on November 9, 2005, this Court granted Plaintiffs a preliminary injunction enjoining Defendants' enforcement of Part II of the Act.  On January 19, 2006, this Court dismissed Plaintiffs' Count V, which was based on a separate redundant claim under 42 USC §1983, but denied Defendants' Motion to Dismiss based on Eleventh Amendment Immunity, abstention, and due process.  (See January 19, 2006 Order of this Court, "Order Granting Defendants Governor Jennifer M. Ganholm and Attorney General Michael Cox's Motion to Dismiss as to Count V and Denying the Motion to Dismiss as to All Other Counts.)

On December 23, 2005, Plaintiffs filed a Motion for Summary Judgment, arguing that the Act fails strict scrutiny because the evidence offered by the State is insufficient either to justify a content-based ban on violent video games or to establish that the Act is narrowly-tailored. Plaintiffs further argue that the State cannot present any additional evidence that will lead to a different outcome.  Contrary to Plaintiffs' claims, the evidence presented here demonstrates the Act's constitutionality.

---

[3] At the direction of the Court, the entire legislative history has not been filed.

## ARGUMENT

### I.     Standard of Review

Summary Judgment is proper under Rule 56(c) if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4]   A material fact affects the outcome of the case under the governing law.[5]   The plain language of rule 56(c) mandates the entry of summary judgment only where a party has failed "to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[6]   Defendants bear the burden of proving that the State has a compelling interest in regulating minors' access to ultra-violent video games, and that the Act is narrowly-tailored to achieve that interest.

Plaintiffs cannot say that Defendants have completely failed to prove the essential elements of this case, making summary judgment against Defendants improper.  Moreover, Defendants have proven a compelling interest and a narrow tailoring of the Act through the legislative record and additional testimony and documents incorporated in this brief.

### II.     Under both binding First Amendment case law precedent and binding Sixth Circuit precedent, the Act is constitutional.

Throughout this litigation, Plaintiffs have insisted on pressing three legal issues:  first, that existing First Amendment case law does not support the constitutionality of the Act; second, that the Sixth Circuit's Opinion in *James* supports Plaintiffs' position; and third, that Defendants must meet the *Brandenburg* test.  None are true.

As to the first legal issue, the Supreme Court has recognized that a State can regulate otherwise-protected expression both for the well-being of its youth and in order to support

---

[4] *Celotex Corp v Catrett*, 477 US 317, 322; 106 S Ct 2548; 91 L Ed 2d 265 (1986).
[5] *Anderson v Liberty Lobby, Inc*, 477 US 242, 249; 106 S Ct 2505; 91 L Ed 2d 202 (1986).
[6] *Celotex*, 477 US at 322.

4

parents' claims to authority in their own household.[7]  The Supreme Court has also "consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."[8]  The federal courts have expressed a similar interest in safeguarding both the physical and psychological well-being of minors.[9]  The government may, therefore, regulate the content of constitutionally-protected speech in order to promote a compelling interest, as long as it chooses the least restrictive means to further the articulated interest.[10]

The Supreme Court's strong statements recognizing the importance of parental authority encourage careful analysis of situations that require a <u>distinction between the rights of adults and the rights of youth</u>.  Yet, these statements are completely contradicted by Judge Posner's suggestion in *American Amusement Machine Ass'n v Kendrick* that a State may not be able to restrict minors' access to video games despite the level of proof of harm to the minor, because shielding children from violence would be deforming and leave them unequipped to cope in the world.[11]  As dicta, it is not accompanied by the significant legal analysis necessary to support it or to justify its serious consequences.  Although this dicta was not the basis for the Court's holding in *Kendrick*, it has nonetheless impacted other courts, as evidenced by a California district court's recent reiteration of it, also without any accompanying analysis.[12]  Perhaps, also, Judge Posner's dicta has indirectly influenced later courts to demand an almost impossibly high

---

[7] *FCC v Pacifica Foundation*, 438 US 726, 749; 98 S Ct 3026; 57 L Ed 2d 1073 (1978).

[8] *Ginsberg v New York*, 390 US 629, 630; 88 S Ct 1274; 20 L Ed 2d 195 (1968).

[9] *Video Software Dealers Ass'n v Maleng*, 325 F Supp 2d 1180, 1186 (W.D. Wash 2004).

[10] *Sable Communications of California, Inc v FCC*, 492 US 115, 126; 109 S Ct 2829; 106 L Ed 93 (1989).

[11] *American Machine Ass'n v Kendrick*, 244 F3d 572, 576-79 (7th Cir, 2001)

[12] *Video Software Dealers Ass'n v Schwarzenegger*, No. C-05-04188 RMW, slip opinion at 9, lines 8-11 (December 21, 2005 N.D. CA) (stating that "[i]t is uncertain that even if a causal link exists between violent video games and violent behavior, the First Amendment allows a state to restrict access to violent video games, even for those under eighteen years of age").  (Exhibit 20, Schwarzenegger Opinion.)

5

proof of causality:  proof that video games always cause, and/or are the only cause of a minor's aggressive thoughts, feelings or behavior.

This underscores the need for <u>each</u> court to carefully consider the various contours of the novel issue presented here.  Therefore, in accordance with Supreme Court case law, and contrary to Judge Posner's expressed doubts, this Court can consider evidence of the State's compelling interest in regulating minors' access to ultra-violent video games.

As to the second legal issue, Plaintiffs' numerous references to *James v Meow Media, Inc.* throughout this litigation imply that *James* supports their position, and further, that the Sixth Circuit has ruled significantly on the issue.  Nothing could be further from the truth.

*James* is only marginally applicable to this case to show that the expressive content of video games is protected by the First Amendment.[13]  The Sixth Circuit recognized that the video games medium presents "thorny" issues and that the constitutional status of video games has been infrequently litigated in comparison to certain other forms of media such as movies and the internet.[14]  The Court conceded, in fact, that the manner in which the player controls the game is not "particularly communicative,"[15] signaling that whether video games are protected speech under the First Amendment depends on the framing of the resulting harm.  This certainly explains the Court's caution in limiting its holding that video games constitute protected speech to the specific facts of that case.

Here, the ultra-violent video game player's mere functional act of maneuvering a control and thereby affecting the result of murder, maiming or disfigurement, is harmful to minors even apart from any expressive element contained in the video.  Defendants do not concede, therefore,

---

[13] *James*, 300 F3d at 695.
[14] *James*, 300 F3d at 696.
[15] *James,* 300 F3d at 696.

that this case is governed by strict scrutiny, although Defendants also present evidence sufficient to meet the strict scrutiny standard.

Even more significantly, *James* articulated the important point that "[t]he protections of the First Amendment have always adapted to the audience intended for the speech."[16]  It also cited both Supreme Court and Sixth Circuit precedent for restricting as to minors, speech that is fully protected when directed to adults.[17] Moreover, *James* differentiated the tort issue presented in that case from "regulations that we have countenanced in the past"— regulations that were, as in the instant case, "the product of the reasoned deliberation of democratically elected legislative bodies."[18]  *James* noted specifically that in previous cases involving legislative decisions, legislative bodies had "demarcated what otherwise protected speech was inappropriate for children" and "outlined in advance the measures that speakers were required to take in order to protect children from the speech."[19]

Similarly, here, the Michigan Legislature has drawn a line as to the types of videos that are inappropriate for children, and outlined measures to regulate minors' access to them. Therefore, the State's regulation can also be differentiated from the *James* analysis.

As to the level of scrutiny to be applied in reviewing the constitutionality of such regulation, the Sixth Circuit in *James* stated that it <u>generally</u> applied its obscenity jurisprudence only to sexual material,[20] "permitt[ing] the "regulation of offensive material that people find 'disgusting' or 'degrading.'"[21]  The Court's analysis does not, however, prevent a showing that

---

[16] *James*, 300 F3d at 696 (cautioning that the holding should no be interpreted as a broad holding on the protected status of video games, but as a recognition of the particular manner in which [plaintiff] seeks to regulate them through tort liability).

[17] *James*, 300 F3d at 696 (citing *Sable Communications*, 492 US at 126 and *Connection Distrib Co v Reno*, 154 F3d 281, 191-92 (6th Cir, 1998)).

[18] *James*, 300 F3d at 696.

[19] *James*, 300 F3d at 697.

[20] *James*, 300 F3d at 697.

[21] *James*, 300 F3d at 698.

video game violence has escalated to the point where the people of Michigan find its consumption by children to be disgusting and degrading. Defendants in fact allege that Michigan citizens would find video games such as *Postal II*—a game that allows juvenile players to attack schoolgirls with a shovel and then decapitate them, or shoot them in the knee, set them on fire, and urinate on them as they crawl around defensively—disgusting and degrading. (Ex. 2, screen clips from *Postal II* VHS Tape). Defendants also allege that Michigan citizens would find video games such as *Grand Theft Auto* disgusting and degrading to the extent that they allow a minor who plays these games to kill, maim and dismember an image of a human being. These videos are no less offensive simply because they may also have other redeeming qualities such as the potential for teaching strategic planning and concentration. (Ex. 2, screen clips from *Grand Theft Auto* VHS tape.)

Thus, the impact of ultra-violent videos on the players themselves fits squarely within the parameters of the Sixth Circuit's conceptualization of obscenity. The Sixth Circuit was simply unwilling—understandably—to extend its obscenity concept to a causal connection between violence in video games and the commission of violent acts, especially where potentially limitless liability was at issue.[22] The Court analyzed the issue within the context of what the court conceded to be the "slippery concept" of foreseeability and its role in assessing negligence with regard to tort liability under Kentucky law."[23] More accurately, the Court's stated purpose for engaging in First Amendment analysis was to answer the question of whether the ideas and images presented in videos could constitute "tools for a criminal act" under the narrow exception of affirmative actions that create a high degree of risk of intentional misconduct.[24]

---

[22] *James*, 300 F3d at 698; see also, *Kendrick*, 244 F3d at 574-75 (law of obscenity to applicable to argument that violence in video games causes players to commit acts of violence).
[23] *James*, 300 F3d at 692-93.
[24] *James*, 300 F3d at 694-695.

*James* had no reason to assess the impact of violent video games on the minor who plays the game. Therefore, the question of whether ultra-violent video games are disgusting and offensive as to minors because of their impact on minors' psychological and emotional health, is one of first impression in this Circuit.

Even if this court refuses to extend the concept of obscenity to video game violence as to minors, *James* certainly left the door open for legislative bodies to appropriately regulate minors' access to ultra-violent video games. And *James* did not dictate a near-impossible evidentiary standard that would all but guarantee the gaming industry's free reign to govern the types of images and scenarios with which minors may freely interact without parental knowledge or supervision.

Finally, with regard to the third legal issue, the *Brandenburg* test is inapplicable here. As the Sixth Circuit articulated, *Brandenburg* applies only where the claim is that the speech might incite violence.[25] On facts similar to the instant case, the California district court in *Schwarzenegger* rejected Plaintiffs' argument that *Brandenburg* applies because they recognized that "[t]he Act seems to be intended more to prevent harm to minors than preventing minors from engaging in real-world violence."[26]

Here, since Defendants argue primarily that ultra-violent video games are harmful to the minors who play them, they need not prove that these games are directed to inciting or producing imminent lawless action or that they are likely to produce such action.[27]

---

[25] *James*, 300 F3d at 698.
[26] *Schwarzenegger*, No. C-05-04188, slip opinion at p. 11 (Ex. 20).
[27] See *Brandenburg*, 395 US at 444.

9

**III.    The Legislative Record, along with additional testimony and documents presented by Defendants is sufficient to prove both a compelling interest and narrow-tailoring of the Act to achieve that interest.**

Defendants have already submitted to this Court portions of the legislative record.

Defendants now submit additional evidence, including trial testimony from the Illinois

*Blagoyevich* litigation, and documents from the California *Schwarzenegger* litigation.

**A.    The type of evidence presented by Defendants has been well-accepted by the United States Supreme Court in other significant cases, and should be given the same value here in proving the State's compelling interest in protecting its minor citizens.**

The Supreme Court in *Turner Broadcasting Systems v FCC* stated that in order for there

to be a compelling interest, the recited harms must be real and not merely conjectural, and that

the regulation must alleviate these harms in a direct and material way.[28]  However, proof of real

harm does not require, proof that ultra-violent video games always lead to aggression or that

ultra-violent video games are the only factor that influences a minor's aggressive thoughts or

feelings, or decreases a minor's prosocial behavior.  This degree of proof is not required by

*Turner*, nor has it been required by the Supreme Court in many other analogous arenas, most

notably in death penalty cases and cases against the tobacco industry.

Perhaps the most poignant example is the death penalty area.  One can hardly imagine an

issue more sensitive, or important than whether a state can constitutionally execute a juvenile

offender under age 18.  Yet, the United States Supreme Court has demonstrated a surprising

openness to, and acceptance of, psychological research—research that is no more extensive or

conclusive than the body of psychological studies that supports Defendants' position.[29]  Notably,

---

[28] *Turner*, 512 US at 664.

[29] *Roper v Simmons*, __US __, 125 S Ct 1189, 1195; 161 L Ed 2d 1 (2005) (relying on research documenting the statistical overrepresentation of adolescents in reckless behavior; the research of Lawrence Steinberg and Elizabeth Scott as to juveniles' diminished control over their environment, and writings by Erickson on the transitory traits of juveniles); see also, *Thompson v Oklahoma*, 487 US 815, 835; 108 S Ct 2687; 101 L Ed 2d 702 (1988) (explaining that juveniles

10

the Supreme Court accepted the premise of this research—that juveniles needed special consideration because they were immature—without demanding a direct causal connection between the juvenile's immaturity and the type of criminal act the juvenile had committed. Even more notably, the Supreme Court never required that the juvenile's general level of immaturity be the <u>only</u> cause of the particular act committed. Indeed, the juvenile offender whose fate—and very life—was before the court in *Roper v Simmons* had had a difficult home life, exhibited poor performance in school, and was known to have abused drugs and alcohol.[30]

Similarly, in the tobacco cases, courts have not required proof that cigarettes cause cancer in every child who smokes, or that cigarettes are the only cause of designated illnesses in children who smoke. This impossibly-high evidentiary standard would have prematurely foreclosed any discussion of the parameters under which a state might regulate tobacco as to minors. Apart from the obvious ethical considerations of conducting the most conclusive research to address this high evidentiary standard—using children as research guinea pigs, giving them cigarettes to smoke, and monitoring the long-term effects—even such studies could not rule out contributory causes of tobacco-related illness, including genetics, environmental factors such as diet and pollution, and addictive tendencies that draw certain individuals to the addictive nature of nicotine.

Instead, courts have accepted the premise that tobacco use, particularly among children and adolescents, is one of our Nation's most troubling public health threats.[31] The United States Supreme Court has also accepted both Food and Drug Administration (FDA) data on deaths from

---

are not trusted with adult privileges and responsibilities for the same reasons that their conduct is not as morally reprehensible as that of an adult).

[30] *Roper*, 125 S Ct at 1189.

[31] *Food & Drug Admin v Brown & Williamson Tobacco Corp*, 529 US 120; 120 S Ct 1291; 146 L Ed 2d 121 (2000).

tobacco-related illnesses such as cancer, respiratory illness, and heart disease,[32] and reports from

the Surgeon General as to the deleterious health effects of smoking,[33] and proceeded to decide

other issues, such as whether and to what extent the FDA can regulate tobacco products.[34]

　　　In stark contrast, courts analyzing the constitutionality of a state's ability to regulate

minors' access to ultra-violent videos, have often rejected the extensive psychological research

on the deleterious effects of media violence.  These courts have required not only a direct causal

connection between ultra-violent video games and harm to minors, but proof that ultra-violent

video games always cause aggression, or that they are the only factor causing aggressive

thoughts, feelings, or behaviors.  This level of proof is virtually unprecedented in the arena of

protecting minors from undesirable influences.

　　　Moreover, many courts have paid little attention to the bold admonitions from the

medical community as to the dangers of  violent video games.  Yet, the medical community's

position should not be dismissed or diminished.  It is a response born not of the laboratory setting

but rather from experience in recognizing and responding to the real-life effects of violence in

our children.  The Michigan Legislature wisely considered the compelling position adopted by

the American Medical Association, the American Pediatric Association and the American

Psychological Association—that violent video games have a negative impact on minors—and

---

[32] *Brown & Williamson*, 529 US at 134-35.

[33] *Brown & Williamson*, 529 US at 145, 155 (citing a 1964 Surgeon General report documenting an increased risk of mortality due to cigarette smoking, and a 1988 Surgeon General report summarizing scientific literature demonstrating that tobacco is addicting).

[34] See, e.g., *Brown & Williamson*, 529 US at 160-161 (holding that although tobacco use is a significant threat to public health, the FDA does not have the authority from Congress to regulate tobacco products); *Lorillard Tobacco Co v Attorney General of Massachusetts*, 533 US 525, 570-71; 121 S Ct 2404; 150 L Ed 2d 532 (2001) (holding that although the important of the State's interest in preventing the sue of tobacco products by minors was "uncontested," the State's attempts to regulate outdoor advertising for smokeless tobacco and cigars was more extensive than necessary to advance the State's interest).

responded appropriately. (Ex. 3, Joint Statement on the Impact of Entertainment Violence on Children, Congressional Public Health Summit, July 26, 2000).

Turning to the type and volume of evidence in this case, Defendants present relevant portions of the legislative record consisting of at least 55 social science studies employing various research methodologies, and hundred of meta-studies. Defendants also present additional evidence submitted by the State of Illinois during its trial on the merits, as well as by the State of California during its hearing on Plaintiffs' Motion for Preliminary Injunction. Much of the evidence presented is based on psychological research by Dr. Craig Anderson and others. Despite its similarity to the evidence presented in *Roper v Simmons*,[35] it was largely rejected by the district court in Illinois.[36] Defendants also present two types of scientific evidence: 1) the evidence of juvenile brain development that was before Supreme Court in a number of death penalty cases[37] (Ex. 4, Ruben C. Gur testimony in *Patterson v State of Texas*), and 2) limited scientific brain research on video games—a field of study that even in its infancy is drawing conclusions consonant with both the psychological research and common-sense.

In short, *Turner* requires substantial evidence,[38] and substantial evidence is before this Court.

---

[35] See, e.g., *Roper*, 125 S Ct at 1195.
[36] *Entertainment Software Ass'n v Blagojevich*, No. 05-C-4265, ___ F Supp 2d ___, 2005 WL 344810 (ND Ill Dec 2, 2005), at *5-9.
[37] Amicus Curie American Medical Association, filed in *Rope*r, 125 S Ct at 1183; see also, *Roper*, No. 03-633, US Trans LEXIS 55, October 13, 2004 (oral argument transcripts demonstrating the parties' discussion of scientific evidence).
[38] *Turner*, 512 US at 666; see also *Interactive Digital Software Ass'n v St Louis County*, 329 F3d 954, 957 (8th Cir, 2003) (applying the substantial evidence standard to law regulating violent video games).

### B.     Defendants' evidence proves the State's compelling interest.

#### i.     The research of Dr. Craig Anderson demonstrates the deleterious effects of exposure to violent video games.

Defendants offer the testimony of Dr. Craig Anderson, who testified on behalf of the defendants in the Illinois litigation.  Dr. Anderson is a psychologist and professor at Iowa State University, and the leading researcher on media violence and aggression.  Based on his research, Anderson testified that "exposure to violent video games increases aggressive behavior, aggressive thinking, physiological arousal, aggressive feelings, and is also associated with a decrease in prosocial behavior."  (Ex. 11, *Blagoyevich* trial transcripts, 213:5-10.)

In the early 1990's, Anderson developed what is referred to as the general aggression model, an integration of numerous theories and data relating to the development, learning, instigation, and expression of human aggression.  (Ex. 11, *Blagoyevich* trial transcripts, 215:17-24.)  Anderson also describes a process called priming, whereby certain kinds of situational cues can "increase the likelihood or increase the accessibility of certain kinds of thoughts or certain kinds of knowledge structures."  (Ex. 11, *Blagoyevich* trial transcripts, 220:19-24.)   Although priming can take place in a matter of seconds, he posits that with exposure to violent video games, priming might take up to 15 minutes. (Ex. 11, *Blagoyevich* trial transcripts, 226:14-21.)  Additionally, Anderson describes a concept called hostile attribution bias,  a propensity to see intentional harm—threat— in situations where harm may or may not be present. (Ex. 11, *Blagoyevich* trial transcripts, 229:13-17.)  Anderson describes these collectively as ways that an individual's propensity to behave aggressively can be increased. (Ex. 11, *Blagoyevich* trial transcripts, 230:19-21.)

Anderson testified that these types of schemata or knowledge structures become more chronically accessible or available for a person to use, often almost automatically without realizing it. (Ex h 11, *Blagoyevich* trial transcripts, 229:23-25:230:3-17.)  Generally, human

beings bring these well-rehearsed structures with them and respond accordingly, even if the situation does not necessarily warrant it. (Ex. 11, *Blagoyevich* trial transcripts, 230-232.) Specifically, Anderson noted that as children become more aggressive, their social relationships—as for example with parents, peers or teachers—tend to deteriorate and there is a tendency for them to start interacting with children who may have been socially rejected. (Ex. 11, *Blagoyevich* trial transcripts, 232: 5-16.) Basically, according to Anderson, violent video games enable you to practice, looking for sources of threat, practice making decisions about how to respond to that threat, and eventually carry out some form of action. Anderson also testified that exposure to violent media can decrease pro social behavior by desensitization -- decreasing one's negative emotional reactions to violence. (Ex. 11, *Blagoyevich* trial transcripts, 232:17-22.) In short, video games model physical aggression. (Ex. 11, *Blagoyevich* trial transcripts, 267:5-6.)

Anderson's testimony--is confirmed by a number of meta-analysis he has conducted. (Ex. 11, *Blagoyevich* trial transcripts, 262-264; see also Ex. 19, Anderson meta-analysis.) A meta-analysis is a set of statistical procedures that combine the results of numerous studies with the same hypothesis to reach an overall view of that the research literature shows. (Ex. 11, *Blagoyevich* trial transcripts, 262; 8-12.)

Plaintiffs criticize Anderson's work, arguing that his studies do not show that video games have caused the commission of violent acts or an increased level of violence. (Pls' Motion for SJ at 8.) Plaintiffs also include portions of Anderson's trial testimony in the Illinois litigation, and the Illinois district court's references to his testimony, in an attempt to prove: 1) that Anderson does not demonstrate any long-term consequences of playing violent video games; and, 2) that there may be numerous stimuli that could contribute to the priming of more aggressive long-term behavior. (Ex. 3, pp 274-75; 328)

Yet, Anderson testified that although some effects of video game exposure dissipate fairly quickly, the most relevant long term effects of repeated exposure to violent media are an increase in aggressive behavior, a decrease in positive attitudes, beliefs, and thought processes, and reduction of normal inhibitions against aggression. (Ex. 11, *Blagoyevich* trial transcripts, 276: 6-10.  His testimony also makes clear that aggressive behavior is not necessarily the only harm associated with violent video exposure.  (Ex. 11, Blagoyevich trial transcripts, 277:1-4).

### ii.    Scientific functional magnetic resonance imaging research confirms the conclusions of Dr. Anderson's psychological research.

Defendants also offer the testimony of Dr. William Kronenberger, who testified in the Illinois litigation.  Dr. Kronenberger, a clinical psychologist with special training in pediatric psychology, worked with a team from the Indiana University School of Medicine, conducting first-hand studies and research on aggressive behavior in children or adolescents.  (Ex. 11, *Blagoyevich* trial transcripts, 10-11; 22: 2-12.)  The team's research sought to examine differences between adolescents with high versus low exposure to violent media, and then to examine certain neurological processes—the activation of brain regions identified as candidate regions—to see if there was a relationship with high versus low media violence exposure.  (Ex. 11, *Blagoyevich* trial transcripts, 25: 17-23; 26: 18-21.) Using functional magnetic resonance imaging (fMRI), the team's research concluded that children with high exposure to video game and other media violence demonstrate depressed activity in the frontal lobe of the brain and heightened activity in the posterior cingulate and amygdala areas of the brain. (Ex. 8, *Media Violence Exposure*, p. 2.) Both of these responses are also present in children suffering from Disruptive Behavior Disorders.   (Ex. 8, *Media Violence Exposure*, p. 2.)

The team's research consisted of two phases. Specifically, phase one utilized two groups: 1) a disruptive behavior disorder group—either oppositional defiant disorder or conduct disorder—all of whom had a designated number of aggressive features, and a control group.

16

(Ex. 11, *Blagoyevich* trial transcripts, 37:18-24.)  The team first gathered a media violence measure based on the adolescent's exposure to violence. (Ex. 11, *Blagoyevich* trial transcripts, 42-43.)  Then, they divided the adolescents into high and low media violence exposure by "cutting right down the middle.  (Ex. 11, *Blagoyevich* trial transcripts, 44:6-18.)  They proceeded to look at the differences between the control group and the disruptive behavior disorder group to see if there were differences in brain activation between a group that was known not to have aggressive behavior.  They also looked at candidate brain regions, specifically the dorsolateral prefrontal cortex (DLPFC)—including the middle frontal gyrus and the inferior frontal gyrus— (Ex. 11, *Blagoyevich* trial transcripts, 51:20-23), and the anterior cingulate cortex (ACC).  (Ex. 11, *Blagoyevich* trial transcripts, 49:3-14.)

Results indicated that the control sample showed an increased activation in the ACC and in certain important regions of the DLPFC.  (Ex. 11, *Blagoyevich* trial transcripts, 52:6-10.)  Comparing high and low media violence exposure in the control group, the team found that the low media violence exposure control group showed activation in the ACC and the left inferior frontal gyrus portion of the DLPFC. (Ex. 11, 53:19-25; 54:1-4.)

Phase two of the study recruited a new sample of adolescents and looked at media violence exposure and aggressive behavior, and then aggressive behavior and brain functioning, focusing on the parts of the brain functioning that were associated with aggressive behavior. (Ex. 11, *Blagoyevich* trial transcripts, 68:6-12.  In addition to looking at the prefrontal cortex, as they had in phase one, the research team also looked at the limbic system (hypothesized to be associated with emotional functioning and threat arousal stimuli), and the amygdala (which research shows activates in situations that involve threat or when stimuli are present that involve fear, distress, or negative emotion.)  (Ex. 11, *Blagoyevich* trial transcripts, 68:13-25.)  The team measured these by developing a paradigm called an emotional Stroop, using words involving

17

aggression or harm that were printed in different colors, and a control condition that involved

non-aggressive verbs.  The participant had to state what color ink a particular word was printed

on.  (Ex. 11, *Blagoyevich* trial transcripts, 69:18-20.)

The team's expectation was that aggressive words would trigger activation in the limbic

system, particularly in the amygdala.  (Ex. 11, *Blagoyevich* trial transcripts, 69:21-23.)  Using a

control and a DBD group, they found that the control group showed activation of the ACC and

the DLPFC.  The DBD group showed increased activation of the amygdala, and the

parahippocampal gyrus, another structure of the limbic system.  (Ex. 11, *Blagoyevich* trial

transcripts: 70:7-10, 25; 71:1-3.)  Individuals with high media violence exposure showed

activation of the amygdala and parahippocampal gyrus when they performed tasks, while low

media violence exposure did not show activation of these areas, but rather, activation of the

DLPFC. (Ex. 11, *Blagoyevich* trial transcripts: 71:4-8.)

Plaintiffs attack the Kronenberger team's fMRI study, as well as Kronenberger's trial

testimony in the Illinois litigation, to demonstrate the "deficiencies" in the study, including its

failure to show that playing violent video games specifically causes a reduction in frontal lobe

activity, and the study's failure to distinguish television from video games.  (Pls' Motion for SJ,

p. 9.)

Admittedly, the Kronenberger team criticizes its own study and cites the need for further

study (Ex. 8, *Media Violence Exposure*, p. 3-4), a position scientists often take in their area of

expertise.  Even so, the data is sufficient for this Court to conclude that the team-'s multi-method,

multi-trait approach demonstrates a relationship between video game violence exposure and

aggression.

### C.    The evidence is narrowly-tailored to achieve that interest.

The Act does not restrict adult access to ultra-violent video games, nor does it curtail minors' freedom to play violent video games as long as their parents have made the decision to purchase them for, or share them with, their children.  The Act restricts only an unsupervised minor's right to purchase these games.  The Act also covers only the type of violence that violates community norms and that prompted this legislation.  It does not sweep into its ambit non-violent videos, moderately-violent videos, or even violent videos where the violence is not continuous and repetitious.  Moreover, it protects all minors from the harmful effects of ultra-violent video games, regardless of the minor's viewpoint or status.

Plaintiffs do not demonstrate that game development will be chilled if the Act is enforced.  Neither do they demonstrate that adult access will be limited or curtailed.  Plaintiffs present no evidence that game creators, distributors, and retailers would pull all T-rated and M-rated videos off the shelf, thus depriving adults of these videos or teens of the videos they could legitimately purchase under the Act.  The industry's own rating system, specifically its content descriptors, precludes T-rated videos from falling within the ambit of the Act.   And Plaintiffs demonstrate no significant financial burdens associated with wholesalers or retailers' efforts to determine which videos violate the Act or to limit minors' access to "testing" ultra-violent videos.

Plaintiffs claim—and this Court has shared their concern[39]—that store clerks will not know in advance whether the games they seek to sell contain illegal depictions of "extreme and loathsome violence."  (Pls' Motion for SJ, p. 15.)   Yet, store clerks need not open each video and view it in an attempt to determine if it violates the Act, since they can rely on the industry's own rating system, thereby utilizing the industry's intimate familiarity with its own games.  While the

---

[39] *Entertainment Software Ass'n v Granholm,*  No. 05-CV-73634, 2005 US Dist LEXIS 283, *9-10 (ED MI 2005)

"harmful to minors" standard—not the ESRB rating system— is the standard for determining whether a specific video violates the Act, the ESRB provides an affirmative defense that shields a store clerk acting in good faith.  (Ex. 1, Bill 416, Part II, Sec 23(1).)

Of course, the affirmative defense is the easiest way to avoid liability.  But even short of the affirmative defenses of the ESRB rating system, there are certainly less cumbersome and less expensive ways for Plaintiffs' members who sell video games to determine video game content.  Industry literature and gaming cites are potential sources of content information.  Additionally, chain stores, which appear to make up a significant portion of Plaintiffs' membership, could have one person view a new movie, categorize it based on the standard of the Act, and disseminate this information to the member's many chain stores throughout Michigan.  At a minimum, it would not be necessary for <u>each</u> store clerk to play through all levels of <u>each</u> game in order to make this assessment play through all levels of each game.

Thus, it <u>is</u> possible to protect sellers from prosecution without wholesale refusals to sell video games to minors.  A retailer <u>can</u> reasonably, economically, and relatively easily assess whether the content of a particular game is prohibited.  Any burden associated with this process would be minimal in comparison to the dangers of a minor purchasing an ultra-violent video without parental knowledge.  This minimal burden therefore passes constitutional muster.

   i. **Ultra-violent video games inflict a unique harm on minors that differs from other forms of entertainment.**

Plaintiffs repeatedly argue that the Act is not narrowly-tailored because is underinclusive by failing to address other forms of media.  Specifically, Plaintiffs argue in their Motion for Summary Judgment that "the record is devoid of evidence demonstrating that video games are more 'harmful' than other violent media."  (Pls' Motion for SJ, P. 9, ¶ 2.)  This Court in its

Opinion granting Plaintiffs' Motion for Preliminary Injunction criticized research submitted by Defendants that did not evaluate the independent effect of violent video games.[40]

The Constitution does not require Michigan to solve all of the state's problems in one public act.  "States adopt laws to address the problems that confront them."[41]  Moreover, "[l]egislatures may implement their program step by step . . . deferring complete elimination of the evil to future regulations."[42]  The Supreme Court has long recognized that "each medium of expression presents special First Amendment problems."[43]

Here, the People of Michigan passed this Act to address growing concerns that ultra-violent video games were negatively impacting minors.  Research and developments in computer gaming strongly support these concerns by suggesting that the interactive component of video games heighten the potential harm of ultra-violent videos.  (Ex. 18, Jeanne B. Funk, *Violence Exposure in Real-life, Video Games, Television, Movies and the Internet*, p 24 and abstract).  The potential impact of this interactive element sets the video game medium apart from other forms of "expressive" media.  The State can, therefore, pass a law addressing only video games, particularly where, as here, the Act is limited to ultra-violent video games, limits only minors' access to those games, and mandates regulation rather than a total ban.

Studies have suggested that the active nature of video games makes them unique among screen-based media because video game players actually participate in, and to some degree actually create, the video game actions instead of simply being a recipient of these actions.  (Ex. 18, Funk *Exposure in Real-life*, p 24).  One published study that directly tested whether violent video game exposure is more detrimental than violent movie or television exposure found that

---

[40] *Granholm*, No. 05-CV-73634, at *7.
[41] *Burson v Freeman*, 504 US 191, 207; 112 S Ct 1846; 119 L Ed 2d 5 (1992).
[42] *City of New Orleans v Dukes*, 427 US 297, 303; 96 S Ct 2513; 49 L Ed 2d 511(1976).
[43] *Denver Area Educ Telecommunication Consortium, Inc v FCC,* 518 US 727, 742; 116 S Ct 374; 135 L Ed 2d 888 (1996) (quoting *FCC v Pacifica Found*, 438 US 726, 748 (1978)).

high exposure to video games was associated with lower levels of empathy and more positive attitudes towards violence. (Ex. 18, abstract).

Emerging research also highlights the power of video games as a teaching tool. A recent International Academic Conference on the Future of Game Design and Technology presented as one of its themes, future game impacts and applications, and included academic research and emerging industry trends that focused on designing games for learning and other serious purposes.[44] It also examined from a public policy perspective both the positive and negative impacts of games on individuals and society.[45] Also, the Games for Entertainment and Learning (GEL) Lab at Michigan State University designs prototypes, techniques, and games not just for entertainment but also for learning.[46] (Ex. 4, GEL lab publication.) For example, the National Science Foundation funded a learning game created to teach middle and high school students the concepts of adaptation and evolution. (Ex. 4, GEL lab publication.) A game called Fantastic Food Challenge is designed to teach nutrition. (Ex. 4, GEL lab publication.)

The military has also used video games as an effective teaching tool. University Professor and author Eugene Provenzo, Jr., cites the Marine Corps's adaptation of the video game *Doom* to train soldiers in the Corps. Provenzo argues that video games teach children not only about violence but also how to be violent. (Ex. 5, Legislative History, Provenzo testimony.) Similarly, Lieutenant Colonel David Grossman, a former Professor of Psychology at West Point, has argued that first person shooter video gamesare "murder simulators which over time, teach a

---

[44] See, e.g., http://www.futureplay.org
[45] http://www.futureplay.org
[46] http://www.mindgames.msu.edu

person how to look another person in the eye and snuff their life out." (Ex. 5, Legislative History, Provenzo testimony.)[47]

The United States Army utilizes a first person shooter CD-Rom as a recruitment tool for the purpose of allowing potential recruits to familiarize themselves with Army operations, including basic training, marksmanship, and team-based multi-player, force-versus-force missions.[48] (Ex. 6, Army CD-Rom.) Although the video game includes killing, the Army has implemented a parental control option whereby there is no killing and a soldier simply sits down.[49] (Ex. 6, Army CD-Rom.)

Apart from the world of academia, common sense tells us that video games teach. And the Supreme Court has indicated that where it thinks something is a matter of common sense, it will not insist on social scientific evidence of harm.[50] In a video game, the player essentially becomes a character in the video and interacts with other video characters. If the player's role includes maiming, decapitating, or dismembering a humanlike character, <u>and</u> if the player is a minor whose brain is not yet fully formed and whose psyche is immature, <u>and</u> if videos are an effective teaching tool, then that player is presumably learning aggressive thoughts, feelings, or behavior.

Plaintiffs avoid the common sense implications of the interactive teaching power of video games, attempting instead to use Dr. Anderson's testimony to prove that the Act is not narrowly tailored. Specifically, Plaintiffs cite Anderson's testimony regarding the comparison of effect size between television and video games, and Anderson's "concession" that there was no

---

[47] See also David Grossman, *On Killing: The Psychological Cost of Learning to kill in War and Society* (1996) (pointing out that the military trains soldiers to kill using video games similar to those played daily by millions of children).

[48] http://www.americasarmy.com/support/faq_win.php (Parents Info).

[50] *Kendrick,* 244 F3d at 579 (discussing *Ginsburg*).

difference in vulnerability to violent images between adults and minors. (Pls' Motion for SJ, p. 10; Ex. 11, *Blagojevich* Trial Transcripts, pp. 279-80, 328.).

Regarding the effect size, Plaintiffs state that Anderson "conceded in his *Blagojevich* testimony that the 'effect sizes' for television and 'video game violence' are essentially the same." Anderson conceded no such thing. Dr. Anderson merely stated that the effect size—the variance in results between television and video games—is only 4%, and diminishes from there if the researcher is trying to predict more serious criminal behavior. (Ex. 11, *Blagojevich* Trial Transcripts, pp. 279-280.) Furthermore, Anderson testified the effect size of video games, even at .2, is larger than the effect of asbestos exposure on contracting laryngeal cancer, or the effects of second-hand tobacco smoke in the work place on lung cancer. (Ex. 11, *Blagojevich* trial transcripts, p272: 24-25; 273: 1-10) And even a small effect size in combination with other factors such as the teaching potential of interactive video games and minors' vulnerability and susceptibility to influence and psychological damage[51] is sufficient to demonstrate that the Act is narrowly tailored to achieve the State's compelling interest in protecting its minors from these harms.

Moreover, Anderson testified that, in his opinion, violent video games can be differentiated from television because in a violent video game you have to identify with one of the violent characters – the character you control – and that, in a sense, you become that character and actually determine the course of the game. (Ex. 11, *Blagoyveich* Trial Transcripts, 270: 23-25; 271: 1-28.) The participant looks for threats and decides how to deal with them and how to accomplish his or her goals in the game. (Ex. 11, *Blagoyveich* Trial Transcripts, 271: 20-25; 271: 1-12.) Essentially, the player rehearses the aggression sequence. (Ex. 11, *Blagoyveich* Trial Transcripts, 271: 20-25; 271: 1-12.)

---

[51] *Roper*, 125 S Ct at 1195 (citing *Eddings v Oklahoma*, 455 US 104, 110-112; 102 S Ct 869; 71 L Ed 1 (1982).)

Regarding Anderson's lack of a finding as to differences in vulnerability to violent images between adults and minors,  (Pls' Motion for SJ, p. 10; Ex. 11, *Blagojevich* Trial Transcripts, p. 328.), we already know that there is an overarching and significant difference in the way that adults and minors process information and make decisions—a difference that can and should be factored into any analysis as to the impact of ultra-violent video games on minors.

In sum, the interactive component of video games, combined with a minor's under-developed brain, is sufficient to justify the Act's isolation of video games from other forms of expressive media.

### ii.    The industry has failed to self-regulate.

The video game industry has adopted a voluntary rating system, supposedly to advise consumers about the content of video games.   A division of Plaintiff Entertainment Software Association, the Entertainment Software Rating Board (ESRB), assigns ratings to games:   E (six years and older); E10 (ten years and older); T (thirteen years and older); M (seventeen years and older); and AO (adults only).[52]  (Ex. 14, ESRB ratings.)  The rating system also includes content descriptors alongside the rating, including "blood", "intense violence" and "mild violence."[53]

If this voluntary rating system was effective in educating parents and advising them of the level of violence to which their children are being exposed, there would be no need for State regulation.  But the system has not been effective.

First of all, as the industry's own instructions concede, in order to "take full advantage of the rating system," parents must check both the **rating symbol** (on the front of the game box) and the **content descriptors** (on the back of the game box)."[54]  Parents who have not studied the

---

[52] http://www.esrb.org/esrbratings_guide_print.asp (last visited January 17, 2006).
[53] http://www.esrb.org/esrbratings_guide_print.asp (last visited January 17, 2006).
[54] http://www.esrb.org/esrbratings_guide_print.asp (last visited January 17, 2006) (emphasis in original).

ESRB website would not necessarily know this, and therefore, would not be able to take full advantage of the rating system.

Second, unlike television or the internet, both of which are likely to be located in the home and therefore are presumably easier for parents to monitor, video games can—and often are—purchased without parental knowledge.  Consequently, even parents who might otherwise utilize the rating system do not have the opportunity to do so. Even if parents attempt to monitor their children's whereabouts and their video game purchases, studies have shown that about one in four children were tell their parents where they were going. (Ex. 15, Legislative History, Mark I. Singer, Exposure to Violence.)

Third, Plaintiffs can hardly assert with a straight face that the industry is committed to "help[ing] parents guide their children's choices," (Pls' Motion for SJ, p. 16) when information from the Federal Trade Commission (FTC) invalidates the industry's self-proclaimed success. According to the most recent FTC report, an overwhelming percentage of minors play M-rated video games and count them among their favorites.[55]  (Ex. 13, 2004 FTC Report, pp. 20-28.) That same report indicates that the industry specifically targets its M-rated video games to minors, and that 69 percent of minors 13 through 16 years old were successful in purchasing M-rated games. (Ex. 13, 2004 FTC Report, pp. 20-28).

Finally, State of Michigan undercover investigations are consistent with the FTC findings (Ex. 12, Governor Granholm press release), and confirm Defendants' assertion that the rating system is not working.  Children often enter stores without their parents and are not deterred by announcements or labeling that a video game is intended for adults or minors over the age of 17. Therefore, consistent with the United States Supreme Court's mandate in *Sable Communications*

---

[55] FTC Report, *Marketing Violent entertainment to Children:  A Fourth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries*, at 20-28 (July 2004) (attached as Ex. 13).

*of California, Inc v FCC*,[56] the State considered the efficacy of the less restrictive alternative of exclusive reliance on the ESRB ratings but concluded that this alternative was insufficient.

The combination of the industry's targeted advertising to children and its lax self-regulation support the State's decision to institute regulations to address its compelling interest in protecting its minor citizens.

## IV.    The Act is not vague and does not offend due process.

The standard for vagueness is whether a "person of ordinary intelligence is afforded a reasonably opportunity to know what is prohibited, so that he may act accordingly.[57]   The Due Process Clause does not impose an "insuperable obstacle to legislation" by requiring mathematical precision of terms.[58]

Here, a person of ordinary intelligence would know what video games are prohibited based on the explicit definitions and standards contained in the Act.  For example, the Act defines "extreme and loathsome violence" very explicitly as "graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings." (Ex. 1, Senate Bill 416, Part II, Sec. 16(g)).  It also sets forth the types of injuries or violence that would violate the act:  death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture.  (Ex. 1, Senate Bill 416, Part II, Sec. 16(g).)  This is more explicit than the industry's own rating system, which does not even attempt to define what actions might constitute these levels of violence.  (ESRB rating system.)  In the rare event that a retailer or store clerk cannot determine the nature of the party or the violence, or has not viewed the video and has had insufficient training or information as to the specific content of video in question, that employee is shielded by the Act's affirmative

---

[56] *Sable Communications of California, Inc v FCC*, 492 US 115, 129-130; 109 S Ct 2829; 106 L Ed 2d 93 (1989).

[57] *Grayned v City of Rockford*, 408 US 104, 108-109; 92 S Ct 2294; 333 L Ed 2d 222 (1972).

[58] *United States v Petrillo*, 332 US 1, 7; 67 S Ct 1538; 91 L Ed 1877 (1947).

defense. The Act's other definitions are equally easy for the common person to understand. (Ex.

1, Senate Bill 416, part II, Sec. 16)  Short of describing in detail the parties and actions of each

and every video—an insurmountable obstacle not required by the law[59]—, it would be difficult

to imagine how the Act could have been more clearly written.

**V.      The Act does not violate equal protection.**

The Act does not violate equal protection simply because it does not include other media

forms, including cable television, broadcast television, movies, books, and magazines.   Video

games differ significantly from other expressive media forms, and the Act appropriately

responds to those differences by choosing at this time to regulate only violent video games as to

minors.  Defendants' arguments in support of this argument have already been discussed

elsewhere in this brief and no genuine issues of material fact remain.  Therefore, summary

judgment in favor of Defendants is appropriate.

**VI.     The Act comports with due process and therefore summary judgment on this issue
          is appropriate.**

The Act does not unconstitutionally delegate legislative authority.  (Pls' First Amended

Complaint, p 23, ¶ 72).  The Act neither relies on the ESRB ratings nor delegates the legislature's

authority without accompanying legislative standards.  The standard for the Act is not the ESRB

rating system but the "harmful to minors" standard that contains language closely mirroring the

*Miller* obscenity test.[60]

Section 16 of the Act defines "Harmful to Minors" as having all of the following

characteristics:

(i)      Considered as a whole, appeals to the morbid interest in asocial,
         aggressive behavior of minors as determined by contemporary local
         community standards.

---

[59] *Petrillo*, 332 US at 7.

[60] *Miller v California*, 413 US 15; 93 S Ct 2607; 37 L Ed 419 (1973).

    (ii)     Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.

    (iii)    Considered as a whole, lacks serious literary , artistic, political, educational, or scientific value for minors.

(Ex. 1, Enrolled Bill 416, Part II, Sec 16 (H)(i)-(iii).

The ESRB rating is merely one of a number of conditions that might allow a person to assert an affirmative defense.  Section 23 of the Act provides:

    (1)     It is an affirmative defense to an alleged violation under this part that the person acted in good faith.  Except as provided in subsection (2), good faith exists if at the time the alleged violation occurs all of the following conditions are satisfied:

                            * * *

    (c)     Relying upon information described in subdivisions (a) and (b), the person complies with a rating system established by the pertinent entertainment industry that does not conflict with this part.

(Ex. 1, Enrolled Bill 416, Part II, Sec 23 (1)(c).

The Act does not give the ESRB the power to define what constitutes an ultra-violent explicit video game.  The ESRB rating is merely one of a number of conditions that might allow a person to assert an affirmative defense.  Such a reference to an industry standard is not uncommon.[61]

Thus, the Act neither relies on the ESRB system nor delegates the Legislature's authority without accompanying legislative standards.[62]  In *Currin v Wallace*, the United States Supreme Court held that Congress did not impermissibly delegate its legislative authority to a private entity where Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given tobacco market "unless two-thirds of the growers voting favor it."[63]  The

---

[61] See *People v Luera*, 86 Cal App 4th 513, 519-520, 103 Cal Rptr 2d 438, 442-443 (Cal App 2nd Dist 2001) (a statute that created an affirmative defense rated by the Motion Picture Association of America was valid).

[62] *Currin v Wallace*, 306 US 1, 15-16; 59 S Ct 379; 83 L Ed 441 (1939).

[63] Accord *Cusack Co v Chicago*, 242 US 526, 530; 37 S Ct 190; 61 L Ed 472 (1917).

use of an industry standard in the Act is, therefore, a permissible exercise of power by the Michigan Legislature.

In short, the Legislature did not unlawfully delegates its authority to the ESRB rating system.  Therefore, there are no genuine issues of material fact as to Plaintiffs due process claims, and summary judgment in favor of Defendants is appropriate.

## CONCLUSION

Video games continue to grow more graphic, more realistic, and more popular. Moreover, the interactive component of ultra-video games makes them a powerful tools for teaching.  Even the video industry itself recognizes that there are certain games that should be restricted or controlled by parents, as evidenced by its voluntary rating system.  Sadly, because the rating system has failed to adequately involve the parent in this vital decision-making, the State has a compelling interest in protecting its minor citizens from the deleterious effects of ultra-violent video games.  The resulting Act is narrowly tailored to address the unique harm of video games as to minors while restricting neither adult access nor minors' access to this violent content when parental authority has deemed it acceptable.  Plaintiffs have not shown the absence of genuine issues of material fact warranting an entry of summary judgment against Defendants and this court's entry of an order permanently enjoining the Act as unconstitutional.  Defendants are entitled to summary judgment on all counts because of the Act is constitutional.

Respectfully submitted,

Michael A. Cox
Attorney General

*s/ Denise C. Barton*
P.O. Box 30736
Lansing, MI 48909
Primary E-Mail: Bartond@michigan.gov
(P41535)

Dated:  January 23, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the following: Defendants' Motion in Opposition to Plaintiffs' Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment.

*s/ Denise C. Barton (P41535)*
Dept of Attorney General
Public Employment, Elections & Tort Defense Div.
P.O. Box 30736
Lansing, MI 48909-8236
(517) 373-6434
Email: bartond@michigan.gov

2005/entertainment/opposition mtn