Kronenberger - direct

22

1  what I would say.

2  Q  Dr. Kronenberger, have you conducted any firsthand studies

3  or research on aggressive behavior in children or adults --

4  actually, I am sorry -- children or adolescents?

5  A  Yes.

6  Q  Do you conduct this by yourself or do you collaborate with

7  other researchers?

8  A  Virtually all of my research and certainly all of my

9  research on aggressive behavior is as part of a research team.

10 So we have teams of people that bring together different

11 abilities so that we can do the research.

12 Q  In general, what type of specialists or practitioners make

13 up this team?

14 A  To some extent it depends on what we are studying. In the

15 case of our studies using neuroimaging, we have clinical

16 psychologists, neurologists, social worker, neuroradiologists,

17 physicists and neuroscientists on the team.

18 Q  Then do you consult with each other throughout the course

19 of the studies, or is everybody independent?

20 A  We meet regularly.

21      When we go over findings, we meet when we can as a

22 whole group. Obviously, occasionally people are out of town

23 and things like that, but we try to bring the group together as

24 many people as are there to review research finding and to

25 share our interpretations of different results from our

```
 1  different perspectives.
 2  Q   Have you conducted any firsthand studies or research on
 3  exposure to media violence?
 4  A   Yes.
 5  Q   In the particular context with adolescents, have you done
 6  any firsthand research studying the exposure of media violence
 7  on adolescents?
 8  A   Yes.
 9  Q   Did you find any type of relationship between the exposure
10  to media violence and these teens?
11  A   Yes.  We have one study where we showed that teens with
12  more -- with histories of disruptive behavior disorder and
13  aggressive behavior report, and their parents report, more
14  media violence exposure than teens from what we call a control
15  sample that did not have that history.
16  Q   What types of media are you referring to when you say that
17  you study media violence?
18  A   We study teens' and parents' reports of television and
19  video game violence.
20  Q   Is it all video games?
21  A   Well, when we ask them the questions, we ask them questions
22  about different types of video games, but some of those
23  questions are also about violence in video games.
24  Q   Have you done any research involving media violence
25  exposure in adolescent brain activity?
```

1  A   Yes.

2  Q   Have any of these studies been reported or published in any
3  publications?

4  A   Yes.  We have --

5         Well, again, depending on how you define brain
6  functioning, we have one publication in a peer review journal
7  that used functional MRI.  We have one publication of a peer
8  review journal that used what we call neurocognitive testing.
9  We have, well, two presentations that we rely on that involved
10 functional MRI as well.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q    Dr. Kronenberger, are you being retained as an expert in
2    this lawsuit?
3    A    Yes.
4    Q    And are you aware that the lawsuit involves a statute or a
5    law related to violent video games?
6    A    Yes.
7    Q    What have you been asked to do as an expert in this case?
8    A    I've been asked to provide opinion and interpretation of my
9    research.
10   Q    Are you asked to make any types of conclusions about your
11   research?
12   A    Well, I've been asked to state how I interpret my research
13   results. Oh, also I think I was asked if my research results
14   were consistent with a part of the finding of the legislature.
15   Q    And what is your understanding as to what part of that
16   Illinois legislature finding you're supposed to --
17   A    I would have to see it to know the exact quote, but in so
18   many words it says violent video games affect the brain
19   functioning of children.
20             MS. LIU:  Your Honor, I would like to introduce some
21   documents to the witness.
22             THE COURT:  As far as exhibits, have people talked
23   about them so that we don't need to go through some huge
24   foundational thing?  I'm guessing that -- are you talking about
25   journal articles, things like that?

1  pushing your luck when you start to enter more than five
2  variables or so, and we already had more than that. We thought
3  it was justified because we wanted to do a very stringent test.
4      What we found -- when we accounted for all those
5  variables was the Conners continuous performance test -- so one
6  of the lab-based tests -- and the parent report of executive
7  functioning ADHD in the environment continued to show that
8  positive relationship with media violence exposure. So those
9  two continued to be positive.
10      The Stroop color-word test was no longer statistically
11 significant, but it was right on the margin. And the reason
12 the margin makes a difference there is that is when you start
13 to say maybe we made a mistake putting too many variables in,
14 and if we had a bigger sample, it would have been statistically
15 significant.
16      Now, you can't say without doing it, but you can warn
17 that that might have happened. Remember the zero order
18 correlation when we just correlated Stroop and media violence
19 exposure was significant.
20      The self-report of executive functioning problems in
21 the environment, that dropped out. That was no longer
22 statistically significant. It didn't go down to zero, but it
23 was not on that borderline. Our explanation in the article for
24 that one was -- and this is fairly well-known clinically -- is
25 that individuals are not -- particularly individuals with

1  A   Well, actually let me --

2      There is one more big problem I want to mention and it

3  was discussed a little bit in Dr. Williams' testimony, but the

4  subject attrition rate was huge. Something like almost 60

5  percent, at least in terms of the dissertation, dropped out of

6  the control condition.

7      I believe he reported something on the order of 25 or

8  30 percent, in the paper itself, or the article itself, dropped

9  out, and a big portion dropped out of the treatment condition.

10 Q   Why is that a problem?

11 A   That is a problem in that --

12     Again, the reason you do random assignment is to,

13 using sort of law as a probability, create groups that are

14 likely to be equivalent on average on all kinds of dimensions

15 that you have not measured.

16     But once you start allowing a large portion of people

17 who are randomly assigned to one condition or another, you no

18 longer have a true experimental study. You don't know that the

19 people who dropped out of one condition are the same kinds of

20 people than the people who dropped out of another condition.

21     Now, he did a good job in trying to do T-tests on

22 those things that he had measured, and that is very

23 commendable, but the problem is there are things that you have

24 not measured.

25 Q   What about the measure of aggression?

1  A    The measure of aggression is suspect in a couple of ways.
2  One is that measurement of argument is essentially a measure of
3  verbal aggression. At least that is how it would usually be
4  coded in the research literature.
5           And video games typically, for the most part, are
6  modeling physical aggression. And as we have seen in some of
7  the correlational studies, violent video game exposure tends to
8  correlate better with measures of physical aggression than with
9  measures of verbal aggression. So the measure itself is a
10 little bit strange.
11          Using whether or not you had a fight in the last month
12 creates somewhat of a problem, not insurmountable, in some
13 ways, but basically people who had reported that they had been
14 in an argument at time one could not show an increase in
15 aggression across time no matter what. I mean, the most they
16 could do at time two was show that they had another argument.
17          Similarly, we know one of the other measures, argument
18 with a spouse, boyfriend, whatever, but we don't know what
19 portion of the subjects didn't have a spouse, boyfriend,
20 significant other, girlfriend, I mean, whatever the measure
21 was.
22          I guess I would also like to point out that this
23 argument, this whole bit about reliability of measures, you can
24 -- in this dissertation, you essentially have two measures of
25 aggression, and this was arguments with friends, arguments with

1  boyfriend and girlfriend, whatever. Those two measures
2  themselves, as reported in the article, only correlated with
3  each other .22.
4      So if you were to think about that in terms of a
5  scale, that reliability -- I mean, that is essentially a
6  reliability estimate -- is considerably lower than what
7  Dr. Williams was saying was minimal for using a scale.
8  Q  And another thing Dr. Williams relied upon talking about
9  these mathematics is the meta-analysis by Dr. Sherry.
10     Could you tell us about that meta-analysis and in
11 particular with relation to the Hoffman and Ballard studies
12 that Dr. Williams talked about?
13 A  Yes. One of the things that Sherry reported and
14 Dr. Williams also talked about to some extent was this idea
15 that, in experimental studies, there seemed to be a negative
16 relationship between amount of time spent playing a game and
17 effect size on some measure of aggression or aggression-related
18 variables. And, in particular, they talked about -- focused on
19 two studies. One was a Hoffman dissertation, the other was, I
20 believe, Ballard and Weist, or Weist, W-e-i-s-t, I believe,
21 both of which used mortal combat as the violent video game.
22     Hoffman had the participants play for 75 minutes, I
23 believe, and, according to Sherry, reported an effect size of
24 something like .05 whereas Ballard had participants play I
25 believe it was 10 minutes or so and reported a much larger