## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

                Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

                Defendants.

_____/

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

---

BODMAN LLP
By:    Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

        and

JENNER & BLOCK LLP
By:    Paul M. Smith
        Katherine A. Fallow
        Amy L. Tenney
        Matthew S. Hellman
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

_____/

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By:    Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

---

## RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Detroit_676702_1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................... 1

I.      THE ACT UNCONSTITUTIONALLY RESTRICTS PROTECTED SPEECH. .............. 2

        A.      The Act Fails to Satisfy the *Brandenburg* Standard. ................................... 3

        B.      The Act's "Psychological Well-Being" Rationale is Illegitimate and
                Inadequate. ................................................................................................ 7

        C.      The Act Does Not Materially Advance Its Goals And Is Not Narrowly
                Tailored. .................................................................................................. 10

II.     THE ACT IS UNCONSTITUTIONALLY VAGUE. ...................................................... 14

III.    THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        EQUAL PROTECTION AND DUE PROCESS ARGUMENTS. ................................... 16

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ..........................................................12

*America Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ..............2, 3, 6, 11

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ...............................................................7

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)......................................................................17

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)......................................................................................4

*Currin v. Wallace*, 306 U.S. 1 (1939) ............................................................................................18

*Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) ..........................................................................................2, 3, 5, 6, 7, 8, 10, 13, 14

*Entertainment Software Ass'n v. Granholm*, 404 F. Supp. 2d 978 (E.D. Mich. 2005) ......................................................................................................................2, 10, 12, 16

*Entertainment Software Ass'n v. Granholm*, No. 05-73634, 2006 WL 148756 (E.D. Mich. Jan. 19, 2006) .......................................................................................................17

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ..................................................................8

*Ginsberg v. New York*, 390 U.S. 629 (1968) ..................................................................................15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......................................................................14

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ...........2, 3, 6

*Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968)......................................................17

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002)...................................................2, 3, 5, 7

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999) ....................................................................17

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ...................................................8

*Motion Picture Ass'n of America v. Specter*, 315 F. Supp. 824 (E.D. Pa. 1970) .........................17

*People v. Luera*, 103 Cal. Rptr. 2d 438 (Cal. Dist. Ct. App. 2001)...............................................18

ii

*Potter v. State*, 509 P.2d 933 (Okla. Crim. App. 1973) ...................................................................17

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...........................................................................3

*State v. Watkins*, 191 S.E.2d 135 (S.C. 1972), *vacated and remanded on other grounds*, 413 U.S. 905 (1973).........................................................................................................17

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ...................................................3

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004)................2, 3

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) ....................................15

*Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) ...................................................................................................................................2, 3, 4

## LEGISLATIVE MATERIALS

2005 Michigan Public Act 108 (Mich. 2005) .................................................................3, 7, 12, 15

## MISCELLANEOUS

Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_ releases/viewRelease.php4?art=339&print=true .............10

FTC, *Report to Congress: Marketing Violent Entertainment to Children* (July 2004) available at http://www.ftc.gov/os/2004/07/040708kidsviolencerpt.pdf.................................13

Entertainment Software Association, Press Release, *All New Video Game Consoles to Include Parental Controls* (Nov. 28, 2005), *available at* http://www.theesa.com /archives/2005/11/all_new_video_g.php ...............................................................................14

Detroit_676702_1

## INTRODUCTION

Plaintiffs have already explained in their motion for summary judgment that 2005 Michigan Public Act 108 (Mich. 2005) (the "Act"), violates the First and Fourteenth Amendments to the United States Constitution and should be permanently enjoined. The State has opposed Plaintiffs' motion and has also filed a cross-motion arguing that it is entitled to summary judgment. But the State gets it wrong on both the law and the relevant issues in this case. Because the Act restricts fully protected speech, it is presumptively unconstitutional and the *State* carries the burden of satisfying the most demanding First Amendment scrutiny. The State has wholly failed to carry its burden. Therefore, Plaintiffs are entitled to summary judgment and Defendants' cross-motion must be denied.[1]

Although the State's brief attempts to obscure the real issues before this Court, the following points are clear:

- Strict scrutiny applies to the Act, which restricts expression fully protected by the First Amendment.

- The State does not – and cannot – satisfy the *Brandenburg* standard for restricting speech to prevent violence.

- The Act's only other rationale – preventing asocial personality development – is illegitimate because it seeks to control how minors think by limiting the expression to which they are exposed.

- Because the Act is not narrowly-tailored, and is in fact unconstitutionally vague, it will create a chilling effect as retailers and distributors will not know which games will subject them to criminal and civil liability.

Notably, the State attempts to avoid the fact that every other attempt to restrict "violent" video games has been invalidated as violating the First Amendment. *Entertainment Software*

---

[1] This response memorandum demonstrates why Plaintiffs' motion for summary judgment should be granted and why, for the same reasons, Defendants' cross-motion should be denied. Along with this memorandum, Plaintiffs are submitting a reply in support of their motion for summary judgment that incorporates by reference the arguments made herein.

1

*Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) ("*Blagojevich*"); *Video Software Dealers v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) ("*Schwarzenegger*"); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ("*VSDA*"). This case is no different from all of the others: the Act's rationales are equally flawed; the evidence supporting the Act is equally nonexistent; and the Act's chilling effect is equally pernicious. Because the law is clear and the material facts are not in dispute, Plaintiffs are entitled to summary judgment in their favor.[2]

## I.    THE ACT UNCONSTITUTIONALLY RESTRICTS PROTECTED SPEECH.

It is beyond argument that the First Amendment fully protects expression in video games, including "violent" video games. The State's claim that "violent" video games are unprotected obscenity, State Opp. at 7-9, is entirely unsupported and contrary to well-settled precedent. As this Court has already recognized, the Sixth Circuit's decision in *James v. Meow Media* held that "video games constitute expression protected by the First Amendment." *Entertainment Software Ass'n v. Granholm*, 404 F. Supp. 2d 978, 981-82 (E.D. Mich. 2005) (citing *James v. Meow Media*, 300 F.3d 683 (6th Cir. 2002)). And *James* held with equal clarity that "violent" video games cannot be regulated under the more permissive standards for sexual obscenity. *James v.*

---

[2] Even if this Court were to conclude that Plaintiffs' motion for summary judgment is premature, the State's claim that *it* deserves summary judgment cannot be seriously credited. The evidence submitted by the State has consistently been rejected by courts as insufficient to uphold legislation restricting video games, and it is thus wholly unsuited as a basis to grant summary judgment for the State. In contrast, Plaintiffs' own experts have been found credible and persuasive in similar cases. *See Blagojevich*, 404 F. Supp. 2d at 1067-68. At a minimum, if this Court is not prepared to enter summary judgment for Plaintiffs, it should set the case for trial rather than award summary judgment to the State.

*Meow Media*, 300 F.3d 683, 698 (6th Cir. 2002) ("We decline to extend our obscenity jurisprudence to violent, instead of sexually explicit, material.") (citing *AAMA*, 244 F.3d at 574).

The State takes the untenable position that *James*'s holding on First Amendment protection for video game expression is limited to the area of tort law. State Opp. at 8 (citing *James*, 300 F.3d at 692-93). But the Sixth Circuit's conclusion that the expressive components of video games are protected by the First Amendment had nothing to do with the intricacies of tort law and everything to do with the fact that video games, like movies or music, are expressive works. 300 F.3d at 696 (holding that the First Amendment applies because "the plaintiffs seek to attach tort liability to the communicative aspect of the video games produced by the defendant").[3] As in *James*, because the Act targets the content and communicative aspects of "violent" video games, the First Amendment fully applies, and the Act must satisfy strict scrutiny. Because the Act imposes a content-based regulation on protected speech and is subject to strict scrutiny, the State must show that its interest is compelling, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and based upon substantial evidence of harm. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994).

    **A.**    **The Act Fails to Satisfy the *Brandenburg* Standard.**

The Act expressly states that its purpose is to prevent aggression or violence in minors supposedly caused by exposure to "violent" video games. Act, pt. II, §§ 15(a), (b), (f), (g). As Plaintiffs explained in their motion, to the extent the State is trying to prevent violent or aggressive behavior by minors, it must satisfy the *Brandenburg* standard. *James*, 300 F.3d at 699 ("Federal courts, however, have generally demanded that all expression, advocacy or not,

---

[3] Every other court to have considered the issue has agreed with *James*'s conclusion that "violent" video games are protected, without reference to any tort context limitations. *AAMA*, 244 F.3d at 577-78; *IDSA*, 329 F.3d at 957; *Blagojevich*, 404 F. Supp. 2d at 1072; *Schwarzenegger*, 401 F. Supp. 2d at 1045-46; *VSDA*, 325 F. Supp. 2d at 1184-85.

meet the *Brandenburg* test before its regulation for its tendency to incite violence is permitted.") (citing *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 (9th Cir. 1989)); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (government may not regulate speech to prevent violence unless that speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

The State tries to avoid this stringent standard by taking the inconsistent positions of both disavowing any interest in curbing violent behavior and at the same time asserting that social science demonstrates that "violent" video games increase minors' aggression. *Compare* State Opp. at 9 *with id.* at 14-18 (discussing social science research purporting to demonstrate that video games make minors more violent) *and* Act, pt. II, §§ 15(f), (g) (stating purpose to prevent "violent, aggressive, and asocial behavior from *manifesting itself* in minors," and to "directly and substantially *alleviat[e] the real-life harms perpetrated by minors* who play ultra-violent explicit video games.") (emphases added).[4] But the State cannot have it both ways. Either the State *is* attempting to prevent minors from behaving aggressively based on its belief that "violent" video game expression causes such behavior, in which case it must satisfy *Brandenburg*, or the State is *not* trying to achieve that purpose, in which case the "aggression" studies on which it primarily relies are irrelevant and do not establish a compelling state interest.[5]

---

[4]  The titles of the social science research the State relies upon and has included in its submissions before this Court also make clear the State's purpose is to prevent violence. *See, e.g., Violent Media Content and Aggressiveness in Adolescents*, State Exhibit AA; *Violent Video Games and Aggressive Behavior in Young Women*, State Exhibit FF; *Effects of Violent Video Games on Aggressive Behavior*, State Exhibit LL.

[5]  The State cites *Schwarzenegger* in claiming that the Act does not seek to prevent violence and is not subject to *Brandenburg*. State Opp. at 9 (citing *Schwarzenegger*, 401 F. Supp. 2d at 1045). But that case involved only a preliminary assessment of what California's law "seemed" to be aimed at. In any event, there is no question that the Act is aimed at preventing violence, and thus must satisfy *Brandenburg* under well-settled rule of the Sixth Circuit and the Supreme Court.

Detroit_676702_1

The State's rhetorical gymnastics aside, there is no question that the State cannot meet the *Brandenburg* standard. Indeed, the State has not even tried to do so. As Plaintiffs' opening brief explains, no evidence suggests that Plaintiffs have intended to incite violence through the sale and distribution of video games. And no evidence suggests that video games, played by millions daily, are likely to cause imminent violence. *James*, 300 F.3d at 698-99. For the same reasons, the court in *Blagojevich* concluded that a similar statute in Illinois came "nowhere near" to satisfying the *Brandenburg* standard. *Blagojevich*, 404 F. Supp. 2d at 1073.

To the extent the State is seeking a reduced level of *Brandenburg* scrutiny because the Act targets something the State vaguely defines as "aggression," that argument must be rejected outright. In essence, the State seems to be arguing that it may restrict speech to prevent an unquantified increase in "aggression" among minors, and that it need only point to *some* evidence to justify such a restriction. But that position is wholly unsupported by "substantial evidence," as strict scrutiny requires, *supra* at 3, and would eviscerate the *Brandenburg* standard altogether. Indeed, to understand the fatal flaw in this argument, one need look no further than Dr. Anderson's testimony, on which the State so heavily relies. According to Dr. Anderson, individuals are "primed" by playing violent video games, thereby "increas[ing] the likelihood or . . . the accessibility of certain kinds of thoughts or certain kinds of knowledge structures," which leads to the individuals to employ "these well-rehearsed structures [by responding] accordingly, even if the situation does not necessarily warrant it." State Opp. at 14-15 (quotation marks omitted). Under Dr. Anderson's approach, even viewing a "picture of a gun" can prime an individual eventually to exhibit violent behavior. Testimony of Craig Anderson, *Blagojevich*

5

11/14/05 Tr. at 221 (attached as Exh. 1) ("Anderson Test.").[6] If a theory this breathtakingly broad were an adequate basis for regulation, there would be nothing left of *Brandenburg*, as the government would be free to regulate almost any expression on the ground that it could "prime" an individual ultimately to commit a violent act.

Not only is the State's argument legally flawed, but the evidence it submits is entirely insufficient to satisfy its burden of establishing a compelling state interest.  Plaintiffs have already shown, in their opening brief, that the legislative record cited by the State fails to demonstrate that playing "violent" video games is likely to cause minors to engage in violence (let alone imminent violence).  In response, the State has offered two or three additional studies, and, remarkably, relies almost entirely on testimony given by Dr. Anderson and Dr. Kronenberger in the Illinois trial – even though the court in *Blagojevich* rejected their testimony as failing to provide substantial evidence.  This evidence should be rejected for the same reasons that other courts have found similar research insufficient to justify restricting "violent" video games.  *Blagojevich*, 404 F. Supp. 2d. at 1074 ("Indeed, defendants have failed to present substantial evidence showing that playing violent video games causes minors to have aggressive feelings or engage in aggressive behavior."); *see also AAMA*, 244 F.3d at 578-79 (holding that Dr. Anderson's research submitted in that case did not provide substantial evidence to support restriction on "violent" video games); *IDSA*, 329 F.3d at 959 (similarly rejecting city's reliance on Dr. Anderson's research).  Even taken at face value, the research of Dr. Anderson and Dr. Kronenberger does not demonstrate, or even *purport* to demonstrate, the relevant legal point: that violent video games are intended and likely to cause imminent violence.  Dr. Anderson himself

---

[6] Because the State has made this testimony central to its defense of the Act, Plaintiffs are attaching to this memorandum the entire trial transcripts so that the Court may have the benefit of Dr. Anderson's and Dr. Kronenberger's full testimony, including their admissions on cross-examination.

Detroit_676702_1

conceded the obvious point that "the vast majority of the kids . . . playing violent video games right now . . . are going to grow up and be just fine."  Anderson Test., 11/15/05 Tr. at 283 (attached as Exh. 2).  As the Sixth Circuit put it, research like Dr. Anderson's and Dr. Kronenberg's deals with the "glacial process of personality development [and not] the temporal imminence that we have required to satisfy the *Brandenburg* test."  *James*, 300 F.3d at 698.[7]

### B.    The Act's "Psychological Well-Being" Rationale is Illegitimate and Inadequate.

To the extent the Act has a rationale beyond the legally unsubstantiated aim of preventing minors from acting aggressively, it apparently is to protect the "psychological well-being of minors" and to prevent them from developing an "asocial" mentality.  Act, pt. II, § 15(e).

As Plaintiffs' opening brief explains, the State's interest in protecting the psychological well-being of minors in this area amounts to an interest in controlling how minors think by limiting the expression to which they are exposed.  Thought control is not a *legitimate* interest for the State, much less a compelling one sufficient to satisfy strict scrutiny.  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("[The government] cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts") (quoting *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)); *Blagojevich*, 404 F. Supp. 2d at 1074 ("In this country, the

---

[7] Not only does Dr. Anderson's testimony fail to satisfy the *Brandenburg* standard, but it also fails to provide substantial evidence of any other "harm" claimed by the State.  For example, Dr. Anderson conceded that children are no more susceptible than adults to any effect caused by "violent" video games.  Anderson Test., 11/15/05 Tr. at 324-25.  Moreover, as discussed *infra*, Dr. Anderson has conceded that "violent" video games are essentially no more harmful than "violent" television.  Dr. Anderson further admitted that increases in "aggression" could be the result of a large number of stimuli, and he has not done the research to compare the relative effects of any of these other factors.  *Id.* at 328.  Finally, just as the State has failed to consider the substantial body of research that contradicts the position it advocates, Dr. Anderson has ignored contrary evidence in reaching his conclusions about the so-called effects of exposure to "violent" video games.  *Id.* at 335-36.  This one-sided research cannot support the State's claimed interests in this case.

Detroit_676702_1

State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes.").

In response, the State argues that because some other areas of the law treat minors differently than adults, so too should it be here.   State Opp. at 10-13.  The State fails to recognize, however, that government action does not automatically become constitutional simply because it is done in the name of protecting minors.  Minors are not always accorded a different constitutional status than adults.  To the contrary, in the realm of the First Amendment, limitations on governmental action are in general "no less applicable when [the] government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *see McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment."); *Blagojevich*, 404 F. Supp. 2d at 1075 ("[Concerns about thought control] apply to minors just as they apply to adults.").  How the law treats minors in the areas of public health and criminal justice simply is not relevant to the First Amendment inquiry.

Even if the State's interest were legitimate, the State has proffered almost no evidence, let alone substantial evidence, demonstrating that "violent" video games cause, or are even related to, the State's vague theory of "harm" to minors.  Instead, the State's research is almost entirely concerned with whether "violent" video games cause minors to act violently, and for the reasons discussed above, is facially insufficient to satisfy *Brandenburg*.  *Supra* at 5.  As Plaintiffs' opening brief noted, only two of the articles the State submitted in the preliminary injunction proceedings dealt with the issue of psychological harm at all, and those two articles were not even relevant – much less substantial evidence supporting the State's position.  *See* Pls.' Mot. Summ. J. at 13-14 (noting that one article did not distinguish between the effect of "violent"

video games and other media, and that the other studied only the effect of "violent" television programs).

The supplemental evidence cited by the State in its response not only fails to constitute substantial evidence of "harm" to minors, it further underscores the illegitimacy of the State's claimed interest.  For example, the State cites to testimony by Dr. Anderson that exposure to "violent" video games increases "aggressive feelings," "aggressive thinking," and is associated with a decrease in "prosocial behavior."  State Opp. at 14 (quoting Anderson Test., Tr. at 213:5-10) (Exhibit 11 to Defs.' Mot. Summ. J.).  But as already noted, the State may not restrict speech to control minors' "thoughts" and "feelings," or to engineer their personalities.  Likewise, the State describes Dr. Anderson's opinion that children who are exposed to "violent" media generally may tend to befriend "children who may have been socially rejected."  *Id.* at 15 (citing Anderson Test., Tr. at 232:5-16) (Exhibit 11 to Defs.' Mot. Summ. J.).  The idea that the State may censor speech to control who children decide to befriend flies in the face of basic First Amendment principles, as well as common sense.

Nor is substantial evidence demonstrated by Dr. Anderson's vague allusion to unnamed additional harms supposedly caused by exposure to "violent" video games.  State Opp. at 16 (citing Anderson Test., Tr. at 277:1-12) (Exhibit 11 to Defs.' Mot. Summ. J.).  (stating "I wouldn't necessarily agree . . . whether or not [increased aggression] is the only harm" arising from "violent" video games).  Dr. Anderson followed this tepid assertion with the admission that he did not believe that playing "violent" video games caused minors to develop clinical psychological problems.  *Id.*  This testimony, from the State's leading expert no less, only confirms that there is no substantial evidence demonstrating that minors suffer "psychological"

9

harm from video games.[8]  Thus, because the State's goal of controlling the thoughts of minors is illegitimate, and because the State has failed to offer substantial evidence that "violent" video games are otherwise "harmful" to minors, the Act cannot be defended on that ground either.

> **C.    The Act Does Not Materially Advance Its Goals And Is Not Narrowly Tailored.**

Even if the Act's aims were compelling, the Act does not materially advance those aims, nor advance them in a narrowly tailored manner.  With respect to material advancement, the State's primary claim is that video games are different "from other forms of entertainment" and therefore require regulation in ways that "violent" movies, music, and books do not.  State Opp. at 20-24.  This statement is flatly refuted by Dr. Anderson himself, who has testified that the effects of exposure to "violent" television and video games are essentially the same.  Anderson Test., 11/15/05 Tr. at 278-80.  There is no basis to credit the State's unsubstantiated musings about the distinctive "interactive" nature of video games, State Opp. at 21-23, when the expert it

---

[8] The State's reliance on Dr. Kronenberger's research to support the Act is even more tenuous. Despite devoting several pages to describing Dr. Kronenberger's methodology, the State does not explain how his studies support the Act.  *See* State Opp. at 16-18.  But as this Court has already preliminarily recognized, and as *Blagojevich* found, Dr. Kronenberger's research falls far short of the "substantial evidence" required for restricting speech.  First and foremost, none of Dr. Kronenberger's "brain scan" studies – only one of which has been published – separated out the effect of playing "violent" video games from the effect of watching "violent" television, and as a result nothing in his research supports singling out video games for censorship, as this Court has already noted.  *Granholm*, 404 F. Supp. 2d at 982.  *See also* Testimony of William Kronenberger, 11/14/05 Tr. at 77 (conceding that his studies "did not analyze the effect of violent video games specifically") ("Kronenberger Test."); Second, Dr. Kronenberger admitted at trial – as he conceded repeatedly in his publications – that his research does *not* support a conclusion that playing "violent" video games causes the brain patterns observed by his research team.  *Blagojevich*, 404 F. Supp. 2d at 1074; Kronenberg Test., 11/14/05 Tr. at 77-78 (conceding that his findings are merely "correlational"); Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_releases/viewRelease.php4?art=339&print=true. Third, and fundamentally, Dr. Kronenberger's research at most describes differences in brain patterns observed through MRI; he does not even claim to be able to predict the behaviors of those he observed.  Kronenberg Test., 11/14/05 Tr. at 90; *see also Blagojevich*, 404 F. Supp. 2d at 1065. These are only of the few reasons the court in *Blagojevich* found Dr. Kronenberger's testimony "unpersuasive."  *Id.* at 1067.

relies on admits there is no meaningful difference between the effect of video games and television.[9]  Nor does the State bolster its case by arguing that video games are different because they are a "teaching tool."  State Opp. at 21-22.  The fact that educational video games exist signifies that video games are *more* like other media, such as books and movies, not less.  And the State's appeal to the "common sense" notion that video games are more dangerous than other forms of media is simply self-serving.  State Opp. at 23.  To the contrary, courts have consistently concluded that video games do not warrant special regulation, and in fact contribute only "a tiny fraction of the media violence to which modern American children are exposed."  *See AAMA*, 244 F.3d at 579.  The State carries the burden of demonstrating the constitutionality of the Act, and it may not rely on self-serving speculation to meet this burden.  *See Blagojevich*, 404 F. Supp. 2d  at 1075 (finding no evidence demonstrating that video games are more harmful than any other media).

        The Act is fatally flawed for the independent reason that it fails to accomplish its (legally inadequate) goals in a narrowly tailored manner.  As Plaintiffs' opening brief describes, the Act's vague terms and significant criminal and civil penalties will cause retailers and distributors to steer clear of games that have even a chance of running afoul of the Act.  In response, the State points primarily to the Act's affirmative defense provisions, but these are inadequate to save the Act.  As the State describes them, the provisions offer a "good faith" defense to the retailer who follows ESRB guidelines in selling or renting games to minors.  State Opp. at 19-20.  This good faith defense is misleading, however, because it applies only to the extent that the ESRB

---

[9] The State maintains that Dr. Anderson made no such concession, characterizing Dr. Anderson as saying that "the effect size—the variance in results between television and video games—is only 4%, and diminishes from there if the researcher is trying to predict more serious criminal behavior."  State Opp. at 24.  But this argument merely proves Plaintiffs' point – the difference in "effect size" between video games and television is at most four percent, and thus does not support singling out video games from other media for censorship.

guidelines "do[] not conflict" with the Act's definition of "violent" video games. Act,

§ 23(1)(c). Thus, if a 13-year old purchases a game rated "'T' for Teen" under the ESRB

guidelines, the retailer will have no good faith defense if it turns out that the game is deemed

"violent" under the Act, even if the retailer checked to be sure the customer was thirteen years

old. The Act's affirmative defense therefore does not provide meaningful protection.[10]

     The Act also is not narrowly tailored because it was enacted without due consideration of

viable alternatives, including the industry's own rating and educational system, and the advent of

technological parental controls. *E.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08

(1996) (plurality op.) (noting that government may not regulate protected speech without

enquiring into less speech-restrictive alternatives). The State's suggestion that it is justified in

taking the draconian step of censorship because the industry's voluntary rating system is not

effective is misleading and unsupported. First, the State's primary argument—that the system is

ineffective because it employs a rating on the front of the video game package and a detailed

description on the back of the package—is simply overblown rhetoric. State Opp. at 25-26.

Even if the State had any evidence to support its assertion that this format has stymied parents

(and it does not) a parent who looks only at the front of the package will still be able to make an

---

[10] The State's other proposals for avoiding liability are even more fanciful. Even if the Act did not employ vague terms, reliance on "[i]ndustry literature and gaming sites," State Opp. at 20, would not be adequate to provide information about the level and degree of violence in the games, both because the games themselves are often complex and include many stages, and because the video game experience is in large part determined by the individual player's choices, and is not susceptible to general characterization. *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61 (attached as Exh. 2 to Mot. for Prelim. Inj.). The State's alternative proposal—having a representative from each retailer play each game to determine their content, State Opp. at 20— suffers from all of the above problems, and is infeasible as a practical matter, as this Court has already recognized. *See Granholm*, 404 F. Supp. 2d at 983 ("Nor is it reasonable to expect store clerks to play each level of each game to determine if it fall within the Act's definition of ultra-violent explicit. Indeed, very few experienced video players can successfully reach the highest levels of many games in order to view their content.")

Detroit_676702_1

informed choice about whether the game is age-appropriate for his or her child.  Indeed, video game packaging provides *more* information to consumers than other comparable media does. For example, the Motion Picture Association of America does not require DVDs to display *any* ratings information on the front of their packaging.  Second, it is simply implausible to claim that video games are less subject to parental control than "television or the internet," because the latter are used at home.  State Opp. at 26. Video games are also played at home, and are equally susceptible to parental monitoring.   And in any case, minors can generally only purchase video games to the extent their parents give them the money to do so; television and internet are freely available in most households already.

Third, the State misinterprets the FTC's findings, which, as *Blagojevich* found, actually support Plaintiffs' position.  In the face of similar arguments by the State of Illinois, *Blagojevich* concluded that

> Defendants, however, fail to discuss two important facts. First, the FTC has found that seventy percent of parents report being involved with selecting their children's video games, and eighty-three percent purchase video games themselves or with their children . . . .Second, the FTC has found that other segments of the entertainment industry are even worse at ensuring that unaccompanied minors are unable to purchase explicit material.
>
> [T]he 2004 FTC study cited by defendants shows that eighty-one percent of unaccompanied teenagers could purchase R-rated DVDs, and eighty-three percent could purchase music with explicit lyrics – far more than were able to purchase M-rated video games.

404 F. Supp. 2d. at 1075; FTC, *Report to Congress: Marketing Violent Entertainment to Children* (July 2004) at 20, 23-24, *available at* http://www.ftc.gov/05/2004/07 /040708 kidsviolencerpt.pdf.  Thus, rather than presenting a special case for regulation, video games are, if anything, *less* in need of regulation.  As *Blagojevich* put it, "the underinclusiveness of [the Illinois Act] – given that violent images appear more accessible to unaccompanied minors in

13

other media – indicates that regulating violent video games is not really intended to serve the proffered purpose." *Blagojevich*, 404 F. Supp. 2d at 1075. (citing *Florida Star v. BJF*, 491 U.S. 524, 540 (1989) (finding cause of action based on identifying rape victim by "instrument of mass communication" alone raised "serious doubts about whether [the state] is, in fact, serving ... the significant interests which [it] invokes.").

Finally, the State completely ignores the fact that many popular game consoles now come equipped with technological controls that enable parents to limit which games their children play. *See* Entertainment Software Association, Press Release (Nov. 28, 2005), *All New Video Game Consoles to Include Parental Controls*, *available at* http://www.theesa.com/archives /2005/11/all_new_ video_g.php . The State has not, and cannot, show that these parental controls are not a viable – and indeed much preferable – less restrictive alternative to serve the State's purported goals. The State has therefore failed to carry its burden in satisfying the third prong of the strict scrutiny test.

## II.     THE ACT IS UNCONSTITUTIONALLY VAGUE.

The State's defense of the Act on vagueness grounds is wholly inadequate. The Due Process Clause requires that statutes be sufficiently definite such that a "person of ordinary intelligence [is afforded] a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). One telling indication that the Act does not meet this standard is that the State is unwilling or unable to say which of the games submitted by Plaintiffs as exhibits in this litigation, if any, would fall under the Act's definition of an "ultra-violent" video game. The State cannot expect retailers and clerks to do what the State itself cannot do in this litigation: concretely identify which games will be covered by the Act.

As Plaintiffs demonstrated in their opening brief, many of the Act's terms are vague in the fantastical, otherworldly context typical of video games.  For example, the Act would regulate depictions of violence against "parties who realistically appear to be human beings." This qualitative language opens up a host of interpretative difficulties when it is applied to the human-like zombies, demigods, and aliens that are video game staples. Similarly, the Act employs terms associated with real-life harms to video game characters who are not conscious, have no feelings, and return to their original state every time the game is played anew.  The Act's use of such terms (*e.g.*, by regulating games that depict "causing death, inflicting cruelty, dismemberment . . . or other mutilation") in this context makes it impossible to know what they mean.  The Act also employs an incoherent and unprecedented "harmful to minors" requirement, which has no intelligible meaning outside the context of sexual obscenity, *see Ginsberg v. New York*, 390 U.S. 629 (1968).  It is simply not clear when a game might appeal to a "morbid interest in committing uncontrolled aggression against an individual." Act, § 16(k); *see Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter alia*, term "morbid" was not defined).

Even if the Act's terms were intelligible (and they are not), there would still be a fatal vagueness problem with the Act because the complexity and open-endedness of the games means video game distributors cannot know whether the games they distribute will run afoul of the Act.  For example, the Act regulates games that "continually and repetitively depict[] extreme and loathsome violence." Act, § 16(k).  But many games leave the amount and manner of violence up to the individual player.  A retailer will have no way of knowing in advance whether the game will be played in a way that "continually and repetitively depicts" such

Detroit_676702_1

violence, and indeed the amount of "violent" images shown in a game may vary from player to player and from game play to game play.  Many games have multiple levels and stages, only some of which would run afoul of the Act.  Because it is unreasonable to assume that retailers could obtain an encyclopedic knowledge of every stage of every game they distribute, the Act does not give fair warning of what it prohibits. *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61.

This Court already found in entering its preliminary injunction that the Act will create a "chilling effect" because "[t]here is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act."  *Granholm*, 404 F. Supp. 2d at 983.  The State continues to have no answers or explanations for any of the vague aspects of the Act other than to recite the terms of the Act and declare them not vague.  That is no answer at all.  This Court should thus grant summary judgment to Plaintiffs on vagueness grounds as well.

### III.  THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EQUAL PROTECTION AND DUE PROCESS ARGUMENTS.

Without much argument, the State contends that it is entitled to summary judgment on Plaintiffs' equal protection and due process claims.  State Opp. at 28-30.  Plaintiffs have not yet sought summary judgment on these claims, but the State's half-hearted arguments on these claims do not entitle them to summary judgment.  First, with respect to equal protection, the State rehashes its argument in a single paragraph that video games are different than other media and therefore can be singled out for regulation by the State.  State Opp. at 28.  But Plaintiffs have already demonstrated that video games expression is protected in the same manner as other media, and that the Act singles out video game content for censorship.  *See supra* part II.  When the State discriminates in a way that burdens fundamental rights – such as the First Amendment right to freedom of speech – the Equal Protection Clause requires that the State satisfy strict

16

scrutiny. *See, e.g.*, *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir. 1999) ("A statute challenged on equal protection grounds will be subject to strict scrutiny when the statute . . . has an impact on a 'fundamental' right"). For the same reasons the State cannot justify the Act under the First Amendment, it fails to satisfy the Equal Protection Clause. The State has not offered any legitimate, let alone compelling, justification to restrict fundamental First Amendment rights of expression. The State's argument thus fails as a matter of law, and it is not entitled to summary judgment on this claim.

Second, the State misstates the relevant law regarding Plaintiffs' due process claim. It is true that the Act's affirmative defense for reliance on privately-created ESRB standards will in most cases be of no help to video game retailers, *see supra* part II.C. But, as this Court has already recognized in denying the State's motion to dismiss, that does not change the fact that the Act has premised liability on a failure to comply with the ESRB. *Entertainment Software Ass'n v. Granholm*, No. 05-73634, 2006 WL 148756, *2 (E.D. Mich. Jan. 19, 2006). This delegation of authority violates due process. *See, e.g., Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968) (striking down city ordinance subjecting films to review by board); *Motion Picture Ass'n of Am. v. Specter*, 315 F. Supp. 824, 826 (E.D. Pa. 1970) (rejecting a law incorporating the MPAA ratings); *State v. Watkins*, 191 S.E.2d 135, 143-44 (S.C. 1972) (unconstitutional delegation for legislation to exempt from obscenity law films rated by MPAA), *vacated and remanded on other grounds*, 413 U.S. 905 (1973); *Potter v. State*, 509 P.2d 933, 935-36 (Okla. Crim. App. 1973) (same). *Cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 69-70 (1963) (holding unconstitutional state statute allowing independent commission consisting of private citizens to make recommendations about the suitability of certain publications). Like the

statutes in the  motion picture rating cases, Act would similarly—and impermissibly—rely upon the private, voluntary and continually evolving ESRB system as a basis for proscribing speech.

The State's arguments to the contrary are meritless.  Although the State claims that the "Act does not give the ESRB the power to define what constitutes an ultra-violent explicit video game," State Opp. at 29, it indisputably gives the ESRB the power to define when a retailer will be subject to criminal liability for selling a violent game.   There is no material difference in the due process analysis between a law that lets a private party define criminal conduct and a law that lets a private party define exceptions to criminal conduct.  In either case, the critical power to define the scope of criminal law is unconstitutionally delegated.  The cases cited by the State are not to the contrary.  *People v. Luera*, 103 Cal. Rept. 2d 438 (Cal. Dist. Ct. App. 2001) was decided on the basis of California law, and did not even consider whether the federal due process clause barred a state statute defining child pornography as not encompassing any film rated by the MPAA.  *Id.* at 441-42.  Likewise, *Currin v. Wallace*, 306 U.S. 1 (1939) is not on point. *Currin* involved a challenge to a statute under separation of powers doctrine, not due process, and involved neither delegation of standards to a third party nor any speech interests protected under the First Amendment.

Detroit_676702_1

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that this Court deny the State's motion for summary judgment, enter summary judgment against the Defendants, and permanently enjoin the Act.

Respectfully submitted,

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION,
and MICHIGAN RETAILERS ASSOCIATION


By:     /s/ Alicia J. Blumenfeld_____
        Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone:  (313) 259-7777
Facsimile:  (313) 259-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

and

JENNER & BLOCK LLP
By:     Paul M. Smith
        Katherine A. Fallow
        Amy L. Tenney
        Matthew S. Hellman
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

February 21, 2006

Detroit_676702_1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

                    Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY  in her official capacity as
Wayne County Prosecuting Attorney,

                    Defendants. _____ /

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

## PROOF OF SERVICE

        Alicia J. Blumenfeld certifies that she is an employee of Bodman LLP, that on February 21, 2006 she caused to be served a copy of **RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** and this Proof of Service upon the person(s) listed below via electronic filing:

Denise C. Barton, Esq.
Jason R. Evans, Esq.
Assistant Attorney General
Department of Attorney General
525 W. Ottawa Street, Floor 5
P.O. Box 30736
Lansing, Michigan 48909

        I declare under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

                                     __/s/ Alicia J. Blumenfeld_____
                                         Alicia J. Blumenfeld