223

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION


 3
   ENTERTAINMENT SOFTWARE          )
 4 ASSOCIATION, et al.,            )
                                   )
 5              Plaintiffs,        )  No. 05 C 4265
                                   )
 6       v.                        )  Chicago, Illinois
                                   )  November 15, 2005
 7 ROD BLAGOJEVICH, et al.,        )  9:45 a.m.
                                   )
 8              Defendants.        )


 9

10              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
11
   APPEARANCES:
12
   For the Plaintiffs:  JENNER & BLOCK, LLC
13                       One IBM Plaza
                         330 North Wabash Avenue
14                       40th Floor
                         Chicago, IL   60611, by
15                       MS. KATHERINE A. FALLOW
                         MS. KATHLEEN R. HARTNETT
16                       MR. DAVID P. SANDERS

17                       JENNER & BLOCK, LLP
                         601 13th Street
18                       1200 South
                         Washington, D.C.   20005, by
19                       MR. PAUL M. SMITH

20
   For the Defendants:  FLETCHER, TOPOL, O'BRIEN & KASPER, P.C.
21                       222 North LaSalle Street
                         Suite 300
22                       Chicago, IL   60601, by
                         MR. MICHAEL J. KASPER
23

24

25
```

Appendix 2 Page 1

Dockets.Justia.com

224

```
 1                    HOGAN MARREN, LTD.
                      180 North Wacker Drive
 2                    Suite 600
                      Chicago, IL   60606, by
 3                    MR. PATRICK E. DEADY
                      MS. LAURA C. LIU
 4
                      OFFICE OF THE ILLINOIS ATTORNEY GENERAL
 5                    100 West Randolph Street
                      13th Floor
 6                    Chicago, IL   60601, by
                      MR. ANDREW L. DRYJANSKI
 7                    MS. ELLECIA L. PARSELL-BURKE

 8                    COOK COUNTY STATE'S ATTORNEY
                      500 Richard J. Daley Center
 9                    Chicago, IL   60602, by
                      MR. STEPHEN L. GARCIA
10


11
   COURT REPORTER:    LAURA M. BRENNAN
12                    219 South Dearborn Street, Room 2102
                      Chicago, IL   60604
13                    (312) 427-4393

14

15

16

17

18

19

20

21

22

23

24

25
```

Anderson – direct

225

1      (The following proceedings were had in open court:)

2          THE CLERK:  05 C 4265, Entertainment v. Blagojevich.

3          THE COURT:  Well, so much for 9:45.

4          All right, can the lawyers please give your names for

5     the record?

6          MR. SMITH:  Paul Smith for the plaintiffs.

7          MS. FALLOW:  Katherine Fallow for the plaintiffs.

8          MS. HARTNETT:  Kathleen Hartnett for the plaintiffs

9          MR. SANDERS:  David Sanders for the plaintiffs.

10         MR. KASPER:  Michael Kasper for defendant Blagojevich.

11         MR. DEADY:  Patrick Deady for defendant Blagojevich.

12         MR. DRYJANSKI:  Andrew Dryjanski for defendants

13    Madigan and Blagojevich.

14         MR. GARCIA:  And Stephen Garcia for defendant Devine.

15         THE COURT:  Are we ready to resume with Professor

16    Anderson?

17         MR. KASPER:  Yes, we are.

18         THE COURT:  Come on right back up here and we will get

19    going.

20         Do you understand you are still under oath?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay, you can start.

23             CRAIG ANDERSON, DEFENDANTS' WITNESS

24                     PREVIOUSLY SWORN

25                 CONTINUED DIRECT EXAMINATION

Anderson - direct

1  BY MR. KASPER:

2  Q   Professor Anderson, as you recall yesterday, we were

3  talking about the general aggression model before we broke, and

4  in particular we were talking about this concept of priming.  I

5  was wondering if you could just begin by describing the concept

6  once again.

7  A   Priming is the phenomenon in which some sort of cue in the

8  environment -- it can be a visual cue, auditory, it doesn't

9  matter -- leads to an increase in the accessibility of a

10  particular kind of thought or cognition.

11          So, for example, a photo of a gun for many people

12  automatically primes thoughts about violence.

13  Q   How long does the priming effect take?

14  A   There are kind of different types of priming, some of which

15  take place very, very quickly, less than a second in some

16  cases.

17          In the kind of situation that we are talking about

18  here, exposure to violent video games, it presumably would take

19  somewhat longer, somewhere on the order of maybe 5 minutes, 10

20  minutes, maybe even as long as 15 minutes or so.  But it

21  certainly wouldn't take a really long time.

22  Q   How does that relate to this concept of duration of play

23  that Dr. Williams was talking about yesterday?

24  A   Well, what it really means is that there is no particular

25  reason to expect -- in a short-term experimental context, there

Anderson - direct

1  is no real reason to expect that the effects of playing a

2  violent versus a nonviolent video game would get bigger over

3  time.

4  Q  Why is that?

5  A  Because the priming would take place and, in some sense,

6  reach maximal level fairly quickly.  No one has really done the

7  studies to see exactly how long in this context is optimal.

8  But certainly 75 minutes, for example, of playing is much

9  longer than what it would be reasonable to expect that priming

10  would require.

11  Q  Turning your attention to the second chart over here --

12  A  Yes.

13  Q  -- how does violent video game exposure affect the

14  long-term propensity for aggression?

15  A  If I may?

16        THE COURT:  That is fine.

17        THE WITNESS:  The top part here that is labeled in

18  this version Repeated Violent Game Playing really contains an

19  awful lot of sort of history of psychological research from

20  several different domains.  Social learning theory is in there,

21  cognitive psychology type processes, developmental processes,

22  and so on.

23        But basically the idea is that what one is really

24  doing is learning different kinds of knowledge structures,

25  rehearsing a particular way of thinking and decision-making,

Anderson - direct

228

1    and, in addition, getting reinforced, that is rewarded, for

2    making decisions such as decisions about how to deal with

3    conflict by use of force.

4    Q    So what is a knowledge structure?

5    A    A knowledge structure is sort of a broad label for a

6    variety of kinds of basically variables that are thought to

7    exist internally, things like beliefs, attitudes, perceptual

8    schemata.

9          We can think of knowledge structures as ranging from

10   fairly -- what we might think as fairly simple kinds of ideas

11   such as how do you identify a chair.  Well, someone has to

12   learn with experience what a chair is, how to perceive what a

13   chair is, or how does one learn how to read.

14         As Dr. Kronenberger kind of illustrated when he was

15   talking about Stroop effects, where color words are presented

16   sometimes in ink colors that don't match the words, so the word

17   "red" maybe printed in blue, and that turns out to be a

18   difficult kind of task to do because there is a conflict

19   between this automatic reading response.  Well, it's automatic

20   in people who have learned how to read.

21         So this kind of a knowledge structure, in this case

22   about what a particular formation of letters and what that

23   means, happens -- takes place over time with practice and

24   eventually gets automatized.

25   Q    You used the word "rehearsal" in the top box there.  What

Anderson - direct

229

1  types of behaviors are rehearsed in video games, in violent

2  video games?

3  A    In violent video games, you rehearse really the whole

4  sequence.  You rehearse, you practice being vigilant, that is,

5  looking for sources of threat.  You practice identifying

6  sources of threat.  You practice making decisions about how to

7  respond to that threat.  And eventually you actually carry out

8  some form of action, typically a violent action to deal with

9  that threat, clicking a mouse button or something on the

10  keyboard or a pretend sort of gun of some kind.

11  Q    Yesterday Dr. Williams used the term, hostile attribution

12  bias.  Where does that fit into that chart?

13  A    A hostile attribution bias is probably best thought of as a

14  type of fairly high level perceptual schemata, sort of a

15  propensity to see threat, see intentional harm in ambiguous

16  situations where harm may or may not have actually been

17  attendant.

18  Q    And what happens as you go down further in the chart?

19  A    The idea in developmental psychology, personal psychology,

20  and so on is that -- and that is why this model isn't really

21  just a model of video game playing; it is a much more general

22  model than that.

23        The idea is that with practice, these types of

24  schemata, knowledge structures and so on, essentially become

25  more chronically accessible or available for the person to use

Anderson – direct

230

1   in situations that seem to fit that particular schemata.

2   Q    Give me an example.

3   A    Well, in terms of, like, hostile attribution bias, someone

4   who has developed this idea that when bad things happen to

5   them, it is probably caused by someone else, this idea of you

6   are looking for threat or, you know, insults or something along

7   that line.

8        What that means is that when one then gets in an

9   ambiguous situation where some kind of harm has been done, that

10  person is more likely to decide very quickly, in some cases

11  automatically, without even realizing they are making a

12  decision, but they are more likely to decide that the harm was

13  intentional.

14       And as a consequence of that, they are more likely to

15  respond, say, to that bump in the lunchroom that we talked

16  about yesterday with some kind of aggressive behavior on their

17  own.

18  Q    How does that relate to the third box?

19  A    Increase in aggressive personality.  Basically these are

20  different ways that one's propensity to behave aggressively in

21  a variety of situations can be increased.

22       One thing I guess I should point out here is the

23  general aggression model does not specifically say that playing

24  a violent video game will influence each and every single one

25  of these.  That actually is an empirical question, and there

Anderson - direct

231

1   are studies showing some of these linkages in the video game

2   literature.

3           Again, the general aggression model was designed to be

4   general, not just a media violence model.  But the idea, again,

5   is that these kind of rehearsals and practice and so on can

6   lead to an increase in aggressive personality, sort of loosely

7   defined, which in turn then can influence person variables and

8   actually situation variables.

9   Q   What does that mean, the increase in the aggressive

10  personality regarding -- how does that relate to the bottom two

11  boxes?

12  A   Well, there are lot of different ways of measuring

13  aggressive personality, but basically it's usually defined as a

14  tendency to respond more aggressively than what sort of non-

15  aggressive individuals or sort of normal individuals would

16  respond in a variety of situations.

17  Q   And the two boxes down at the bottom, do they equate to the

18  top two boxes on the first chart?

19  A   Yes.  That is actually how one gets from all this learning

20  aspect of the model back to any particular episode is an

21  increase in aggressive personality over time.

22          Well, first of all, that is a person variable, so that

23  any situation that one goes into, they are sort of bringing

24  these now well-rehearsed knowledge structures with them.  So if

25  the situation happens to be one that involves a provocation of

Anderson - direct

232

1   some kind or an ambiguous provocation of some kind, it

2   increases the likelihood that the person will interpret it and

3   act on it as if it was an intentional action that requires an

4   aggressive response.

5           It is also the case that as children, for example,

6   become more aggressive, the kind of situations that they find

7   themselves in also tends to change; that is, their social

8   relationships with say, parents, or peers or teachers tend to

9   deteriorate, and so they start interacting with a -- or there

10  is a tendency for them to start hanging out more with other

11  kids who have in some sense become social rejects from the

12  classroom or wherever they are.

13  Q   And you talked also in your research about the concept of

14  pro social behavior.  How does that apply in this situation?

15  A   It's -- that hasn't seen as much research, but there is

16  some research suggesting that if one --

17          Well, let me back up a second.  The one way in which

18  exposure to violent media in general, exposure to violent video

19  games can decrease pro social behavior is through this

20  aggression desensitization box.  And desensitization here

21  really refers to a decrease in negative emotional reactions to

22  violence or scenes of violence.

23          Typically when children and both adults as well see a

24  scene of violence or see someone being injured or in pain or

25  whatever, they have a fairly strong emotional reaction to it.

Anderson - direct

1  One consequence of that is that that can lead to -- first of

2  all, a negative emotional reaction to violence can lead to a

3  decrease in aggression.  So if you are actually hurting

4  someone, perhaps unintentionally, perhaps intentionally, but

5  that then produces a negative emotional reaction in you, you

6  are likely to stop it.

7          There is also evidence from some of the work Rowell

8  Huesmann has done suggesting that when children are making

9  decisions about how to behave towards some person, that

10  thinking about hurting them, hurting another person, influences

11  their decision to inhibit any sort of aggressive impulse they

12  might have.

13  Q   So how does desensitization work with this concept of

14  knowledge structure?

15  A   I think of this as, in some sense, a somewhat more

16  primitive kind of -- I guess one can still call it a knowledge

17  structure, but it's more based in emotion that is sort of an

18  older part of the brain.

19          And how this relates to pro social behavior, which is

20  where I got started on all this, is if you are in a situation

21  where someone needs help, one of the first things that has to

22  happen in order for you to decide to help is you have to notice

23  that they need help.  And to some extent the judgment of

24  whether someone needs help or not is a judgment about how

25  whether they are in fact in pain or how severe it is whatever

Anderson - direct

234

1   it is that they are suffering.

2           So if you tend to downplay that because you are not

3   desensitized to violence, then you are less likely to help.

4   That is kind of how you get to --

5   Q   Thank you.

6           Doctor, have you personally conducted any experimental

7   studies measuring the relationship between violent video games

8   and aggression?

9   A   Yes, I have.

10  Q   Did you publish a study with Professor Karen Dill in 2000

11  which included an experimental study of this nature?

12  A   Yes.

13  Q   Is that the experiment that Dr. Williams talked about

14  yesterday involving the game Wolfenstein 3D and Myst?

15  A   Yes, that is.

16  Q   Could you explain briefly why you chose those games?

17  A   Yes.  We chose those two games because pre-testing

18  indicated that they were fairly similar on dimensions that are

19  important in testing theories of aggression, that they tended

20  to produce the same amount of arousal as measured by heart rate

21  and blood pressure, tended to be similar in enjoyment and

22  frustration, some of those other kinds of dimensions.

23  Q   Did you find that those were the two most closely matched

24  games?

25  A   Those were the two most closely matched games that we

Anderson - direct

235

1  looked at in the pre-test.

2  Q    Thank you.

3        Have you done any other experiments involving violent

4  video games and aggression?

5  A    Yes, we have done a number of them since that time.

6  Q    Have you done Professor Nicholas Carnagey's?

7  A    Yes.

8  Q    I hand you a copy of Exhibit Number 6, which is a copy of

9  that study, and I would ask you to take a look at it.

10        MR. KASPER:  Your Honor, would you like a copy?

11        THE COURT:  I thought I had one.

12        MR. KASPER:  You have got that one.

13        THE COURT:  I can get rid of the other one.

14        MR. KASPER:  Thank you.

15        THE COURT:  The rule is I always get the first one.

16  BY MR. KASPER:

17  Q    Is that a copy of the study?

18  A    Yes, it is.

19  Q    In that study what games did you select?

20  A    In the first experiment we started off with 10 different

21  games.  We had two goals in that first experiment.  One was to

22  test the idea, the hypothesis, that exposure to violent games

23  would increase the accessibility of aggressive cognitions,

24  aggressive thoughts, and by using multiple examples of violent

25  games and nonviolent games, you basically increase the -- your

Anderson – direct

236

1  ability to generalize to a broader category of games.

2          The second goal of that study then was to try to use

3  some of the ratings data and the heart rate data and so on to

4  select two games that were again similar on theoretically

5  relevant dimensions and different in terms of violent content.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

237

1  Q   And what were the results of that first experiment?

2  A   The main result was that, in fact, exposure to one of the

3  violent games did significantly increase aggressive thoughts or

4  accessibility of aggressive thoughts.  And then the other piece

5  was that we did, in fact, find two games that matched pretty

6  well on a number of dimensions, and those two games were

7  Marathon 2 and Glider Pro.

8  Q   And going back to the first point, the level of aggressive

9  cognition, how did you measure aggressive cognition in that

10 study?

11 A   In that study aggressive cognition was measured by a task

12 called the word completion task.  In that task participants are

13 presented with a list of partially completed words.  So, for

14 example, H blank T.  And then their task is to go through this

15 list and as quickly as possible fill in the blanks to make

16 words, real words, out of each letter string.

17          About half of the -- I don't remember the exact number

18 now.  Half of the words, roughly, could be completed with an

19 aggressive word completion or a nonaggressive completion.  So,

20 H blank T could be hit, it could be hot, hat, hut.

21 Q   And is the word completion a standard measure of aggression

22 in your field?

23 A   It is a measure of -- the word completion task is used as a

24 measure of accessibility of different kinds of thoughts in the

25 cognitive research literature, and this version, using words

238

1   that can be completed with aggressive words, is a standard

2   measure of or would be considered a standard measure of

3   aggressive cognition, accessibility to aggressive cognition.

4   Q    And regarding the second finding involving Marathon 2 and

5   Glider Pro, would you explain that?

6   A    Well, we went through the data that we had gathered in that

7   first study in terms of cardiovascular arousal and ratings in

8   terms of things like enjoyment, how frustrating was the game,

9   things like that, and those two games seemed to match quite

10  well on those dimensions.

11  Q    And you've mentioned a first experiment.  Does that mean

12  there was a second experiment?

13  A    Yes.  The second experiment then used those two games,

14  Marathon 2 and Glider Pro, and basically measured -- you know,

15  had people play one game or another, that is, subjects randomly

16  assigned to play one game or another, and then a short time

17  afterwards were put in a version of what's called the

18  competitive reaction time task, which is frequently used to

19  measure aggressive behavior in a laboratory setting.

20  Q    And how is the aggression measured?

21  A    In this version of the task, participants are led to

22  believe that they're competing against another participant in

23  another room on a reaction time task, a series of reaction time

24  trials, and again in this particular version they're told that

25  there's going to be two different phases to this task.

239

1          In the first phase of 25 trials, if the participant

2    loses a reaction time trial -- in other words, if they respond

3    more slowly than their opponent -- I should point out there is

4    no real opponent here.  This is all computer controlled.  But

5    they're told if they lose to their opponent, they will receive

6    a noise blast over a set of headphones, and the noise blast

7    is -- the amount of noise blast is essentially set by the

8    opponent, that is, again, from the participant's perspective.

9    In fact, it's all set by the computer.

10          So, this goes on for 25 reaction time trials, and then

11    their roles are supposedly reversed, in which the participant

12    now sets a punishment level, essentially, for his or her

13    opponent prior to each trial, and then the opponent supposedly

14    would receive those noise blasts whenever the participant won

15    the trial or the opponent lost the trial.

16    Q    And is the noise blast a standard measure of aggression

17    used in your field?

18    A    Yes, the noise blast has been used quite a bit, and the

19    competitive reaction time procedure actually goes back many,

20    many years and has been used in a wide array of research

21    studies on aggression.

22    Q    And what were the results of experiment two?

23    A    The main result was -- well, I should back up.  One of the

24    other manipulations we did in this study was we had the

25    computer vary the pattern of punishment or noise blast that the

240

1   participant received in those first 25 trials.  In one

2   condition the noise blast pattern increased fairly

3   systematically over the course of the 25 trials.  In the other

4   condition the noise blast pattern was much more ambiguous.  And

5   we had found in some other research that the ambiguous -- we

6   call it the ambiguous provocation condition -- seems to produce

7   both higher levels of aggression, higher levels of noise blast

8   settings, and seems to be a more sensitive measure than the

9   increasing provocation pattern.

10          And then in terms of results, that's pretty much what

11  we found, that is, there was a significant violent video game

12  effect on noise blasts in the ambiguous provocation condition

13  and not in the increasing provocation condition.

14  Q   Did you do a third experiment in that study?

15  A   We did.  We then did a third experiment.  It differed in

16  several important ways.  One was we went back to the standard,

17  the more standard version of the competitive reaction time

18  task.  In the standard version, again from the subject's

19  perspective, both the participant and his or her opponent sets

20  punishment levels for each other on each trial.  So, we no

21  longer have this two-phase kind of thing.  So, that was one

22  change, again, and this is really the more standard version of

23  the competitive reaction time task.

24          We also used four different games in this study, two

25  violent games, two nonviolent games.  We actually used some of

241

1   the editing software that comes with Marathon to modify the

2   game.  So, we basically used mods, in the lingo of the game

3   domain.  We modified Marathon 2 in several ways, the most

4   important one of which is in the original version of the game,

5   you're essentially shooting green-blooded aliens on this space

6   station.  And so, we had that condition still in there, but

7   then we modified it for a second condition in which the

8   green-blooded aliens were replaced with red-blooded more

9   humanlike characters.  So, again, we have two violent game

10  conditions here.

11          And then we also had two nonviolent game conditions,

12  one of which was Glider Pro, as we had used in the second

13  study.  The other was another modification of the Marathon

14  game, and in this version we basically made it a nonviolent

15  version.  We took out all of the people that you might be able

16  to shoot, basically removed them from the game, so there was

17  nothing to shoot, and instead turned the game into more of an

18  exploration game where you had to go from one part of the space

19  station to another part of the space station in order to find

20  oxygen containers and eventually to try to get off the ship

21  before you ran out of oxygen.

22  Q   What were the results of that?

23  A   The results were -- and again I should also point out we

24  only used the ambiguous provocation pattern in the second

25  study, and what we found was essentially to say that those who

Appendix 2 Page 19

242

1   had played a violent video game gave more or higher punishment

2   levels to their opponent than those who played one of the

3   nonviolent games.

4   Q   And you've talked about using the noise blast and the word

5   completion measures of aggression.  Have you used other

6   measures of aggression in your studies?

7   A   Yes.  I should point out that one of the things that some

8   people in the field, including Dr. Williams on occasion, kind

9   of makes -- I don't know if you want to call them verbal

10  mistakes on.  When social psychologists talk about aggression,

11  they very specifically mean aggressive behavior, that is,

12  behavior intended to harm another person.  So, we don't really

13  talk about word completion as a measure of aggression.  It's a

14  measure of aggressive cognition.  And we have used a number of

15  other different measures of aggressive cognition and aggressive

16  affect in different studies.

17  Q   And the noise blast, is that a measure of aggressive

18  behavior?

19  A   Yes, the noise blast is a measure of aggressive behavior.

20  Q   And are you aware of Dr. Goldstein's view that many of

21  these measures of aggression are not valid?

22  A   Yes, I have read some of his comments to that effect.

23  Q   And do you have any response to those?

24  A   Well, the simple and probably the best response is simply

25  that these are well accepted measures by the field.  His views

243

1  have very much a minority view.  These mechanics of aggression

2  have been validated in a number of different ways over the

3  last -- well, over 40 years now, I believe, the competitive

4  reaction time task has been used.

5          THE COURT:  When you say validated, what do you mean?

6          THE WITNESS:  There's several ways of validating such

7  measures.  One way is to see whether variables that seem to

8  influence aggression in the real world also influence responses

9  to these laboratory measures.

10         So, for example, is it the case that people, whether

11  it's at sort of adolescent age or adults, who are known to be

12  highly aggressive individuals, either because they're in, for

13  example, juvenile facilities or have been diagnosed as having

14  an identified aggression kind of problem, do they tend to

15  behave more aggressively in these laboratory settings using

16  these laboratory tasks.  So, that's one way of doing it.  And

17  the answer is yes, they do.

18         Another way is to look at whether certain kinds of

19  situational variables that we know produce or lead to an

20  increased likelihood of aggression in the real world, do they

21  also do so with these laboratory tasks.  So, does provocation

22  of some kind tend to lead to an increase in aggression on these

23  lab measures, and the answer is yes, they do.

24         Another way that such validation is done is to see

25  whether very different kinds of laboratory measures of

1  aggression themselves tend to yield the same kinds of effects,

2  and there are some nice, actually, meta-analytic studies of

3  this kind done by Norman Miller's group out at UNC that show,

4  in fact, that some of these verbal measures or some of the

5  written measures of aggression that have been used in electric

6  shocks, noise blasts, things like that, do tend to yield the

7  same kinds of effects, actually to a great extent.

8  BY MR. KASPER:

9  Q   And did you understand Dr. Williams' testimony yesterday

10  that he agreed with you regarding the acceptability of these

11  measures of aggression?

12  A   Yes.  I mean, my understanding is that he basically takes a

13  pretty mainstream view that these are well validated and widely

14  accepted measures.

15  Q   Okay.  Now I want to talk to you about the question of

16  controlling.  When you say to control something in an

17  experiment, what do you mean by that?

18  A   A couple ways of controlling for a variable that you, in

19  essence, either want to equate entirely or at least

20  statistically control for it.  So, for example, in terms of

21  arousal, which has been talked a lot about, if one is

22  interested in testing the hypothesis that violent video games

23  can increase aggressive behavior by increasing aggressive

24  cognition, then under those circumstances you would want to

25  control for arousal because under some circumstances heightened

245

1   arousal can lead to increases in aggressive behavior.

2          I should also point out, though, if, in fact, one has

3   a different hypothesis that one wants to test -- and my

4   research group hasn't done this because we're not as interested

5   in it for theoretical reasons, but one could also ask whether

6   or not arousal, say produced by a violent video game or

7   produced by a nonviolent video game, for that matter, can

8   arousal produced by any kind of a game increase aggressive

9   behavior, and in that case you wouldn't want to control

10  arousal, but, in fact, you'd want to control other factors such

11  as possibly aggressive thinking.

12  Q   So, why do you control for arousal specifically in the

13  violent video game area?

14  A   My colleagues and I have been primarily interested in what

15  we call the cognitive route to aggression, mainly because of an

16  assumption on our part that the cognitive route is the one

17  that's most likely to have long lasting effects with repeated

18  exposure, that is, the cognitive route is the one where we

19  would expect learning type effects, development of particular

20  kinds of knowledge structures, and so on.

21         For the most part, we tend to think that arousal

22  produced by playing a violent video game is likely to dissipate

23  relatively quickly after one ceases playing the game,

24  relatively quickly meaning within a half hour or so, and we

25  don't think that there's going to be a big in some sense

1  learning piece having to do with arousal.

2          I should point out, however, there are some medical

3  people who are a little bit concerned about the arousal aspect,

4  but that's outside my area of expertise.

5  Q   And do you also control for something called trait

6  hostility and, if so, why?

7  A   In a number of these studies, we have also measured trait

8  hostility, or trait aggressiveness sometimes is the label that

9  gets used, and we do that for a couple of reasons.  One is to

10  be able to control for -- because we know that trait

11  aggressiveness is, in fact, related to aggressive behavior.  I

12  mean, in some sense that's why it's called trait

13  aggressiveness, and we know that that's related to aggressive

14  behavior very often, at least, in laboratory studies.  So,

15  that's kind of one reason.

16          Another reason is to give you the ability to see

17  whether or not the experimental manipulations, for example, of

18  playing a violent or nonviolent video game, whether that

19  violent video game effect is the same for people who score low

20  on trait aggressiveness as it is for those who score high on

21  trait aggressiveness, or is one sort of end of that continuum

22  in some sense more susceptible to these kinds of effects.

23  Q   Dr. Anderson, have you reviewed the other experimental

24  research by other people in this field?

25  A   Yes.  There are a number of experimental studies done by a

247

1   variety of people.  Eric Ullman at Yale has done a study in

2   which he looked at what I would call aggressive cognitions as a

3   result of playing a violent or nonviolent video game and found

4   an increase.

5   Q   And are the results generally consistent with --

6   A   The results are generally consistent across these studies.

7   Q   Okay.  Thank you.

8           And moving on to this notion of correlational studies,

9   what's the value of a correlational study that Dr. Williams

10  talked about yesterday?

11  A   That's a good question, and the answer is perhaps a little

12  more complicated than what Dr. Williams indicated.  I mean, he

13  was right to a large degree, but not quite complete.

14          One of the things that's very important in any science

15  is the development and testing of theoretical models of

16  whatever it is the underlying phenomenon is.  The value of

17  theoretical knowledge -- well, in fact, one of the often

18  considered founding fathers of social psychology, a guy named

19  Kurt Lewin, put it very succinctly when he said there's nothing

20  so practical as a good theory, and by a good theory he means

21  one that has been tested, revised, you know, is consistent with

22  data.

23          And theories are basically causal in nature, and the

24  reason they're so practical or useful is because they give you

25  ideas about how to change things in some way in the environment

248

1  that might produce a desired change in whatever problem that

2  you're looking at.  And a good theory also tells you or at

3  least gives you a fairly good idea of what kinds of proposed

4  change programs are unlikely to work.

5         So, for example, we know that Head Start programs

6  work, and the founding of Head Start programs was based on an

7  awful lot of research by a lot of people, and we know that they

8  work.  We know that midnight basketball programs to reduce

9  violent crime in the inner city don't really work, and we could

10  have known that had people looked at the research before.

11  Again, theoretical models about aggression and crime and so on.

12         So, what I'm getting at is then what we're really

13  interested in doing is testing theoretical models and

14  developing them, and correlational studies play an integral

15  role in that, and they play an integral role in several ways.

16  One, they allow you to see whether or not your predictor

17  variables, the variables you think are causal, actually relate

18  to real world measures of aggression, things that you cannot do

19  in the lab.  Obviously, we cannot run laboratory studies where

20  people actually get into fist fights, but we can use

21  correlational studies and measure such in more extreme types of

22  aggressive behavior.

23         Correlational studies also provide the opportunity for

24  a theory to be falsified, and that's very important because if

25  a theory is not falsifiable, it isn't a scientific theory, and,

249

1  in fact, that is to some extent the crux of some of the debate

2  involving intelligent design and teaching intelligent design in

3  biology classrooms.

4          THE COURT:  What do you mean by falsified, can it be

5  falsified?  What does that mean?

6          THE WITNESS:  To be falsifiable means that you can, in

7  fact, gather data that show that the theory or some aspect of

8  the theory is incorrect.  So, in this context if, in fact, we

9  ran a bunch of correlational studies looking at violent video

10  game exposure and some other kind of measure of aggression, if

11  those correlational studies tended to find no relationship,

12  then that would suggest either that there's something wrong

13  with the theory or that there's something wrong with one's

14  measures, and, of course, one typically -- you know, in the

15  early stages of a research program, you're never sure which is

16  which.  So, that's what falsifiability has to do with.

17  BY MR. KASPER:

18  Q   And Dr. Williams indicated yesterday that correlational

19  studies cannot prove causation.  What do you have to say in

20  response to that?

21  A   Well, first of all, we don't in science circles typically

22  talk about proving unless we're writing for a more general

23  audience, but, you know, sometimes that word slips out in --

24  actually, in all of our writings from time to time.

25          It's certainly the case that no single study -- and

250

1   this is true whether an experiment or a correlational study --

2   can definitively answer questions about big phenomenon, complex

3   phenomenon.  But one of the other things that correlational

4   studies can do for you is that they allow you to test plausible

5   alternative explanations.  And as you might recall from

6   Dr. Williams' presentation yesterday, that actually is one of

7   the criteria that he wanted to talk about as being important,

8   an important function of research, and establishing causality

9   is can you rule out plausible alternative explanations.

10          So, for example, in the video game violence domain,

11   one plausible alternative explanation for the observed

12   correlation between violent video game exposure and aggression

13   is that kids who play or people who play a lot of violent video

14   games also just in general are spending a lot of time in front

15   of a screen, whether it's a television screen or a computer

16   screen, and that time spent in front of a screen reduces one's

17   opportunities to learn social skills in that over time that can

18   lead to more aggression problems in the real world.

19          But one can test that alternative explanation by

20   measuring something like total screen time and measuring video

21   game violence exposure and measuring aggressive behavior and

22   see whether the correlation between violent video game exposure

23   and aggression disappears when you statistically control for

24   total screen time.

25

Anderson - direct

1  Q    Have you been involved in any correlational studies

2  yourself?

3  A    Yes, we have done a number of correlational studies.

4  Q    Did you do one with Karen Dill in 2000?

5  A    Yes, we did.

6  Q    What measure of aggression did you use in that study?

7  A    We had several, but one of -- the main one was a measure of

8  basically delinquency taken from the criminology literature.

9  We took items from what is called the National Youth Survey and

10 selected items that had an aggressive component to it.

11        The National Youth Survey is a big, big scale that

12 includes items about drug use and all sorts of other kinds of

13 things.  We took 10 items from that scale that had an

14 aggressive component to them.

15 Q    What were your findings?

16 A    What we found was that -- we found that participants who

17 reported higher level --

18        Basically we found a strong positive correlation

19 between violent video game exposure and aggressive behavior on

20 this measure.

21 Q    Have you reviewed the other research in the correlational

22 area, in this area as well?

23 A    Yes.  There are a number of correlational studies done,

24 again, by a number of research teams.

25 Q    I am going to hand you what has been marked as Exhibit

Anderson - direct
                                                                    252

1  Number 7, which is an article by Doug Gentile.  Do you

2  recognize this article, Doctor?

3  A    Yes, I do.

4  Q    In particular, I would like to direct your attention to

5  page 146 of that study chart --

6  A    Yes.

7  Q    -- entitled "Playing Violent Video Games Makes a

8  Difference."

9         Can you explain that chart?

10 A    Yes.  This is a study that Doug Gentile ran, and I believe

11 it's the one that was published in 2004, I believe, but we

12 reproduced this one figure in this book chapter.

13        Basically what happened in this study was a number of

14 measures.  This was a correlational study, a cross-sectional

15 correlational study, in which we -- I shouldn't say "we"

16 because I wasn't involved in this study -- in which Dr. Gentile

17 and his associates measured violent video game play; that is,

18 exposure to violent video games and a measure of trait

19 hostility or, again, sort of trait aggression and also measured

20 whether or not these students had been in a fight, I believe it

21 was in like the last six months or the last year.  I don't

22 remember specifically.

23 Q    What were the findings there?

24 A    The basic findings were that for both low hostility

25 individuals and high hostility individuals, the likelihood of

Anderson – direct

253

1 being in a physical fight was much higher if one scored high on

2 this measure of violent video game exposure.

3 Q    Thank you.  Are you familiar with the concept of

4 longitudinal study, and what do longitudinal studies help

5 resolve?

6 A    Longitudinal studies are useful in -- basically you can

7 sort of think of them as the third leg of a three-legged stool

8 with experimental studies and correlational studies being the

9 other two.

10       The longitudinal studies allow you to see whether or

11 not a variable measured at one point in time can predict

12 another variable measured at a later point in time while

13 controlling for a number of other factors.

14       In other words, it's another way of looking at

15 alternative explanations.  It allows somewhat stronger causal

16 conclusions than their typical correlational study.

17 Q    Are you aware of any longitudinal studies in the area of

18 video games?

19 A    At this point, as far as I know of, there are three, two of

20 which are not terribly clear for methodological reasons.

21       One was done by Slater.  I believe it came out in

22 about 2003.  In that study they measured exposure to violent

23 video games and violent television and violent movies and kind

24 of lumped it all together.  And they did find that media

25 violence over the course of that study, media violence at time

Anderson - direct

254

1  one did predict aggression at time two even after controlling

2  for sort of aggressiveness in time one and controlling for some

3  other factors as well.

4         But it is not -- it's not clean in the sense that the

5  video game measure -- there wasn't a -- video games were lumped

6  together with t.v. violence exposure as well.

7         A second longitudinal study that I know about was done

8  in Japan by a group of people.  The first author's name, I

9  believe, was Ihori.  I think it's I-h-o-r-i.

10        And in their study they focused on video games, but

11 they did not distinguish between violent -- you know, exposure

12 to violent video games versus sort of exposure to video games

13 in general.  They just had sort of the more general measure.

14        We know from other studies that that kind of a measure

15 is not as good a predictor of aggressive behavior as a more

16 pure measure of violent video game exposure.  Again, they found

17 a small but significant longitudinal effect.

18 Q   Okay.

19        THE COURT:  You said there were three.  What is the

20 third one?

21        THE WITNESS:  The third one is a currently unpublished

22 study that Doug Gentile and his colleagues ran.  It is going to

23 appear eventually in a book.  We just recently signed a

24 contract with Oxford University Press to have this published.

25 There is actually a couple other studies in that, what will be

Anderson – direct

255

1  that book.

2              That was a study of third-, fourth- and fifth-graders.

3              THE COURT:  That was the one that was mentioned.

4              THE WITNESS:  This was the one that Dr. Williams

5  discussed.

6              THE COURT:  Thanks.

7  BY MR. KASPER:

8  Q   Getting to that, the one involving the third-, fourth- and

9  fifth-graders, Dr. Williams claimed that third-, fourth- and

10  fifth-graders would not be able to accurately complete the

11  self-report test regarding the level of violence in video

12  games.

13             What do you have to say in response to that?

14  A   Well, I suspect that he has not run third-, fourth- and

15  fifth-graders in research.  In fact, you can, and Dr. Gentile

16  did so successfully and was able to get usable measures.

17  Q   His next criticism involved the reliability factor.  What

18  is that?

19  A   Typically when you construct a scale, let's say a scale

20  designed to measure a trait like trait aggression, you create a

21  number of statements, a number of items, each of which is

22  designed to measure this underlying trait.

23             THE COURT:  Pardon me.  That's starting to get

24  annoying.

25             (Brief interruption.)

Anderson - direct

256

1        THE COURT:  Go ahead.

2        THE WITNESS:  Typically you get a more accurate

3  measure of whatever it is you are measuring, say, trait

4  aggression, if you have more items.

5        Now, there are limits to that.  I mean, at some point

6  the items get so redundant that you don't need more.

7        The concept of reliability, he is actually referring

8  to a statistical concept called coefficient alpha.  And

9  basically what coefficient alpha is is if you took each item

10  from a scale and correlated it with the average of the other

11  items on the scale and then did that repeatedly and then

12  averaged those correlations, that is essentially -- it is not

13  quite mathematically what happens, but that is essentially --

14  conceptually that is what coefficient alpha is.

15        The idea is that if, in fact, all these items are

16  measuring the same thing, that number should be relatively

17  higher, or at least you hope that it will be relatively high.

18  Q   The reliability factor is point .68 according to

19  Dr. Williams?

20  A   On the video game violence exposure measure, the

21  reliability estimate was .68.

22  Q   Is that an acceptable reliability factor?

23  A   That is, in fact, considered acceptable.  You will see

24  publications with that in top journals.  It would be nice if it

25  was bigger but --

Anderson – direct

257

1  Q    What is the impact of a lower reliability?

2  A    The impact of having a lower reliability scale is that in

3  order to find a true underlying correlation with something

4  else, you have to have a bigger sample size.  And the reason

5  for that is basically when the internal reliability or the

6  coefficient alpha, as it goes down, you tend to get smaller and

7  smaller effect sizes.

8  Q    Dr. Williams' next criticism of that study was he used the

9  phrase that he looked at video games writ large rather than a

10  single game.

11        What do you say in response to that?

12  A    I am not sure what that means.  I mean, generally speaking,

13  the more versions of whatever kind of stimulus you are looking

14  at gets sampled, the general feeling is the more you can

15  generalize to other domains or other sort of stimulus samples.

16        And in a longitudinal study, of course you are going

17  to be looking at whatever games kids play.  It's not an

18  experimental study where you, as a researcher, control that.

19  So I don't see that as a criticism.  I don't understand.

20  Q    Then he went on to talk about the percentage of variance,

21  the 1, 2 and the 3.6 percentage of variance.

22        Could you briefly explain that?

23  A    Yes.  Well, in fact, you can translate those into something

24  that looks like effect sizes.

25  Q    So, for example, the 3.6, which I believe was the measure

Anderson – direct

1  of physical aggression, could you translate that?

2  A    Yes.  That is roughly the same as an effect size in

3  correlation terms of .19.

4  Q    What type of effect size is that?

5  A    That effect size is as big as most factors that have been

6  identified as being risk factors for aggression in adolescents

7  and youth.  So that is actually bigger than the effect size

8  reported at least in one surgeon general's report.

9         That is bigger than the effect size reported for

10  things like having abusive parents, coming from a broken home,

11  things like that.

12        The only one in that particular list, the only risk

13  factor that was identified as being a lot bigger was gang

14  membership.  So it is a sizable effect.

15  Q    I am going to hand you what has been marked as Defendants'

16  Exhibit Number 8 and ask if you could tell me if you recognize

17  this.  This is another one of the studies.

18        Can you tell us what that is?

19        THE COURT:  I tell you what, before we get into this,

20  let's take a 10-minute break at this point.

21     (Brief recess.)

22        THE COURT:  Go ahead.

23  BY MR. KASPER:

24  Q    Dr. Anderson, we had just left off with Exhibit Number 8.

25  Would you turn your attention to page 235 of that exhibit,

Anderson - direct
259

1  please?

2  A    Yes.

3  Q    Do you see that chart?

4  A    Yes, I do.

5  Q    Would you please explain that?

6  A    Yes.  This is an illustration of --

7         THE COURT:  First of all, what is this?  This is a

8  chapter from what book?

9         THE WITNESS:  It's a book that has not yet appeared.

10        THE COURT:  That is what I was trying to figure out.

11 It is about to be published.

12        THE WITNESS:  It's about to be published.

13        THE COURT:  Go ahead.

14        THE WITNESS:  That is what they tell us, any day.

15        THE COURT:  235 was the page?

16        MR. KASPER:  Yes, page 235, your Honor.

17 BY MR. KASPER:

18 Q    Would you please explain that chart, Dr. Anderson?

19 A    Yes.  This chart illustrates from this longitudinal study

20 the effect of violent video game exposure on likelihood of

21 being in a fight as measured at time two, controlling for

22 whether or not people were in a fight at time -- had been in a

23 fight as measured at time one, controlling for -- the HA refers

24 to hostile attribution bias -- and controlling for whether they

25 are male or female.

Anderson - direct

260

1          What we see, for example, the white bar -- the two

2     white bars -- one that is labeled 18 percent, the other is

3     labeled 36 percent -- shows that, again, controlling for these

4     other -- or actually, for low hostile attribution bias, females

5     who did not report being in a fight at time one.  The

6     likelihood of reporting a fight at time two was higher for

7     those who reported playing a lot of violent video games.

8          You can see that there is an increase for each of the

9     four separate groups in that figure.

10   Q    Thank you.  Moving on to the area --

11         THE COURT:  Pause.  Hang on.  I just want to make sure

12    I am absorbing this here.

13         So what you are doing here -- I am looking at this

14    same chart.  If you look at the column that is to the left or

15    the graph column that is to the left in both sets, on the

16    left-hand side what that basically says is that 18 percent of

17    the females who had not previously been in a fight and had a

18    low HA, hostile attribution bias --

19         THE WITNESS:  Right.

20         THE COURT:  And that's the thing about assuming

21    somebody is bumping into you and did it on purpose.

22         THE WITNESS:  Right.

23         THE COURT:  18 percent of them were in a fight

24    later --

25         THE WITNESS:  Yes.

Anderson - direct

261

1          THE COURT:  -- as compared to 36 percent of the people

2     in that same category where the only difference was that they

3     had a high violent video game exposure?

4          THE WITNESS:  Right.

5          I should point out now, you see in the figures this

6     predicted likelihood.  It is predicted from the statistical

7     model.  So, in other words, the statistical model that found

8     significant violent video game effects --

9          THE COURT:  I see.  In other words, we are not talking

10    about somebody saying, "okay, I was never in a fight before,

11    then I played all these all violent video games and then I was

12    in a fight;" you're taking a statistical model that comes from

13    other studies and trying --

14         THE WITNESS:  No, no, a statistical model from these

15    data.

16         THE COURT:  From the data.

17         THE WITNESS:  In the model.  Basically the regression

18    model would have sex in the model.  It would have all these

19    other things.

20         THE COURT:  Right.

21         THE WITNESS:  And that is a common way of trying to

22    illustrate fairly complicated findings.

23         THE COURT:  Okay.   All right, thanks.

24    BY MR. KASPER:

25    Q   Moving on, Dr. Anderson, to the meta-analysis area, have

Anderson - direct

1  you ever done a meta-analysis involving video games?

2  A    Yes, I have.

3  Q    And when did you do your first meta-analysis?

4  A    The first one was published in 2001 with Brad Bushman, who

5  is now at the University of Michigan.

6  Q    Again, Dr. Williams talked about this briefly, but can you

7  just very briefly describe the meta-analysis?

8  A    Yes.  Basically meta-analysis is a set of statistical

9  procedures used to combine the results of studies of, let's

10  say, the same hypothesis, so that you can get an overall view

11  of what does this research literature in general tend to show

12  us.

13  Q    What were the results of your 2001 meta-analysis?

14  A    The 2001 meta-analysis found that exposure to violent video

15  games was associated with increases in aggressive behavior,

16  aggressive thinking or cognitions, aggressive affect and

17  physiological arousal and was also associated with a decrease

18  in pro social behavior.

19  Q    Have you done any other meta-analyses?

20  A    Yes.

21  Q    When was the next one?

22  A    The next one would have been published in 2003.

23  Q    What was the difference between the second one and the

24  first one?

25  A    One of the things in the 2003 meta-analysis that we did --

Anderson – direct

263

1        Well, first of all, there were a few more studies

2   added because a few more studies had come out.  And, in

3   addition, we did a separate breakdown of studies that used

4   participants, I believe it was 18-years-old or younger.

5   Q   What was your finding in the 2003 meta-analysis?

6   A   As I recall, we had essentially the same findings.  If I

7   remember right, there weren't enough studies of physiological

8   arousal that had used younger populations.

9        But the other four effects were essentially the same

10  as in the 2001 meta-analysis.

11  Q   Have you done any other meta-analyses?

12  A   We have in 2004 published an updated meta-analysis.

13  Q   What was the difference between the 2004 and the 2003

14  version?

15  A   One of the key differences is that we went in and

16  identified what we call best practices or violations of best

17  practices in this area and then calculated average effect

18  sizes, basically meta-analysis, for studies that are considered

19  best practices studies versus those that had at least one of

20  these kind of not best practices features.

21  Q   What are some of the best practices?

22  A   One of the best practices features involves, particularly

23  like in correlational studies, using a measure of time spent

24  playing any kind of video game as a predictor variable instead

25  of something that more specifically focused on video game

Anderson – direct

1  violence exposure.

2  Q    What were the results of that meta-analysis?

3  A    The results were essentially that, when you combine all the

4  studies, that you get significant effects, the same five

5  significant effects, but that those effect sizes are somewhat

6  larger in the best practices studies than they are in the not

7  best practices studies.

8  Q    Yesterday we heard a lot about Dr. Williams' study.  Are

9  you familiar with his study?

10  A    Yes, I am.

11  Q    What were his findings?

12  A    His basic finding was no appreciable change in arguments

13  over the course of this -- over this one-month study as a

14  function of playing what was Asheron's Call 2.

15  Q    Were you surprised by those findings?

16  A    No, not at all, not once I read the methodology.

17  Q    Why not?

18  A    There are a number of problems with that study, one of

19  which is the age, you know, the average age of 27.  You know,

20  would you really expect major changes in personality

21  essentially involving fights and whatnot to occur after playing

22  a violent game for one month?

23         Another problem is all of these participants, or at

24  least it looked like all of these participants, certainly a

25  huge portion of them, are very experienced computer users and

Anderson - direct

265

1   gamers.  I mean, they were recruited to a great extent from

2   gaming sites.

3           The control group was not given a nonviolent game to

4   play, and as a consequence, we don't know whether or not those

5   in the Asheron's Call condition, we don't know whether they

6   actually spent more hours playing a violent game during that

7   one-month period than how much time they normally spent playing

8   violent games, say, in the month prior or whether they spent

9   more time playing violent games during that one-month period

10  than participants in the control condition spent on playing

11  maybe even more violent games because we don't really know what

12  they did.

13          So we don't know whether or not -- I mean, the real

14  advantage of an experimental manipulation typically is that you

15  have control over the independent variable.  You know what your

16  subjects are getting in terms of violent video game exposure.

17  We don't know what they got here.

18          Furthermore, in the Asheron's Call condition, we had

19  something like 30 some percent played fewer than five hours a

20  week.  Actually there was a group that didn't play at all and

21  were dropped from the study.  One apparently played almost as

22  much as 300 hours.

23          Again, the advantage of experimental control kind of

24  disappeared.

25  Q   What was the measure of aggression that Dr. Williams --

Anderson - direct

266

 1  A    Well, actually let me --

 2         There is one more big problem I want to mention and it

 3  was discussed a little bit in Dr. Williams' testimony, but the

 4  subject attrition rate was huge.  Something like almost 60

 5  percent, at least in terms of the dissertation, dropped out of

 6  the control condition.

 7         I believe he reported something on the order of 25 or

 8  30 percent, in the paper itself, or the article itself, dropped

 9  out, and a big portion dropped out of the treatment condition.

10  Q    Why is that a problem?

11  A    That is a problem in that --

12         Again, the reason you do random assignment is to,

13  using sort of law as a probability, create groups that are

14  likely to be equivalent on average on all kinds of dimensions

15  that you have not measured.

16         But once you start allowing a large portion of people

17  who are randomly assigned to one condition or another, you no

18  longer have a true experimental study.  You don't know that the

19  people who dropped out of one condition are the same kinds of

20  people than the people who dropped out of another condition.

21         Now, he did a good job in trying to do T-tests on

22  those things that he had measured, and that is very

23  commendable, but the problem is there are things that you have

24  not measured.

25  Q    What about the measure of aggression?

Anderson – direct

267

1  A    The measure of aggression is suspect in a couple of ways.

2  One is that measurement of argument is essentially a measure of

3  verbal aggression.  At least that is how it would usually be

4  coded in the research literature.

5           And video games typically, for the most part, are

6  modeling physical aggression.  And as we have seen in some of

7  the correlational studies, violent video game exposure tends to

8  correlate better with measures of physical aggression than with

9  measures of verbal aggression.  So the measure itself is a

10  little bit strange.

11           Using whether or not you had a fight in the last month

12  creates somewhat of a problem, not insurmountable, in some

13  ways, but basically people who had reported that they had been

14  in an argument at time one could not show an increase in

15  aggression across time no matter what.  I mean, the most they

16  could do at time two was show that they had another argument.

17           Similarly, we know one of the other measures, argument

18  with a spouse, boyfriend, whatever, but we don't know what

19  portion of the subjects didn't have a spouse, boyfriend,

20  significant other, girlfriend, I mean, whatever the measure

21  was.

22           I guess I would also like to point out that this

23  argument, this whole bit about reliability of measures, you can

24  -- in this dissertation, you essentially have two measures of

25  aggression, and this was arguments with friends, arguments with

Anderson - direct

268

1  boyfriend and girlfriend, whatever.  Those two measures

2  themselves, as reported in the article, only correlated with

3  each other .22.

4          So if you were to think about that in terms of a

5  scale, that reliability -- I mean, that is essentially a

6  reliability estimate -- is considerably lower than what

7  Dr. Williams was saying was minimal for using a scale.

8  Q   And another thing Dr. Williams relied upon talking about

9  these mathematics is the meta-analysis by Dr. Sherry.

10          Could you tell us about that meta-analysis and in

11  particular with relation to the Hoffman and Ballard studies

12  that Dr. Williams talked about?

13  A   Yes.  One of the things that Sherry reported and

14  Dr. Williams also talked about to some extent was this idea

15  that, in experimental studies, there seemed to be a negative

16  relationship between amount of time spent playing a game and

17  effect size on some measure of aggression or aggression-related

18  variables.  And, in particular, they talked about -- focused on

19  two studies.  One was a Hoffman dissertation, the other was, I

20  believe, Ballard and Weist, or Weist, W-e-i-s-t, I believe,

21  both of which used mortal combat as the violent video game.

22          Hoffman had the participants play for 75 minutes, I

23  believe, and, according to Sherry, reported an effect size of

24  something like .05 whereas Ballard had participants play I

25  believe it was 10 minutes or so and reported a much larger

Anderson – direct

269

1  effect size.

2          Now, both those studies also used I believe it was the

3  Buss Durke hostility inventory as their measure.  But if you go

4  back to the original Hoffman dissertation, it turns out that

5  Hoffman had 64 total participants, but half of those

6  participants were observers; that is, they did not actually

7  play a video game.  But the effect size that Sherry reports

8  reports using all 64.  And what we really want to look at is

9  those participants who played the game.

10          And so we went back, or I went back -- and actually I

11  didn't go back.  I mean, I did this when we did the original

12  meta-analysis and estimated effect sizes or the effect size

13  using players and just using the Buss Durke hostility

14  inventory.  It is not clear what Sherry used.

15  Q   When you say you went back, do you mean you went back in

16  2001?  In 2001 you are talking about with your Bushman

17  meta-analysis?

18  A   I believe that was when, yes.

19          And the effect size that we came up with -- again,

20  there's a couple ways of doing that, but the effect size on

21  Buss Durke inventory was somewhere around .28 to about .36,

22  much bigger and within the normal range than one would expect

23  here.

24          Then there is a third real problem with comparing

25  these two studies and perhaps is maybe the biggest problem of

Anderson - direct

270

1  all is that, again, these are experimental studies, subjects

2  randomly assigned to play a violent game or a nonviolent game.

3  So the effect size depends not only on the characteristics of

4  the violent game, but also on the characteristics of the

5  nonviolent game.

6          They used two very different nonviolent games.  The

7  game that Hoffman used, Sonic 2, actually has some aggressive

8  behavior in it whereas the game that Ballard and Weist used was

9  a game call Corner Pocket that is basically a billiards game.

10  So the studies really aren't comparable at all.

11          And, realistically, if you really want to know what

12  the time course is, what are the time effects, the way to do it

13  is not by comparing studies in some kind of meta-analysis that

14  way because the methods are different, the subject populations

15  are different and so on; the right way to do that is to do a

16  study where you randomly assign people to play either a violent

17  or nonviolent game, and then you have some of them randomly

18  assigned to play the game for 10 minutes and some for 20 and

19  some for 30 and so on.

20  Q   Okay.

21  A   That study hasn't been done.

22  Q   Dr. Anderson, in your opinion, are there characteristics of

23  violent video games that differentiate them from television?

24  A   Yes, there are, and actually Dr. Williams, I believe,

25  talked a little bit about them.

Anderson - direct

271

1          One of the big differences is that in a violent video

2    game, you have to identify with the violent -- with one of the

3    violent characters; that is, the character that you control.

4    You in some sense become that character.  And that is a little

5    bit different from what happens when watching a t.v. show, not

6    to say that people don't identify with characters, but they

7    don't have to.  They don't become that person.

8    Q   Do you rely on any research in making that study?

9    A   Pardon?

10   Q   Do you rely on any research or any authority in making that

11   statement about the identification?

12   A   There is research showing that, in the television violence

13   literature, that children who identify more strongly with

14   aggressive characters tend to show bigger effects of television

15   violence across time.

16   Q   Are there any other characteristics of video games?

17   A   One is, in a video game, as an active participant as

18   opposed to a passive participant.

19   Q   What do you mean by that?

20   A   By that you basically are determining the course of the

21   game.  Again, this gets back to you're looking for threats and

22   deciding how to deal with them and deciding how to accomplish

23   whatever goals you have in the game.

24   Q   Are there any others?

25   A   You also get to, or have to, rehearse sort of the entire

Anderson - direct

1  aggression sequence.

2  Q    What do you mean by that, the entire aggression sequence?

3  A    That goes back to this idea that you are perceptually sort

4  of looking for sources of threat or enemies and making

5  decisions about how to deal with it and then actually carrying

6  out that action.

7  Q    How does that relate to this chart here?

8  A    In a sense what you are really doing is sort of a virtual

9  social encounter.  You are practicing all the pieces in the

10 computer world, but you're practicing social behaviors or anti-

11 social behaviors and the decision processes and so on that go

12 along with it.

13 Q    Dr. Anderson, would you please summarize your professional

14 opinion on the effects of violent video game exposure on

15 aggression?

16 A    Yes.  Based on all the research literature, based on other

17 theories and data involving personality, cognitive development,

18 and so on, it is my opinion that in fact -- and based on the

19 t.v. movie violence literature as well, that exposure to

20 violent video games increases aggression, increases aggressive

21 thoughts, increases aggressive affect.  I am less concerned

22 about increases in physiological arousal, but in terms of the

23 pieces that matter to this case, those are my conclusions.

24 Q    You have used the term "effect size" throughout your

25 testimony.  In terms of the effect size of video game violence

Anderson - direct

273

1  exposure on aggression, how does that translate into sort of

2  the real world for comparison?

3  A   You know, that is always a difficult question.  We do know

4  that the effect size is bigger in the media violence literature

5  in general, as well as what has come out of the meta-analyses

6  on video game effects, that the effect sizes are bigger than,

7  for instance, the effect of asbestos exposure on larynx cancer.

8  It's bigger than the effect of second-hand tobacco smoke in the

9  workplace on cancer.  It's smaller than the effect of tobacco

10 smoking on lung cancer.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

274

1   Q    Thank you.  Have you reviewed the findings of the

2   legislation at issue in this case?

3   A    Yes, I have.

4   Q    And in your opinion are those findings supported by the

5   research and authority in your field?

6   A    Yes, they are supported.

7   Q    Thank you.

8            MR. KASPER:  Nothing further.

9            THE COURT:  Mr. Smith.

10                     CROSS EXAMINATION

11  BY MR. SMITH:

12  Q    Good morning, Professor.

13  A    Good morning.

14  Q    I want to begin, if I might, by just being clear about the

15  particular effects that you are pointing to here so we can

16  understand that.

17           You mentioned I think in your summary that video game

18  exposure causes aggressive thoughts and aggressive feelings and

19  aggressive behavior, putting aside the issue of physiological

20  arousal.  Those thoughts and feelings are short term phenomena?

21  A    My judgment is, again, based on both the TV literature and

22  existing video game literature, that it's reasonable to

23  conclude that those are going to be longer term effects, as

24  well.

25  Q    Well, do you have your declaration in this case in front of

275

1  you by any chance?

2  A    No.

3  Q    Handing you a copy of your declaration submitted to the

4  court in support of the motion and asking you to refer to

5  paragraph 12 at the bottom of Page 4, you've just listed short

6  term effects of exposure to video games there, right?  Do you

7  see the four bullet points?

8          MR. SMITH:  Would you like us to get another copy,

9  your Honor?  I think we probably have one.

10          THE COURT:  I think I've got it right here.  What

11  page?  I've got it right here.  It's Tab 1 in the response.

12  Which paragraph?

13          MR. SMITH:  I'm looking at paragraphs 11 and 12.

14  BY MR. SMITH:

15  Q    You've just listed four of what you call short term effects

16  of most relevance to this case.  Do you see that?

17  A    Um-hm.

18  Q    And then you say, "It is generally believed by media

19  violence researchers that the last three of these four short

20  term effects of exposure usually dissipate fairly quickly."

21  And those three are an increase in aggressive behavior, an

22  increase in aggressive thinking, and an increase in aggressive

23  emotions.

24          So, it is true, is it not, that your belief is that

25  aggressive thinking and aggressive emotions triggered by

1  exposure dissipate fairly quickly?

2  A    No.  This section specifically refers to short term

3  effects.

4  Q    Okay.  Let's turn over then to the next section, which

5  refers to the long term effects.  That would be paragraph 14.

6  And you say there that the most relevant long term effects of

7  repeated exposure to violent media are an increase in

8  aggressive behavior, an increase in positive attitudes,

9  beliefs, and thought processes, and a reduction of normal

10 inhibitions against aggression; is that right?

11 A    Yes.

12 Q    Okay.  So, now, we understand the increase in aggressive

13 behavior.  The other two are effectively mechanisms that lead

14 to an increase of aggressive behavior?  Is that fair to say?

15 A    Yes.

16 Q    And essentially what those are are part of your model over

17 here, the part that reflected how exposure to particular media

18 lead to a more aggressive set of attitudes or beliefs or

19 perceptions about the word, right?

20 A    Yes.

21 Q    Okay.  So, just so I understand it, ultimately all of that

22 part of your testimony, in terms of attitudes and beliefs and

23 perceptions, effectively those are all things which you

24 ultimately say are harmful because those ways of thinking and

25 feeling lead to aggressive behavior; is that right?

277

1    A    Yes and no.  Yes in the sense that they are what seems to

2    lead to increases in aggressive behavior.  What's less -- I

3    guess the part that I wouldn't necessarily agree with is

4    whether or not that's the only harm.

5    Q    I guess that's what I'm trying to isolate, if I could, so

6    we know what's at stake here, Professor.

7              Is there some long term serious effect of playing

8    video games other than this behavioral effect which you're

9    telling us about that the court should be taking into account?

10   A    If, in fact, one views thinking of the world in a more

11   aggressive kind of way as harmful and getting into more fights,

12   what does that impact -- what impact does that have on other

13   sort of psychological things, presumably there could be other

14   harms, as well.

15   Q    So, just so I understand it, you've now identified in

16   addition to aggressive behavior thinking about the world in a

17   more aggressive way --

18   A    Aggressive cognitions.

19   Q    -- and then the psychological effects of getting into

20   fights?  What did you mean by that?

21   A    Again, this is hypothetical.  We don't have -- well, there

22   is at least one study, correlational study, showing

23   increased -- showing an association between violent video game

24   play and problems, sort of psychological problems.

25   Q    You mean clinical problems?

278

1  A    Yes.  Well, yeah, identified by a clinical instrument.

2  Q    But you've certainly never testified here or in any other

3  place that the courts of this country or the legislatures of

4  this country should suppress video games because they cause

5  clinical problems, have you?

6  A    Oh, no.  Never.

7  Q    And that's not your opinion today?

8  A    That's not my opinion, no.

9  Q    Now, going back to the aggressive model then, is it fair to

10  say that all of that portion of your testimony was an

11  explanation of the kinds of psychological effects in terms of

12  feelings and thinking that leads ultimately to what you predict

13  would be greater aggressive behavior down the road?

14  A    Yes.

15  Q    And that is really the gist of what that whole model is

16  about is explaining behavior ultimately?

17  A    Yes.

18  Q    Now, you would agree, wouldn't you, that the evidence that

19  exposure to a violent medium is clearer with respect to other

20  media, like TV and movies, than it is with respect to violent

21  video games?

22  A    Yes.

23  Q    And the effect sizes, putting aside the fact that there's

24  vastly more research on the TV side and that the evidence is

25  much clearer, the effect sizes that have been calculated by

279

1  people in your field are about the same on both sides of that

2  line?

3  A    Yes, for the most part.

4  Q    So, that's about a .2 correlation, you said --

5  A    Right.

6  Q    -- is roughly where we are?

7  A    Yeah, roughly.

8  Q    Or about 4 percent of the variance; is that right?

9  A    Four percent of the variance here is a statistical concept.

10  It's not easily translated into understandable terms, but yes.

11  Q    But that is, in fact, the statistical concept.  You square

12  the correlation, and you get the R squared, and that gives you

13  the 4 percent of the variance.  Now, you were about to clarify

14  that that's --

15        THE COURT:  Hang on just one second, Mr. Smith.

16    (Brief pause.)

17        THE COURT:  Go ahead.

18  BY MR. SMITH:

19  Q    That 4 percent of the variance, roughly speaking, doesn't

20  mean that exposure to violent media causes 4 percent of the

21  aggression among people who'd had that exposure, does it?

22  A    Right.  It does not mean that.

23  Q    What it means is if you could somehow -- for example, in

24  the experimental context, if you expose a pool of people to

25  games, either a violent game or a less violent game, and then

280

1  you give them sort of a test, like the noise blast, you're

2  going to have a vast range of difference in terms of how long

3  they hold that button down or how hard they push it, and of

4  that vast range, only 4 percent of that variation is in any way

5  statistically linked to the fact that they've just either

6  played a violent game or a nonviolent game?

7  A    Yes.

8  Q    96 percent of that variation has to do with something else

9  altogether in what they brought into the room?

10  A    Yes.

11  Q    And, in fact, just so we understand it, if you look at the

12  research overall, in your judgment, if you're trying to predict

13  not immediate aggressive behavior like noise blasts, but long

14  term criminal behavior, serious violence, the effect size is

15  actually quite a bit less than .2; isn't that right?

16  A    If you're trying to predict -- yeah.  It tends to go down

17  the more severe form of aggressive behavior one is looking at,

18  and that would be true of any predictor.

19  Q    Right.  Because it's farther away and because it's a rare

20  event?

21  A    Essentially, yes.

22  Q    Now, just so I understand it, this .1 or -- it's more like

23  .1 for the more serious violence?

24  A    It ranges from about .13 to a little bit larger, but the

25  .13 is one estimate that gets used a lot.

281

1  Q    Okay.  And what these measures are, this .13 or this .2,

2  are a correlation -- a perfect correlation is a 1.0?

3  A    Yes.

4  Q    And a perfect negative correlation is a zero; is that

5  right?

6  A    No.  A perfect negative is a minus one.

7  Q    The absence of correlation is a zero; is that correct?

8  A    Yes, exactly.

9  Q    And so, these are on the scale -- from the absence of

10 correlation to a perfect correlation, they're at .13 or .2, and

11 that scale runs from zero to one; is that right?

12 A    Well, it runs from minus -- yeah, okay.  Minus one, plus

13 one, and zero being nothing.  Okay.

14 Q    Now, Professor, you don't believe, do you, that media

15 exposure of any kind by itself causes anybody to engage in

16 violent behavior?

17 A    No.

18 Q    You consider it just one of what you call risk factors?

19 A    Exactly.

20 Q    And in order for somebody to end up being a person that

21 would engage in violence, they have to have been exposed to a

22 number of different risk factors?

23 A    Typically, yes.  More extreme forms of violence usually you

24 can identify a number of risk factors.

25 Q    But your belief is that in all cases for somebody to --

282

1  that media violence alone can't be the only risk factor?

2  A    Except in rare cases of imitation, which we really haven't

3  talked about, where one directly copycats -- young children in

4  particular have a tendency to imitate exactly what they see.

5  That's a relatively rare phenomenon.

6  Q    But in terms of what we're talking about here, which is

7  long term effects leading to people growing up to be more

8  aggressive people --

9  A    Yes, exactly.

10  Q    -- you need to have risk factors like poverty or abuse in

11  the family or some sort of violence in your environment that

12  you grow up?

13  A    Yes.

14  Q    Something like that, right?

15  A    Exactly.

16  Q    Or you would look at genetic factors?

17  A    Certain genetic factors are also risk factors, yes.

18  Q    Are there other powerful risk factors other than those

19  we've just named here that come to mind?

20  A    Gang membership, or sometimes it's called antisocial peers.

21  There's probably a dozen or so.  I mean, it varies a little bit

22  depending on who's writing the report, but there's about a

23  dozen or so such factors.

24  Q    Now, you would say that exposure to a violent TV show or a

25  video game is a risk factor for everyone?

283

1   A   Yes, in the sense that to date there really haven't been

2   any particular groups or subgroups identified that seem

3   consistently immune -- you know, totally immune, but there

4   probably are groups, certainly in the television violence

5   literature, that are more susceptible.

6   Q   Right.  Because they have other risk factors?

7   A   Well, it's beyond the number of other risk factors, but

8   yes.

9   Q   Certainly whether it's a risk factor for everyone or not,

10  you don't believe, do you, that most people who are exposed to

11  a healthy dose of violent TV or video games will end up

12  committing a lot of violent acts in their life?

13  A   If by healthy, yeah.  I mean --

14        THE COURT:  You'd call it unhealthy.

15  BY THE WITNESS:

16  A   I would call it unhealthy dose.  But, no, I agree with the

17  gist of the statement.

18  BY MR. SMITH:

19  Q   In fact, the vast majority of the kids that are out there

20  playing video games right now that you consider violent video

21  games are going to grow up and be just fine; isn't that right?

22  A   I would guess that -- I would predict that, yes.

23  Q   And when you talked in your testimony about how children

24  who are exposed to violent video games tend to become social

25  rejects and that leads to a greater series of psychological

284

1   problems, you don't consider most of the kids who are playing

2   violent video games or other kinds of video games right now to

3   be social rejects, do you?

4   A    Oh, I don't believe I said -- it may have been

5   misunderstood.

6   Q    Well, you did say that was one of the -- I'm sorry.

7   A    What I was trying to convey was that kids who become more

8   aggressive, for whatever reason, tend to go off on this

9   developmental trajectory where their relationships with their

10  parents deteriorate, relationships with teachers deteriorate,

11  and so on.  But I did not mean to imply that there's any

12  research saying that violent video games has led to this

13  increase in aggression and that we now also have evidence that

14  they become the social rejects and blah, blah, blah.

15  Q    Right.  Whatever effects the video games have, they don't

16  lead to the kind of aggression which you said leads people to

17  have problems with their teachers and their families and their

18  peers?

19  A    It's another risk factor.  It's one of many.

20  Q    And the reality is, of course, that a large majority of

21  kids these days are playing these games; is that right?

22  A    It looks like, yes, a majority of kids are at least

23  occasionally playing some violent video games, the vast

24  majority.

25  Q    And one of the reasons for that is because when you use the

285

1    term violent video games, you're talking about games that range

2    all the way from Sonic The Hedgehog, which you've just

3    mentioned, up through Mortal Kombat and beyond, up to Grand

4    Theft Auto; is that right?

5    A    Yes.  Although, obviously, there are degrees of violent

6    content.

7    Q    Sure, there are degrees, but in your world view, an E-rated

8    game that's rated absolutely appropriate by the industry for

9    everyone, like a Sonic The Hedgehog game, is a violent video

10   game that can be harmful to kids of any age and to adults, for

11   that matter; is that right?

12   A    Yes.  We have some research evidence that -- not on Sonic

13   The Hedgehog game, but on some other E-rated games.

14   Q    You did just mention that as one of the games that was

15   being used in those prior studies?

16   A    Right.

17   Q    As one that would be a different comparison than a billiard

18   game because it is more violent?

19   A    It's more violent than the billiard game, but it would

20   still be on the low violent.

21           THE COURT:  I suppose not if you're the billiard ball.

22           THE WITNESS:  Well, that's true.

23           MR. SMITH:  Fair point, your Honor.

24   BY MR. SMITH:

25   Q    Now, Professor, you can't sit here and tell us how much

1  violence would be reduced in the world if we were to, in fact,

2  cut off people under 18 from buying games that are covered by

3  the statute, can you?

4  A    No.

5  Q    And that's for a whole variety of reasons.  For one thing,

6  you've never tried to do any calculation of what percentage of

7  the violence in this country is, in fact, caused by exposure to

8  violent media, have you?

9  A    That is correct.

10 Q    And we also know, don't we, that most of the games that are

11 played by people under age 18 are bought by their parents,

12 right?

13 A    I don't know that.

14 Q    You don't have any information about that subject?

15 A    Some of my coauthors in various papers may have, but I

16 don't recollect.  I mean, I wouldn't be surprised, but I don't

17 know.

18 Q    Well, does the psychological literature tell us anything

19 about what happens if you cut off access to one particular

20 medium or one particular set of games in terms of what kids do

21 to replace that in their media diet?

22 A    Not that I know of.

23 Q    Do you have any basis to say whether or not if, in fact, we

24 had an effective mechanism that said we're not going to let the

25 kids in Illinois have any more access to violent video games,

287

1  whether they're bought by their parents or not, whether they

2  would, in fact, be exposed to less violence in the media

3  thereafter?

4  A    There's some reason to believe that their in some sense

5  total media violence consumption would go down, but also

6  there's some reason to believe it wouldn't go down exactly the

7  amount of hours that they're playing violent video.  There's

8  some reason to believe that their consumption of TV violence

9  would go up, but probably not by a comparable or at least an

10  exact same amount.  But, again, I just -- that's speculation.

11  Q    Basically we have to speculate about whether or not there

12  would be any reduction at all?

13  A    Yes, at this point.

14  Q    Now, is it fair to say that violent video games did not

15  become particularly violent until the early 1990s?

16  A    They certainly took a jump in the early '90s, yes.

17  Q    Prior to that time the violence in games was very stylized

18  and cartoonish, and then there was kind of a revolution in game

19  design around 1993, 1994?

20  A    Yes.

21  Q    And because of the technological changes, the games become

22  more realistic, and we also saw the introduction of the first

23  person shooter games that are a matter of concern to you about

24  that time?

25  A    Yes.

288

1   Q    Now, it's also true, is it not, that if you went back to

2   the early 1990s about the time that revolution occurred and

3   compared that to the present, the amount of time that kids are

4   spending playing video games per capita has probably tripled?

5   A    Yes.  I don't have the exact figures in front of me, but

6   yes, it's gone up a lot.

7   Q    Well, did you discuss that in your draft of the book that

8   you talked about in which the longitudinal study is included?

9   A    Probably.

10  Q    Let me put that in front of you, if I could, and ask you to

11  look at Page 13 and see if that refreshes your recollection

12  about whether or not the hours per week played by kids in this

13  country has tripled since the early 1990s up to the time when

14  this book was drafted.  Do you see there on Page 13 it reports

15  an average back in the early 1990s of two hours for girls and

16  four hours for boys, and then later on we're up to nine hours

17  per week for both?

18  A    With boys averaging thirteen hours and girls five.

19  Q    Right.

20  A    Right.

21  Q    Now, it's also true, is it not, Professor, that during that

22  same roughly eleven or twelve-year period since the

23  introduction of these much more graphic violent games, the

24  introduction of first person shooters, and during that time

25  when the exposure was going up by threefold, the crime rate,

289

1  the violent crime rate for adolescents in this country, has

2  gone down substantially?

3  A   I don't actually have those numbers.  Certainly the arrest

4  rates and -- there's different ways of measuring that.

5  Q   If you look at arrest rates and victimization rates, they

6  peaked in 1994 in this country and have gone down roughly 50

7  percent, both for juvenile crime and for overall violent crime;

8  is that right?

9  A   I don't know.

10  Q   You've never looked at those data?

11  A   No, I have not.  Not that I can recall.

12  Q   Isn't it a fact that in all of your articles you wrote

13  until the early 1990s, in many of them you would report those

14  exact violent crime rates, and you stopped doing it in more

15  recent articles?

16  A   Yeah, in a couple articles with Brad Bushman.  Brad -- we

17  reported some FBI crime rate statistics, yes.

18  Q   Right.  And the last time you did that with him was about

19  2001?

20  A   Um-hm.

21  Q   You talked about how there had been an explosion of

22  violence in this country from 1950 up until about 1994.  Do you

23  recall that?

24  A   I recall the figure.  I don't recall exactly where the peak

25  was.

290

1  Q   So, you would agree with me, having signed on to those

2  articles, that looking at the overall crime rate in this

3  country is something that we ought to think about when we're

4  looking at the effects of violent media?

5  A   Actually, I don't think it's terribly relevant, but Brad

6  really liked that figure and wanted to use it.

7  Q   You've also authored at least five or six articles which

8  all start off with a paragraph talking about Columbine and

9  Paducah and all the other high school shootings, haven't you,

10 Professor?

11 A   Yes, I have.

12 Q   And you don't have any basis to say that any of those

13 shootings had anything to do with video games, do you?

14 A   Correct.  And, in fact, in most, if not all of those cases,

15 those articles also point out that such incidents do not

16 constitute scientific evidence, that that's why we need to do

17 research.

18 Q   But despite that fact, you thought it was appropriate to

19 make them the introductory paragraph in your articles in the

20 psychological journals?

21 A   Yes.

22 Q   And especially the ones that you wrote for the more popular

23 audiences?

24 A   I don't have a recollection of what appears where.

25 Q   Now, I want to, if I could, turn to the categories of

291

1  methods that we have available that you and others have used to

2  study the effects of violent video games.

3         The first we have is these experiments that you've

4  been describing and that Professor Williams talked about, which

5  are the ones where you expose people to a game for ten or 15

6  minutes at the most and then you see in the immediate aftermath

7  where they are or they are not more aggressive on some measure.

8         The great strength of those kinds of studies is that

9  they can really establish cause and effect in the short term;

10  is that right?

11  A   Yes, that's the biggest.

12  Q   And the real drawback of them is that they can't tell you

13  anything about long term effects on their own, right?

14  A   What they can tell you in conjunction with psychological

15  theory about learning processes is what's likely to happen.

16  Q   So, that's basically what these charts and graphs over here

17  are supposed to do is to sort of get you from the noise blasts

18  up to some prediction about how somebody is going to behave in

19  ten or 15 years and a prediction about their being more

20  violent?

21  A   That's generally what the theoretical models are about.

22  Q   Now, there's never been any experiment that shows that

23  somebody engages in serious aggression in the immediate

24  aftermath of being exposed to a violent video game; is that

25  right?

292

1 A    Not that I know of, that would not get by an institutional

2 review board.

3 Q    Now, so, in order for anybody to draw any conclusions about

4 serious aggression, long term effects, the kinds of things

5 which you ask the court to take into account here, we have to

6 buy into the model as somehow a predictor, as a way to sort of

7 make that leap from the experiments up to the real world in the

8 long run?

9 A    One doesn't have to buy into necessarily my preferred model

10 because there are other models out there.

11 Q    We just have to buy one of them.

12 A    You have to buy one of them, and you have to -- well, and

13 it's also the case that, at least in my view, the longitudinal

14 studies done in the television violence area are relevant, as

15 well.

16 Q    So, you basically go over and say if it happened with

17 television, it must happen with video games?

18 A    It's very likely, yes.

19 Q    Now, before we get to the longitudinal piece, let me talk

20 about these correlation studies.  You had some discussion in

21 your direct examination about causation and what they show

22 about causation.  You agreed I think in your direct that no

23 single correlation study can establish causation between

24 exposure to the game and the aggression measure that's

25 happening simultaneously; is that right?

293

1   A    Correct.

2   Q    And the reason for that is you're basically taking the two

3   measures at the same time.  You're asking people what games do

4   you play and what do you like as a person simultaneously?

5   A    Right.

6   Q    And so, the problem is that people who have particular

7   characteristics, whether it be aggressiveness or loneliness or

8   whatever it might be, are very likely to have those

9   characteristics play a role in their decisions about what media

10  they want to consume, what games or what TV or whatever it may

11  be?

12  A    There certainly is research in the TV literature suggestive

13  of that.

14  Q    And you yourself believe that some of this .2 effect that

15  you've talked about is, in fact, reflective of that

16  bidirectional causality, that the causation is, in fact, going

17  the other direction?

18  A    From the correlational studies, yes.  The effect sizes that

19  are estimated from, say, the longitudinal studies take that

20  into account.

21  Q    Right.  But we're talking here about correlation studies.

22  A    Okay.

23  Q    And so, to the extent that you report a .2 correlation

24  between aggressive measures and the amount of violent video

25  game somebody plays, you would agree and it is, in fact, your

294

1  belief that some percentage of that .2 correlation reflects the

2  aggressive personality of the person causing them to decide

3  what game to play?

4  A   Yes.

5  Q   So, if we were actually going to try to isolate what the

6  amount of the so-called effect size is, which really is an

7  effect size, which is to say the game's causing the agresssion,

8  it would be something less than .2?

9  A   Yes.  Although, you know, again, the estimates -- I guess

10 the estimates don't particularly matter, whether you start at

11 .2 or start at .25 or whatever.

12 Q   And one of the problems with correlations is sitting here

13 today you can't tell us how far down that would go, whether it

14 would go all the way to zero, for example.  You have no way to

15 separate in the correlation studies themselves how much the

16 causation goes this way and how much the causation goes that

17 way?

18 A   Yes and no.  There are a few studies that have a measure of

19 aggressive personality and a measure of violent video game

20 exposure and a measure of aggressive behavior, and those

21 studies do tend to find that you still have a significant

22 effect of video game violence on aggressive behavior after you

23 control for sort of trait aggression.  Those are fairly rare.

24 Q   Most of the correlations don't have anything like that in

25 them?

295

1   A   Most don't.

2   Q   Including the ones that you've done?

3   A   Well, some of the ones we've done do.

4   Q   Now, if we look at the research on violent video games,

5   leaving aside the television, which we'll get to, if we sit

6   here today, we have your one longitudinal study and the

7   unpublished book chapter, and everything else that's ever been

8   done is either one of these short term experiments or it's a

9   correlation study or it's Dr. Williams' one month, whatever you

10  want to call that.  That's the total state of the research that

11  exists in the world at this point; is that right?

12  A   Well, on violent video games, yes.

13  Q   Yes.  And you believe basically that the ones you've

14  described here and in the exhibits that have been put in are

15  the state of the art, both experimental and correlational

16  studies, that are out there?

17  A   I believe what I talked about for the most part are

18  representative of generally good studies.

19  Q   Right.

20  A   I'm not sure what --

21  Q   Well, and if you go back to the Anderson and Dill piece in

22  the year 2000, basically you think that's the first time

23  anybody did it right in either side.  The first experimental

24  study that made an attempt to control for arousal and the first

25  correlation study that focused on the right measures of

296

1  aggression and the right measures of video game exposure,

2  right?

3  A    No.  There were some prior studies that had some pretty

4  good methods, but didn't have what I would regard, at least at

5  that time, as a good sample -- they didn't have a big enough

6  sample size.

7  Q    So, if we throw that in the mix, it was certainly your view

8  at the time, the year 2000, that those were the first studies

9  that were done the right way in either of those categories,

10  right?

11  A    Only if you include --

12  Q    Sample size.

13  A    -- the caveat that -- sample size.

14  Q    Well, that's a pretty important caveat, wouldn't you say,

15  whether the sample size is large enough to give you meaningful

16  results?

17  A    It is -- yes, I think it's very important, except when one

18  is -- I mean, you could have a lot of well designed, well

19  carried out studies with a too small sample size that when you

20  combined meta-analytically start to make more sense.

21  Q    Right.  But going back to that time in the year 2000, we

22  didn't have that, either.  The only meta-analysis that first

23  appeared in this area was a year later?

24  A    Yes.

25  Q    Right.  But in that year, early 2000, when you had just

297

1   done what you thought was the first adequate correlations and

2   experimental studies and we had no meta-analysis yet, you were

3   already testifying before a Senate committee that the evidence

4   was very clear that video games caused violence; is that right?

5   A    I don't remember the exact testimony, but I believe that it

6   seemed clear to me in part because we had already started the

7   meta-analysis.

8   Q    You had started the meta-analysis, but not completed it?

9   A    We had done most of the analyses by then.

10  Q    And what that was was the study combining correlations and

11  experiments that existed as of the year 2000?

12  A    Yes.  Well, that's the 2001 meta-analysis.

13  Q    Right.  But as of March 21st, 2000, when you testified in

14  front of Senator Brownback, you had done some of that

15  meta-analysis?

16  A    That's my recollection.

17  Q    And you had done the Anderson and Dill experiment with

18  Wolfenstein and Myst?

19  A    Yes, that would have been done.

20  Q    And you had done the correlations that you talked about,

21  that you had done the correlations that were included in that

22  same Anderson and Dill piece?

23  A    Yes, I would assume so.

24  Q    And you were willing at that point to come in and say to

25  the Senate committee that "Though there are many complexities

298

1  in the realm of behavioral research, there was one clear and

2  simple message that parents, educators, and public policymakers

3  such as yourselves need to hear.  Playing violent video games

4  can cause increases in aggression and violence."  Is that

5  right?

6  A   Yes.  I mean, I assume that's -- you're reading.  I don't

7  know exactly where that is.

8  Q   Now, I wanted to ask you, if I could, about the correlation

9  that you talked about.  You had started doing this in the

10  Anderson and Dill piece, and you've done it more recently,

11  where you actually try to do some kind of a calculation of

12  aggressiveness using some scales off the National Youth Survey?

13  A   Yes.

14  Q   You mentioned that, I think, in your direct testimony, that

15  you picked some measures of aggression off the National Youth

16  Survey?

17  A   Yes.

18  Q   And you've said in the past that you think that's an

19  indication that there's a correlation between video game play

20  and criminal behavior, haven't you?

21  A   Yes.

22  Q   Do you still take that position?

23  A   Yes.

24  Q   But the reality, in fact, is that some of those measures

25  that you had on that scale were criminal and some of them were

299

1  not?

2  A   One of them is not.

3  Q   And what was that behavior?

4  A   That was throwing rocks, snowballs, or other objects at

5  people.

6  Q   Okay.  So, you produced a composite score for these college

7  kids that were in this survey and asked them "In the past year

8  have you done any of the following things" and combined all of

9  these self-reports about the things they had done into a score,

10  and since your deposition you've now gone back and checked to

11  figure out there was only one of those that was noncriminal?

12  A   Yes.

13  Q   Okay.  Now, can you tell us have you gone back and checked

14  how many of the people got a high score on this measure of

15  criminal aggressiveness because they had thrown snowballs in

16  the past year?

17  A   No, but we have gone back -- I did go back -- not in the

18  Anderson and Dill data sets.  That's an old data set.  I'm not

19  sure I can recreate it there.  But in a newer data set that

20  appears in this book with high school students, where we have

21  the same measure of video game violence exposure, the National

22  Youth Survey thing, I went back and calculated a correlation

23  without that item, and the correlation dropped from about .36

24  to about .33 when you delete that item.

25  Q   Right.  But can you tell us -- you can't tell us sitting

300

1  here then on the Anderson and Dill article what percentage of

2  people got a high score because that was the behavior they had

3  engaged in?

4  A    Well, no, not exactly.

5  Q    Okay.  Now, in the Anderson and Dill correlation, you had

6  227 college students that you gave these questionnaires to?

7  A    Yes, roughly.

8  Q    Roughly.  And two-thirds of them or more were women?

9  A    Could be.  It was more women than men.

10  Q    Can you tell us what percentage of these undergraduates at

11  the midwestern university had, in fact, engaged in criminal

12  aggression in the past year when you asked them that question?

13  A    Well, we deleted two items that no one reported having

14  done.

15  Q    That was two out of ten, right?

16  A    Two out of ten.  So, that left six that at least one person

17  in this sample reported having done recently.

18  Q    But is it fair to say that it was a minute fraction of the

19  227 people who had engaged in any form of criminal aggressive

20  behavior?

21  A    I would guess that it would be a small fraction, yes.

22  Q    Is it under ten?  You have no idea?

23  A    I would guess that it would be under ten.

24  Q    Was it under five?

25          THE COURT:  What now are you talking about?

Appendix 2 Page 78

301

1          MR. SMITH:  Five people, your Honor, is what I --

2   BY THE WITNESS:

3   A   No, no, no.  I'm sorry.  Ten?  I thought you meant 10

4   percent.  I'm sorry.

5   BY MR. SMITH:

6   Q   Thank you for that clarification.  You think it's under

7   ten, which would be 22 people?

8   A   Well, we know at least six.

9   Q   How do we know that again?

10  A   No, that wouldn't necessarily be the case.

11  Q   You know there are eight things that one person did.

12          THE COURT:  There could be one person that did all six

13  categories.

14          THE WITNESS:  There could be one person, right.

15  BY MR. SMITH:

16  Q   That's eight, right, categories, isn't it?

17  A   Yeah.  It actually couldn't be one person doing six, or the

18  reliability coefficient couldn't have been what it was.

19  Q   Where does the number six come from?

20  A   There were six items that at least one person --

21  Q   I thought it was ten, and you deleted two, leaving eight.

22  That's just what's confusing me.  It was eight, and you deleted

23  two, and it was six?

24  A   I was deleting the --

25  Q   Oh, the snowballs.

1  A   The snowballs.  So, it's actually seven.  You're right.  I

2  was thinking of -- sorry.

3  Q   So, we know there were seven behaviors that somebody

4  engaged in?

5  A   It's the "apraisal.".

6  Q   Right.  Like "apraisal."

7       But we don't know how many people out of that 227

8  engaged in any of those seven behaviors?

9  A   I don't at this point, no.

10 Q   But you think it was less than 22, at least?

11 A   I would think so.  Less than 22.

12 Q   Now --

13      THE COURT:  Find a convenient place to pause.

14      MR. SMITH:  This would be fine, your Honor.

15      THE COURT:  Okay.  We've going to break until about

16 1:40, but before we do that, I want to revisit the topic I

17 raised at the end of the day yesterday about combining this

18 with the final determination of the case.  So, give me your

19 thoughts.

20      MR. SMITH:  Your Honor, we've gone back and thought

21 about that and tried to figure out whether there's a lot of

22 other evidence we would put in if this was a merits trial, and

23 with the caveat that we think Dr. Goldstein's testimony is very

24 important and that that will get weight, even though it's on

25 paper -- he's effectively been cross-examined in his

303

1  deposition.

2          THE COURT:  So, somebody could give me the deposition.

3          MR. SMITH:  Yes.

4          MR. KASPER:  We have it here today.

5          MR. SMITH:  And obviously with the caveat that the

6  other declarants' testimony will get the weight it would get,

7  because we do have to establish vagueness and the censorship

8  aspects of this, we would certainly think it appropriate,

9  because I really can't think of what else we would put on, for

10  you to go ahead and decide the case.

11          MR. KASPER:  We agree with that, your Honor.

12          MR. DRYJANSKI:  Your Honor, just speaking for the

13  Attorney General's Office, our position is we may not

14  necessarily not disagree with what was just said.

15          THE COURT:  Whoa.  You got to do that again.

16          MR. DRYJANSKI:  Basically our position is because

17  there are still motions pending, motions to dismiss --

18          THE COURT:  Let's assume they're denied.  What's your

19  position?  I'm not saying I'm going to deny them, but I need to

20  know the answer now, not whenever I end up deciding them.

21          MR. DRYJANSKI:  I think our position would still be

22  that assuming the motion is denied, our office would really

23  want to look at it more in detail to see if there is something

24  we would want to put on.  But that may not end up being the

25  case.  And I understand you don't want to put that off very

304

1  long.

2         THE COURT:  So, that's a nonanswer, basically.  What's

3  your answer, Mr. Garcia?

4         MR. GARCIA:  We have no position.  I can't imagine

5  there's anything else we would put on.

6         THE COURT:  Okay.  Fine.  I'll rule on your motion at

7  1:30.  I'll see you at 1:40.  Actually, 1:40, not 1:30.

8     (Whereupon, the within trial was recessed to 1:40 o'clock

9     p.m. of the same day.)

10

11

12

13

14

15

16

17

18

19

305

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION


 3
    ENTERTAINMENT SOFTWARE            )
 4  ASSOCIATION, et al.,             )
                                     )
 5                   Plaintiffs,     )   No. 05 C 4265
                                     )
 6        v.                         )   Chicago, Illinois
                                     )   November 15, 2005
 7  ROD BLAGOJEVICH, et al.,         )   1:40 p.m.
                                     )
 8                   Defendants.     )


 9


10                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MATTHEW F. KENNELLY
11
    APPEARANCES:
12
    For the Plaintiffs:  JENNER & BLOCK, LLC
13                       One IBM Plaza
                         330 North Wabash Avenue
14                       40th Floor
                         Chicago, IL   60611, by
15                       MS. KATHERINE A. FALLOW
                         MS. KATHLEEN R. HARTNETT
16                       MR. DAVID P. SANDERS

17                       JENNER & BLOCK, LLP
                         601 13th Street
18                       1200 South
                         Washington, D.C.   20005, by
19                       MR. PAUL M. SMITH

20
    For the Defendants:  FLETCHER, TOPOL, O'BRIEN & KASPER, P.C.
21                       222 North LaSalle Street
                         Suite 300
22                       Chicago, IL   60601, by
                         MR. MICHAEL J. KASPER
23


24


25
```

306

```
 1                         HOGAN MARREN, LTD.
                           180 North Wacker Drive
 2                         Suite 600
                           Chicago, IL   60606, by
 3                         MR. PATRICK E. DEADY
                           MS. LAURA C. LIU
 4
                           OFFICE OF THE ILLINOIS ATTORNEY GENERAL
 5                         100 West Randolph Street
                           13th Floor
 6                         Chicago, IL   60601, by
                           MR. ANDREW L. DRYJANSKI
 7                         MS. ELLECIA L. PARSELL-BURKE

 8                         COOK COUNTY STATE'S ATTORNEY
                           500 Richard J. Daley Center
 9                         Chicago, IL   60602, by
                           MR. STEPHEN L. GARCIA
10


11
   COURT REPORTER:         LAURA M. BRENNAN
12                         219 South Dearborn Street, Room 2102
                           Chicago, IL   60604
13                         (312) 427-4393

14

15

16

17

18

19

20

21

22

23

24

25
```

307

```
 1      (The following proceedings were had in open court:)

 2          THE CLERK:  05 C 4265, Entertainment v. Blagojevich.

 3          THE COURT:  Could the lawyers please give your names?

 4          MR. SMITH:  Paul Smith for the plaintiffs.

 5          MS. FALLOW:  Katherine Fallow for the plaintiffs.

 6          MS. HARTNETT:  Kathleen Hartnett for the plaintiffs.

 7          MR. SANDERS:  Dave Sanders for the plaintiffs.

 8          MR. KASPER:  Michael Kasper for defendant Blagojevich.

 9          MR. DEADY:  Patrick Deady for defendant Blagojevich.

10          MR. DRYJANSKI:  Andrew Dryjanski for defendants

11  Madigan and Blagojevich.

12          MS. PARSELL-BURKE:  Ellecia Parsell-Burke for

13  defendant Madigan and defendant Blagojevich.

14          MR. GARCIA:  Stephen Garcia for defendant Devine.

15          THE COURT:  Okay, you can all have a seat.

16          MR. DRYJANSKI:  Your Honor, may I say something to the

17  Court?

18          Earlier you had the question regarding the conversion.

19  We would -- the office of the attorney general would go along

20  with the conversion with the plaintiff and defendant

21  Blagojevich.

22          THE COURT:  All right.  Well, I am going to go ahead

23  and rule on these motions anyway.  Quite honestly, if I had

24  planned to do them orally, I would have been in a position to

25  do it at the beginning of the hearing, and the only reason I
```

308

1  didn't do that was that my intention was to put it in an

2  opinion, in the written opinion, whatever it turns out to be,

3  that I write after this.

4        But now that I spent not only that time, but the time

5  over the last hour and a half collecting my thoughts on that, I

6  am just going to go ahead and rule on it.  Both motions to

7  dismiss are denied.  Here are the reasons.

8        First of all, the primary argument that is made by

9  both defendant Madigan and defendant Devine is that the lawsuit

10  is barred by the Eleventh Amendment, which, as some

11  commentators have noted, despite its language, precludes the

12  commencement of a suit not only by citizens of one state

13  against another state, but by citizens of the same state,

14  although I am not sure it would matter in this case.  I am not

15  sure what the citizenship of the plaintiffs is.

16        There is an exception to that rule under the case of

17  Ex Parte Young, 209 U.S. 123, a decision by the Supreme Court

18  about 97 years ago.  And what the Supreme Court said in Ex

19  Parte Young is that a state officer can be made a defendant in

20  a suit to enjoin the enforcement of an allegedly

21  unconstitutional act so long as the officer has "some

22  connection with the enforcement of the act."

23        And actually the full quote is a little bit broader

24  than that.  It's quoted by the plaintiffs in their response.

25  What the Supreme Court said at page 157 is:

309

```
 1          "The fact that the state officer by virtue of his
 2   office has some connection with the enforcement of the act is
 3   the important and material fact, and whether it rises out of
 4   the general law or especially created by the act itself is not
 5   material so long as it exists."
 6          Now, as the plaintiffs correctly point out, if you
 7   read defendant Madigan and defendant Devine's motions together,
 8   essentially there would be no one to sue, I suppose, unless you
 9   were to sue the entire citizenry of the State of Illinois.
10   Defendant Madigan basically says, well, I don't have anything
11   to do with prosecuting local offenses, and defendant Devine
12   says, we don't prosecute misdemeanors unless a citizen or a law
13   enforcement agency brings them to us.
14          The "unless" would probably be good enough anyway, and
15   there is some indication in the interrogatory answers that
16   there is a little bit more to it than that.  But if you take
17   these together, there would essentially be no one to sue.  I
18   guess we would still have one defendant left in the lawsuit,
19   defendant Blagojevich, which, somewhat paradoxically I think is
20   the defendant that has the best Eleventh Amendment argument but
21   has chosen not to make it for whatever reason.
22          But in looking at what has been cited to me, I am
23   persuaded by the plaintiffs' contention, first of all, with
24   regard to the attorney general, that under Illinois statute,
25   she has the obligation to institute and prosecute all actions
```

310

1    and proceedings in favor of or for the use of the state which

2    may be necessary in the execution of the duties of any state

3    officer.  She has exclusive jurisdiction to represent the state

4    in appellate criminal proceedings.  She has the duty to provide

5    assistance and guidance to county state's attorneys and their

6    prosecutions under state laws.  She can investigate criminal

7    offenses in conjunction with state's attorneys.

8          So this is more than just a generalized duty to

9    enforce the law, and I think that, under Ex Parte Young, it is

10   sufficient.  So that is why defendant Madigan's motion is

11   denied.

12         With regard to defendant Devine, as I indicated, there

13   is an interrogatory answer that suggests at least some closer

14   connection with enforcement of the law.  It was initially

15   discussed in the briefs, and I think that either one of those

16   would be sufficient.

17         There is a second argument made by defendant Devine,

18   that because they basically said, well, we are not going to do

19   anything about any of these cases until the case is over, until

20   the present case is over with, that there isn't really a viable

21   claim for a declaratory judgment against him; in other words,

22   it's a hypothetical case.

23         I don't agree with that, and really the reason I don't

24   agree with that is because it is a First Amendment case.  And

25   really that takes me back to one of the real problems with the,

Anderson - cross

311

1  it seems to me, with the Eleventh Amendment argument that has

2  been made is that if the defendants are both right -- and I

3  think that if one of them is right, in all likelihood both of

4  them are right -- you would have a situation where someone who

5  claims a First Amendment interest would essentially have to

6  risk prosecution, actual criminal prosecution, before they

7  could challenge it, and that would essentially overturn several

8  decades of First Amendment law about chilling effect.

9        But with regard to defendant Devine, it seems to me

10  that the fact that he has the authority to institute

11  prosecutions and the fact that in the First Amendment context

12  the plaintiff only needs to show that they have a well-founded

13  fear that the law will be enforced I think is sufficient, and

14  so the motion to dismiss is denied.

15        All right.  Based on what everybody has said, I am

16  combining the preliminary injunction hearing with the decision

17  on the merits, and so we will now pick up where we left off

18  with Professor Anderson.  I do intend to include a more

19  elaborate explanation of that in whatever ruling I make, but I

20  wanted to give you the reasoning now.

21        Okay, Mr. Smith, you can proceed.

22        MR. SMITH:  Thank you, your Honor.

23              CRAIG ANDERSON, DEFENDANTS' WITNESS

24                      PREVIOUSLY SWORN

25                 CONTINUED CROSS EXAMINATION

Anderson – cross

312

1   BY MR. SMITH:

2   Q   Good afternoon, Professor.

3   A   Good afternoon.

4   Q   I want to turn, if I might, to the issue of longitudinal

5   studies, and longitudinal studies, I believe you said, are

6   important essentially for two reasons.  They can study longer

7   term effects directly and they help you identify causation, is

8   that correct, or is that a fair summary?

9   A   They also help you rule out alternative explanations, which

10  is what is relevant to the causation issue.

11  Q   Now, in fact, you believe that consistent results across

12  all three categories of studies, experimental, correlational

13  and longitudinal are necessary before scientists can avowedly

14  conclude that video game play causes aggressive behavior, don't

15  you?

16  A   Yes, but with the caveat that I believe that the television

17  violence longitudinal studies are certainly relevant.

18  Q   But referring to Exhibit 8, which I guess I am not sure

19  whether it's in evidence.

20          THE COURT:  8?

21  BY MR. SMITH:

22  Q   8, which is the article.  Defendant's Exhibit 8, I am

23  sorry.

24          THE COURT:  You know, I am considering all the

25  exhibits that have been offered to be in evidence.

Anderson – cross

313

1          MR. SMITH:  That is helpful.

2    BY MR. SMITH:

3    Q    This is the article that is in evidence, I guess, now,

4    Professor Anderson, if you turn over to page 229 of your public

5    policy article.

6          Do you have that up there?

7    A    Which page?

8    Q    229, top of the left-hand column.

9    A    Okay.

10   Q    This is a document which was authored this year and is

11   about to be published in a book, is that right?

12   A    Yes, it is.

13   Q    That is where you made the statement that before scientists

14   are willing to believe that playing violent video games

15   predicts aggressive behavior, they would want to see studies of

16   each type performed and determine whether the results of the

17   different studies converged.

18          In that sentence, you were referring to experimental,

19   correlational and longitudinal, right?

20   A    Yes.

21   Q    If you look back at the previous three?

22   A    Yes.

23   Q    You made that statement in this article, or in this

24   chapter, I guess it was, after you had a longitudinal study in

25   hand to report, which you then go on to describe in the rest of

Anderson – cross

314

1   this publication, right?

2   A    Yes.

3   Q    You certainly didn't make that statement in any of your

4   previous articles which have made similar causal claims based

5   solely on experimental and correlational studies, right?

6   A    I am sorry?

7   Q    You didn't make the same statement that longitudinal

8   studies are essential before scientists would believe -- would

9   accept the claim of causation in any of your previous articles,

10  did you?

11  A    I can't honestly say.  I mean, I have certainly talked

12  about the value and the need for longitudinal studies as part

13  of a triangulation on truth regarding that particular

14  hypothesis.  But I also believe that television violence

15  longitudinal studies are relevant.

16  Q    You didn't say here that the television studies were not.

17  You said longitudinal studies on video games were essential

18  before all three -- before scientists would believe that video

19  games predict aggressive behavior, right?

20  A    That's not quite what the sentence says.

21          It says before scientists are willing to believe that

22  playing violent video games predicts aggressive behavior, they

23  would want to see studies of each type performed and determine

24  whether the results of the different studies converged.

25          It does not say that all three would have to be

Anderson - cross

315

1  specifically with video games.  It could be media violence

2  studies.

3  Q   You go on to the end of the paragraph and you say:

4        "Although more research is needed, all of these types

5  of studies have been conducted with similar results.  Playing

6  violent video games can indeed cause increases in aggressive

7  thoughts, feelings and behaviors."

8        You are not referring there to television studies,

9  right?

10 A   You say the same paragraph?

11 Q   Yes.

12       THE COURT:  Last sentence of the same paragraph.

13       THE WITNESS:  I see, okay.

14       I am not sure.

15 BY MR. SMITH:

16 Q   Let me ask you about the one longitudinal study you have

17 done.  You mentioned there were three.

18       There are two others which you said had been poorly

19 done, Slater and some other one?

20 A   I am not sure I would say that they were necessarily poorly

21 done, but they are not as relevant.

22 Q   Okay.  They are --

23 A   Slater and Ihori.

24 Q   You don't consider them particularly significant for

25 present purposes, is that fair to say?

Anderson - cross

316

1  A    Yes.

2  Q    Now, the one that you did differs substantially from the

3  television studies that you mentioned just now in that the

4  length of the study period was something like two to five

5  months as opposed to something like 15 or 20 years?

6  A    Yes.  The time period in the one in this book was two to

7  six months.

8  Q    Six months, thanks.

9        And the games that were being played by these

10  elementary school kids were whatever games they happened to be

11  playing, right?

12  A    Yes.

13  Q    So they are primarily games that are played by elementary

14  school kids?

15  A    Yes, although that is, obviously, quite a range.

16  Q    Quite a range including a lot of very childish cartoonish

17  games, is that right?

18  A    I would assume some of them are, yes.

19  Q    A lot of the games that we are studying here then would be

20  games functionally equivalent to a Saturday morning cartoon

21  show?

22  A    I can't really say how equivalent they would be.  I know

23  that there are certainly E rated children's games that have a

24  lot of shooting in them, but so does Road Runner, not so much

25  shooting, but --

Anderson - cross

1  Q    You would certainly call Road Runner a very violent

2  cartoon?

3  A    In the television literature, it's considered a pretty

4  violent cartoon, yes.

5  Q    I think you said in your deposition that television

6  literature concludes that things like Road Runner and Bugs

7  Bunny have caused significant amounts of harm in causing

8  aggression?

9  A    They certainly have been identified as some of the violent

10  media that young children consume that was part of that measure

11  of childhood media violence consumption that later predicted

12  long-term effects.

13  Q    Now, turning back to your longitudinal study, whether or

14  not a game like Super Mario Brothers or Sonic The Hedgehog or

15  whatever it may be was considered violent was something that

16  you left up to the third or fourth-graders to decide

17  themselves?

18  A    Yes.  They rated violent content.

19  Q    Did you tell them what it means to be violent?

20  A    This study was actually run by Dr. Gentile, and I don't

21  know the exact instructions that the students got.

22  Q    As I understand it, what you did is you asked them to tell

23  you how much those kinds of games they played and other kinds

24  of games, and you came up with some sort of measure of their

25  video game -- violent video game exposure?

Anderson – cross

318

1  A    Yes.  They used a fairly standard measure of violent video

2  game exposure.

3  Q   Then you had various measures of aggression before the

4  start of the time frame which were done by what, peer reports

5  as well as teacher?

6  A   Peer reports, teacher reports and self-report.

7  Q   Then essentially what you did is you said is the aggression

8  at time two, taking into account the aggression at time one, is

9  the change in aggression significantly related to the kinds of

10  games they were watching back at time one?  Is that a fair

11  summary?

12  A   Yes.

13  Q   Now, when you did that, once you took into account the

14  other possible variables, just so we are clear, the percentage

15  of the change that occurred between time one and time two that

16  was related to violent video game exposure was somewhere

17  between 1 and 4 percent?

18  A    Yes.  For physical aggression, it was -- depending on how

19  many variables you controlled for was about 3.6 percent, if you

20  control for a whole bunch of things, to I believe it was about

21  15 percent as sort of like the raw correlation.

22  Q   To get to 15 percent, you would have to not control for the

23  aggression at time one, which is to say you are basically

24  comparing their overall level of aggression with their video

25  game consumption, which makes it a correlation study?

Anderson - cross

319

1  A    Yes.  I mean, a correlation study across time, but, yes.

2  Q    If you don't back out the aggression at time one, you are

3  basically not accomplishing the purpose of a longitudinal

4  study; is that fair?

5  A    Exactly.

6  Q    So the 15 percent figure isn't really relevant, is it?

7  A    Not as relevant, certainly.

8  Q    Now, the documents at least that we have been provided

9  don't report this, and maybe you can tell us:  What was the

10 amount of change in aggression that occurred between time one

11 and time two in this period of two to six months in elementary

12 school years for these children?

13 A    On the composite physical aggression measure, that's not

14 really easy as specifying.  We did look at one of the --

15 earlier today, one of the figures that just focused on fighting

16 at school, and it showed changes on the order of roughly 20 to

17 30 percent increase in percentage of kids comparing low video

18 game violence children to high video game violence children.

19 Q    I don't think that is quite responsive to my question.

20       My question is:  How much did these kids actually

21 change?  We have a figure of -- the video game exposure

22 explains 3.6 of the variance.  I want to know what a hundred

23 percent of the variance is in terms of changes over this one

24 short period of time in one school year, in elementary school

25 years.

Anderson - cross

1         Is there a way you can tell us?  Was there a great

2    increase in aggression for these kids, or is there any way you

3    can quantify that at all?

4    A    Well, about the only way, off the top of my head at least,

5    that we can quantify that is by looking at the changes in the

6    proportion, who got into fights as a function of whether they

7    were low game players or high game players.

8         That's not quite what you are looking for, I don't

9    think.

10   Q    I guess what I am asking you is can you tell us, isn't it

11   true that the people who started out very aggressive stayed

12   very aggressive, and the people that started out low aggressive

13   stayed pretty low aggressive?

14   A    That's generally true, yes.

15   Q    There was a high correlation between aggression at time one

16   and aggression at time two?

17   A    Yes.  That correlation probably, going from memory here,

18   was probably about .4, .5.

19   Q    So whatever amount of change there was, and it was a

20   reasonably small amount, is that fair to say?

21   A    In terms of the average level?

22   Q    Yes.

23   A    I would assume that the amount of change overall would be

24   small.

25   Q    And that variance, then you were able to explain something

Anderson – cross

321

1   like 3.6 of that small variance by looking at their video game

2   exposure?

3   A    Yes, that would be a fair statement.

4   Q    Now, in this study, one of the things that they got in

5   advance of the study period was not just a measure of video

6   game exposure but also a measure of violent television

7   exposure, violent movie exposure, exposure to professional

8   wrestling, exposure basically to other violent media that kids

9   consume, is that right?

10  A    Yes.

11  Q    And when we got to the end of the study period, and there

12  were variables then put in to try to see whether or not they

13  helped to eliminate other causes, those three variables,

14  although they were calculated, were not included to try to see

15  whether they affected the measure of video game exposure

16  effects, right?

17  A    That is true, yes.

18  Q    So essentially even though you had the data and you knew

19  that you could go in –– whoever did this study, I guess it's in

20  your book, but it's somebody else who did it.

21        Even though they had the data on these other media,

22  which we know, according to your approach, is equally likely to

23  cause increases in aggression, nobody went in to see whether or

24  not those variables had greater explanatory power or at least

25  reduced the perceived effect of video game violence?

Anderson - cross

322

1  A   That was true as of the time that I gave my deposition.

2  Since then Dr. Gentile has gone back and looked at those

3  results and essentially partialed out the effects of time one

4  television and film violence.

5  Q   How about the professional wrestling?

6  A   That was measured in a different way, so it wasn't a

7  comparable scale.

8  Q   Is it fair to say that that meant that the perceived effect

9  of the video games went down further?

10  A   It didn't.  It stayed about the same.

11  Q   Stayed about the same?

12  A   Yes.

13  Q   What was the effect size for violent television?

14  A   The effect size for violent television was marginally

15  significant, about a .1 effect size.  That's when you control

16  for violent video game exposure.

17        And the effect size for violent video games was about

18  .13, which was statistically significant.

19  Q   And the effect size for video games that you initially

20  found is .19, right?

21  A   Those are different kinds of analyses, but roughly

22  speaking.  I mean, you are comparing the path analysis results

23  to the destructive testing analysis.

24  Q   Which was it that Dr. Gentile did?

25  A   He redid path analysis.

Anderson – cross

323

1  Q    Why didn't he use it in the destructive analysis?

2  A    Pardon me?

3  Q    Why didn't he use those variables in the destructive

4  analysis?

5  A    They're essentially doing the same thing but not quite

6  identical in terms of controlling.

7  Q    But you can't tell us if he had treated it the same way

8  that he treated the other variables like parental involvement

9  and hostile attribution bias and other things whether that

10  would have made the effect size for video games go away after

11  the destructive analysis?

12  A    It would not have.

13

14

15

16

17

18

19

20

21

22

23

24

25

324

1  Q   You could tell us that sitting here today?

2  A   I could tell you that with certainty.

3  Q   But you didn't know that at the time of your deposition?

4  A   Correct.  I did not.

5  Q   And as this book went to the publisher, nobody had bothered

6  to try to partial out the effects of TV and movie violence?

7  A   When it went to the publisher for review, it had not,

8  right.

9  Q   Now, I want to ask you a few questions, if I could,

10 Professor Anderson, about how the research relates to the

11 statute that we actually have in front of us.  At the time of

12 your deposition, you actually hadn't read the statute, except

13 for the findings; is that right?

14 A   That is correct.

15 Q   Have you read it now?

16 A   No.

17 Q   Are you aware, for example, that the statute only regulates

18 access for people under 18?

19 A   I have heard that, yes.

20 Q   And the reality, though, is that the research that you've

21 done and others have done on video games does not support any

22 hypothesis that people under 18 are more vulnerable to these

23 effects you've been talking about than adults; is that right?

24 A   Right.  That is correct.  In the video game literature,

25 there's not a clear age vulnerability, I guess, would be the

325

1  word I was looking for.

2  Q    Yet earlier in your direct testimony when you were dealing

3  with Professor Williams' study, you said that because his

4  average age was 27, we wouldn't expect to see the kinds of

5  effects that you found in your two to six-month study because

6  that involved children.  The reality is that the vulnerability

7  is the same.

8  A    Lack of evidence of a vulnerability effect is not the same

9  as there being no vulnerability effect.

10  Q    So, it may be that --

11  A    There is, in fact, some evidence, fairly good evidence, in

12  the television violence literature that long term effects are

13  bigger for children than for older individuals.  A lot of the

14  studies in the video game domain, I mean, where we're looking

15  at the shorter term effects, it's not clear to me that there

16  should be bigger effects on children than adults in a short

17  term context.

18  Q    Such as a month or a three-month study?

19  A    No.  I'm talking about a one-hour study where we're dealing

20  with priming effects.

21  Q    So, in the one-month context, turning back to Professor

22  Williams' study, the fact he had an average age of 27

23  doesn't -- there's no reason to think based on the research

24  that that population average would be less vulnerable to

25  effects than some other age?

326

1  A    Not in the video game literature.   In the television

2  literature there is.

3  Q    Now, you also have set out in your research to try to

4  determine whether games that are more graphic and more

5  realistic have a greater impact than games that are more

6  cartoonish --

7  A    Right.

8  Q    -- more juvenile, right?

9  A    Yes.

10  Q    And, surprisingly, you found no difference at all, right?

11  A    Correct.   I mean, in terms of mean differences, there was a

12  slight hint, but not anywhere near, you know, statistical

13  significance.

14  Q    Well, and the slight difference that you found that was

15  statistically insignificant was that the E-rated games, the

16  most childish cartoonish games, were more harmful than the

17  T-rated games, the more realistic and violent ones, right?

18  A    Oh, I was thinking about a different study.   I'm sorry.

19  Q    Well, let's focus on the one I remember, which there was an

20  experiment in which you focused on --

21  A    Yes.

22  Q    -- teenagers' access.   You did an experimental study.

23  A    Right.

24  Q    You had teenagers play little kid games and games like

25  James Bond, more T-rated games, right?

327

1  A    Yes.

2  Q    And you found that they became more violent on your

3  measures of aggression when they played the E-rated games than

4  the T-rated games, right?

5  A    Yes, for that sample.  Although, as you said, that wasn't a

6  statistically reliable difference.  That is, the T violent

7  games versus the E violent games.

8  Q    Right.  And the E-rated games that showed up to be

9  marginally more harmful, although maybe not quite statistically

10  significant, those were games with like happy music and little

11  cartoony characters?

12  A    Yes.

13  Q    Now, you also set out to test -- I think you mentioned in

14  your direct testimony whether or not changing the nature of the

15  victims that you attack in your play from green-blooded aliens

16  to red-blooded humans might change the effect.  I believe you

17  didn't give the answer, but the answer is there's no difference

18  at all, right?

19  A    The answer is there was no statistically significant -- and

20  that's what I was just referring to a couple minutes ago.

21  There was a hint, but it was not close to significant.

22  Q    So, there's no support in the research that you've done or

23  that you can report on video games for saying that games that

24  single out humanlike victims ought to be treated differently

25  from games that have alien victims?

328

1  A    That is correct.

2  Q    Now, you mentioned a couple of times that there are other

3  kinds of stimuli other than video games that can kind of

4  trigger this GAM model that you have, and I think you've

5  mentioned a couple times that just viewing a picture of a gun

6  can lead somebody in experimental research to be more

7  aggressive?

8  A    Yes, that's true.

9  Q    In fact, you did a study like that and published it, right?

10  A    Yes.

11  Q    And what that illustrates is that there are probably almost

12  an infinite number of stimuli that you could give somebody in

13  one of these experimental situations and show some immediate

14  priming of slightly more aggressive behavior in the aftermath,

15  right?

16  A    Infinite is very big, but yes.  Stimuli that are associated

17  with aggressive thinking.

18  Q    Yes.

19  A    It would be a very large number.

20  Q    So, the fact that you have focused on video games is

21  largely a matter of your choice rather than some suggestion

22  that they're different from the large number of other things

23  that could have exactly the same effect in the experimental

24  context, right?

25  A    Yes.

329

1  Q    And just so we understand on these -- back to these

2  experiments for a moment.  The differences that you're

3  calculating between those who watched Wolfenstein and those who

4  watched Myst -- or I mean played in each case -- are tiny

5  fractions of a second differentials in terms of how long they

6  push that button down on the noise blast?

7  A    In that particular study, yes, it was a duration measure,

8  and it was a relatively small difference in terms of like

9  number of seconds or milliseconds.

10  Q    Milliseconds, right?

11  A    I assume so.  I don't remember.

12  Q    And, in fact, what you've done is you've studied both

13  intensity and duration at the same time a couple of times, and

14  in some studies the duration goes up, but the intensity

15  doesn't, and in other studies the intensity goes up, and the

16  duration doesn't at all, right?

17  A    That has happened in a couple of studies, yes.

18  Q    Now, is it fair to say, Professor, that you're a pretty

19  much outspoken critic of the video game industry?

20  A    Yes, I would say that.

21  Q    And you've actually criticized the industry for fighting

22  the passage of laws of the kind we're dealing with here today?

23  A    Yes, you could characterize that.

24  Q    And indeed if we look back at Exhibit 8, you've gone so far

25  as to advocate the passage of laws of the kind we're dealing

330

1   with here, have you not?

2   A   I don't know that -- I mean, I've tried very hard to stay

3   out of giving my personal views about what the proper role is.

4   Q   Let me ask you to look at Page 250 in Exhibit 8, the public

5   policy.  This is the article where you set out to discuss the

6   public policy implications of your research, Exhibit 8?

7   A   At what page?

8   Q   240.

9   A   240.  Sure.

10  Q   Just to finish the prefatory question, this is the article

11  where you set out to discuss the public policy implications of

12  your research?

13  A   Yes.  We wanted to list what some possible public policy

14  options might be.

15  Q   And one of the options you discuss at Page 240 is legal

16  access restrictions?

17  A   Yes.

18  Q   And you say there that -- let me get my marked up version

19  of that.  You say there, don't you, Professor, that legal

20  access restrictions of the kind we're dealing with here would

21  be both appropriate and feasible in the United States?

22  A   Where are you referring to?

23  Q   Well, let's start with there's a mention of United Kingdom,

24  Australia, Canada, Germany, and then you say, "Nonetheless,

25  this approach seems feasible in the United States for two

Appendix 2 Page 108

331

1  reasons," right?

2  A    Yes.

3  Q    And then you go on to say, "Legal precedent in the United

4  States has established that the government has an entirely

5  appropriate role in specific instances in limiting the

6  influence and activities to which children are exposed."  Do

7  you see that?

8  A    Yes.

9  Q    And you go on to discuss the legal precedent that would

10  support such a law, arguing that the Ginsberg case supports the

11  constitutionality of such a law?

12  A    Yes.

13  Q    Then you go on at the top of the next column to say, "It's

14  important to note that this," meaning Ginsberg, "is not the

15  only legal precedent under which regulating access could be

16  legally defensible while still being sensitive to First

17  Amendment concerns."  Do you see that?

18  A    Yes.

19  Q    And then you endorse as an excellent review this Law Review

20  article by Professor Saunders at Michigan State?

21  A    Yes.

22  Q    And he's the fellow who wrote the book called Saving Our

23  Children from the First Amendment?

24  A    Yes, he is.

25  Q    One thing I wanted to just catch up on before we finish

Appendix 2 Page 109

332

1    here, Professor, is on your discussion of Professor Williams'

2    article.

3            I think you said something about how he had brought in

4    a lot of gamers to be the subjects.  Isn't it, in fact, true

5    that he made a very careful effort to ensure that a large

6    percentage of the people on both the control side and on the

7    treatment side were people that had never played games before?

8    A    I think he made a lot of effort to be sure that they had

9    not played role -- these massively multiplayer online

10   role-playing games.

11   Q    Well, the exhibit will speak for itself, Professor, but you

12   don't remember him indicating in the exhibit that a significant

13   percentage of the people in the test had never played any games

14   at all?

15   A    I don't remember that.

16   Q    You also focused on his measures of aggression and focused

17   on this arguments with partners or girlfriends or boyfriends or

18   whatever.  He had a whole range of measures of aggression that

19   he used in there; isn't that right?

20   A    Not in his published article.

21   Q    Don't you remember seeing the reference to the normative --

22   what's it called -- the normative beliefs in the aggression

23   scale?

24   A    Yes, but that's not a measure of aggression.

25   Q    What would you call that?

333

1  A    It's aggressive cognition.

2  Q    So, what you were saying here is that he didn't use very

3  good measures of aggression, but he might have done a pretty

4  good job in measuring aggressive cognition and how it changed

5  over the month?

6  A    That could be.  I don't remember much about that particular

7  scale.

8  Q    Certainly you have measured aggressive cognition changes in

9  much of your work, right?

10  A    Yes.

11  Q    And the fact that he found no change in aggressive

12  cognition over the period of a month would be pretty

13  significant, would it not?

14  A    Not given the way that that study was conducted.

15  Q    Now, a couple of other things, Professor.  One is you have

16  on your website a discussion of the video game industry in

17  which you make the point that because the video game industry

18  is owned by media conglomerates, the media have suppressed the

19  truth about the research on video games; is that right?

20  A    I think we've implied that.  I'm not sure we state it quite

21  as volatilely as that, but it might have been.  I just don't

22  remember.

23  Q    Certainly you intended to imply that in what you have on

24  your website, right?

25  A    Pardon me?

334

1  Q    You certainly intended to imply that in what you put on

2  your website?

3  A    Well, one of the things that we've discussed in several

4  publications, and I don't remember exactly where and whatnot,

5  is that there certainly can be multiple reasons why an industry

6  would object to or contradict research that they think might

7  not look favorably upon them.  You know, one reason might be

8  something as simple as economic self-interest.

9  Q    You don't have any evidence of that, though, do you?

10  A    No.

11  Q    And the reality is that another reason might be that

12  there's a much greater controversy about this among the

13  professionals in your field and related fields than you would

14  like to let on; isn't that right?

15  A    Pardon me?

16  Q    There's a much greater controversy about the validity of

17  your studies and your conclusions than you like to let on,

18  isn't there?

19  A    Not within the scientific research community, no.

20  Q    And those social scientists who disagree with you, are they

21  outside the scientific research community?

22  A    They're very much in the minority in terms of their views

23  about media violence effects.

24  Q    And have you reviewed Dr. Goldstein's declaration in this

25  case?

335

1  A    Yes.

2  Q    And he lists there a whole range of people who criticize

3  fundamentally everything that you do in your research, don't

4  they?

5  A    He has an interesting and unique set of criticisms.

6  Q    Well, and he's not just offering his own.  He's pointing to

7  any number of other scholars around the world who find this

8  entire method of study is inapt and inappropriate, right?

9  A    Well, he can cite some.  I mean, without rereading his

10  entire deposition, it would be hard to comment specifically on

11  it, but, in fact, the major critics of the conclusions that

12  media violence researchers have come to have not actually

13  conducted original empirical research and are not seen in the

14  psychological community, certainly, as truly understanding how

15  to do such research and what the research implications are of

16  existing studies.

17  Q    Well, Dr. Goldstein has conducted original research and is

18  a social psychologist just like you, is he not?

19  A    He has never conducted original research on media violence.

20  Q    Have you ever read his depositions in these cases where you

21  and he testify against each other?

22  A    I have looked over his entire publication record.

23  Q    But the answer to my question is you haven't read the

24  deposition?

25  A    Pardon me?

336

1   Q    The answer is you haven't read the deposition?

2   A    I have read the deposition.

3   Q    And you don't recall references there to the fact that he

4   did original research on media effects on aggression?

5   A    No.  Do you have a specific --

6   Q    No.  I'm just asking you.  You don't recall that.

7   A    No, I don't recall that.

8          MR. SMITH:  I have no further questions, your Honor.

9          THE COURT:  Redirect?

10          MR. KASPER:  No further questions, your Honor.

11          THE COURT:  I have a few, and I suspect that some of

12   these -- I was noting them as I went along.  I suspect that

13   some of these ended up getting answered in later questions.

14   So, I may be asking you to repeat something.  Please excuse

15   that.

16          MR. SMITH:  Your Honor, perhaps before -- I'm sorry to

17   interrupt you like that.  I intended to offer as exhibits the

18   two portions of the Justice Department websites which summarize

19   crime rates in the last 12 years that I was --

20          THE COURT:  Do you have any objection to these?

21          MR. KASPER:  No.  No objection.

22          THE COURT:  What are the numbers?

23          MR. SMITH:  They are Plaintiffs' Exhibits 5 and 6,

24   your Honor.

25          THE COURT:  They're admitted.  Just give them to my

337

1  law clerk.

2            All right.  I wanted to go back to something you

3  talked about yesterday, and I wanted to make sure I heard it

4  right; although, I think you repeated it this morning at the

5  beginning of your testimony.  It had to do with your

6  explanation of this concept of priming, and I think you said

7  that something as, I guess I would say, inconsequential as

8  seeing a photograph of a gun could actually prime aggressive

9  thoughts in a person.  Did I hear you right on that?

10           THE WITNESS:  Yes.

11           THE COURT:  Explain that to me.  How does that work?

12           THE WITNESS:  The most current models of human memory

13  think of memory -- by memory, I'm including understanding

14  concepts, words, you know, not just memory for events.  Okay?

15  (Continuing) -- as a series or as a system of nodes that are

16  interconnected, that are linked in some fashion.

17           And so, one might have a node that in some sense

18  represents the concept of gun, and one might have a node that

19  represent a concept of killing or of harming.  And these nodes

20  themselves, the idea is that they get linked to each other in a

21  couple of ways.  Nodes that are -- or concepts that are very

22  similar in meaning are thought of as kind of being close to

23  each other.  And this is all sort of by analogy.  It's not like

24  one thinks that there's, you know, six particular neurons

25  that --

338

1             THE COURT:  I understand.

2             THE WITNESS:  Okay.  And the second way that nodes or

3   concepts can be highly associated is if they are thought about

4   at about the same point in time, if they're thought about in

5   conjunction with each other alot.  The more often a particular

6   pair of concepts are paired with each other, the stronger the

7   linkage is between those concepts.

8             And so, the idea of priming is that if one concept is

9   activated -- for example, by seeing a photo of a gun makes you

10  sort of activate that concept of gun in your mind, that nodes

11  that are closely linked to it, in essence, get a little bit of

12  the energy that goes into that gun concept.  It's called

13  spreading activation.  So that this -- again, so if you

14  activate or think about a gun, some of that energy or that

15  activation spreads out along these linkages to related

16  concepts.  And so, I mean -- and this is a common model.

17            THE COURT:  Are there studies that suggest that

18  something like seeing pictures not of somebody committing

19  violence, but of an implement that might be used in doing that

20  is enough to cause the same or similar kinds of effects that

21  you've talked about here with violent video games?

22            THE WITNESS:  There are studies, both field

23  experiments and laboratory experiments, that show such effects.

24            THE COURT:  Okay.

25            THE WITNESS:  I'd also point out that one of the

339

1  things that we've done is --

2       THE COURT:  You need to talk louder because you're

3  talking to me now, and they're not hearing you, probably.

4       THE WITNESS:  I'm sorry.  One of the things that we've

5  done, some colleagues of mine and I have done, in the last

6  couple of years is to look at life experiences with guns to see

7  how that might change how one thinks of guns and then in turn

8  to see whether that has an impact on what commonly is called

9  this weapons priming effect.  So, we've looked at hunters

10  versus nonhunters.  The idea that hunters think of hunting

11  weapons, at least, not so much as instruments of killing

12  people, but they might tend to associate it with more like

13  family, going out hunting with dad, growing up, like those

14  sorts of things.  And, in fact, that's what our results tend to

15  show, that hunters, when you show them a picture of a hunting

16  gun, you don't get this same kind of effect that you do with

17  nonhunters.

18       THE COURT:  Okay.  You were talking about these

19  experimental studies where the measure -- and I know I'm using

20  the wrong terminology here, but the measure was the noise

21  blast.

22       THE WITNESS:  The noise blast.

23       THE COURT:  The noise blast thing.  And as I

24  understand it, what the people in those studies are typically

25  told is that they're actually noise blasting another person

340

1  they might be playing against or something like that, but they

2  don't see the person.

3          THE WITNESS:  Correct.

4          THE COURT:  Is there some reason to think that

5  somebody's willingness to noise blast some anonymous person

6  that they can't see somehow translates into a willingness or a

7  greater inclination to do harm to an actual person that they

8  can see?

9          THE WITNESS:  There certainly are studies suggesting

10 that this whole sort of punishment reaction time paradigm is a

11 valid measure of aggression in that people who are generally

12 sort of identified as being more aggressive versus less

13 aggressive behave very differently in those tasks.  Variables

14 that influence a sort of real world aggression also have the

15 same kind of effect in the laboratory tasks.  And so, there's

16 all that kind of evidence, basically, that the task is a valid

17 task.

18         THE COURT:  But I gather -- at least my sense from

19 listening to you is that there aren't as many studies that

20 measure whether somebody actually went out and did something to

21 somebody else physically.

22         THE WITNESS:  Some of the children's studies have done

23 that.

24         THE COURT:  Okay.

25         THE WITNESS:  There's a study by Irwin and Gross, if I

341

1 remember right, where they had children playing either a

2 violent or nonviolent video game and then later observed them,

3 I believe on a playground, although it may have been, you know,

4 like in a free-play situation indoors.  I don't remember.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Anderson –

342

1          THE COURT:  I recall somebody saying something.  It

2   may have been somebody yesterday.

3          THE WITNESS:  They had measures of kicking and hitting

4   and punching.

5          They had -- as I recall, they actually had measures

6   both of aggression, what they call aggression against another

7   person, as well as aggression, what they called aggression

8   against objects.

9          THE COURT:  Objects, like kicking something.

10         THE WITNESS:  Yes, and we have sort of separated those

11  out because we are primarily more interested in the aggression

12  against other people, and you get that kind of an effect.

13         THE COURT:  This morning when you were discussing -- I

14  don't know the word that was used -- the critique of --

15  actually your critique of Professor Williams' critique, okay.

16  You were talking about the reliability issue, and there was a

17  question and, honestly, I am just going to tell you, I didn't

18  get it, okay.  So I need you to explain it a little bit better.

19  There was something about a factor of .68 which you said was

20  considered acceptable, but it would be nice if it was bigger.

21  I need you to walk me through that again.

22         THE WITNESS:  Okay.  Any measurement has a certain

23  element of error in it.  So in any science, in any measurement,

24  whatever you can do to reduce that element of error in essence

25  gives you more power to detect whatever kind of underlying

Anderson -

343

1  phenomenon might be there, in essence, sort of like having a

2  better microscope or something.

3          This reliability measure is actually an internal

4  reliability measure.  There's other forms of reliability out

5  there, but those weren't discussed today or yesterday, as far

6  as I know.

7          Internal reliability measure is typically used when

8  you have multiple items on some kind of a scale, that each item

9  is designed to measure sort of the same thing but in a slightly

10  different way.  And in basically test theory what you really

11  want is a set of items that correlate pretty well with each

12  other, so that a person who gives a 5 on item one will tend to

13  give, you know, a similar answer on other items that, again,

14  are supposedly measuring the same kind of thing.

15          And what a reliability measure is, this coefficient

16  alpha, conceptually what it is is if you, say, have a ten-item

17  scale, you can take item one and correlate it with the average

18  of the other nine and you get some number.  You can take item

19  two and correlate it.

20          THE COURT:  Now I get it.

21          THE WITNESS:  Eventually you can sort of average

22  those.

23          THE COURT:  You average those out, and that is where

24  you get to the figure that ended up as .68.

25          THE WITNESS:  Yes, although it is not exactly that,

Anderson -

344

1  but conceptually that is what that is.

2          THE COURT:  All right.  When you say it would be nice

3  if it was bigger, how much bigger would be better, I suppose?

4          THE WITNESS:  Well, ideally you would want things to

5  be in the 90s.

6          THE COURT:  Okay, ideal is in the 90s.  That tells me

7  what I need to know.

8          THE WITNESS:  If you get bigger maybe --

9          THE COURT:  Go ahead.

10          THE WITNESS:  If you get bigger than that, then you

11  have wasted time on items you didn't really need.

12          THE COURT:  Okay, fair enough.

13          THE WITNESS:  One way you improve reliability is by

14  adding more items.

15          THE COURT:  I may just not have caught this, but in

16  the last or second to the last question that Mr. Kasper had

17  asked you, basically sort of summing up your opinion, and your

18  opinion -- I am leaving out some of it -- was that exposure to

19  violent video games, and I got down, "increases aggressive

20  thoughts and affect."

21          Did I also hear you say, because if I did, I didn't

22  catch it, that it increases actual physical aggression?  Is

23  that part of your opinion as well?

24          THE WITNESS:  Yes.

25          THE COURT:  Yes, okay.  I thought that was the case,

Anderson –

345

1 but I didn't think I had it in my notes.

2          One more question about these figures.  When Mr. Smith

3 was questioning you, he asked you about the study that had the

4 .2 correlation.  And, see, now I am getting a blank stare,

5 which means I am using the wrong terminology.  There was

6 something that was a .2 that translated to 4 percent?

7          THE WITNESS:  Right.

8          THE COURT:  Do you know what I am talking about?

9          THE WITNESS:  Yes, I think he was talking about

10 average effect sizes.

11          THE COURT:  Yes, that is it.  Explain that to me

12 again.

13          THE WITNESS:  When you do --

14          THE COURT:  .2 of what, I guess?

15          THE WITNESS:  .2 here is a measure of effect size.

16 Actually there are a number of different measures of effect

17 size.  We have all been focusing on one specific one called

18 correlation.

19          THE COURT:  Okay.

20          THE WITNESS:  Those can be translated into others, and

21 it all has the same meaning.

22          A correlation effect size can range from minus one to

23 plus one.

24          THE COURT:  That I got.

25          THE WITNESS:  Okay.  That's right, we just did that.

Anderson -
346

1          THE COURT:  And plus one would be if the two factors

2     essentially move together.

3          THE WITNESS:  Right, perfectly lockstep.

4          THE COURT:  Lockstep, and minus one would be if they

5     moved in opposite directions or didn't do it together.

6          THE WITNESS:  Yes, if they moved in opposite

7     directions.

8          THE COURT:  Zero would be if there is --

9          THE WITNESS:  Just random.

10         THE COURT:  Random, okay.

11         So what is a .2?  What does that tell you?  I get

12    where it is on the scale, but what is that?  They move together

13    20 percent of the time?  I mean, how would I translate it, in

14    other words?

15         THE WITNESS:  No.  If you --

16         Let's say you have a measure of anything, and let's

17    just say it's aggressive behavior.  So you have got a hundred

18    participants, each of whom has a score, and you can plot those

19    scores.  And you just -- you know, some are low, some are

20    middle, some are high.  You have got this mess of data points,

21    okay.

22         If one calculates the average score, and then -- that

23    is called the mean.

24         THE COURT:  Yes.

25         THE WITNESS:  The average score.

1      Then for each participant you take their score,

2  subtract it from the mean, square it, that eliminates plus and

3  minus signs.

4      THE COURT:  Okay.

5      THE WITNESS:  And then some of those 100 square

6  deviation scores essentially, you get a measure that is called

7  the variance of that measure.

8      A .2 correlation essentially means that knowing the

9  person's score on some other variable, in this case let's say

10  violent video game exposure, allows you to account for 4

11  percent of that variance.

12      THE COURT:  Got it.  Now I understand it.  I am going

13  to suggest that at new judge school they put in a statistics

14  course.  Of course, I probably would have forgotten it by now.

15      THE WITNESS:  Yes.  If you don't use it every day, it

16  goes.

17      THE COURT:  You have now just explained to me why it

18  is that when my daughter got to a statistics class in high

19  school, I stopped being able to help her with the math.

20      Okay.  Just a second.  I am just taking a note here.

21      THE WITNESS:  You have learned in 30 seconds what my

22  students take a whole semester --

23      THE COURT:  Well, but they may actually retain it

24  longer than I do.  On the other hand, they probably have to

25  because I don't have to wait until the end of the semester to

Anderson -

348

1  be tested on it.

2          I am actually now not talking just about violent video

3  games, violent media generally.  Is there any study that

4  suggests that the context of the violence is at all

5  significant?

6          In other words, compare, for example, like what's the

7  Tom Cruise about the D-Day invasion which has this horribly

8  violent scene that goes on for about half an hour at the

9  beginning of it with, let's say, you know, a Van Damme movie

10 where everybody is just kind of beating the heck out of each

11 other all the time?  Is there anything that suggests the

12 context in which you see it is at all significant?

13         THE WITNESS:  Yes, there are studies, especially in

14 t.v. literature suggesting things such as --

15         And these aren't as solid as the basic findings.

16         THE COURT:  I understand.

17         THE WITNESS:  But suggesting that rewarding aggression

18 in the film, showing characters being rewarded, can increase

19 the effect versus punishing can reduce it.

20         What other kinds of context effects are out there?

21 There is also some research -- actually even some research in

22 the video game area, as well as the t.v. area, that if parents

23 -- it's called mediate.  If parents discuss issues of violence

24 and what is in the media that they are consuming and basically

25 talk about these kind of issues and point out how these are not

Anderson –

349

1   appropriate solutions in the real world context and so on, that

2   that can reduce the media violence effect.

3          Just simply watching it with them presumably doesn't

4   help, but actually discussing this whole issue of how does one

5   really resolve conflict in the real world as opposed to the

6   television world.

7          THE COURT:  All right, then the last question, and I

8   don't say this to make light of anything that you have said

9   here, but there was one thing in this book chapter that really

10  kind of caught my eye.  I am just going read it here:

11         "In a study of college students, playing a golf video

12  game improves student's actual control of force when putting

13  even though the video game gave no physical feedback on that

14  student's actual putting movement or force."

15         When you say "actual control of force when putting,"

16  do you mean -- does this talk about playing the video game

17  improving your actual putting when you are playing real golf?

18         THE WITNESS:  Yes.

19         THE COURT:  Can you tell me what video game that is so

20  I can go out and buy it this afternoon?  Maybe I will just

21  recess the hearing and go get it right now.

22         THE WITNESS:  I apologize, but my coauthor wrote that

23  part.

24         THE COURT:  Okay, I will find that one.  You cited the

25  article.

Anderson -

350

1        Again, not to make light of it, but that really kind

2   of caught my attention.  If there is something I can do to

3   reduce the number of three-putt greens, I think I'd be for it.

4            THE WITNESS:  Well, it certainly is the case then that

5   video games are good teachers.  So there are lots of

6   interesting studies out there showing improvements in --

7            THE COURT:  I notice there was a further discussion in

8   here of it actually.

9            All right, do you have any further questions based on

10  the questions I asked?

11           MR. SMITH:  No, your Honor.

12           THE COURT:   Do you?

13           MR. KASPER:  No, your Honor.

14           THE COURT:  Thank you very much.  You are excused.

15      (Witness excused.)

16           THE COURT:  Do you have another witness?  Yes, no?

17           MS. FALLOW:  Yes, your Honor.

18           THE COURT:  Let's see.  We have been going about an

19  hour.  Let's take a 10-minute break and then we will start

20  back.

21           Is this the last one, the last live person?

22           MR. SMITH:  Yes.

23           MS. FALLOW:  Yes.

24      (Brief recess.)

25           THE COURT:  Do you have the next witness in the room?

Nusbaum – direct

1          MS. FALLOW:  Yes, it's Howard Nusbaum.

2      (Witness sworn.)

3          HOWARD CHARLES NUSBAUM, PLAINTIFFS' WITNESS

4                           DULY SWORN

5                       DIRECT EXAMINATION

6  BY MS. FALLOW:

7  Q   Professor Nusbaum, can you state your fall name for the

8  record, please?

9  A   Howard Charles Nusbaum.

10         THE REPORTER:  Please spell your last name.

11         THE WITNESS:  N-u-s-b-a-u-m.

12  BY MS. FALLOW:

13  Q   And where are you currently employed?

14  A   University of Chicago.  I am the chair of the psychology

15  department, the University of Chicago.

16         I have an appointment as a professor in the Department

17  of Psychology, in the Committee on Computational Neuroscience,

18  and I have membership in the Center for Integrated Neuroscience

19  and Neuroengineering.  And I am a member of the advisory board

20  for the Brain Research Imaging Center.

21  Q   How long have you been chair of the Department of

22  Psychology?

23  A   Since 1997.

24  Q   And what courses do you teach?

25  A   I teach a variety of courses in cognition and cognitive

Nusbaum – direct

352

1  neuroscience, so courses in language processing, attention,

2  learning and memory, cognitive neuroscience, which I am

3  teaching currently, research methods in cognitive neuroscience,

4  and I participate in an fMRI research methods course.

5  Q   I think you mentioned that you were a member of the

6  Committee on Computational Neuroscience?

7  A   Yes.

8  Q   And are you involved in any other way in brain imaging at

9  the University of Chicago?

10  A   Yes.  The current Brain Research Imaging Center, which was

11  established about six years ago roughly, was set up in

12  collaboration with my department, with me as the

13  representative, to establish a basic research imaging center

14  that would allow psychologists, neurologists, psychiatrists and

15  neuroscientists to do imaging research.

16       We participated in the process of hiring the director

17  and participated in financial planning.

18  Q   With respect to your areas of research, are you involved in

19  any journals?

20  A   Yes.  I am on the editorial board currently for Brain and

21  Language.  I serve as an ad hoc reviewer for a number of

22  journals such as Nature, Nature Neuroscience, the Journal of

23  Cognitive Neuroscience, Cognition, Brain and Neuroscience,

24  Neurons, Cerebral Cortex, and others I can't remember.

25  Q   Have you published in the area of cognitive neuroscience?

Nusbaum – direct

353

1  A    Yes.  I have published a couple of studies having to do

2  with spoken language processing and the cortical mechanisms

3  underlying the process of language comprehension.

4         And, in addition, I have published several articles

5  that are, shall we say, methodological issues regarding how to

6  do and interpert fMRI research.

7  Q   Just stepping back a bit, you have done --

8         Have you done any research in fMRI?

9  A    Yes.  I have done research involving how it is listeners

10 shift attention between talkers, trying to understand which

11 parts of the brain are involved in that process of changing

12 attention from one person to another.

13        I have done research published in Neuroimage on how

14 seeing a person's face affects your perception of speech in

15 terms of recruiting motor cortex as part of the comprehension

16 process.

17 Q   I think you mentioned that you have published some pieces

18 on how to do fMRI studies, is that correct?

19 A   Correct.  We were -- I am sorry.

20 Q   Can you just elaborate generally on what those pieces say?

21 A   We were invited to write a commentary on a piece in the

22 area of neuroeconomics that was published in the proceedings of

23 the National Academy of Sciences.  That was with John

24 Caccioppo.

25        In that study, we looked at the brain areas that were

Nusbaum – direct

354

1   involved in making risky decisions or not risky decisions, a

2   kind of gambling task and, shall we say, provided a little

3   corrective guidance to the interpretation of the results that

4   were reported by the original study.

5           Following that we published a paper -- Steve Small and

6   I published a paper in Brain and Language where we provide

7   theoretic guidance on the problem of understanding language in

8   the brain and natural behavior in context in fMRI research.

9   And John Cacioppo and I and a large number of other

10  collaborators published a paper in the Journal of Personality

11  and Social Psychology as guidance for social psychologists on

12  how to understand and carry out fMRI research.

13  Q   Are those publications listed in your CV?

14  A   They are.

15  Q   Did you submit a CV to this Court attached to your

16  declaration?

17  A   Yes.

18          MS. FALLOW:  Your Honor, I am going to mark this as

19  Plaintiffs' Exhibit 7.

20          THE COURT:  You don't need to give it back to me.  I

21  have got it.  Exhibit how many?

22          MS. FALLOW:  7.

23          THE COURT:  7, that is admitted.

24  BY MS. FALLOW:

25  Q   I am going to hand you this.  Is this a current copy of

Nusbaum – direct

355

1  your CV?

2  A   I believe reasonably current.

3  Q   Dr. Nusbaum, are you a clinical psychologist?

4  A   No.  I'm a cognitive psychologist.

5  Q   Can you just explain generally what the difference is

6  between a clinical psychologist and a cognitive psychologist?

7  A   Well, clinical psychologists deal with the diagnosis and

8  treatment of mental illness.

9       When they do research, it's typically into the area of

10  psychopathology or the effectiveness of therapy.

11      I'm a cognitive psychologist.  I study mechanisms of

12  learning, memory, attention, interpersonal communication, and

13  the evaluation of information, affect of information.

14  Q   In general are you in the area of basic science versus

15  clinical treatment?  Is there a difference between that?

16  A   I don't do clinical treatment.  I am not trained in

17  providing therapy.  I do basic research trying to understand

18  sort of the fundamental psychological processes by which we

19  understand each other as speech perceivers, speech producers,

20  and the brain mechanisms that are involved in that process.

21  Q   Professor Nusbaum, what were you asked do in your capacity

22  as an expert for the plaintiffs in this case?

23  A   I was asked to review -- I think it's Section 12-5 -- the

24  findings with respect to the violent video game law, and

25  specifically with respect to the third part of the findings

Nusbaum - direct

356

1  having to do with frontal lobe function, executive function as

2  represented in Dr. Kronenberger's team's research.

3  Q   I am just going to show you what has been already marked as

4  Plaintiffs' Exhibit 2.

5        MS. FALLOW:  This is the copy of the law, your Honor.

6  BY MS. FALLOW:

7  Q   When you say you were asked to review the finding

8  12-A-5-A-3 --

9        If you look, is it that one?

10  A   Yes.

11  Q   -- having to do with the general assembly, finds that

12  minors who play violent video games are more likely to

13  experience a reduction of activity in the frontal lobes of the

14  brain which is responsible for controlling behavior?

15  A   Yes, I was asked to review that in the research.

16  Q   What is your opinion of that finding?

17  A   I don't believe that there is any research supporting that

18  claim.  I was actually surprised to see it because it is not

19  even qualified in respect of the research that could possibly

20  be used to support it.

21        It's an unequivocal statement that the frontal lobes

22  control behavior.  That's not an accurate scientific statement.

23  It's an unequivocal statement that playing a violent video game

24  reduces frontal lobe activity.  That's not well-supported by

25  any research.

Nusbaum – direct

357

1  Q   You mentioned that you were asked to review both the

2  findings and also Dr. Kronenberger's research as a basis for

3  that finding, is that right?

4  A   That is correct.

5  Q   Do you have an opinion about whether Dr. Kronenberger's

6  research supports this finding?

7  A   I do.  I don't believe it does support the finding.

8       Across the four studies that are most relevant, the

9  Journal in Clinical Psychology, executive functioning study and

10  the three fMRI studies, there is certainly no evidence within

11  those studies that I think supports this --

12  Q   Finding?

13  A   -- this finding.  Sorry.

14  Q   And you were here yesterday during Dr. Kronenberger's

15  testimony, is that right?

16  A   That is correct.

17  Q   Or part of it at least?

18  A   Yes.

19  Q   You left at lunch time?

20  A   Yes.

21  Q   And Dr. Kronenberger said that his research was also

22  building upon the research of Dr. Anderson and others showing a

23  causal conclusion -- I mean, causal connection between violent

24  media and aggressive behavior, is that right?

25  A   Yes.

Nusbaum – direct

358

1  Q   Do you have an opinion on that?

2  A   Well, I have not read all of the research cited by

3  Professor Anderson.  I have read the papers that

4  Dr. Kronenberger cites.  I would say they are not compelling.

5  I am not convinced by those studies, Anderson and Dill, the

6  Bushman and Anderson work, that the case is particularly

7  strong, that playing violent video games produces aggressive

8  thoughts, behavior or feelings.

9  Q   And, Professor Nusbaum, did you submit a declaration in

10 this case?

11 A   I did.

12 Q   Again, I am marking this as Plaintiffs' Exhibit 8.

13        MS. FALLOW:  I gather you don't need a copy?

14        THE COURT:  I don't.

15 BY MS. FALLOW:

16 Q   Is this the declaration that you submitted in this case?

17 A   Yes.

18 Q   Now, you have stated that you don't believe that

19 Dr. Kronenberger's research supports the finding.  I would just

20 like to --

21        Can you just explain sort of in terms of general

22 categories?  I take it you have some criticisms of

23 Dr. Kronenberger's research, is that right?

24 A   Yes.  Essentially I have problems with the background

25 assumptions of the work, where it starts from, the methodology

Nusbaum - direct

359

1  that is represented in the work and the conclusions that are

2  drawn.

3  Q    All right.  I would like to go through these one by one.

4         Starting with the first category of background

5  assumptions, can a particular pattern of brain activity predict

6  behavior?

7  A    No.  There is a many-to-many relationship between brain

8  activity and behavior.  So you can see for any particular brain

9  activity multiple possible behaviors.  For any particular

10  behavior, there may be many possible brain activity patterns.

11  So there is a many-to-many relationship between them.

12  Q    And can you draw causal conclusions about behavior from

13  observing a particular pattern of brain activity?

14  A    Not to date.  The technology and our understanding of the

15  brain is not to the point where you could make that prediction,

16  and I am dubious that it ever could get to that point because

17  of the fundamental many-to-many relationship between brain and

18  behavior.

19  Q    So what do you see as the relationship between patterns of

20  brain activity and a particular behavior?

21  A    Well, there is a correlation between behavior and brain

22  activity.

23         So there are many different behaviors that can result

24  in different patterns of brain activity.  Some of those change

25  as a function of context.  And it's useful in service of trying

Nusbaum - direct

360

1  to understand how the brain functions in any particular

2  experiment or any particular task to a degree, but it is not

3  particularly dispositive of what a person is going to do if

4  there is a change in brain activity in one particular region.

5  Q   Do you believe that Dr. Kronenberger is suggesting that a

6  particular pattern of brain activity can be used to predict

7  behavior?

8  A   Well, Dr. Kronenberger seems to be suggesting a bunch of

9  things.  One of those is that a reduction in brain activity

10 represents a kind of functional deficit.

11         Another is that a composite pattern of brain activity,

12 an increase in arousal in one part of the brain, a decrease in

13 arousal in another part of the brain would predict a propensity

14 to aggression, largely by comparison to a model that Richard

15 Davidson proposed in a science paper, and by comparison more

16 generally or vaguely to a group of kids that he has diagnosed

17 as disruptive behavior disorder.

18 Q   I am going to address some of the things that you just

19 talked about.  I am actually going to show you --

20         MS. FALLOW:  Actually, your Honor, I was going to have

21 in front of him Defendants' Exhibits 1, 2 and 3, which is

22 Dr. Kronenberger's material essentially.

23         THE COURT:  Okay.

24 BY MS. FALLOW:

25 Q   Professor Nusbaum, you reviewed Dr. Kronenberger's

Nusbaum – direct

361

1  declaration in giving your opinion in this case, is that right?

2  A   Yes, I did.

3  Q   If you just look at page 6 of Dr. Kronenberger's

4  declaration, specifically paragraph 16, Dr. Kronenberger talks

5  about -- makes some general statements about the frontal lobes

6  of the brain.

7       I just want to ask you:  Are the frontal lobes

8  associated with these functions or functions other than the

9  ones he lists such as impulse, control, self-regulation,

10  choice, attention and concentration?

11  A   The frontal lobes is huge territory in the brain.  So it's

12  everything in front of what is called the central sulcus.  It's

13  right about here.  That whole part of the brain is the frontal

14  lobes.

15       There's lots of stuff going on in the frontal lobes.

16  So they don't do any one thing at all.  And there is no one

17  behavior which is probably uniquely controlled by any single

18  part of the brain.  So, no, I don't agree with that.

19  Q   So in addition to that the frontal lobes might be involved

20  in other functions than what he lists, are other parts of the

21  brain involved in some of these functions?

22  A   Yes, sorry.  That is what I was trying to say is that

23  although the frontal lobes are implicated in attention, for

24  example, the parietal lobes, the thalamus, the superior

25  colliculus, which are subcortical structures in the brain stem,

Nusbaum – direct

362

1  are also involved in attention.

2          So any particular complex behavior that humans have,

3  you're not going to find one particular spot in the brain that

4  does just that, and any particular spot in the brain probably

5  participates in lots of complex behaviors.

6  Q   In paragraph 17 of his declaration, you sort of brought

7  this up.  He talks about a reduced activation of certain

8  regions in the frontal lobes has been associated with greater

9  impulsivity, difficulties in concentration and so forth.

10          Just as an initial matter, what does it mean to

11  observe a reduced activation in certain regions in the frontal

12  lobes?

13  A   Well, in any particular research study where you have

14  collected fMRI data, every part of the brain is typically

15  active.  So it is very difficult to see what is going on.

16          In order to make assessment about a relative reduction

17  or a reduction in activity, it's always by comparison to

18  another condition.  So in one condition, there may be more

19  activity; in another condition, there may be less activity; and

20  it's under those circumstances that the reduction is inferred

21  by that comparison.

22  Q   And from Dr. Kronenberger's testimony, he also talks about

23  observing reduced activity comparing one group to another, is

24  that right?

25  A   Yes.  That is a little bit more questionable in the sense

Nusbaum - direct

363

1  that different people's brains have different states of

2  activation, and different groups may have different chronic

3  activation states, and so it becomes difficult to actually

4  compare between groups.  It's done, but that is a trickier kind

5  of comparison.

6  Q   In your opinion -- I think you may have alluded to this --

7  but does reduced activity in the frontal lobes always signal an

8  impairment or a deficit?

9  A   No.  It can signal expertise, for example.  If you develop

10  expertise in a particular kind of task, for example, a certain

11  kind of attentional task like looking for a stimulus coming up

12  on a screen and you do that in conjunction with something else,

13  you might see a reduction in activity as you develop what is

14  called automaticity.

15       So automaticity refers to the case where, in

16  performing a task over and over again, you develop a great

17  facility with it.  So, for example, in playing tennis, the

18  first time you hit a ground stroke, you might think about every

19  single part of the ground stroke.  But once you get facility

20  with that ground stroke, then you just look at the ball and try

21  to move your body into the place where you hit the ball.  You

22  stop paying attention to the complement parts.

23       That kind of expertise in other kinds of studies is

24  accompanied by a reduction in activity in the brain, and in

25  attentional studies where expertise is developed, there is a

Nusbaum - direct

364

1  reduction in the frontal lobes, reflecting increased cortical

2  efficiency of processing.

3  Q   Just one thing.  While you are testifying, if you can try

4  to slow it down just a little bit so that the court reporter --

5  you are saying a lot of terms that she may -- well, I assume

6  she knows everything, but, anyway, just to make it easier for

7  her.

8         THE COURT:  Since she just criticized you, I do want

9  to thank you for not taking that example back to putting.  It

10  would have struck a little too close to home.

11         THE WITNESS:  Then I won't bring up the LPGA study.

12         THE COURT:  There you go.

13         THE WITNESS:  Okay.

14  BY MS. FALLOW:

15  Q   Actually is there a study involving golfing and expertise?

16         THE COURT:  You had to do it.  It's all right.  I want

17  to hear it.

18         That's fine.

19         THE WITNESS:  My colleague, Steve Small, has tested

20  members of the LPGA, or professional golfers, against novice

21  golfers.  They show a picture of a green or something.  Maybe

22  it's a fairway.  I don't know the parts.  And you have to put

23  yourself into the zone.  In the process of putting yourself in

24  the zone, these people are lying in a scanner and their brain

25  activity is being recorded.

Nusbaum – direct

365

1       What happens is that when you look at the professional

2  golfers, they show significantly less cortical activity.  They

3  show less amygdala activity.  They show less prefrontal

4  activity than the novice golfers who basically light up like a

5  Christmas tree.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

366

1  BY MS. FALLOW:

2  Q   Okay.  And then in paragraph 18 of his declaration -- you

3  also sort of talked about this -- Dr. Kronenberger describes

4  this particular pattern of underactivity of what he calls brain

5  inhibitory mechanisms in the frontal cortex coupled with

6  hyperarousal of the amygdala and temporal lobe regions, which

7  he posits as responsible for chronic explosive and/or severe

8  aggressive behavior.  In your opinion can this pattern of

9  activity be used as a diagnosis of behavior?

10  A   No.  I don't think any particular pattern of brain activity

11  can be used as a diagnosis of behavior.  New York Times Science

12  Times had an article in the front page about this a month or so

13  ago.  In this particular instance, the pattern that

14  Dr. Kronenberger is referring to is taken from a description in

15  a study by Richard Davidson published in Science, but Richard

16  Davidson has also described depressives as having the same kind

17  of brain activity pattern in general.

18        So, you could see that brain activity pattern and not

19  decide is this person depressed or aggressive, or you could

20  actually set up circumstances that might produce that pattern

21  of brain activity in an experiment, and that would not lead to

22  any particular behavioral outcome.

23  Q   The same pattern of activity as described here.

24  A   Exactly.  It's also difficult to interpret the term

25  hyperarousal.  It sort of suggests that there's an absolute

367

1   level of arousal followed by a larger level of arousal.

2          Because the statement is made with respect to

3   individuals who have presumably chronic levels of activity, one

4   can't really say what hyperarousal is.  There's no absolute

5   standard.  So, the measure that one gets off of an fMRI

6   neuroimaging system is an arbitrary scale.  And so,

7   hyperarousal is really not a meaningful term.

8   Q   Now, let's just turn to some of the methodological

9   criticisms you have of Dr. Kronenberger's research.  In your

10  opinion, is it possible to draw a valid inference from

11  Dr. Kronenberger's research about the effect of violent video

12  games, as opposed to other kinds of violent media?

13  A   Because the measures that Dr. Kronenberger uses conflate

14  exposure to both and don't separate out the specific exposure

15  to violent video games, no.

16  Q   And what about Dr. Kronenberger's suggestion that he has

17  found a correlation that teens who watch violent television are

18  also more likely to watch violent video games?  Would that

19  support an inference from this research about the specific

20  effect of violent video games?

21  A   Well, that supports an inference about the teen's behavior

22  with respect to watching video.  It doesn't tell you which of

23  those two activities has the causal role in producing the

24  change in behavior or brain activity or anything.  Since you

25  can't separate out in his studies the specific effect of video

368

1   game exposure, you can't draw an inference about the specific

2   effect of video game exposure.

3   Q   Now, Dr. Kronenberger has testified about certain

4   neurocognitive tests that he has used.  Just as an initial

5   matter, can you explain what neurocognitive testing is?

6   A   Well, neurocognitive testing is a term that's used more

7   typically within the neuropsychological or clinical psychology

8   community.  The way that it's used is with an inference given a

9   particular pattern of behavior, can one decide what part of the

10  brain is active, but in truth most of the research we now have

11  on fMRI and better brain measures suggests, indeed as I had

12  outlined earlier, you can't make those clear kinds of

13  inferences.

14       Some areas may be more involved when you do a certain

15  kind of thing, but that doesn't obviate the role of the rest of

16  the networks of the brain in those particular activities.  So,

17  we can look at the relatively greater activity or lesser

18  activity of a particular region in a particular task, but that

19  doesn't say that region is specifically handling the processing

20  for that task.

21  Q   And Dr. Kronenberger also talked about executive

22  functioning.  Can you explain what executive functioning is?

23  A   Well, executive functioning is a very broad term that's

24  intended to cover a lot of different areas of psychological

25  processing, everything from attention and choice, working

369

1  memory, some aspects of behavioral regulation and control.

2  There isn't one particular executive function.  There's no

3  specific theory about what executive function is.

4          And although there's a lot of research and inference

5  about how particular forms of brain damage affect particular

6  kinds of executive functioning, there's no clear theory about

7  it, no clear scientific agreement about it.

8  Q   And Dr. Kronenberger explained that he had used in at least

9  three of his four tests either a Stroop task or a continuous

10 performance test.  What is your opinion about the validity of

11 using either the Stroop task or the CPT to measure control over

12 behavior?

13 A   Well, the Stroop task is used in lots of research, but it's

14 not typically used as a direct measure of control over

15 behavior.  It reflects the competition between two responses.

16 So, when J.R. Stroop in 1935 proposed this as a way of

17 investigating psychological processing, he wanted to pit the

18 habits of reading against another habit, naming colors, one

19 being stronger than the other, and showing, in fact, that they

20 compete in various ways.

21         But that doesn't tell us anything about behavior

22 control.  There's a lot of similarity in the use of the term

23 inhibiting a response where it refers to not naming the word,

24 but naming the color, versus inhibiting a response where it

25 means taking something that doesn't belong to you or hitting

370

1  somebody that you're angry at.  Those kinds of inhibitory

2  responses seem very different and look to be very different in

3  the research.

4  Q   And what about the continuous performance test?

5  A   The continuous performance test is a kind of vigilance task

6  that requires the inhibition of a propensity to respond.  So,

7  in those circumstances where you see a letter come up and you

8  press the button, that's the most frequent kind of response.

9  On some occasions a letter comes up you're not supposed to

10  respond to, and you're supposed to inhibit a response.

11         That's a perfectly valid measure of some aspects of

12  attentional processing, but again it's about inhibiting a

13  response that's not tied to a particular motive or goal you

14  would have.  It's not oh, I desperately want this pretty thing

15  here or I'm really angry at you.  It's really about, well, you

16  told me to do this task, and I'm going to do it this way.

17         So, it's more akin to what radar operators do when

18  they're sitting in Greenland and looking for bogeys coming over

19  the Poles or something, where they're just sort of looking for

20  something, and they get pretty bored, and it's not terribly

21  exciting.

22  Q   Now, Dr. Kronenberger, as you know, also used fMRI in some

23  of his studies about the effect of media violence.  In your

24  opinion, do fMRI images show an exact snapshot of a person's

25  brain activity?

371

1   A    No.  Very few people ever actually look at the raw data

2   that comes off of an fMRI scanner.  What we're looking at in

3   most of the data presentations is not a direct picture of the

4   brain activity.  In fact, your brain is highly active all the

5   time.  What you're looking at is typically processed models,

6   mathematical models that are made about the kind of brain

7   activity or the kind of circumstance that one expects, and

8   looking at, say, a 1 percent to 3 percent change in total brain

9   activity that might be significant.

10          So, those images that we look at are not really

11  snapshots of brain activity.  They're snapshots of differences

12  of brain activity.  In fact, people seldom look at brain

13  activity with fMRI.

14  Q   And then in Dr. Kronenberger's studies, we saw these

15  pictures of brain activity, as you've just described, but

16  they're comparing it to group.  It actually represents a group

17  of some number of people.  Do those images reflect the actual

18  brain activity of each person in that group?

19  A    No.  There's an interesting problem that occurs in group

20  images or group analyses.  So, you can have a situation where

21  activation appears in a nice fat clump in one part of the

22  brain, but, in fact, if you looked at the activity in every

23  individual subject, nobody shows activity in that part of the

24  brain.

25          And the way to imagine this sort of as a picture is to

1  imagine that each subject had activity on the circumference of

2  a circle, and then if you spatially averaged all those spatial

3  locations, you'd get the center of the circle.  So, it would

4  appear like there's activity in the middle of the circle when

5  nobody ever had activity there.

6  Q   And Dr. Kronenberger, as you know, used something called a

7  media exposure measure in order to assess each subject's

8  exposure to media violence.  In your opinion, is that measure

9  valid?

10  A   Well, valid of what?  I mean, it's a highly retrospective

11  measure.  It's a subjective report.  It's prone to recall

12  error.  It's prone to the potential to please an experiment or

13  to fit into a particular setting.  It doesn't necessarily tell

14  you what kids were doing in terms of their exposure to media.

15  It probably correlates with it, but there's also probably

16  distortion, and who the subjects are that are making the

17  reports might show different amounts of distortion, making it

18  difficult to use.

19  Q   And Dr. Kronenberger also used a measure called the DBD, I

20  think disruptive behavioral disorder, in order to separate the

21  subjects in his research into sort of two -- control versus

22  DBD.  In your opinion, is the DBD classification used by

23  Dr. Kronenberger a valid way to measure aggression?

24  A   It seems like a funny way to measure aggression.  I mean,

25  it's true that the diagnostic criteria that he uses for

373

1   inclusion into the DBD group require reports of aggression, but

2   there's no actual observation of aggression involved in any of

3   those classifications.  So, it could very well be the case that

4   the DBD group is much more like an ADHD group, attention

5   deficit hyperactivity disorder.  And, in fact, in most of his

6   studies, the measures correlate quite closely with ADHD.

7   Q   And did the DBD classification also rely on reporting by

8   parents?

9   A   Reporting by parents, reporting by teachers, I think.  I

10  can't remember exactly.  But, again, if you have a kid that's a

11  little bit hyperactive or maybe doesn't follow rules

12  particularly well, some of their behaviors can be judged to be

13  aggressive if you have concerns about that kid in that context.

14  Whether or not they actually hit anybody is another issue.

15  Q   Judged to be aggressive by the parent or by the --

16  A   Judged by parents, certainly.  Parents can judge their kids

17  to be aggressive when they've had trouble controlling them or

18  having them comply with their requests.

19  Q   Now, I'd like to turn to sort of the third -- the

20  classification of your criticism of Dr. Kronenberger's

21  research, the actual results and conclusions.  And if you see,

22  I would like to talk about the Mathews, et al. study, which is

23  the last study attached to Defendants' Exhibit 1, and that

24  you're in the right document.  And have you reviewed this

25  study?

374

1  A    Yes, I have.

2  Q    And this study involved which areas of the brain?

3  A    I'm sorry?

4  Q    This study involved which areas of the brain?

5  A    Well, they examined activity specifically in the anterior

6  cingulate, ACC, the inferior frontal gyrus, and the middle

7  frontal gyrus, bilateral for both of those gyri.

8  Q    And I know you've said that specific brain regions may be

9  involved actually in a number of different functions, but can

10  you just explain generally what those three areas of the brain

11  are associated with?

12  A    Lots of things.  The anterior cingulate is involved -- the

13  anterior cingulate, the inferior frontal gyrus, and the middle

14  frontal gyrus have relative involvement in different ways in

15  working memory, memory encoding, memory retrieval, some aspects

16  of emotion, some aspects of motor control, a lot of stuff.

17  Q    Now, you said working memory.  What does that mean?

18  A    Sorry.  Working memory is where someone tells you a phone

19  number and you have to walk across the room and dial it.  When

20  you're holding it in your head, that's working memory.  Working

21  memory is thought of as a repository for information while

22  you're operating on it.

23  Q    And in your opinion, do these areas, the ACC, the IFG, and

24  the MFG, do they correspond to aggression?

25  A    No.  These areas certainly are not highly associated with

375

1  people who are aggressive, or activity in these areas is

2  certainly not highly associated with people who are aggressive.

3  Q   Assuming that you wanted to measure the parts of the brain

4  that are thought to be associated with aggression or control

5  over behavior using fMRI, which areas would you look at?

6  A   Well, I guess the best way to think about it is there's

7  kind of a tale of two patients.  In the 1800s Paul Broca had a

8  patient who had damage in the dorsolateral prefrontal cortex,

9  the left side inferior frontal gyrus, and middle frontal gyrus.

10  That patient no problems in behavioral control that were

11  reported, but that patient could only say the word "ton."  In

12  other words, damage to the left side IFG and MFG produces

13  what's called Broca's aphasia, a problem producing speech.

14  This is something actually that Dr. Kronenberger referred to, I

15  believe, in his deposition, even though he didn't identify it

16  with these areas.

17          However, another patient case, Phineas Gage was a

18  railroad worker in the 1800s and was tamping explosives with an

19  iron rod.  That iron rod was shot by the explosive through the

20  forehead damaging the orbitofrontal and ventromedial portions

21  of the brain, ventromedial prefrontal cortex.  He turned from a

22  nice family guy, church-going, you know, very soft spoken, to

23  someone who ended up being homeless, penniless, with no friends

24  because he basically became a sociopath, couldn't keep his

25  hands to himself, started a lot of fights in bars.

376

1          So, within the realm of these two tales, the inferior

2    frontal gyrus and middle frontal gyrus is typically associated

3    with cognitive processes, like language use and working memory,

4    but the orbitofrontal and ventromedial prefrontal cortex are

5    more closely associated with aspects of behavioral control and

6    self-regulation.

7    Q    And in any of Dr. Kronenberger's research, did he look at

8    the areas you've just identified?  The orbitofrontal cortex or

9    the ventromedial prefrontal cortex?

10   A    Not that I know of.  In Dr. Mathews' study there's a

11   specific comment that they didn't look at those areas because

12   they were not technically able to.

13   Q    And in the Mathews study, as you know, Dr. Kronenberger

14   said that they used a counting Stroop task.  In your opinion,

15   does the Stroop task used in this study measure self-control?

16   A    No.  It measures your ability to respond to one thing by

17   picking it out of two choices and ignore the other thing.  So,

18   it's about filtering and selective attention and responding.

19   Maybe working memory, but certainly not behavioral control in

20   that sense.

21   Q    And then in Dr. Mathews' studies, Dr. Kronenberger refers

22   to the study as finding similarities between control

23   adolescents with high media violence exposure and the teens

24   with a diagnosis of a disruptive behavior disorder.

25          If you look at Table 1 on Page 289 of the Mathews

1  study, in your opinion does this show -- do you agree that

2  there are similarities in these two groups?

3  A   I'm sorry.  Which are the two groups again?

4  Q   The control with a high media violence and the DBD group.

5  The all DBD is what Dr. Kronenberger was comparing.

6  A   The all DBD group actually shows bilateral activity in the

7  middle frontal gyrus.  That means on the left and right sides.

8  The controls with high media violence exposure show left-sided

9  middle frontal gyrus activity only.  So, typically in our

10  studies we'd say they look different.

11  Q   And do you read the Mathews study as showing a reduction in

12  activation in the frontal lobes for the DBD group and this

13  control group with high media violence?

14  A   It's really hard to make that assessment.  If you look at

15  the table, they report that there's one cluster of activity in

16  the left middle frontal gyrus for controls with high media

17  violence exposure and two clusters, one in the left inferior

18  frontal gyrus and one in the anterior cingulate, although we

19  don't actually know what part of the anterior cingulate.

20       Now, if you just counted clusters that way, you'd say,

21  well, there's two here in one group and one in the other group,

22  and so it looks like there's a reduction.  However, the

23  scientific standard for presenting data of this sort is not

24  just to report numbers of clusters, but the size of the

25  clusters, how many voxels in the cluster.  So, actually, if you

378

1  were to look at the tables in the Wang study that's a

2  presentation, they tell you how many voxels are active in a

3  cluster and what the signal strength is.  Here it's impossible

4  to assess just because the number of clusters doesn't tell you

5  how much signal is there.

6  Q    And what about for the DBD group versus the control group?

7  Is there a reduction in the number of clusters?

8  A    Overall?

9  Q    Yes.

10  A    It doesn't look like it to me.  It looks three and three.

11  Q    And Dr. Kronenberger talked about, for the DBD group,

12  finding activity actually at the -- greater activity in the

13  middle frontal gyrus, as opposed to the inferior frontal gyrus?

14  A    Yes.

15  Q    And what does it mean -- what does that mean in terms of --

16  what's your opinion of that finding?

17  A    Well, Dr. Kronenberger doesn't really give us much of an

18  interpretation of what the relative responsibilities are of the

19  inferior frontal gyrus or the middle frontal gyrus.  I could

20  make up a good story here and say, well, the guys who are using

21  the inferior frontal gyrus were talking to themselves when it's

22  on the left side.  They're kind of subvocalizing the task.  The

23  guys with the middle frontal gyrus activity maybe on both sides

24  are using visuospatial working memory and verbal working memory

25  in a slightly different way.  So, in other words, you could say

379

1  you can get the same effects when two groups use different

2  strategies, but it doesn't imply a deficit.

3  Q   And then Dr. Kronenberger agreed that in this study there's

4  no showing of a difference in Stroop task performance between,

5  for instance, the control with high media violence versus the

6  control with low media violence; that is right?

7  A   That's my reading, yes.

8  Q   So, if you do have two different groups and they have the

9  same performance, but they show a different pattern of brain

10  activity, what conclusion can you draw from that?

11  A   Well, they're different groups with different strategies.

12  So, Patty Reuter-Lorenz, who's a neuroscientist at Michigan,

13  has been studying older adults over the age of 65 and younger

14  adults under the age of 50 and looking at their memory

15  performance, and when they're matched on memory performance,

16  they show patterns like this.

17       In other words, they do equally well in memory, but

18  they show a different strategy, the older adults being

19  bilateral in their cortical recruitment and the young adults

20  being more unilateral.  Since there's no difference in

21  performance, you can only say that they're using the brain

22  differently to achieve this performance.

23  Q   Assuming that this study does show a reduction of activity

24  in the frontal lobes, could there be an explanation for this

25  other than impairment?

380

1  A   Well, there could.  A reduction in frontal lobe activity

2  could reflect an increase in expertise in carrying out certain

3  kinds of attentional tasks.  So, Poldrack has reported a study

4  where people do a certain kind of attentional task repeatedly,

5  and what he finds is there's a reduction in cortical activity

6  in these kinds of regions.

7         So, reductions in cortical activity could reflect

8  increases in efficiency.  And indeed when people play violent

9  video games, there's evidence from work by Green and Bavelier

10  that they do improve in selective attention and attentional

11  capacity.

12         So, there's behavioral evidence from one set of

13  studies, one study, that shows that playing certain violent

14  video games to a great degree improves your expertise with

15  attention and attention capacity.  There's another study that

16  shows when you develop expertise with attention capacity, you

17  get a reduction in these kinds of areas for activity in the

18  brain.  So, that's a possible explanation.

19  Q   And how do you interpret the role of the DBD group in this

20  study and in Dr. Kronenberger's other studies of brain imaging

21  and executive function in terms of comparing DBD with the high

22  media violence group?

23  A   His intent or the effect when you read the paper?

24  Q   Well, how do you interpret the role, or how do you read

25  that?

Appendix 2 Page 158

381

1  A   Well, the implication of their inclusion is that they serve

2  as a kind of blueprint to the brain.  So, here's a group of

3  kids that on basic criteria of report seem to be aggressive.

4  They show a certain pattern of brain activity.  Now, here's

5  another group of kids.  They're not necessarily aggressive.

6  Nobody's diagnosed them as aggressive.  But look,

7  Dr. Kronenberger would say.  There are similarities in their

8  brain activity.  Thus we can take that as a kind of surrogate

9  outcome measure.  We can say, oh, there's an early warning sign

10  there that they're going to turn out like these DBD kids,

11  although the similarities don't really warrant that kind of

12  conclusion.

13  Q   Now I'd like to turn to the nonfMRI study of executive

14  functioning, which is Defendants' Exhibit 2, and this is the

15  study that Dr. Kronenberger was a principal author on.  And you

16  reviewed this study?

17  A   I did.

18  Q   And in your opinion, did this study find a difference in

19  executive functioning along the lines of media violence

20  exposure?

21  A   No.  I was confused about this study for a long time until

22  I looked very carefully at the measures that were used.

23  Dr. Kronenberger wants us to read this study and take the

24  Stroop color-word data as indicating that a slowdown in Stroop

25  color-word response is a measure of a problem of a certain kind

382

1   of executive function.  And that might be a valid conclusion,

2   except he doesn't actually report the data that represent the

3   interference effect.

4          So, he tells us, oh, this is how long it takes

5   people -- well, he doesn't tell us how long it takes people to

6   name things.  He tells us that it takes longer to name

7   color-word ink when you have high exposure to media violence

8   regardless of other qualifications.  But, in fact, what he

9   could mean is that people with high exposure to media violence

10  just slow down in everything they do because he didn't measure

11  the difference between the time it takes them to name the color

12  of X's in relation to the color-naming time for the words.

13         So, Stroop interference is actually the difference in

14  the reaction time, and that's important.  If you're really slow

15  at naming everything, you'll be slow at naming the X's and slow

16  at naming the ink for color-words.  And then you subtract that

17  difference, and there may or may not be a Stroop interference

18  effect.

19         He only reported -- even though he makes an argument

20  about why he does it, he only reports the color-word naming

21  times raw in relation to media exposure.  And so, you can't

22  tell anything about executive function from that.

23  Q   Okay.

24  A   Oh, and sorry.  The continuous performance task is another

25  situation of that kind.  So, in the continuous performance

383

1   task, executive function might be reflected to some degree, at

2   least in terms of attention and focus of attention vigilance,

3   by your propensity to correctly withhold a response to an X or

4   your failure to withhold that response, that is, to respond

5   inappropriately when this infrequent X stimulus comes up in the

6   continuous performance task.  That's a task where letters come

7   up, you press the button when you see a letter, and you don't

8   press to an X.  But what he reports is the variance -- he

9   reports a standard error of the mean, but it's the variance in

10  reaction time.  That means how slow are you to how fast are

11  you, not whether or not you're responding incorrectly.

12          Now, the measure that you really want, if you believe

13  that people can't inhibit their responses, is the false alarm

14  rate.  How many times do you press the button to the X.  But he

15  didn't give us that information.

16          So, from the two laboratory measures, there's no

17  evidence in this paper that I can see about the relationship,

18  raw or regressed out, about media exposure and executive

19  function.

20  Q   Now, I just want to talk briefly about the Wang study,

21  which is not in evidence, but I know you've reviewed that

22  study; is that right?

23  A   Yes.

24  Q   And you know that this is the study where they put the

25  subjects in the fMRI scanner and had them watch filmed clips of

384

1  two kinds of video games; is that right?

2  A    That's correct.

3  Q    And Dr. Kronenberger described the study as involving

4  simulated video game play.  Do you agree with that

5  characterization?

6  A    I'm not sure what that characterization means.  I

7  understand from reading what he said that it means pressing a

8  button when something is supposed to happen.  But that doesn't

9  simulate video game play because the world doesn't respond when

10  you make an action.  And anybody who's played a video game is

11  going to immediately recognize there's a decoupling between

12  what they do and what's happening in the world, and that's a

13  very different situation.  It doesn't simulate game play at

14  all.

15  Q    Now, would you expect the fMRI results to be different if

16  the subjects were actually playing the game?

17  A    Well, they could very well be very different.  I mean, when

18  you interact with something, your behavior, your attitude, your

19  responses is different.  In this particular case, we actually

20  don't know a lot about the brain activity that was reported.

21  They only reported, I believe, middle frontal gyrus and

22  inferior frontal gyrus activity.  So, they did not report

23  whether or not there was anterior cingulate activity.

24          And also, quite surprising, given that there was a

25  violent video game that they were watching, there was no

385

1  evidence of amygdala activity, which is something they would

2  have predicted.  At least they didn't report it.

3          So, I have no idea what it would be like, but since

4  it's a very different situation for you to interact with the

5  world and change it, I'm sure that the brain activity would be

6  different.

7  Q   Now, why do you say that amygdala activity is something

8  they would have predicted?

9  A   Well, that's part of the background assumption from

10  paragraph 18 from Dr. Kronenberger's declaration.  So, he makes

11  the assertion about hyperarousal of the amygdala, and that's in

12  the context of if you're exposed to some kind of violent

13  information, in principle you should get hyperarousal.

14          In Dr. Cronin's (phonetic) study, they used the

15  violence-related words as a proxy for violent presentation.

16  One presumes that if watching a violent video game in this

17  study activated the amygdala, they would have been quite happy

18  to report it, but they didn't.

19  Q   Now, Dr. Kronenberger testified yesterday that the Wang

20  study showed bilateral activation in the middle frontal gyrus

21  for the control group, whereas in the Mathews study it showed

22  bilateral activation for that same area in the DBD group.  Is

23  that consistent with Dr. Kronenberger's claim of a deficit in

24  the prefrontal cortex?

25  A   Well, it's a little confusing.  So, the standard model of a

386

1   deficit is a stroke.  In a stroke a part of the brain dies.

2   That part of the brain can't respond.  If you believe that a

3   part of your brain is unresponsive because of habitual behavior

4   of some kind, it should just be unresponsive.

5           Now, I know Dr. Kronenberger has argued that it's a

6   different task, and so there's different demands on it, and I

7   agree with that, but in respect of the model of deficit, if the

8   brain is deficit, it should be deficit in both cases.  The fact

9   that it responds in one case and doesn't respond in another

10  case doesn't signal a deficit.  It signals a difference in

11  strategy.  I think people were just approaching this task

12  slightly differently than the other task, neither of which has

13  to do with behavioral control or self-regulation.

14  Q    And does this study show an impairment of executive

15  functioning for teens with high media violence exposure?

16  A    This study?

17  Q    Yes.

18  A    There's no measure that I'm aware of of executive

19  functioning in this study.  That would be a behavioral claim.

20  In fact, this study didn't give us any behavioral data.  I

21  didn't know until late in the game that people were doing

22  anything.  I did not see a clear measure of a task of pressing

23  buttons, and given that people were pressing buttons, you might

24  want to know how much agreement there was in the places the

25  buttons were pressed, are people perceiving these videos the

387

1  same way, are they equally quick.  There are a lot of questions

2  you could ask about the behavioral data, but none of it's

3  given.

4  Q   As when you mean you didn't see it 'til late in the game,

5  it wasn't in that Wang slide presentation?

6  A   I didn't see it in the Wang study.  I saw it described

7  either in the deposition for Dr. Kronenberger or his

8  declaration.

9  Q   Now, you already mentioned the Kalnin study, and that's

10  phase two of Dr. Kronenberger's research, as he testified.

11         Now, Dr. Kronenberger has described this study as

12  using a, quote, emotionally provocative, end quote,

13  neurocognitive task.  Do you agree with that description?

14  A   No.  Well, I suppose it depends on what he really means by

15  emotionally provocative, but in the vernacular of something

16  that's emotionally provocative, very few people really get

17  upset when they see the word hit or kill.  They might have a

18  judgment about that word, but they don't really get agitated.

19  So, I don't consider it emotionally provocative.  We do

20  emotionally provocative Stroop tasks, too, and all that really

21  means is that subjects can decide whether a word is positive or

22  negative.

23         In this particular study, they actually didn't collect

24  valence ratings.  So, we don't know if there were effects on

25  people's mood.  You could collect what's called a profile of

388

1  mood states or a panus (phonetic), which is another measure of

2  how you're feeling.  So, these people saw these words.  You

3  could ask them essentially by the appropriate measures, are you

4  feeling anxious, upset, agitated, or something, depressed, sad.

5  They didn't ask them anything.  So, there's no evidence from

6  the behavioral aspect of this that it's emotionally provocative

7  at all.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nusbaum – direct

1   Q   Is it possible that you would have the same kind of

2   response to a word like "hit" or "kill" and to a word like

3   "love" or "happy"?

4   A   In behavioral terms or in fMRI terms?

5   Q   In terms of responding more slowly to those terms.

6   A   Oh, absolutely.  In our emotional Stroop test where we use

7   things like "happy" and "sad," people are slowed down both to

8   the "happy," the positive and the negative words.

9           There is no way to know in this study because they

10  didn't include the positive control words.

11  Q   Now, based on the slide presentation which is attached as

12  the first exhibit to Defendants' Exhibit 1, the Kalnin study,

13  do you believe that this study shows that the DBD subjects with

14  high media violence exposure were slower to respond to the,

15  quote, "violent" words than the DBD group with low media

16  violence exposure?

17  A   No, no.

18          Looking at the reaction time data, if anything, it's

19  the opposite.  I was a little bit surprised to see this

20  presentation of data.  Typically, if you want to make an

21  argument about a Stroop effect, you would take, as I mentioned

22  before, a difference between those two conditions, violent and

23  nonviolent words, and plot the magnitude of the interference

24  effect across the groups.

25          They didn't do that.  But they presented the data from

Nusbaum - direct

390

1  the two separate groups in separate graphs.  So you can't even

2  easily compare them, and then they put the graphs on different

3  scales.  So it's a little bit misleading.

4       I mean, the top of both graphs is the same, but the

5  bottom of the two graphs is different.

6       And then I was actually a little bit surprised to hear

7  Dr. Kronenberger say that you can't -- in response to a

8  question from you, Ms. Fallow, that you can't compare those

9  reaction times because you don't have the variances.

10      Well, he didn't put the error bars on.  Standard

11  scientific presentation of these kinds of data would be to put

12  both figures on the same reaction time graph, so you could

13  compare them directly, and then to plot around each point a

14  small bar that would indicate the 95 percent confidence

15  interval.

16      That would tell you, simply by looking, whether or not

17  they are different.  That would be sort of the standard in most

18  scientific presentations.  So it is a little bit disturbing the

19  way this data has been presented.

20      No, you can't draw a conclusion of that sort at all.

21  Q   What about the assertion that they may have been -- that

22  the DBD subjects with high media violence may have been, just

23  as an absolute number, slower to respond to the violent words

24  than the DBD subject with low media violence?

25  A   Well, the DBD subjects with high media exposure are slow

Nusbaum – direct

391

1  kids.  If you look at the nonviolent words, they are the

2  slowest kids.  If you look at the violent words, they are the

3  slowest kids.

4         Not only that, even though they are matched on IQ,

5  they have the lowest accuracy on both sets of words of both

6  groups.

7         So there is clearly something different about these

8  kids than all the other groups.

9  Q   Now, on page -- I am sorry.

10        Dr. Kronenberger has stated in paragraph 33 of his

11 declaration, the second and third bullet points, that the

12 Kalnin study shows more activation in certain areas of the

13 brain when responding to the violent as opposed to the

14 nonviolent words.

15        Based on your review of the presentation, did the fMRI

16 images in this slide's presentation represent the subject's

17 response to the emotional versus the nonemotional words or the

18 violent versus the nonviolent?

19 A   There is no evidence of that.  I mean, it could very well

20 be the case that they calculated those subtractions and never

21 put it into the presentation.

22        But when I read the presentation, I was very confused

23 by it because it looked like they were taking the violent words

24 and the nonviolent words and simply looking at contrasts

25 between the groups.  There didn't seem to be any evidence that

Nusbaum - direct

392

1   they were actually taking a difference between the two types of

2   words and then a double subtraction of the two groups.

3          It is not particularly difficult to do that, but there

4   is no evidence in the presentation that they did it.

5   Q    Okay.  Now, putting that aside, assuming whether Dr. Kalnin

6   separated out the reaction to the two sets of words,

7   Dr. Kronenberger cites the study as showing greater activation

8   in the amygdala and the parahippocampal gyrus for both the DBD

9   group and the high media violence exposure group.

10         Now, you have already talked a little bit about the

11  amygdala.  Is the amygdala associated with feelings of fear?

12  A    Well, in the research on the amygdala, the amygdala is one

13  of the target areas people study in what is called fear

14  conditioning.  And what fear conditioning is about is your

15  anticipation of potential harm following a particular stimulus.

16         However, in the research on conditioning, it also

17  follows that you get amygdala activation when you anticipate a

18  reward or pleasure.  The amygdala is more active when you see a

19  happy face.  It's also more active when you see a disgusted

20  face and a fearful face.

21         So it is not entirely clear to me that it is the seat

22  of emotional experience, as one might infer, but it certainly

23  is involved in lots of cases where there is uncertainty in

24  learning and uncertainty in outcomes.

25         It's even active if you are listening to two different

Nusbaum - cross

393

1  syllables, one to each ear.  So I don't think you could

2  necessarily state that because that area of the brain is active

3  that it reflects fear on the part of the subjects.

4        MS. FALLOW:  Thank you very much.  I have no further

5  questions.

6        THE COURT:  Cross-examination.

7                    CROSS EXAMINATION

8  BY MS. LIU:

9  Q   Good afternoon, Dr. Nusbaum.

10        You are not a neuroanatomist, are you?

11  A   No, I am not a neuroanatomist.

12  Q   You don't design fMRI studies independently?

13  A   Independently of?

14  Q   You design them yourself?

15  A   Yes.

16  Q   Do you require a radiologist or a neuroradiologist?

17  A   In order to design a study, no.

18  Q   For the fMRI technique or any of the specific calibrations

19  for the fMRI?

20  A   I actually have not done any of the published studies with

21  a radiologist.  The published studies were done with a

22  neurologist.

23        In both those cases I designed -- I certainly designed

24  entirely the first study.  I designed significant aspects of

25  the second study that is published.  That was collaborative

Nusbaum - cross

394

1    work, but I did design the studies.

2    Q   You designed the actual testing but not the actual -- the

3    fMRI coordinates or how the graphs are going to read?

4    A   The data analysis in both those studies was relatively

5    parochial, but, in fact, I directed all the data analysis in

6    the cognitive neuroscience paper.

7    Q   Now, you have never done any fMRI studies firsthand or

8    designed or collaborated, have you, with respect to any

9    relationships between adolescent behavior and destructive

10   disorders?

11   A   Correct.

12   Q   What about adolescent behavior in ADHD?

13   A   No.

14   Q   Have you performed firsthand or designed any studies

15   including fMRI or just neurocognitive testing to measure fear

16   or aggression?

17   A   No.  I guess I should qualify that, though.  I am currently

18   working on a study of loneliness where people are looking at

19   emotionally disturbing pictures, and there are inferences being

20   made about the subjects based on a lot of research that is done

21   with John Caccioppo that suggests not that they feel fear or

22   aggression, but they certainly are in what might be called a

23   threat appraisal mode; that is, they are wary when they see

24   some of these images.

25   Q   Are you using any kind of a hypothesis or methodology that

Nusbaum - cross

395

1   is analogous to what you would test for adolescent disruptive

2   behavior disorders?

3   A   I would not particularly test for disruptive behavior

4   disorder.

5   Q   You don't even treat any adolescents or children with

6   disruptive behavior disorders, do you?

7   A   That is correct.  I don't treat anyone.

8   Q   You don't evaluate them?

9   A   Hmm?

10  Q   You do not evaluate them?

11  A   I do not evaluate them, no.

12  Q   You don't treat or diagnose any children with attention

13  deficit disorders either?

14  A   No, I don't, although I have talked about collaborations

15  with various people having to do with attention deficit

16  disorder; that is, I have consulted with them.

17  Q   You identified earlier in your testimony several published

18  studies that you cited to Ms. Fallow regarding attention and

19  fMRI studies as well as testing on brain activity with respect

20  to attentional capacity, et cetera; do you remember?

21  A   Yes.

22  Q   And is it your testimony now that those articles are

23  relevant to any of the opinions in your declaration?

24  A   Only as background to my understanding of cortical function

25  and fMRI research and the relationship to behavior.

Nusbaum - cross

1  Q   You have never conducted any firsthand research,

2  experimental, correlational, longitudinal, on the effects of

3  violent video games, have you?

4  A   Yes.

5  Q   What in particular?

6  A   We have carried out a study that involves people learning

7  to play violent individual games and the effects of sleep on

8  consolidating that learning.

9  Q   Was this this particular study where you recruited the

10 students over 18?

11 A   Yes.

12 Q   And there was no fMRI testing in this, correct?

13 A   No.

14 Q   And did this involve a violent video game as you described

15 to involve computer robots?

16 A   Yes.

17 Q   There was no human-like depictions in there?

18 A   Well, it's very similar to Marathon 2 which Dr. Anderson

19 was talking about.  The games that we used were Unreal

20 Tournament and Quake 3.  There are human-like depictions, but

21 they don't look like normal humans.

22 Q   You are describing them as human because they have a head

23 and two arms and two legs and that's it?

24 A   Well, they have a face.

25 Q   Would you mistake them for a human?

Nusbaum - cross

397

1  A   They wear clothes.

2       I am sorry?

3  Q   Would you or a 13-year-old mistake them for a human?

4  A   I don't think anybody would mistake anybody in a video game

5  for a real human, 13 or not.

6       If you asked, looking at one of these images, is this

7  one a person and is this one a robot, they would probably say

8  that one is a person.

9  Q   Particularly subjects over the age of 18, correct?

10  A   Probably subjects under the age of 13, certainly the

11  13-year-olds that I have met that play these games.

12  Q   But you didn't test those 13-year-olds in this particular

13  experiment?

14  A   No, I did not.

15  Q   You are still not using fMRI testing in this particular

16  experiment?

17  A   Correct.

18  Q   Have you designed or conducted any firsthand research or

19  experimentation on any type of media violence other than

20  violent video games?

21  A   I suppose you could consider the IAPS pictures that we are

22  using in the loneliness study -- that is International

23  Affective Picture System.

24       The IAPS pictures have pictures of car crashes,

25  dismembered human beings, babies with tumors, as well as nice

Nusbaum – cross

398

1  couples sitting on a park bench, good sunsets, and baby seals

2  not being clubbed.

3          So it has pictures that are violent in it, and people

4  are not happy about those pictures, and that is an fMRI study,

5  but it was not carried out as a study of media violence per se.

6  Q    So you are not trying to measure any type of relationship

7  in that study with media violence or affect or disorder or

8  mood?

9  A    In our research we don't ask questions about media

10  violence.

11          What we are asking is a question about emotional

12  responses in humans with a role of attention in those emotional

13  responses and, in this particular study, how loneliness plays a

14  role.

15  Q    You were referring to studies that have shown sometimes

16  decreased activity in the dorsolateral prefrontal area may

17  actually implicate an expertise or an effect called

18  automaticity.

19          Do you remember that?

20  A    Yes.

21  Q    Are you referring specifically to any literature

22  publication in support of that?

23  A    Certainly at least the Poldrack study.

24  Q    In the Poldrack study, are you referring to the neural

25  correlates --

Nusbaum - cross

399

1          THE COURT:  Spell that.

2          THE WITNESS:  Poldrack, P-o-l-d-r-a-c-k.

3  BY MS. LIU:

4  Q   This is the neural correlates of motor skill automaticity

5  article 2005?

6  A   Yes.

7  Q   In this particular case, how old were the subjects, do you

8  recall?

9  A   I am sure they were at least college students.  I didn't

10  check their ages.

11  Q   What was the hypothesis?

12          Were they trying to measure anything related to media

13  violence?

14  A   No.

15  Q   Did they use certain regions of interest?

16          In other words, did they hypothesize that there were

17  going to be certain areas of the brain that may or may not be

18  activated during tasks?

19  A   Absolutely.

20  Q   So is there --

21          Is it fair to make an assumption that there are

22  certain areas of the brain or regions including systems of the

23  brain that a scientist can make an a priori assumption about

24  potential activity when they are designing a study to go look

25  for that activity in the scanning results?

Nusbaum – cross

400

1  A   Sure, as long as you don't make the additional

2  interpretation that that area is controlling the behavior that

3  you are investigating.

4       I don't think in the Poldrack study they are ever

5  arguing that any of those regions is controlling particular

6  behavior, but they are looking at decreases in activity in

7  certain regions as a result of automaticity or learning.

8  Q   But just because one particular brain region is being

9  recruited during a certain task or a mental process, even if

10  it's your opinion that that is not the sole exclusive neural

11  activity correlate, it is possible that you can't rule out that

12  particular brain activation as being associated, can you?

13  A   Oh, no.  By definition it would be associated.

14       The word "associated" means correlated with.  And so

15  in that respect, that activity is certainly part of the

16  package.

17       But what its role is is unclear.  So I think in one of

18  our principles in the Journal of Personality and Social

19  Psychology article, you mentioned something about the light

20  that goes on in your heater when the heater turns on, and that

21  light goes on every time your heater turns on, but it is not

22  producing any heat.

23       That can happen to the brain, too; that is, you can

24  see activity in regions that's correlated with a function, but

25  it is not clear just from that alone what role that plays in

Nusbaum – cross

401

1  the function.  You have to do other research.

2  Q   It's not your opinion --

3        THE COURT:  Can we take a break for just a second?  I

4  just need to take a short break.

5      (Brief recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

402

1    (Brief recess.)

2  BY MS. LIU:

3  Q   Dr. Nusbaum, one of your criticisms also regarding

4  Dr. Kronenberger's methodology is the use of a self-report; is

5  that correct?

6  A   Yes.

7  Q   Isn't it true, though, one of the studies that you rely

8  upon heavily, the Green and Bavelier study with respect to I

9  think it was the acquisition of skill increased efficiency

10  study, they also rely upon self-report?

11  A   Correct, but one of the things that's nice about that study

12  is they formed a hypothesis from the reports of people's

13  game-playing, and they found group difference, significant

14  group difference based on that, but then they experimentally

15  tested it by training randomly assigned subjects either to a

16  Tetris group or to a Medal of Honor or Call of Duty group.  So,

17  they were able to test the hypothesis that came from the first

18  study in an experimental setting and replicate their findings.

19  Q   Well, even in this particular study that you rely upon,

20  isn't it true that they didn't account for gender in four out

21  of the five studies, four out of the five tests that they

22  applied to the subjects in the Green and Bavelier study?

23  A   Yes.

24  Q   In fact, the first four tests was all male subjects?

25  A   Correct.

403

1 Q    It wasn't until the last experiment in which they included

2 the training session they decided to add the females?

3 A    Yes.

4 Q    And is it your opinion that the gender has nothing to do

5 with a person's ability with respect to this relationship that

6 the study was trying to prove with visual perception, motor

7 skills, etc.?

8 A    Well, in the last study they showed that females got the

9 effect, as well.  So, whether it has an effect, I don't think

10 they went on to test that.  So, I can't really say whether it

11 does or doesn't have an effect.

12 Q    Well, both these studies, the Poldrack study and the Green

13 and Duvalier study, which you're citing in support of your

14 proposition that video games and, in fact, action video games

15 may increase perception, visual attention, and motor skills,

16 don't they both also involve sessions of training in which the

17 subjects are actually trained?

18 A    Yes.

19 Q    So, that's a little different than putting a kid in the

20 scanner, having them perform Stroop tasks that aren't

21 particularly interesting; isn't that correct?

22 A    Well, in the Poldrack study, the training that they provide

23 on the tasks is I'm taking that as a proxy for video game

24 experience.  I'm taking that as a proxy in light of the fact

25 that in the Green and Duvalier study if people come in having

404

1  played video games, they showed this expertise on tasks of

2  visual attention.

3         So, it's true nobody has done the study that links up

4  both of those things.  It's an inference.  But then I'm only

5  making this inference as an alternative possible interpretation

6  of what Dr. Kronenberger is claiming.  So, it's not my argument

7  that we should advocate the playing of these games in order to

8  improve everyone's attention skills.  It's only that there's no

9  clear evidence that the reduction in cortical activity

10 necessarily reflects a deficit in Dr. Kronenberger's study.

11 Q   Now, isn't it your opinion that the Stroop task that was

12 used by Dr. Kronenberger's team in their research is, in fact,

13 relevant to any kind of cognitive process that may require

14 focus attention?

15 A   It's relevant to many, not to all.

16 Q   Well, can't the Stroop task performance be used to measure

17 schoolwork and performance in schoolwork, and isn't it, in

18 fact, used?

19 A   Not often that I'm aware of.

20 Q   You're not aware of it being used often or --

21 A   I'm not aware that it is typically used as a proxy to

22 measure schoolwork performance.

23 Q   Are you involved in any type of diagnosis or evaluation of

24 kids with learning disabilities in schoolwork?

25 A   No.

405

1  Q    When you --

2  A    But I can tell you, for example, that some studies find

3  that Stroop interference is unrelated to age, for example.

4  Q    Isn't it related -- color-word test specifically, isn't

5  that related to reading?

6  A    It can be related to reading, yes.  There's a study that I

7  found that showed that reading skill relates to it, but not

8  always.  So, it's only one of those kinds of tasks that you

9  have to, as in Dr. Anderson's work, perhaps regress out a lot

10 of effects to see.  However, it's also not specifically related

11 to age.  So, the Stroop color-word interference doesn't really

12 increase a lot over age.  It does change with IQ, though.

13 Q    Now, you're not disputing that the areas that

14 Dr. Kronenberger's team found during their fMRI studies in the

15 neurocognitive testing, namely, the prefrontal cortex region,

16 the anterior cingulate, and parts of the limbic system, could

17 have been, in fact, activated comparatively during these

18 studies, are you?

19 A    I wouldn't say that those were found as active in

20 neurocognitive testing.  I would say there was active in fMRI

21 studies, according to their report.  And I'm not disputing that

22 the areas that they say are active are active when they say

23 they're active.

24 Q    Is it true or isn't it true that the anterior cingulate

25 activation is generally associated with executive attention?

406

1  A   With?  I'm sorry.

2  Q   Executive attention.

3  A   I'm not quite sure what executive attention means.  It's

4  certainly involved in a lot of attentional tasks, some of which

5  have to do with focus of attention, some of which have to do

6  with monitoring yourself for making errors, say, when you're

7  taking a test and you make an error, encoding in memory, and

8  some aspects of monitoring attention, but I wouldn't say

9  executive attention because I'm not quite sure what that means.

10 Q   Well, if I explain to you does it include areas of

11 task-switching or inhibitory control?

12 A   Task-switching, absolutely.

13 Q   Conflict resolution?

14 A   Conflict resolution where conflict is between a propensity

15 to make two responses, not a conflict where you're having an

16 argument with somebody.

17 Q   Correct.  Not a conflict in an affective way as a

18 behavioral response.

19 A   Correct.

20 Q   What about planning and allocation of attentional

21 resources?

22 A   There's a little more controversy about that, but

23 personally I think it's involved.

24 Q   So, these areas of executive functioning, would you agree

25 they include self-control -- in the cognitive sense, not the

Appendix 2 Page 184

407

1  behavioral way.  Self-control, attention, concentration,

2  self-monitoring.  Are those areas that would be included in

3  executive functioning, as you know it?

4  A   Well, you've slipped in a lot of terms that are not really

5  part of the literature of cognitive processing.  So,

6  concentration, for example, is more of a vernacular term.

7  Self-control, more of a vernacular term.  They may be relevant

8  in clinical settings, but in cognitive research on the anterior

9  cingulate that's scientific, trying to figure out what it's

10  really used for, those wouldn't be the functions that people

11  would be talking about.  But in something like task-switching,

12  for example, yes, there's evidence that it's involved.

13         However, I should point out the anterior cingulate has

14  a lot of little parts, and not all the same parts are doing the

15  same things at different points in time.  And so, in some

16  studies on emotional Stroop, for example, let's say the rostral

17  portion, that is, the lower portion, of the anterior cingulate

18  is active, where cognitive Stroop, a more dorsal or higher up

19  portion might be more active.  Some parts are involved in motor

20  control.  And so, it's not just one undifferentiated object.

21  Q   Now, would you dispute a finding that tasks involving

22  inhibitory responses or impulse control would result in

23  activation in the dorsolateral prefrontal cortex area?

24  A   Not all tasks involving inhibitory control.  Some.

25  Q   But there are tasks?

1  A    If by inhibitory control we're referring to something like

2  the Stroop, obviously, yes.

3  Q    Yes.  Correct.  I'm sorry.  Like the Stroop interference

4  where you have to inhibit one possible response in order to

5  select the second.

6  A    Yes.

7  Q    Have you found any literature or studies critiquing

8  Dr. Kronenberger and his team's research or findings?

9  A    No.  I haven't found anybody who's cited them at all.

10  Q    Have you heard of anectdotally or seen any literature or

11  in-press articles or new studies showing fMRI activation with

12  respect to violent video games?

13  A    I saw a press release for a Michigan State study which

14  showed one sagittal slice.  Hard to know what that means, hard

15  to know what the conditions are about.  But that's the only

16  study that I've seen.

17  Q    What do you know about that study, just anectdotally?

18  A    What do I know about it?  I can't remember much about it.

19  Q    Are you aware that it involved violent video games?

20  A    Yes.

21  Q    And that the subjects were scanned in an fMRI?

22  A    Yes.

23  Q    And isn't it correct that that would be an article that may

24  or may not affect your opinions in this case?

25  A    When it appears in January and I read it, I'll be

409

1  interested to see what they say and what they did.

2  Q    So, isn't it correct that your opinions can be summed up by

3  saying that you don't believe that the conclusions are

4  supported by the research, but you don't have any contradictory

5  research or findings that can unequivocally say that

6  Dr. Kronenberger's results are wrong?

7  A    That's correct.

8  Q    And you don't dispute the fact that the DLPFC and the ACC,

9  as well as part of the amygdala, may be implicated during the

10  conditions that were tested in Dr. Kronenberger's tests?

11  A    The amygdala, I think, is only active in one of the four

12  different -- three fMRI studies that he reports.

13  Q    That was in the Kalnin study; is that correct?

14  A    In the Kalnin study, correct.

15  Q    And the Wang study and the Kalnin study, the articles that

16  you -- I'm sorry.  Not the articles.  The documents or the

17  presentations you reviewed, those were papers, correct?  They

18  were power points, but they were not actually published

19  articles?

20  A    Correct.

21  Q    So, you don't know the underlying data that went into the

22  picture that was presented in the paper or the power point, do

23  you?

24  A    Absolutely.  I'm kind of surprised that anyone would take

25  that as evidence, given the lack of supporting detail.

410

1  Q   Well, if you were a team member and you consulted with the

2  other team members, wouldn't it be reasonable to infer that you

3  would, in fact, know the underlying data?

4  A   I would, but whether anybody else in the world would

5  necessarily treat as evidentiary that presentation seems highly

6  questionable, especially given the way some of the data are

7  presented.

8        MS. LIU:  No further questions.

9        THE COURT:  Any questions?

10       MS. FALLOW:  No.  I'm sorry.

11       THE COURT:  You're excused.  Thank you.

12   (Witness excused.)

13       THE COURT:  Okay.  In terms of other evidence that

14  people want to give me, I take it do people want to give me

15  copies of the depositions of some or all the people?  Tell me

16  what you're going to give me.

17       MR. SMITH:  We're going to certainly give you -- I

18  guess the declaration of Professor Goldstein is already --

19       THE COURT:  The declarations we're considering already

20  in evidence.

21       MR. DEADY:  We have the transcript from

22  Dr. Goldstein's deposition that we have today.

23       THE COURT:  Dr. Goldstein.  And are you going to give

24  me -- wasn't there one person on the plaintiffs' side that

25  didn't get called?

411

1          MR. SMITH:  That was Dr. Goldstein.

2          THE COURT:  I'm sorry.  On the defendants' side that

3    didn't get called.  Do you have his or her deposition?

4          MR. DEADY:  They didn't take their deposition.

5          THE COURT:  Didn't take it.  Okay.  So, the only

6    additional evidence I'm going to get is Dr. Goldstein's

7    deposition.

8          MR. DEADY:  That's correct.

9          THE COURT:  And you have that here?

10         MR. DEADY:  Yes.

11         THE COURT:  Oh, perfect.  Okay.

12         All right.  So, neither side has -- other than that,

13   neither side has any other evidence that you want to present;

14   is that right?

15         MR. SMITH:  That's correct, your Honor.

16         MR. KASPER:  Correct, your Honor.

17         MR. DRYJANSKI:  That's correct.

18         THE COURT:  Everybody says yes.  All right.

19         Okay.  In terms of argument, you tell me what you have

20   in mind in terms of length.  You have to talk first.

21         MR. SMITH:  I have to talk first.

22         THE COURT:  Yes.

23         MR. SMITH:  You have to give me a second to think.

24         THE COURT:  And I get to talk last, which is the

25   advantage.  So, you have to show yours before I show mine, in

412

 1   other words.

 2           MR. SMITH:  Twenty minutes, half an hour.

 3           THE COURT:  Oh, you can have a half an hour.

 4           MR. DEADY:  I think a half an hour is fine.

 5           THE COURT:  Is it just you guys that are going to

 6   argue?

 7           MR. KASPER:  Actually, your Honor, as you may recall,

 8   a couple weeks ago I mentioned my upcoming honeymoon.  Well,

 9   the time is upon us.  So, Mr. Deady and Mr. Dryjanski are going

10   to argue for us.

11           THE COURT:  Okay.

12           MR. KASPER:  Actually, I'm leaving as soon as we're

13   done.

14           THE COURT:  Oh, okay.  Well, have a good time.

15           MR. KASPER:  Well, thank you.

16           MR. DEADY:  And we were just going to -- Judge, I was

17   just going to handle the violent video, and then Mr. Dryjanski

18   was going to handle the sexually explicit.

19           THE COURT:  Okay.  So, if I give you a half hour

20   altogether, is that enough?  Do you think it's not enough or --

21           MR. DEADY:  I would think probably enough, Judge, but

22   it depends on what the questions are.

23           THE COURT:  Okay.  Well, I'm not necessarily going to

24   give people a hook at 30 minutes and one second.  So, I

25   probably will have some questions.

413

1        But let's see.  Why don't we say 10:00 o'clock, and I

2  ought to be done before 10:00 tomorrow, unlike today.  And

3  depending on how you want to break yours up, I mean, if you

4  want to save some time for rebuttal, that's fine.

5        MR. SMITH:  I'm sure I'll save a little time.

6        THE COURT:  And I'd like to get it done in the morning

7  session.  So, that means 10:00 o'clock to 12:30.  So, I'll

8  probably end up giving you a little bit more time beyond a half

9  an hour, but don't plan on it because if you plan on a half

10  hour, then you'll end up taking an hour.

11        MR. SMITH:  The other motion that's outstanding is the

12  standing motion that was --

13        THE COURT:  I'm aware of that, and I know that I

14  didn't deal with that earlier, and I will try to -- if I don't

15  deal with that tomorrow, I'll deal with it in the ruling, but

16  for purposes of the argument tomorrow assume that that motion

17  is going to be denied, as well.  But be prepared to answer

18  questions about it because I'm going to look over it again

19  tonight, and if there's something to ask on either side, I'll

20  let you know tomorrow.  Okay.  Any other questions?  Anything

21  anybody needs to bring up?

22        MR. KASPER:  No, your Honor.

23        THE COURT:  Very good.  Thanks a lot.

24     (Whereupon, the within trial was adjourned to Wednesday,

25     November 16, 2005, at 10:00 o'clock a.m.)