**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

        Plaintiffs,

v

JENNIFER GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General for the State of Michigan, et
al, and KYM L. WORTHY, in her official
capacity as Wayne County Prosecuting
Attorney,

        Defendants.

No. 05-73634

HON. GEORGE CARAM STEEH
MAGISTRATE JUDGE PEPE

---

Dennis J. Levasseur (P39778)
Alicia J. Blumenfeld (P67511)
Bodman LLP

Denise C. Barton (P41535)
Jason R. Evans (P61567)
Ann Sherman (P67762)
Attorneys for Defendants
Michigan Department of Attorney General
Public Employment, Elections & Tort Div.

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
Jenner & Block LLP

---

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

**I.**     **The *Brandenburg* test is inapplicable because aggression, although it can encompass
violence, is not necessarily tantamount to violence.**

The *Brandenburg* test sets forth a standard that must be met before the government may

regulate speech to prevent violence.[1]  Violence is defined as "[p]hysical force exerted for the

---

[1] *Brandenburg v Ohio*, 395 US 444, 447 (1969).

purpose of violating, damaging, or abusing."[2] Aggression, however, is a far broader concept than violence. Aggressive actions are marked by hostility.[3] Dr. Craig Anderson, a well-known authority in this area, indicates that social psychologists define aggression as "behavior that is intended to harm another individual." (Pls' Exh 1, Anderson direct, 213:13-15.) He describes aggression as a continuum that runs from fairly mild to very severe, and distinguishes violence as being on the "high end of this sort of severity dimension." (Pls' Exh 1, Anderson direct, 232:17-20.) Dr. Anderson discusses as one of the possible ramifications of increased aggression in children a deterioration in social relationships with parents, peers or teachers. (Pls' Exh 1, Anderson direct, 232:5-9.) He also discusses desensitization, the potential for a decrease in negative emotional reactions to violence or scenes of violence. (Pls' Exh 1, Anderson direct, 232:17-22.) These potential ramifications can hardly be characterized as violence. Therefore, aggression is not tantamount to—although it may certainly encompass—physical force.

Here, the Act's stated purposes of preventing "violent, aggressive and asocial behavior from manifesting itself in minors, and "directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games," includes violence, but also includes less severe manifestations of aggressive behavior. Its reference to "real-life harms" is broad enough to include many harmful responses, including those described by Dr. Anderson. Accordingly, the Act's purposes fall well outside of the parameters of the *Brandenburg* test.

**II.     The State seeks to protect minors, not control their thoughts.**

Plaintiffs claim that the State's sole aim in passing the Act is to control the thoughts of minors. (Pls' Brief at 7). This narrow characterization not only minimizes the State's clear intent in passing the Act but also wholly ignores the language of the Act that refers to "real-life harms,"

---

[2] The American Heritage Dictionary of the English Language (5th ed. 1976).

and "aggressive behavior." It is quite apparent that, when read as a whole, the Act seeks to do something far different than control the way a minor thinks. A thought is only an idea or a notion.[4] The Act, in contrast, seeks to protect the minor and society from the negative <u>consequences</u> that may flow from minors' access to ultra-violent video games—harmful consequences that have been well-recognized by the medical community. (See Defs' response to Pls' Motion for SJ, Exh 3, *Joint Statement on the Impact of Entertainment violence on Children*, Congressional Public Health Summit, July 26, 2000).

### III. The functional aspects of ultra-violent video games are not protected speech.

Defendants agree with Plaintiffs that, under *James v Meow Media*, the First Amendment fully protects expression in video games.[5] But a careful reading of *James* reveals that the Sixth Circuit did not so hold as to the mere functional aspect of video games. Moreover, the court's analysis in *James* lends supports to Defendants' assertion that the functional aspect can be a separate component of the constitutional inquiry into whether video games are protected speech.

Here, for purposes of constitutional "speech" analysis, the functional task of pressing a button and thereby maiming, mutilating, or decapitating an image resembling a human being can be separated from the expressive elements of an ultra-violent video game such as the playing of music or the shaping of a storyline. This functional element is not expressive and therefore is not fully protected by the First Amendment. And contrary to Plaintiffs' claims, (Pls' Response Brief at 3), the Act targets not just the communicative aspects of ultra-violent video games, but all aspects—including the functional ones. Even if the high-tech graphics, storyline, and music are stripped from these games, the minor player's functional act of urinating on the video "victim" or

---

[3] See The American Heritage Dictionary (5th ed. 1976) (defining aggressive as "[i]nclined to move or act in a hostile fashion").
[4] See The American Heritage Dictionary (5th ed. 1976).
[5] *James v Meow Media*, 300 F3d 683 (6th Cir, 2002).

the chopping off of legs and watching the victim crawl in pain ((Defs' response to Pls' Motion for SJ, Exh 2, screen clips from Postal II VHS Tape) is harmful to that minor player, and the State has a rationale basis for limiting a minor's access to these games.

### III. Even if the state must establish a compelling interest, the State meets this burden by offering substantial evidence of harm and narrow tailoring.

As to the expressive aspects of ultra-violent videos, the State has demonstrated a compelling interest based on substantial evidence. Plaintiffs confuse substantial evidence, which is the standard the State must meet to establish a compelling interest,[6] with an arbitrarily-imposed "standard" that requires an exact articulation of every specific harm that flows from violent video games. (See Pls' Brief at 9). While Plaintiffs mischaracterize isolated statements by Dr. Anderson (Pls' Brief at 9), his testimony, when taken as a whole, articulates a broad psychological harm from violent video games that is consistent both with warning statements by the medical community and with the vast body of research considered by the Michigan Legislature prior to passing the Act. Moreover, Dr. Anderson's statements—however "tepid" and inconclusive Plaintiffs may try to characterize them—must be weighed in the context of the immaturity of the juvenile brain. The United States Supreme Court has repeatedly recognized the importance of considering minors' vulnerability, impulsivity, and diminished judgment.[7]

As to narrow tailoring, even if ultra-violent video games represent only a portion of the media violence to which modern American children are exposed, this does not minimize these games' distinctive potential for harm to minors. And common sense is important—as the Supreme Court implicitly recognizes when it factors in juveniles' lack of it[8]—and common sense dictates that the interactive process of actually making the decision to "do" the decapitating,

---

[6] *Turner Broadcasting Sys, Inc v FCC*, 512 US 622, 666; 114 S Ct 2445; 129 L Ed 2d 497 (1994) (articulating the substantial evidence standard in the context of First Amendment rights).
[7] See, for example, *Roper v Simmons*, __US__; 125 S Ct 1189, 1195; 161 L Ed 2d 1 (2005).

maiming, killing, torturing, or urinating, and then carrying out this decision and seeing the result, is far more harmful to minors than mere passive viewing.

Moreover, the "viable alternatives" advanced by Plaintiffs all fail for insufficiency to protect minors from harm. Failure of the industry's rating system is well-documented, both by FTC research and the State's own sting operation. (Defs' Response to Pls' Motion for SJ, Exh 13, 2004 FTC Report, at 20-28; Exh 12, Granholm press release.) Further, parents may not even notice the small rating on the front of the game, or may not, without easy access to the content descriptors, understand its import. Many parents are unfamiliar with video game content and would not begin to fathom the extent of the violence in a mature-rated game. And even assuming the FTC finding as to parent-reported involvement in selecting and purchasing their children's video games (Exh 13, FTC report at 20-28) accurately represents <u>all</u> parental involvement, this statistic neither reflects buying patterns in Michigan (Exh 12, Granholm Release) nor differentiates according to age group. Parents are less likely to be involved in the selection and purchase of video games for minors between the ages of 13 and 16—the age group Plaintiffs target to purchase M rated videos. (Exh 12, FTC Report at 20-28.) With regard to parental controls, not all video games come with these controls, and in any event, they presuppose a parent's understanding of the rating system to assess which games need monitoring.

In the end, as the Entertainment Software Association has publicly acknowledged, it is parents' "ultimate responsibility . . . to take charge of the media their kids consume."[9] Despite this concession, Plaintiffs' position, if adopted by this Court, would take this important decision out of the hands of parents where it belongs and place it in the hands of those who stand to profit from the sale of these ultra-violent video games.

---

[8] See, e.g., *Roper v Simmons*, __US__; 125 S Ct 1189, 1195; 161 L Ed 2d 1 (2005).

        Respectfully submitted,

        Michael A. Cox
        Attorney General

        *s/ Denise C. Barton*
        P.O. Box 30736
        Lansing, MI 48909
        Primary E-Mail: Bartond@michigan.gov
        (P41535)

Dated: March 2, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the following: Defendants' Reply To Plaintiffs' Response To Defendants' Cross-Motion For Summary Judgment.

        *s/ Denise C. Barton (P41535)*
        Dept of Attorney General
        Public Employment, Elections & Tort Defense Div.
        P.O. Box 30736
        Lansing, MI 48909-8236
        (517) 373-6434
        Email: bartond@michigan.gov

2005/entertainment/defs2reply

---

[9] ESA, Press Release (Nov. 28, 2005), *All New video Game Consoles to Include Parental Controls,* available at http://www.theesa.com/archives/2005/11/all_new_video_g.php.