UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

            Plaintiffs,

vs.

Case No. 05-73634

HON. GEORGE CARAM STEEH

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY, in her official capacity as
Wayne County Prosecutor,

            Defendants.
_____/

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
<u>AND PERMANENTLY ENJOINING THE ACT AS UNCONSTITUTIONAL</u>

      This case arises out of Entertainment Software Association's (ESA), Video Software Dealers Association's (VSDA), and Michigan Retailers Association's (MRA) (hereafter referred to as "plaintiffs") complaint against defendants Jennifer Granholm, in her official capacity as Governor of the State of Michigan, Michael A. Cox, in his official capacity as Attorney General of the State of Michigan, and Kym L. Worthy, in her official capacity as Wayne County Prosecutor (hereafter referred to as "defendants"). Defendants' proposed law violates the First and Fourteenth Amendments of the United States Constitution and, for the reasons stated below, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED. The

preliminary injunctive relief that was previously ordered with regard to 2005 Mich. Public Act 108, is now converted into a permanent injunction.

## FACTUAL BACKGROUND

On September 14, 2005, Governor Jennifer Granholm signed into law 2005 Mich. Public Act 108 ("the Act"), which was due to take effect on December 1, 2005.  The Act regulates the distribution of both sexually explicit video games and ultra violent explicit video games to those under the age of 17.  The plaintiffs only challenge the second part of the Act dealing with ultra violent explicit video games.

The Act imposes civil and criminal penalties for a person to "knowingly disseminate to a minor an ultra-violent explicit video game that is harmful to minors." The Act defines an "ultra-violent explicit video game" as one that "continually and repetitively depicts extreme and loathsome violence." Act, pt. II, § 16(l).  "Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture." Act, pt. II, § 16(g).  A video game is considered "harmful to minors" if it displays all of the following characteristics:

> (I) Considered as a whole, appeals to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standard.
> (ii) Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.

>    (iii) Considered as a whole, lacks serious literary, artistic, political, education, or scientific value for minors.

Act, pt. II, § 16(h).

Relying on research studies, and in order to protect the public health and general welfare of Michigan citizens, the Legislature found that: (1) ultra-violent explicit video games are harmful to minors because minors who play them are more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression; (2) there is a causal connection between media violence and aggressive behavior in some children, and that the effects of media violence are "measurable and long-lasting"; and (3) that minors are capable of purchasing, and do purchase, ultra-violent explicit video games. Legislative History Enrolled Senate Bill No. 416, Part II §§ 15(a)-(c). The stated interests of the Legislature for the enactment are: "(1) safeguarding both the physical and psychological well being of minors, (2) preventing violent, aggressive and asocial behavior from manifesting itself in minors, and (3) directly and substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, §§ 15(e)-(g).

The plaintiffs are creators, publishers, and distributors of video games. Their complaint seeks to invalidate the Act on the grounds that it is unconstitutional under the First and Fourteenth Amendments. The plaintiffs claim that the Act is a violation of protected free speech, equal protection, due process, and that it is unconstitutionally vague.

On November 9, 2005, this Court granted a preliminary injunction enjoining the defendants' enforcement of the law before it took effect. The Court determined that

3

plaintiffs were likely to succeed on their claims that the Act was unconstitutional under the First and Fourteenth Amendments.

Plaintiffs filed a motion for summary judgement, pursuant to Fed. R. Civ. P. 56, to invalidate the Act as an unconstitutional violation of free speech under the First Amendment, and as unconstitutionally vague under the Fourteenth Amendment.[1] Defendants filed a cross-motion for summary judgement arguing that the Act neither violates free speech nor is unconstitutionally vague, and that the Act is narrowly tailored to promote a compelling state interest.

The issue of regulating violent video games to minors has been decided in the Seventh and Eighth Circuit, both of which have found that the attempted regulation in those districts violates the First Amendment.  Amer. Amusement Mach. Ass'n v. Kendrick, 244 F. 3d 572 (7th Cir. 2001), Interactive Digital Software Ass'n v. St. Louis County, 329 F.3d 954 (8th Cir. 2003).  Several other District Courts have similarly held such acts to be unconstitutional. *See* Video Software Dealers Ass'n v. Maleng, 325 F.Supp.2d 1180 (W.D. Wash. 2004), Entertainment Software Ass'n v. Blagojevich, 404 F.Supp.2d 1051 (E.D. Ill. 2005) ("E.S.A.") (granting preliminary injunction), Video Software Dealers Ass'n v. Schwarzenegger, 401 F.Supp 2d 1034 (N.D. Cal. 2005) (granting preliminary injunction).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and

---

[1] The plaintiffs currently do not move for summary judgment on their due process or equal protection claims.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a

genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

I. First Amendment

    A. Protected Free Speech

The first issue that must be decided is whether video games are considered to be constitutionally protected free speech.  The notion that video games are protected free speech under the First Amendment is becoming widely adopted in Circuit Courts around the United States.  *See* Kendrick, 244 F. 3d 572 (7th Cir. 2001); and Interactive Digital Software Ass'n, 329 F.3d 954 (8th Cir. 2003). The Sixth Circuit held that video games were protected free speech under the First Amendment for the purposes of regulating tort liability and stated that "[o]ur decision here today should not be interpreted as a broad holding on the protected status of video games."  James v. Meow Media Inc., 300 F.3d 683, 696 (6th Cir. 2002).  However, the Court did recognize that "most federal courts to consider the issue have found video games to be constitutionally protected [free speech]."  Id.

Video games are a form of creative expression that are constitutionally protected under the First Amendment.  They contain original artwork, graphics, music, storylines, and characters similar to movies and television shows, both of which are considered

protected free speech.  The defendant concedes that the First Amendment fully protects the expressive element in video games but argues that the interactive functional element, which is not present in other forms of electronic media, can be distinguished and should not be considered protected speech.  Defendants' argument fails to take into consideration the nature of interaction in various forms of entertainment media.  As stated by Judge Posner, "All literature (here broadly defined to include movies, television, and the other photographic media, and popular as well as highbrow literature) is interactive; the better it is, the more interactive."  Kendrick, 244 F.3d at 577.

The interactive, or functional aspect, in video games can be said to enhance the expressive elements even more than other media by drawing the player closer to the characters and becoming more involved in the plot of the game than by simply watching a movie or television show.  In video games, it is the player who controls the actions of the character and often determines the outcome of the game.  With the rapid advancements of video game technology and new innovations, such as online gaming, video games are becoming more open ended with more possibilities to interact with other players and control the fate of the characters and the worlds they inhabit.  It would be impossible to separate the functional aspects of a video game from the expressive, inasmuch as they are so closely intertwined and dependant on each other in creating the virtual experience.  For these reasons, this Court finds that video games contain creative, expressive free speech, inseparable from their interactive functional elements, and are therefore protected by the First Amendment.

B. Constitutional Violation

Having determined that video games are considered protected free speech, the next issue is whether the Act violates the First Amendment. Courts have recognized that children "are entitled to a significant measure of First Amendment protection." Ernoznik v. City of Jacksonville, 422 U.S. 205, 212 (1975). However, "certain speech, while fully protected when directed to adults, may be restricted when directed towards minors." James, 300 F.3d at 696 (citing Sable Communications v. F.C.C., 492 U.S. 115 (1989)).

1. Strict Scrutiny

Since the attempted regulation of the video games is content based, the law is "presumptively invalid " and subject to strict scrutiny. R.A.V. v. City of Paul, 505 U.S. 377, 382 (1992). To satisfy the strict scrutiny standard the State must prove that the "Act is necessary to further a compelling State interest." Id. at 403. In making this claim the State cannot simply "posit the existence of the disease sought to be cured. Rather it must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." E.S.A., 404 F.Supp.2d at 1072 (citing Turning Broadcasting System v. F.C.C., 512 U.S. 644 (2004)). The State is required to support its claim by a showing of "substantial evidence." Id. Strict scrutiny also requires the Act to be narrowly tailored and a material advancement of the State's interest. R.A.V., 505 U.S. 377.

The plaintiffs argue that the Act fails the three-part test set forth in Brandenburg v. Ohio, 395 U.S. 444 (1969), and therefore violates the First Amendment. Under the

first prong of the Brandenburg test, free speech may be restricted if it "is directed to inciting or producing the imminent lawless action and is likely to incite or produce such action." Id., at 447. The plaintiffs correctly assert that because the video game producers do not intend for the consumers to commit violent actions, the Act fails this first prong.  The second prong requires that the danger of violence must be imminent. The research conducted by the State has failed to prove that video games have ever caused anyone to commit a violent act, let alone present a danger of imminent violence. Finally, as discussed below, the State's research fails to prove that ultra-violent video games are "likely" to produce violent behavior in children.

The defendants contest the applicability of the Brandenburg test, citing that the standard was rejected in the case of Video Software Developers Ass'n v. Schwarzenegger, 401 F.Supp.2d 1034 (N.D. Cal. 2005) (preliminary injunction was granted, based on likelihood of succeeding on the merits on a violation of the First Amendment, to bar a California Act which regulated the distribution of violent video games to minors).   Rather they argue that the obscenity test from Ginsberg v. New York, 390 U.S. 629 (1968) should be applied as the level of scrutiny.  In Ginsberg, the Court allowed New York to restrict minors' access to sexually explicit material, even though the restriction would have been invalid if directed toward adults.  In order for free speech to be restricted under the Ginsberg test, the material must be shown to be "disgusting or degrading."  The defendants argue that some video games incorporate such a level of violence that they meet this standard.  The defendants give the example of Postal II, a game in which players have the ability to shoot schoolgirls in the knees,

9

set them on fire, and urinate on their corpses. Despite the fact that *some* of these games are likely to be considered "disgusting or degrading" by certain people, neither the Supreme Court nor Sixth Circuit has ever applied the Ginsberg test in cases that don't involve sexually explicit material, James, 300 F.3d at 689.  This court finds the Ginsberg test inapplicable to the ultra-violent explicit section of the Act.

       2. Substantial Evidence

Even if the Act satisfied the Brandenburg requirements, the State has failed to support its claims by "substantial evidence."  The research presented by the State is the same research that was presented in the case of E.S.A., 404 F.Supp.2d 1051, in which a similar law was permanently enjoined due to lack of "substantial evidence."  The court in E.S.A. held a trial in order to test the opinions of the expert witnesses, two of which were the same experts whose opinions are offered in this case.  In viewing the expert evidence, the court concluded:

> Indeed, defendants have failed to present substantial evidence showing that playing violent video games causes minors to have aggressive feelings or engage in aggressive behavior.  At most, researchers have been able to show a correlation between playing violent video games and a slightly increased level of aggressive thoughts and behavior.  With these limited findings, it is impossible to know which way the causal relationship runs: it may be that aggressive children may also be attracted to violent video games.

Id. at 1074.

Dr. Craig Anderson is a psychologist and professor at Iowa State University whose studies have primarily dealt with the effect violent media has on aggressive behavior.  Dr. Anderson developed a "general aggression model" to explain his theory

10

on how one's personality and experiences can trigger aggressive thoughts and behavior. Dr. Anderson's theory states that playing violent video games is an activity that creates aggressive thoughts and behavior which eventually become "automatized" with repeated exposure.  (Anderson dep. at 227-30).  Despite this claim, Dr. Anderson's studies have not provided any evidence that the relationship between violent video games and aggressive behavior exists. His tests fail to prove that "video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere."  Kendrick, 244 F.3d at 578-79.

Dr. William Kronenberg is a clinical psychologist at the University of Indiana School of Medicine whose studies purport to test the effect of violent video games on brain activity.  Using technology that can measure the flow of blood to the brain, which infers brain activity, Dr. Kronenberg conducted tests on the effect of violent media on adolescents. From Dr. Kronenberg's research, the court in E.S.A. concluded that:

> [t]here is barely any evidence at all, let alone substantial evidence, showing that playing violent video games causes minors to 'experience a reduction of activity in the frontal lobes of the brain which is responsible for controlling behavior.'

E.S.A., at 1074 (citing the Illinois General Assembly's justifications for the legislation to ban the sale of violent video games to minors; 720 ILCS 5/12A-5(a)(3)).  Dr. Kronenberg's research not only fails to provide concrete evidence that there is a connection between violent media and aggressive behavior, it also fails to distinguish between video games and other forms of media.

The defendants also argue that the medical community has recognized the threat that violent media poses toward minors, and should be taken into consideration. The American Medical Association, the American Pediatric Association and the American Psychological Association, have taken the position that violent video games have a "negative impact" on minors.[2] The position taken in the joint statement of the medical associations is not based on any scientific study, but appears to represent the policy or political views of their governing bodies. Of course, this joint statement does not even attempt to describe the "negative impact" perceived. Once again, this falls far short of the "substantial evidence" requirement needed to restrict free speech. Based on the research presented by the defendants, it cannot be said that the legislature enacted the law using "reasonable inferences" from scientific literature based on "substantial evidence." Turner Broadcasting System, 512 U.S. at 655.

Lastly the Act cannot withstand the strict scrutiny test because the State is unable to prove that it "materially advances the State's purported goals, and that it does so in a narrowly tailored way." R.A.V., 505 U.S. at 395. The Act does not materially advance the stated goals of the legislature. While the State claims to try to protect the physical and psychological well-being of minors as well as prevent violent and asocial behavior, the Act fails to regulate other comparable forms of violent media from minors. Video games consist of "a tiny fraction of the media violence to which American children are exposed." Kendrick, 244 F.3d at 579. It cannot be said that the Act materially

---

[2]Joint Statement on the Impact of Entertainment Violence on Children, Congressional Public Health Summit (July 26, 2000).

advances these purported goals by preventing a minor from purchasing such video games as Resident Evil 4 or Doom 3, while they can still easily purchase the Resident Evil and Doom movies.

The defendants do argue that video games are a "unique" form of screen-based media because the player actually controls the violent action as opposed to passively observing these actions, but present no scientific evidence to back up this claim. Without such evidence to support this claim, it could just as easily be said that the interactive element in video games acts as an outlet for minors to vent their violent or aggressive behavior, thereby diminishing the chance they would actually perform such acts in reality. It is also possible that the act of "playing" a video game diverts the focus of the player away from some of the depictions of violence or gore in a way that does not happen in other forms of media. Not only does the Act not materially advance the State's stated interests, but it appears to discriminate against a disfavored "newcomer" in the world of entertainment media. Thus, "singling out" the video game industry does not advance the State's alleged goals and therefore does not fulfill the strict scrutiny requirement.

The Act is also not narrowly tailored to the State's interest. "Narrow tailoring requires that regulation of speech be limited to what is necessary to achieve the legislature's end, and that the State justify rejection of less speech restrictive alternatives." R.A.V., 505 U.S. at 395. In granting the preliminary injunction on the Act, this Court recognized the "chilling effect" that it would have on video game retailers. The law would make the retailers themselves responsible for determining which games

are considered ultra-violent.  Since they could not determine this in advance, the retailers would likely steer clear of any game with the potential of such violence in order to avoid civil and criminal liability, thus denying constitutionally protected free speech to minors and adults.

The defendants have also failed to consider less restrictive ways of achieving their interests.  Video games currently have a rating system developed by the Entertainment Software Ratings Board (ESRB).  The defendants argue that this is a voluntary system that is not enforced by retailers but is rather an imperfect means of informing parents of a video game's contents, and therefore does not help the State's purported interests.  However, there are reasonable alternatives using the existing ESRB system, such as undertaking an advertising campaign to inform parents of the rating system and what to watch out for when purchasing games for their children, much like the theater industry did when ratings were first introduced.

The defendants have failed to prove that the Act is necessary to further a compelling state interest by substantial evidence.  Therefore it is the holding of this Court that 2005 Mich. Public Act 108 is unconstitutional as a violation of the First Amendment.

II.  <u>Fourteenth Amendment - Vagueness</u>

The Constitution requires that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited."  <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983).  Such precision is necessary to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Vagueness of a "content-based regulation of speech raises special First Amendment concerns because of its obvious chilling effect on free speech", especially where the regulation imposes criminal penalties. NAACP v. Button, 371 U.S. 415, 433 (1963).

Plaintiffs take issue with the Act's prohibition of "extreme and loathsome violence", which is defined as "graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings." Act, pt. II, § 16(g). Plaintiffs aver that "human beings" is a term ill-suited to a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters, which may have some human characteristics, or may be "human" at some times but not others. The court in E.S.A. held that the Illinois statute's use of the term "human-on-human" violence was unconstitutionally vague, leaving "video game creators, manufacturers, and retailers guessing about whether their speech is subject to criminal sanctions." E.S.A., 404 F.Supp.2d at 1077. "It is also open to subjective interpretation and enforcement by law enforcement officers who may apply the law in an 'arbitrary and discriminatory' way." Id. (quoting Grayned v. City of Rockford, 408 U.S. 104, 109 (1972)).

The Illinois district court provides an apt explanation why the definition of violence as that in which a human suffers physical harm is inadequate in the realm of video games:

> [I]n the video game context, the Act's definition of "violent video games" is vague because it is unclear what falls into the category of "human" and what conduct constitutes "serious physical harm." Video games create multiple worlds of fiction: some resemble reality, others are devoid of

15

> reality, and many fall somewhere in between. Some video game characters depict human beings; others represent aliens, zombies, mutants, and gods; and still others have characters that transform over the course of a game from humans into other creatures or vice versa. Some of these characters will "suffer" injuries that would be fatal to a normal human being, but will nonetheless survive due to super powers; others may appear to die but come back to life.

Id. at 1077.

The Act defines "harmful to minors", in part, as "appeal[ing] to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standards." Act, pt. II, § 16(h)(I). The Act defines "morbid interest in asocial, aggressive behavior" as "a morbid interest in committing uncontrolled aggression against an individual." As noted earlier, the "harmful to minors" standard for sexually explicit speech cannot be expanded to cover depictions of violence. Ginsberg, 390 U.S. 629. The Act fails to provide explanations of many of the terms that appear in its definitions, such as "morbid."

The lack of precision among these definitions will subject Michigan retailers to steep civil and criminal liability if they guess wrongly about what games the Act covers. Retailers will respond by either self-censoring or otherwise restricting access to any potentially offending video game title. In turn, it is possible that authors and game designers will "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked." VSDA v. Maleng, 325 F.Supp.2d 1180, 1191 (W.D. Wash. 2004) (quoting Grayned, 408 U.S. at 109). Such behavior will deprive access to such expression by adults as well as minors.

The Act fails to withstand the challenge that it is unconstitutionally vague, providing an additional reason to grant summary judgment for plaintiffs.

CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED for the reasons stated above. Part II of the Act is unconstitutional under the First and Fourteenth Amendments, therefore the preliminary injunction previously ordered is now converted into a permanent injunction.

        S/George Caram Steeh
        GEORGE CARAM STEEH
        UNITED STATES DISTRICT JUDGE

Dated: March 31, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on March 31, 2006, by electronic and/or ordinary mail.

        S/Josephine Chaffee
        Secretary/Deputy Clerk