# *EXHIBIT 1*

Dockets.Justia.com

**FILED**

JUL 2 5 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

LAH

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION; VIDEO SOFTWARE DEALERS ASSOCIATION; and ILLINOIS RETAIL MERCHANTS ASSOCIATION,<br><br>       Plaintiffs,<br><br>       vs<br><br>ROD BLAGOJEVICH, in his official capacity as Governor of the State of Illinois; LISA MADIGAN, in her official capacity as Attorney General of the State of Illinois; and RICHARD A. DEVINE, in his official capacity as State's Attorney of Cook County,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**05C 4265**

No.

JUDGE KENNELLY

MAGISTRATE JUDGE DENLOW

## COMPLAINT

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Illinois Retail Merchants Association ("IRMA"), by and through their attorneys, aver and allege as follows:

### NATURE OF THE ACTION

1.    Plaintiffs are associations whose members include companies that create, publish, distribute, sell, rent, or make video games available to the public. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief against enforcement of a new Illinois statute that significantly infringes upon constitutionally protected rights of free expression.

2.    The challenged act, Illinois House Bill 4023 (hereinafter, the "Act"), was signed into law on July 25, 2005, and goes into effect on January 1, 2006. The Act penalizes the sale or rental of video games based solely on their expressive content, in violation of the First Amendment. Specifically, the Act makes it illegal for anyone in Illinois to sell or rent to anyone under the age of 18 a "violent" video game. According to the Act, "violent video games" are those that "include depictions of or simulations of human-on-human violence in which the player kills or otherwise causes serious physical harm to another human." Act § 12A-10(e). A person who violates the Act is subject to criminal penalties and substantial fines. Because some of Plaintiffs' members create, manufacture, rent, or sell games that may fall within the statutory definition, Plaintiffs' members may be subject to prosecution under the Act.

3.    The Act violates the First Amendment and other provisions of the United States Constitution by creating penalties for the sale or rental of video games based solely on a game's "violent" content. The First Amendment prohibits such content-based censorship. Not only does the Act directly restrict the dissemination and receipt of a considerable amount of fully protected expression, but, because of its numerous vague terms, the Act also creates a chilling effect on a great deal of speech, as game creators and retailers will respond to the Act's uncertainty by self-censoring, depriving adults and children of access to undeniably protected expression.

4.    The Act is unconstitutional under binding Seventh Circuit precedent. In *American Amusement Machine Association v. Kendrick*, 244 F.3d 572 (7th Cir. 2001), the Court of Appeals addressed an Indianapolis ordinance that similarly sought to restrict minors' access to "violent" video games. The Seventh Circuit unequivocally held that such video games are fully protected by the First Amendment and that a restriction on this protected expression could not be

-2-

Case 1:05-cv-04265    Document 1    Filed 07/25/2005    Page 3 of 38

justified by speculation that these games might harm minors who have constitutional rights to access them.

    5.      The Act also makes it illegal to sell or rent a "sexually explicit" video game to anyone under the age of 18. Act § 12B-11 *et seq* The statutory definition of "sexually explicit video games" is much broader than the Act's "harmful to minors" section, Act § 11-21(a), and contains no exception for material that has serious literary, artistic, political, or scientific value. Thus, the Act's prohibition on "sexually explicit video games" does not conform to settled constitutional requirements for the regulation of obscenity as to minors  As a result, the Act will improperly suppress speech that is wholly protected under the First Amendment as to both adults and children. The restriction on "sexually explicit video games" is not narrowly tailored to serve a compelling state interest and should be stricken.

    6.      Just as the Act restricts protected expression in violation of clear and binding precedent, it imposes additional burdens on retailers that violate the First Amendment  The Act requires video game retailers to label all "violent video games" and "sexually explicit video games" with a "solid white '18' outlined in black," measuring not less than 2 inches squared. Act § 12A-25(a). Retailers must also post a sign, no smaller than 18 by 24 inches, with lettering in 36-point font, that "notifies customers that a video game rating system . . . is available to aid in the selection of a game." Act § 12B-30(a)-(b). Finally, retailers must make available "upon request a brochure to customers that explains the . . . ratings system." These requirements— which conflict with the voluntary labeling and signage systems already employed by the video game industry—impose significant burdens on Plaintiffs' members' expression. These requirements also unconstitutionally compel speech by forcing retailers to relay a government message for which there is no legitimate, much less substantial, underlying purpose.

-3-

7       Plaintiffs maintain (a) that the challenged provisions of the Act are void and of no

force and effect because they are unconstitutional under the First and Fourteenth Amendments to

the Constitution of the United States and thus actionable under 42 U.S.C. § 1983; and (b) that

Plaintiffs and their members, as well as many citizens of Illinois, will suffer immediate, serious,

and irreparable injury if the challenged provisions take effect

## JURISDICTION AND VENUE

8       This action arises under the Constitution of the United States, the First and

Fourteenth Amendments thereto, and the laws of the United States, 42 U.S.C. §§ 1983 and 1988,

and 28 U.S.C. §§ 2201 and 2202. This Court has jurisdiction over the subject matter of this

action under 28 U.S.C. §§ 1331 and 1343(a)(3). This action is brought against the defendants in

their official capacity pursuant to 42 U.S.C. § 1983.

9.      Venue is proper in the Northern District of Illinois. Many of Plaintiffs IRMA's

and VSDA's members are located in and/or do business in this judicial district, and the claims

thus arise in this district. Defendant Richard A. Devine also resides in this judicial district, and is

responsible for enforcing the Act within Cook County.

## PARTIES

10      Plaintiff ESA is a nonprofit trade association organized under the laws of the

State of Delaware with its principal place of business in the District of Columbia  A

fundamental purpose of ESA is to serve and promote the business and public affairs interests of

companies that publish entertainment software used for video games, including such companies'

right to publish and distribute works of expression that are protected under the First Amendment

-4-

to the United States Constitution and similar provisions of the constitutions of various states.
ESA members include a number of entities that produce, distribute, and/or supply video games to
owners and operators of sales and rental outlets within Cook County and throughout Illinois.

11.    Plaintiff VSDA, established in 1981, is the not-for-profit international trade
association for the $24 billion home entertainment industry. VSDA is incorporated in the State
of Delaware and its principal place of business is Los Angeles, California. VSDA represents
more than 1,000 companies throughout the United States, Canada, and other nations. Its
members operate approximately 10,000 retail outlets in the U.S., including more than 200 in the
state of Illinois, that sell and/or rent DVDs, VHS cassettes, and console video games.
Membership comprises the full spectrum of video retailers (from single-store operators to large
chains), video distributors, the home video divisions of major and independent motion picture
studios, and other related businesses that constitute and support the home video entertainment
industry.

12.    Plaintiff IRMA represents the interests of over 20,000 stores in Illinois, hundreds
of which sell and/or rent DVDs, VHS cassettes and console video games. Membership in IRMA
is comprised of all sizes of store companies from "mom and pop" to companies operating
throughout the United States and around the world.

13.    The interests that Plaintiffs ESA, VSDA, and IRMA seek to protect in this action
are germane to the purposes of each organization, and neither the claims nor the forms of relief
sought in this action require participation of individual members of Plaintiffs. One or more
members of each association have standing to bring this action in their own right.

-5-

14.    Plaintiffs are threatened with immediate, serious, and irreparable injury as a result of the enactment and imminent enforcement of the challenged provisions of the Act. Once the Act is in force, Plaintiffs and their members will be subject to liability for disseminating works fully protected under the First Amendment. The Act will have an immediate and vast chilling effect upon constitutionally protected speech because those who sell, rent, or permit to be sold or rented video games (and their respective distributors and providers) will, to avoid liability under the Act, refrain from offering for rental or sale a wide array of games, either to minors or to all customers. This will in turn chill video game distributors, publishers, and creators from developing, publishing and distributing works that may run afoul of the Act's vague definition of prohibited content. Plaintiffs will also be unlawfully compelled by the Act to disseminate a message on behalf of the state that is not tied to a legitimate regulatory purpose.

15.    The Act will also cause irreparable harm to willing listeners—both under and above age 18—who will be deprived of the ability to hear Plaintiffs' members' speech. In this facial challenge to the Act, Plaintiffs have standing to assert not only their own rights and harm, but also that of the potential recipients of Plaintiffs' members' speech.

16.    Defendant Rod Blagojevich is the Governor of the State of Illinois. As Governor, he is vested with "the supreme executive power" of the state and is "responsible for the faithful execution of [its] laws." Ill. Const. art. V, § 8. This injunctive action is brought against Governor Blagojevich in his official capacity.

17.    Defendant Lisa Madigan is the Attorney General of the State of Illinois. In that capacity, she "consult[s] with and advise[s] the several state's attorneys in matters relating to the duties of their office; and when, in [her] judgment, the interest of the people of the state requires

it, [s]he shall attend the trial of any party accused of crime, and assist in the prosecution." 15

ILCS 205/4. This injunctive action is brought against Attorney General Madigan in her official

capacity.

18.    Defendant Richard Devine is the State's Attorney responsible for enforcing

criminal laws within Cook County. This injunctive action is brought against State's Attorney

Devine in his official capacity.

## BACKGROUND

### Video Games and the First Amendment

19.    The challenged provisions of the Act seek to regulate the content of a certain

medium of expression (defined as "video games" under the Act) and limit access to certain video

games based solely on the content of the expression depicted or contained therein.

20.    Video games are a form of artistic expression much like other forms of protected

expression, such as movies, books, and music. Video games contain extensive storylines and

character development, comparable to that of books and movies. The storylines and plot, and

associated dialogue among characters, continue throughout the game play and are an integral part

of the game itself. Like the best of literature, the storylines often involve familiar themes such as

good versus evil, triumph over adversity, struggle against corrupt governments and rulers, and/or

quest for adventure. Expression in other media, such as movies and books, draws thematic ideas

directly from video games. Video games similarly draw and evolve themes from other media.

21.    Video games also feature the artwork of some of the best modern graphic artists.

The typical video game contains many different animated or computer-generated illustrations.

Video games also contain music, much of it original and performed by top musicians and orchestras. Like the music that plays during movies, the music in video games enhances and complements the expression conveyed by the images and dialogue, often in dramatic fashion

22.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U S. Const. amend. I, and the prohibitions of the First Amendment apply to the State of Illinois, U.S. Const. amend. XIV.

23.    The First Amendment shields verbal expression, written expression, visual expression, entertainment, art, and music. The protections of the First Amendment apply just as much to video games as they do to books, newspapers, films, theater, and music.

24.    The First Amendment also protects expressions and depictions of violence devoid of obscene sexual content Thus, video games depicting violence—like movies or illustrations that depict violence—are fully protected by the First Amendment.

25.    Sexually explicit expression that is not obscene is fully protected by the First Amendment. Although a state may regulate minors' access to some sexually explicit material that is otherwise fully protected as to adults, any such regulation must meet the narrow test of obscenity for minors established by the United States Supreme Court. Any content-based regulation of speech that does not fall within this narrow category must satisfy strict scrutiny.

## The Act's Restrictions on Protected Speech

26.    The Act was passed by the Illinois Assembly on May 28, 2005, and was signed into law by Governor Blagojevich on July 25, 2005 A true, complete, and accurate copy of the

-8-

Case 1:05-cv-04265    Document 1    Filed 07/25/2005    Page 9 of 38

Act is attached hereto as Exhibit 1, and is incorporated herein as if fully set forth. The Act

provides that it will go into effect on January 1, 2006.

### The "Violent Video Games" Provisions

27.    The Act seeks to suppress expression in the video game medium because of the

supposed effect of that expression on minors under the age of 18. The stated legislative purpose

of the Act is to "prevent[] violent, aggressive, and asocial behavior" in minors and to "prevent

psychological harm to minors who play the games." Act § 12A-5(e), (f). According to the Act's

preamble, prohibiting the sale of "violent" video games will "eliminat[e a] societal factor[] that

may inhibit the physiological and neurological development of its youth"; and "facilitat[e] the

maturation of Illinois' children into law-abiding, productive adults." Act § 12A-5(g), (h). The

Act further states that the restrictions are justified by the State's "compelling interest in assisting

parents in protecting their minor children from violent video games." Act § 12A-5(d).

28.    The Act seeks to suppress expression in games deemed "violent," defined by the

Act as follows:

> "Violent" video games include depictions of or simulations of human-on-
> human violence in which the player kills or otherwise causes serious
> physical harm to another human. "Serious physical harm" includes
> depictions of death, dismemberment, amputation, decapitation, maiming,
> disfigurement, mutilation of body parts, or rape.

Act § 12A-10(e)

29.    Section 12A-15 of the Act would impose restrictions on freedom of expression by

making it unlawful for any "person" to sell, rent, or permit to be sold or rented to a minor, any

video game meeting the description of "violent" video game set forth in Paragraph 28. Act

§ 12A-15(a). A minor is defined as a person under 18 years old. Act § 12A-10(d). A "person"

-9-

under the Act includes, but is not limited to "an individual, corporation, partnership, and association." Act § 12A-10(d).

30.    The Act requires any person who sells or rents a "violent" video game using an electronic scanner to "program the scanner to prompt sales clerks to check identification before the sale or rental transaction is completed." Act § 12A-15(b). Sales or rentals of such games may not be made through a "self-scanning checkout mechanism." Act § 12A-15(c).

31.    A person who violates the Act's "violent" video game provisions is liable for a petty offense under the Illinois Criminal Code, and subject to a $1,000 fine. Act § 12A-15(a), (b), (c).

32.    A retail sales clerk is not liable under § 12A-15(a) "unless he or she has complete knowledge that the party to whom he or she sold or rented the violent video game was a minor and the clerk sold or rented the video game to the minor with the specific intent to do so." Act § 12A-15(d). A video game retailer has an affirmative defense under the Act "if the retail sales clerk had complete knowledge that the party to whom he or she sold or rented a violent video game was a minor and the clerk sold or rented the video game to the minor with the specific intent to do so." § 12A-20(3). It is also an affirmative defense to the Act if "the video game sold or rented was pre-packaged and rated EC, E, E10+ or T by the Entertainment Software Rating[] Board." § 12A-20(4).

### The "Sexually Explicit Video Games" Provisions

33.    The Act also seeks to suppress expression in games deemed "sexually explicit," which, according to the Act, are presumed to be "inappropriate for minors." Act § 12B-5. The

-10-

Act states that the restriction is justified by the State's "compelling interest in assisting parents in protecting their minor children from sexually explicit video games." Act § 12B-5.

34.    "Sexually explicit video games" are defined by the Act as including those games:

> that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or a lewd exhibition of the genitals or post-pubescent female breast.

Act § 12B-10(e).

35.    Section 12B-15 of the Act provides that "[a] person who sells, rents, or permits to be sold or rented, any sexually explicit video game to any minor, commits a petty offense for which a fine of $1,000 may be imposed." Act § 12B-15(a). Like the "violent" video game provisions, the Act requires electronic scanners to be programmed to prompt clerks to check identification in selling or renting "sexually explicit" video games, prohibits the use of self-scanning checkout mechanisms for the sale or rental of such games, and imposes fines for violations of both provisions. Act § 12B-15(b), (c).

36.    As with the "violent" video game provisions, a retail sales clerk is not liable under the "sexually explicit" video game provisions "unless he or she has complete knowledge that the party to whom he or she sold or rented the sexually explicit video game was a minor and the clerk sold or rented the video game to the minor with the specific intent to do so." § 12B-15(d). Likewise, a video game retailer has an affirmative defense under the Act "if the retail sales clerk had complete knowledge that the party to whom he or she sold or rented a violent [sic] video game was a minor and the clerk sold or rented the video game to the minor with the specific intent to do so." § 12B-20(3). It is also an affirmative defense to the "sexually explicit" video

-11-

game provisions if "the video game sold or rented was pre-packaged and rated EC, E10+, E, or T by the Entertainment Software Rating[] Board." § 12B-20(4).

## The Act's Labeling, Signage and Brochure Provisions

37.    Not only does the Act ban the sale or rental of "violent" and "sexually explicit" video games to minors, and regulate the method of sales and rentals of such games, but it also imposes additional burdens on retailers through its labeling, signage and brochure requirements. Section 12A-25 of the Act requires any "video game retailer," defined as a person who "sells or rents video games to the public," Act § 12A-10(a), to "label all violent video games . . . with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and "shall be displayed on the front face of the video game package." Act § 12A-25(a). Failure to comply with this labeling requirement "is a petty offense punishable by a fine of $500 for the first 3 violations, and $1,000 for every subsequent violation." Act § 12A-25(b). Identical labeling requirements and punishments are imposed with respect to "sexually explicit" video games. Act § 12B-25(a)-(b).

38.    Sections 12B-30 and 12B-35 of the Act would compel still more speech. Section 12B-30 requires that any "retailer who sells or rents video games shall post a sign that notifies customers" of the ESRB rating system. Act § 12B-30(a). "The sign shall be prominently displayed in, or within 5 feet of, the area in which games are displayed for sale or rental, at the information desk if one exists, and at the point of purchase." Act § 12B-30(a). The Section further requires that the sign be printed in a minimum of 36-point type in black ink on a light background, and measure no less than 18 by 24 inches. Act § 12B-30(b). Section 12B-35 requires that a retailer "make available upon request a brochure to customers" that explains the

-12-

ESRB rating system. Act § 12B-35(a). Failure to comply with either requirement is "a petty offense punishable by a fine of $500 for the first 3 violations, and $1,000 for every subsequent violation." Act §§ 12B-30(c), 12B-35(b).

## The Act Violates the First Amendment

39.    By restricting the sale or rental of video games deemed "violent" under the statute, the Act imposes penalties based on the content of the games' expression. The Act therefore is subject to the most exacting scrutiny under the First Amendment.

40.    No compelling state interest exists that justifies the broad suppression of speech imposed by the Act. The Act is based on purported legislative findings that the "violent" video games promote "violent, asocial, or aggressive behavior," and that playing these games cause "a reduction of activity in the frontal lobes of the brain which is responsible for controlling behavior." Act § 12A-5(a). But those claims, which ignore conflicting evidence, are not supported by credible factual support. The purported legislative "findings" therefore are not based on reasonable inferences drawn from substantial evidence.

41.    In addition, the Act suppresses "violent" expression without any legislative finding, or underlying evidence, that exposure to such expression is directed to and likely to cause imminent violent action by the game player.

42.    The Act is not the least restrictive means of achieving any of the Assembly's asserted goals, and the Assembly refused to consider less speech-restrictive means of regulating minors' access to "violent" and "sexually explicit" video games, including those that were proposed by Plaintiffs and their members.

-13-

43.    The Illinois Assembly's "finding" that the video game industry's voluntary rating system is "not adequately enforced" is not supported by substantial evidence.

44    Nor does the Act's restriction of "sexually explicit" video games conform with the First Amendment. The Act's definition of "sexually explicit" falls far short of the constitutional standard for expression that may be regulated as obscene as to minors. Critically, the "sexually explicit" video games provision contains no exception for material that has serious literary, artistic, political, or scientific value. As a result, the Act threatens to penalize expression that is fully protected for both adults and minors.

45.    The prohibition on the sale or rental of "sexually explicit" video games is not · narrowly tailored to serve a compelling interest. The State claims "a compelling interest in assisting parents in protecting their minor children from sexually explicit video games," but an interest in "protecting" viewers from constitutionally protected speech cannot alone be sufficient to justify restriction of that expression. Any legitimate interest in curbing minors' access to "harmful" sexual materials, moreover, is served by the Act's separate "harmful to minors" section, which appears to comply with the three-part constitutional test for "harmful to minors" regulation. Act § 11-21(a).

46.    The Act's incorporation of the ESRB voluntary rating system into a statutory affirmative defense constitutes an unlawful delegation of the Assembly's authority to define the parameters of unlawful speech.

47.    The Act presents Plaintiffs' members with the possibility of arbitrary and discriminatory enforcement because the Act fails to set forth minimal standards for enforcement. The Act does not set forth adequately specific standards for determining which video games have

-14-

sufficient "violent" or "sexually explicit" content to fall within the Act's prohibitions. Likewise, the Act forces each individual retailer to determine which video games must be labeled with the large "18" sticker, to avoid penalties under the labeling provisions. As a result, different retailers and publishers will almost certainly reach different, and conflicting, determinations as to which games are likely to be restricted by the Act.

48.    The Act will have a chilling effect on game manufacturers and retailers. Under the Act, game manufacturers and retailers must determine which games may be subject to the statute's criminal penalties. By their nature, games offer the player a wide range of possible game play of significant duration. Even if only a small portion of a game contained content that theoretically met the Act's definitions, the entire game would be suppressed. Moreover, to ensure that the games they sold did not violate the Act, retailers and clerks would be expected to review the entire possible course of play in a particular game. The significant burdens imposed by the law will ultimately lead to a chilling of speech of game developers, retailers, and consumers.

49    Some of the content displayed by the video games created, published, distributed, rented, sold, and/or made available to the public by Plaintiffs or their members, while fully protected by the United States Constitution, may be deemed by law enforcement officials in Illinois, including the Defendants, to meet the Act's definitions for "violent" and "sexually explicit" video games, thus subjecting Plaintiffs or their members to the threat of prosecution, as well as creating a chilling effect on their rights to freedom of expression

50.    The challenged provisions of the Act would infringe the First Amendment rights (i) of businesses physically present in Illinois, including Plaintiffs' members, who face the threat

-15-

of prosecution if they do not comply with restrictions on their right to distribute constitutionally protected expression, (ii) of potential customers of those businesses—including both those under 18 as well as adults—who, because of these restrictions, will be deprived of the opportunity to receive fully protected speech, and (iii) of businesses located outside Illinois, including members of Plaintiffs, whose ability to distribute their creative works within Illinois will be burdened based on the content of those works of expression.

51. The Act's labeling and signage requirements, and provisions governing the use of electronic scanners, impose an additional content-based burden on video game retailers that is unsupported by a compelling state interest. Video game manufacturers and retailers have already invested significant amounts of money and resources into developing labels, signs, and materials that educate parents and consumers about the industry's voluntary rating system. The Act's size, appearance, and placement requirements conflict with these existing practices, and complying with the Act's requirements in this regard would be extremely costly, burdensome, and impractical for game makers and retailers. These requirements also unconstitutionally compel retailers to disseminate a State message for which there is no underlying substantial regulatory interest.

52. The challenged provisions of the Act threaten Plaintiffs, their members, and other businesses involved in the creation, distribution, display, sale, or rental of video games, as well as adults and those under 18 who wish to receive the speech in those games, with serious, immediate, and irreparable injury for which there is no adequate remedy at law.

53. In this facial constitutional challenge to the Act, Plaintiffs have standing to assert the rights of, and harm to, the potential customers of Plaintiffs and their members.

-16-

## COUNT I

### (First and Fourteenth Amendments—Freedom of Expression)

54.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 53 as if fully set forth herein.

55.    The challenged provisions of the Act would restrict access to video games based solely upon the "violent" or "sexually explicit" content of the creative expression depicted. The content of the expression made subject to these restrictions is not obscene or obscene as to minors. Nor does it fall within any other category of expression that may constitutionally be regulated based solely upon its content.

56.    The Act imposes unconstitutional content regulation by prohibiting a person from selling, renting, or permitting to be sold or rented, any video game meeting the statutory definition of "violent" or "sexually explicit" video games to any person under the age of 18. The Act restricts the freedom of creators, distributors, and publishers of games, as well as purchasers, renters, and other players of such games, to communicate and receive expression that is not constitutionally subject to regulation based upon its content. Moreover, the Act's stated purposes are unsupported as a factual matter and are insufficient under the First Amendment to justify the broad content discrimination imposed by the Act. Not only does the Act fail to serve a compelling governmental interest, but the Act is not narrowly tailored to serve any such interest, and the Assembly refused to consider less speech-restrictive means of achieving its goals.

57.    The Act does not establish standards for determining which games contain content meeting the description set forth in Paragraphs 28 and 34 hereof. The challenged provisions of the Act would impose upon every person who sells, rents, or permits to be sold or rented video games, the burden of determining whether each such video game meets the description set forth in Paragraphs 28 and 34 hereof, prior to publishing, distributing, or otherwise holding that game out to the public. The challenged provisions impose upon every such person the risk of substantial penalties. This burden and risk are aggravated by the vagueness of the statutory description of the regulated content. The challenged provisions thus would establish an unconstitutional scheme of censorship under which even works of expression that do not meet the statutory description in the Act would be suppressed because of the burden placed upon persons selling or renting video games of determining the scope of the Act's coverage and because of the risk of erroneous determinations. Persons selling, renting, or permitting to be sold or rented video games (and their respective distributors and suppliers) would be induced to refuse to include certain works in their inventories or premises, for fear of running afoul of the Act's ambiguous prohibitions. Imposition of this burden and risk serves no compelling interest and is not narrowly tailored to serve any such interest.

58.    Furthermore, the Act would compel a person who sells or rents video games to label every game that meets the statutory definition of "violent" or "sexually explicit" and to post signs and provide literature relating to a video game rating system. The labeling requirement essentially compels retailers and game manufacturers to disseminate the government's message that minors should be denied access to certain video games—even though the games are fully protected as to both minors and adults. Forcing individuals to disseminate a message on behalf

-18-

of the State violates the First Amendment every bit as much as restricting the dissemination of individuals' own messages.

59.    For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the First Amendment to the United States Constitution, as applied to the State of Illinois by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (First and Fourteenth Amendments—Vagueness)

60.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 59 as if fully set forth herein.

61.    The challenged provisions of the Act are unconstitutionally vague in that many of the terms and phrases employed therein, including but not limited to, the terms and phrases "kills or otherwise causes serious physical harm," "depictions of or simulations of," and "human-on-human," have no clear meaning in the context of animated video games. Persons of common intelligence are, therefore, forced to guess at their meaning and at the scope of the challenged provisions.

62.    The unconstitutional vagueness of the challenged provisions will have a chilling effect on producers, designers, publishers, and distributors of video games and will impose substantial burdens upon persons who sell, rent, or permit to be sold or rented video games, preventing them from exercising their constitutionally protected freedom of expression. The Act's vagueness is also likely to lead to enforcement by law enforcement officials on an unfair,

-19-

subjective, and ad hoc basis. The statutory defenses exacerbate, rather than cure, the Act's

vagueness problems. Given the vagueness of terms like "complete knowledge," clerks and

retailers will not know whether they will qualify for a statutory defense. Furthermore, the scope

of the defenses is unclear—for example, how would a store manager prosecuted under the Act be

treated? Because many of the Act's terms have no clear meaning, the Act will restrict a far

broader range of video games than even the State claims it is seeking to regulate, as stores, store

clerks, and game developers will respond to this uncertainty and fear of prosecution by refusing

to provide video games—to both adults and minors - -that conceivably could be deemed to fall

within the Act's prohibitions.

63.     For each of the reasons set forth above, and others, the challenged provisions of

the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the

United States Constitution, as well as the First Amendment to the United States Constitution, as

applied to the State of Illinois by the Due Process Clause of the Fourteenth Amendment

## COUNT III

### (Fourteenth Amendment—Equal Protection)

64      Plaintiffs repeat and reallege the allegations of paragraphs 1 through 63 as if fully

set forth herein.

65.     The challenged provisions of the Act regulate and restrict under the threat of

substantial penalties certain works of expression presented through the medium of video games.

These same regulations, restrictions, and penalties do not apply to other works of expression

containing the same or similar content, but communicated in other media, including, by way of

-20-

example only, cable television, broadcast television, movies, books, magazines, and the like. Indeed, many of these other media—which compete with video games for consumers—contain expression that is based on video games that could fall within the prohibitions of the Act. Likewise, video games that could fall within the Act's prohibitions may themselves be based on similar speech in other, unregulated media.

66.    The challenged provisions of the Act arbitrarily and irrationally would establish a legislative scheme of classifications that burden fundamental rights and that are not closely related to any compelling state interest.

67.    For the foregoing reasons, and others, the challenged provisions of the Act are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (First and Fourteenth Amendments—Due Process)

68.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 67 as if fully set forth herein.

69.    The Act unconstitutionally delegates the power of the legislature to define the narrow categories of speech that may be criminalized, in derogation of Due Process. The Act creates an affirmative defense to the statute's "violent" and "sexually explicit" video game prohibitions "the video game sold or rented was pre-packaged and rated EC, E10+, E, or T by the Entertainment Software Rating[] Board." Act § 12B-20(4). In so doing, the Act impermissibly delegates legislative authority to the ESRB, a private entity. By delegating the power to

-21-

determine what video games are subject to the law's restrictions to a private organization, and without any accompanying legislative standards, the Act violates Due Process.

70.    For each of the reasons set forth above, and others, the challenged provisions of the Act are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the First Amendment to the United States Constitution, as applied to the State of Illinois by the Due Process Clause of the Fourteenth Amendment.

## COUNT V

### (Violation of 42 U.S.C. § 1983)

71.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 70 as if fully set forth herein.

72.    The challenged provisions of the Act would cause Plaintiffs and their members to be subjected to the deprivation of rights, privileges, and immunities secured to them by the Constitution and laws of the United States. The challenged provisions thus constitute a deprivation of rights actionable under 42 U.S.C. § 1983.

73.    In the event Plaintiffs prevail on any claims under the Constitution of the United States set forth in this Complaint, Plaintiffs are entitled to recover attorneys' fees under 42 U.S.C. § 1988.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand that this Court enter a judgment in Plaintiffs' favor and

against Defendants as follows:

(a)    That this Court issue a declaratory judgment that the challenged
provisions of the Act are void and of no force and effect;

(b)    That this Court issue a preliminary injunction and a permanent
injunction against Defendants enjoining them from enforcing, or
directing the enforcement of, the challenged provisions of the Act
in any respect;

(c)    That Plaintiffs be awarded their attorneys' fees under 42 U.S.C.
§ 1988;

(d)    That Plaintiffs be awarded their costs herein; and

(e)    That this Court order such other general and equitable relief as it
deems fit and proper.

ENTERTAINMENT SOFTWARE ASSOCIATION,
VIDEO SOFTWARE DEALERS ASSOCIATION, and
ILLINOIS RETAIL MERCHANTS ASSOCIATION

_____
One of the Attorney for Plaintiffs

David P. Sanders (ARDC # 2452359)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611-7603
Tel. (312) 222-9350
Fax (312) 527-0484

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Thomas G. Pulham
JENNER & BLOCK LLP
601 13th Street, NW, Suite 1200
Washington, DC 20005
Tel. (202) 639-6000
Fax (202) 639-6066

Doc No. 1284978

-23-