# *EXHIBIT 2*

Dockets.Justia.com

7D

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ENTERTAINMENT SOFTWARE  )
ASSOCIATION; VIDEO SOFTWARE )
DEALERS ASSOCIATION; and  )
ILLINOIS RETAIL MERCHANTS  )
ASSOCIATION,       )
           )
  Plaintiffs,     )
           )
  vs.        ) Case No. 05 C 4265
           )
ROD BLAGOJEVICH, in his official ) Judge Matthew F. Kennelly
capacity as Governor of the State of )
Illinois; LISA MADIGAN, in her official )
capacity as Attorney General of the State of )
Illinois; and RICHARD A. DEVINE, in his )
official capacity as State's Attorney of )
Cook County,      )
           )
  Defendants.    )

**F I L E D** LAL

AUG 2 3 2005

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

### NOTICE OF FILING

TO: SEE CERTIFICATE OF SERVICE

PLEASE TAKE NOTICE that on August 23, 2005, Plaintiffs Entertainment Software

Association, Video Software Dealers Association, and Illinois Retail Merchants Association filed

their **Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction** and

**Appendix to Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction**

with the Clerk of the United States District Court for the Northern District of Illinois, Eastern

Division, copies of which are herewith served upon you.

Respectfully submitted,

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE DEALERS
ASSOCIATION, and ILLINOIS RETAIL
MERCHANTS ASSOCIATION

One of the Attorneys for Plaintiffs

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
JENNER & BLOCK LLP
601 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone: (202) 639-6000
Fax: (202) 639-6066

David P. Sanders (ARDC # 2452359)
Wade A. Thomson (ARDC # 6282174)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611-7603
Phone: (312) 222-9350
Fax: (312) 537-0484

## CERTIFICATE OF SERVICE

I, Wade A Thomson, an attorney, hereby certify that I caused copies of the foregoing Notice of Filing and i) **Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction** and ii) **Appendix to Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction**, which are referred to in the Notice of Filing, to be served upon the following via messenger before 5 p.m. on August 23, 2005:

> Andrew Dryjanski
> Assistant Attorney General
> Office of the Illinois Attorney General
> 100 W. Randolph Street
> 13th Floor
> Chicago, Illinois 60601
>
> Stephen L. Garcia
> Office of State's Attorney of Cook County
> 500 Richard J. Daley Center
> Chicago, IL 60602
>
> Michael J. Kasper
> Fletcher, Topol, O'Brien & Kasper, P.C.
> Suite 300
> 222 North LaSalle Street
> Chicago, IL 60601-1013

_____
Wade A. Thomson

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION; VIDEO SOFTWARE DEALERS ASSOCIATION; and ILLINOIS RETAIL MERCHANTS ASSOCIATION, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) No. 05 C 4265 ) Judge Kennelly ) |
| ROD BLAGOJEVICH, in his official capacity as Governor of the State of Illinois; LISA MADIGAN, in her official capacity as Attorney General of the State of Illinois; and RICHARD A. DEVINE, in his official capacity as State's Attorney of Cook County, | ) ) ) ) ) ) ) |
| Defendants. | ) **FILED** LAL ) AUG 2 8 2005 |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 2

    A.    The Nature Of Video Games ................................................................................... 2

    B.    The Video Game Industry's Well-Established Voluntary Rating System ............ 3

    C.    The Challenged Statutes ........................................................................................ 4

        1.    The "Violent" Video Game Ban ................................................................ 4

        2.    The "Sexually Explicit" Video Game Ban ................................................ 5

        3.    The Act's Labeling, Signage, And Check-Out Restrictions ...................... 6

ARGUMENT ......................................................................................................................... 7

I    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
    CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION
    OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL
    VAGUENESS ................................................................................................................. 8

    A    Video Games Constitute Expression Protected By The First
        Amendment ............................................................................................................. 8

    B    The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny And
        Violate The First Amendment ............................................................................... 8

        1    Because the Act Regulates Expression Based On Content, It
            Must Survive Strict Scrutiny ...................................................................... 8

        2.    The State Does Not Have A Compelling Interest In Restricting
            Access To The Targeted "Violent" Games ............................................... 10

            a.    Preventing "Real-World" Violence ............................................ 10

            b    Preventing Psychological Or Developmental Harm ................. 12

        3.    The Act Does Not Materially Advance The State's Interests
            And Is Not Narrowly Tailored .................................................................. 14

C.    The Act's "Sexually Explicit" Video Game Restrictions Fail Strict
Scrutiny And Violate The First Amendment ............................ 16

D.    The Act's Labeling, Signage, And Check-Out Provisions Are
Unconstitutional ....................................................... 17

E.    The Act is Unconstitutionally Vague ................................... 21

II.    THE EQUITIES STRONGLY SUPPORT AN INJUNCTION ................... 23

CONCLUSION ..................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ............................................. 15

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ........... *passim*

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd*,
475 U.S. 1001 (1986) ......................................................................................................... 12

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................ 10, 11, 13

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................................... 10, 11

*Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503 (7th Cir. 1998) .... 2, 24

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ................................ 24

*Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63 (2d Cir. 1997) ....................................... 9

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................ 2, 24

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ...................................................... 9

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ...................................................................... 14

*FoodComm International v. Barry*, 328 F.3d 300 (7th Cir. 2003) ....................................... 7

*Ginsberg v. New York*, 390 U.S. 629 (1968) ............................................................... 12, 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................... 21, 23

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) .... *passim*

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ........................................ 2, 10, 11

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004) ............................... 24

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ...................................................... 13

*Kolender v. Lawson*, 461 U.S. 352 (1983) ....................................................................... 21

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ....................................... 9

*Miller v. California*, 413 U.S. 15 (1973) ........................................................................... 16

*NAACP v. Button*, 371 U.S. 415 (1963).................................................................................21

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) ...............24

*O'Brien v. Town of Caledonia*, 748 F.2d 403 (7th Cir. 1984)......................................24

*Pacific Gas & Electric Co v. Public Utility Commission of California*,
475 U.S. 1 (1986).........................................................................................18, 19

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)................................................8, 9

*Reno v. ACLU*, 521 U.S. 844 (1997)....................................................16, 17, 21, 23

*Riley v. National Federation of the Blind of North Carolina, Inc*, 487 U.S. 781 (1988) ..... 18, 20

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002).....................2

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*,
502 U.S. 105 (1991)....................................................................................10

*Texas v. Johnson*, 491 U.S. 397 (1989)..................................................................1

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ............ 9

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994)...................................9, 10, 14

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001)...........................................7

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .............. 8, 14, 15

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001)..........................................18

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ..... *passim*

*West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943).................................20

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002)...................................2

*Winters v. New York*, 333 U.S. 507 (1948)..............................................................9

## LEGISLATIVE MATERIAL

House Bill 4023 (Ill. 2005 )......................................................... *passim*

iv

## INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Illinois Retail Merchants Association ("IRMA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing House Bill 4023 (Ill. 2005) (hereinafter, the "Act"). The Act was signed into law on July 25, 2005, and is due to take effect on January 1, 2006.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles. *First,* they are likely to succeed on their claim that the Act is unconstitutional. Illinois's sweeping legislation places *criminal* penalties on the sale or rental of "violent" video games to individuals under age 18; similarly criminalizes the sale or rental of non-obscene but "sexually explicit" video games to individuals under age 18; and imposes numerous other burdens on the expression of consumers, video game retailers, and video game creators. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989).

Indeed, the Seventh Circuit has already struck down, on First Amendment grounds, a law that is materially indistinguishable from the Act's "violent" video game provisions. *See American Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572 (7th Cir. 2001) (Posner, J.) ("*AAMA*"). *AAMA* held that "violent" video games are fully protected expression and may not be restricted based on a desire to prevent violence or protect minors from "wildly speculative" harms like those alleged by the Act. *Id.* at 579. Similar attempts to regulate "violent" video games have been invalidated by *every* federal court to have reached the question. *See Interactive*

*Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*") (ban on "violent" games"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash 2004) ("*VSDA*") (same); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (attempted tort liability); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same).

The Act's other restrictions are equally foreclosed by the First Amendment and Supreme Court precedent. The "sexually explicit" category of video games restricted by the Act is defined much more broadly than the narrow "harmful to minors" category of sexual speech that the Constitution permits a state to regulate (and which the Act itself regulates, in a separate section), and is therefore unconstitutional. The Act also unconstitutionally compels expression through a variety of burdensome and unnecessary labeling and signage requirements.

*Second*, not only are Plaintiffs likely to prevail on their claims, but the equities also weigh strongly in favor of an injunction, as they did in *AAMA. See* 244 F.3d at 580. Plaintiffs and their members will suffer irreparable harm if the Act is allowed to go into effect, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). The First Amendment rights of members of the public — whose rights are also at stake in this facial challenge — will be similarly impaired. Accordingly, the Act must be enjoined.

## FACTUAL BACKGROUND

### A.     The Nature Of Video Games.

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games. Compl. ¶¶ 10-13. They bring this action because, if allowed to go into effect, the

2

Act will censor distribution of some of Plaintiffs' creative works, based solely upon their
expressive content. *Id.* ¶ 14. In this facial challenge, Plaintiffs also assert the rights of willing
listeners. *Id* ¶ 15.

Video games are a modern form of artistic expression. Like motion pictures and
television programs, video games tell stories and entertain audiences through the use of complex
pictures, sounds, and text. *See* Price Decl ¶¶ 3-4.[1] Video games feature the artwork of leading
graphic artists, as well as music      much of it original — that enhances the game's artistic
expression in the same way as movie soundtracks. *Id.* These games often contain storylines and
character development as richly detailed as (and sometimes based on) books and movies. *Id*
¶¶ 3-4, 39. Like great literature, these games frequently involve familiar themes such as good
versus evil, triumph over adversity, struggle over corrupt powers, and quest for adventure. *Id.*
¶¶ 4, 11-43. Although video games are largely designed to entertain, they also can inform, and
even promote certain viewpoints. *See, e g., AAMA*, 244 F 3d at 578 (describing a "feminist"
video game that has "a message, even an 'ideology,' just as books and movies do"); Price Decl.
¶ 4.

## B.    The Video Game Industry's Well-Established Voluntary Rating System.

Like other popular media, such as motion pictures and music, the video game industry
has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl.
¶¶ 4-11. That system — which the FTC has called the "most comprehensive" of industry-wide

---

[1] In support of their Motion, Plaintiffs are submitting the Declaration of Ted Price ("Price
Decl."), President and CEO of Insomniac Games, Inc ; Declaration of Crossan R. Andersen
("Andersen Decl."), President of Plaintiff VSDA; and Declaration of Douglas Lowenstein
("Lowenstein Decl."), President of Plaintiff ESA   Plaintiffs are also submitting copies of video
games that may be deemed to be covered by the Act's restrictions, along with taped recordings
of representative play of those games. The declarations and supporting materials will be
submitted as a separate appendix to the memorandum in support of Plaintiffs' Motion.

3

media rating systems — is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 4-5. The ESRB system includes not only letter ratings (EC, E, E10+, T, M, and AO), but also numerous "content descriptors," descriptive phrases that give consumers and parents additional information about a game's contents. *Id.* ¶¶ 7-8.[2] The purpose of the ESRB system is to provide easily understood information about games to consumers and parents — not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 6. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, nearly all video game publishers submit their games for rating. *Id.* Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to require parental consent for the sale of "M" games to individuals under age 17. *See* Andersen Decl. ¶ 18.

## C.     The Challenged Statute.

### 1.     The "Violent" Video Game Ban.

The Act imposes a misdemeanor criminal punishment of up to $1,000 on "[a] person who sells, rents, or permits to be sold or rented, any violent video game" to individuals under age 18. Act §§ 12A-15(a), 12A-10(c). "Violent" video games are defined by the Act as those that "include depictions of or simulations of human-on-human violence in which the player kills or otherwise causes serious physical harm to another human." *Id.* § 12A-10(c). "'Serious physical

---

[2] Sample ESRB content descriptors include "alcohol reference" (reference to and/or images of alcoholic beverages); "cartoon violence" (violent actions involving cartoon-like situations and characters; may include violence where a character is unharmed after the action has been inflicted); "mature humor" (depictions or dialogue involving "adult" humor, including sexual references ); and "suggestive themes" (mild provocative references or materials). *See* Ex. A to Lowenstein Decl. (ESRB Game Ratings, http://www.esrb.com/esrbratings_guide_print.asp).

4

harm' includes depictions of death, dismemberment, amputation, decapitation, maiming, disfigurement, mutilation of body parts, or rape." *Id.*

The Act's "violent" video game ban claims to serve five purposes: "assisting parents in protecting their minor children from violent video games," "preventing violent, aggressive, and asocial behavior," "preventing psychological harm to minors who play violent video games," "eliminating any societal factors that may inhibit the physiological and neurological development of its youth," and "facilitating the maturation of Illinois' children into law-abiding, productive adults." Act § 12A-5(d)-(h). Furthermore, the Act purports to make "findings" that "minors who play violent video games are more likely to: (1) [e]xhibit violent, asocial, or aggressive behavior[,] (2) [e]xperience feelings of aggression[, and] (3) [e]xperience a reduction of activity in the frontal lobes of the brain which is responsible for controlling behavior." *Id.* § 12A-5(a).

### 2.    The "Sexually Explicit" Video Game Ban.

The Act also imposes a criminal punishment of up to $1,000 on "[a] person who sells, rents, or permits to be sold or rented, any sexually explicit video game" to an individual under age 18. Act § 12B-15. The Act's definition of "sexually explicit" video games[3] borrows to some degree from recognized constitutional standards for the regulation of "harmful to minors" sexual speech, but omits the critical third prong of the constitutional standard — that such games lack serious literary, artistic, political, or scientific value. *Id.* § 12B-10(e). Notably, the Act contains a separate "harmful to minors" section that appears to meet the constitutional standard,

---

[3] "Sexually explicit" video games are defined by the Act as "those that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or a lewd exhibition of the genitals or post-pubescent female breast." Act § 12B-10(e).

5

but which applies to *all* media, not just to video games. *See id.* § 11-21. The Act's only purported "finding" related to "sexually explicit" video games is the bare assertion that such games are "inappropriate for minors." *Id.* § 12B-5.

### 3.    The Act's Labeling, Signage, And Check-Out Restrictions.

In addition to imposing substantial penalties on persons who sell or rent "violent" or "sexually explicit" video games to minors, the Act imposes numerous additional burdens on speech. For example, the Act requires, under threat of criminal punishment of up to $1,000, that those who sell or rent "violent" or "sexually explicit" games "via electronic scanner" must program the scanner "to prompt sales clerks to check identification before the sale or rental transaction is completed." Act §§ 12A-15(b); 12B-15(b). And, under threat of the same criminal penalty, the Act bars the sale or rental — to minors and adults — of any "violent" or "sexually explicit" game "through a self-scanning checkout mechanism." *Id.* §§ 12A-15(c); 12B-15(c).

The Act also unlawfully compels a variety of speech on the part of the "video game retailer," defined as *any* "person who sells or rents video games to the public." Act §§ 12A-10(a), 12B-10(a). *First*, retailers "shall label all violent video games" and "all sexually explicit video games" (as defined above) "with a solid white '18.'" *Id.* §§ 12A-25; 12B-25. The Act further specifies that the "18" label must be outlined in black, must be at least 2 inches by 2 inches large, and must be placed on the face of the video game package. *Id. Second*, the Act requires retailers to erect signs of specific appearance, dimension, and lettering, notifying customers of the ESRB rating system. *Id.* § 12B-30. These signs must be "prominently posted in, or within 5 feet of" a variety of locations throughout an establishment, including "the area in which games are displayed for sale or rental, at the information desk if one exists, and at the point of purchase." *Id. Third*, a retailer "shall make available upon request a brochure to

6

customers" explaining the ESRB system. *Id.* § 12B-35. Violation of any of these provisions is punishable by a fine of $500 for each of the first three violations, and $1,000 for every subsequent violation. *See id.* §§ 12A-25, 12B-25, 12B-30, 12B-35. Notably, these detailed signage and brochure requirements apply regardless whether retailers already voluntarily post similarly designed signs and provide such brochures — as a great majority do.

## ARGUMENT

"A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Once these conditions are met — as they are here — a court proceeds to balance "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted" with "the irreparable harm the moving party will suffer if relief is denied," along with the public interest. *Id.* "This balancing involves a sliding scale analysis: the greater [a movant's] chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor." *FoodComm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

Plaintiffs easily satisfy this standard. Indeed, the Seventh Circuit has already ordered a preliminary injunction based on a challenge to a materially identical ban on "violent" video games. *See AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," that plaintiffs "will suffer irreparable harm if the ordinance is permitted to go into effect," and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis").

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

    A.    **Video Games Constitute Expression Protected By The First Amendment.**

The Seventh Circuit has unequivocally held — consistent with other federal courts — that video games constitute expression protected by the First Amendment. *See AAMA*, 244 F.3d at 577-78; *accord, e g , IDSA*, 329 F.3d at 957 (noting that "[t]he mere fact" that video games "appear in a novel medium is of no legal consequence"); *VSDA*, 325 F Supp. 2d at 1184-85 (such games "are expressive and qualify for the protections of the First Amendment"). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *VSDA*, 325 F Supp. 2d at 1184.

    B.    **The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny And Violate The First Amendment.**

        1.    **Because The Act Regulates Expression Based On Content, It Must Survive Strict Scrutiny.**

The Act restricts access to expression based on its "violent" content, and thus is subject to the most exacting First Amendment scrutiny. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a regulation restricting speech because of its content will ever be permissible " *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000)

As the Seventh Circuit has made clear, this rule is no different where "violent" video games are at issue, because depictions of violence — including those in video games — are fully protected under the First Amendment. *AAMA*, 244 F.3d at 575-76 (likening the "violence" in

video games to "violence" in works of "[c]lassic literature and art," which "are saturated with graphic scenes of violence, whether narrated or pictorial," and concluding that "[t]he notion of forbidding not violence itself, but pictures of violence, is a novelty"); *accord, e.g., IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *cf., e.g., Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, the Supreme Court has made clear that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).

Nor is heightened scrutiny inapplicable because the Act targets *minors'* access to protected expression. Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969); *AAMA*, 244 F.3d at 576 ("Children have First Amendment rights."). As the Seventh Circuit has explained, there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *AAMA*, 244 F.3d at 577.

Thus, like all content-based regulations of speech, the Act must withstand strict scrutiny. Under this standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*,

9

512 U.S  622, 664-65 (1994); *Simon & Schuster, Inc  v  Members of the N.Y  State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); *AAMA*, 244 F 3d at 576 ("The grounds must be compelling and not merely plausible."). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see, e.g., VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the state "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664; *see AAMA*, 244 F 3d at 576-79 (assessing the government's claimed interests and alleged supporting evidence).

### 2.     The State Does Not Have A Compelling Interest In Restricting Access To The Targeted "Violent" Games.

The Act's stated goals essentially boil down to two purported State interests for its restrictions on "violent" games: (1) preventing "violent, aggressive, and asocial behavior," Act § 12A-5(e); and (2) preventing psychological or other developmental harms to minors allegedly resulting from playing "violent" video games, *id.* Act § 12A-5(f)-(h). Neither approaches a constitutionally sufficient rationale for the Act.

#### a.     Preventing "Real-World" Violence.

With respect to the "preventing real-world violence" rationale, the State must meet the stringent demands of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See, e g , James*, 300 F 3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" which meets the *Brandenburg* standard). Under *Brandenburg*, the government may regulate expression based on a concern that it will cause unlawful or violent behavior *only* if the government can prove that such expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v*

10

*Free Speech Coalition*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447)
(emphasis added). As the Supreme Court has explained, "the mere tendency of speech to
encourage unlawful acts is not a sufficient reason for banning it." *Id.* Thus, the government may
not punish speakers based solely on a prediction or suspicion that their words will tend, in the
aggregate, to encourage undesired behavior.

Here, the Act regulates speech ostensibly based on the General Assembly's conclusory
"findings" that "minors who play violent video games are more likely to: (1) [e]xhibit violent,
asocial, or aggressive behavior [and] (2) [e]xperience feelings of aggression." Act § 12A-5(a)
But even assuming that such findings were based on any reliable evidence,[4] the State would fail
to meet the *Brandenburg* standard based on such aggregate effects. The General Assembly
could not and did not find that games played safely every day by millions are "likely" to produce
"imminent" violence. Nor are such games, designed for entertainment, "directed" to inciting
violence. *See, e.g., James*, 300 F.3d at 698

Partly for these legal reasons, the Seventh Circuit in *AAMA* rejected the government's
argument that a "violent" video game ban was justified because video games "incite youthful
players to breaches of the peace." 244 F.3d at 575; *see also, e.g., James*, 300 F.3d at 698
(holding that the "glacial process of personality development" allegedly affected by "violent"
video games "is far from the temporal imminence that we have required to satisfy the

---

[4] The Act cites no support for its cursory conclusions about the effects of "violent" games
on minors' real-world violent behavior. And there is no such support. As every court
considering the issue has concluded, the research fails to establish any causal link between
exposure to such games and subsequent harm to anyone. *See IDSA*, 329 F.3d at 959 (finding law
lacking "the 'substantial supporting evidence' of harm that is required before an ordinance that
threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do not
support" the regulation of "violent" video games, because these studies "do not find that video
games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at 1188
(finding that "the current state of the research cannot support the . . . Act because there has been
no showing that exposure to video games . . . is likely to lead to actual violence").

11

*Brandenburg* test"). In addition, the Seventh Circuit examined the "studies" submitted by the government and concluded that there was no evidence that "video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere." 244 F.3d at 578-79.[5]

### b.    Preventing Psychological Or Developmental Harm.

The State's second asserted interest — preventing various "harms" to minors — is no more constitutionally sufficient than the first. Indeed, the Seventh Circuit already considered and rejected this argument in *AAMA*: "Common sense says that the [State's] claim of harm to its citizens from these games is implausible, at best wildly speculative." *AAMA*, 244 F.3d at 579.

As an initial matter, the requirements of strict scrutiny are not relaxed simply based on a generalized allegation of "harm" to minors. The only "minors" exception to the rule of strict scrutiny concerns the "harmful to minors" regulation of certain sexually explicit materials, which has no application to the "violent" material that the State seeks to regulate here. *See, e.g.,* *Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors" regulation of certain explicit sexual expression); *IDSA*, 329 F.3d at 959 (noting that "*Ginsberg* did not involve protected speech like the speech at issue in this case" (internal parentheses omitted)); *VSDA*, 325 F. Supp. 2d at 1185 (explaining that *Ginsberg* is limited to sexually explicit expression). Indeed, the Seventh Circuit has made clear that the concerns underlying

---

[5] In an analogous context — where it was claimed that non-obscene pornography may be regulated because it may increase the infliction of violence on women — the Seventh Circuit concluded that, even if such allegations were true, protected speech could not be restricted where the dangers were not immediate. "All of these unhappy effects," the court observed, "depend on mental intermediation." *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). That the allegedly harmful expression might one day lead to action was not enough — "this simply demonstrates the power of . . . speech." *Id.*

*Ginsberg* do not apply with respect to "violent" video games. *See, e.g.*, *AAMA*, 244 F.3d at 578-79.

To the extent that the State's "harm" justification is anything more than a repackaging of the "preventing real-world violence" rationale, the State's alleged interest in restricting access to expression based on its content and a consumer's reaction to that content amounts to nothing more than thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253. The government simply does not have a generalized power to limit minors' exposure to creative works based on a belief that they will be psychologically harmful. Such works "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc v. Wilson*, 343 U.S. 495, 501 (1952). But with the exception of a narrow subset of sexually explicit speech (which meets the three-prong standard set by the Supreme Court), the State simply may not restrict protected expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes—or neuron firing patterns[6] —or because it fears that the speech prevents the listener from becoming a sufficiently "productive" citizen. Act § 12A-5(h).[7]

---

[6] The Act's unsupported "finding" concerning "frontal lobe activity," and its correlated alleged "interest" in protecting minors' neurological development, *see* Act § 12A-5(a)(3) & (g), represent nothing more than a transparent attempt to repackage in the language of neuroscience the same psychological harm rationale that the Seventh Circuit clearly rejected in *AAMA*. The State's attempt to censor protected expression is no more constitutional for the change in terminology.

[7] The Act also asserts a goal of "assisting parents," Act § 12A-5(d), but contains no defense for sales or rentals made to minors who have parental permission to purchase or rent a "violent" or "sexually explicit" game. *See id.* §§ 12A-20, 12B-20; *cf.* Andersen Decl. ¶ 23 (noting that many retailers maintain member databases indicating whether their adult customers

13

### 3.    The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests); *VSDA*, 325 F. Supp. 2d at 1189 (explaining that "the Act is too narrow in that it will have no effect on the many other channels through which violent representations are presented to children").[8] As the Seventh Circuit observed in *AAMA*, "violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." 244 F.3d at 579. But the Act leaves these other media unaffected. Under the Act, for example, a minor

have authorized the rental and sale of "M" rated games to their children). This suggests that the State is interested not in assisting parents in determining what is best for their children, but in imposing the State's own view of "appropriate" content on children and parents alike. In any event, the State may not suppress First Amendment rights in the name of helping parents to protect minors from the imagined harms of "violent" expression. *See, e.g., AAMA*, 244 F.3d at 577 (explaining that "the right of parents to enlist the aid of the state to shield their children from ideas of which the parents disapprove cannot be plenary," because children have their own rights under the First Amendment); *IDSA*, 329 F.3d at 960 (rejecting an asserted state interest in "assisting parents" as non-compelling, and explaining that "the government cannot silence protected speech by wrapping itself in the cloak of parental authority").

[8] Such differential regulation of comparable expression invokes the specter of impermissible viewpoint discrimination. *See, e.g., Playboy*, 529 U.S. at 812 ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." (striking down a regulation that targeted "adult" cable channels, but permitted similar expression by other speakers)); *Turner*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns.").

14

could be legally barred from buying or renting an "M" rated video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *See, e.g.*, Price Decl ¶¶ 4, 39 (noting that the M-rated game *Tom Clancy's Rainbow Six 3* is based on writer Tom Clancy's highly successful novels).[9]

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S at 816. The State cannot make such a showing here, where such an alternative exists: encouraging awareness of the voluntary ESRB video game rating system, which provides guidance to parents and other consumers *See generally* Lowenstein Decl ; *Playboy*, 529 U S at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"). The State, in fact, rejected Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system. *See* Lowenstein Decl. ¶ 22-23.[10]

_____

[9] The Seventh Circuit has explained why the State's alleged interest in facilitating the development of Illinois' youth will actually be *disserved* by restricting minors' access to violent images. As the court explained in *AAMA*, "shield[ing] children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." 244 F.3d at 577.

[10] The Act's lack of narrow tailoring is not cured by the Act's apparent defenses, the meaning and scope of which are unclear. There are four "affirmative defenses" to liability under the Act: (1) that the defendant who sold or rented the game was a "family member" of the minor customer; (2) that the defendant reasonably relied upon an "official or apparently official document" presented by the customer stating that the customer was 18 or older; (3) for the video

15

## C. The Act's "Sexually Explicit" Video Game Restrictions Fail Strict Scrutiny And Violate The First Amendment.

The Act's special restrictions on the sale or rental of "sexually explicit" video games are squarely foreclosed by Supreme Court precedent. In *Ginsberg v New York*, 390 U.S. 629, 636-43 (1968), the Supreme Court carved out a narrow "harmful to minors" exception to the general rule that non-obscene sexual expression may not be restricted without satisfying the strictest Constitutional scrutiny. Under *Ginsberg* and *Miller v California*, 413 U.S. 15 (1973), the government may restrict minors' access to sexually explicit material only if that material (1) predominantly appeals to minors' prurient, shameful or morbid interest in sex; (2) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (3) lacks serious literary, artistic, political, or scientific value as to minors. *See Miller*, 413 U.S. at 24-25; *Ginsberg*, 390 U.S. at 633, 636-43. A purported "harmful to minors" statute that does not contain all of these elements will not be sustained under *Ginsberg* and *Miller. See Reno v. ACLU*, 521 U.S. 844, 864-66 (1997).

Here, under the Act's definition of "sexually explicit" video games, *see* Act § 12B-10(c), video games with serious literary, artistic, political or scientific value could be censored. For example, the Act may be read to restrict *God of War*, a video game in which the player's

game retailer, if the retail sales clerk had "complete knowledge" that the customer was a minor and "specific intent" to sell or rent to that minor; and (4) that the video game at issue "was pre-packaged and rated EC, E, E10+ or T" by the ESRB." Act §§ 12A-20, 12B-20. The Act separately states that a "retail sales clerk" shall not be found liable unless the clerk had "complete knowledge" that the customer was a minor and "specific intent" to sell or rent to that minor. *Id.* §§ 12A-15(d), 12B-15(d). These purported defenses include vague and confusing terms, such as "retail sales clerk," "complete knowledge," and "pre-packaged," which will only enhance the Act's chilling of speech. *See* Andersen Decl. ¶ 16. These defenses also illegitimately incorporate the voluntary ESRB rating system as the basis for legal sanctions, and fail to cover the common situation where a parent authorizes a child to buy or rent M-rated games, *see id* ¶ 23. But, at the most fundamental level, these defenses do not cure the Act's First Amendment problem because they permit criminal punishment for the sale or rental to minors of fully protected expression.

16

character navigates a sophisticated plot through ancient Greece, but which shows female characters with their breasts exposed, along with a pivotal scene suggesting that sexual conduct is taking place between the main character and these women. *See* Price Decl. ¶ 33. Allowing such games with serious artistic and literary value to be restricted would broaden the government's power to regulate expression far beyond the narrow contours of *Miller* and *Ginsberg*. Thus, in *Reno v. ACLU*, the Supreme Court refused to sustain a regulation of sexual speech as to minors that, like the Act, "importantly, omit[ted] any requirement that the 'patently offensive' material covered by [the statute] lack serious literary, artistic, political, or scientific value." 521 U.S. at 865.

Indeed, the Act itself contains a separate, and apparently proper, "[h]armful to minors" section, Act § 11-21, which, unlike the Act's "sexually explicit" provisions, does not single out video games from other media for regulation. Any legitimate interest that the State has in shielding minors from "harmful to minors" sexual material is fully served by this general "harmful to minors" provision, which Plaintiffs do not challenge.[11]

## D.    The Act's Labeling, Signage, And Check-Out Provisions Are Unconstitutional.

Several other provisions of the Act — those requiring labeling, signage, and brochures, under the threat of criminal penalty — unconstitutionally compel speech of video game retailers. The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent the

---

[11] Because the special restriction on sexually explicit video games goes beyond the narrow contours of *Ginsberg*, it is subject to strict scrutiny as a content-based burden on expression. The restriction plainly fails strict scrutiny because the Assembly's purported reason for regulating this material — the bald assertion that it is "inappropriate for minors" — is patently insufficient to demonstrate a compelling state interest. The criminal restriction also fails the narrow tailoring requirement, because it lacks the third prong of the *Ginsberg/Miller* test for material that is harmful to minors, and as a result will cover a wide range of constitutionally protected speech. *See Reno*, 521 U.S. at 873.

17

government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S 405, 410 (2001). Because compelled messages alter the content of what the compelled party would otherwise express, they are considered content-based regulation under the First Amendment and require strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v. Public Utility of California*, 475 U.S. 1 (1986) ("*PG&E*"), but to *all* statements, whether of fact or opinion, *see Riley*, 487 U.S. at 797-98.

*First*, the Act's requirement that retailers place a large "18" label on all "violent" and "sexually explicit" video games compels video game retailers to channel the State's message that minors are not entitled to access the labeled games — even if retailers disagree with this proposition. *See* Andersen Decl. ¶ 18. The labeling requirement — like the sale and rental restrictions — is inconsistent with the voluntary rating system used by Plaintiffs.[12] The "18" label, which imparts no substantive information (other than a stigmatizing message), is contrary to and may physically obscure the detailed information concerning the ESRB rating and content descriptors on the game packaging *See* Andersen Decl. ¶ 12; Lowenstein Decl ¶ 17 The conflict between the labels mandated by the Act and the existing labels used by Plaintiffs will be inherently confusing to parents and other consumers who are the intended beneficiaries of the

---

[12] At a fundamental level, the "18" label conflicts with the ESRB rating system because it suggests that certain games (including games rated T or lower by the ESRB) are categorically inappropriate for individuals under 18, whereas the ESRB ratings are intended only as a guide to parents and consumers. *See* Andersen Decl. ¶¶ 18-22. The "18" label also conflicts with the specific classifications of the ESRB system. For example, the "18" label may be required for certain games classified as "E 10+" or "T" by the ESRB, *see* Price Decl. ¶ 9, even though the ESRB system indicates that such games may be suitable for ages 10 and up. Similarly, games rated "M" by the ESRB may be suitable for ages 17 and up, but the "18" label suggests that 17-year-olds may not buy or rent such games.

information conveyed by the voluntary rating system. In all cases, the label represents a message that video game retailers have not chosen for themselves. "Such forced association with potentially hostile views burdens" their expression and "risks forcing [them] to speak where [they] would prefer to remain silent." *PG&E*, 475 U.S. at 18.

Not only would the labeling provision unconstitutionally burden the expression of video game retailers, creators, and manufacturers, but it would create a substantial chilling effect on First Amendment rights. For example, the Act places the burden of labeling on individual video game retailers, each of whom will be left to his own devices to determine which games fit within the Act's vague terms. Some retailers, in an abundance of caution — and out of fear of criminal penalty — may label a far wider range of games than even those arguably covered by the Act. *See* Andersen Decl. ¶¶ 9-11; Lowenstein Decl. ¶¶ 16-18; Price Decl. ¶¶ 8-10. Moreover, the Act provides no affirmative defense to the labeling requirement for EC, E, E10+, or T-rated games. Retailers thus must label *all* games that they believe arguably fall within the Act's definitions of "violent" or "sexually explicit," even if the rental or sale of such games ultimately would be subject to the affirmative defense. Therefore, the Act permits the irrational and chilling result of criminalizing a retailer's failure to *label* "violent" or "sexually explicit" games with ratings of EC, E, E10+, or T, even though those games may be *sold* or *rented* due to the EC, E, E10+, or T affirmative defense. Such a framework fails — as a matter of both constitutional law and common sense.

*Second*, the Act's signage and brochure requirements impermissibly coerce video game retailers, under threat of criminal penalty, to convey messages that they already convey voluntarily, but to do so in a highly regimented manner that infringes upon their expression and business operations. *See* Andersen Decl. ¶ 13. The Act imposes detailed demands — such as

19

sign dimensions and locations  – which are unrelated to any compelling state interest and certainly do not satisfy the exacting scrutiny required of compelled speech. *See, e.g., Riley*, 487 U.S. at 795. Moreover, there is simply no need for these criminal prohibitions, because video game retailers, like the rest of the video game industry and the ESRB itself, are already voluntarily committed to educating the public about the ESRB ratings system, and most if not all retailers already inform consumers with signs and brochures describing the ratings system. *See* Andersen Decl. ¶¶ 13, 18; Lowenstein Decl. ¶ 11. It is a fundamental First Amendment principle that the state may not coerce a speaker to deliver a message simply because that speaker may be willing to deliver the same message voluntarily. *See, e.g., West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943).

   *Third*, in addition to unconstitutionally compelling speech, the Act saddles video game retailers with unreasonable administrative burdens  – under threat of criminal penalty  – that are designed to (and will) impair and chill protected expression. For example, the Act requires all retailers who sell "violent" or "sexually explicit" games "via electronic scanner" to program such scanners "to prompt sales clerks to check identification before the sale or rental [of a controlled game] is completed." Act §§ 12A-15(b), 12B-15(b). Although many larger retailers voluntarily use such prompts for "M"-rated video games, the Act's requirements impose a new, unique, and costly burden on retailers. *See* Andersen Decl. ¶ 14. In addition, the Act forbids stores from permitting the use of "self-scanning checkout mechanism[s]" for the purchase or rental of "violent" or "sexually explicit" games — to minors *and* adults alike. Act §§ 12A-15(c), 12B-15(c). This restriction would impose a serious burden on adults' protected speech, *see* Andersen Decl. ¶ 15, whose rights the state does not contest. These provisions impose burdens on retailers

20

based on the content of the expression being sold, and thus violate the First Amendment for the reasons detailed above. *See supra* Sections I.B-I.C.

### E.    The Act Is Unconstitutionally Vague

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Several key terms in the Act either are inherently vague or are defined in such a way as to fail to provide fair notice. For instance, the Act's "violent" video game prohibition targets "human-on-human" violence committed by "the player." Act § 12A-10(e). But "human" is a term particularly ill-suited to a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some "human" characteristics, or which may be "human" at some times and not others. For example, in *God of War*, the player assumes the role of Kratos, a Spartan commander in Ancient Greece who "dies" at various points in the game, but continues battling various gods and other entities; eventually,

the player learns that Kratos is actually the son of Zeus. *See* Price Decl. ¶¶ 25-32. Because Kratos is the son of a god, and thus able to keep battling while "dead," would he be considered "human" within the meaning of the statute? Would the "human" label apply to the gods that he battles? Similarly, in *Resident Evil IV*, part of a popular series of video games that have inspired feature films, the vast majority of enemies in the game are zombies and mutants with human characteristics. *See id.* ¶¶ 11-17. Would zombies and mutants be viewed as "human" within the meaning of the Act? And, in *Jade Empire*, which takes the player's character on an adventure through a mythical Chinese kingdom, both the player's character and the enemy forces possess magical abilities and transform into non-humanoid creatures. *See id.* ¶¶ 18-24. Does this game contain "human-on-human" violence as defined by the Act? These are only representative examples of the great confusion that will be generated by the Act's vague terms. Can a part-animal or part-alien creature be "human"? Are "the living dead conjured back to life by voodoo," *AAMA*, 244 F.3d at 577, human? And even if the player's on-screen character is not human, will the State deem her acts to constitute "human-on-human violence" merely because the actual player is?

Moreover, the Act only covers "depictions of or simulations of" violence — terms with no logical boundary in a medium in which all images are obviously computer-generated and thus inherently unrealistic. The Seventh Circuit observed that video games are populated by "cartoon characters, that is animated drawings[,]" and that "[n]o one would mistake them for photographs of real people." *Id.* at 579. Similar confusion will be spawned by the Act's use of other vague terms — such as the various, non-exclusive categories of "serious physical harm," Act § 12A-

22

10(e) — that become all the more ambiguous and unclear when applied to the inherently unrealistic video game medium.[13]

Stores and store clerks will be subject to steep liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any* potentially offending video game title, or, conceivably, by pulling "M" games off the shelves altogether. *See, e.g.*, Lowenstein Decl. ¶ 15; Andersen Decl ¶¶ 9-11, 17; Price Decl ¶¶ 9-10. As the federal district court in Washington stated, in striking down a Washington State "violent" video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone    than if the boundaries of the forbidden area were clearly marked '" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109) Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well — whose right to access "violent" and "sexually explicit" video games could not be questioned by the State.

## II.    THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected

---

[13] The Act's definition of "sexually explicit" video games also fails for vagueness. As the Supreme Court explained in *Reno*, the "serious value" requirement, which the Act's "sexually explicit" definition lacks, "critically limits the uncertain sweep of the obscenity definition." 521 U S at 873 (ruling that a federal obscenity statute lacking the required elements was unconstitutionally vague)

23

expression goes into effect  As the Seventh Circuit has made clear, "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F 3d 503, 507 (7th Cir.

1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality))  And no adequate remedy

at law exists for Plaintiff's claims. *See, e.g., National People's Action v Village of Wilmette*,

914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of

first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of

an injunction. As the Seventh Circuit recently observed, "there can be no irreparable harm to a

[government] when it is prevented from enforcing an unconstitutional statute because 'it is

always in the public interest to protect First Amendment liberties '" *Joelner v Village of*

*Washington Park*, 378 F.3d 613, 620 (7th Cir 2004) (quoting *Connection Distributing Co v.*

*Reno*, 154 F.3d 281, 288 (6th Cir 1998)); *see also O'Brien v Town of Caledonia*, 748 F.2d 403,

408 (7th Cir. 1984) (recognizing that "the public has a strong interest in the vindication of an

individual's constitutional rights," as well as "an interest in encouraging the free flow of

information and ideas," particularly "when the situation involves the punishing of a person who

has contributed to that flow of information")  The enforcement of the Act will not only affect

Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout

Illinois and beyond, all of whom will suffer infringements on their constitutional right to produce

and view the expression contained in the wide array of video games implicated here  As in

*AAMA*, the equities compel an injunction here. *See* 244 F.3d at 580.

24

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
JENNER & BLOCK LLP
601 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone: (202) 639-6000
Fax: (202) 639-6066

David P. Sanders (ARDC # 2452359)
Wade A. Thomson (ARDC # 6282174)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611-7603
Phone: (312) 222-9350
Fax: (312) 537-0484

Attorneys for Plaintiffs